## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

        *Plaintiffs*,

   v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services, *et al.*,

        *Defendants*.

Case No. 25-cv-00342

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

    A.  The Administration leverages federal funding and the threat of massive liability to effect sweeping social change without Congress's involvement .................................. 2

        1.     Attacks on diversity, equity, inclusion, and accessibility ....................................... 3

        2.     Attacks on transgender rights ................................................................................ 6

        3.     Attacks on abortion access ..................................................................................... 7

    B.   HUD and HHS adopt new policies effectuating the President's directives ................... 7

        1.     HUD Continuums of Care Grant Conditions ......................................................... 7

        2.     HHS Agency-Wide Conditions .............................................................................. 9

        3.     HHS Administration for Children and Families Conditions ................................. 11

    C.  TRO Plaintiffs face an imminent need to decline funds or accept harmful conditions. . 12

        1.     HUD Continuums of Care Grants .......................................................................... 12

        2.     CDC Rape Prevention and Education Grants ......................................................... 16

        3.     ACF FVPSA State Coalitions Grants ................................................................... 19

LEGAL STANDARD ..................................................................................................... 20

ARGUMENT ................................................................................................................. 21

    I.   The Plaintiffs Are Likely To Succeed On the Merits of Their Claims ........................... 21

      A.   The New Conditions Violate the APA ....................................................................... 21

        1.     The New Conditions are Final Agency Action ....................................................... 22

        2.     The New Conditions Exceed Defendants' Statutory Authority ............................... 23

        3.     Various Conditions Are Contrary to Law ............................................................... 24

4.    The New Conditions are Arbitrary and Capricious ................................................... 26

B.    The New Funding Conditions Violate Multiple Constitutional Provisions Safeguarding the Separation of Powers ......................................................................... 28

C.    Multiple New Conditions Violate the First Amendment ............................................. 30

D.    The New Conditions Are Unconstitutionally Vague ................................................... 35

II.    TRO Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief........................ 39

III.   The Balance of the Equities and Public Interest Favor a TRO ........................................ 42

CONCLUSION..................................................................................................................... 44

# TABLE OF AUTHORITIES

## CASES                                                                   Page(s)

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205 (2013) ................................ 31, 34

*Am. Pub. Health Ass'n v. NIH*, No. 25-1611, 2025 WL 2017106 (1st Cir. July 18, 2025).......... 41

*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................................................................... 22

*Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36 (1st Cir. 2010) ....................... 21

*California v. DOT*, No. 1:25-cv-00208, --- F. Supp. 3d. ---, 2025 WL 1711531
    (D.R.I. June 19, 2025).............................................................................................. 23, 42

*Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*,
    No. 24-1265, --- F.4th ---, 2025 WL 1911788 (1st Cir. July 11, 2025)........................... 35

*Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, --- F. Supp. 3d. ---, 2025 WL 1114466
    (N.D. Ill. Apr. 14, 2025) ........................................................................................ 31, 36

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ................................................ 29, 30

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ......................................................................... 23

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020)........................................................... 28, 30

*City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017) ............................................ 39

*City of Chicago v. Sessions,* 888 F.3d 272 (7th Cir. 2018)........................................................ 39

*City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017) ...................................... 39

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020)........................................................... 23

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998) ............................................................................ 30

*Colorado v. HHS*, No. 1:25-cv-00121, --- F. Supp. 3d. --- 2025 WL 1017775
    (D.R.I. Apr. 5, 2025)................................................................................................... 25

*Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1426226 (D.R.I. May 16, 2025) .................... 29

*Counterman v. Colorado*, 600 U.S. 66 (2023)............................................................................ 36

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)............................................................. 28

*FCC v. Fox Television Stations*, 556 U.S. 502 (2009)................................................................ 27

*FCC v. Fox Television Stations*, 567 U.S. 239 (2012)................................................................ 35

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)........................................................... 26

*Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022) ......................................................... 35, 36

*Grayned v. City of Rockford*, 408 U.S. 104 (1972).................................... 35, 37, 38, 39

*Hannon v. Allen*, 241 F. Supp. 2d 71 (D. Mass. 2003) ..................................................... 40

*Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589 (1967)............................... 35

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986).................................................... 23

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ..................... 41

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022) ........................................... 27

*Manguriu v. Lynch*, 794 F.3d 119 (1st Cir. 2015) ......................................................... 25

*Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814, 2025 WL 1582368
  (W.D. Wash. June 3, 2025)................................................................. 22, 23, 27, 29, 44

*Massachusetts v. NIH*, 770 F. Supp. 3d 277 (D. Mass. 2025) ........................... 41, 42, 44

*Metro. Transp. Auth. v. Duffy*, No. 2:25-cv-01413, 2025 WL 1513369
  (S.D.N.Y. May 28, 2025).......................................................................................... 40

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ... 26, 27

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) .............................. 31, 34

*Nken v. Holder,* 556 U.S. 418 (2009) ........................................................................... 21

*Ohio v. EPA*, 603 U.S. 279 (2024)................................................................................ 26

*PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, 2025 WL 685124 (D. Md. Mar. 4, 2025)......... 29, 30

*R.I. Latino Arts v. Nat'l Endowment for the Arts*, No. 1:25-cv-00079, 2025 WL 1009026 (D.R.I.
  Apr. 3, 2025)................................................................................................. 34, 40

*Reno v. ACLU*, 521 U.S. 844 (1997).......................................................................... 35, 36

*Rust v. Sullivan*, 500 U.S. 173 (1991) ......................................................................... 31, 34

*S.F. AIDS Found. v. Trump*, No. 4:25-cv-01824, --- F. Supp. 3d. ---, 2025 WL 1621636
  (N.D. Cal. June 9, 2025) ............................................................................... 33, 34

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012) ................... 40

*Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47 (D.R.I. 2023) ................................. 21

*South Dakota v. Dole*, 483 U.S. 203 (1987) ................................................................. 29

*Tex. Educ. Agency v. Dep't of Educ.*, 992 F.3d 350 (5th Cir. 2021) ............................ 29

*Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013)............................. 44

*United States v. Facteau*, 89 F.4th 1 (1st Cir. 2023) ................................................... 35

*United States v. William*s, 553 U.S. 285 (2008) .......................................................... 35

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) ................... 4

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ............................. 35

*Washington v. Trump*, 768 F. Supp. 3d 1239 (W.D. Wash. 2025) ............................... 29

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................ 20

## STATUTES

10 U.S.C. § 1093 ......................................................................................................... 7

18 U.S.C. § 287 ........................................................................................................... 4

31 U.S.C. § 3729 ......................................................................................................... 4

31 U.S.C. § 3730 ......................................................................................................... 4

34 U.S.C. § 12291 .......................................................................................... 11, 24, 26, 37

34 U.S.C. § 12491 ....................................................................................................... 8

42 U.S.C. § 10406 ...................................................................................................... 26

42 U.S.C. § 10410 ...................................................................................................... 11

42 U.S.C. § 10411 .......................................................................................... 12, 24, 26, 37

42 U.S.C. § 11360 ........................................................................................................ 8

42 U.S.C. § 280b-1b ...................................................................................... 10, 26, 28, 37

42 U.S.C. §§ 11381–11389 ...................................................................................... 8, 23

5 U.S.C. § 704 .......................................................................................................... 21

5 U.S.C. § 706 .......................................................................................................... 21

Pub. L. No. 117-103, 136 Stat. 49 (Mar. 15, 2022) .............................................. 11, 24

Pub. L. No. 118-42, 138 Stat. 25 (Mar. 9, 2024) ..................................................... 7

Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) ................................................. 7

## RULES AND REGULATIONS

24 C.F.R. § 5.106 ............................................................................................ 15, 25, 38

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ........................................................................................... 31

U.S. Const., art. I, § 1 ........................................................................................ 29

U.S. Const., art. I, § 7 ........................................................................................ 30

U.S. Const., art. I, § 8 ........................................................................................ 29

U.S. Const., art. I, § 9 ........................................................................................ 29

U.S. Const., art. II, § 3 ....................................................................................... 30

## OTHER AUTHORITIES

DOJ, *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/ZS6R-B8E9 ............................................................... 5

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ......................................... 3

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025)............................... 6, 25, 34

Exec. Order No. 14173, 90 Fed. Reg. 8663 (Jan. 21, 2025)................................. 3, 4, 36

Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) ......................................... 7

Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025) ....................................... 10

Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025), *available at* https://perma.cc/3W6K-FGHA ........................................... 5

Mem. from Acting Dir. of OMB, Matthew J. Vaeth, to Heads of Exec. Dep'ts and Agencies (Jan. 24, 2025), *available at* https://perma.cc/5JZR-8V9X....................................... 7

Mem. from Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), *available at* https://perma.cc/SV3A-NE9F ........ 5

Mem. from Att'y Gen. Pam Bondi, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), *available at* https://perma.cc/KH9Y-A2VQ.......................... 5

*Program: Rape Prevention and Education Program, Sexual Violence Prevention*, CDC (May 28, 2025), *available at* https://perma.cc/QJP9-JUEQ.......................................... 10

The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://perma.cc/G8JU-QQ44 ........ 32

## INTRODUCTION

This TRO motion seeks relief for a subset of Plaintiffs (TRO Plaintiffs) that face an imminent deadline—in most cases, at the end of the month—to either agree to unlawful grant conditions or forgo critical federal funding. TRO Plaintiffs will suffer irreparable harm absent this Court's swift intervention.

All plaintiffs in this case are nonprofit organizations dedicated to helping some of the most vulnerable members of our society—victims of domestic violence and sexual assault, and people who are homeless. Congress has created a range of grant programs to fund these and similar organizations, and Congress has tasked the Departments of Housing and Urban Development (HUD) and Health and Human Services (HHS) with administering many of these programs. But rather than faithfully execute their duties to distribute grant funds to support life-saving work, the Departments have decided to spring a trap. They are forcing grantees—including grantees in the middle of performing their grants—to agree to new conditions and certify compliance with various requirements to receive their grants funds. The Departments have imposed these requirements in a manner expressly designed to expose grantees to civil and criminal liability under the False Claims Act.

A TRO is warranted. The new restrictions are plainly unlawful. They have no grounding in the relevant statutes and do not aim to better effectuate the programs' purposes. They instead seek to advance the Administration's wholly unrelated ideological goals—including to end "diversity, equity, inclusion, and accessibility," deny transgender people's identities, and cut off access to abortion resources. The Departments lack any authority to impose such extra-statutory conditions. The conditions are also unconstitutionally vague and discriminate against speech on

1

the basis of viewpoint. And the Department failed the most basic requirements of administrative law to provide reasoned explanations for their decisions.

These new conditions impose severe harm by leaving TRO Plaintiffs with an impossible choice: They can accept the conditions—and fundamentally change their programming; abandon outreach, methods, and programs designed to best serve their communities; and risk exposing themselves to ruinous liability. Or they can decline the funding and halt their funded programs— displacing domestic and sexual violence survivors from safe housing, putting previously homeless families, including children, back on the streets, and ending programs designed to reduce and prevent domestic and sexual violence.

To protect TRO Plaintiffs from the immediate, irreparable injuries they will suffer from declining the funds or accepting them with the harmful and unlawful conditions, this Court should grant a temporary restraining order immediately barring Defendants from imposing or enforcing these conditions on TRO Plaintiffs. All plaintiffs in this case intend to separately seek a preliminary injunction covering a broader set of plaintiffs whose injuries are not quite as emergent, but who will also face irreparable harm absent preliminary relief during the pendency of this litigation. For TRO Plaintiffs, however, there is no time to spare.

## BACKGROUND

### A. The Administration leverages federal funding and the threat of massive liability to effect sweeping social change without Congress's involvement

Beginning in January, this Administration launched a campaign to leverage federal funding to advance sweeping social change without involving Congress. A series of executive orders direct agency heads to use their control of federal funding to curtail diversity, equity, inclusion, and accessibility activities; to deny the rights and very existence of transgender people; to curtail access to abortion care; and more. Bolstering that effort, the Administration has

2

announced it will weaponize the False Claims Act to threaten massive liability to federal funding recipients who do not comply with the Administration's conditions.

### 1. *Attacks on diversity, equity, inclusion, and accessibility*

In his first days in office, President Trump issued multiple executive orders that broadly seek to eradicate "diversity, equity, and inclusion" (DEI) and "diversity, equity, inclusion, and accessibility" (DEIA) values and initiatives. One order directs agencies to terminate all DEI and DEI offices, all "equity" programs, and all "equity-related" grants or contracts. Exec. Order No. 14151, § 2(b), 90 Fed. Reg. 8339 (Jan. 20, 2025). Another order of most direct relevance here, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (Anti-DEI Order), aims to end purportedly "illegal" DEI and DEIA in the federal government and the private sector. Exec. Order No. 14173, §§ 3–4, 90 Fed. Reg. 8663 (Jan. 21, 2025) (Anti-DEI Order). Among other things, the Anti-DEI Order requires agency heads to "include in every contract or grant award" a term requiring each counterparty or grant recipient to "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(iv)(B). The requirement that recipients not operate "*any* programs promoting DEI" is not limited to programs operated using federal funds. *Id.* (emphasis added).

Without defining "DEI" or "DEIA," or providing guidance on what might make such programs "illegal," the Anti-DEI Order makes clear that the Administration has a novel and extreme view that diversity, equity, and inclusion is often illegal. The Order laments that "dangerous, demeaning, and immoral DEIA or DEIA programs are widespread across the public and private sectors; revokes multiple diversity-related executive actions issued over the last half century; and orders particular offices to "immediately cease … [p]romoting diversity," to "[e]xcise references to DEI and DEI principles, under whatever name they may appear," from

federal funding procedures, and to "[t]erminate all 'diversity,' 'equity,'" and similar programs and activities. *Id.* § 3.

The Anti-DEI Order leaves no doubt that the Administration seeks to use the False Claims Act (FCA) as a weapon against federal funding recipients. It directs agencies to include terms requiring a grant recipient "to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code." *Id.* The FCA imposes civil liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision." Thus, the Anti-DEI Order seeks to require grantees to concede an essential, and otherwise "demanding," element of an FCA claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016).

In making a certification that could trigger the FCA, federal funding recipients such as Plaintiffs open themselves to potential massive liability. Both the federal government and any private citizen may sue a recipient of federal funds for FCA violations. 31 U.S.C. § 3730. If found liable, a funding recipient faces potential treble damages, meaning three times the amount of federal funds that the recipient received from the government in connection with the certifications. And potential liability is not only civil—the FCA provides for criminal penalties of up to five years imprisonment for those who make a "false, fictitious, or fraudulent" claim to any agency in seeking funds. 18 U.S.C. § 287.

The Administration began implementing the Anti-DEI Order's directives shortly after it was issued. On February 5, 2025, Attorney General Bondi sent a letter to all employees of the

Department of Justice (DOJ) making clear that DOJ intends to aggressively "investigate, eliminate, and penalize" "illegal DEI and DEIA." Mem. from Att'y Gen. Pam Bondi, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), *available at* https://perma.cc/KH9Y-A2VQ (Bondi Letter). The letter does not define "DEI" or "DEIA" or explain what makes a DEI or DEIA program illegal.

Then, in a May 19, 2025, memorandum, DOJ Deputy Attorney General Todd Blanche described the FCA as DOJ's "primary weapon" in combatting government waste, fraud, and abuse and promised to "vigorous[ly] enforce[e]" the FCA against funding recipients who "knowingly violat[e] civil rights laws." Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025), *available at* https://perma.cc/3W6K-FGHA (Blanche Memo). The Blanche Memo also "strongly encourages" private parties to file suits under the FCA's *qui tam* provision, and encourages the public to report information about "discrimination by federal-funding recipients" to DOJ. *Id.* And it states that the new initiative will engage the DOJ's Criminal Division. The Blanche Memo does not explain when DEI would be considered "illegal," but a press release announcing the Initiative broadly warns institutions not to "promote divisive DEI policies." DOJ, *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/ZS6R-B8E9.

Further confirming the Administration's plans to aggressively use the FCA to "advance the Administration's policy objectives," a June 11, 2025, memo announcing the DOJ Civil Division's enforcement priorities lists using the FCA to combat DEI as the very first priority. Mem. from Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), *available at* https://perma.cc/SV3A-NE9F.

## 2. *Attacks on transgender rights*

The Administration has also launched a broadside attack on the rights and dignity of transgender people. On January 30, the President issued an order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" Order). That Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It decries "the erasure of sex" in both "policy" and "language," and it commits to using what the Administration characterizes as "accurate language and policy that recognize women are biologically female, and men are biologically male." *Id.* § 1. The Order discredits "gender ideology," which it describes as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f).

To accomplish its ideological vision, the "Gender Ideology" Order makes a host of directives, including requiring federal agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e); *see also id.* § 3(g). The Order directs the Attorney General to "ensure … the right to single-sex spaces"—taking into account the Order's emphasis that such spaces be designated by sex assigned at birth not gender identity, those spaces exclude transgender people—and directs a host of federal agencies to "prioritize" enforcement of that right. *Id.* § 5.

### 3. Attacks on abortion access

In the "Enforcing the Hyde Amendment" Executive Order, President Trump also declares it the policy of the United States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (Abortion Order). In subsequent guidance, OMB stated that the Administration's policy is "not to use taxpayer funds to fund, facilitate, or promote abortion, including travel or transportation to obtain an abortion, consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion." Mem. from Acting Dir. of OMB, Matthew J. Vaeth, to Heads of Exec. Dep'ts and Agencies at 1 (Jan. 24, 2025), *available at* https://perma.cc/5JZR-8V9X (OMB Memo). OMB directed federal agencies to "reevaluate all … agency actions in conformity with the policy set out by the" Abortion Order. *Id.* at 2.

The Hyde Amendment is an appropriations rider that limits the use of appropriated funds for abortions, but the rider applies only to funds appropriated to HHS. Pub. L. No. 118-47, div. D, §§ 506, 507, 138 Stat. 460, 703 (Mar. 23, 2024). Other statutes impose similar but not identical restrictions and exceptions on other appropriations for certain other agencies. *See, e.g.*, Pub. L. No. 118-42, §§ 202, 203, 138 Stat. 25, 153 (Mar. 9, 2024) (DOJ); 10 U.S.C. § 1093 (Department of Defense). But Congress has imposed no such restriction on HUD's funding.

### B. HUD and HHS adopt new policies effectuating the President's directives

Following the President's instructions, HUD and HHS began imposing new funding conditions on grants (collectively, New Conditions).

### 1. HUD Continuums of Care Grant Conditions

As relevant for purposes of this TRO motion, HUD has adopted a policy of imposing new conditions on grants under its Continuums of Care (CoC) program. The CoC program generally

aims to help people experiencing homelessness move into transitional and permanent housing, and to give them support they need to remain in housing long-term. 42 U.S.C. §§ 11381–11389. Those grants can support a host of services, such as constructing or rehabilitating housing, providing rental assistance, or offering supportive services such as child care, job training, healthcare, mental health services, trauma counseling, and life skills training. *Id.* §§ 11360(29), 11383(a). It also funds programs that help ensure that tenants in public and subsidized housing can move to a different, safe unit when they suffer domestic violence or sexual assault at home. *Id.* § 11383(a)(13); 34 U.S.C. § 12491(e).

On March 13, 2025, HUD Secretary Turner announced in a post on X that HUD was implementing a policy to impose new funding conditions on "HUD's Continuum of Care Program" (HUD CoC Conditions). Scott Turner (@Secretary Turner), X (Mar. 13, 2025, 2:47PM), https://x.com/SecretaryTurner/status/1900257331184570703, captured at https://perma.cc/2PHL-3Q2A and https://perma.cc/LPL2-WK5T. Secretary Turner proclaimed that CoC funds "will not promote DEI, enforce 'gender ideology,' [or] support abortion." *Id.* This new policy adopts four new conditions relevant in this case:

- CoC recipients may not "use grant funds to promote 'gender ideology,' as defined in [the "Gender Ideology" Executive Order]." (HUD "Gender Ideology" Condition)

- CoC recipients must "certif[y]" that they do "not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964" and must "agree that [their] compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S.

8

Government's payment decisions for purposes of" the False Claims Act. (HUD Discrimination Certification)

- CoC recipients may not use grant funds to "fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment." (HUD Abortion Condition)

- CoC recipients' use of grant funds and "operation of projects assisted with" grant funds must be "governed by … [a]ll current Executive Orders." (HUD CoC E.O. Condition)

### 2. HHS Agency-Wide Conditions

HHS, meanwhile, revised its Grants Policy Statement (HHS GPS), which sets agency-wide policy on grants and cooperative agreements and is incorporated by reference as a standard term and condition of HHS awards. HHS, HHS Grants Policy Statement, at 3–4 (Apr. 16, 2025), *available at* https://perma.cc/S4GP-SXQD. The revised HHS GPS imposes a new certification requirement (HHS Discrimination Certification) to advance the Administration's anti-DEI and other policy goals. Relevant here, it requires recipients to "certify[]" that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." *Id.* at 19. This prohibition is not limited to the grantee's use of grant funds. *See id.*

The HHS GPS specifies that "DEI" refers to "diversity, equity, and inclusion" and that "DEIA" refers to "diversity, equity, inclusion, and accessibility." *Id.* And it defines "discriminatory equity ideology" by reference to an executive order that defines that disfavored view as "an ideology that treats individuals as members of preferred or disfavored groups, rather

than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations," and then goes on to provide a lengthy, non-exhaustive list of such prohibited "immoral" views. *See* Exec. Order No. 14190, 90 Fed. Reg. 8853, 8853-8854 (Jan. 29, 2025) (K-12 Order).

The HHS GPS holds out the threat of FCA liability by providing that "recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [False Claims Act section § 3729(b)(4)]."

The HHS GPS applies the new HHS Discrimination Certification to awards (including continuations) and award modifications that add funding made on or after April 16, 2025. HHS GPS at 3. The only exceptions are for awards made by the National Institutes of Health (NIH), non-discretionary awards, and awards to individuals. *Id.* The HHS GPS therefore applies broadly to awards issued by all HHS components other than NIH, including the Centers for Disease Control and Prevention (CDC). Although the HHS GPS does not apply to non-discretionary awards, it gives HHS agencies the option to apply parts of the HHS GPS to such awards. *Id.*

As relevant to this TRO motion, the HHS Discrimination Certification applies to Rape Prevention and Education (RPE) grants administered by CDC, which HHS treats as a "discretionary" grant. *Program: Rape Prevention and Education Program, Sexual Violence Prevention*, CDC (May 28, 2025), *available at* https://perma.cc/QJP9-JUEQ. Congress specifically directed that a set amount of funds be awarded to state sexual assault coalitions to coordinate and provide rape prevention and education activities in their states. 42 U.S.C. § 280b-1b(d)(1). The authorizing statute incorporates diversity, equity, inclusion values by requiring HHS to "ensure meaningful involvement" of "culturally specific organizations" and "representatives of underserved communities"—that is, organizations "primarily directed toward

10

racial and ethnic minority groups" and "populations underserved because of" various factors including "sexual orientation, gender identity, underserved racial and ethnic populations," and disabilities. 34 U.S.C. § 12291(a)(8), (46); *see also* Pub. L. No. 117-103, div. W, §§ 2(b), 301(5)(A), 136 Stat. 49, 846 (Mar. 15, 2022) (reauthorizing rape prevention education grants and providing that 34 U.S.C. § 12291 "shall apply to … any grant program authorized under this Act").

### 3. *HHS Administration for Children and Families Conditions*

HHS's Administration for Children and Families (ACF) has also updated its Standard Terms and Conditions to implement the President's orders. Like the HHS GPS, those Standard Terms require grantees to "certify[]" that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" (ACF Anti-DEI Certification). ACF, *Standard Terms and Conditions* at 7 (effective Oct. 1, 2024), https://perma.cc/KSH8-AA5U (ACF Standard Terms). The Standard Terms adopt the same definitions of "DEI," "DEIA," and "discriminatory equity ideology" as in the HHS GPS's Discrimination Certification. *Id.* That condition already applies to ACF's discretionary awards by virtue of the HHS GPS, but the ACF Standards Terms also extend this condition to non-discretionary awards made by ACF.

As relevant to this TRO motion, the ACF Standard Terms apply to State Coalitions grants under the Family Violence Prevention Services Act (FVPSA). Congress created that grant program for state domestic violence coalitions to work with service providers and law enforcement to encourage appropriate responses to domestic violence and to conduct public education campaigns, among other things. 42 U.S.C. § 10410. Like the rape prevention and

education program, the FVPSA State Coalitions grant program reflects a commitment to

diversity, equity, and inclusion: The statute specifically requires coalitions to address the needs

of "racial and ethnic minority populations and underserved populations" and to provide violence-

prevention information "targeted to underserved populations." *Id.* § 10411(d)(3), (8).

### C. TRO Plaintiffs face an imminent need to decline funds or accept harmful conditions.

TRO Plaintiffs now face an imminent requirement to accede to the conditions described

above or else decline funding needed to support critical programming.

#### 1. *HUD Continuums of Care Grants*

Multiple TRO Plaintiffs or their members have recently received grant agreements from

HUD for new or continuation awards under the Continuums of Care (CoC) program.

Plaintiff Pennsylvania Coalition Against Domestic Violence (Pennsylvania Coalition)

uses funds from its CoC Grants to rapidly rehouse domestic violence survivors. Declaration of

Susan Higginbotham (Higginbotham Decl.) ¶ 10. These grants directly support the Pennsylvania

Coalition's provision of short-term and medium-term rental assistance to survivors and their

children who are experiencing homelessness. *Id.* ¶ 14. The Pennsylvania Coalition received two

new CoC Grant agreements in recent weeks that include the HUD CoC Conditions and that it

must accept by August 1. *Id.* ¶ 12.

Plaintiff House of Hope Community Development Corporation (House of Hope) receives

four CoC awards, and uses these awards to provide funding for permanent supportive affordable

housing, rental assistance and supportive services, on-site intensive case management to

residents with mental health challenges and substance use disorders, and street outreach services

to 18-24-year-old homeless young adults across Rhode Island. Declaration of Laura Jaworski

(Jaworski Decl.) ¶¶ 8-12. House of Hope has received multiple notices of award (NOAs) for

these grants that include the HUD CoC Conditions, and it must accept the earliest of these awards by August 1, 2025, to avoid an interruption in services. *Id.* ¶ 11.

Plaintiff Rhode Island Coalition to End Homelessness (RICEH) receives five CoC awards directly from HUD, which it uses to support programs for unsheltered people in Rhode Island. Declaration of Kim Simmons (Simmons Decl.) ¶ 8-9. On May 28, 2025, RICEH received NOAs that included the HUD CoC Conditions for the renewal of each of these grants. *Id.* ¶ 9. RICEH sent HUD the NOAs with the new funding conditions stricken, but RICEH does not know whether HUD will accept the NOAs with the alterations. *Id.* ¶ 9. In fact, RICEH has since received another NOA that includes the HUD Conditions. *Id.* ¶ 9. Because RICEH needs multiple HUD CoC Grants for work performed starting July 1, 2025, for cashflow reasons, it will need to accept the awards by drawing down funds as soon as July 30, 2025. *Id.* ¶ 10.

Plaintiff Virginia Sexual and Domestic Violence Action Alliance's (Virginia Action Alliance) members rely on HUD CoC Grants to fund important emergency shelter and semi-permanent housing for survivors of domestic violence. Declaration of Jonathan Yglesias (Yglesias Decl.) ¶ 10.a. In June 2025, Virginia Action Alliance Member Doe 1 received an NOA that included the HUD CoC Conditions. *Id.* Virginia Action Alliance Member Doe 1 will need to accept the award by August 2025 in order to avert programmatic cashflow issues. *Id.* Similarly, Virginia Action Alliance Member Doe 2 received an NOA with the HUD Conditions in June 2025, which it uses to house 39 families per year, and to provide housing location services, mental health services, and financial assistance. *Id.* ¶ 10.b. Virginia Action Alliance Member Doe 2 signed the agreement to avoid disrupting its critical services—and leaving 39 families without homes—and is now operating under the unlawful conditions. *Id.*

13

Declining these awards would cause these Plaintiffs and members grave harm. If the

Pennsylvania Coalition does not accept its CoC Grants, it will lose millions of dollars in funds,

and both it and its member programs would need to cut staff. Higginbotham Decl. ¶ 12. The

Pennsylvania Coalition's CoC Grants support rental assistance for hundreds of households,

including about 350 children, and declining CoC funds would mean those families could not pay

rent and would face imminent eviction. *Id.* ¶¶ 11-12, 14. As for the House of Hope, it does not

have the cash flow to pay out-of-pocket for the services that its CoC Grant provides and wait for

reimbursement. Jaworski Decl. ¶ 11. If it does not accept its CoC funds, it will not be able to

provide on-site intensive case management services to 51 residents, including support for people

with mental health challenges and substance use disorders who urgently need help. *Id.* If RICEH

does not accept its CoC funds, it would have to undergo layoffs of the majority of its staff, and

severely curtail services to the 105,000 Rhode Islanders who rely on RICEH for coordination of

emergency housing, shelter, and safety. Simmons Decl. ¶ 11. And if Virginia Action Alliance

Member Doe does not accept its CoC award, over 20 households in its programs would be

evicted, including over 40 children and their parents. Yglesias Decl. ¶ 10.a.

Given the critical programs the CoC awards support, declining the awards is hardly an

option. But accepting the awards and their conditions would also cause these organizations

profound harm. The requirement to certify compliance with the Administration's new (and

unexplained) view of federal nondiscrimination law—and to agree that compliance is material

for False Claims Act purposes—will force grantees to change their programming and mission for

fear of facing massive liability. Higginbotham Decl. ¶ 46; Jaworski Decl. ¶ 29; Simmons Decl.

¶ 22; Yglesias Decl. ¶¶ 30, 39. While these organizations have always complied and will always

comply with federal antidiscrimination laws, the Anti-DEI Order and statements from DOJ

indicate that the government intends to enforce a legally unsupported, new interpretation of
federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA.
Even if the courts ultimately reject the Administration's view of the law, Plaintiffs still bear
serious burdens—they must either attempt to comply with the Administration's obviously
expansive (yet unexplained) view or risk burdensome investigation and enforcement.

This is simply untenable. As required by law, Plaintiffs operate programs that target
underserved or marginalized communities, including difficult to reach populations and those that
require additional support, like immigrants, transgender survivors, racial and ethnic minorities,
and men. Higginbotham Decl. ¶ 47. Plaintiffs are fearful that they will face burdensome FCA
litigation, or, worse, massive civil liability or even criminal penalties, if they continue to carry
out these activities central to their missions. Dotson Decl. ¶ 34; Yglesias Decl. ¶ 30; McCormick
Decl. ¶ 47.

The prohibition on using grant funds to "promote" "gender ideology" also puts Plaintiffs
in an impossible bind. In providing direct client services and technical assistance in HUD-funded
programs, Plaintiffs and their member organizations support housing for transgender and
LGBTQ+ people, including by using clients' preferred pronouns to demonstrate support and
respect for people who do not identify with the sex they were assigned at birth, recognizing
gender identity in providing direct assistance, and accommodate the needs of the LGBTQ+
community in providing housing. Yglesias Decl. ¶ 36; *see* Simmons Decl. ¶ 18; Jaworski Decl.
¶ 25. Indeed, HUD regulations require CoC grantees to serve people in accordance with their
gender identity. *See* 24 C.F.R. § 5.106. Complying with this condition would directly conflict
with these organizations' missions and organizational values. Yglesias Decl. ¶ 40. Plaintiffs and

their members do not know if or how they can comply with the HUD regulations while simultaneously complying with the funding condition not to "promot[e] gender ideology."

In addition, the HUD Abortion Condition would harm Plaintiffs, which do not offer abortion care themselves but routinely refer people to healthcare services that may include abortion care. Simmons Decl. ¶ 19; Jaworski Decl. ¶ 26. For instance, as part of the "wraparound" supportive services that Pennsylvania Coalition's HUD grant provides to survivors, if a client receiving rental assistance indicates to an advocate that she needs a referral for abortion care, the Pennsylvania Coalition provides that referral. Higginbotham Decl. ¶ 51. Similarly, the Virginia Action Alliance's members make referrals to reproductive healthcare services when a pregnant survivor wishes to terminate a pregnancy. Yglesias Decl. ¶ 37. These services are particularly important to survivors of domestic violence and sexual assault: because reproductive and sexual coercion are common tactics of abuse, access to abortion care can be essential for survivors' safety and autonomy. Higginbotham Decl. ¶ 51; *see* Yglesias Decl. ¶ 37.

Finally, Plaintiffs would be harmed by agreeing to the HUD CoC E.O. Condition. Plaintiffs do not know what this condition's broad and vague language means for their organizations or how to comply with it, given the many new executive orders that it implicates, the broad and vague language of those orders, and the reality that many of the referenced orders imply that providers should exclude certain populations from their services. Simmons Decl. ¶ 20; Higginbotham Decl. ¶ 52; Yglesias Decl. ¶ 38.

### 2. *CDC Rape Prevention and Education Grants*

Plaintiffs Colorado Coalition Against Sexual Assault (Colorado Coalition), Kansas Coalition Against Sexual Assault and Domestic Violence (Kansas Coalition); Jane Doe, Inc., the Massachusetts Coalition Against Sexual Assault and Domestic Violence (JDI); Montana Coalition Against Sexual and Domestic Violence; Oregon Coalition Against Domestic and

16

Sexual Violence (Oregon Coalition); ValorUS (VALOR); Virginia Action Alliance; and Wisconsin Coalition Against Sexual Assault (Wisconsin SA Coalition) (collectively, RPE Plaintiffs) all have RPE grants and received NOAs from CDC subject to the HHS Discrimination Certification in June 2025. Declaration of Brielyn Akins (Akins Decl.) ¶ 19; Declaration of Hema Sarang-Sieminski (Sarang-Sieminski Decl. ¶ 28); Declaration of Michelle McCormick (McCormick Decl.) ¶ 25, 37; Declaration of Kelsen Young (Young Decl.) ¶ 28; Declaration of Keri Moran-Kuhn (Moran-Kuhn Decl.) ¶ 29-30; Declaration of Amanda Dotson (Dotson Decl.) ¶ 20. They must accept these awards by drawing down funds by July 30, 2025. Akins Decl. ¶ 20; McCormick Decl. ¶ 37; Declaration of David Lee (Lee Decl.) ¶ 26; Sarang-Sieminski Decl. ¶ 28.

If they declined the funding from these grants, these state sexual assault coalitions would in many cases need to terminate staff and all would be forced to halt the grant-funded programs—including collaborating with state health departments, disseminating materials about sexual violence prevention, and providing training and technical assistance to members and partners to increase sexual violence primary prevention capacity. Akins Decl. ¶ 21; McCormick Decl. ¶ 37; Young Decl. ¶ 28; Lee Decl. ¶ 26; Dotson Decl. ¶ 21; Sarang-Sieminski Decl. ¶ 29. Reducing these prevention efforts would heighten the risk of sexual violence in the coalitions' states, harming victims and creating a significant public health burden. *See, e.g.*, Akins Decl. ¶ 21; Dotson Decl. ¶ 21. The RPE Grant is a key source of prevention funding, and if Coalitions do not receive it, some states would have no infrastructure for primary prevention efforts at the state level. *Id*.

But if they accept the funds, Plaintiffs also face harm because, under the HHS Discrimination Certification, they would have to certify—on pain of FCA liability—that they do not they do not and will not "operate any program," with grant funds or otherwise, "that advance

or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." These broad and vague terms leave Plaintiffs unsure whether they may undertake day-to-day activities reflecting their missions and guiding principles, which reference "equity" and "diversity," or describe "a world without violence, oppression, and racism where all people honor bodily autonomy and social justice," without running afoul of the condition. Yglesias Decl. ¶ 30; Dotson Decl. ¶ 33; *see also* Akins Decl. ¶ 27; McCormick Decl. ¶ 47; Young Decl. ¶ 33; Moran-Kuhn Decl. ¶ 38; Sarang-Sieminski ¶ 35.

Plaintiffs are also unsure about whether, given this HHS Discrimination Certification, they may continue to operate programs that target underserved or marginalized populations, including people with disabilities, people for whom English is not their primary language, and people who have been excluded from specific services such as shelter due to their gender. Dotson Decl. ¶ 34; Yglesias Decl. ¶ 30; McCormick Decl. ¶ 47; Sarang-Sieminski Decl. ¶ 37. For instance, the Montana Coalition is unsure whether it can continue to use RPE funds to support efforts specifically addressing the needs of Indigenous people, who are at a disproportionate risk of experiencing violence or murder or going missing. Young Decl. ¶ 33. This uncertainty puts them at great risk given the Administration's plans to aggressively use the FCA, and certifications like this, to go after diversity, equity, and inclusion activities broadly. *See supra* Section A.1. Those plans threaten Plaintiffs not just with potential liability, but with the prospect of burdensome litigation by ideologically motivated or opportunistic *qui tam* relators.

Additionally, Plaintiffs do not know whether they can comply with the HHS requirements while also complying with RPE Grant requirements. The 2024 RPE Grant notice of funding opportunity (NOFO) emphasized that certain communities face a higher burden of

sexual violence due to systemic inequities, highlighting that achieving health equity required tackling root causes like racism and structural bias. Akins Decl. ¶ 28; McCormick Decl. ¶ 47; Moran-Kuhn Decl. ¶ 38. Fundamentally, the work of preventing sexual violence necessarily requires, as RPE Grant NOFO programmatic goals and strategies have recognized, a focus on reaching historically under-resourced populations that face health inequities based on identity categories that align with gender, race, sexuality, and more. Yglesias Decl. ¶ 31. Now, Plaintiffs do not know whether much of their RPE-funded work would fall within the Administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs. *Id.*

### 3.  *ACF FVPSA State Coalitions Grants*

Plaintiffs JDI, the Idaho Coalition Against Domestic Violence (Idaho Coalition), and the Oregon Coalition have each received Family Violence Prevention and Services State Domestic Violence Coalition Grants (FVPSA Coalition Grant) for decades. Sarang-Sieminski Decl. ¶ 20-21; Moran-Kuhn Decl. ¶ 19; Declaration of Tai Simpson-Bruce (Simpson-Bruce Decl. ¶ 13). Each of these coalitions has used the FVPSA Coalition Grant to strengthen the capacity of domestic and sexual violence programs in their states through a comprehensive approach centered on training, technical assistance, needs assessment, and collaboration. Sarang-Sieminski Decl. ¶ 21; Moran-Kuhn Decl. ¶ 20; Simpson-Bruce Decl. ¶ 14.  Each Coalition recently received a FVPSA Coalition Grant that is subject to the ACF Anti-DEI Certification, which, like the similar HHS Discrimination Certification, requires grantees to certify that they do not promote "DEI," "DEIA," or "discriminatory equity ideology" in violation of federal antidiscrimination laws. Sarang-Sieminski Decl. ¶ 21; Moran-Kuhn Decl. ¶ 21; Simpson-Bruce Decl. ¶ 15.

19

Each Coalition must accept this award by drawing down funds in August 2025, due to cash flow needs to support its personnel and operating costs. Sarang-Sieminski Decl. ¶ 22 (must draw down by August 15); Moran-Kuhn Decl. ¶ 21 (must draw down by August 1) Simpson-Bruce Decl. ¶ 15 (must draw down by August 1). Without the FVPSA Coalition Grant, each would be forced to lay off staff members and to stop providing a range of core programs to build member capacity to address survivors' needs. Sarang-Sieminski Decl. ¶ 23; Moran-Kuhn Decl. ¶ 22; Simpson-Bruce Decl. ¶ 16. Each Coalition's ability to function as a Coalition would be compromised, leaving communities of survivors and their state's survivor-advocate workforce without the support they need. *Id.*

But agreeing to the ACF Anti-DEI Certification would also cause these Plaintiffs harm. It would impede their ability to conduct their work in accord with their missions, which grounds their work in understanding that racism, homophobia, transphobia, ableism, and other forms of oppression are intertwined with gender-based violence and directly impact access to safety, healing, and justice. Sarang-Sieminski Decl. ¶ 37; *see also* Simpson-Bruce Decl. ¶ 18; Moran-Kuhn Decl. ¶ 33. JDI, for instance, is unsure whether it can continue to operate programs that are designed to highlight the needs of underserved or marginalized communities, including black, immigrant, and LGBTQ+ survivors without running afoul of the Administration's expansive view of when "DEI," "DEIA," and "discriminatory equity ideology" are unlawful. *Id.* ¶ 39.

## LEGAL STANDARD

To obtain a temporary restraining order, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is

the opposing party, the final two factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009). Irreparable injury operates on "a sliding scale" such that "the greater the likelihood [of success], the less harm must be shown." *Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47, 49 (D.R.I. 2023) (citing *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010)).

## ARGUMENT

Plaintiffs are likely to prevail on their claims that the unauthorized and ill-considered New Conditions are unlawful. Those New Conditions threaten imminent irreparable harm to those Plaintiffs identified above with immediate deadlines related to CoC Grants from HUD, RPE grants from HHS's CDC, and/or FVPSA state coalition grants from HHS's ACF. Those Plaintiffs recently received new grant agreements with the unlawful conditions and must imminently draw down funds under those grants to support critical activities—and, absent relief, will be forced to accept the unlawful conditions if they do. The balance of equities and public interest weighs decisively against such a result.

## I. The Plaintiffs Are Likely To Succeed On the Merits of Their Claims

### A. The New Conditions Violate the APA

The New Conditions are reviewable "final agency action" that violate the APA in myriad ways. Plaintiffs are likely to succeed on their claims that the New Conditions must be set aside as "in excess of statutory, jurisdiction, authority, or limitations," "contrary to law," "arbitrary [and] capricious," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. §§ 704, 706(2)(A)–(C).[1]

---

[1] The multiple constitutional problems with the New Conditions provide grounds for relief both under the APA and as independent claims and are discussed in sections I.B–I.D below.

### 1. *The New Conditions are Final Agency Action*

The New Conditions are final agency action reviewable under the APA. In a recent case challenging the HUD CoC Conditions, the government did "not dispute … the new funding conditions … are 'final agency action.'" *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814, 2025 WL 1582368, at *14 n.18 (W.D. Wash. June 3, 2025), *appeal pending*, No. 25-3664 (9th Cir.). Rightly so for that condition and the others at issue here.

For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). The HUD CoC Conditions, HHS GPS (which includes the HHS Discrimination Certification), and ACF Standard Terms (which includes the ACF Anti-DEI Certification) mark the consummation of Defendant's decisionmaking process: Secretary Turner's post on X makes clear that HUD has made a final decision to impose the CoC Conditions on CoC Grants going forward. Scott Turner (@Secretary Turner), X (Mar. 13, 2025, 2:47PM), https://x.com/SecretaryTurner/status/1900257331184570703, captured at https://perma.cc/2PHL-3Q2A; https://perma.cc/LPL2-WK5T. And, in fact, HUD has issued awards to Plaintiffs incorporating those Conditions. Higginbotham Decl. ¶ 12; Jaworski Decl. ¶ 11; Simmons Decl. ¶ 9; Yglesias Decl. ¶ 10. Likewise, by adopting the updated HHS GPS and ACF Standard Terms, HHS and ACF have made final decisions to impose those policies on a large set of HHS grants, and in fact has issued awards to Plaintiffs that incorporate those policies' conditions. Akins Decl. ¶ 19; McCormick Decl. ¶¶ 25, 37; Young Decl. ¶ 28; Moran-Kuhn Decl. ¶¶ 29-30; Dotson Decl. ¶ 20.

These Conditions also determine rights or obligations and produce legal consequences.
They preclude organizations from receiving an award if they do not agree to the conditions, and
once agreed to, they constrain grantees' conduct and subject grantees to possible FCA liability.

### 2. The New Conditions Exceed Defendants' Statutory Authority

The New Conditions exceed Defendants' statutory authority. For agencies charged with
administering statutes, "[b]oth their power to act and how they are to act is authoritatively
prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency
"literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv.
Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "Any action that an agency takes outside the bounds
of its statutory authority … violates the Administrative Procedure Act." *City of Providence v.
Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

**HUD CoC Conditions.** Nothing in the Homeless Assistance Act nor any other statute
authorizes HUD to impose the HUD CoC Conditions, as another district court recently held. *See
King Cnty.*, 2025 WL 1582368, at *15. The Homeless Assistance Act attaches various conditions
to CoC Grants—such as requirements that grantees "monitor and report to the Secretary the
progress of the project," "ensure … that individuals and families experiencing homelessness are
involved" in the project, and "monitor and report" the receipt of any matching funds. 42 U.S.C.
§ 11386(b). But Congress has not authorized the executive branch to impose additional
substantive conditions designed to advance policy goals wholly unrelated to the Homeless
Assistance Act's purposes and requirements. *Cf. California v. DOT*, No. 1:25-cv-00208, --- F.
Supp. 3d ----, 2025 WL 1711531, at *2 (D.R.I. June 19, 2025) (holding that the federal agency
lacked authority "to impose immigration enforcement conditions on federal dollars specifically

23

appropriated for transportation purposes"). Nor did Defendants identify any such authority in adopting the conditions.

**HHS Discrimination Certification and ACF Anti-DEI Certification.** Similarly, no statute authorizes HHS to impose the HHS Discrimination Certification to HHS grants across the board. Nor does any statute authorize HHS to apply that condition to rape prevention education grants or FVPSA state coalitions grants. Congress made RPE grants subject to the general conditions on VAWA grants, including that grantees use grant funds "only for the specific purposes described" in the statute; protect the privacy of people receiving services; and not use grant funds for tort litigation, lobbying, or excessive expenditures on conferences. 34 U.S.C. § 12291(b)(2), (5), (9), (10), (15)(C); *see also* Pub. L. No. 117-103, §§ 2(b), 301(5)(A) (reauthorizing rape prevention education grants and providing that 34 U.S.C. § 12291 "shall apply to … any grant program authorized under this Act"). But, like with the CoC Grants, Congress has not authorized the executive branch to impose additional substantive conditions designed to advance wholly unrelated policy goals. Nor did Defendants identify any such authority in adopting the conditions.

So too for the FVPSA State Coalitions grants. While Congress gave HHS authority to implement "new grant conditions established … by" statute, and to otherwise carry out the programs Congress created, it did not authorize the agency to impose conditions that advance wholly unrelated policy goals of eradicating "DEI" or denying transgender people's identities. *See* 42 U.S.C. § 10411.

### 3. *Various Conditions Are Contrary to Law*

In addition to exceeding Defendants' statutory authority, multiple New Conditions are contrary to law. For one, multiple HUD CoC Conditions outright conflict with a binding agency

24

regulation. It is well established that "that agencies must comply with their own regulations." *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015). Agency action that violates a regulation is "contrary to law" in violation of the APA. *Colorado v. HHS*, No. 1:25-cv-00121, --- F. Supp. 3d ----, 2025 WL 1017775, at *2 (D.R.I. Apr. 5, 2025).

Binding HUD regulations require grantees to recognize and respect individuals' gender identity. Among other things, HUD regulations provide that, for CoC (and other) grants, recipients must provide individuals with equal access to shelters and other services "in accordance with the individual's gender identity" and must place and serve individuals "in accordance with the[ir] gender identity." 24 C.F.R. § 5.106(b)(1)-(2); *see also id.* §§ 5.106(b)(3), (c).

The HUD "Gender Ideology" Condition and HUD CoC E.O. Condition conflict with that rule. The "Gender Ideology" Condition bars grantees from "promoting gender ideology" as defined in the "Gender Ideology" Order—an order that proclaims that there are only "two sexes, male and female," and that categorically rejects as "false" the idea that a person can have a gender identity distinct from their biological sex. "Gender Ideology" Order § 2. Relatedly, the HUD CoC E.O. Condition requires compliance with all executive orders—and thus requires grantees to follow the "Gender Ideology" Order. These requirements all appear to require grantees to deny individuals' gender identity and to instead serve people in accordance with their biological sex as defined under the executive order. That flies in the face of the regulation, which unequivocally requires grantees to recognize individuals' gender identity and to serve them in accordance with it, not their biological sex.

In addition, the HHS Discrimination Certification and ACF Anti-DEI Certification—requiring grantees to certify that they do not engage in DEI, DEIA, or "discriminatory equity

ideology" in violation of federal nondiscrimination laws—are contrary to law. They conflict with various statutory provisions that expressly contemplate grants targeting "underserved populations"—a group that Congress defined to include those who face barriers to accessing and using victim services, including because of their "religion, sexual orientation, gender identity," race or ethnicity, disabilities, or "alienage status"—as well as grants involving "culturally specific" services or organizations "primarily directed toward racial and ethnic minority groups." *See* 34 U.S.C. §§ 12291(a)(8), (46) (defining "underserved populations" and "culturally specific"); 42 U.S.C. § 280b-1b(a)(7) (specifically authorizing rape prevention education grants supporting "efforts to increase awareness in underserved communities" and among "individuals with disabilities"); *id.* § 280b-1b(c) (requiring HHS to ensure "meaningful involvement" of "racial and ethnic minority groups" and "underserved" communities in implementing rape prevention education grants); *id.* § 10406(a)(3) (authorizing grants "to provide specialized services for … underserved populations[] and victims who are members of racial and ethnic minority populations"); *id.* § 10411(d)(3) (requiring grantees to address the needs of victims "who are members of racial and ethnic minority populations and underserved populations").

### 4. The New Conditions are Arbitrary and Capricious

The New Conditions are also arbitrary and capricious. Under arbitrary and capricious review, courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). To pass muster, an agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies are free to change their

existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). The New Conditions fail on multiple fronts.

Defendants' imposition of the New Conditions fails the most basic requirement of agency decision-making: the Conditions "have not been explained at all," as the other district court considering the HUD CoC Conditions recently held. *King Cnty.*, 2025 WL 1582368, at *17. Defendants provided no explanation for their actions, and they certainly did not provide a "reasoned explanation" as the APA requires. *See Fox Television*, 556 U.S. at 515.

Defendants have likewise failed to "show that there are good reasons for the new policy," and for some conditions even fail to "display awareness" that the New Conditions are a change in policy at all. *Id.* at 515. While a few conditions "make reference to certain Executive Orders," the "rote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relation to the agency's underlying action—does not constitute 'reasoned decisionmaking.'" *Id.*; *accord, e.g.*, *Louisiana v. Biden*, 622 F. Supp. 3d 267, 295 (W.D. La. 2022) ("A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order.").

Beyond that, Defendants have failed to consider multiple "important aspects of the problem," *State Farm*, 463 U.S. at 43. Defendants did not consider how funding conditions advancing unrelated policy goals would impact the efficacy of grant programs—including the CoC, RPE, and FVPSA grant programs that support TRO Plaintiffs' work—or hinder efforts to address homelessness and prevent sexual violence. Nor did they consider how deterring grantee

27

efforts to engage with and support particular communities—as the DEIA-related conditions threaten to do—will effectively exclude those communities from the benefits of the funded programs.

They likewise have not considered the "serious reliance interests" of grantees and the members of the public they serve that are jeopardized by the New Conditions. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). As relevant to this TRO motion, the conditions are being imposed in the middle of the period of performance for many Plaintiffs and their members, not in connection with a new award where the grantee at least knew of the condition upon receiving the initial award. These grantees have been counting on the continued receipt of this funding to carry out their ongoing, mission-critical activities.

Finally, Defendants did not consider or explain how the conditions barring and deterring "DEIA"-related activity can be reconciled with Congress's express authorization for programs focused on underserved populations and individuals with disabilities, *see* 42 U.S.C. § 280b-1b(a)(7)—let alone how the "gender ideology"-related conditions discussed above square with the binding regulations requiring grantees to serve individuals in accordance with their gender identity.

**B.    The New Funding Conditions Violate Multiple Constitutional Provisions Safeguarding the Separation of Powers**

The New Conditions also violate the Spending Clause and other constitutional provisions safeguarding the separation of powers. As court after court has recognized, imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of … the separation of powers." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) (holding that the executive branch violated separation of

28

powers by conditioning federal funding on recipients' facilitating immigration enforcement).[2] Defendants have done precisely that here. As explained above, *supra* section I.A.1, Congress has not authorized Defendants to impose the New Conditions. In doing so anyway, Defendants have exceeded their constitutional authority and encroached on Congress's power to control federal spending, in violation of foundational separation-of-powers principles.

The Constitution "exclusively grants the power of the purse to Congress, not the President." *Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1426226, at *18 (D.R.I. May 16, 2025) (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018)); *see also* U.S. Const., art. I, § 1 (Spending Clause); *id.*, art. I, § 9, cl. 7 (Appropriations Clause). Among the "legislative powers" the Constitution vests in Congress, *see id.*, art. I, § 1, is the Spending Clause, which authorizes Congress to distribute funds to states and private entities to promote "the general welfare," *id.*, art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). And because "the ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare," *Tex. Educ. Agency v. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021), the executive branch may not impose conditions on the distribution of funds that Congress has not authorized, *see Colorado*, 2025 WL 1426226, at *18.

---

[2] *See also, e.g.*, *City & Cnty. of S.F.*, 897 F.3d at 1231, 1234–35 ("withhold[ing] all federal grants from so-called 'sanctuary' cities and counties" violated separation of powers); *King Cnty.*, 2025 WL 1582368, at *6, 15–17 ("gender ideology" and anti-DEI funding conditions violated separation of powers); *PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, 2025 WL 685124, at *14–21 (D. Md. Mar. 4, 2025) (conditioning funding on recipients' denying gender-affirming care violated separation of powers); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261–63 (W.D. Wash. 2025) ("gender ideology" funding conditions violated separation of powers).

The executive branch's role, rather, is to implement Congress's spending directives and to "take care that the laws be faithfully executed," U.S. Const., art. II, § 3. "When it comes to spending, the President has none of his own constitutional powers to rely upon" and can only exercise authority Congress has delegated. *City & Cnty. of S.F.*, 897 F.3d at 1233–34. He has no power, moreover, "to enact, to amend, or to repeal statutes" on his own. *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998); *see also* U.S. Const., art. I, § 7, cl. 2 (Presentment Clause).

Here, because Congress has not delegated to the executive branch the authority to adopt the New Conditions, *see supra* section I.A.1, Defendants unconstitutionally "claim[] for [themselves] Congress's exclusive spending power" and "attempt[] to coopt Congress's power to legislate." *See City and Cnty. of S.F.*, 897 F.3d at 1234; *see also PFLAG*, 2025 WL 685124, at *21 (concluding that executive order "unilaterally" imposing funding conditions unconstitutionally "circumvent[ed] bicameralism and presentment"). At bottom, the Founders established our system of separated powers to guard against "a concentration of power [that] would allow tyranny to flourish." *City of Chicago*, 961 F.3d at 892. In that system, "the power to wield the purse to alter behavior rests squarely with the legislative branch"—whose "elected representatives and dual chambers [] provide[] institutional protection from the abuse of such power." *Id.* That "institutional protection from abuse" would disappear if the executive branch could "impose [its] policy preferences regardless of the will of Congress." *Id.* Defendants' attempt to leverage federal funding "to effectuate [the executive's] own policy goals" violates the separation of powers. *See City & Cnty. of S.F.*, 897 F.3d at 1235.

## C.  Multiple New Conditions Violate the First Amendment

Multiple conditions implementing the President's Anti-DEI Order—HHS Discrimination Certification, ACF Anti-DEI Certification, and the HUD Discrimination Certification (DEI-

related certifications)—as well as the HUD "Gender Ideology" Condition, violate the First Amendment's protection of "the freedom of speech," U.S. Const. amend. I.

While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 214–15 (2013). Crucially, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Nor may it leverage government funding to "aim at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998). And imposing a funding condition "not relevant to the objectives of the program" can also violate the First Amendment. *Open Soc'y*, 570 U.S. at 214. The DEI-related certifications and "Gender Ideology" Condition transgress these limits.

***DEI-related certifications.*** The HHS Discrimination Certification, ACF Anti-DEI Certification, and the HUD Discrimination Certification impermissibly restrict speech "outside the scope of the federally funded program," *Open Soc'y*, 570 U.S. at 217. Those requirements compel grantees to certify that they do not "operate *any* programs"—whether funded by the grant or not—that (in the case of the HHS and ACF conditions) "advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" or (in the case of HUD's requirement) "that violate any applicable Federal antidiscrimination laws." HHS GPS at 19; ACF Standard Terms; HUD Discrimination Certification. Those requirements "on [their] face makes clear" that it applies to "any program …, irrespective of whether the program is federally funded." *Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, --- F. Supp. 3d ----, 2025 WL 1114466, at *11 (N.D. Ill. Apr. 14, 2025).

Those conditions also restrict speech on the basis of viewpoint. The HHS Discrimination Certification and ACF Anti-DEI Certification specifically prohibit advancing "discriminatory equity ideology"—an undisguised suppression of a particular viewpoint. Those conditions' prohibition on promoting "DEI" and "DEIA" likewise discriminate against certain speech, as "diversity, equity, and inclusion" programs almost invariably contain speech promoting those values. Indeed, as the Administration itself has acknowledged, it is restricting work related to "diversity, equity, and inclusion" because of disagreement with its "foundational rhetoric and ideas."[3] The HUD Discrimination Certification requiring grantees to certify that they do not violate anti-discrimination law (and that this is material for FCA purposes), while less transparent, also inhibits speech. The surrounding context makes clear that this certification requirement is meant to further the President's anti-DEI agenda, consistent with the Anti-DEI Order's instruction that federal agencies impose these types of certification requirements to combat DEI activities, and consistent with its (novel and unfounded) view that such activities are often illegal—and thereby constrains grantees' speech regarding DEIA values. Anti-DEI Order § 3(b)(iv).

It does not matter that these requirements purport to bar only conduct that violates nondiscrimination laws. For one, it is clear that Defendants are taking a novel and incredibly broad view of the activities that violate nondiscrimination laws, suggesting that any DEI-related activities could implicate civil rights laws (although Defendants do not provide a standard for what actually violates these laws). Plaintiffs and their members will have to self-censor speech to mitigate the chances that they will be subject to government investigations and civil and criminal

---

[3] The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://perma.cc/G8JU-QQ44.

litigation and liability under Defendants' novel interpretation of these laws. And the prospect of self-censorship of speech is especially great given the utter vagueness of the DEI-related certifications. As another court recently held in preliminarily enjoining a similar certification requirement, "[t]he problem … is that the meaning of this is left entirely to the grantee's imagination." *Chicago Women*, 2025 WL 1114466, at *11. Indeed, the DEI-related certifications independently violate the First Amendment due to their extreme vagueness, as explained in more detail further below. *See infra* Section I.D.

**HUD "Gender Ideology" Condition.** The HUD "Gender Ideology" Condition—which prohibits grantees from using grant funds to "promote 'gender ideology' as defined in" the "Gender Ideology" Order—violates the First Amendment as well. As another court recently held in preliminarily enjoining a similar funding condition, this restriction cannot be justified as the government merely refusing to "affirmatively fund[]" the targeted speech. *S.F. AIDS Found. v. Trump*, No. 4:25-cv-01824, --- F. Supp. 3d ----, 2025 WL 1621636, at *16–18 (N.D. Cal. June 9, 2025).

For one, the restriction is "entirely untethered to any 'legitimate objective[s]'" of the programs it burdens. *Id.* at *16. Instead, it is "directed … towards disfavored speech." *Id.* at *17. Under this Condition, a grantee apparently could not "refer to the clients they serve … by any pronoun" or preferred name that matches their gender identity as opposed to their sex assigned at birth. *Id.* But that "is pure speech that has no relation to," *id.*, the CoC Grant program's purposes of helping homeless individuals secure housing.

Moreover, the "Gender Ideology" Condition impermissibly "withhold[s] subsidies for a censorious purpose—aiming to suppress" what the government views to be "the dangerous idea[] of … 'gender ideology.'" *S.F. AIDS Found.*, 2025 WL 1621636, at *18; *see also R.I. Latino Arts*

*v. Nat'l Endowment for the Arts*, No. 1:25-cv-00079, --- F. Supp. 3d ----, 2025 WL 1009026, at

*13–14 (D.R.I. Apr. 3, 2025) (noting that government cannot "use subsidies to suppress

dangerous ideas" and concluding that bar on funding art programs that "promote gender

ideology" was "a clear First Amendment violation"). The underlying Executive Order makes

clear its goal is "to root out the 'extreme,' 'false claims' of gender identity that contradict the

government's view that there is only one 'biological reality of sex,'" namely to erase the

recognition of transgender peoples' existence. *S.F. AIDS Found.*, 2025 WL 1621636, at *17

(citing "Gender Ideology" Order §§ 1, 2(f)). By defunding any activities "related to the

dangerous ideas it has identified," the HUD "Gender Ideology" Condition effectuates "precisely

the kind of 'invidious viewpoint discrimination' that the Supreme Court has suggested would

present First Amendment concerns even in the context of federal subsidies." *Id.* (citing *Finley*,

524 U.S. at 587).

The HUD "Gender Ideology" Condition also unconstitutionally strays beyond the "scope

of the federally funded program," *Open Soc'y*, 570 U.S. at 218. As the Supreme Court has

explained, a funding condition "by its very nature affects 'protected conduct outside the scope of

the federal funded program'" when it "demand[s] that a funding recipient[] adopt—as their

own—the Government's view on an issue of public concern." *Id.* (quoting *Rust*, 500 U.S. at

197). The HUD "Gender Ideology" Condition does just that. Under the Condition, a grantee risks

noncompliance if it says anything recognizing someone's gender identity, such as by using a

transgender person's preferred pronouns. So this Condition leaves grantees with no choice but to

use the pronouns corresponding to the person's sex assigned at birth—speech that reflects the

Administration's view that gender identity should not be acknowledged or respected—a

condition far afield from the scope of HUD's homelessness programs.

**D.    The New Conditions Are Unconstitutionally Vague**

Plaintiffs are likely to succeed in showing that the New Conditions are unconstitutionally vague because they impose unclear, ill-defined prohibitions that give Defendants sweeping discretion over their enforcement. Due process fundamentally requires that the law give "fair notice of what is prohibited." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012) (citing *United States v. William*s, 553 U.S. 285, 304 (2008)). A government-imposed requirement violates due process if it fails to "provide a person of reasonable intelligence fair notice of what is prohibited," or if it fails to provide explicit standards for the law's application, opening the door to "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

"[H]eightened" and "stricter" standards for potentially vague regulations are applied in two circumstances, both of which are present here. *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (quotations omitted). First, "vagueness review is more stringent when the challenged laws implicate the First Amendment's protections for speech." *United States v. Facteau*, 89 F.4th 1, 33 n.20 (1st Cir. 2023); *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). With any "content-based regulation of speech," "[t]he vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). "First Amendment freedoms need breathing space to survive, and therefore government may regulate in the area only with narrow specificity." *Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*, No. 24-1265, --- F.4th ----, 2025 WL 1911788, at *21 (1st Cir. July 11, 2025) (quoting *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 604 (1967)).

Second, "a stricter standard is applied" for vagueness where "criminal penalties may be imposed." *Frese, 53* F.4th at 6 (quotation omitted). "The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno,* 521 U.S. at 872. And where, as here, there is "content-based regulation of speech" that implicates criminal penalties, vagueness is of the utmost "special concern." *Counterman v. Colorado*, 600 U.S. 66, 100 (2023).

**DEI-related conditions.** The HUD Discrimination Certification, HHS Discrimination Certification, and ACF Anti-DEI Certification—which generally require grantees not to engage in "DEI" activities that violate federal antidiscrimination law—are unconstitutionally vague in violating both the First and Fifth Amendments.

These conditions, the Anti-DEI Order on which they are based, and the surrounding context signal that the Administration has a novel and expanded view that many until-recently-encouraged "DEI" and "DEIA" activities would violate federal anti-discrimination laws, but the DEI-related conditions fail to provide fair notice of what exactly the Administration believes is prohibited. They contain no definitions of "DEI," nor do they specify the attributes of a DEI program that would make it "illegal." As one court observed, what this Administration will claim is illegal "is anything but obvious." *Chi. Women*, 2025 WL 1114466, at *11. That is especially so given that "the thrust" of the underlying DEI Executive Order "is that the government's view of what is illegal in this regard has changed significantly with the new Administration." *Id.*; *see e.g.*, Anti-DEI Order at § 1 (criticizing diversity, equity, and inclusion practices of a wide variety of "influential institutions of American society"); *id.* § 3 (revoking multiple longstanding diversity-related executive actions and requiring the Office of Management and Budget to "[e]xcise" from federal funding procedures all "references to DEI and DEI principles, under

whatever name they may appear," and to "[t]erminate all 'diversity,' 'equity,'" and similar activities).

The DEI-related conditions also fail to provide fair notice of how a grantee could comply while also carrying out various instructions Congress set forth by statute—such as the instruction to meaningfully involve racial and ethnic minority groups in rape prevention education grants, to use those grants to "increase awareness in underserved communities" and among "individuals with disabilities," and to use FVPSA State Coalition Grants to address the needs of victims "who are members of racial and ethnic minority populations and underserved populations. 42 U.S.C. § 280b-1b(a)(7), (c); *id.* § 10411(d)(3); 34 U.S.C. § 12291(a)(9). Particularly given the Administration's explicit plan to use the FCA—and certifications like these—as a "weapon" in its battle against "DEI," the certification requirements' unclear commands leave Plaintiffs vulnerable to the kind of "arbitrary and discriminatory" application of the law that due process prohibits. *Grayned*, 408 U.S. at 108–09.

The DEI-related conditions fail ordinarily vagueness review, and they certainly cannot meet the heightened standards that apply for regulations that implicate criminal liability or that regulate protected speech. The DEI-related certifications—and the accompanying exposure to burdensome *qui tam* litigation and potential False Claims Act liability—will predictably chill grantees from speaking in support of diversity, equity, and inclusion, including in their activities unrelated to the use of federal funds. That violates the First Amendment.

***HUD "Gender Ideology" Condition.*** The HUD "Gender Ideology" Condition, which bars grantees from using awarded funds to "promote 'gender ideology,'" unconstitutionally fails to provide fair notice of what it means to "promote" what the Administration terms "gender ideology." Is respecting a person's gender identity (like by using their preferred pronouns or

name) enough, or does the restriction reach only more affirmative advocacy? The condition also does not provide fair notice of how a grantee could comply with this condition's apparent command that grantees deny that individuals have a gender identity separate from their biological sex while also following binding regulations that require grantees to accommodate and serve individuals "in accordance with the[ir] gender identity." *See* 24 C.F.R. § 5.106. As with the DEI-related conditions, the HUD "Gender Ideology" Condition could not meet ordinary vagueness standards, and it falls far short under the heightened standards for regulations that implicate First Amendment speech and could lead to criminal liability.

***HUD Abortion Condition.*** The HUD Abortion Condition is unconstitutionally vague in that it fails to provide fair notice of what it means to use grant funds to "promote" so-called "elective abortion." For instance, it provides no guidance on whether advising someone about the option of abortion counts as "promoting," or whether more active advocacy is required. Nor does it provide any guidance on what counts as an "elective" abortion, which undeniably is subject to different interpretations among those holding different views on the subject.

***HUD CoC E.O. Condition.*** The HUD CoC E.O. Condition (providing that the use of grant funds is "governed by … [a]ll current Executive Orders") also fails to provide fair notice. Executive Orders are issued by the president to direct federal agencies and officials on how to implement or enforce the law—they do not impose legal requirements or obligations on private parties such as federal grantees. These conditions require Plaintiffs to guess at how to comply, particularly given that the referenced Executive Orders are themselves broad and vague—and the "future" ones do not even exist yet.

Each of these conditions requires people of ordinary intelligence to guess at what is prohibited. *See Grayned*, 408 U.S. at 108. And by failing to provide guidance or standards to

determine what activities this Administration considers newly prohibited, each of the conditions also subjects Plaintiffs' funding to the Administration's unlimited discretion and exposes them to potentially arbitrary and discriminatory enforcement. Faced with threatened civil penalties and potential criminal liability under the FCA, recipients are forced to curtail their activities by "steer[ing] far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (cleaned up). Plaintiffs are likely to succeed on their Fifth Amendment challenge for all the conditions, and are likely to show that the first two conditions violate the First Amendment on vagueness grounds as well.

## II.    TRO Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief

The fast-approaching NOA deadlines and imminent need to draw down on funds force Plaintiffs into a Hobson's choice. Plaintiffs must decide whether to: (a) accept unconstitutional and otherwise unlawful funding conditions that are inconsistent with congressional directives, will impede their ability to provide core services, and are at odds with their fundamental missions; or (b) forgo federal funds that are essential to their ability to fulfill their missions, and that are necessary to save lives.

This imminent "choice itself demonstrates irreparable harm." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017). "[F]orcing [a plaintiff] either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face an irreparable harm, is the type of 'Hobson's choice' that supports irreparable harm." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017), *aff'd*, 888 F.3d 272 (7th Cir. 2018) (subsequent proceedings omitted) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *see also, e.g.*, *City of Philadelphia*, 280 F. Supp. 3d at 657 (finding irreparable harm when City was "faced with a 'Hobson's Choice' between, on the one hand, complying with

a law it credibly believe[d]" to be "unconstitutional, and on the other hand, foregoing funds it plan[ned] to use for life-saving projects"); *cf. Metro. Transp. Auth. v. Duffy*, No. 2:25-cv-01413, 2025 WL 1513369, at *45 (S.D.N.Y. May 28, 2025) ("Plaintiffs can cease operation of the Tolling Program or else may brace for impact and prepare to suffer the effects of Defendants' threatened compliance measures. Either option would irreparably harm Plaintiffs.").

Here, either option—accepting the conditions or forgoing funds—would seriously harm Plaintiffs and their members. Agreeing to the New Conditions would cause profound harm. Accepting conditions that are unconstitutional, including because they are vague and infringe on the speech of Plaintiffs and their members, causes irreparable harm even without more. *See, e.g.*, *R.I. Latino Arts*, 2025 WL 1009026, at *15 ("Irreparable harm is … *presumed* upon a determination that [Plaintiffs] are likely to prevail on their First Amendment claim." (emphasis added) (quoting *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 11 (1st Cir. 2012)); *Hannon v. Allen*, 241 F. Supp. 2d 71, 78 (D. Mass. 2003) ("Even the temporary loss of a constitutional right may be a form of irreparable harm."). But there is more: the New Conditions would require Plaintiffs and their members to change their conduct, contrary to their values and mission. *See supra* Background section C; Atkins Decl. ¶¶ 27, 36; Higginbotham Decl. ¶¶ 54-55; Simmons Decl. ¶ 22; Lee Decl. ¶ 48; Yglesias Decl. ¶ 40; Young Decl. ¶ 44.

The harm from accepting the New Conditions is especially acute here given that Defendants have intentionally crafted the conditions to expose grantees to FCA liability. It is invariably harmful for an organization to expose itself to criminal investigation or prosecution, or lawsuits that could bankrupt the organization, and it is far from speculative that these risks could come to fruition. DOJ has formed a nationwide task force specifically to target grantees that sign these certifications, has described potential FCA liability as a "weapon" it will deploy, and has

"strongly encouraged" private parties to bring civil suits. Plaintiffs and their members have no choice but to take the threats seriously. *See, e.g.*, Moran-Kuhn Decl. ¶ 48; Sarang-Sieminski Decl. ¶ 23; Yglesias Decl. ¶ 40; Simmons Decl. ¶ 22. Plaintiffs and their members need not wait for the "Damoclese[] sword" of FCA liability "to actually fall" before the Court enters preliminary relief. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016).

The alternative—forgoing HHS and HUD funds—would also cause irreparable harm. Plaintiffs have relied on HHS and HUD Grant funds to provide essential services to members, individuals, and communities. *See supra* Background section C. Losing out on these grants would drain Plaintiffs' budgets and require them to lay off staff and cut services, causing a devastating impact on organizations, on their missions, and on the most vulnerable people in their communities. Simmons Decl. ¶ 11; Higginbotham Decl. ¶ 12; Sarang-Sieminski Decl. ¶ 23; Dotson Decl. ¶ 21; Yglesias Decl. ¶ 25; Young Decl. ¶ 28; Akins Decl. ¶ 21; McCormick Decl. ¶ 37; Jaworski Decl. ¶ 11.

Such interference with the organizations' services "is not accurately measurable or adequately compensable by money damages." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 325 (D. Mass. 2025); *see also Am. Pub. Health Ass'n v. NIH*, No. 25-1611, 2025 WL 2017106, at *11 (1st Cir. July 18, 2025). The inability of an organization to "accomplish [its] primary mission" constitutes irreparable harm. *Newby*, 838 F.3d at 9. Even more so here—"[i]t is impossible to accurately measure or compensate" for the losses in life-saving services to homeless individuals and vulnerable victims of domestic violence and sexual assault if organizations are unable to carry out their mission because they are forced to give up federal funds. *Massachusetts v. NIH*, 770 F. Supp. 3d at 325.

41

### III.    The Balance of the Equities and Public Interest Favor a TRO

The balance of equities and public interest strongly favor a temporary restraining order permitting Plaintiffs and their members to access grant funding free from the New Conditions until the Court decides the forthcoming motion for a preliminary injunction. Such an order would only require the government to permit Plaintiffs to use funding that federal agencies have already awarded. Meanwhile, absent relief, the grant recipients would be forced to comply with the likely unlawful conditions or be forced to cut lifesaving programing due to lost grants. Indeed, as another judge in this district recently recognized, "[t]he fact that [Plaintiffs] have shown a likelihood of success on the merits strongly suggests that an injunction would serve the public interest." *California v. DOT*, 2025 WL 1711531, at *2. "[T]here is substantial public interest in having governmental agencies abide by the federal laws." *Massachusetts v. NIH*, 770 F. Supp. 3d at 326 (cleaned up).

Lives hang in the balance. HUD's CoC Grants fund both emergency and longer-term housing for survivors of sexual and domestic violence. Yglesias Decl. ¶ 10.b. And in those HUD CoC-funded facilities, plaintiffs provide survivors with resources for substance use disorder and medical conditions. Lee Decl. ¶ 15. "Without the HUD CoC funds, survivors of violence likely will be homeless and at risk of addiction relapse." *Id.*

For instance, as of April, Pennsylvania Coalition CoC Grant funds provide direct rental assistance to around 380 households, including about 400 adults and about 350 children. Higginbotham Decl. ¶ 14. Without these funds, these families will lose housing support and will face imminent eviction. *Id.* Virginia Member Doe's clients face similar harms: absent HUD CoC funds, over 40 children and their parents would be evicted from their homes. Yglesias Decl. ¶ 10.a. The lack of availability of HUD-funded transitional housing will have cascading effects.

42

Shelter stays will be longer, and the number of people being turned away for lack of space would drastically increase. *Id.*

Additionally, HUD CoC funding is critical to protect domestic violence survivors, because the lack of safe, affordable housing keeps victims (and often their children) in abusive situations. *Id.* Victims of abuse "cannot wait six months for housing in abusive situations," because "this kind of wait could be lethal." Higginbotham Decl. ¶ 57. But less HUD CoC-funded housing means longer waiting lists, fewer beds at shelters, and more survivors and their children who are unable to leave dangerous situations. Yglesias Decl. ¶ 10.a.

People who are unsheltered for any reason experience "danger and uncertainty," and often have intense medical needs and disabilities that they cannot treat without the services that HUD CoC Grants fund. Simmons Decl. ¶ 10. Unhoused people who rely on Plaintiffs' services for medical care will not be able, for instance, to keep their insulin cold or to connect with healthcare providers for kidney disease and cancer treatment. *Id.* ¶ 11. "It is not an overstatement to say" that organizations "use[] these funds to save lives." *Id.* ¶ 10. Without these funds, communities "would see a rash of people dying out on the street." *Id.* For Plaintiff House of Hope, where an estimated 80% of staff have experienced homelessness, substance use disorders, incarceration and other related trauma, the loss of these funds would result in massive layoffs to the same staff members that serve as leaders to their peers using House of Hope's services. Jaworksi Decl. ¶ 33. "To rip them away from their employment and pitch them back into financial and possible housing instability would be a remarkable twist of fate." *Id*.

RPE funding is similarly important to Plaintiffs and their communities. Decreased primary prevention efforts increases the risk that the people in Plaintiffs' communities will experience sexual violence and subsequent adverse short and long-term health outcomes,

contributing to a substantial public health burden. Akins Decl. ¶ 21. In some cases, Plaintiffs'

RPE Grant-funded activities provide the only statewide primary prevention infrastructure, and

elimination of this funding would "destroy sexual violence prevention efforts in the state."

Dotson Decl. ¶ 25.

These harms are not speculative. Plaintiffs' lifesaving housing and RPE services depend

on organizations' committed staff members. Without CoC funding, TRO Plaintiffs will lack

funds to pay for housing for survivors. Higginbotham Decl. ¶ 14; Yglesias Decl. ¶ 10.a. And

without HHS funding, organizations would cut staff working on violence prevention efforts. Lee

Decl. ¶ 28; Akin Decl. ¶ 21; Sarang-Sieminski Decl. ¶¶ 23, 29 McCormick Decl. ¶ 38.

Thus, the balance of the equities and the public interest is clear. On the one hand, "the

government cannot suffer harm from an injunction that merely ends an unlawful practice."

*Massachusetts v. NIH*, 770 F. Supp. 3d at 326 (cleaned up); *see also Texans for Free Enter. v.

Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[I]njunctions protecting First

Amendment freedoms are always in the public interest."). On the other, a loss of funds to

Plaintiffs and, with respect to Coalitions, their member programs would reverberate to unhoused

people and people at risk of homelessness, and vulnerable victims of domestic violence and

sexual assault through a loss of life-saving services. Particularly here, where so much is at stake,

the government should not be permitted to "leverag[e] the needs of our most vulnerable fellow

humans" by conditioning federal funds on the acceptance of unlawful funding conditions. *King

Cnty.*, 2025 WL 1582368, at *19.

**CONCLUSION**

As described in Plaintiffs' Motion for Temporary Restraining Order, the Court should

enjoin Defendants from requiring TRO Plaintiffs or their members to agree to the New

Conditions or substantially similar conditions as a requirement for receiving funding, and from

otherwise enforcing these or substantially similar conditions against TRO Plaintiffs and their

members.

July 21, 2025                                    Respectfully submitted,

*/s/ Amy R. Romero*
Amy R. Romero (RI Bar # 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

/s/ Kristin Bateman
Kristin Bateman (Cal. Bar No. 270913)[+][^]
Robin F. Thurston (D.C. Bar No. 1531399)[+]
Skye L. Perryman (D.C. Bar No. 984573)[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar # 1016621)[+]
Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
Brian C. Rosen-Shaud (ME Bar No. 006018)[+][^]
Nina Cahill (D.C. Bar No. 1735989)[+]
Jacobson Lawyers Group PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

*/s/ Lynette Labinger*
Lynette Labinger (RI Bar # 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

45

*/s/ Mary C. Dunn*
Mary C. Dunn (RI Bar #6712)
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900
mcd@blishcavlaw.com
Cooperating counsel, Lawyers' Committee for RI

*/s/ Lauren A. Khouri*
Lauren A. Khouri (D.C. Bar No. 10282288)[+]
Elizabeth Theran (D.C. Bar No. 90030162)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org
etheran@nwlc.org

[+] *Pro hac vice* motion forthcoming
[^] Not admitted in the District of Columbia. Practice
supervised by members of the D.C. bar.

*Counsel for Plaintiffs*