## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

*Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services, *et al.*,

*Defendants*.

Case No. 1:25-cv-00342

## MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF UNDER 5 U.S.C. § 705 AND FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

    A. The Administration leverages federal funding and the threat of massive liability to effect sweeping social change without Congress's involvement ............................................... 2

        1.    Attacks on diversity, equity, inclusion, and accessibility ......................................... 2

        2.    Attacks on transgender rights ...................................................................................... 6

        3.    Attacks on abortion access .......................................................................................... 7

    B. HUD and HHS adopt new policies effectuating the President's directives ..................... 8

        1.    HUD Continuums of Care Grant Conditions ............................................................. 8

        2.    HUD Office of Community Planning and Development Grant Conditions ............... 9

        3.    HUD Agency-Wide Conditions ................................................................................ 10

        4.    HHS Administration for Children and Families Conditions ..................................... 11

        5.    HHS Health Resources & Services Administration Condition ................................. 14

    C. Plaintiffs face an imminent need to decline funds or accept harmful conditions ........... 16

        1.    HUD grants .................................................................................................................. 16

        2.    HHS ACF grants ......................................................................................................... 21

        3.    HHS HRSA grants ...................................................................................................... 25

LEGAL STANDARD ...................................................................................................... 26

ARGUMENT .................................................................................................................... 27

I.    Plaintiffs Are Likely To Succeed On the Merits of Their Claims .................................... 28

    A. The New Conditions violate the APA ............................................................................. 28

        1.    The New Conditions are final agency action ............................................................. 28

        2.    The New Conditions exceed Defendants' statutory authority ................................... 29

3.    The New Conditions are arbitrary and capricious ..................................................... 31

4.    Various New Conditions are contrary to law............................................................. 34

B.  The New Conditions violate multiple constitutional provisions safeguarding the separation of powers........................................................................................................ 36

C.  Multiple New Conditions violate the First Amendment .................................................. 39

D.  The New Conditions are unconstitutionally vague ........................................................ 43

II.   Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief ....................................... 48

III.  The Balance of the Equities and Public Interest Favor a Preliminary Injunction ................. 51

IV.  Relief Should Extend Broadly Enough To Prevent Any Irreparable Harm .......................... 56

CONCLUSION..................................................................................................................... 61

GLOSSARY OF NEW CONDITIONS.................................................................................... 63

CERTIFICATE OF SERVICE ................................................................................................ 65

## TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ........................ 39, 43

*American Public Health Association v. Nat'l Insts. of Health*, No. 25-1611, 2025 WL 2017106 (1st Cir. July 18, 2025) ...................................................................... 51

*Bennett v. Spear*, 520 U.S. 154 (1997) .................................................................................. 28

*Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36 (1st Cir. 2010) ........................ 27

*Bridgeport Hosp. v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024) ...................................................... 56

*Cabrera v. U.S. Dep't of Lab.*, No. 25-CV-1909 (DLF), 2025 WL 2092026 (D.D.C. July 25, 2025) .......................................................................................................... 57

*California v. U.S. Dep't of Transp.*, No. 1:25-cv-00208, --- F. Supp. 3d ----, 2025 WL 1711531 (D.R.I. June 19, 2025) .................................................................................. 30, 51

*Career Colleges & Sch. of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024) .............. 57

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) ........................................ 57

*Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*, No. 24-1265, – F.4th –, 2025 WL 1911788 (1st Cir. July 11, 2025) .................. 44

*Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730 (E.D. Tex. 2023)................................ 58

*Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, --- F. Supp. 3d ----, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) .......................................................... 39, 40, 41, 45

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ............................... 37, 38

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ........................................................................ 30

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020)........................................................ 37, 39

*City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017) ............................................ 48

*City of Los Angeles v. Sessions*, No. 2:18-cv-07347, 2019 WL 1957966 (C.D. Cal. 2019) ............................................................................................................ 60, 61

*City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017) ...................................... 48

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020)........................................................... 30

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998) ......................................................................... 38

*Colorado v. Dep't of Health & Human Servs.*, --- F. Supp. 3d ----, 2025 WL 1017775
(D.R.I. Apr. 5, 2025) ............................................................................................ 34

*Colorado v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-00121, 2025 WL
1426226 (D.R.I. May 16, 2025) ....................................................................... 37, 38

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ........................ 56

*Counterman v. Colorado*, 600 U.S. 66 (2023) .................................................................. 44

*DHS v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ...................................... 32

*FCC v. Fox Television Stations*, 567 U.S. 239 (2012) ..................................................... 43

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...................................... 31, 33

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) .............................................. 31

*Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022) .............................................................. 44

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ........................................... 43, 46, 47

*Hannon v. Allen*, 241 F. Supp. 2d 71 (D. Mass. 2003) .............................................. 49

*Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589 (1967) ........................... 44

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ................................................ 30

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............... 50, 51

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022) ....................................... 33

*Maceira v. Pagan*, 649 F.2d 8 (1st Cir. 1981) ........................................................... 49

*Manguriu v. Lynch*, 794 F.3d 119 (1st Cir. 2015) ..................................................... 34

*Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814, 2025 WL 1582368
(W.D. Wash. June 3, 2025) ......................................................... 28, 30, 32, 37, 56

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600 (D.
Mass. 2020) .......................................................................................................... 59

*Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025) ......... 51, 52, 55, 56

*Metro. Transp. Auth. v. Duffy*, No. 2:25-cv-1413, 2025 WL 1513369 (S.D.N.Y. May
28, 2025) ............................................................................................................... 49

*Michigan v. EPA*, 576 U.S. 743 (2015) ...................................................................... 32

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).......................................... 58

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992).......................................... 48

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)................................................................................................................. 31, 33

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ...................... 56

*NEA v. Finley*, 524 U.S. 569 (1998) ........................................................................ 39, 43

*New Hampshire Hosp. Ass'n v. Burwell*, No. 15-CV-460-LM, 2016 WL 1048023 (D.N.H. Mar. 11, 2016)........................................................................................ 27

*New York v. Kennedy*, No. 25-cv-196, --- F. Supp. 3d ----, 2025 WL 1803260  (D.R.I. July 1, 2025)..................................................................... 27, 30, 31, 32, 51

*Nken v. Holder,* 556 U.S. 418 (2009) ...................................................................... 27

*Ohio v. EPA*, 603 U.S. 279 (2024)........................................................................ 31, 32

*Orr v. Trump*, No. 1:25-cv-10313, --- F. Supp. 3d ----, 2025 WL 1145271 (D. Mass. Apr. 18, 2025).................................................................................................. 57

*PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, 2025 WL 685124 (D. Md. Mar. 4, 2025)......... 37, 38

*R.I. Latino Arts v. NEA*, No. 1:25-cv-00079, --- F. Supp. 3d ----, 2025 WL 1009026 (D.R.I. Apr. 3, 2025)............................................................................................ 42

*Reno v. ACLU*, 521 U.S. 844 (1997)........................................................................ 44

*Rust v. Sullivan*, 500 U.S. 173 (1991)................................................................... 39, 43

*S.F. AIDS Found. v. Trump*, No. 4:25-cv-01824, --- F. Supp. 3d ----, 2025 WL 1621636 (N.D. Cal. June 9, 2025) ......................................................................... 42, 43

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012) ................... 49

*Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47 (D.R.I. 2023) ................................. 27

*South Dakota v. Dole*, 483 U.S. 203 (1987) ................................................................ 37

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350 (5th Cir. 2021).................................... 37

*Texans for Free Enterprise v. Texas Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013) .................. 56

*Texas v. Cardona*, 743 F. Supp. 3d 824 (N.D. Tex. 2024) .......................................... 58

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025).................................................... 57, 58, 61

v

*United States v. Facteau*, 89 F.4th 1 (1st Cir. 2023) .................................................... 44

*United States v. William*s, 553 U.S. 285 (2008) ....................................................... 43

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016).................. 4

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982)............................ 44

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)...................................................... 27, 51

*Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025).................................................................................. 56

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................................ 39

U.S. Const., art. I, § 1 .......................................................................................... 37

U.S. Const., art. I, § 7 .......................................................................................... 38

U.S. Const., art. I, § 8 .......................................................................................... 37

U.S. Const., art. I, § 9 .......................................................................................... 37

U.S. Const., art. II, § 3 ......................................................................................... 38

**Statutes**

10 U.S.C. § 1093 .................................................................................................. 7

18 U.S.C. § 287 ..................................................................................................... 4

31 U.S.C. § 3729 ............................................................................................... 4, 15

31 U.S.C. § 3730 .................................................................................................... 4

34 U.S.C. § 12291 ...................................................................................... 14, 36, 46

34 U.S.C. § 12491 .................................................................................................. 8

42 U.S.C. § 601 ................................................................................................... 13

42 U.S.C. § 5307 ............................................................................................. 33, 36

42 U.S.C. § 5318 .................................................................................................. 36

42 U.S.C. § 10401 ............................................................................................... 13

42 U.S.C. § 10402 ............................................................................................... 14

42 U.S.C. § 10406 ............................................................................................ 14, 34, 36

42 U.S.C. § 10408 ....................................................................................................... 14

42 U.S.C. § 10411 ................................................................................. 14, 34, 36, 46

42 U.S.C. § 11360 ......................................................................................................... 8

42 U.S.C. §§ 11381 *et seq.* .......................................................................................... 8

42 U.S.C. §§ 11386 ..................................................................................................... 30

5 U.S.C. § 704 ............................................................................................................. 28

5 U.S.C. § 705 ........................................................................................ 27, 56, 57, 58

5 U.S.C. § 706 ........................................................................................ 28, 56, 57, 58

Pub. L. No. 118-42, 138 Stat. 25 (Mar. 9, 2024) ....................................................... 7

Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) ................................................... 7

The Judiciary Act, 1 Stat. 73 (1789) ......................................................................... 27

**Rules and Regulations**

24 C.F.R. § 5.106 ................................................................................... 18, 34, 35, 46

45 C.F.R. § 1370.5 ................................................................................................ 35, 47

**Other Authorities**

ACF, *Federal Fiscal Year 2025 Standard Terms and Conditions*,
      https://perma.cc/K2S7-PPX8 ................................................................................ 12

ACF, *Standard Terms and Conditions*, https://perma.cc/KSH8-AA5U ................................. 12, 13

*Community-Based Child Abuse Prevention (CBCAP) Grants*, ACF, Children's
      Bureau (current as of June 15, 2020), https://perma.cc/LW84-G82J .............................. 13

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ....................................... 3

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ...................... 6, 7, 35, 42

Exec. Order No. 14173, 90 Fed. Reg. 8663 (Jan. 21, 2025) ........................... 3, 40, 45

Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) ....................................... 7

Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025) ..................................... 12

*Help for Families,* ACF, Office of Fam. Assistance, https://perma.cc/WV2S-PWKQ (archived Aug. 4, 2025) .................................................................................................... 13

HRSA Fact Sheet, Fiscal Year (FY) 2024 - Nation (data as of Sept. 30, 2024), https://perma.cc/7YHD-Z4Z7 ...................................................................................... 15

HRSA, *FY 2025 HRSA General Terms and Conditions* (May 14, 2025), https://perma.cc/VLK7-3KB2 ................................................................................ 14, 15

HUD Funding Opportunities, HUD, https://perma.cc/F7TG-C4ER (archived Aug. 4, 2025) .................................................................................................................... 11

HUD, Form HUD 424-B, Applicant and Recipient Assurances and Certifications, https://perma.cc/23TW-QMCN ................................................................................ 11

HUD, *General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs* (revised Apr. 22, 2025), https://perma.cc/K5KJ-L8ZF ..................................................................................... 11

Letter from Claudette Fernandez, Acting Dir., CPD Gen. Deputy Assistant Sec'y, to Council of State Cmty. Dev't Agencies and Nat'l Cmty. Dev't Ass'n (June 5, 2025), https://perma.cc/92AE-R3BT ...................................................................... 10

Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025) https://perma.cc/3W6K-FGHA ....................................... 5

Mem. from Acting Dir. of OMB Matthew J. Vaeth to Heads of Exec. Dep'ts and Agencies (Jan. 24, 2025), https://perma.cc/5JZR-8V9X .................................... 7

Mem. From Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F .......................................................................................................................... 5

Mem. from Att'y Gen. Pam Bondi, Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ .................................... 4

Mem. from Att'y Gen. Pam Bondi, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (July 29, 2025), https://perma.cc/UYU5-KW2S ........................................................................................... 5, 6, 40, 41, 45

Press Release, Dep't of Educ., *U.S. Department of Education and U.S. Department of Justice Announce Title IX Special Investigations Team* (Apr. 4, 2025), https://perma.cc/BXN6-499W .................................................................................... 7

Scott Turner (@Secretary Turner), X (Mar. 13, 2025, 2:47PM), https://x.com/SecretaryTurner/status/1900257331184570703, captured at https://perma.cc/2PHL-3Q2A; https://perma.cc/LPL2-WK5T.................................... 8, 29

The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and
Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025),
https://perma.cc/G8JU-QQ44 .......................................................................... 40

U.S. DOJ, *Justice Department Establishes Civil Rights Fraud Initiative* (May 19,
2025), https://perma.cc/ZS6R-B8E9 .................................................................. 5

## INTRODUCTION

The Administration is engaged in a lawless and unauthorized campaign to leverage federal funding to coerce grantees into carrying out the Administration's ideological agenda. A series of executive orders direct agency heads to use their control of federal funding to curtail diversity, equity, inclusion, and accessibility activities; to deny the rights and very existence of transgender people; to curtail access to abortion care; and more. To bolster this effort, the Administration has announced it will weaponize the False Claims Act to target funding recipients that do not comply with the Administration's interpretation of these conditions. The Administration has undertaken this campaign unilaterally, without any congressional authorization.

This case concerns the implementation of this campaign by the Departments of Housing and Urban Development (HUD) and Health and Human Services (HHS) on programs that Congress enacted to support victims of domestic violence and sexual assault and people experiencing homelessness. The agencies' imposition of the new conditions will in no way further Congress's purposes in enacting these programs, and will only serve to harm those Congress sought to help.

The new conditions are unlawful many times over. Defendants' adoption and implementation of the conditions violate multiple black-letter Administrative Procedure Act requirements under binding Supreme Court precedent. Defendants did not provide any explanation for their actions, let alone an adequate one, and did not address the reliance interests of those impacted by the new conditions. Defendants' actions also violate the APA, and the constitutional separation of powers, because the Spending Clause of the Constitution affords Congress exclusive power to condition federal funding, and Congress has not prescribed any of

these conditions or authorized Defendants to do so. The conditions relating to "DEI" and gender ideology also violate the First Amendment in chilling and discriminating against speech, and those conditions and the others are all unconstitutionally vague.

These new conditions leave Plaintiffs and their members with an impossible choice. If they accept the conditions, they will have to fundamentally change their programming, abandon outreach and practices designed to best serve their communities, and risk exposing themselves to criminal penalties or ruinous civil liability. If Plaintiffs decline the funding, they will be left with sizeable holes in their budgets, which will result in displacing domestic violence and sexual assault survivors from safe housing, putting previously homeless families and youth back on the streets, and ending programs designed to reduce and prevent domestic violence, sexual assault, and homelessness. Plaintiffs and their members will suffer immediate, irreparable injuries no matter which path they choose.

To protect against the imminent, irreparable harms that these unlawful conditions will cause, the Court should exercise its authority under the APA to stay or preliminarily set aside the unlawful conditions during the course of this litigation. And it should issue a preliminary injunction barring the defendants from imposing these or similar conditions through other means.

## BACKGROUND

A. **The Administration leverages federal funding and the threat of massive liability to effect sweeping social change without Congress's involvement**

### 1. *Attacks on diversity, equity, inclusion, and accessibility*

In his first days in office, President Trump issued multiple executive orders that broadly seek to eradicate "diversity, equity, and inclusion" (DEI) and "diversity, equity, inclusion, and accessibility" (DEIA) values and initiatives. One order directs agencies to terminate all DEI and DEI offices, all "equity" programs, and all "equity-related" grants or contracts. Exec. Order No.

14151, § 2(b), 90 Fed. Reg. 8339 (Jan. 20, 2025). Another order, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (Anti-DEI Order), aims to end purportedly "illegal" DEI and DEIA in the federal government and the private sector. Exec. Order No. 14173, §§ 3–4, 90 Fed. Reg. 8663 (Jan. 21, 2025) (Anti-DEI Order). Among other things, the Anti-DEI Order requires agency heads to "include in every contract or grant award" a term requiring each counterparty or grant recipient to "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(iv)(B). The requirement that recipients not operate "*any* programs promoting DEI" is not limited to programs operated using federal funds. *Id.* (emphasis added).

Without defining "DEI" or "DEIA," or explaining what might make such programs "illegal," the Anti-DEI Order makes clear that the Administration has a novel and extreme view that diversity, equity, and inclusion is often illegal. The Order laments that "dangerous, demeaning, and immoral" DEIA or DEIA programs are widespread across the public and private sectors; revokes multiple diversity-related executive actions issued over the last half century; and orders particular offices to "immediately cease … [p]romoting diversity," to "[e]xcise references to DEI and DEI principles, under whatever name they may appear," from federal funding procedures, and to "[t]erminate all 'diversity,' 'equity,'" and similar programs and activities. *Id.* § 3.

The Anti-DEI Order leaves no doubt that the Administration seeks to use the False Claims Act (FCA) as a weapon against federal funding recipients. It directs agencies to include terms requiring a grant recipient "to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code." *Id.* The FCA imposes civil liability on

"any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision." Thus, the Anti-DEI Order seeks to require grantees to concede an essential, and otherwise "demanding," element of an FCA claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016).

In making a certification that could trigger the FCA, federal funding recipients such as Plaintiffs open themselves to potential massive liability. Both the federal government and any private citizen may sue a recipient of federal funds for FCA violations. 31 U.S.C. § 3730. If found liable, a funding recipient faces potential treble damages, meaning three times the amount of federal funds that the recipient received from the government in connection with the certifications. And potential liability is not only civil—the FCA provides for criminal penalties of up to five years imprisonment for those who make a "false, fictitious, or fraudulent" claim to any agency in seeking funds. 18 U.S.C. § 287.

The Administration quickly began implementing the Anti-DEI Order's directives. On February 5, 2025, Attorney General Bondi sent a letter to all Department of Justice (DOJ) employees making clear that DOJ intends to aggressively "investigate, eliminate, and penalize" "illegal DEI and DEIA." Mem. from Att'y Gen. Pam Bondi, Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ. The letter does not define "DEI" or "DEIA" or explain what makes a DEI or DEIA program illegal.

On May 19, 2025, Deputy Attorney General Todd Blanche announced the formation of a new task force, called the "Civil Rights Fraud Initiative," which will use the False Claims Act as a "weapon" against federal funding recipients. Letter from Todd Blanche, Deputy Att'y Gen., to

DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025) https://perma.cc/3W6K-FGHA (Blanche Memo). The Blanche Memo specifically focuses on funding recipients that engage in DEI activities as targets for potential investigation and enforcement actions. *Id.* The memo also "strongly encourages" private parties to file suits under the FCA's *qui tam* provision, and encourages the public to report information about "discrimination by federal-funding recipients" to DOJ. *Id.* And it states that the new initiative will engage the DOJ's Criminal Division. The Blanche Memo does not explain when DEI would be considered "illegal," but a press release announcing the Initiative broadly warns institutions not to "promote divisive DEI policies." U.S. DOJ, *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/ZS6R-B8E9.

 Further confirming the Administration's plans to aggressively use the FCA to "advance the Administration's policy objectives," a June 11 memo announcing the DOJ Civil Division's enforcement priorities lists using the FCA to combat DEI as the very first priority. Mem. From Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F.

 Then, on July 29, after this case was filed, the Attorney General issued a memo to all federal agencies purporting to provide "guidance for recipients of federal funding regarding unlawful discrimination." Mem. from Att'y Gen. Pam Bondi, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (July 29, 2025), https://perma.cc/UYU5-KW2S (Bondi Discrimination Memo). The memo provides a "non-exhaustive list" of DEI activities and other practices that the Department of Justice cautions would "risk" violating antidiscrimination laws and "recommend[s]" that funding recipients avoid. *Id.* at 1-2, 4-8. The examples do not provide guidance for most of the activities that Plaintiffs and their members must undertake (or

avoid) in carrying out their grants here, but even for the examples provided, the memo confirms that the Administration has a new, expansive, and unsupported view of when "DEI" is (or might be) illegal—warning against conduct like talking about "toxic masculinity" or creating (non-exclusive) "safe spaces" for people of certain demographics. *See id.* at 6, 8.

### 2. *Attacks on transgender rights*

The Administration has also launched a broadside attack on the rights and dignity of transgender people. On January 30, the President issued an order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" Order). That Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It decries "the erasure of sex" in both "policy" and "language," and it commits to using what the Administration characterizes as "accurate language and policy that recognize women are biologically female, and men are biologically male." *Id.* § 1. The Order discredits "gender ideology," which it describes as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f).

To accomplish its ideological vision, the "Gender Ideology" Order makes a host of directives, including requiring federal agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e); *see also id.* § 3(g). The Order also pronounces that Title IX of the Educational Amendments Act does not require "gender-identity based access to single-sex spaces" and expresses a view that such access "has harmed women." *Id.* § 3(f). The Order further directs the Attorney General to "ensure … the right to

single-sex spaces"—meaning, require exclusion of transgender people from spaces that align with their gender identity—and directs DOJ and other enforcement agencies to "prioritize" enforcement of that right. *Id.* § 5.

Following these directives, the Departments of Justice and Education have since launched a "Title IX Special Investigations Team" to focus on Title IX investigations involving transgender individuals using single-sex spaces that match their gender identity. Press Release, Dep't of Educ., *U.S. Department of Education and U.S. Department of Justice Announce Title IX Special Investigations Team* (Apr. 4, 2025), https://perma.cc/BXN6-499W.

### 3.  *Attacks on abortion access*

In the "Enforcing the Hyde Amendment" Executive Order, President Trump also declared it the policy of the United States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (Abortion Order). In subsequent guidance, OMB stated that the Administration's policy is "not to use taxpayer funds to fund, facilitate, or promote abortion, including travel or transportation to obtain an abortion, consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion." Mem. from Acting Dir. of OMB Matthew J. Vaeth to Heads of Exec. Dep'ts and Agencies at 1 (Jan. 24, 2025), https://perma.cc/5JZR-8V9X (OMB Memo). OMB directed federal agencies to "reevaluate all … agency actions in conformity with the policy set out by the" Abortion Order. *Id.* at 2.

The Hyde Amendment is an appropriations rider that limits the use of appropriated funds for abortions, but the rider applies only to funds appropriated to HHS. Pub. L. No. 118-47, div. D, §§ 506, 507, 138 Stat. 460, 703 (Mar. 23, 2024). Other statutes impose similar but not identical restrictions and exceptions on other appropriations for certain other agencies. *See, e.g.*, Pub. L. No. 118-42, §§ 202, 203, 138 Stat. 25, 153 (Mar. 9, 2024) (DOJ); 10 U.S.C. § 1093

(Department of Defense). Congress, however, has imposed no such restriction on HUD's funding.

## B.  HUD and HHS adopt new policies effectuating the President's directives

Following the President's instructions, HUD and HHS began imposing new funding conditions on grants (collectively, New Conditions).[1]

### 1.  *HUD Continuums of Care Grant Conditions*

HUD has adopted a policy of imposing new conditions on grants under its Continuums of Care (CoC) program. The CoC program aims to help people experiencing homelessness move into transitional and permanent housing, and to give them the support they need to remain in housing long-term. 42 U.S.C. §§ 11381–11389. Those grants can support a host of services, such as constructing or rehabilitating housing, providing rental assistance, or offering supportive services such as child care, job training, healthcare, mental health services, trauma counseling, and life skills training. *Id.* §§ 11360(29), 11383(a). It also funds programs that help ensure that tenants in public and subsidized housing can move to a different, safe unit when they suffer domestic violence or sexual assault at home. *Id.* § 11383(a)(13); 34 U.S.C. § 12491(e).

On March 13 HUD Secretary Turner announced in a post on X that HUD was implementing a policy to impose new funding conditions on "HUD's Continuum of Care Program" (HUD CoC Conditions). Scott Turner (@Secretary Turner), X (Mar. 13, 2025, 2:47PM), https://x.com/SecretaryTurner/status/1900257331184570703, captured at https://perma.cc/2PHL-3Q2A; https://perma.cc/LPL2-WK5T. Secretary Turner proclaimed that CoC funds "will not promote DEI, enforce 'gender ideology,' [or] support abortion." *Id.* This

---

[1] For convenience, appended to the end of the brief is a "Glossary of New Conditions" listing all of the challenged New Conditions.

new policy imposes four new conditions relevant in this case. As they read today, the HUD CoC Conditions provide that:

- CoC recipients may not "use grant funds to promote 'gender ideology,' as defined in [the "Gender Ideology" Executive Order]." (HUD "Gender Ideology" Condition);

- CoC recipients must "certif[y]" that they do "not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964" and must "agree that [their] compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of" the False Claims Act. (HUD Discrimination Certification);

- CoC recipients may not use grant funds to "fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment." (HUD Abortion Condition); and

- CoC recipients' use of grant funds and "operation of projects assisted with" grant funds must be "governed by … [a]ll current Executive Orders." (HUD CoC E.O. Condition).

### 2. *HUD Office of Community Planning and Development Grant Conditions*

HUD's Office of Community Planning and Development (CPD) has also imposed new conditions on the grants it administers. CPD develops communities by promoting decent housing, suitable living environments, and expanded economic opportunities for low- and moderate-income people. It does so via the administration of grant programs such as the CoC, Community Development Block Grant (CDBG), Emergency Solutions Grants (ESG), HOME

Investment Partnerships, and Housing Opportunities for Persons with AIDS programs, among others.

Shortly after HUD adopted the HUD CoC Conditions, CPD announced that it will attach new conditions to Fiscal Year 2025 agreements governing all CPD-administered grants (collectively, HUD CPD Conditions). In particular, on June 5, CPD General Deputy Assistant Secretary Claudette Fernandez issued a letter to the executive directors of two organizations representing states and local jurisdictions that administer CPD grant programs (Fernandez Letter). The Fernandez Letter states that "FY2025 grant agreement[s]" from CPD will "emphasize conformity with applicable Administration priorities and executive orders," and it clarifies that, "[u]nder the FY 2025 grant agreement, conformity means" that the recipient will be subject to several enumerated conditions identical to the HUD CoC Conditions, including the HUD "Gender Ideology" Condition, the HUD Discrimination Certification, and the HUD Abortion Condition. Letter from Claudette Fernandez, Acting Dir., CPD Gen. Deputy Assistant Sec'y, to Council of State Cmty. Dev't Agencies and Nat'l Cmty. Dev't Ass'n (June 5, 2025), https://perma.cc/92AE-R3BT.

### 3. *HUD Agency-Wide Conditions*

HUD has also revised its agency-wide policies to effectuate the executive orders. First, it has adopted a policy of requiring grantees to comply with all Executive Orders (General HUD E.O. Condition). In April, HUD added to its General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs (HUD General Requirements) a requirement that "[r]ecipients of Federal Awards must comply with applicable existing and future Executive Orders, as advised by the Department," including but not limited to several specifically enumerated ones including the Anti-DEI Order, the "Gender Ideology" Order, and the Abortion Order, as well as five others. HUD, *General Administrative, National,*

10

*and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs* (revised Apr. 22, 2025), https://perma.cc/K5KJ-L8ZF. HUD includes some or all of these general requirements and terms in its Notices of Funding Opportunities for new grants, and has included the General HUD E.O. Condition in every NOFO since these were added to the general requirements and terms, reflecting its policy of including that requirement in every grant. *See* HUD Funding Opportunities, U.S. Dep't of Hous. & Urb. Dev., https://perma.cc/F7TG-C4ER (archived Aug. 4, 2025).

Second, around May 2025, HUD updated its standard Applicant and Recipient Assurances and Certifications (HUD Certifications) on Form HUD-424-B, which must be submitted as part of any application for HUD funding or post-award submission. The revised HUD Certifications now require applicants and grantees to certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws" (General HUD Anti-DEI Certification). U.S. Dep't of Hous. & Urb. Dev., Form HUD 424-B, Applicant and Recipient Assurances and Certifications, https://perma.cc/23TW-QMCN.

### 4. *HHS Administration for Children and Families Conditions*

HHS's Administration for Children and Families (ACF) has also updated its Standard Terms and Conditions to implement the President's orders. Two new conditions (ACF Standard Conditions) are relevant here.

First, the ACF Standard Terms require grantees on new awards made on or after May 8 to "certify[]" that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" (ACF Anti-DEI Certification). ACF, *Standard*

11

*Terms and Conditions* at 7, https://perma.cc/KSH8-AA5U (ACF Standard Terms).[2] The ACF

Standard Terms specify that "DEI" refers to "diversity, equity, and inclusion" and that "DEIA"

refers to "diversity, equity, inclusion, and accessibility." *Id.* And they define "discriminatory

equity ideology" by reference to an executive order that defines that disfavored view as "an

ideology that treats individuals as members of preferred or disfavored groups, rather than as

individuals, and minimizes agency, merit, and capability in favor of immoral generalizations,"

and then goes on to provide a lengthy, non-exhaustive list of such prohibited "immoral" views.

*See* Exec. Order No. 14190, 90 Fed. Reg. 8853, 8853-8854 (Jan. 29, 2025) (K-12 Order). This

condition threatens FCA liability by providing that "recipients must comply with all applicable

Federal anti-discrimination laws material to the government's payment decisions for purposes of

[False Claims Act section § 3729(b)(4)]." ACF Standard Terms at 7.

Second, for new awards made on or after March 28, 2025, the ACF Standard Terms

require "recipients whose programs are covered by Title IX" to "certify" that they are "compliant

with Title IX of the Education Amendments of 1972 … [and] will remain compliant for the

duration of the Agreement" (ACF Title IX Certification). ACF Standard Terms at 6. This term

also invokes the specter of False Claims Act liability by requiring covered recipients to "certify"

---

[2] On July 29, ACF updated its Standard Terms to revise this condition. The revised condition states that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams." ACF, *Federal Fiscal Year 2025 Standard Terms and Conditions* at 8, https://perma.cc/K2S7-PPX8. The Standard Terms state that the revision is "[e]ffective July 29, 2025, for awards and funded modifications made on or after this date." Plaintiffs will seek a stipulation from Defendants confirming that the prior condition would not apply to any grant of Plaintiffs or their members, some of whom received award notices before July 29, 2025. If the parties reach a satisfactory stipulation, that will resolve the request for preliminary relief with respect to the ACF Anti-DEI Certification (though Plaintiffs would still pursue preliminary relief with respect to the ACF Title IX Certification, which remains unchanged).

that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. *Id.* The ACF Standard Terms make the threat of serious consequences explicit: The recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance" may subject the recipient to "liability under the False Claims Act … and/or criminal liability." *Id.*

The ACF Standard Terms apply to all awards made by ACF, both discretionary and nondiscretionary. *Id.* at 3. This covers a whole host of grant programs that support a wide variety of activities including helping victims of domestic violence, preventing child abuse, providing adoption assistance, expanding child care access, providing energy and home water assistance, and supporting low-income families with children, to name just a few.[3] ACF also administers grants under the Family Violence Prevention Services Act (FVPSA), which Congress passed to assist states in raising public awareness about, and preventing, domestic violence and to provide immediate shelter and other supportive services to victims. 42 U.S.C. § 10401(b). FVPSA grants include grants for State Domestic Violence Coalitions (State Coalitions grants), which Congress directed HHS to award for use in domestic violence intervention and prevention efforts,

---

[3] For example, the Temporary Assistance for Needy Families Grant authorizes block grants to states, which provide funds directly to organizations to provide assistance to needy families, promote job preparation, and more. *See* 42 U.S.C. § 601; *Help for Families,* Admin. for Child. & Fams., Office of Fam. Assistance, https://perma.cc/WV2S-PWKQ (archived Aug. 4, 2025). As another example, ACF administers the Community-Based Child Abuse Prevention (CBCAP) Grant, which makes available funds to community agencies for child abuse and neglect prevention activities and family support programs. *Community-Based Child Abuse Prevention (CBCAP) Grants*, Admin. for Child. & Fams., Children's Bureau (current as of June 15, 2020), https://perma.cc/LW84-G82J .

including by working with service providers and law enforcement to encourage appropriate responses to domestic violence and by conducting public education campaigns, among other things. *Id.* § 10411. They also include formula grants to states, which states then use to make subgrants to entities that carry out programs to prevent domestic violence and provide immediate shelter and supportive services to domestic violence victims. *Id.* §§ 10406, 10408.

FVPSA grant programs reflect a commitment to diversity, equity, and inclusion. For example, the statute specifically requires coalitions to address the needs of "racial and ethnic minority populations and underserved populations" and to provide violence-prevention information "targeted to underserved populations."[4] *Id.* § 10411(d)(3), (8). Similarly, the statute explicitly specifies that state grants can be used to provide "specialized services" to "underserved populations" and "victims who are members of racial and ethnic minority populations." *Id.* § 10406(a)(3).

### 5. *HHS Health Resources & Services Administration Condition*

HHS's Health Resources & Services Administration also revised its general terms and conditions (HRSA General Terms) on May 14 to impose additional conditions. HRSA, *FY 2025 HRSA General Terms and Conditions* (May 14, 2025), https://perma.cc/VLK7-3KB2. The HRSA General Terms "apply to all active awards." *Id.* at 1. The HRSA General Terms require that the terms and conditions of awards flow down to subrecipients. *Id.* at 2.

---

[4] "The term 'underserved populations' means populations who face barriers in accessing and using victim services, and includes populations underserved because of geographic location, religion, sexual orientation, gender identity, underserved racial and ethnic populations, populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age), and any other population determined to be underserved by the Attorney General or by the Secretary of Health and Human Services, as appropriate." 34 U.S.C. § 12291(a)(46); 42 U.S.C. § 10402(14).

The HRSA General Terms include a new condition that applies to "recipients whose
programs are covered by Title IX" (HRSA Title IX Certification). *Id.* at 4 (punctuation altered).
Like the ACF Standard Terms, the HRSA General Terms require covered recipients to "certify"
that they are "compliant with Title IX of the Education Amendments" and Title VI—but further
specifies that the requirement to comply with Title IX "includ[es] the requirements set forth in"
the "Gender Ideology" Executive Order. *Id.* As with the ACF policy, the HRSA General Terms
invoke the specter of False Claims Act liability. HRSA requires covered recipients to "certify"
that these requirements are "material terms of the Agreement"; that "[p]ayments under the
Agreement are predicated on compliance" with Title IX, the "Gender Ideology" Executive
Order, and Title VI, and that the recipient "therefore … is not eligible for funding … absent
compliance with" those requirements; and that the recipient acknowledges that this certification
"reflects a change in the government's position regarding the materiality" of those requirements.
*Id.* The HRSA Title IX Certification also makes the threat of serious consequences explicit:
Recipients must certify that they "acknowledge[] that a knowing false statement relating to
Recipient's compliance with the above requirements and/or eligibility for the Agreement may
subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal
liability, including under 18 U.S.C. §§ 287 and 1001." *Id.*

HRSA administers a host of programs designed to support quality health care for the
nation's highest-need communities, including people with low incomes, people with HIV,
pregnant women, children, parents, rural communities, and transplant patients. HRSA Fact
Sheet, Fiscal Year (FY) 2024 - Nation (data as of Sept. 30, 2024), https://perma.cc/7YHD-Z4Z7.
This includes, for example, the Maternal and Child Health Services Block Grant, which states

use for various programs designed to ensure that mothers and children have access to quality maternal and child health services.

## C. Plaintiffs face an imminent need to decline funds or accept harmful conditions

Plaintiffs now face an imminent requirement to accede to the conditions described above or else decline funding needed to support critical programming.

### 1. HUD grants

Multiple Plaintiffs or their members have recently received, or will soon receive, grant agreements from HUD for new or continuation awards subject to the HUD Conditions. Declaration of Laura Jaworski (Jaworski Decl.) ¶ 11; Declaration of Kim Simmons (Simmons Decl.) ¶ 10; Declaration of Jonathan Yglesias (Yglesias Decl.) ¶ 10(a); Declaration of Amanda Dotson (Dotson Decl.) ¶ 11(a); Declaration of Kelsen Young (Young Decl.) ¶ 15; Declaration of Lucy Rios (Rios Decl.) ¶ 27; Declaration of Krista Colón (Colón Decl.) ¶¶ 11, 15; Declaration of Carianne Fisher (Fisher Decl.) ¶ 15-16; Declaration of Benedict Lessing (Lessing Decl.) ¶ 8; Kramer Decl. ¶ 12. These include grants under the Continuums of Care, Emergency Solutions Grants, and Community Development Block Grants programs—which these organizations use for a wide range of activities. Among these activities are including rapidly rehousing survivors of sexual and domestic violence and their children who cannot safely stay at home, securing housing for people who are unhoused, and offering these people a range of services from helping people navigate mental health or substance use issues to helping them obtain restraining orders. Lessing Decl. ¶ 7; Jaworski Decl. ¶¶ 8-12; Simmons Decl. ¶ 8-9; Declaration of Lisa Guillette (Guillette Decl.) ¶ 11; Declaration of Susan Higginbotham (Higginbotham Decl.) ¶ 10, 14; Yglesias Decl. ¶ 10.a; Fisher Decl. ¶ 12, 15-16; Dotson Decl. ¶¶ 10-14, 13; Declaration of Monique Minkens (Minkens Decl.) ¶ 8-9; Declaration of Michelle McCormick (McCormick Decl.) ¶ 10, Young Decl. ¶ 14; Declaration of David Lee (Lee Decl.) ¶ 15; Colón Decl. ¶¶ 12, 16.

Under the policies HUD has adopted, these grants and others are or will be subject to the HUD Conditions.[5]

Accepting the awards with the HUD Conditions would cause these organizations profound harm. Start with the HUD Discrimination Certification and General HUD Anti-DEI Certification. The requirement to certify compliance with the Administration's novel view of federal nondiscrimination law—and to agree that compliance is material for False Claims Act purposes—will force grantees to change their programming and mission for fear of facing massive liability. *See* Higginbotham Decl. ¶ 46; Jaworski Decl. ¶ 29; Simmons Decl. ¶ 22; Yglesias Decl. ¶¶ 30, 39; Guillette Decl. ¶ 21. While these organizations have always complied with federal antidiscrimination laws and always will, the Anti-DEI Order and statements from DOJ and the HUD Secretary indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all manner of DEI and DEIA activities. Even if the courts ultimately reject the Administration's view of the law, Plaintiffs still bear serious burdens—they must either attempt to comply with the Administration's obviously expansive yet ill-defined view or risk burdensome investigation and enforcement.

This is simply untenable. Plaintiffs' organizational values and missions are rooted in equity and inclusion. *See* Guillette Decl. ¶ 16. Additionally, as required by law, Plaintiffs operate

---

[5] Plaintiffs have already received HUD Grant notices of award that include the HUD CoC Conditions, and the Plaintiffs covered by the court's Temporary Restraining Order needed to accept the earliest of these awards by August 2025. *See* Jaworski Decl. ¶ 11; Simmons Decl. ¶ 10; Yglesias Decl. ¶ 10(a). Others currently receive HUD Grants and expect to receive continuing awards in September 2025 that will be subject to the HUD Conditions. Dotson Decl. ¶ 11(a); Young Decl. ¶ 15. Some received the NOAs for their conditional awards before HUD began imposing the New Conditions, but have not yet received their grant agreements documents, which they expect will include those conditions, and many of which require acceptance within 30 days. McCormick Decl. ¶ 11.

programs that target underserved or marginalized communities, including difficult-to-reach populations and those that require additional support, including immigrants, transgender survivors, racial and ethnic minorities, and men. Higginbotham Decl. ¶ 47; Lessing Decl. ¶ 28; Declaration of Julio Berroa (Berroa Decl.) ¶ 2. Plaintiffs fear that they will face burdensome FCA litigation, or, worse, massive civil liability or even criminal penalties, if they continue to carry out these activities central to their missions. Dotson Decl. ¶¶ 34, 40, 42; Yglesias Decl. ¶ 30; McCormick Decl. ¶ 47; Guillette Decl. ¶ 21; Lessing Decl. ¶ 28.

The prohibition on using grant funds to "promote" "gender ideology" also puts Plaintiffs in an impossible bind. In providing direct client services and technical assistance in HUD-funded programs, Plaintiffs and their member organizations support housing for transgender and nonbinary people, including by using clients' preferred pronouns to demonstrate support and respect for people who do not identify with the sex they were assigned at birth, recognizing gender identity in providing direct assistance, and accommodate the needs of the nonbinary and transgender community in providing housing. Yglesias Decl. ¶ 36; *see* Berroa Decl. ¶ 14; Simmons Decl. ¶ 18; Jaworski Decl. ¶ 25; Lessing Decl. ¶ 30; Dotson Decl. ¶ 37; Young Decl. ¶ 39. Indeed, HUD regulations *require* CoC grantees to serve people in accordance with their gender identity. *See* 24 C.F.R. § 5.106. Complying with this condition would directly conflict not only with these organizations' missions and organizational values, Yglesias Decl. ¶ 40; Berroa Decl. ¶ 14, but with their ethical obligations to their clients, Guillette Decl. ¶ 17 ("Complying with this condition may force us to choose between federal funding and ethical obligations to the youth we serve."). Plaintiffs and their members do not know if or how they can comply with the HUD regulations while simultaneously complying with the funding condition not to "promot[e] gender ideology."

In addition, the HUD Abortion Condition would harm Plaintiffs, which do not offer abortion care themselves but routinely refer people to healthcare services that may include abortion care. Simmons Decl. ¶ 19; Jaworski Decl. ¶ 26; Guillette Decl. ¶ 18; Lessing Decl. ¶ 30; Dotson Decl. ¶ 38; Young Decl. ¶ 40. For instance, as part of the "wraparound" supportive services that Pennsylvania Coalition's HUD grant provides to survivors, if a client receiving rental assistance indicates to an advocate that she needs a referral for abortion care, the Pennsylvania Coalition provides that referral. Higginbotham Decl. ¶ 51. Similarly, the Virginia Action Alliance's members make referrals to reproductive healthcare services when a pregnant survivor wishes to terminate a pregnancy. Yglesias Decl. ¶ 37. These services are particularly important to survivors of domestic violence and sexual assault: because reproductive and sexual coercion are common tactics of abuse, access to abortion care can be essential for survivors' safety and autonomy. Higginbotham Decl. ¶ 51; *see* Yglesias Decl. ¶ 37.

Finally, Plaintiffs would be harmed by agreeing to the HUD CoC E.O. Condition and General HUD E.O. Condition. Plaintiffs do not know what this condition's broad and vague language means for their organizations or how to comply with it, given the many new executive orders that it implicates, the broad and vague language of those orders, and the reality that many of the referenced orders imply that providers should exclude certain populations from their services. Simmons Decl. ¶ 20; Higginbotham Decl. ¶ 52; Yglesias Decl. ¶ 38; Guillette ¶ 15; Dotson Decl. ¶ 39; Young Decl. ¶ 41. This Condition, moreover, would require compliance with the Anti-DEI Order and "Gender Ideology" Order—which would cause the same harms as complying with the related HUD Conditions, as described above.

But the alternative of declining the funds is no alternative at all: Given the critical programs that HUD funds support, declining the awards is hardly an option. Plaintiffs use HUD

awards to provide rental assistance to victims of domestic violence and sexual assault and individuals and families experiencing homelessness, to fund permanent supportive affordable housing, to offer on-site intensive case management to residents with mental health challenges and substance use disorders and other supportive services, and to conduct street outreach to homeless adults and children. *See* Lessing Decl. ¶ 10; Jaworski Decl. ¶¶ 8–12; Simmons Decl. ¶¶ 8–9; Guillette Decl. ¶ 11; Rios Decl. ¶ 27; Higginbotham Decl. ¶ 16; Fisher Decl. ¶ 12, 16; Kramer Decl. ¶ 14. They also use HUD grants to rapidly rehouse survivors of sexual and domestic violence, including by providing short-term and medium-term rental assistance to survivors and their children who are experiencing homelessness. Higginbotham Decl. ¶ 10, 14; Yglesias Decl. ¶ 10.a; *see also* Fisher Decl. ¶ 12; Dotson Decl. ¶ 10–14; Minkens Decl. ¶ 8–9; McCormick Decl. ¶ 10, Young Decl. ¶ 14. Some use HUD grants to provide emergency shelter or support operations for emergency domestic violence shelters, including by funding employees who do things like answer a 24-hour help line and provide help obtaining restraining orders, and by covering expenses for facility security, utilities, and food. Fisher Decl. ¶ 15–16; Dotson Decl. ¶ 13(f), (g); Lee Decl. ¶ 15; Colón Decl. ¶¶ 12, 16.

If Plaintiffs or their members turned down the HUD grants, these critical services would be at risk. Plaintiffs and their members would have to reduce programming and lay off staff. Simmons Decl. ¶ 11 (RICEH would need to lay off the majority of its staff, reducing a staff of 28 to about 7); Lee Decl. ¶ 15; Fischer Decl. ¶ 18; Rios Decl. ¶ 28; Colón Decl. ¶ 16; Higginbotham Decl. ¶ 12; Lessing Decl. ¶¶ 11, 25; Guillette Decl ¶¶ 12-13; Dotson Decl. ¶ 11.b. This would have a devastating impact on the people that Plaintiffs and their members serve: Without funding dedicated to the operating costs of their emergency shelters, Plaintiffs would be forced to cut services. They would have to turn people away, including youth experiencing homelessness who

20

are in urgent need of shelter and support, and more survivors and their children would be forced to remain in abusive situations. Dotson Decl. ¶ 13(g); Fisher Decl. ¶ 18; *see* Guillette Decl. ¶ 14. This would also have a devastating impact on the staff members who are terminated, many of whom may be themselves survivors or peers to the clients that their organizations serve. *See* Jaworski Decl. ¶ 33 ("To rip them away from their employment and pitch them back into financial and possible housing stability would be a remarkably cruel twist of fate.").

Similarly, turning down funds that support rental assistance would put people at risk of imminent eviction and homelessness. Higginbotham Decl. ¶¶ 11–12, 14; Yglesias Decl. ¶ 10(a); Lessing Decl. ¶ 11; Dotson Decl. ¶ 12(b); Young Decl. ¶ 16; Rios Decl. ¶ 28 ("Because these households are very low income, paying the full rent will be impossible and people will be evicted."). And Plaintiffs would have to terminate the supportive services on which their clients rely, including case-management services for residents with mental health challenges and substance abuse disorders, and the provision of utility assistance, legal support, and emergency food. *See* Jaworski Decl. ¶ 11; Simmons Decl. ¶ 11; Dotson Decl. ¶¶ 11(b), 13(e); Lee Decl. ¶ 15.

### 2.   *HHS ACF grants*

Plaintiffs the Rhode Island Coalition; the California Partnership; the D.C. Coalition; End Abuse Wisconsin; the Idaho Coalition; the Iowa Coalition; JDI; the Kansas Coalition; the Montana Coalition, the Oregon Coalition, the Pennsylvania Coalition; VALOR; Violence Free Minnesota; and the Virginia Coalition, have each regularly received the Family Violence Prevention and Services State Domestic Violence Coalition Grants (FVPSA Coalition Grant), many for decades. Colón Decl. ¶ 25; Dalton Decl. ¶ 16; Minkens Decl. ¶¶ 19–21; Declaration of Tai Simpson-Bruce (Simpson-Bruce Decl. ¶ 13); Faisal Decl. ¶ 20-21; Sarang-Sieminski Decl. ¶¶ 20–21; Moran-Kuhn Decl. ¶ 19; Fisher Decl. ¶¶ 26–27; Rios Decl. ¶¶ 35–36; Kramer Decl.

¶¶ 16–17; Yglesias Decl. ¶¶ 16–17. Each of these coalitions has used the FVPSA Coalition Grant

to strengthen the capacity of domestic violence and sexual assault programs in their states

through a comprehensive approach centered on training, technical assistance, needs assessment,

and collaboration. *See* Colón Decl. ¶ 26; Sarang-Sieminski Decl. ¶ 21; Moran-Kuhn Decl. ¶ 20;

Simpson-Bruce Decl. ¶ 14; Dalton Decl. ¶ 16; Rios Decl. ¶¶ 36–38; Faisal Decl. ¶¶ 20–21;

Kramer Decl. ¶ 17.

Each Coalition recently received a FVPSA Coalition Grant that is subject to the ACF

Anti-DEI Certification, which requires grantees to certify that they do not promote "DEI,"

"DEIA," or "discriminatory equity ideology" in violation of federal antidiscrimination laws.

Colón Decl. ¶ 22; Sarang-Sieminski Decl. ¶ 21; Moran-Kuhn Decl. ¶ 21; Simpson-Bruce Decl.

¶ 15; Dalton Decl. ¶ 17; Minkens Decl. ¶ 21; Rios Decl. ¶ 39; Kramer Decl. ¶ 18; Yglesias Decl.

¶ 18. Some Coalitions now covered by the TRO granted in this case needed to accept these

awards by drawing down funds as soon as August 2025, due to cash-flow needs to support their

personnel and operating costs. Sarang-Sieminski Decl. ¶ 22 (must draw down by August 15);

Moran-Kuhn Decl. ¶ 21 (must draw down by August 1); Simpson-Bruce Decl. ¶ 15 (must draw

down by August 1). Others must also draw down in the coming months, none later than October

2025. Fisher Decl. ¶ 29; Faisal Decl. ¶ 22; Yglesias Decl. ¶ 18.

In addition, Plaintiff Coalitions and their members receive FVPSA funds as pass-through

funds from state entities, which states receive from HHS through ACF. Akins Decl. ¶¶ 24, 25;

*see also* Dalton Decl. ¶ 23–24; Minkens Decl. ¶ 26–27; Faisal Decl. ¶ 25; Sarang-Sieminski

¶ 31; McCormick Decl. ¶¶ 40–41; Higginbotham Decl. ¶ 33; Colón Decl. ¶¶ 34, 39; Lee Decl.

¶ 31; Dotson Decl. ¶¶ 12–14. Plaintiffs and their members use FVPSA pass-through funds to

provide emergency shelter to domestic violence victims, provide services to non-residential

clients, and support crisis hotlines. Akins Decl. ¶¶ 24, 25; *see also* Dalton Decl. ¶¶ 23–24; Minkens Decl. ¶¶ 26–27; Faisal Decl. ¶ 25. And Plaintiff Coalitions may both receive FVPSA pass-through funds and themselves pass those funds to local programs, including making grants for culturally specific projects. Higginbotham Decl. ¶ 41. Some of these organizations received conditional grant awards in May 2025 and expect to soon receive grant agreement documents that will be subject to the ACF Standard Terms. Akins Decl. ¶¶ 23, 24. Others that have historically received this pass-through funding expect the Standard Terms to apply to continuation awards and new awards. Dalton Decl. ¶ 24; Faisal Decl. ¶ 25; Sarang-Sieminski Decl. ¶ 34; Lee Decl. ¶ 34; Dotson Decl. ¶ 29(a). And still others that currently receive FVPSA pass-through funds expect to reapply for those grants as early as August or September 2025. McCormick Decl. ¶ 41; Minkens Decl. ¶ 25; Dotson Decl. ¶ 27(a) .

Finally, Plaintiffs' members also receive various additional grants through other ACF Grant Programs, including the Temporary Assistance for Needy Families Program, the Community-Based Child Abuse Prevention Program, and others. Colón Decl. ¶ 38; Rios Decl. ¶ 61; Lee Decl. ¶ 32. Because ACF administers these grants, they will be subject to the ACF Standard Terms. Plaintiff D.C. Coalition, for instance, receives a FVPSA discretionary grant to fund domestic violence survivor shelters, and its next award for that two-year grant will be subject to the conditions. Dalton Decl. ¶ 18.

Agreeing to the ACF Anti-DEI Certification and the Title IX Certification would harm Plaintiffs that receive ACF funds—whether through Coalition Grants, FVPSA pass-through funding, or any other ACF Grant Program. First, agreeing to the Anti-DEI Certification would impede Plaintiffs' ability to conduct their work in accord with their missions, which grounds their work in understanding that racism, homophobia, transphobia, ableism, and other forms of

oppression are intertwined with gender-based violence and directly impact access to safety,

healing, and justice. Sarang-Sieminski Decl. ¶ 37; *see also* Simpson-Bruce Decl. ¶ 18; Moran-

Kuhn Decl. ¶ 33; Dalton Decl. ¶ 27; Minkens Decl. ¶ 30–31; Rios Decl. ¶ 64; Faisal Decl. ¶ 28;

Yglesias Decl. ¶ 29. Organizations would have to radically change their activities to avoid

risking noncompliance with the ACF Anti-DEI Condition, including by "fundamentally

alter[ing]" programs in a way that undermines their ability to serve underserved populations and

runs contrary to their values. Faisal Decl. ¶ 36; McCormick Decl. ¶ 54; Sarang-Sieminski Decl.

¶ 39; Colón Decl. ¶ 47; Minkens Decl. ¶ 32-33; Yglesias Decl. ¶ 31. For instance, JDI Member

The Network/La Red is an LGBTQ+ organization whose mission is to serve LGBTQ+ survivors

of partner abuse across Massachusetts. Sarang-Sieminski Decl. ¶ 32. To avoid the risk of

violating this funding condition, they would have to "fundamentally change [] hiring practices,

organizational culture, the communities they serve, and their programming." Sarang-Sieminski

Decl. ¶ 33; *see also* Higginbotham Decl. ¶ 43 (member uses FVPSA funds for a culturally

specific project); Faisal Decl. ¶ 39 (under prohibitions on DEIA programs, Iowa Coalition is

unsure whether it can provide programming targeting addiction, which qualifies as a disability).

In addition, Plaintiffs are concerned that agreeing to the Title IX Certification would

result in victims who are transgender or gender-nonconforming being turned away from services.

Fisher Decl. ¶ 47; Simpson-Bruce ¶ 23; Dalton Decl. ¶ 27; Minkens Decl. ¶ 35; Rios Decl. ¶ 69.

Some plaintiffs are uncertain, for example, whether they may continue operating K–12 and

college campus programs that use gender-selective groups—organized by identity and

expression rather than biological sex—for programing on how rigid gender-norm conformity can

be a violence risk factor. Yglesias Decl. ¶ 34. Others are concerned that this condition could

prohibit their organization from accommodating the needs of transgender and nonbinary

survivors, including by allowing them to use the bathroom that aligns with their gender identity. Higginbotham Decl. ¶ 49; *see* Colón Decl. ¶ 51.

But turning down HHS ACF grants is not an option for Plaintiffs or the people they serve. Without the FVPSA Coalition Grant, for example, domestic violence coalitions would be forced to lay off staff members and to stop providing a range of core programs to build member capacity to address survivors' needs. Colón Decl. ¶ 27; Sarang-Sieminski Decl. ¶ 23; Moran-Kuhn Decl. ¶ 22; Simpson-Bruce Decl. ¶ 16; Fisher Decl. ¶ 30; Minkens Decl. ¶ 23; Rios Decl. ¶ 40; Faisal Decl. ¶ 24; Yglesias ¶ 19. Each coalition's ability to function would be compromised, leaving communities of survivors and their state's survivor-advocate workforce without the support they need and impeding the coalitions' missions of serving as statewide organizations supporting domestic violence providers. *See, e.g.,* Faisal Decl. ¶ 24; Rios Decl. ¶ 40 (capacity to function as a statewide organization "would be compromised, making us less effective as a coalition and the leading authority and voice on domestic violence in the state").

Similarly, losing the FVPSA pass-through grants would require Plaintiffs to cut staff and significantly reduce programming, harming survivors and their communities. Colón Decl. ¶¶ 17, 40; Akins Decl. ¶ 25; Dalton Decl. ¶ 25; Faisal Decl. ¶ 26; Higginbotham Decl. ¶ 43; Lee Decl. ¶ 35. D.C. Member Doe, for instance, would need to reduce social services for victims, "undo[ing] progress made in hiring and retaining experienced staff to provide ongoing, long-term services to survivors" during a time of increased need among the community, and putting "survivors and their dependents []at risk of remaining in cycles of violence." Dalton Decl. ¶ 25.

### 3. *HHS HRSA grants*

Plaintiffs and Plaintiff Coalitions' members also receive grants administered by HRSA, passed through state and local governments. The Community Care Alliance receives funding from the Ryan White HIV/AIDS Program administered by HRSA and passed through the State

of Rhode Island. Lessing Decl. ¶ 24. The organization uses this funding to provide "non-medical case management, nutrition support, transportation, food pantry/served meals, rehabilitative services, and emergency financial assistance" to over 70 individuals with HIV in Rhode Island. *Id.* ¶ 24. The D.C. Coalition receives Maternal and Child Health grants, which they use for many purposes including "engaging schools to implement age-appropriate education on healthy and unhealthy relationships" and educating "school-based mental health counselors on how to screen for domestic violence in a manner a survivor would feel comfortable disclosing harm." Dalton Decl. ¶ 21.

Each of these grants will be subject to HRSA funding conditions, including HRSA Title IX Certification. The D.C. Coalition, for instance, anticipates receiving a notice of award for continued Maternal and Child Health grant funding later this year. Dalton Decl. ¶ 20. Declining HRSA grant funding would mean Community Care Alliance would be unable to provide direct services to over 70 clients, Lessing Decl. ¶ 24, and would jeopardize the D.C. Coalition's programming. Dalton Decl. ¶¶ 20-21, 31.

But accepting the HRSA funding conditions also would harm Plaintiffs and their communities. Community Care Alliance worries that complying with the requirements of the "Gender Ideology" order will interfere with its practice of "recogniz[ing] gender identity in providing direct assistance" and "us[ing] clients' preferred pronouns to demonstrate support" for their clients. Lessing Decl. ¶ 29. And the D.C. Coalition fears it would need to turn transgender clients away. *See* Dalton Decl. ¶ 30.

## LEGAL STANDARD

The Administrative Procedure Act authorizes courts to "to postpone the effective date of an agency action or issue all necessary and appropriate process to preserve status or rights

pending conclusion of the review proceedings" when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Courts also have equitable authority to grant a preliminary injunction. *See* The Judiciary Act, § 11, 1 Stat. 73, 78 (1789). The same standards apply to both types of preliminary relief. *See New Hampshire Hosp. Ass'n v. Burwell*, No. 15-CV-460-LM, 2016 WL 1048023, at *5 n.6. (D.N.H. Mar. 11, 2016).

To obtain preliminary relief of either type, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is the opposing party, the final two factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009). The "most important" factor "is whether the movant has demonstrated a likelihood of success on the merits," but the court need only assess "probable outcomes" and "need not conclusively determine the merits of the underlying claims." *New York v. Kennedy*, No. 25-cv-196, --- F. Supp. 3d ----, 2025 WL 1803260, *2 (D.R.I. July 1, 2025). And irreparable injury operates on "a sliding scale" such that "the greater the likelihood [of success], the less harm must be shown." *Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47, 49 (D.R.I. 2023) (citing *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010)).

## ARGUMENT

Plaintiffs are likely to prevail on their claims that the unauthorized and ill-considered New Conditions are unlawful. Those New Conditions threaten imminent irreparable harm to Plaintiffs who either have received or will receive grants subject to them in the coming months. Plaintiffs recently received or expect to receive new grant agreements covered by the New Conditions that Defendants have adopted and will have to draw down funds under those grants to

support critical activities—and, absent relief, will be forced to accept the unlawful conditions if they do. The balance of equities and public interest weigh decisively against such a result.

## I. Plaintiffs Are Likely To Succeed On the Merits of Their Claims

### A. The New Conditions violate the APA

The New Conditions are reviewable "final agency action" that violate the APA in myriad ways. Plaintiffs are likely to succeed on their claims that the New Conditions must be set aside as "in excess of statutory, jurisdiction, authority, or limitations," "contrary to law," "arbitrary [and] capricious," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. §§ 704, 706(2)(A)–(C).[6]

#### 1. The New Conditions are final agency action

The New Conditions are final agency action reviewable under the APA. In a recent case challenging the HUD CoC Conditions, the government did "not dispute … the new funding conditions … are 'final agency action.'" *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814, 2025 WL 1582368, at *14 n.18 (W.D. Wash. June 3, 2025), *appeal pending*, No. 25-3664 (9th Cir.). That was for good reason. Those conditions, as well as the others at issue here, are straightforwardly final agency action.

For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). The HUD CoC Conditions, HUD CPD Conditions, General HUD E.O. Condition, General HUD Anti-DEI Certification, ACF Standard Conditions, and HRSA Title IX Certification mark the consummation of Defendant's decisionmaking process. Secretary Turner's

---

[6] The multiple constitutional problems with the New Conditions provide grounds for relief both under the APA and as independent claims, as discussed in sections I.B–I.D below.

post on X and the Fernandez Letter, respectively, make clear that HUD has made a final decision that, going forward, it will impose the CoC Conditions on CoC Grants and the HUD CPD Conditions on grants administered by the Office of Community Planning and Development. Scott Turner (@Secretary Turner), X (Mar. 13, 2025, 2:47PM), https://x.com/SecretaryTurner/status/1900257331184570703, captured at https://perma.cc/2PHL-3Q2A; https://perma.cc/LPL2-WK5T. And, in fact, HUD has issued awards to Plaintiffs incorporating those Conditions. Higginbotham Decl. ¶ 12; Jaworski Decl. ¶ 11; Simmons Decl. ¶ 9; Yglesias Decl. ¶ 10; Lessing Decl. ¶ 8. HUD also made a final decision to impose the General HUD E.O. Condition on all grants, as evidenced by that condition's inclusion in all notices of funding opportunity posted since HUD revised the HUD General Requirements to include that condition. And it has similarly made a final decision to impose the General HUD Anti-DEI Certification on all grantees, as reflected in the updated Form HUD-424-B on Applicant and Recipient Assurances and Certifications.

Likewise, by adopting the updated ACF Standard Terms, ACF has made final decisions to impose those conditions on those components' grants, and in fact has issued awards to Plaintiffs that incorporate those policies' conditions. Akins Decl. ¶ 19; McCormick Decl. ¶¶ 25, 37; Young Decl. ¶ 28; Moran-Kuhn Decl. ¶¶ 29-30; Dotson Decl. ¶ 20. So too for the HRSA Title IX Condition, which HRSA adopted in its General Terms.

These Conditions also determine rights or obligations and produce legal consequences. They preclude organizations from receiving an award if they do not agree to the conditions, and once agreed to, they constrain grantees' conduct and subject grantees to possible FCA liability.

### 2. *The New Conditions exceed Defendants' statutory authority*

The New Conditions exceed Defendants' statutory authority. For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively

prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *accord, e.g.*, *New York v. Kennedy*, 2025 WL 1803260, at *2 ("Administrative agencies … possess only the authority that Congress has provided." (quotations omitted)). "Any action that an agency takes outside the bounds of its statutory authority … violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

**HUD CoC Conditions.** Nothing in the Homeless Assistance Act nor any other statute authorizes HUD to impose the HUD CoC Conditions, as another district court recently held. *See King Cnty.*, 2025 WL 1582368, at *15. The Homeless Assistance Act attaches various conditions to CoC Grants—such as requirements that grantees "monitor and report to the Secretary the progress of the project," "ensure … that individuals and families experiencing homelessness are involved" in the project, and "monitor and report" the receipt of any matching funds. 42 U.S.C. § 11386(b). But Congress has not authorized the executive branch to impose additional substantive conditions designed to advance policy goals wholly unrelated to the Homeless Assistance Act's purposes and requirements. *See California v. U.S. Dep't of Transp.*, No. 1:25-cv-00208, --- F. Supp. 3d ----, 2025 WL 1711531, at *2 (D.R.I. June 19, 2025) (holding that federal agency lacked authority "to impose immigration enforcement conditions on federal dollars specifically appropriated for transportation purposes"). Nor did Defendants identify any such authority in adopting the conditions.

**HUD CPD Conditions.** By the same token, no statute authorizes HUD to impose the HUD CPD Conditions on grants administered by HUD's Office of Community Planning and Development. Defendants identified no such authority in adopting the conditions.

**General HUD E.O. Condition and General HUD Anti-DEI Certification.** Likewise, no statute authorizes HUD to require grant recipients to comply with all executive orders or to agree to the General HUD Anti-DEI Certification. Defendants identified no such authority in adopting the conditions.

**ACF Anti-DEI Certification, ACF Title IX Certification, and HRSA Title IX Certification.** Similarly, no statute authorizes HUD to impose the General HUD Anti-DEI Certification on HUD grants across the board. Nor does any statute authorize HHS or ACF to impose the ACF Anti-DEI Certification or ACF Title IX Certification on ACF grants, or authorize HHS or HRSA to impose the HRSA Title IX Certification on HRSA grants. Defendants have not identified any such authority in adopting the conditions.

### 3. The New Conditions are arbitrary and capricious

The New Conditions are also arbitrary and capricious. Under arbitrary and capricious review, courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). To pass muster, an agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In assessing the reasonableness of an agency's explanation for its action, "the Court must look to 'the grounds that the agency invoked when it took the action.'" *New York v. Kennedy*, 2025 WL

1803260, at *14 (quoting *Michigan v. EPA*, 576 U.S. 743, 758, (2015)). The New Conditions fail on multiple fronts.

Defendants' imposition of the New Conditions fails the most basic requirement of agency decision-making: the Conditions "have not been explained at all," as another district court considering the HUD CoC Conditions recently held. *King Cnty.*, 2025 WL 1582368, at *17. Defendants provided no explanation for their actions, much less "a satisfactory explanation for [their] action, including a rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292 (quotations omitted).

Defendants' adoption and implementation of the New Conditions is also arbitrary and capricious because they did not consider the "serious reliance interests" of grantees and the members of the public they serve, which are jeopardized by the New Conditions. *See DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020). The Supreme Court has made clear that the failure to "consider[] potential reliance interests"—standing alone—renders agency action arbitrary and capricious. *Id.* Specifically, an agency is "*required* to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33 (emphasis added). There is no indication Defendants did that here—and no apparent consideration of the reliance interests of Plaintiffs, their members, similar organizations, and most importantly the people they all serve. The failure to consider reliance interests is also particularly egregious here given that, in many instances, Defendants are imposing the conditions in the middle of the period of performance for grantees, not in connection with a new award where the grantee at least knew of the condition upon receiving the initial award. *See* Moran-Kuhn Decl. ¶ 21; Higginbotham Decl. ¶ 21; Sarang-

Sieminski Decl. ¶ 22. These grantees have been counting on continued receipt of this funding to carry out their ongoing, mission-critical activities.

Defendants have also failed to "show that there are good reasons for the new policy," and, for some conditions, even fail to "display awareness" that the New Conditions are a change in policy at all. *FCC*, 556 U.S. at 515. While some conditions "make reference to certain Executive Orders," the "rote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relation to the agency's underlying action—does not constitute 'reasoned decisionmaking.'" *Id.*; *accord, e.g.*, *Louisiana v. Biden*, 622 F. Supp. 3d 267, 295 (W.D. La. 2022) ("A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order.").

Defendants did not consider multiple other "important aspects of the problem," as well. *State Farm*, 463 U.S. at 43. Defendants did not consider how funding conditions advancing unrelated policy goals would impact the efficacy of grant programs or hinder efforts to address homelessness, provide safety for domestic violence survivors, prevent sexual violence, or further any of the other myriad purposes for which Congress established grant programs now subject to the New Conditions. Nor did they consider how deterring grantee efforts to engage with and support particular communities—as the DEI-related conditions threaten to do—will effectively exclude those communities from the benefits of the funded programs.

Finally, Defendants did not consider or explain how the conditions barring and deterring "DEIA"-related activity can be reconciled, for example, with Congress's express authorization for programs focused on "economically disadvantaged and minority students" (for CDBG grants administered by HUD's CPD, *see* 42 U.S.C. § 5307(c)) or for programs targeted toward

underserved populations and racial and ethnic minorities (for FVPSA grants, *see id.* §§ 10406(a)(3), 10411(d)(3), (8)). Nor did they consider or explain how the "gender ideology"-related conditions discussed above square with the binding regulations requiring grantees to serve individuals in accordance with their gender identity. *See infra* section I.A.4.

### 4. *Various New Conditions are contrary to law*

In addition to exceeding Defendants' statutory authority, multiple New Conditions are contrary to law. For one, the HUD "Gender Ideology" Condition in the HUD CoC Conditions and HUD CPD Conditions, as well as the HUD CoC E.O. Condition and General HUD E.O. Condition, outright conflict with a binding agency regulation. It is well established "that agencies must comply with their own regulations." *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015). Agency action that violates a regulation is "contrary to law" in violation of the APA. *Colorado v. Dep't of Health & Human Servs.*, --- F. Supp. 3d ----, 2025 WL 1017775, *2 (D.R.I. Apr. 5, 2025).

Binding HUD regulations require grantees to recognize and respect individuals' gender identity. Among other things, HUD regulations provide that, for CoC (and other) grants, recipients must provide individuals with equal access to shelters and other services "in accordance with the individual's gender identity" and must place and serve individuals "in accordance with the[ir] gender identity." 24 C.F.R. § 5.106(b)(1)-(2); *see also id.* §§ 5.106(b)(3), (c).

The HUD "Gender Ideology" Condition, HUD CoC E.O. Condition, and General HUD E.O. Condition conflict with that rule. The "Gender Ideology" Condition bars grantees from "promoting gender ideology" as defined in the "Gender Ideology" Order—an order that proclaims that there are only "two sexes, male and female," and that categorically rejects as "false" the idea that a person can have a gender identity distinct from their biological sex.

"Gender Ideology" Order § 2. Relatedly, the HUD CoC E.O. Condition and General HUD E.O. Condition require compliance with all executive orders—and thus require grantees to follow the "Gender Ideology" Order. These requirements all appear to require grantees to deny individuals' gender identity and to instead serve people in accordance with their "biological sex" as defined under the executive order. That flies in the face of the regulation, which unequivocally requires grantees to recognize individuals' gender identity and to serve them in accordance with it, not their biological sex. *See* 24 C.F.R. § 5.106.

Similarly, the ACF Title IX Certification contravenes HHS regulations barring discrimination on the basis of gender identity in programs and activities funded under FVPSA. In particular, 45 C.F.R. § 1370.5(a) provides that "no person shall on the ground of actual or perceived sex, including gender identity, be excluded from participation in, be denied the benefits of, or be subject to discrimination under, any program or activity funded in whole or in part through FVPSA." Instead, "as with all individuals served, transgender and gender nonconforming individuals must have equal access to FVPSA-funded shelter and nonresidential programs" and must be offered "an assignment consistent with their gender identity." 45 C.F.R. § 1370.5(a)(4). Given the Administration's view of Title IX as reflected in the "Gender Ideology" Order, the ACF Title IX Certification would require grantees to exclude transgender people from single-sex places that align with their gender identity—in violation of these regulatory requirements.

In addition, the DEI-related certifications are contrary to law. The General HUD Anti-DEI Certification conflicts with statutes authorizing use of CDBG grant funds to assist "economically disadvantaged and minority students" and "historically Black colleges" and

conditioning certain grants on recipients' success in providing "equal opportunity in housing and employment for" minority groups and others. 42 U.S.C. §§ 5307(b)(2), (c), 5318(a)-(b).

Similarly, the ACF Anti-DEI Certification—requiring grantees to certify that they do not engage in DEI, DEIA, or "discriminatory equity ideology" in violation of federal nondiscrimination laws—conflicts with various statutory provisions that expressly contemplate grants promoting diversity, equity, and inclusion. In particular, various statutory provisions authorize grants targeting "underserved populations"—a group that Congress defined to include those who face barriers to accessing and using victim services, including because of their "religion, sexual orientation, gender identity," race or ethnicity, disabilities, or "alienage status"—as well as grants involving "culturally specific" services or organizations "primarily directed toward racial and ethnic minority groups." *See* 34 U.S.C. §§ 12291(a)(8), (46) (defining "underserved populations" and "culturally specific"); *id.* § 10406(a)(3) (authorizing grants "to provide specialized services for … underserved populations[] and victims who are members of racial and ethnic minority populations"); *id.* § 10411(d)(3) (requiring grantees to address the needs of victims "who are members of racial and ethnic minority populations and underserved populations"). These provisions conflict with the ACF Anti-DEI Certification—which the Administration would apparently understand to bar grantees, in nearly all circumstances, from "[u]sing race, sex, or other protected characteristics for … resource allocation"—precisely what these statutory provisions contemplate. *See* Bondi Discrimination Memo at 2.

## B. The New Conditions violate multiple constitutional provisions safeguarding the separation of powers

The New Conditions also violate the Spending Clause and other constitutional provisions safeguarding the separation of powers. As court after court has recognized, imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's]

36

policy objectives strikes at the heart of … the separation of powers." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) (holding that the executive branch violated separation of powers by conditioning federal funding on recipients' facilitating immigration enforcement).[7] Defendants have done precisely that here. As explained above, *supra* section I.A.1, Congress has not authorized Defendants to impose the New Conditions. In doing so anyway, Defendants have exceeded their constitutional authority and encroached on Congress's power to control federal spending, in violation of foundational separation-of-powers principles.

The Constitution "exclusively grants the power of the purse to Congress, not the President." *Colorado v. U.S. Dep't of Health & Human Servs.*, No. 1:25-cv-00121, 2025 WL 1426226, at *18 (D.R.I. May 16, 2025) (quoting *City & Cnty. of S.F.*, 897 F.3d at 1231); *see also* U.S. Const., art. I, § 1 (Spending Clause); *id.,* art. I, § 9, cl. 7 (Appropriations Clause). Among the "legislative powers" the Constitution vests in Congress, *see* U.S. Const., art. I, § 1, is the authority to distribute funds to states and private entities to promote "the general welfare" under the Spending Clause, *id.*, art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). And because "the ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare," *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021), the executive branch

---

[7] *See also, e.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231, 1234–35 (9th Cir. 2018) ("withhold[ing] all federal grants from so-called 'sanctuary' cities and counties" violated separation of powers); *King Cnty.*, 2025 WL 1582368, at *6, 15–17 ("gender ideology" and anti-DEI funding conditions violated separation of powers); *PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, --- F. Supp. 3d ----, 2025 WL 685124, at *14–21 (D. Md. Mar. 4, 2025) (conditioning funding on recipients' denying gender-affirming care violated separation of powers); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261–63 (W.D. Wash. 2025) ("gender ideology" funding conditions violated separation of powers).

may not impose conditions on the distribution of funds that Congress has not authorized, *see Colorado*, 2025 WL 1426226, at *18.

The executive branch's role, rather, is to implement Congress's spending directives and to "take care that the laws be faithfully executed," U.S. Const., art. II, § 3. "When it comes to spending, the President has none of his own constitutional powers to rely upon" and can only exercise authority Congress has delegated. *City & Cnty. of S.F.*, 897 F.3d at 1233–34. He has no power, moreover, "to enact, to amend, or to repeal statutes" on his own. *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998); *see also* U.S. Const., art. I, § 7, cl. 2 (Presentment Clause).

Here, Defendants have usurped Congress' exclusive power to impose conditions on federal funding under the Spending Clause. Congress did not prescribe the New Conditions or authorize the executive to adopt these conditions. Defendants thus *unconstitutionally* "claim[] for [themselves] Congress's exclusive spending power" and "attempt[] to coopt Congress's power to legislate." *See City and Cnty. of S.F.*, 897 F.3d at 1234; *see also PFLAG, Inc.*, 2025 WL 685124, at *21 (concluding that executive order "unilaterally" imposing funding conditions unconstitutionally "circumvent[ed] bicameralism and presentment").

At bottom, the Founders established our system of separated powers to guard against "a concentration of power [that] would allow tyranny to flourish." *City of Chicago*, 961 F.3d at 892. In that system, "the power to wield the purse to alter behavior rests squarely with the legislative branch"—whose "elected representatives and dual chambers [] provide[] institutional protection from the abuse of such power." *Id.* That "institutional protection from abuse" would disappear if the executive branch could "impose [its] policy preferences regardless of the will of Congress." *Id.* Defendants' attempt to leverage federal funding "to effectuate [the executive's] own policy goals" thus violates the separation of powers. *See City & Cnty. of S.F.*, 897 F.3d at 1235.

### C. Multiple New Conditions violate the First Amendment

Multiple conditions implementing the President's Anti-DEI Order—the HUD Discrimination Certification in the HUD CoC Conditions and HUD CPD Conditions and the ACF Anti-DEI Certification (collectively, DEI-related Certifications)—as well as the HUD "Gender Ideology" Condition, violate the First Amendment's protection of "the freedom of speech," U.S. Const. amend. I.

While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Crucially, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Nor may it leverage government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998). And imposing a funding condition "not relevant to the objectives of the program" can also violate the First Amendment. *Open Soc'y*, 570 U.S. at 214. The DEI-related certifications and "Gender Ideology" Condition transgress these limits.

***DEI-related certifications.*** The HUD Discrimination Certification in the HUD CoC Conditions and HUD CPD Conditions and the ACF Anti-DEI Certification impermissibly restrict speech "outside the scope of the federally funded program," *Open Soc'y*, 570 U.S. at 217. Those requirements compel grantees to certify that they do not "operate *any* programs"— whether funded by the grant or not—that (in the case of the ACF Anti-DEI Certification) "advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" or (in the case of HUD's requirements) "that violate any applicable Federal antidiscrimination laws." Those requirements "on [their] face make[] clear" that they apply to "any program …, irrespective of whether the program is federally funded." *Chi. Women in*

*Trades v. Trump*, No. 1:25-cv-02005, --- F. Supp. 3d ----, 2025 WL 1114466, at *11 (N.D. Ill. Apr. 14, 2025) (hereinafter, *CWIT*).

Those conditions also impermissibly restrict speech on the basis of viewpoint. The ACF Anti-DEI Certification specifically prohibits advancing "discriminatory equity ideology"—an undisguised suppression of a particular viewpoint. The prohibition in that condition on promoting "DEI" and "DEIA" likewise discriminates against certain speech, as "diversity, equity, and inclusion" programs almost invariably contain speech promoting those values. Indeed, as the Administration itself has acknowledged, it is restricting work related to "diversity, equity, and inclusion" because of disagreement with its "foundational rhetoric and ideas."[8] The HUD Discrimination Certification's requirement for grantees to certify that they do not violate anti-discrimination law (and that this is material for FCA purposes)—while less transparent— also inhibits speech. The surrounding context makes clear that this certification requirement is meant to further the President's anti-DEI agenda, consistent with the Anti-DEI Order's instruction that federal agencies impose these types of certification requirements to combat DEI activities, and consistent with its (novel and unfounded) view that such activities are often illegal—and thereby constrains grantees' speech regarding DEIA values. Anti-DEI Order § 3(b)(iv); *see also* Bondi Discrimination Memo at 7-8 (warning that the "content" of "DEI training programs" may be unlawful).

It does not matter that the DEI-related conditions purport to bar only conduct that violates nondiscrimination laws. For one, Defendants are taking a novel and incredibly broad view of the activities that violate nondiscrimination laws, suggesting that DEI-related activities or programs

---

[8] The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025), https://perma.cc/G8JU-QQ44.

designed to achieve equity and eliminate disparities, as well as trainings on DEI-related topics, could implicate civil rights laws. *See generally* Bondi Discrimination Memo. Plaintiffs and their members will have to self-censor speech to mitigate the chances that they will be subject to government investigations and civil and criminal litigation and liability under Defendants' novel interpretation of these laws. The recent Bondi Discrimination Memo does not mitigate this problem because it presents recipients of federal funding with "non-binding suggestions" for "best practices" that it admits are "not mandatory requirements"—thereby necessarily reaching behavior beyond established anti-discrimination requirements. *Id.* at 1. The memo, moreover, specifically identifies certain expressive behavior to avoid, such as talking about "toxic masculinity," designating places as "safe spaces" for certain groups (even while making them open to all), or discussing job applicants' "cultural competence." *Id.* at 6, 8. Given that the memo—issued by the agency responsible for enforcing the FCA—threatens "legal pitfalls" for grantees that do not adopt these best practices, grantees would reasonably interpret these recommendations as requirements to avoid significant civil and criminal risk. *Id.* at 1.

And the prospect of self-censorship of speech is especially great given the utter vagueness of the DEI-related certifications. As another court recently held in preliminarily enjoining a similar certification requirement, "[t]he problem … is that the meaning of this is left entirely to the grantee's imagination." *CWIT*, 2025 WL 1114466, at *11. Indeed, the DEI-related certifications independently violate the First Amendment due to their vagueness and chilling effect, as explained further below. *See infra* Section I.D.

**HUD "Gender Ideology" Condition.** The HUD "Gender Ideology" Condition—which prohibits grantees from using grant funds to "promote 'gender ideology' as defined in" the "Gender Ideology" Order—violates the First Amendment as well. As another court recently held

in preliminarily enjoining a similar funding condition, this restriction cannot be justified as the
government merely refusing to "affirmatively fund[]" the targeted speech. *S.F. AIDS Found. v.
Trump*, No. 4:25-cv-01824, --- F. Supp. 3d ----, 2025 WL 1621636, at *16–18 (N.D. Cal. June 9,
2025).

For one, the restriction is "entirely untethered to any 'legitimate objective[s]'" of the
programs it burdens. *Id.* at *16. Instead, it is "directed … towards disfavored speech." *Id.* at *17.
Under this Condition, a grantee apparently could not "refer to the clients they serve … by any
pronoun" or preferred name that matches their gender identity as opposed to their sex assigned at
birth. *Id.* But that "is pure speech that has no relation to" the CoC Grant program's purposes of
helping homeless individuals secure housing. *See id.*

Moreover, the "Gender Ideology" Condition impermissibly "withhold[s] subsidies for a
censorious purpose—aiming to suppress" what the government views to be "the dangerous idea[]
of … 'gender ideology.'" *S.F. AIDS Found.*, 2025 WL 1621636, at *18; *see also R.I. Latino Arts
v. NEA*, No. 1:25-cv-00079, --- F. Supp. 3d ----, 2025 WL 1009026, at *13–14 (D.R.I. Apr. 3,
2025) (noting that government cannot "use subsidies to suppress dangerous ideas" and
concluding that bar on funding art programs that "promote gender ideology" was "a clear First
Amendment violation"). The underlying Executive Order makes clear its goal is "to root out the
'extreme,' 'false claims' of gender identity that contradict the government's view that there is
only one 'biological reality of sex'"—in other words, to erase the recognition of transgender
people's existence. *S.F. AIDS Found.*, 2025 WL 1621636, at *17 (citing "Gender Ideology"
Order §§ 1, 2(f)). By defunding any activities "related to the dangerous ideas it has identified,"
the HUD "Gender Ideology" Condition effectuates "precisely the kind of 'invidious viewpoint

discrimination' that the Supreme Court has suggested would present First Amendment concerns even in the context of federal subsidies." *Id.* (citing *Finley*, 524 U.S. at 587).

The HUD "Gender Ideology" Condition also unconstitutionally strays beyond the "scope of the federally funded program," *Open Soc'y*, 570 U.S. at 218. As the Supreme Court has explained, a funding condition "by its very nature affects 'protected conduct outside the scope of the federal funded program'" when it "demand[s] that a funding recipient[] adopt—as their own—the Government's view on an issue of public concern." *Id.* (quoting *Rust*, 500 U.S. at 197). The HUD "Gender Ideology" Condition does just that. Under that Condition, a grantee risks noncompliance if it says anything recognizing someone's gender identity, such as by using a transgender person's preferred pronouns. Indeed, in a recent case, the government said merely using preferred pronouns would violate a materially identical funding restriction. *See S.F. AIDS Found.*, 2025 WL 1621636, at *17. So this Condition leaves grantees with no choice but to affirmatively use the pronouns corresponding to the person's sex assigned at birth—speech reflecting the Administration's view that gender identity should not be acknowledged or respected—and thus impermissibly controls the grantee's own speech.

### D.  The New Conditions are unconstitutionally vague

Plaintiffs are likely to succeed in showing that the New Conditions are unconstitutionally vague because they impose unclear, ill-defined prohibitions that give Defendants sweeping discretion over their enforcement. Due process fundamentally requires that the law give "fair notice of what is prohibited." *FCC*, 567 U.S. at 253 (2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)). A government-imposed requirement violates due process if it fails to "provide a person of reasonable intelligence fair notice of what is prohibited," or if it fails to provide explicit standards for the law's application, opening the door to "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

"[H]eightened" and "stricter" standards for potentially vague regulations are applied in two circumstances, both of which are present here. *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (quotations omitted). First, "vagueness review is more stringent when the challenged laws implicate the First Amendment's protections for speech." *United States v. Facteau*, 89 F.4th 1, 33 n.20 (1st Cir. 2023); *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). With any "content-based regulation of speech," "[t]he vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). "First Amendment freedoms need breathing space to survive, and therefore government may regulate in the area only with narrow specificity." *Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*, No. 24-1265, – F.4th –, 2025 WL 1911788, at *21 (1st Cir. July 11, 2025) (quoting *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 604 (1967)).

Second, "a stricter standard is applied" for vagueness where "criminal penalties may be imposed." *Frese, 53* F.4th at 6 (quotation omitted). "The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno,* 521 U.S. at 872. And where, as here, there is "content-based regulation of speech" that implicates criminal penalties, vagueness is of the utmost "special concern." *Counterman v. Colorado*, 600 U.S. 66, 100 (2023).

***DEI-related certifications.*** The HUD Discrimination Certification in the HUD CoC Conditions and HUD CPD Conditions, General HUD Anti-DEI Certification, and ACF Anti-DEI Certification—which generally require grantees not to engage in "DEI" activities that violate federal antidiscrimination law—are unconstitutionally vague and violate both the First and Fifth Amendments.

These conditions, the Anti-DEI Order on which they are based, and the surrounding context signal that the Administration has a novel and expanded view that many until-recently-encouraged "DEI" and "DEIA" activities would violate federal anti-discrimination laws. But the DEI-related conditions fail to provide fair notice of what exactly the Administration believes is prohibited. As one court observed, what this Administration will claim is illegal "is anything but obvious." *CWIT*, 2025 WL 1114466, at *11. The vagueness of the DEI-related conditions is amplified by the fact that "the thrust" of the underlying DEI Executive Order "is that the government's view of what is illegal in this regard has changed significantly with the new Administration." *Id.*; *see also, e.g.*, Anti-DEI Order § 1 (criticizing diversity, equity, and inclusion practices of a wide variety of "influential institutions of American society"); *id.* § 3 (revoking multiple longstanding diversity-related executive actions and requiring the Office of Management and Budget to "[e]xcise" from federal funding procedures all "references to DEI and DEIA principles, under whatever name they may appear," and to "[t]erminate all 'diversity,' 'equity,'" and similar activities).

The Bondi Discrimination Memo, and its "non-exhaustive" (and "non-binding") list of ways in which DEI programs could violate the law, does not provide any clarity for these purposes. For example, it entirely fails to address how the DEI-related conditions would be construed or applied in a host of contexts, including in various programs that Congress created specifically to target services to racial and ethnic minorities and other underserved groups, *see supra* section I.A.4.

The DEI-related conditions also fail to provide fair notice of how a grantee could comply while also carrying out various instructions Congress set forth by statute—such as the instruction to use FVPSA State Coalition Grants to address the needs of victims "who are members of racial

45

and ethnic minority populations and underserved populations." 42 U.S.C. § 10411(d)(3); 34 U.S.C. § 12291(a)(9). Particularly given the Administration's explicit plan to use the FCA—and certifications like these—as a "weapon" in its battle against "DEI," the certification requirements' unclear commands leave Plaintiffs vulnerable to the kind of "arbitrary and discriminatory" application of the law that due process prohibits. *Grayned*, 408 U.S. at 108–09.

The DEI-related certifications fail ordinary vagueness review, and they certainly cannot meet the heightened standards applicable to regulations that implicate criminal liability or that regulate protected speech. The DEI-related certifications—and the accompanying exposure to burdensome *qui tam* litigation and potential False Claims Act liability—will predictably chill grantees from speaking in support of diversity, equity, and inclusion, including in their activities unrelated to the use of federal funds. That violates the First Amendment.

***HUD "Gender Ideology" Condition.*** The HUD "Gender Ideology" Condition, which bars grantees from using awarded funds to "promote 'gender ideology,'" unconstitutionally fails to provide fair notice of what it means to "promote" what the Administration terms "gender ideology." Is respecting a person's gender identity (for example, by using their preferred pronouns or name) enough, or does the restriction reach only more affirmative advocacy? The condition also does not provide fair notice of how a grantee could comply with this condition's apparent command that grantees deny that individuals have a gender identity separate from their biological sex while also following binding regulations that require grantees to accommodate and serve individuals "in accordance with the[ir] gender identity." *See* 24 C.F.R. § 5.106. As with the DEI-related certifications, the HUD "Gender Ideology" Condition could not meet ordinary vagueness standards, and it falls far short under the heightened standards for requirements that implicate First Amendment speech and could lead to criminal liability.

***HUD Abortion Condition.*** The HUD Abortion Condition is unconstitutionally vague in that it fails to provide fair notice of what it means to use grant funds to "promote" so-called "elective abortion." For instance, it provides no guidance on whether advising someone about the option of abortion counts as "promoting," or whether more active advocacy is required. Nor does it provide any guidance on what counts as an "elective" abortion, which undeniably is subject to different interpretations among those holding different views on the subject.

***HUD CoC E.O. Condition and General HUD E.O. Condition.*** The HUD CoC E.O. Condition (providing that the use of grant funds is "governed by … [a]ll current Executive Orders") and General HUD E.O. Condition (requiring grantees to comply with executive orders) also fail to provide fair notice. Executive Orders are issued by the president to direct federal agencies and officials on how to implement or enforce the law—they do not impose legal requirements or obligations on private parties such as federal grantees. These conditions require Plaintiffs to guess at what it means for an Executive Order to purportedly apply to a private party, and how to comply. That is particularly the case given that the referenced Executive Orders are themselves broad and vague—and the "future" ones do not even exist yet.

***ACF Title IX Certification.*** The ACF Title IX Certification is also unconstitutionally vague because it and the related "Gender Ideology" Executive Order signal that the Administration has a novel and expanded view of when conduct would violate Title IX, yet they do not provide fair notice on how a grantee could comply with the Administration's view without violating other binding regulations requiring grantees to treat individuals in accordance with their gender identity, *see, e.g.*, 45 C.F.R. § 1370.5.

Each of these conditions requires people of ordinary intelligence to guess at what is prohibited. *See Grayned*, 408 U.S. at 108. And by failing to provide guidance or standards to

determine what activities this Administration considers newly prohibited, each of the conditions also subjects Plaintiffs' funding to the Administration's unlimited discretion and exposes them to potentially arbitrary and discriminatory enforcement. Faced with threatened civil penalties and potential criminal liability under the FCA, recipients are forced to curtail their activities by "steer[ing] far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (cleaned up). Plaintiffs are likely to succeed on their Fifth Amendment challenge for all the conditions, and are likely to show that the DEI-related certifications and HUD "Gender Ideology" Condition violate the First Amendment on vagueness grounds as well.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent Emergency Relief

The New Conditions force Plaintiffs into a Hobson's choice. Plaintiffs must decide whether to: (a) accept unconstitutional and otherwise unlawful funding conditions that are inconsistent with congressional directives, will impede their ability to provide core services, and are at odds with their fundamental missions; or (b) forgo federal funds that are essential to their ability to fulfill their missions, and that are necessary to save lives.

This imminent "choice itself demonstrates irreparable harm." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017). "[F]orcing [a plaintiff] either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face irreparable harm, is the type of 'Hobson's choice' that supports irreparable harm." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017), *aff'd*, 888 F.3d 272 (7th Cir. 2018) (subsequent proceedings omitted) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *see also, e.g.*, *City of Philadelphia*, 280 F. Supp. 3d at 657 (finding irreparable harm when City was "faced with a 'Hobson's Choice' between, on the one hand, complying with a law it credibly believe[d]" to be "unconstitutional, and on the other hand, foregoing funds it

48

plan[ned] to use for life-saving projects"); *cf. Metro. Transp. Auth. v. Duffy*, No. 2:25-cv-1413, 2025 WL 1513369, at *45 (S.D.N.Y. May 28, 2025) ("Plaintiffs can cease operation of the Tolling Program or else may brace for impact and prepare to suffer the effects of Defendants' threatened compliance measures. Either option would irreparably harm Plaintiffs.").

The Hobson's choice also represents irreparable harm because either path—accepting the conditions or forgoing funds—would cause irreparable harm to Plaintiffs and their members. Agreeing to the New Conditions would cause profound harm. Accepting the conditions would cause immediate constitutional harms, including censoring speech based on viewpoint and otherwise chilling Plaintiffs' speech due to the vagueness of the conditions. "[I]rreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim," *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 11 (1st Cir. 2012), including where government action produces a "'chilling effect' on the exercise of [] rights of expression," *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981); *Hannon v. Allen*, 241 F. Supp. 2d 71, 78 (D. Mass. 2003) ("Even the temporary loss of a constitutional right may be a form of irreparable harm.").

But there is more: the New Conditions would force Plaintiffs and their members to agree to conditions that undermine their missions or to change their conduct and the services they provide, contrary to their values and mission. *See supra* Background section C; Atkins Decl. ¶¶ 27, 36; Dalton Decl. ¶ 27; Guillette Decl. ¶ 21; Faisal Decl. ¶ 28; Higginbotham Decl. ¶¶ 54-55; Jaworski Decl. ¶ 29; Lee Decl. ¶ 48; Minkens Decl. ¶ 30-31; Moran-Kuhn Decl. ¶ 33; Rios Decl. ¶¶ 40, 64; Simmons Decl. ¶ 22; Sarang- Sieminski Decl. ¶ 37; Simpson-Bruce Decl. ¶ 18; Yglesias Decl. ¶ 40; Young Decl. ¶ 44.

The harm from accepting the New Conditions is especially acute here given that Defendants have intentionally crafted the conditions to expose grantees to FCA liability. It is invariably harmful for an organization to expose itself to criminal investigation or prosecution, or lawsuits that could bankrupt the organization. And it is far from speculative that these risks could come to fruition: DOJ has formed a nationwide task force specifically to target grantees that sign these certifications, has described potential FCA liability as a "weapon" it will deploy, and has "strongly encouraged" private parties to bring civil suits. *See supra* Background section A.1. Plaintiffs and their members have no choice but to take the threats seriously. *See, e.g.*, Dotson Decl. ¶ 33; Guillette Decl. ¶ 21; Lessing Decl. ¶ 26; McCormick Decl. ¶ 46; Moran-Kuhn Decl. ¶ 48; Sarang-Sieminski Decl. ¶ 23; Yglesias Decl. ¶ 40; Simmons Decl. ¶ 22. Plaintiffs and their members need not wait for the "Damoclese[] sword" of FCA liability "to actually fall" before the Court enters preliminary relief. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016).

The alternative—forgoing HHS and HUD funds—would also cause irreparable harm. Plaintiffs have long relied on HHS and HUD grant funds to provide essential services to members, individuals, and communities. *See supra* Background section C. Losing out on these grants would decimate Plaintiffs' budgets and require them to lay off staff and cut services, causing a devastating impact on organizations, on their missions, and on the most vulnerable people in their communities. *See* Akins Decl. ¶ 21; Colón Decl. ¶ 16; Dotson Decl. ¶ 21; Fisher Decl. ¶ 16; Guillette Decl. ¶ 12-13; Higginbotham Decl. ¶ 12; Jaworski Decl. ¶ 11; Lessing Decl. ¶¶ 11, 25; McCormick Decl. ¶ 37; Rios Decl. ¶ 28; Sarang-Sieminski Decl. ¶ 23; Simmons Decl. ¶ 11; Yglesias Decl. ¶ 25; Young Decl. ¶ 28.

Such interference with the organizations' services "is not accurately measurable or adequately compensable by money damages." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 325 (D. Mass. 2025); *see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-1611, 2025 WL 2017106, at *11 (1st Cir. July 18, 2025). The inability of an organization to "accomplish [its] primary mission" constitutes irreparable harm. *Newby*, 838 F.3d at 9. Even more so here—"[i]t is impossible to accurately measure or compensate" for the losses in life-saving services to homeless individuals and vulnerable victims of domestic violence and sexual assault if organizations are unable to carry out their mission because they are forced to give up federal funds. *Nat'l Insts. of Health*, 770 F. Supp. 3d at 325.

## III.    The Balance of the Equities and Public Interest Favor a Preliminary Injunction

The final two factors—balance of equities and public interest—look to "the effect on each party of the granting or withholding of the requested relief, paying particular regard for the public consequences." *New York*, 2025 WL 1803260, at *20 (quoting *Winter*, 555 U.S. at 24) (alterations omitted). These factors strongly favor preliminary relief staying the New Conditions. Such an order would only require the government to permit grantees to use funding that federal agencies have already awarded or would otherwise award without imposing the unlawful conditions. Grantees would, of course, still be required to comply with federal antidiscrimination laws and other applicable laws. Meanwhile, absent relief, grant recipients would be forced to change their programming to avoid risking noncompliance with the likely unlawful conditions— and the serious consequences that could follow—or to cut lifesaving programing due to lost grants. Indeed, as another judge in this district recently recognized, "[t]he fact that [Plaintiffs] have shown a likelihood of success on the merits strongly suggests that an injunction would serve the public interest." *California*, 2025 WL 1711531, at *2. "[T]here is substantial public

interest in having governmental agencies abide by the federal laws." *Nat'l Insts. of Health*, 770 F. Supp. 3d at 326 (cleaned up).

The interests at stake are not the mere receipt of federal funds or the government's technical compliance with federal laws: Plaintiffs "use[] these funds to save lives." Simmons Decl. ¶ 10. The DEI-related conditions would result in fewer services to populations that are already underserved or marginalized, and would curtail trainings on how to reach and serve the populations that need it most. Higginbotham Decl. ¶ 47; Lessing Decl. ¶ 28; Faisal Decl. ¶ 36; McCormick Decl. ¶ 54. Transgender clients would not receive appropriate care, as the HUD "Gender Ideology" Condition would require providers to breach their ethical obligations. Yglesias Decl. ¶ 40; Guillette Decl. ¶ 17. The HUD Abortion Condition would mean that clients who need information on reproductive care would not receive it, including clients who are survivors of domestic violence and sexual assault and reproductive coercion. Higginbotham Decl. ¶ 51; *see* Yglesias Decl. ¶ 37. And the HUD CoC E.O. Condition and General HUD E.O. Condition would pull Plaintiffs away from their critical public health and safety work to determine how to comply with the myriad of frequently issued executive orders that those conditions implicate. Simmons Decl. ¶ 20; Higginbotham Decl. ¶ 52; Yglesias Decl. ¶ 38; Guillette ¶ 15; Dotson Decl. ¶ 39; Young Decl. ¶ 41. The ACF and HRSA Title IX Certifications would undermine the public interest by making service providers fearful of providing effective and appropriate services to transgender victims. Higginbotham Decl. ¶ 49; *see* Colón Decl. ¶ 51.

HUD Grants support life-saving rental assistance for people without housing, including survivors of sexual and domestic violence. Yglesias Decl. ¶ 10.b. For instance, Pennsylvania Coalition HUD Grant funds provide direct rental assistance to around 380 households, including about 400 adults and about 350 children. Higginbotham Decl. ¶ 14. Without these funds, these

families would lose housing support and face imminent eviction. *Id.* Virginia Member Doe's clients face similar harms: absent HUD funds, over 40 children and their parents would be evicted from their homes. Yglesias Decl. ¶ 10.a; *see also* Rios Decl. ¶ 27 (Rhode Island Member Doe provides assistance for approximately 90 households, who will face eviction absent HUD funding); Berroa Decl. ¶ 11 (absent HUD funds, Haus of Codec would have to abandon programs providing housing to youth); Dotson Decl. ¶ 13 (Wisconsin Coalition Against Sexual Assault's Member Doe 4 uses HUD funds to provide shelter for 35 households and emergency shelter for 85 victims of domestic violence); Faisal Decl. ¶ 12 (absent HUD funding, survivors would be left without housing support and would burden the broader coordinated support system). Diminished availability of HUD-funded transitional housing will have cascading effects: shelter stays will be longer, and the number of people being turned away for lack of space would drastically increase. Yglesias Decl. ¶ 10.a. In North Carolina, it would mean the loss of one of the state's only housing programs dedicated to survivors of domestic violence. Fisher Decl. ¶ 12.

HUD funding is especially critical to protect domestic violence survivors because the lack of safe, affordable housing keeps victims and their children in abusive situations. *Id.* Victims of abuse "cannot wait six months for housing in abusive situations" because "this kind of wait could be lethal." Higginbotham Decl. ¶ 57. But less HUD-funded housing means longer waiting lists, fewer beds at shelters, and more survivors and their children who are unable to leave dangerous situations. Yglesias Decl. ¶ 10.a.; Dotson Decl. ¶ 13(g); Fisher Decl. ¶ 18; McCormick Decl. ¶ 22; Rios Decl. ¶ 24. And elimination of staff means longer wait times for critical services like assistance with restraining orders. *See* Lee Decl. ¶ 15; Colón Decl. ¶ 13.

This is also true of vulnerable youth. HUD funds support low-barrier, trauma-informed services for youth experiencing homelessness. Guillette Decl. ¶ 10. Additionally, people who are unsheltered for any reason experience "danger and uncertainty," and often have intense medical needs and disabilities that they cannot treat without the services that HUD grants fund. Simmons Decl. ¶ 10. Unhoused people who rely on Plaintiffs' HUD-funded services for medical care will not be able, for instance, to keep their insulin cold or to connect with healthcare providers for kidney disease and cancer treatment. *Id.* ¶ 11. Without these funds, communities "would see a rash of people dying out on the street." *Id.*; *see also* Lee Decl. ¶ 15 (without HUD funds, "survivors of violence likely will be homeless and at risk of addiction relapse").

Finally, HUD Plaintiffs will have to lay off staff—permanently damaging trust with their employees and the people that they serve and causing increased unemployment in their communities. *See* Rios Decl. ¶ 28; Jaworksi Decl. ¶ 33. For Plaintiff House of Hope, where an estimated 80% of staff have experienced homelessness, substance use disorders, incarceration and other related trauma, the loss of these funds would result in massive layoffs to the same staff members that serve as leaders to their peers using House of Hope's services. Jaworksi Decl. ¶ 33. "To rip them away from their employment and pitch them back into financial and possible housing instability would be a remarkable twist of fate." *Id.*

HHS funding is similarly important to Plaintiffs and their communities. Without the FVPSA Coalition Grant, for example, Plaintiff Coalitions would be forced to lay off staff—leaving them "unable to maintain the staffing levels necessary to provide needed training and support to local domestic violence service providers who work directly with domestic violence victims." Fisher Decl. ¶ 30; *see also* Colón Decl. ¶ 17; Sarang-Sieminski Decl. ¶ 23; Moran-Kuhn Decl. ¶ 22; Simpson-Bruce Decl. ¶ 16; Minkens Decl. ¶ 23; Rios Decl. ¶ 40; Faisal Decl.

¶ 24; Yglesias Decl. ¶ 19. Declining FVPSA Coalition funds would have a "catastrophic detrimental impact" on Coalitions that are "an essential part of the structure of victim services" in their states. Faisal Decl. ¶ 24. As a result, victims will "experience greater barriers to receiving vital services due to lack of trauma-informed care training among service providers," especially for people who are unhoused. *Id*. ¶ 24. And without the statewide infrastructure that Plaintiff Coalitions provide, systems "will become more fragmented, and survivors are left navigating unsafe, and inequitable conditions." *Id*. ¶ 24.

Similarly, without other FVPSA Grants funds, Plaintiffs and their members would have to cut a variety of emergency shelter programs, crisis hotlines, and other lifesaving services. Colón Decl. ¶¶ 37, 40; Dalton Decl. ¶ 25; Faisal Decl. ¶ 26; Higginbotham Decl. ¶ 43; Lee Decl. ¶ 35. For instance, in less than a year, Colorado Member Doe alone has used FVPSA pass-through funds to provide 106 victims with emergency shelter and 187 non-residential victims with services, and has responded to 2,186 calls on their crisis hotline. Akins Decl. ¶ 25. Declining this funding would "leav[e] victims of domestic violence and sexual assault without resources to keep them[selves], and their children, safe." Akins Decl. ¶ 25. These threats to public health and safety are at least as grave as those that courts have found strongly favor a preliminary injunction. *See Nat'l Insts. of Health*, 770 F. Supp. 3d at 287, 326 (finding a preliminary injunction was appropriate to halt funding cuts for biomedical research awards that created the imminent risk of stopping "life-saving clinical trials," which could result "in the loss of life for those" relying on those "clinical trials as their last hope," among other grievous outcomes).

Thus, the balance of the equities and the public interest is clear. On the one hand, "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Nat'l*

*Insts. of Health*, 770 F. Supp. 3d at 326 (cleaned up); *see also Texans for Free Enterprise v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). On the other, a loss of funds to Plaintiffs' and their members' programs would reverberate to unhoused people and people at risk of homelessness, and vulnerable victims of domestic violence and sexual assault, through a loss of life-saving services. Particularly here, where so much is at stake, the government should not be permitted to "leverag[e] the needs of our most vulnerable fellow humans" by conditioning federal funds on the acceptance of unlawful funding conditions. *King Cnty.*, 2025 WL 1582368, at *19.

## IV.    Relief Should Extend Broadly Enough To Prevent Any Irreparable Harm

This Court should stay or preliminarily set aside the New Conditions under 5 U.S.C. §§ 705 and 706 in connection with Plaintiffs' APA claims, and should enter a preliminary injunction on all of Plaintiffs' claims barring Defendants from implementing or enforcing them or any substantially similar condition in any way during the pendency of this action.

*a.* Under the APA, where the Court finds an agency action to be unlawful, the court must "hold unlawful and set aside" the action. 5 U.S.C. § 706(2). It is well established that "when a federal court sets aside an agency action, the federal court vacates that [action]" in full, not just as applied to the plaintiffs in the matter. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (2024) (Kavanaugh, J., concurring); *see also Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024). Thus, "[t]he normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Woonasquatucket*, 2025 WL 1116157, at *25; *see also, e.g., Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Nothing in the Supreme Court's recent decision

limiting universal injunctions disturbs this established remedy under the APA. *Trump v. CASA,*
*Inc.*, 145 S. Ct. 2540, 2554 n.10 (2025) ("Nothing we say today resolves the distinct question
whether the Administrative Procedure Act authorizes federal courts to vacate federal agency
action.").

There are two mechanisms by which this Court may afford interim relief on Plaintiffs'
APA claims that corresponds to the final relief on APA claims described above. First, under 5
U.S.C. § 705, the Court may stay the agency action by "postpon[ing] the effective date" of the
action or otherwise taking action necessary "to preserve status or rights pending conclusion of
the review proceedings." 5 U.S.C. § 705. A § 705 stay "operates upon the [agency action] itself
by halting or postponing some portion of [it], or by temporarily divesting a rule or policy of
enforceability." *Orr v. Trump*, No. 1:25-cv-10313, --- F. Supp. 3d ----, 2025 WL 1145271, at *23
(D. Mass. Apr. 18, 2025), *appeal pending*, No. 25-1579. Accordingly, "just as vacatur under
§ 706 is not a party-specific remedy, neither is a stay under § 705." *Cabrera v. U.S. Dep't of
Lab.*, No. 25-CV-1909 (DLF), 2025 WL 2092026, at *8 (D.D.C. July 25, 2025). "Both
provisions specify what courts are authorized to do with respect to *agency actions*, not parties."
*Id.*; *see also, e.g.*, *Career Colleges & Sch. of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th
Cir. 2024) (holding that "[n]othing in the text of Section 705" suggests that preliminary relief
under that provision "needs to be limited" to plaintiffs), *cert. granted on other question*, 145 S.
Ct. 1039 (2025); *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 971 (D. Md. 2020).

Second, as Justice Kavanaugh recently explained, "in cases under the Administrative
Procedure Act," courts may "preliminarily 'set aside'" an agency action under § 706(2) itself.
*CASA*, 145 S. Ct. at 2567 (Kavanaugh J., concurring); *see also id.* at 2569 (explaining that courts
may enter relief not limited to the plaintiffs "by preliminarily setting aside . . . an agency rule

under the APA"). If courts may vacate an agency action upon a final judgment, courts may also

provide that relief on an interim basis upon a showing of likelihood of success.

Because the Funding Conditions violate the APA for the multiple reasons described

above[9] and threaten irreparable harm, preliminary relief under § 705 and § 706(2) is warranted.

This Court should stay or preliminarily set aside the New Conditions—such that no applicant or

awardee is required to accept these conditions in order to access federal grant funding—during

the pendency of this action.

*b.* Independent of preliminary relief under the APA, a preliminary injunction under Rule

65 is also warranted on all of Plaintiffs' claims. Granting a preliminary injunction is appropriate

where setting aside (or staying) an agency action alone is not "sufficient to redress [the

plaintiffs'] injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). So, for

example, an injunction is warranted where the agency could attempt to take similar action again

"as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex.

2024). In such circumstances, injunctive relief can appropriately "restrain agency officials from

… conduct based on the disputed agency [action]." *Chamber of Com. of U.S. v. CFPB*, 691 F.

Supp. 3d 730, 745 (E.D. Tex. 2023), *appeal dismissed*, No. 23-40650, 2025 WL 1304573 (5th

Cir. May 1, 2025); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from

"implementing or enforcing" the guidance documents at issue, as well as any future guidance

documents promoting a similar interpretation against plaintiffs).

Here, injunctive relief is necessary because merely staying or setting aside the policies

imposing the New Conditions would not on its own prevent Defendants from adopting a similar

---

[9] The APA claims here encompass all substantive grounds for relief because Defendants'
violations of the separation of powers, First Amendment, and Fifth Amendment also violate the
APA as contrary to constitutional right. 5 U.S.C. § 706(2)(B).

new policy or imposing the same or similar conditions on a case-by-case basis. Indeed,

Defendants have already demonstrated their willingness to change grant conditions in a manner

that may evade judicial review, such as when HHS amended its Grants Policy Statement less

than an hour before the TRO hearing in this case. Plaintiffs should not live in fear that HHS or

HUD could spring similar conditions on the federal funding upon which Plaintiffs rely. *See*

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 612 (D. Mass.

2020) (granting § 705 stay and preliminary injunction). To ensure Plaintiffs and their members

are protected from irreparable harm, the Court should enter the following preliminary injunctive

relief:

1) Defendant Department of Housing and Urban Development (HUD), Defendant
   Scott Turner, and any person in active concert or participation with those parties,
   are enjoined from requiring any recipient or subrecipient to agree to, and from
   enforcing, the following requirements or any substantially similar requirement:

   a) The requirement that the recipient not "use grant funds to promote 'gender
      ideology,' as defined in E.O. 14168, Defending Women from Gender
      Ideology Extremism and Restoring Biological Truth to the Federal
      Government";

   b) The requirement that the recipient "agrees that its compliance in all
      respects with all applicable Federal anti-discrimination laws is material to
      the U.S. Government's payment decisions for purposes of section
      3729(b)(4) of title 31, United States Code [and] … certifies that it does not
      operate any programs that violate any applicable Federal
      antidiscrimination laws, including Title VI of the Civil Rights Act of
      1964";

   c) The requirement that the recipient "not use any Grant Funds to fund or
      promote elective abortions, as required by E.O. 14182, Enforcing the
      Hyde Amendment";

   d) The condition that "the Recipient's use of funds provided under this
      Agreement … , and the Recipient's operation of projects assisted with
      Grant Funds are governed by … [a]ll current Executive Orders";

   e) The requirement that recipients comply with applicable existing and future
      Executive Orders; and

   f) The requirement in Form HUD-424-B that recipients certify that they
      "[w]ill not use Federal funding to promote diversity, equity, and inclusion

(DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws."

2) Defendant Robert F. Kennedy, Jr., Defendant the United States Department of Health and Human Services, Defendant Andrew Gradison, Defendant the Administration for Children and Families, and any person in active concert or participation with those parties, are enjoined from requiring any grantee or subrecipient to agree to, and from enforcing, the following requirements or any substantially similar requirement:

    a) The requirement in the ACF Standard Terms and Conditions that recipients must "certify[]" that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws."

    b) The requirements in the ACF Standard Terms and Conditions relating to Title IX of the Education Amendments of 1972, including the requirement that a recipient "certify" that "it is compliant with Title IX" and "will remain compliant for the duration of the Agreement" and that these are "material terms of the Agreement."

3) Defendant Robert F. Kennedy, Jr., Defendant the United States Department of Health and Human Services, Defendant Thomas Engels, Defendant Health Resources and Services Administration, and any person in active concert or participation with those parties, are enjoined from requiring any recipient or subrecipient to agree to, and from enforcing, the following requirement or any substantially similar requirement:

    a) The requirement in the HRSA General Terms and Conditions that any recipient "certify" that it "is compliant with Title IX of the Education Amendments of 1972, as amended, …, including the requirements set forth in [the "Gender Ideology" Order]" and "will remain compliant for the duration of the Agreement" and that these are "material terms of the Agreement."

To ensure Plaintiffs receive "complete relief," this injunction should extend to all HUD, ACF, and HRSA applicants and grantees, not just Plaintiffs and their members. *See City of Los Angeles v. Sessions*, No. 2:18-cv-07347, 2019 WL 1957966, at *6 (C.D. Cal. 2019); *see also CASA*, 145 S. Ct. at 2556-57 (acknowledging that universal injunctions are appropriate where necessary to afford "complete relief" to the parties). For competitive grants, Plaintiffs and their members would be at a competitive disadvantage because the agencies can subject other

applicants to the New Conditions, but not Plaintiffs and their members. This difference could

make the agencies more likely to award grants to those other applicants, whom, absent universal

relief, the Administration could hold to its ideological goals. Thus, "to ensure an even playing

field" and "provide complete relief" to Plaintiffs, the Court should "enjoin[] Defendants from

imposing the Conditions as to all competitors." *Los Angeles*, 2019 WL 1957966, at *6.*

## CONCLUSION

The Court should stay the New Conditions under the APA and enter a preliminary

injunction barring the implementation of those conditions or any substantially similar conditions.


August 4, 2025                                  Respectfully submitted,

*/s/ Kristin Bateman*
Kristin Bateman (Cal. Bar No. 270913)[+][^]
Robin F. Thurston (D.C. Bar No. 1531399)[+]
Skye L. Perryman (D.C. Bar No. 984573)[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar # 1016621)[+]
Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
Brian C. Rosen-Shaud (ME Bar No. 006018)[+][^]
Nina Cahill (D.C. Bar No. 1735989)[+]
Jacobson Lawyers Group PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

/s/ Amy R. Romero
Amy R. Romero (RI Bar # 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

/s/ Lynette Labinger
Lynette Labinger (RI Bar # 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

/s/ Mary C. Dunn
Mary C. Dunn (RI Bar #6712)
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900
mcd@blishcavlaw.com
Cooperating counsel, Lawyers' Committee for RI

 /s/ Lauren A. Khouri
Lauren A. Khouri (D.C. Bar No. 10282288)[+]
Elizabeth E. Theran (D.C. Bar No. 90030162)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org
etheran@nwlc.org

[+] Admitted *pro hac vice*
[^] Not admitted in the District of Columbia. Practice
supervised by members of the D.C. bar.


*Counsel for Plaintiffs*

62

## GLOSSARY OF NEW CONDITIONS

| **HUD Agency-Wide Conditions** | |
|---|---|
| General HUD E.O. Condition | Recipients must comply with applicable existing and future Executive Orders. |
| General HUD Anti-DEI Certification | Applicants and grantees must certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws." |
| **HUD CoC Conditions** | |
| HUD "Gender Ideology" Condition | Recipients may not "use grant funds to promote 'gender ideology,' as defined in [the "Gender Ideology" Executive Order]." |
| HUD Discrimination Certification | Recipients must "certif[y]" that they do "not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964" and must "agree that [their] compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of" the False Claims Act. |
| HUD Abortion Condition | Recipients may not use grant funds to "fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment." |
| HUD CoC E.O. Condition | Recipients' use of grant funds and "operation of projects assisted with" grant funds must be "governed by … [a]ll current Executive Orders." |
| **HUD CPD Conditions** | |
| HUD "Gender Ideology" Condition | Recipients may not "use grant funds to promote 'gender ideology,' as defined in [the "Gender Ideology" Executive Order]." |
| HUD Discrimination Certification | Recipients must "certif[y]" that they do "not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964" and must "agree that [their] compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of" the False Claims Act. |
| HUD Abortion Condition | Recipients may not use grant funds to "fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment." |
| HUD CoC E.O. Condition | Recipients' use of grant funds and "operation of projects assisted with" grant funds must be "governed by … [a]ll current Executive Orders." |

| HHS ACF Standard Conditions | |
|---|---|
| ACF Anti-DEI Certification | Grantees must "certify[]" that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." |
| ACF Title IX Certification | "Recipients whose programs are covered by Title IX" must "certify" that:<br>• They are "compliant with Title IX of the Education Amendments of 1972 … [and] will remain compliant for the duration of the Agreement";<br>• This requirement "go[es] to the essence of the Agreement" and is a "material term[] of the Agreement";<br>• Payment is "predicated on compliance with" that requirement "and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance";<br>• This "certification reflects a change in the government's position regarding the materiality of" the requirements and "therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement";<br>• The "[r]ecipient acknowledges that a knowing false statement relating to Recipient's compliance with" this requirement "may subject Recipient to liability under the False Claims Act … and/or criminal liability." |
| HHS HRSA General Terms | |
| HRSA Title IX Condition | "Recipients whose programs are covered by Title IX" must "certify" that:<br>• They are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order]" and "will remain compliant for the duration of the Agreement";<br>• This requirement "go[es] to the essence of the Agreement" and is a "material term[] of the Agreement";<br>• Payment is "predicated on compliance with" that requirement "and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance";<br>• This "certification reflects a change in the government's position regarding the materiality of" the requirements and "therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement";<br>• The "[r]ecipient acknowledges that a knowing false statement relating to Recipient's compliance with" this requirement "may subject Recipient to liability under the False Claims Act … and/or criminal liability." |

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, I electronically filed the within document and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Kristin Bateman*