# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*,

      Plaintiffs,

      v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services, *et
al.*,

      Defendants.

No. 25-cv-000342-MRD-PAS

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

    A.  HUD and its grants ............................................................................................... 3

    B.  HHS and its grants ................................................................................................ 5

        1.  ACF ............................................................................................................. 6

        2.  HRSA ......................................................................................................... 9

LEGAL STANDARDS ..................................................................................................... 11

    A.  Subject-matter jurisdiction ............................................................................... 11

    B.  Preliminary injunction ...................................................................................... 12

ARGUMENT .................................................................................................................... 13

  I.   THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS ............................... 13

    A.  The Court of Federal Claims has exclusive jurisdiction to hear Plaintiffs' claims seeking to compel payments of the grants at issue. .......................................... 13

    B.  Framing Plaintiffs' contractual claims as constitutional claims does not bestow subject-matter jurisdiction on this Court ............................................................ 15

        1.  Plaintiffs seek to enforce contractual rights. ............................................ 17

        2.  Plaintiffs request contractual remedies. ................................................... 19

  II.  PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS ........... 20

    A.  Plaintiffs are unlikely to succeed on their APA or separation-of-powers claims. ............. 20

        1.  APA statutory framework ......................................................................... 20

        2.  The challenged conditions are not contrary to law because Defendants have discretion to impose them .................................................. 22

(a) The agency certifications ...............................................................22

    (i)  HUD's CoC certifications.................................................23

    (ii) ACF's and HRSA's certifications....................................22

(b) The remaining CoC Conditions lie within HUD's discretion.............24

3.  Defendants did not act arbitrarily or capriciously in imposing the challenged conditions.........................................................25

4.  Plaintiffs cannot prevail on their separation-of-powers claim. ...................26

(a) Statutory authority ........................................................................27

(b) Germaneness ................................................................................27

(c) Interaction with existing law .........................................................28

B.  HUD's conditions do not violate the First Amendment ..........................29

C.  Because HUD's CoC Conditions and ACF and HRSA's Title IX certifications are not unconstitutionally vague, Plaintiffs are unlikely to prevail on their Fifth Amendment claim .........................................34

III.   PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM ..................................37

IV.   THE HARM TO THE GOVERNMENT FROM ENTRY OF A PRELIMINARY INJUNCTION CANNOT BE REMEDIED ................................................40

V.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN THE GOVERNMENT'S FAVOR ...................................................................40

VI.   THE COURT SHOULD LIMIT THE SCOPE OF ANY INJUNCTIVE RELIEF TO GRANTS PLAINTIFFS SPECIFICALLY IDENTIFY AND SHOULD ONLY ENJOIN REQUIREMENTS THAT EXCEED PLAINTIFFS' EXISTING OBLIGATION TO COMPLY WITH FEDERAL LAW ..................................................................................41

VII.   ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND BE ACCOMPANIED BY A BOND........................................................................43

CONCLUSION.........................................................................................................44

CERTIFICATE OF SERVICE ......................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........................................................................................30, 31

*Akebia Therapeutics, Inc. v. Azar*,
443 F. Supp. 3d 219 (D. Mass.), *aff'd*, 976 F.3d 86 (1st Cir. 2020) ....................38, 39

*Akebia Therapeutics, Inc. v. Azar*,
976 F.3d 86 (1st Cir. 2020) ........................................................................................13

*Am. Cargo Transp., Inc. v. United States*,
625 F.3d 1176 (9th Cir. 2010) ....................................................................................33

*ACLU of Tenn. v. City of Memphis*,
No. 17-cv-02120, 2020 WL 5630418 (W.D. Tenn. Sept. 21, 2020) .........................36

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
145 F.4th 39 (1st Cir. 2025),
*application for stay pending*, No. 25A103 (U.S. July 24, 2025) ...............................15

*Am. Sci. & Eng'g, Inc. v. Califano*,
571 F.2d 58 (1st Cir. 1978) ........................................................................................14

*Amoco Prod. Co. v. Vill. of Gamble*,
480 U.S. 531 (1987) ....................................................................................................12

*Ass'n of Am. Univs. v. U.S. Dep't of Energy*,
No. 25-cv-10912, 2025 WL 1414135 (D. Mass. May 15, 2025),
*appeal filed*, No. 25-1727 (1st Cir. July 31, 2025) ...................................................15

*Atieh v. Riordan*,
797 F.3d 135 (1st Cir. 2015) ......................................................................................21

*Aversa v. United States*,
99 F.3d 1200 (1st Cir. 1996) ......................................................................................12

*Bennett v. Ky. Dep't of Educ.*,
470 U.S. 656 (1985) ....................................................................................................26

*Biden v. Missouri*,
595 U.S. 87 (2022) (per curiam) ................................................................................26

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002) ...................................................................35

*Boaz Hous. Auth. v. United States,*
    994 F.3d 1359 (Fed. Cir. 2021) ...............................................................14

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ................................................................................14

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
    419 U.S. 281 (1974) ..........................................................................21, 25

*Burgos v. Milton,*
    709 F.2d 1 (1st Cir. 1983) .......................................................................13

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ................................................................................40

*California v. Trump,*
    267 F. Supp. 3d 1119 (N.D. Cal. 2017) ..................................................24

*California v. U.S. Dep't of Educ.,*
    769 F. Supp. 3d 72 (D. Mass. 2025),
    *appeal filed,* No. 25-1244 (1st Cir. Mar. 12, 2025) ...............................15

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
    370 F.3d 151 (1st Cir. 2004) ..............................................................37, 38

*Christopher Vill., L.P. v. United States,*
    360 F.3d 1319 (Fed. Cir. 2004) ..............................................................16

*City & Cty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ................................................................29

*City of Los Angeles v. Barr,*
    929 F.3d 1163 (9th Cir. 2019) ................................................................25

*City of Los Angeles v. Sessions,*
    No. 18-cv-07347, 2019 WL 1957966 (C.D. Cal. Feb. 15, 2019) .............42

*City of Providence v. Barr,*
    954 F.3d 23 (1st Cir. 2020) ...............................................................25, 36

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
    527 U.S. 666 (1999) ................................................................................11

*Columbus Reg'l Hosp. v. United States*,
    990 F.3d 1330 (Fed. Cir. 2021)............................................................................17

*Consol. Edison Co. of New York, Inc. v. U.S. Dep't. of Energy*,
    247 F.3d 1378 (Fed. Cir. 2001)............................................................................16

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022)............................................................................17

*Cushing v. Packard*,
    30 F.4th 27 (1st Cir. 2022)...................................................................................12

*Diaz v. Johnson*,
    No. 19-1501, 2020 WL 9437887 (1st Cir. Nov. 12, 2020).........................................19

*Dist. Hosp. Partners, L.P. v. Burwell*,
    786 F.3d 46 (D.C. Cir. 2015)...............................................................................39

*Draper v. Healey*,
    98 F. Supp. 3d 77 (D. Mass. 2015), *aff'd*, 827 F.3d 1 (1st Cir. 2016).........................35

*Draper v. Healey*,
    827 F.3d 1 (1st Cir. 2016 .....................................................................................35

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*,
    445 F.3d 13 (1st Cir. 2006)..................................................................................12

*FAA v. Cooper*,
    566 U.S. 284 (2012).............................................................................................12

*FDIC v. Meyer*,
    510 U.S. 471 (1994).............................................................................................11

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012).............................................................................................21

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021).............................................................................................21

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985).............................................................................................39

*Frederick Douglass Found., Inc. v. District of Columbia*,
    82 F.4th 1122 (D.C. Cir. 2023).............................................................................34

*Gill v. Whitford*,
  585 U.S. 48 (2018)................................................................................................40

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)..............................................................................................37

*Great N. Res., Inc. v. Coba*,
  No. 20-cv-10866, 2020 WL 6820793 (D. Or. Nov. 20, 2020) ...................................42

*Guardians Ass'n v. Civ. Serv. Comm'n*,
  463 U.S. 582 (1983)................................................................................23, 26, 32

*Hanley v. United States*,
  No. 94-1315, 1994 WL 723678 (1st Cir. Oct. 5, 1994) (per curiam) .........................11

*Heckler v. Chaney*,
  470 U.S. 821 (1985)..............................................................................................20

*Hilton v. Braunskill*,
  481 U.S. 770 (1987)..............................................................................................43

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ..................................................................................18

*Lancor v. Lebanon Hous. Auth.*,
  760 F.2d 361 (1st Cir. 1985) ..................................................................................41

*Leathers v. Medlock*,
  499 U.S. 439 (1991)..............................................................................................31

*Lewis v. Casey*,
  518 U.S. 343 (1996)..............................................................................................41

*Lincoln v. Vigil*,
  508 U.S. 183 (1993)........................................................................................20, 21

*Love v. Butler*,
  952 F.2d 10 (1st Cir. 1991)....................................................................................35

*Marquez-Reyes v. Garland*,
  36 F.4th 1195 (9th Cir. 2022) ...............................................................................36

*Massachusetts v. Nat'l Insts. of Health*,
  770 F. Supp. 3d 277 (D. Mass. 2025),
  *appeal filed*, No. 25-1344 (1st Cir. Apr. 9, 2025)...................................................15

*Mass. Fair Hous. Ctr. v. HUD*,
   No. 25-cv-30041, 2025 WL 1225481 (D. Mass. Apr. 14, 2025)................................................15

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
   367 F.3d 68 (1st Cir. 2004)........................................................................................37

*McCoy v. Mass. Inst. of Tech.*,
   950 F.2d 13 (1st Cir. 1991)........................................................................................14

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982)...........................................................................16, 18

*Milk Train, Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002)...............................................................................21

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024)................................................................................................29

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)............................................................................................21, 25

*N. Star Alaska v. United States*,
   14 F.3d 36 (9th Cir. 1994) .....................................................................................19

*Narragansett Indian Tribe v. Guilbert*,
   934 F.2d 4 (1st Cir. 1991)..................................................................................13, 38

*Nat'l Rifle Ass'n v. Vullo*,
   602 U.S. 175 (2024)................................................................................................32

*Nat'l Urban League v, Trump*,
   __ F. Supp. 3d __, 2025 WL 1275613 (D.D.C. May 2, 2025) ...............................29, 32, 33, 34

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
   287 F.3d 1 (1st Cir. 2002)........................................................................................20

*New Jersey v. Trump*,
   131 F.4th 27 (1st Cir. 2025)....................................................................................12

*Nken v. Holder*,
   556 U.S. 418 (2009)..........................................................................................12, 41

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004)..................................................................................................41

*Padilla-Mangual v. Pavía Hosp.*,
    516 F.3d 29 (1st Cir. 2008) ................................................................12

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ........................................................21

*Pub. Serv. Co. of N.H. v. Town of W. Newbury*,
    835 F.2d 380 (1st Cir. 1987) ................................................................38

*R.I. Coal. Against Domestic Violence v. Bondi*,
    __ F. Supp. 3d __, 2025 WL 2271867 (D.R.I. Aug. 8, 2025) ................15

*Renne v. Geary*,
    501 U.S. 312 (1991) ............................................................................11

*Respect Maine PAC v. McKee*,
    622 F.3d 13 (1st Cir. 2010) ................................................................13

*River St. Donuts, LLC v. Napolitano*,
    558 F.3d 111 (1st Cir. 2009) ................................................................21

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ...................................................................24, 30, 31

*San Juan City Coll. v. United States*,
    391 F.3d 1357 (Fed. Cir. 2004) ............................................................17

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
    No. 22-cv-11091, 2023 WL 3660689 (D. Mass. May 25, 2023) ................38

*7-Eleven, Inc. v. Grewal*,
    60 F. Supp. 3d 272 (D. Mass. 2014) ......................................................40

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012) ..............................................................28

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981) ..............................................................28

*Sierra Club v. EPA*,
    353 F.3d 976 (D.C. Cir. 2004) ..............................................................21

*Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012) (per curiam) ................................................13

*Sossamon v. Lone Star State of Tex.*,
  560 F.3d 316 (5th Cir. 2009), *aff'd*, 563 U.S. 277 (2011)........................................33

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ................................................................18

*Suburban Mortg. Assocs., Inc. v. HUD*,
  480 F.3d 1116 (Fed. Cir. 2007).................................................................16

*Town of Weymouth v. Mass. Dep't of Env't Prot.*,
  961 F.3d 34 (1st Cir.), *modified on other grounds*,
  973 F.3d 143 (1st Cir. 2020) (per curiam) .................................................39

*Trump v. Am. Fed'n of Gov't Emps.*,
  145 S. Ct. 2635 (2025)..........................................................................28

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025)..........................................................................14

*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025)..........................................................................42

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
  770 F. Supp. 3d 155 (D.D.C. 2025) ....................................................18, 19

*U.S. Dep't of Educ. v. California*,
  145 S. Ct. 966 (2025).................................................................14 *et passim*

*U.S. Postal Serv. v. Gregory*,
  534 U.S. 1 (2001)................................................................................33

*United States v. Am. Libr. Ass'n*,
  539 U.S. 194 (2003)............................................................................31

*United States v. Hansen*,
  599 U.S. 762 (2023)........................................................................30, 33

*United States v. Kuzma*,
  967 F.3d 959 (9th Cir. 2020) ................................................................36

*United States v. Mitchell*,
  463 U.S. 206 (1983)............................................................................11

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981)............................................................................42

ix

*Vill. W. Assocs. v. R.I. Hous. & Mortg. Fin. Corp.*,
   618 F. Supp. 2d 134 (D.R.I. 2009) ........................................................16

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ...............................................................12, 38

*West Virginia v. U.S. Dep't of the Treasury*,
   59 F.4th 1124 (11th Cir. 2023) ............................................................26

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................12, 40

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
   758 F.2d 669 (D.C. Cir. 1985) ............................................................38

*Worman v. Healey*,
   293 F. Supp. 3d 251 (D. Mass. 2018), *aff'd*, 922 F.3d 26 (1st Cir. 2019) ................35

*Ysursa v. Pocatello Educ. Ass'n*,
   555 U.S. 353 (2009) ....................................................................31

## Constitutions, Statutes, and Rules

U.S. Const. amend. I ....................................................................2

U.S. Const. amend. V ...................................................................2

5 U.S.C. §§ 701-706 ....................................................................2

5 U.S.C. § 701(a)(2) ...................................................................20

5 U.S.C. § 702 .........................................................................13

5 U.S.C. § 706 .........................................................................41

5 U.S.C. § 706(2) ......................................................................42

5 U.S.C. § 706(2)(A) ................................................................20, 21

18 U.S.C. § 287 ......................................................................8, 11

18 U.S.C. § 1001 .....................................................................8, 11

20 U.S.C. §§ 1681-1689 ...............................................................8, 23

20 U.S.C. § 1682 ....................................................................23, 27

28 U.S.C. § 1346(a)(2) .................................................................................................. 1

28 U.S.C. § 1491(a)(1) ............................................................................................. 1, 13

31 U.S.C. 3729 ....................................................................................................... 8, 11

31 U.S.C. § 3729(b)(4) ............................................................................................... 4

42 U.S.C. §§ 2000d to 2000d-7 .................................................................................. 8

42 U.S.C. § 2000d .......................................................................................... 8, 10, 22

42 U.S.C. § 2000d-1 ............................................................................................. 22, 32

42 U.S.C. §§ 10401-10414 .......................................................................................... 7

42 U.S.C. § 10406(c)(2)(B)(i) ..................................................................................... 7

42 U.S.C. § 11360(16) ................................................................................................ 24

42 U.S.C. § 11360(29) ........................................................................................... 3, 24

42 U.S.C. §§ 11381-11389 ........................................................................................... 3

42 U.S.C. § 11382(d)(2) .............................................................................................. 5

42 U.S.C. § 11383(a)(6) ............................................................................................ 24

42 U.S.C. § 11385 ........................................................................................................ 3

42 U.S.C. § 11386(b) ................................................................................................... 3

42 U.S.C. § 11386(b)(2) .............................................................................................. 3

42 U.S.C. § 11386(b)(3) .............................................................................................. 4

42 U.S.C. § 11386(b)(6) .............................................................................................. 3

42 U.S.C. § 11386(b)(7) .............................................................................................. 4

42 U.S.C. § 11386(b)(8) .................................................................................... 4, 24, 25

Fed. R. Civ. P. 12(b)(1) .............................................................................................. 11

Fed. R. Civ. P. 65(c) .................................................................................................. 43

**REGULATIONS**

2 C.F.R. § 200.340(a)(4) ................................................................................27

2 C.F.R. § 200.341 ..........................................................................................37

2 C.F.R. § 200.342 ..........................................................................................37

24 C.F.R. § 1.5 ..........................................................................................22, 27

24 C.F.R. § 1.5(a)(1) .......................................................................................32

24 C.F.R. § 1.5(a)(3) .......................................................................................32

24 C.F.R. § 570.496 ........................................................................................37

24 C.F.R. § 570.502 ........................................................................................37

24 C.F.R. § 570.900(b)(5)-(7) .......................................................................37

24 C.F.R. § 570.910(a) ...................................................................................37

24 C.F.R. § 578.53 ..........................................................................................27

24 C.F.R. § 578.99(e) ......................................................................................37

45 C.F.R. § 75.300(a) ................................................................................6, 32

45 C.F.R. § 75.374 ..........................................................................................37

45 C.F.R. § 80.4 ..............................................................................................32

45 C.F.R. Part 86 ............................................................................................23

45 C.F.R. § 86.4 ..............................................................................................27

45 C.F.R. § 86.4(a) ..........................................................................................23

45 C.F.R. § 86.4(c) ..........................................................................................23

45 C.F.R. § 1370.3(a)(10) ..............................................................................23

45 C.F.R. § 1370.5(a) ......................................................................................23

### <u>MISCELLANEOUS AUTHORITIES</u>

Dep't of Health & Hum. Servs., *Admin. & Nat'l Pol'y Requirements*,
    https://perma.cc/9M5Y-8PHG ...........................................................................................9

Dep't of Health & Hum. Servs., *HHS Grants & Contracts*,
    https://perma.cc/FGB7-4R3J ............................................................................................5

Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025)..........................................4, 8, 24, 25

Exec. Order No. 14,182, 90 Fed. Reg. 8751 (Jan. 24, 2025)........................................................5

**<u>INTRODUCTION</u>**

Seventeen state domestic violence and sexual abuse coalitions, as well as their individual members (collectively, "Plaintiffs"), seek to enjoin two federal agencies—the Department of Housing and Urban Development ("HUD") and the Department of Health and Human Services ("HHS")—from withholding or conditioning grant funds on certain new antidiscrimination-related conditions. Plaintiffs challenge HUD conditions that seek to (1) prevent grant recipients from using Government funds to promote "gender ideology" as the President has defined it by executive order; (2) require grant recipients to certify compliance with "all applicable Federal anti-discrimination laws" and certify the materiality of that compliance for False Claims Act purposes; (3) require grant recipients to certify that none of their programs violate "any applicable Federal anti-discrimination laws"; and (4) prohibit the use of federal money to either fund or promote elective abortions. In a similar vein, Plaintiffs seek to enjoin two HHS operating divisions—the Administration for Children and Families ("ACF") and the Health Resources and Services Administration ("HRSA")—from requiring Plaintiffs to certify compliance with Title IX of the Education Amendments of 1972 because Plaintiffs object to the wording of those certifications.

Plaintiffs' claims face a threshold barrier: this Court lacks subject-matter jurisdiction over them. Plaintiffs are essentially asserting that they are entitled to payment by the Government under grant agreements. These claims amount to Tucker Act actions over which the Court of Federal Claims has exclusive jurisdiction. 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). Plaintiffs' constitutional and administrative claims are statutory challenges to conditions of the grants by another name, for which there is no jurisdiction in this Court.

Because this Court lacks jurisdiction, it need not consider Plaintiffs' other arguments. If it does, however, Plaintiffs' bid for an injunction fails for additional reasons.  First, Plaintiffs cannot show they are likely to succeed on the merits of their claims.  Their argument that HUD and HHS lack statutory authority to impose the challenged conditions is contrary to explicit grants of authority to the Secretaries of those agencies.  Federal agencies may impose conditions on funding to further certain policies and priorities consistent with the authority provided by grant program statutes.  Where, as here, Congress has provided the relevant authority to the agency, there is no separation-of-powers issue.  Plaintiffs' claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, must likewise fail because, as mentioned, the Secretaries of HUD and HHS have the authority to prescribe terms for the grants Plaintiffs seek. Both agencies have long required compliance with federal antidiscrimination law as a condition of receiving a federal grant; to the extent Plaintiffs' claims are reviewed under the APA, it is not arbitrary and capricious for the agencies to require compliance with such laws now.

Plaintiffs have similarly fallen short in demonstrating violations of either the First or Fifth Amendments, U.S. CONST. amends. I, V.  The First Amendment permits the Government to set spending conditions for the use of its funds.  And contrary to Plaintiffs' contentions, the challenged conditions adequately advise Plaintiffs about the conduct to which they apply; Plaintiffs' fears to the contrary are completely speculative.

In addition to failing to establish their likelihood of success on the merits, Plaintiffs cannot show imminent, irreparable harm warranting emergency relief. The harm they face is monetary, which is quintessential reparable harm. Moreover, to the extent that the challenged conditions are construed to require compliance only with existing federal law, there can be no harm, let alone irreparable harm. As Plaintiffs themselves recognize, they are already required to

comply with federal law.  Moreover, the public interest and balance of equities do not favor an injunction because much of the disbursement of public funds to Plaintiffs is likely irreversible, and the Government has an interest in ensuring federal funds are used in compliance with federal law.

The United States incorporates by reference the declarations of Claudette Fernandez (HUD) ("Fernandez Decl."), Katherine Chon (ACF) ("Chon Decl."), and Cynthia Baugh (HRSA) ("Baugh Decl."), attached to this Opposition Memorandum as Exhibits A, B, and C, respectively.

## BACKGROUND

### A.  HUD and its grants

Under the Continuum of Care ("CoC") program, HUD awards grants to non-profits and local governments that provide housing and supportive services to the homeless.  42 U.S.C. §§ 11381-11389; Fernandez Decl. ¶ 4.  Supportive services include, among other things, childcare, job training, outpatient health services, food, mental health services, and assistance in obtaining other federal, state, and local assistance.  42 U.S.C. §§ 11360(29), § 11385.  HUD also administers the Community Development Block Grant ("CDBG") program, which provides annual grants on a formula basis to states and municipalities to help provide decent housing, suitable living environments, and expanded economic opportunities for low and moderate-income individuals.  Fernandez Decl. ¶5.

To receive CoC funding, the recipient must agree to various conditions.  42 U.S.C. § 11386(b).  The recipient must agree, for example, to monitor and report the project's progress and the provision of matching funds to HUD.  *Id.* §§ 11386(b)(2), 11386(b)(6).  The recipient must further agree to ensure, "to the maximum extent practicable," that homeless individuals are

involved in maintaining and operating facilities for the project and in providing supportive services. *Id.* § 11386(b)(3). And the recipient must "take the educational needs of children into account" by ensuring, to the maximum extent possible, that children are placed near their schools so that their education is not adversely affected. *Id.* § 11386(b)(7). Additionally, the recipient must agree "to comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner." *Id.* § 11386(b)(8). When applicable grant statutes conflict with grant conditions for specific programs, HUD will not require that grantees follow those conditions. Fernandez Decl. ¶ 9.

The grant agreements that HUD has sent to recipients of CoC financial awards on or after March 11, 2025, contain the revised conditions (collectively, the "CoC Conditions"), which provide:

> A. [The recipient] shall not use grant funds to promote "gender ideology," as defined in [Executive Order ("E.O.")] 14[,]168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;[1]
>
> B. [The recipient] agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the False Claims Act, 31 U.S.C. § 3729(b)(4)];
>
> C. [The recipient] certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964; [and]

---

[1] As relevant here, according to E.O. 14,168, "'Gender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. . . ." Exec. Order No. 14,168, 90 Fed. Reg. 8615, 8615-16 (Jan. 20, 2025). By its express terms, E.O. 14,168 cannot be "construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof[.]" *Id.*, § 8(a)(i), 90 Fed. Reg. at 8818. Agencies must also implement the order "consistent with applicable law . . . ." *Id.* § 8(b).

     D.  [The recipient] shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14[,]182, Enforcing the Hyde Amendment[.[2]]

*Id.* ¶ 11.  The CoC grant agreements also provide that the agreement, the recipient's use of grant funds, and the recipient's operation of projects using grant funds are "governed by" "all current Executive Orders."  *Id.* ¶ 12.

Once the recipient meets the required conditions, HUD has 45 days to obligate the funds, which it does by executing a grant agreement with the recipient.  42 U.S.C. § 11382(d)(2).  To the extent that Plaintiffs have either not yet executed and returned their fiscal year ("FY") 2024 grant agreements to HUD, as required, or have unilaterally attempted to change the grant agreement without HUD's authorization, they cannot draw down their FY 2024 CoC grant funds.  Fernandez Decl. ¶ 13.  Although some Plaintiffs have attempted to modify their agreements by deleting or nullifying the CoC Conditions at issue here, HUD has continued to fund their grants.  *Id.*

### B.  **HHS and its grants**

HHS is the largest grant-making agency in the country.  *See* Dep't of Health & Hum. Servs., *HHS Grants & Contracts*, https://perma.cc/FGB7-4R3J.  The agency is composed of many operating divisions; as relevant here, these include ACF and HRSA.  Chon Decl. ¶ 1; Baugh Decl. ¶ 1.

---

[2] By its express terms, E.O. 14,182 cannot be "construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof[.]" Exec. Order No. 14,182, § 4(a)(i), 90 Fed. Reg. 8751 (Jan. 24, 2025).  Agencies must also implement the order "consistent with applicable law . . . ."  *Id.* § 4(b).

### 1. *ACF*

In order to promote the economic and social well-being of children, families, and communities, ACF issues and manages discretionary and nondiscretionary awards to a variety of entities, including nonprofit organizations; the types of grants available are determined by the authorizing statute.  Chon Decl. ¶¶ 4-5.  Discretionary awards are given out after a competitive process, while nondiscretionary awards are given out to specific recipients as directed by the relevant program's authorizing statute.  *Id.* ¶ 5.

In certain programs, the grant recipient passes through a portion of the direct award to other organizations; in federal grant parlance, the second-tier organization is called a "subrecipient" and the funding it receives is called a "subaward."  *Id.* ¶ 6.  Subrecipients must use the subaward in accordance with applicable federal statutes, regulations, and grant conditions, and the grant recipient is responsible for monitoring their conduct.  *Id.* ¶ 7.

HHS grant regulations require ACF and other HHS grant-making operating divisions to ensure that federal funding is used in full compliance with federal statutory and public policy requirements, including those that prohibit discrimination.  *Id.* ¶ 8; 45 C.F.R. § 75.300(a).  ACF and other HHS grant-making operating divisions must communicate all of these public policy requirements to grant recipients and incorporate them into the grant's terms.  *Id.* ¶ 8.  ACF achieves this requirement by incorporating compliance with federal statutes as a term in its Standard Terms and Conditions ("ST&C"), and making the ST&C part of each funding award.  *Id.*  The ST&C for each grant provide that "[a]ll applicable statutory or regulatory provisions supersede any conflicting or inconsistent provisions" in the ST&C itself.  *Id.* ¶ 9.  ACF's ST&C apply to both discretionary and nondiscretionary grants that ACF administers.  *Id.* ¶ 21.

ACF administers both discretionary and nondiscretionary grants under the Family Violence Prevention and Services Act ("FVPSA"), 42 U.S.C. §§ 10401-10414, the purpose of which is to address and prevent domestic violence in a variety of ways. Chon Decl. ¶¶ 10-15. By law, FVPSA supports specialized services for a variety of populations, including children exposed to forms of domestic violence, underserved populations, and victims who are members of racial and ethnic minorities. *Id.* ¶¶ 12, 15. Many FVPSA grants are passed along to subrecipients, whose compliance with the terms of the grant is monitored by the primary awardee. *Id.* ¶ 12.

FVPSA requires grant recipients to comply with federal antidiscrimination laws, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1869. Chon Decl. ¶ 16. In that regard, one relevant section of FVPSA states:

> No person shall on the ground of sex or religion be excluded from participation in, be denied the benefits of, or be subject to discrimination under, any program or activity funded in whole or in part with funds made available under this chapter. Nothing in this chapter [of FVPSA] shall require any such program or activity to include any individual in any program or activity without taking into consideration that individual's sex in those certain instances where sex is a bona fide . . . programmatic factor reasonably necessary to the normal or safe operation of that particular program or activity.

42 U.S.C. § 10406(c)(2)(B)(i). This provision applies to all FVPSA grants. Chon Decl. ¶ 16.

On March 28, 2025, the HHS Office of Grants notified HHS grant-making operating divisions, including ACF, to insert a certification requirement in notices of funding awards provided to entities that participate in, facilitate, or fund programs implicating Title IX. *Id.* ¶ 17. Programs implicating Title IX include grants made to schools, colleges, universities, non-governmental organization programs, and education-related awards to prisons or other detention facilities. *Id.* ¶ 18. The Title IX certification sought the award recipient's assurance that the recipient would comply with the requirements of Title IX. *Id.* ¶ 17. The March 28th version of

the Title IX certification included in the HHS Office of Grants notification expressly incorporated by reference the terms of E.O. 14,168 concerning gender ideology.  *Id.*

On May 9, 2025, ACF updated its ST&C for FY 2025 to include its own Title IX certification (the "ACF Title IX Certification") for funding awards made on or after March 28, 2025.  *Id.* ¶ 19.  The ACF Title IX Certification referred expressly to Title IX, 20 U.S.C. §§ 1681-1689, as well as Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, and omitted E.O. 14,168.  *Id.*

On July 29, 2025, ACF again updated its ST&C.  *Id.* ¶ 20.  The revised ST&C, which is currently in effect, makes the ACF Title IX Certification applicable to new funding awards made on or after May 9, 2025.  *Id.*  The ACF Title IX Certification reads as follows:

> By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients whose programs are covered by Title IX certify as follows:
>
> - Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.
> - The above requirements are conditions of payment that go to the essence of the Agreement and are therefore material terms of the Agreement.
> - Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.
> - Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.
> - Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

8

*Id.* ¶ 19.  ACF has not paused or terminated funding, or taken any adverse action with respect to ACF FVPSA grant recipients based on the ACF Title IX Certification.  *Id.* ¶ 23.  Based on HHS's stipulation with Plaintiffs (ECF No. 39), none of the other terms of ACF's ST&C is at issue for purposes of the preliminary injunction.

### 2. *HRSA*

HRSA awards funding to thousands of recipients, including community-based organizations, to support health services projects.  Baugh Decl. ¶ 4.  HRSA grants share various attributes of ACF grants.  HRSA issues both discretionary and nondiscretionary grants, which can be subawarded from recipients to subrecipients.  *Id.* ¶¶ 5-6.  HRSA requires grant recipients to monitor the conduct of their subrecipients to ensure grants are being used in accordance with applicable statutes, regulations, and contractual terms.  *Id.* ¶ 7.

Like the rest of HHS, HRSA requires recipients and subrecipients to comply with applicable federal laws and policies, including those prohibiting discrimination, and to incorporate those laws into the grant award conditions.  *Id.* ¶ 8.  HRSA also incorporates compliance with federal statutes as a term of its General Terms & Conditions ("GT&C") in every active award contract.  *Id.*

HRSA's GT&C provide that, in case of conflicting or inconsistent requirements, grant recipients must adhere to the following order of precedence listed in HHS's Administrative and National Policy Requirements ("ANPR"): the U.S. Constitution, statutes, regulations, program guidance, and award-specific requirements.  Baugh Decl. ¶ 9.  HHS's ANPR lists E.O.s at the same level of precedence as program guidance.  *Id.*; *see also* Dep't of Health & Hum. Servs., *Admin. & Nat'l Pol'y Requirements* 2, https://perma.cc/9M5Y-8PHG.

HRSA has awarded a Maternal and Child Health ("MCH") Services Block Grant to the District of Columbia Department of Health ("DCDOH"). Baugh Decl. ¶ 10. In FY 2024, Plaintiff D.C. Coalition received MCH Block Grant funds as a subrecipient. *Id.* On October 1, 2025, HRSA expects to award FY 2026 MCH Block Grant funding to DCDOH. *Id.* MCH grant recipients (and, through them, MCH subrecipients) must certify their compliance with federal antidiscrimination laws, including Title IX. *Id.* ¶ 11.

HRSA's Ryan White HIV/AIDS program ("RWHAP") makes mandatory grants to states, including Rhode Island, to improve the health care and support services available to individuals and families with HIV/AIDS. *Id.* ¶ 12. As part of that grant, Rhode Island earns income from drug rebates, and Plaintiff Community Care Alliance is a subrecipient of such a grant. *Id.* As the RWHAP grant recipient, Rhode Island is responsible for ensuring that Community Care Alliance and all other subrecipients comply with program requirements. *Id.* ¶¶ 12-13.

HRSA has updated its GT&C for FY 2025 to require a Title IX certification (the "HRSA Title IX Certification"). Baugh Decl. ¶¶ 14-15, 17. Applicable to all active funding awards (*id.* ¶17), the HRSA Title IX Certification reads:

> By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients, whose programs, are covered by Title IX certify as follows:
>
> - Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14[,]168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.
> - The above requirements are conditions of payment that go the essence of the Agreement and are therefore material terms of the Agreement.
> - Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding

10

> under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.
>
> • Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.
>
> • Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

*Id.* ¶ 16.  HRSA has not paused or terminated funding, or taken any adverse action with respect to HRSA grant recipients based on the HRSA Title IX Certification.  *Id.* ¶ 19.

## LEGAL STANDARDS

### A.  Subject-matter jurisdiction

To proceed on their claims, Plaintiffs must first establish subject-matter jurisdiction in this Court—specifically, by showing whether Congress has waived sovereign immunity and, if so, whether this Court may hear their claims.  *See, e.g.*, *Hanley v. United States*, No. 94-1315, 1994 WL 723678, at *2 (1st Cir. Oct. 5, 1994) (per curiam) (affirming Fed. R. Civ. P. 12(b)(1) dismissal) ("A plaintiff has the burden of showing a waiver of sovereign immunity.").  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").

Federal courts "presume [they] lack jurisdiction unless the contrary appears affirmatively from the record."  *Renne v. Geary*, 501 U.S. 312, 316 (1991) (cleaned up).  The test for deciding whether sovereign immunity has been waived is "stringent," the waiver must be "unmistakably clear," and the Court must "indulge every reasonable presumption against" waiver.  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 678, 682 (1999); *see*

11

*also FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("[A] waiver of sovereign immunity must be unequivocally expressed in statutory text.") (cleaned up).

Plaintiffs have the burden of alleging facts sufficient to establish the Court's subject-matter jurisdiction. *See Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996); *see also Padilla-Mangual v. Pavía Hosp*., 516 F.3d 29, 31 (1st Cir. 2008) (once challenged, "the party invoking subject[-]matter jurisdiction . . . has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction").

**B. Preliminary injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008); *see also Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022). A plaintiff must establish that: (i) it likely will succeed on the merits; (ii) absent preliminary relief, it likely will suffer irreparable harm; (iii) the balance of the equities tips in its favor; and (iv) an injunction is in the public interest. *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025) (citing *Winter*, 555 U.S. at 20). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gamble*, 480 U.S. 531, 542 (1987). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor[,]" using "any relevant evidence" to support its conclusions. *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18, 19 (1st Cir. 2006).

In evaluating whether Plaintiffs have demonstrated a likelihood of success on the merits, the merits need not be "conclusively determine[d];" instead, at this stage, decisions "'are to be understood as statements of probable outcomes' only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

## ARGUMENT

### I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS

#### A.    <u>The Court of Federal Claims has exclusive jurisdiction to hear Plaintiffs' claims seeking to compel payments of the grants at issue.</u>

This Court lacks jurisdiction over Plaintiffs' claims because they arise from Plaintiffs' contracts with the Government and must therefore be heard in the Court of Federal Claims. The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Thus, where a party seeks funding that it believes the Government is obligated to pay under a contract, that lawsuit can only proceed in the Court of Federal Claims. *See, e.g.*, *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983) (vacating district court judgment after concluding that court lacked jurisdiction under 5 U.S.C. § 702 to award money judgment); *id.* ("[E]ven if we agreed with [claimant] that the award was equitable and did not constitute 'money damages,' we would

still find that section 702 did not remove the defense of sovereign immunity."); *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978) ("Irrespective of the terminology employed . . . the object of the instant suit is clearly to compel appellants [the agency] in their official capacities to specifically perform a contract") (citations and quotations omitted). This prohibition on district court jurisdiction extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

In April, the Supreme Court stayed a district court order to make payments based on various education-related grants because the Government was "likely to succeed in showing that the District Court lacked jurisdiction" to bar termination of those grants. *U.S. Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). The Supreme Court held the injunction was effectively an order "to enforce a contractual obligation to pay money," and thus not covered by the APA's limited waiver of sovereign immunity; instead, the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over such suits. *Id.* This Court should follow the Supreme Court's stay ruling. *See Trump v. Boyle,* 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases."); *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991) (noting that "courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings").

Nor does *Bowen v. Massachusetts*, 487 U.S. 879 (1988), require a different result. In *California*, the Supreme Court specifically considered and distinguished *Bowen* in finding that the Tucker Act applied to that case. 145 S. Ct. at 968. The district court in *California* had held that it had jurisdiction based on an expansive reading of *Bowen*. *See California v. U.S. Dep't of*

14

*Educ.*, 769 F. Supp. 3d 72, 76 (D. Mass. 2025) (adopting reasoning of *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 295-96 (D. Mass. 2025), *appeal filed*, No. 25-1344 (1st Cir. Apr. 9, 2025)), *appeal filed*, No. 25-1244 (1st Cir. Mar. 12, 2025).  Rejecting the district court's holding, the Supreme Court ruled in staying the district court's order that the court likely did not have jurisdiction.  *California*, 145 S. Ct. at 968; *see also, e.g., Mass. Fair Hous. Ctr. v. HUD*, No. 25-cv-30041, 2025 WL 1225481 (D. Mass. Apr. 14, 2025) (Even if the plaintiffs had a likelihood of success on the merits, the court "is merely deferring (as it must) to the Supreme Court's unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims.").  *But cf. Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39 (1st Cir. 2025), *application for stay pending*, No. 25A103 (U.S. July 24, 2025).[3]  The same is true here, and the Court lacks jurisdiction over the Plaintiffs' claims as a result.[4]

### B.  Framing Plaintiffs' contractual claims as constitutional claims does not bestow subject-matter jurisdiction on this Court.

That Plaintiffs frame some of their claims here as constitutional does not change the Tucker Act analysis.  As the Federal Circuit has emphasized:

> [I]n determining whether a plaintiff's suit is to be heard in district court or the Court of Federal Claims, we must look beyond the form of the pleadings to the substance of the claim.  We have cautioned litigants that dressing up a claim for

---

[3] In *American Public Health,* the First Circuit declined to follow *California* and stay the case pending appeal, reasoning that the defendants' termination of plaintiffs' grants, which the district court had deemed unlawful, was independent of the terms and conditions of the grant contracts.  The First Circuit thus concluded that the Tucker Act was likely inapplicable.  *See* 145 F.4th at 49-52.  In the case at bar, by contrast, the conditions of the funding contracts are what prompted Plaintiffs to file the lawsuit in the first place.

[4] Defendants recognize that, despite *California*, this Court and others have rejected the applicability of the Tucker Act in similar cases.  *See, e.g., R.I. Coal. Against Domestic Violence v. Bondi*, __ F. Supp. 3d __, 2025 WL 2271867, at *5 (D.R.I. Aug. 8, 2025); *Ass'n of Am. Univs. v. U.S. Dep't of Energy*, No. 25-cv-10912, 2025 WL 1414135, at *5-7 (D. Mass. May 15, 2025), *appeal filed*, No. 25-1727 (1st Cir. July 31, 2025).

money as one for equitable relief will not remove the claim from Tucker Act jurisdiction to make it an APA case.

*Suburban Mortg. Assocs., Inc. v. HUD*, 480 F.3d 1116, 1124 (Fed. Cir. 2007); *see also Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004) ("[A] party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.") (citation omitted); *Consol. Edison Co. of New York, Inc. v. U.S. Dep't. of Energy*, 247 F.3d 1378, 1385 (Fed. Cir. 2001) ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims."); *Vill. W. Assocs. v. R.I. Hous. & Mortg. Fin. Corp*., 618 F. Supp. 2d 134, 139-40 (D.R.I. 2009) (rejecting as "without merit" plaintiffs' "familiar argument" that because they sought a prospective declaration regarding future agency actions, the Court of Federal Claims could not provide adequate relief in case where the Tucker Act applies).

The real question, then, is not how Plaintiffs have characterized their claims, but "whether the cause is one over which the Court of Federal Claims has jurisdiction under the Tucker Act." *Suburban Mortg. Assocs., Inc.*, 480 F.3d at 1125. In other words, is there an adequate remedy in a court other than this Court, thereby precluding jurisdiction under the APA, 5 U.S.C. § 704? "If the suit is at base a claim for money, and the relief available through the Court of Federal Claims under the Tucker Act—a money judgment—will provide an adequate remedy, the inquiry is at an end." *Id.*

To determine whether a particular action is "at its essence a contract action" subject to the Tucker Act, a court must examine "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959,

16

968 (D.C. Cir. 1982). Here, as discussed below, Plaintiffs' claims fail both prongs of the *Megapulse* test because (1) Plaintiffs seek to enforce rights under their contracts with the agencies; and, (2) as relief, Plaintiffs request the Court to order specific performance of those contracts.

**1. *Plaintiffs seek to enforce contractual rights.***

To determine whether the source of the rights in question is contractual, a court must consider whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights exist prior to and apart from rights created under the contract"; and whether "the plaintiff seeks to enforce any duty imposed upon the government by the . . . relevant contracts to which the government is a party." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (cleaned up).

Here, the only source of Plaintiffs' claimed rights is their grant agreements. Plaintiffs seek to challenge Defendants' insertion of one or more of the challenged conditions into their funding contracts, and to require the agencies to remove those terms from the contracts before awarding grant funds. *See* Pls.' Mem. Supp. Prelim. Inj. (ECF No. 30-1), at 59-60 ("P.I. Mem."). Thus, Plaintiffs' claims and the relief sought make clear that the purpose of the suit is to challenge contractual terms.

Courts have routinely held that federal "grant agreements [are] contracts when the standard conditions for a contract are satisfied." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1360-62 (Fed. Cir. 2004) (treating a "Program Participation Agreement" and related grants under the Higher Education Act as a contract). With some exceptions, if the grant agreements to which Plaintiffs are parties had never existed, Plaintiffs would have no claim to funds from the agencies. That means that the source of Plaintiffs' rights is contractual, and that under the

17

Tucker Act this Court lacks jurisdiction.  *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (court lacks subject-matter jurisdiction because asserted right to payment "in no sense . . . exist[ed] independently of that contract").  Whether labeled as a violation of the APA or a constitutional right, absent other exclusive statutory jurisdiction, the Tucker Act governs where the "essential rights at stake" are contractual, "despite plaintiff's allegations of statutory and constitutional violations."  *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77-78 (D.C. Cir. 1985).

Even if this Court concludes the Tucker Act does not remove jurisdiction over all of Plaintiffs' claims, it still must dismiss or transfer the claims that indisputably sound in contract. In this case, some of Plaintiffs' members appear to have already accepted grant contracts subject to the challenged conditions before Plaintiffs brought this lawsuit.[5]  If nothing else, these members of Plaintiffs' coalitions belong in the Court of Claims.

## 2. *Plaintiffs request contractual remedies.*

The second part of the *Megapulse* test requires the Court to examine what relief Plaintiffs seek.  *See Megapulse*, 672 F.2d at 968.  Where, as here, a plaintiff seeks to enforce a contractual agreement with the Government and obtain payment of money, the inquiry is straightforward: a district court "cannot order the Government to pay money due on a contract."  *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025).  A request for an order that the Government "must perform" on its contract is one that "must be resolved by the Claims Court."  *Id.* (quoting *Ingersoll-Rand Co.*, 780 F.2d at 80); *see also California*, 145 S. Ct. at 968.

---

[5] *See, e.g.,* ECF No. 30-7, at ¶ 13(b) (HUD award accepted July 9, 2025); ECF No. 30-13, at ¶ 23 (ACF award accepted July 8, 2025); ECF No. 30-16, at ¶ 19 (HUD award accepted July 9, 2025); ECF No. 30-19, at ¶ 22 (HUD award accepted June 4, 2025); ECF No. 30-23, at ¶ 10(b) (HUD award accepted June 2025).

It makes no difference that Plaintiffs frame the relief they seek as an injunction barring Defendants from enforcing the challenged conditions as part of the grant contracts and requiring Defendant nonetheless to pay out on the contracts.  A district court is not empowered to grant such relief.  *See California*, 145 S. Ct. at 968.

Here, the purportedly non-monetary injunctive relief Plaintiffs seek—an order requiring that specific terms of their grant contracts be excised—is inseparable from the fundamentally contractual relief they seek—uninterrupted grant funding under those contracts.  If Plaintiffs were not grantees of the agencies, they would have no way to negotiate the terms under which the Government administers its funds or Plaintiffs receive them.  Accordingly, the equitable relief they request is dependent on their contractual claims.  Plaintiffs cannot evade the exclusive jurisdiction that the Tucker Act invests in the Court of Claims merely by requesting equitable relief.  *See N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994).

Plaintiffs are, in fact, asking this Court to mandate that HUD and HHS continue payment on the CoC, CDBG, ACF, and HRSA grants.  *See California*, 145 S. Ct. at 968; *Cath. Bishops*, 770 F. Supp. 3d at 163 ("Stripped of its equitable flair, the requested relief seeks one thing: . . . The Conference wants the Government to keep paying up. . . But this Court cannot order the Government to pay money due on a contract."); *Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (although "[plaintiff] attempts to couch his claims in the language of equitable and declaratory relief, the only relief he seems to be seeking apart from monetary damages is reconsideration of his proposal or perhaps an order directing that his proposal be funded.  Because . . . at bottom what he seeks is monetary relief based on what he perceived as a contract created by the communications he received in response to his proposal, [plaintiff] cannot manufacture an APA claim by asking the court to declare that the failure to

fund his proposal was an arbitrary or capricious act"). Therefore, this Court lacks jurisdiction over Plaintiffs' claims.

## II. PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS

Proving likelihood of success on the merits is the *sine qua non* of a preliminary injunction. *New Comm Wireless Servs., Inc. v. SprintCom, Inc*., 287 F.3d 1, 9 (1st Cir. 2002). Therefore, "[i]f the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *Id.* Even apart from the jurisdictional obstacles, Plaintiffs have not shown a likelihood of success on the merits because Defendants' actions violated neither the APA nor the Constitution.

### A. Plaintiffs are unlikely to succeed on their APA or separation-of-powers claims.

#### 1. *APA statutory framework*

The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[6] The scope of review under the

---

[6] The APA does not permit judicial review of "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agencies have broad discretion in creating, awarding, and terminating specific grants, and thus review of the terms and conditions set by agencies, within the limits set by Congress, is outside of the jurisdiction of the Court. In *Lincoln v. Vigil*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision-making standards. 508 U.S. 182, 185-88 (1993). Indeed, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id*. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the *Footnote continued…*

"arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted); *see also Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (noting narrowness of arbitrary-and-capricious standard and that "a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'") (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). This deferential standard requires only that "agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency's explanation need not be of "ideal clarity," but instead must only be clear enough for "the agency's path [to] reasonably be discerned" and to facilitate effective review. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

Defendants' priorities in this context are matters of policy discretion and not of "factual findings." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And all the APA

---

operative statutes." *Id*. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id*.

Although *Lincoln* involved lump-sum appropriations, its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id*. at 752 (citation omitted); *see Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.). To the extent that Plaintiffs challenge discretionary grants, the APA does not allow for judicial review.

requires for a policy change is that an agency "display awareness that it *is* changing position." *Id.* The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

      2.   **<u>The challenged conditions are not contrary to law because Defendants have discretion to impose them.</u>**

        (a) *<u>The agency certifications</u>*

          (i)   <u>HUD's CoC Certifications</u>

HUD's antidiscrimination certification requires grant recipients to certify that they comply with federal antidiscrimination law, to acknowledge that such compliance is material to HUD's grant award, and to agree that program funds will not be put to specified unlawful uses. These requirements are neither novel nor unlawful but simply call attention to recipients' preexisting obligation to comply with the law.

As Plaintiffs acknowledge (P.I. Mem. at 17), recipients of federal assistance must comply with federal antidiscrimination law. 42 U.S.C. § 2000d. Title VI of the Civil Rights Act of 1964 "authorize[s] and direct[s]" federal agencies that award federal funds to "effectuate" § 2000d by issuing rules and regulations. 42 U.S.C. § 2000d-1. HUD has thus promulgated regulations requiring that grant applications include, as a condition of payment, assurances that the grant recipient comply with federal antidiscrimination law. 24 C.F.R. § 1.5.

CoC grant recipients must certify that they "d[o] not operate any programs that violate any applicable Federal anti-discrimination laws," including Title VI. Fernandez Decl. ¶ 11. The certification calls attention to the recipients' legal obligations and makes them certify to HUD that they understand and have accepted those obligations. The recipients' "assurances" of

compliance are "given 'in consideration of federal aid,' and the federal government extends

assistance 'in reliance on' the assurance of compliance." *Guardians Ass'n v. Civ. Serv. Comm'n*,

463 U.S. 582, 630 (1983) (Marshall, J., dissenting).

(ii) <u>ACF's and HRSA's certifications</u>

Similarly, Title IX of the Education Amendments of 1972 (codified at 20 U.S.C.

§§ 1681-1689), authorizes HHS (and thus both ACF and HRSA), to adopt a regulation that

requires every grant recipient to certify that the recipient's activities comply with the

requirements of Title IX. *See* 20 U.S.C. § 1682; 45 C.F.R. § 86.4(a). The regulations provide

HHS with the discretion to specify the form of the Title IX certification and the extent to which a

grant recipient is required to provide it. 45 C.F.R. § 86.4(c).

Although Plaintiffs posit a conflict between the ACF Title IX Certification and FVPSA's

nondiscrimination provisions, *see* 45 C.F.R. § 1370.5(a), the FVPSA regulations explicitly

permit HHS to require a Title IX certification. *See* 45 C.F.R. § 1370.3(a)(10) (government-wide

and HHS regulations applicable or potentially applicable to all grantees include those in 45

C.F.R. Part 86). And while Plaintiffs complain that the Administration's view of gender identity

is incorporated into the ACF Title IX Certification (P.I. Mem. at 35), the language of the

certification explicitly requires only that grant recipients assure ACF that they are and will

remain "compliant with Title IX . . . ." Chon Decl. ¶ 19. Nor is there any practical conflict

between the HRSA Title IX Certification and any seemingly contrary statute or regulation.

HRSA itself has mandated that, in cases of conflict, statutes and regulations take precedence over

executive orders. Baugh Decl. ¶ 9.

(b) *The remaining CoC Conditions lie within HUD's discretion.*

The remaining CoC Conditions restrict how grant recipients can use the CoC funds awarded to them.  Specifically, HUD requires CoC grant recipients to agree (1) not to use grant funds to promote "gender ideology" as defined in E.O. 14,168 and (2) not to use grant funds to fund or promote elective abortions.  These conditions largely track existing restrictions on CoC funds and are lawful under the CoC's catchall provision, 42 U.S.C. § 11386(b)(8).

The catchall provision makes the disbursement of CoC grant funds dependent on the recipient's "compl[iance] with such other terms and conditions as the Secretary [of HUD] may establish to carry out" the CoC program in "an effective and efficient manner."  42 U.S.C. § 11386(b)(8).  HUD's funding conditions concerning gender ideology and abortion are directed at ensuring that grant dollars are not used for certain purposes: the promotion of "gender ideology" and promotion or funding of elective abortions.  By prohibiting recipients from using grant funds for these purposes, the conditions ensure that grant funds are used "effective[ly] and efficient[ly]" to house and provide supportive services for the homeless.

The challenged conditions largely track restrictions on appropriated funds that Congress has already imposed.  The Hyde Amendment "is routinely enacted as part of annual appropriations legislation" to "bar[] the use of federal funds for abortion services."  *California v. Trump*, 267 F. Supp. 3d 1119, 1131 (N.D. Cal. 2017).  The Homeless Assistance Act approves the use of CoC funds to include housing and "supportive services" such as childcare, job training, food, and outpatient health services and medical assistance.  42 U.S.C. § 11383(a)(6); 42 U.S.C. §§ 11360(16), 11360(29).  It is consistent with congressional intent as expressed in the Hyde Amendment to preclude the federal grant money set aside for such supportive services from being used to promote abortion.  *Cf. Rust v. Sullivan*, 500 U.S. 173 (1991) (affirming

24

constitutionality of regulations that prohibit use of federal funds to encourage, promote or advocate abortion as method of family planning).

In the same vein, the condition prohibiting CoC recipients from using funds to promote "gender ideology" as defined in E.O. 14,168, follows from the Homeless Assistance Act itself, which permits HUD to establish funding conditions that clarify recipients' responsibilities and ensure that CoC funds are used effectively and efficiently to further the Act's specific purposes. *See* 42 U.S.C. § 11386(b)(8); *cf. City of Providence v. Barr*, 954 F.3d 23, 41-42 (1st Cir. 2020) (endorsing similar language used by Congress to allow agency to "'impose reasonable conditions on grant awards to ensure that the States [grant recipients] meet statutory, regulatory, and other program requirements.'").

### 3. *Defendants did not act arbitrarily or capriciously in imposing the challenged conditions.*

There is nothing arbitrary or capricious about requiring federal grantees to comply with federal antidiscrimination laws that they are already subject to, or to certify that they are doing so. To the contrary, federal law *already* prohibits grantees from violating those laws. As discussed, the limitations on the use of grant funds flow from the purposes of the grants and the need for the grant programs to remain effective and efficient, as Congress directed. Thus, the conditions are "rational," and the district court would err by "substitut[ing] its judgment" for that of Defendants. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42-43.

Nor did Defendants have an obligation to provide additional explanations of the conditions. Agencies have not typically been compelled to provide a more extensive explanation when setting funding priorities. Rather, an agency's determination must be upheld if "'its path may reasonably be discerned.'" *City of Los Angeles v. Barr*, 929 F.3d 1163, 1181 (9th Cir. 2019) (quoting *Bowman Transp.*, 419 U.S. at 286). Here, the rationale for the conditions is self-

evident from the language of the conditions themselves, which reflect Defendants' desire to prevent violations of federal antidiscrimination law and to prohibit the use of federal grant funds for certain things that are unlawful or do not advance the interests of the relevant program.

**4.** ***Plaintiffs cannot prevail on their separation-of-powers claim.***

Plaintiffs are also unlikely to succeed on the merits of their separation-of-powers claim. *See* P.I. Mem. at 36-38.  The Government is empowered to decide when it will fund certain activities and under what conditions.  Plaintiffs' assumption that the Constitution requires Congress to set out by statute every requirement of a grant program to make those requirements enforceable is not supported by Supreme Court precedent.  *See, e.g., Biden v. Missouri*. 595 U.S. 87, 90, 94 (2022) (per curiam) (finding that a new condition of participation in Medicare and Medicaid requiring facilities to ensure that staff were vaccinated against COVID-19 did not exceed applicable statutory authority, as HHS had "established long lists of detailed conditions with which facilities must comply to be eligible to receive Medicare and Medicaid funds" and was not limited to issuing "bureaucratic rules regarding the technical administration of" the programs); *see also Bennett v. Ky. Dep't of Educ.,* 470 U.S. 656, 669 (1985) (stating that Congress cannot "prospectively resolve every possible ambiguity concerning particular applications of the requirements"); *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023) ("[W]e do not question an agency's authority to fill in gaps that may exist in a spending condition."); *Guardians*, 463 U.S. at 629-30 & n.22 (Marshall, J., dissenting) (noting that assurances of compliance with Title VI as part of applications for federal assistance are given "in consideration of" federal aid, "and the federal government extends assistance 'in reliance on' the assurance of compliance") (citation omitted).

Plaintiffs' separation-of-powers arguments fail because the challenged conditions are: (a) imposed pursuant to Defendants' statutory authority; (b) germane to the grants at issue; and (c) dependent on, and subject to, existing law.

(a) *Statutory authority*

Contrary to Plaintiffs' arguments (P.I. Mem. at 36-38), by law HUD may terminate the grants it issues based merely on a change in policy priorities. 2 C.F.R. § 200.340(a)(4). And HUD's enabling statutes and regulations give it broad leeway to dictate the conditions under which it makes CoC grants. *See, e.g.,* 42 U.S.C. § 11836.

(b) *Germaneness*

Second, as to HUD's CoC Conditions, Plaintiffs do not contest that the certifications of compliance with antidiscrimination laws that HUD has long required were germane to prior HUD-funded grants. *See* 24 C.F.R. § 1.5. They therefore cannot reasonably argue that HUD's CoC Conditions, which reference the same federal antidiscrimination laws the certifications have always referenced, are somehow no longer germane. HUD's grant agreements include such provisions because, by regulation, CoC funds can be used not just for housing, but for a range of "supportive services," including "counseling," "health education," "referral to community resources," "treatment of mental health conditions," and "outpatient health services" including "provision of medication"—all of which could implicate gender ideology, elective abortion, or both. 24 C.F.R. § 578.53. Similarly, ACF's and HRSA's Title IX certifications have been authorized for decades, *see* 45 C.F.R. § 86.4; 20 U.S.C. § 1682, when the relevant programs being funded either involve education programs or the grant recipients provide educational services in some respect. Baugh Decl. ¶ 15.

27

(c) *Interaction with existing law*

In arguing that the challenged conditions exceed Defendants' statutory authority, Plaintiffs overlook the conditions' terms. Two of the CoC Conditions are on their face limited by existing applicable laws. The remaining two CoC Conditions incorporate the terms of E.O.s that expressly require their application to accord with existing law. *See supra* p. 4 n.1 & p. 5 n.2. The same is true for the ACF Title IX Certification, which is limited to existing law on its face, and the HRSA Title IX Certification, which relies on an E.O. that is similarly limited. *See supra* p. 4 n.1 (discussing E.O.'s). By definition, imposing conditions on the issuance of grant funds to the extent *consistent* with applicable law cannot be interpreted as *exceeding* the law. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981); *cf. Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025) (staying preliminary injunction "[b]ecause the Government is likely to succeed on its argument that the Executive Order and Memorandum are lawful[.]"); *id.* (Sotomayor, J., concurring in grant of stay) (Concurring in stay because "relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law[.]'").

Moreover, ACF's and HRSA's grant contracts incorporate overarching "savings clauses" to help ensure that contractual language comports with existing law. Each agency explicitly requires that, when interpreting the scope of a grant condition, the dictates of statutes and regulations take precedence over inconsistent contractual language. ACF's ST&C states that "[a]ll applicable statutory or regulatory provisions supersede any conflicting or inconsistent provisions in this Standard T&Cs." Chon Decl. ¶ 9. HRSA's GT&C for FY 25 indicate that,

"[i]n case of conflicting or inconsistent requirements," statutes and regulations take precedence over the President's executive orders. Baugh Decl. ¶ 9. Particularly as cabined by ACF's and HRSA's own terms and conditions, their Title IX certifications in no way exceed their statutory authority. In the same fashion, HUD will not enforce the conditions when applicable grant statutes conflict with grant conditions imposed on specific programs. Fernandez Decl. ¶ 9.[7]

**B. HUD's CoC Conditions do not violate the First Amendment.[8]**

Plaintiffs challenge HUD's CoC Conditions on their face rather than as applied to any particular speech activity. *See Nat'l Urban League v. Trump*, __ F. Supp. 3d __, 2025 WL 1275613, at *13-16 (D.D.C. May 2, 2025). "Even in the First Amendment context, facial challenges are disfavored." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024). Plaintiffs fail to establish that the CoC Conditions "prohibit[] a substantial amount of protected speech relative to [their] plainly legitimate sweep," as required to establish facial unconstitutionality. *United*

---

[7] The Ninth Circuit's decision in *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018), *see* P.I. Mem. at 37-38, is not to the contrary. There, the court considered more stringent language in an executive order that "unambiguously command[ed] action" to ensure that certain jurisdictions would be ineligible for funding. *Id.* at 1240. The case does not, however, stand for the broad proposition that all savings clauses should be ignored. To the contrary, the Ninth Circuit emphasized that "[s]avings clauses are read in their context." *Id.* at 1239. Examining the context in that case, the court held that because there were no circumstances in which the executive order's directive could be constitutional, the "savings clause does not and cannot override its meaning." *Id.* at 1240. In other words, because the challenged provision commanded wholly illegal action, a savings clause purporting to limit the provision to existing law was meaningless. In the case at bar, on the other hand, the challenged provisions are not unconstitutional on their face, and the savings clauses therefore keep the conditions within lawful bounds.

[8] Plaintiffs have not attacked the ACF or HRSA Title IX Certifications based on the First Amendment. *See* P.I. Mem. at 39-43.

*States v. Hansen*, 599 U.S. 762, 770 (2023) (citation omitted).  As such, Plaintiffs are not likely to succeed on the merits of their First Amendment facial challenges.

Plaintiffs argue that HUD's CoC Conditions violate the First Amendment because they restrict speech outside the scope of the programs being funded by the grant, and that the restrictions amount to viewpoint- and content-based discrimination.  P.I. Mem. at 39-43. Plaintiffs' claims fail because HUD's CoC Conditions pertain to the Government's sponsorship rather than regulation of speech.  It is well established that the Government's spending is not subject to traditional First-Amendment scrutiny.  "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest. . . .  In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust*, 500 U.S. at 193. Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds.  This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (collecting cases) ("*Open Society*").

Consistent with the First Amendment, the Government may "specify the activities [it] wants to subsidize," but it cannot "leverage funding to regulate speech *outside* the contours of the programs itself." *Id.* at 214-15 (emphasis added).  For example, limiting the use of federal funds for a specific purpose—such as prohibiting the "promot[ion] or advoca[cy] [of] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted), but the outright conditioning of federal funds on the recipient's adoption of a policy "explicitly opposing prostitution or sex trafficking" is not, *id.* at 210

(citation omitted). The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218-19.

None of HUD's challenged conditions imposes an unconstitutional condition on Plaintiffs' speech. Rather, as permitted under *Rust* and *Open Society*, the provisions align the Government's sponsorship of activities with its policy priorities. HUD's challenged conditions do not prohibit grant recipients from engaging in protected speech on their "own time and dime." *Open Society*, 570 U.S. at 218. As the Supreme Court has repeatedly held, the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that Government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality opinion) (a "decision not to subsidize the exercise of a fundamental right does not infringe the right") (quoting *Rust*, 500 U.S. at 193); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (the Government "is not required to subsidize First Amendment rights"). Simply put, the Government is permitted to have policy priorities, and the Government does not violate the First Amendment by declining to fund programs that do not align with those policies.

Furthermore, there is nothing unlawful about requiring recipients of federal contracts or grants to affirm that the Government considers compliance with antidiscrimination laws material to its payment decisions. Importantly, the explicit terms of HUD's antidiscrimination certification provision impose no new requirements on primary conduct. HUD's antidiscrimination certification does not adopt any new construction of antidiscrimination law nor does it declare all diversity-related programming to be illegal. Rather, the certification simply require recipients to certify compliance with existing legal obligations under the

"applicable" federal civil rights laws such as Title VI of the Civil Rights Act of 1964, which apply to all recipients of federal assistance.  42 U.S.C. § 2000d-1.

Antidiscrimination laws bind grant recipients *independent* of any certification requirement. There is therefore no First Amendment problem with instructing agencies to require grant recipients to certify that these existing legal obligations are being honored.  *See Nat'l Urban League*, 2025 WL 1275613, at *25 (citing *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024)).  Such certifications are by no means novel.  It has been true for decades that "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to the executive regulations issued under Title VI."  *Guardians*, 463 U.S. at 629-30 & n.22 (Marshall, J., dissenting) (citing regulations from multiple federal agencies); *see also* 45 C.F.R. § 75.300(a); 45 C.F.R. § 80.4; 24 C.F.R. § 1.5(a)(1) & (a)(3).  These "assurance[s]" of compliance are "given in consideration of" federal aid, "and the federal Government extends assistance in reliance on the assurance of compliance"—but Title VI's antidiscrimination obligations apply regardless of any certification. 463 U.S. at 630 (Marshall, J., dissenting) (citation omitted).

The requirement here is no different.  HUD's two antidiscrimination certification provisions specifically address compliance with "applicable Federal antidiscrimination laws." Fernandez Decl. ¶ 11.  Plaintiffs neither argue that these longstanding requirements are unconstitutional nor explain why their wording is constitutionally infirm.  Indeed, Plaintiffs maintain that they "have always" and "always will" comply with antidiscrimination laws.  P.I. Mem. at 17.

Plaintiffs contend that the HUD certifications' reference to Federal antidiscrimination laws does not limit the certifications' scope because the Government has taken "a novel and incredibly broad view of the activities that violate nondiscrimination laws."  P.I. Mem. at 40. This argument likewise falls short.  For starters, although grant recipients are being asked to certify compliance with the antidiscrimination laws, they can still challenge the Government's *interpretation* of those laws.  *See Nat'l Urban League*, 2025 WL 1275613, at *26 (While grantees could challenge the Government's interpretation of what constitutes illegal DEI in a specific case, "the government does not violate the First Amendment by incorporating preexisting federal law" into a grant condition "and declining to detail hypothetical examples of things that might violate the law.").

More generally, Plaintiffs' argument is premised on the unsupported and speculative assumption that the Government will enforce HUD's certifications in bad faith by targeting legal diversity-related conduct.  P.I. Mem. at 40-41.  Prognostication about bad-faith future enforcement actions cannot sustain a facial First Amendment challenge.  *Cf. Hansen*, 599 U.S. at 782, 785 (rejecting First Amendment overbreadth challenge because plaintiff relied on "hypotheticals" and "speculative shot at the bad").  And, in any event, such speculation is contrary to the presumption of good faith that courts routinely accord the Government.  *See, e.g.*, *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) (referring to the "presumption of regularity" that "attaches to the actions of Government agencies"); *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("[U]nlike in the case of a private party, [the courts] presume the [G]overnment is acting in good faith."); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("[G]overnment actors . . .  are accorded a presumption of good

faith because they are public servants, not self-interested private parties."), *aff'd*, 563 U.S. 277 (2011).[9]

In any potential individual enforcement action, Plaintiffs would, of course, have the opportunity to argue their conduct does not violate the law.  *See Nat'l Urban League*, 2025 WL 1275613, at *25, *26.  But they cannot block Defendants' enforcement priorities at the outset based on the possibility that a hypothetical future enforcement action may target legal conduct. The Court should reject Plaintiffs' invitation to encroach on the Executive's Article II authority to set its enforcement priorities under the guise of protecting free speech.

### C. Because HUD's conditions and ACF's and HRSA's Title IX certifications are not unconstitutionally vague, Plaintiffs are unlikely to prevail on their Fifth Amendment claim.

Plaintiffs argue that the provisions of the challenged conditions are too ambiguous for them to comply with "because they impose unclear, ill-defined prohibitions" that provide Defendants with "sweeping discretion over their enforcement."  P.I. Mem. at 43.  Plaintiffs assert that HUD's antidiscrimination certifications fail to provide them with fair notice of what "anti-DEI" conduct is prohibited, or how a grant recipient could comply with HUD's conditions while also obeying Congress's statutory directives, *e.g.*, in FVPSA.  P.I. Mem. at 45-46.  Plaintiffs additionally claim that HUD's Gender Ideology condition does not notify them about what conduct qualifies as "promoting" gender ideology, or about how Plaintiffs can comply with both that condition and conflicting regulatory directives.  P.I. Mem. at 46.  Plaintiffs express similar

---

[9] Relatedly, any argument that enforcement actions would be motivated by something other than targeting unlawful discrimination amounts to a selective-enforcement claim, which arises in an as-applied posture. *See Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1137-38 (D.C. Cir. 2023) (explaining that to assert a selective-enforcement claim, a plaintiffs must "demonstrate he was singled out for enforcement from among others similarly situated," which is "a fact-intensive and case-specific comparative inquiry") (citation omitted).

concerns about the meaning of "promote" in HUD's abortion condition, and also about HUD's condition requiring Plaintiffs to generally comply with executive orders.  P.I. Mem. at 47.

As for the ACF Title IX Certification, Plaintiffs do not fault its actual language.  P.I. Mem. at 47.  But even though that language requires only that a grant recipient assure ACF that the recipient is, and will remain, compliant with Title IX, Plaintiffs nevertheless attempt to bootstrap a vagueness argument based on what they call the Administration's "novel and expanded view of when conduct would violate Title IX."  P.I. Mem. at 47.[10]

The appropriate posture for the void-for-vagueness doctrine under the Fifth Amendment's Due Process Clause is as-applied.  Facial challenges in the Due Process context "are typically disfavored because they 'often rest on speculation,' which leads to the risk of premature interpretation of statutes and regulations."  *Draper v. Healey*, 98 F. Supp. 3d 77, 82 (D. Mass. 2015), *aff'd*, 827 F.3d 1 (1st Cir. 2016).  "The First Circuit has similarly recognized that even 'where an enactment is alleged to be "impermissibly vague in all of its applications,"' . . . it is clear that such an allegation must first be considered in light of the facts of the case— i.e., on an as-applied basis.'"  *Worman v. Healey*, 293 F. Supp. 3d 251, 267 (D. Mass. 2018) (alterations in original) (quoting *Love v. Butler*, 952 F.2d 10, 13 (1st Cir. 1991)), *aff'd*, 922 F.3d 26 (1st Cir. 2019); *see also Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2013) (Claim that state regulation is vague, in violation of due process, is "a constitutional claim eligible only for as-applied, not facial, review."); *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) ("The mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction

---

[10] Plaintiffs do not appear to challenge the HRSA Title IX Certification on vagueness grounds. *See* P.I. Mem. at 43-48.

against enforcement of a policy that . . . is above suspicion in the ordinary course of administration.") (citation omitted).  Because Defendants have not sought to enforce any of the challenged terms against Plaintiffs, Fernandez Decl. ¶ 13; Chon Decl. ¶ 22; Baugh Decl. ¶ 18, Plaintiffs' Fifth Amendment claim fails insofar as it is premised on the void-for-vagueness doctrine.

The challenged grant provisions, which use common words and phrases such as "promote," "violate," "compliance," "certify," and "material," are no more ambiguous than a host of previously upheld grant provisions.  Even criminal statutes need not define every ordinary word they use.  Where challenged language does not define a word, it is simply read with "its ordinary meaning."  *See, e.g., City of Providence*, 954 F.3d at 31 ("When Congress uses a term in a statute and does not define it, we generally assume that the term carries its plain and ordinary meaning."); *United States v. Kuzma*, 967 F.3d 959, 968-69 (9th Cir. 2020) (holding that the word "designed" in a criminal statute was not unconstitutionally vague).  Even under the higher standard applied to criminal laws, courts have rejected facial vagueness challenges to the sort of ordinary terms that Plaintiffs criticize here.  *See, e.g., Marquez-Reyes v. Garland*, 36 F.4th 1195, 1201-07 (9th Cir. 2022) (rejecting facially overbroad challenge to statute that made noncitizens ineligible for relief from removal if they knowingly "encouraged" another noncitizen to unlawfully enter the United States because its meaning was clear in the context of criminal law); *ACLU of Tenn. v. City of Memphis*, No. 17-cv-02120, 2020 WL 5630418, at *17 (W.D. Tenn. Sept. 21, 2020) (finding the phrase "cooperate with" is not ambiguous and not overly broad or confusing in the context of a consent decree).  If the words "encourage" and "cooperate" are not unconstitutionally vague or overbroad in the criminal context, the same or similar words surely cannot be vague in the context of a federal grant agreement.

Moreover, ACF's Title IX Certification and HUD's two antidiscrimination CoC certifications on their face simply require compliance with federal law. These certifications involve nothing more than a clear and unequivocal requirement that a grantee abide by existing law. Such a requirement cannot be deemed vague, especially here, where Plaintiffs admit they already comply with existing antidiscrimination laws. P.I. Mem. at 17. The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). While this doctrine may demand scrutiny of laws that identify *new* conduct for punishment, it has little bite with respect to existing laws.

Finally, by law every grant recipient must receive notice of any proposed cancellation of funding and must be provided with an opportunity to appeal the agency's determination. *See, e.g.*, 2 C.F.R. §§ 200.341, 200.342 (uniform requirements); 24 C.F.R. § 578.99(e) (CoC); 24 C.F.R. §§ 570.496, 570.502, 570.900(b)(5)-(7), 570.910(a) (CDBG); 45 C.F.R. § 75.374 (HHS). Plaintiffs would therefore be provided with adequate due process to address any such issues, and there is thus no lack of fair notice.

### III.   PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM

Plaintiffs' motion should be denied solely on the basis that they have failed to demonstrate irreparable harm, typically "a necessary threshold showing for an award of preliminary injunctive relief." *Charlesbank Equity Fund II v. Blinds To Go, Inc*., 370 F.3d 151, 162 (1st Cir. 2004). "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist*., 367 F.3d 68, 73 (1st Cir. 2004). Further, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."

*Charlesbank Equity*, 370 F.3d at 162; *see also Narragansett Indian Tribe*, 934 F.2d at 6-7 ("[S]peculative injury does not constitute a showing of irreparable harm.") (quoting *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987)).  Plaintiffs' sweeping assertions of harm fails to address a fundamental problem: the relief they seek is monetary damages in the form of payments on the grants, which is the classic example of reparable harm.

Because Plaintiffs ultimately seek an order from this Court to force Defendants to pay them money despite their lack of agreement to the agencies' terms, Plaintiffs' claims are essentially for money damages.  It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also, e.g., Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 230 (D. Mass.) ("[E]conomic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction") (citation omitted), *aff'd*, 976 F.3d 86 (1st Cir. 2020); *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, No. 22-cv-11091, 2023 WL 3660689, at *7 (D. Mass. May 25, 2023) ("Plaintiffs have not demonstrated 'irreparable harm,' but at most, economic loss") (citation omitted); *see also, e.g., Weinberger*, 456 U.S. at 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.").

According to Plaintiffs themselves, their purported inability to continue certain programs if they decline to agree to the challenged conditions results solely from the loss of grant funding. Other than withholding future income streams, neither HUD, ACF, nor HRSA is taking any action that impedes Plaintiffs' ability to carry out their programming initiatives.  The only thing that the federal agencies might do is stop footing the bill.  That is a quintessential economic loss. Were it otherwise, one could always convert the relevant harm for purposes of a preliminary

injunction from an economic loss to the inability to do things that cost money. Such an approach would completely engulf the general rule that "[e]conomic loss alone does not usually rise to the level of irreparable harm." *Akebia*, 443 F. Supp. 3d at 230.

Finally, even if the Court were to find that Defendants failed to comply with the APA, the appropriate remedy is to remand to the agencies for further consideration or explanation, not, as Plaintiffs assert, to set aside the challenged conditions entirely and require the Government to provide money without relevant strings attached. *See* P.I. Mem. at 56-58. If that is the relief Plaintiffs would theoretically be entitled to, it is not appropriate at this preliminary stage of the case to grant the broader relief of requiring the agencies to continue payment under the grants. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) ("'[B]edrock principles of administrative law preclude us from declaring definitively that [the Secretary's] decision was arbitrary and capricious without first affording her an opportunity to articulate, if possible, a better explanation.'") (citation omitted); *Town of Weymouth v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 38 (1st Cir.) ("Because we find that DEP did not follow its own established procedures . . . we vacate the air permit and remand to the agency to redo that analysis."), *modified on other grounds*, 973 F.3d 143 (1st Cir. 2020) (per curiam).

Ultimately, even if Plaintiffs forecast some threat of harm, there is no reason why they cannot vindicate that alleged harm through individualized, specific lawsuits challenging particular funding denials for specific grants. Plaintiffs' declarations do not establish the need for the broad relief they seek.

## IV.   THE HARM TO THE GOVERNMENT FROM ENTRY OF A PRELIMINARY INJUNCTION CANNOT BE REMEDIED

A federal court may not issue an equitable remedy that is "more burdensome to the defendant than necessary to redress the complaining parties." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Gill v. Whitford*, 585 U.S. 48, 68 (2018) ("a remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.") (quotation and citation omitted). If an injunction were granted pursuant to which Plaintiffs were permitted to use the funds without abiding by the challenged conditions, Defendants would be "unlikely to recover the grant funds once they are dispersed."[11]  *See California*, 145 S. Ct. at 969. That is all the more likely in this case, since Plaintiffs themselves contend that the withholding of grant funding would leave them in dire financial straits. P.I. Mem. at 50. None of the Plaintiffs has "'promised to return withdrawn funds should'" Defendants prevail in this litigation. *See California*, 145 S. Ct. at 969. Given the broad relief Plaintiffs seek, the financial harm to the Defendants would be significant. Therefore, relief should be denied.

## V.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN THE GOVERNMENT'S FAVOR

Even if Plaintiffs could establish irreparable harm, they have not shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555 U.S. at 32. Traditionally, a court first determines whether the movant's likely harm "will outweigh the harm which granting the injunction would inflict on [the defendant]." *7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (D. Mass. 2014). Plaintiffs must demonstrate that their

---

[11] For example, HUD estimates that in FY 2024, it committed approximately $35 million in CoC grants to Plaintiffs and their members. Fernandez Decl. ¶ 14.

claimed injury outweighs any harm that granting the injunctive relief would inflict upon Defendants.  *Lancor v. Lebanon Hous. Auth.*, 760 F.2d 361, 362 (1st Cir. 1985).[12]

If the Court does not issue a preliminary injunction, HUD, ACF, and HRSA may retain the grant money at issue during the pendency of the case, and Plaintiffs can obtain money damages at the end of the case if they are successful.  But the opposite is not true—if the grantees are given access now and draw down the funds throughout the litigation, Defendants will be left with no meaningful recourse to recover the expended funds even if they prevail. Accordingly, if the Court enters a preliminary injunction, the federal agencies will bear all the risk. The Supreme Court recognized precisely that dynamic in *California* when it stayed the temporary restraining order granted by the district court in that case.  145 S. Ct. at 969.

## VI.   THE COURT SHOULD LIMIT THE SCOPE OF ANY INJUNCTIVE RELIEF TO GRANTS PLAINTIFFS SPECIFICALLY IDENTIFY AND SHOULD ONLY ENJOIN REQUIREMENTS THAT EXCEED PLAINTIFFS' EXISTING OBLIGATION TO COMPLY WITH FEDERAL LAW

Injunctive relief under the APA is limited.  Courts may either "compel agency action unlawfully withheld or unreasonably delayed," or "hold unlawful and set aside agency action."  5 U.S.C. § 706; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (explaining how the "principal purpose" of the APA's limits on relief is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements").

Injunctive relief should not provide "a remedy beyond what [is] necessary to provide relief" to injured parties.  *Lewis v. Casey*, 518 U.S. 343, 360 (1996).  Accordingly, to the extent

---

[12] In the next step of the analysis, courts consider whether "the public interest will not be adversely affected by the granting of the injunction."  *Lancor*, 760 F.2d at 362.  But where, as here, the Government is the defendant, these factors simply "merge."  *Nken*, 556 U.S. at 435.

the Court is inclined to grant Plaintiffs' request for a preliminary injunction, any such relief should be narrowly tailored to apply only to the grants identified in Plaintiffs' declarations.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025) (Congress has not conferred upon federal courts the power to issue universal injunctions).

Plaintiffs contend that the challenged conditions should be set aside pursuant to 5 U.S.C. § 706(2) to provide complete relief even for organizations who are not named plaintiffs or members of the plaintiff domestic violence coalitions.  P.I. Mem. at 56-58.  But, as the Supreme Court cautioned in *CASA*, "complete relief" between the parties "is a narrower concept" than "universal relief."  *CASA*, 145 S. Ct. at 2557.

*CASA* left open the question of whether a federal court could provide universal injunctive relief under 5 U.S.C. § 706(2).  145 S. Ct. at 2554 n.10.  But Plaintiffs cite no authority supporting their assertion that it is appropriate to recalibrate the competition for grant funding by setting aside an agency action under § 706(2) rather than by using the sort of equitable injunction rejected in *CASA*.  *See* P.I. Mem. at 60-61 (citing *City of Los Angeles v. Sessions*, No. 18-cv-07347, 2019 WL 1957966, at *5 (C.D. Cal. Feb. 15, 2019) (issuing universal equitable injunction to provide plaintiffs with "a level playing field in future grant cycles")).  In any event, the possibility of competitive harm in "future" funding cycles is entirely too speculative to justify issuance of extraordinary relief without some *current* demonstration that any unknown future grant recipient would otherwise be on all fours with Plaintiffs in terms of funding qualifications.  *See Great N. Res., Inc. v. Coba*, No. 20-cv-10866, 2020 WL 6820793, at *3 (D. Or. Nov. 20, 2020).

Further, any relief should at most enjoin only those portions of the challenged conditions which can be read to require actions beyond simply complying with federal antidiscrimination laws.  There can be no irreparable harm from a condition that simply requires compliance with federal law.  Both HUD and HHS have long imposed such requirements.  Moreover, because Plaintiffs have already represented to the Court that they "have always complied with federal antidiscrimination laws and always will," P.I. Mem. at 17, the Court would impose no additional burden upon Plaintiffs by continuing to require such compliance as part of any injunction entered.  Any equitable relief that completely relieves Plaintiffs from meeting their longstanding obligation to comply with federal antidiscrimination laws is factually unjustified and legally unsound.

## VII.  ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND BE ACCOMPANIED BY A BOND

If the Court grants Plaintiffs' Motion for a Preliminary Injunction, it should stay any such order pending any appeal, because Defendants are likely to succeed on appeal and will face irreparable harm absent a stay.  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay").  On the whole, as argued above, a stay is warranted.  At a minimum, the Court should administratively stay any injunctive relief it intends to order for a period of seven days to allow Defendants to seek an emergency, expedited stay from the First Circuit if an appeal is authorized.

Defendants also respectfully request that any injunctive relief accompany a bond, which the Court has discretion to require.  *See* Fed. R. Civ. P. 65(c) ( "The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.") (emphasis added).  A bond is

appropriate here given that any preliminary relief would potentially mandate that Defendants disburse funds that may not be recouped after distribution.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' motion for a preliminary injunction. Moreover, if the Court is inclined to grant any injunctive relief, it should be narrowly tailored and should not enjoin any general requirement of compliance with, or certification of compliance with, federal antidiscrimination laws. Defendants also request that any order be secured by a bond and stayed pending a decision whether to appeal and, if appeal is authorized, stayed pending appeal.

Dated: August 18, 2025                  Respectfully submitted,

U.S. DEPARTMENT OF HOUSING &
URBAN DEVELOPMENT, et al.
By their Attorneys,

SARA MIRON BLOOM
Acting United States Attorney

/s/ *Lauren S. Zurier*
LAUREN S. ZURIER
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (Fax)
Email: Lauren.Zurier@usdoj.gov

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on August 18, 2025, I electronically filed the foregoing document and the accompanying exhibits through this Court's Electronic Case Filing (ECF) system, which will serve it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E).

/s/ *Lauren S. Zurier*
Lauren S. Zurier
Assistant United States Attorney