## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

       *Plaintiffs*,

    v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services, *et al.*,

       *Defendants*.

Case No. 1:25-cv-00342

## REPLY IN SUPPORT OF MOTION FOR RELIEF UNDER 5 U.S.C. § 705 AND FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 2

   I.   This Court Has Jurisdiction ............................................................................ 2

   II.   Plaintiffs' APA Claims Are Likely To Succeed ........................................... 9

      A.   The New Conditions are subject to APA review ....................................... 10

      B.   The New Conditions violate the APA ...................................................... 11

         1.   The New Conditions are arbitrary and capricious ................................. 11

         2.   The New Conditions exceed Defendants' statutory authority and several are contrary to law ................................................................................... 13

   III.   Plaintiffs' Fifth Amendment Claims Are Likely To Succeed ...................... 17

   IV.   Plaintiffs' First Amendment Claims Are Likely To Succeed ...................... 18

   V.   Plaintiffs' Separation-Of-Powers Claims Are Likely To Succeed .................. 21

   VI.   Plaintiffs Have Established Irreparable Harm .............................................. 23

   VII.   The Balance of Equities Favors Relief ....................................................... 24

   VIII.   Relief Should Extend Broadly Enough To Prevent Any Irreparable Harm .................. 25

   IX.   The Court Should Deny Defendants' Request For a Stay and Bond ........................... 27

CONCLUSION ....................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) .............................. 19

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*,
    703 F. Supp. 3d 126 (D.D.C. 2023) ..................................................................... 3

*Bowen v. Massachusetts*, 487 U.S. 879 (1988).............................................................. 9

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ............................................................ 7

*Cabrera v. U.S. Dep't of Lab.*, No. 25-CV-1909 (DLF),
    2025 WL 2092026 (D.D.C. July 25, 2025)................................................................ 27

*California v. Dep't of Transp.*, No. 25-CV-208-JJM-PAS,
    2025 WL 1711531 (D.R.I. June 19, 2025) .................................................................. 9

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)............................................ 5

*Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025)..................... 9, 19, 27

*City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421 (D.C. Cir. 1994) ..................... 24

*City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019)......................................... 13

*City of Phila. v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017) ................................. 24

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020)......................................... 10

*Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health & Hum. Servs.*,
    137 F.4th 932 (9th Cir. 2025) ....................................................................... 3

*Collins v. Dep't of the Treasury*, 83 F.4th 970 (5th Cir. 2023) ...................................... 6

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)......................................................... 10

*Department of Education v. California*, 145 S. Ct. 966 (2025)............................... 5, 8, 26

*Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015)........................... 26

*Fed. Educ. Ass'n v. Trump*, No. CV 25-1362 (PLF),
    2025 WL 2355747 (D.D.C. Aug. 14, 2025) .............................................................. 21

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005)................................................. 4

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985).................................................... 26

*Harris Cnty., Texas v. Kennedy*, No. 25-CV-1275 (CRC),
    2025 WL 1707665 (D.D.C. June 17, 2025)........................................................ 3, 6

*Hatzlachh Supply Co., Inc. v. United States*, 444 U.S. 460 (1980) ............................... 2

*Holmes v. United States*, 657 F.3d 1303 (Fed. Cir. 2011) ........................................... 4

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................................... 24

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995) ........................................................ 6

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ...................................................................................... 11

*Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814,

    2025 WL 1582368 (W.D. Wash. June 3, 2025)........................................................ passim

*Massachusetts v. Nat'l Insts. of Health*, 770 F.Supp. 3d 277 (D. Mass. 2025) ..................... 23, 25

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ............................................................. 7

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) .................................. 28

*Nat'l Urban League*, No. CV 25-471 (TJK), 2025 WL 1275613 (D.D.C. May 2, 2025) ........... 20

*Nat'l Institutes of Health v. American Public Health Association*,

    No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025)............................................... 2, 4, 5, 8

*NEA v. Finley*, 524 U.S. 569 (1998) ........................................................................................... 19

*New York v. Kennedy*, No. 25-CV-196-MRD-PAS,

    2025 WL 1803260 (D.R.I. July 1, 2025) ............................................................................. 26, 28

*New York v. McMahon*, No. CV 25-10601-MJJ,

    2025 WL 1463009 (D. Mass. May 22, 2025) .......................................................................... 26

*Ohio v. EPA*, 603 U.S. 279 (2024)............................................................................................. 11

*Rhode Island Latino Arts v. NEA*, No. 1:25- cv-00079,

    2025 WL 1009026 (D.R.I. Apr. 3, 2025)......................................................................... 19, 20

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017)............................................................................ 17

*Rhode Island Coal. Against Domestic Violence v. Bondi*, No. CV 25-279 WES,

    2025 WL 2271867 (D.R.I. Aug. 8, 2025) ("*RICADV*") ..................................................... passim

*Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219 (1st Cir. 2003)............................................ 23

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ............................. 23

*San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, 2025 WL 1621636 (N.D. Cal.

    June 9, 2025)...................................................................................................................... 17, 19

*San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-CV-02425-EMC,

    2025 WL 1180729 (N.D. Cal. Apr. 23, 2025) ...................................................................... 6, 9

*Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77 (D.D.C. 2010) ................................................ 26

*Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022)............................................................. 5

*Thakur v. Trump*, No. 25-CV-04737-RFL,

2025 WL 1734471 (N.D. Cal. June 23, 2025) ............................................................... 3

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ................................................ 7

*Tootle v. Secretary of the Navy,* 446 F.3d 167 (D.C. Cir. 2006) ............................... 3, 4

*Town of Weymouth v. Mass. Dep't of Env't Prot.*, 961 F.3d 34 (1st Cir.) ..................... 26

*Town of Weymouth v. Massachusetts Department of Environmental Protection,*
    973 F.3d 143 (1st Cir. 2020) ................................................................................ 26

*Turping v. United States*, 134 Fed. Cl. 293 (2017) ........................................................ 4

*United States v. Connolly*, 716 F.2d 882 (Fed. Cir. 1983) .............................................. 6

*Webster v. Doe*, 486 U.S. 592 (1988) ................................................................ 5, 10, 17

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ...................................... 23

*Wong v. Warden*, 171 F.3d 148 (2d Cir. 1999) .............................................................. 10

*Woonasquatucket River Watershed Council v. USDA*, No. 1:25-CV-00097,
    2025 WL 1116157 (D.R.I. Apr. 15, 2025) ...................................................... 13, 28

## Statutes

5 U.S.C. § 701(a)(2) ...................................................................................................... 10

5 U.S.C. § 702 ................................................................................................................. 5

5 U.S.C. § 704 ................................................................................................................. 9

5 U.S.C. § 705 ............................................................................................ 1, 25, 26, 27

5 U.S.C. § 706 .......................................................................................... 25, 26, 27

28 U.S.C. § 1491(a)(1) ............................................................................................ 2, 3, 4

42 U.S.C. §§ 5307(b)(2)-(c) ........................................................................................ 16

42 U.S.C. § 5318(a)–(b) .............................................................................................. 16

42 U.S.C. § 11386(b)(8) .......................................................................................... 13, 14

## Other Authorities

Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025) ............................................... 15

Exec. Order 14151, 90 Fed. Reg. 8633 (Jan. 20, 2025) ............................................... 15

William Baude et al., Hart and Wechsler's *The Federal Courts and the Federal System* 462 (8th
    ed. 2025) .................................................................................................................. 7

Black's Law Dictionary (12th ed. 2024) ......................................................................... 4

## Regulations

24 C.F.R. § 5.106(1)–(2) .............................................................................................. 14

## INTRODUCTION

Absent this Court's intervention, the Department of Housing and Urban Development and the Department of Health and Human Services will imminently subject organizations dedicated to helping unhoused populations and domestic violence and sexual assault victims to vague and otherwise unlawful funding conditions that threaten these organizations' lifesaving work. Plaintiffs face irreparable harm from the impossible choice between accepting those conditions and turning down millions of dollars in federal funding that they use to house survivors of abuse and others experiencing homelessness, and to provide programs to reduce and prevent domestic violence, sexual assault, and homelessness. None of Defendants' arguments in opposition to Plaintiffs' motion for preliminary injunction are convincing.

The Tucker Act has no application here at all, for the simple reason that this case does not involve grant terminations or breach of contract claims. Plaintiffs' claims all relate to requirements that Defendants are imposing as a policy across all actual and potential future grantees, including Plaintiffs and their members. The claims, then, are not founded on any contract and do not seek to enforce or compel performance of any contract; the Tucker Act presents no bar to this Court's jurisdiction.

On the merits, Defendants fail to rebut Plaintiffs' showing that, under the APA, the Funding Conditions exceed the agency's statutory authority or are otherwise contrary to law and that the Funding Conditions are arbitrary and capricious. The Funding Conditions also are constitutionally infirm. Defendants aim to subject disfavored speech to crippling civil and criminal penalties, and have crafted vague prohibitions to ensnare grantees in their False Claims Act trap. Moreover, the Executive Branch has abrogated congressional authority under the Spending Clause to set funding conditions, violating the separation of powers.

The Court should enter a stay and a preliminary injunction setting aside the Funding Conditions and preventing Defendants from interfering with the critical work that Plaintiffs and their members provide for individuals experiencing homelessness and survivors of domestic violence and sexual assault and their communities.

## ARGUMENT

### I.     This Court Has Jurisdiction

The Tucker Act does not strip this Court of jurisdiction over Plaintiffs' claims. *Contra* Defs.' Opp'n at 13–20. The Tucker Act analysis is straightforward here because, unlike in the Supreme Court's recent decision in *National Institutes of Health v. American Public Health Association*, No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025), this case does not involve grant terminations for which Plaintiffs could bring breach of contract claims, Plaintiffs do not ask the Court to order Defendants to contract with Plaintiffs or pay Plaintiffs any money, and the vast majority of Plaintiffs and their members do not even have a contract with the federal government as relevant to the claims. Moreover, unlike in *NIH*, Plaintiffs assert constitutional claims not under the APA, for which this Court must have jurisdiction under Supreme Court precedent.

As a threshold matter, the Tucker Act does not and could not apply where Plaintiffs or their members do not have any agreement with the government related to their claims. The Tucker Act only provides the Court of Federal Claims jurisdiction over claims that are "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Supreme Court has held that this plain text means the Tucker Act does not apply where there is no "actual contract." *Hatzlachh Supply Co., Inc. v. United States*, 444 U.S. 460, 465 n.5 (1980); *see Rhode Island Coal. Against Domestic Violence v. Bondi*, No. CV 25-279 WES, 2025 WL 2271867, at *5 (D.R.I. Aug. 8, 2025) ("*RICADV*"). Although the Tucker Act has been the subject

2

of vigorous litigation since the beginning of this Administration, this fundamental principle remains settled.

Here, with only a few exceptions,[1] Plaintiffs and their members do not have "actual contracts" with the Defendants or did not have actual contracts when filing suit, upon which their claims would be "founded." 28 U.S.C. § 1491(a)(1). As another court in this District recently explained in rejecting the government's Tucker Act defense in a similar case, Plaintiffs "do not challenge conditions, terms, or agency action related to grants that the Office has previously awarded them; they object to the challenged conditions only to the extent that they are or will be placed upon grants" that Plaintiffs seek or sought to obtain. *RICADV*, No. CV 25-279 WES, 2025 WL 2271867, at *5. The Tucker Act cannot apply in these circumstances.

The Tucker Act also cannot apply to any Plaintiffs or their members in this case because Plaintiffs do not challenge grant terminations or other government actions for which Plaintiffs could file suit in the Court of Federal Claims. Courts have "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 939 (9th Cir. 2025) (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006)).[2] Simply put, "there cannot be exclusive jurisdiction [in the

---

[1] Defendants identify five instances where a Plaintiff or its member accepted a HUD or HHS award prior to filing suit. Defs.' Opp'n. at 18 n.5. This Court has jurisdiction over claims related to these awards for all of the reasons described below.

[2] *See also Harris Cnty., Texas v. Kennedy*, No. 25-CV-1275 (CRC), 2025 WL 1707665, at *6 (D.D.C. June 17, 2025); *Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 1734471, at *19 (N.D. Cal. June 23, 2025); *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 134 (D.D.C. 2023).

Court of Federal Claims] under the Tucker Act if there is no jurisdiction under the Tucker Act."
*Id.*

For the Court of Federal Claims to have jurisdiction under 28 U.S.C. § 1491(a)(1), a plaintiff must have "a money-mandating source on which to base his cause of action," meaning a source of law that entitles the plaintiff to a particular amount of money. *See Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005). "A breach of contract claim against the Government is a money-mandating source." *See Turping v. United States*, 134 Fed. Cl. 293, 306 (2017) (citing *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011)).

With grant terminations, a grantee may potentially sue in the Court of Federal Claims because an unlawful grant termination can equate to a breach of contract. Justice Kavanaugh recently wrote in *NIH*, for instance, that where "[t]he core of plaintiffs' suit alleges that the Government unlawfully terminated their grants," "[t]hat is a breach of contract claim." *NIH*, 2025 WL 2415669, at *5 (Kavanaugh, J., concurring in part and dissenting in part). But where, as here, the government has not terminated a contract, and the question is only whether the government may impose new conditions that are not yet in any awards, there is no possible claim for "breach of contract." Black's Law Dictionary (12th ed. 2024) (defining "Breach of Contract" as "[v]iolation of a contractual obligation"). Plaintiffs thus would have no money-mandating source of law to bring suit in the Court of Federal Claims, and "no jurisdiction" would "lie[] in the Court of Federal Claims." *Tootle*, 446 F.3d at 176. This Court cannot "be deprived of jurisdiction by the Tucker Act" in these circumstances. *Id.*

Plaintiffs' APA and non-APA claims are distinguishable from the grant termination claims in *NIH* for the above reasons, but the non-APA claims are also critically distinct because they involve freestanding constitutional claims for which this Court must have jurisdiction under

4

settled Supreme Court precedent. The claims presented in both *NIH* and *Department of Education v. California*, 145 S. Ct. 966 (2025) were solely arbitrary-and-capricious claims under the APA. In both cases, the sole basis for the Court's decision was the APA's "limited waiver of sovereign immunity." *NIH*, 2025 WL 2415669, at *1 (quoting *California*, 145 S. Ct. at 968) (Barrett, J. concurring) (cleaned up). Specifically, the Court found that the government would likely succeed on its argument that the Tucker Act "impliedly" precluded the APA's sovereign immunity waiver under 5 U.S.C. § 702 from applying to the grant termination claims. *See id.*; Gov.'s App. to Stay at 20–22, No. 25A103 (July 24, 2025).

But with Plaintiffs' constitutional claims, sovereign immunity is inapplicable and Defendants must show that the Tucker Act expressly—not impliedly—strips this Court of jurisdiction to hear the claims. It is well settled that "sovereign immunity does not apply when a plaintiff files suit seeking equitable relief against federal officials in their official capacities and alleging that those officials . . . acted unconstitutionally." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022). With such claims, the official's actions "are considered individual and not sovereign actions." *Id*. "So, there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). The sole basis for the Supreme Court's decisions in *NIH* and *California*—sovereign immunity—thus is no barrier here.

Even more fundamentally, this Court must have jurisdiction over Plaintiffs' constitutional claims because these claims could not be brought in the Court of Federal Claims. In *Webster v. Doe*, 486 U.S. 592 (1988), the Supreme Court imposed a clear-statement rule where the government argues that a statute deprives a party of any forum to assert a constitutional claim. *Id.* at 603 ("[W]here Congress intends to preclude judicial review of

constitutional claims its intent to do so must be clear."). *Webster* required a "heightened showing" for these circumstances "in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.*

Here, Plaintiffs could not assert any of their constitutional claims in the Court of Federal Claims. The Federal Circuit has squarely held that the Court of Federal Claims lacks jurisdiction to hear claims under the First Amendment, the Due Process Clause, and constitutional separation-of-powers principles, because the relevant constitutional provisions are not money-mandating. *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995); *United States v. Connolly*, 716 F.2d 882, 887 (Fed. Cir. 1983). The Spending Clause is not either. *San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-CV-02425-EMC, 2025 WL 1180729, at *9 (N.D. Cal. Apr. 23, 2025). *Webster* thus requires a clear statement that Congress intended for the Tucker Act to strip district court jurisdiction over grant-related constitutional claims, and the Tucker Act contains no such statement. *Webster* therefore requires that this Court maintain jurisdiction. Were it otherwise, and "*no* court would have jurisdiction over constitutional claims that happen to involve a contract," then "no court would have jurisdiction over a claim that the government rescinded contracts on the basis of protected traits like race, religion, or sex," *Harris Cnty.*, 2025 WL 1707665, at *6. That cannot be right.

Indeed, this Court must have jurisdiction over Plaintiffs' constitutional claims to avoid rendering the Tucker Act itself unconstitutional. "The [*Webster*] rule is an interpretive tool of constitutional avoidance," *Collins v. Dep't of the Treasury*, 83 F.4th 970, 980 (5th Cir. 2023). The Supreme Court has used this tool aggressively; it has *never* read a federal statute to preclude all judicial review of a constitutional claim, to "avoid squarely facing" the "serious constitutional

question" that such a statute would present. William Baude et al., Hart and Wechsler's *The Federal Courts and the Federal System* 462 (8th ed. 2025). Defendants provide no reason for this Court to go where the Supreme Court has never gone, and find that the Tucker Act is the first federal statute in history that deprives a party of any judicial forum to challenge the constitutionality of a government action.

Defendants cite a two-part test from the D.C. Circuit for assessing whether the Tucker Act impliedly strips district courts of jurisdiction over certain claims—but this test is irrelevant for claims founded on constitutional rights, for which *Webster*'s clear statement rule applies. The test also need not be applied to Plaintiffs' APA claims given the threshold reasons explained above why the Tucker Act could not apply. But if the court were to consider it, the test examines whether a contract is the source of Plaintiffs' legal rights and whether Plaintiffs request relief to enforce that contract. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *but cf. Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023).[3]

Here, "the source of Plaintiffs' rights resides in statutes and the Constitution, not in any contractual provisions in the Grant Agreements." *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1582368, at *9 (W.D. Wash. June 3, 2025) (rejecting Tucker Act defense in challenge to grant conditions) (appeal pending, No. 25-3664). Plaintiffs do not seek to enforce any contractual term and do not allege any breach of contract. *See RICADV*, 2025 WL 2271867, at *5. Instead, they seek to enforce their constitutional rights and the terms of the relevant statutes that Congress enacted, including the APA.

---

[3] In *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Supreme Court set forth a test for whether "[a] special statutory review scheme" "implicitly" "preclude[s] district courts from exercising jurisdiction over challenges to federal agency actions." *Axon*, 598 U.S. at 185. Plaintiffs' claims are properly in district court under that test, because they are not "of the type" Congress intended to be reviewed in the Court of Federal Claims. *Id.* at 186 (quotations omitted).

The relief that Plaintiffs seek is not contractual either. Unlike in *NIH* and *California*, Plaintiffs do not ask the Court to order Defendants to reinstate contracts held by Plaintiffs, to perform such contracts, or "to pay plaintiffs sums due under the agreements." *NIH*, 2025 WL 2415669, at *2 (Barrett, J., concurring); *see California*, 145 S. Ct. 966. Plaintiffs do not request any "relief designed to enforce any obligation to pay money pursuant to [Plaintiffs'] grants." *NIH*, 2025 WL 2415669, at *1 (quotation omitted). Plaintiffs do not ask the Court to order Defendants to contract with Plaintiffs at all. The fact that Plaintiffs do not ask for an order compelling any payment of money "alone[] is sufficient to render the Tucker Act inapplicable." *Turner*, 2025 WL 1582368, at *10.

Rather, Plaintiffs seek to set aside unlawful conditions that Defendants have imposed as requirements "to be *eligible*" to receive an award. *RICADV*, 2025 WL 2271867, at *5. In this regard, the New Conditions and the relief that Plaintiffs seek are analogous to the guidance documents in *NIH*, for which the Court held that the district court *did* have jurisdiction to provide relief. The guidance documents in *NIH* reflected grant prioritization policies that governed what types of future grants NIH would fund, similar to how the New Conditions govern the terms that will be included in future HUD and HHS grants. *See* 2025 WL 2415669, at *1 (Barrett, J., concurring) (describing the agency policy as "[g]oing forward, [not to] fund research related to DEI objectives, gender identity, or COVID-19"). Vacating the NIH guidance policies did not require the Government to make any payments on grants. *See id.* The same is true with respect to vacating the New Conditions: if the Court stays the conditions, that relief applies prospectively, and Plaintiffs will still need to receive, accept, and execute grant agreements with HUD and HHS to be entitled to payment on future grants.

Finally, Defendants contend that the "real question" with respect to jurisdiction is whether there is an "adequate remedy in a court other than this Court, thereby precluding jurisdiction under the APA, 5 U.S.C. § 704." Defs.' Opp'n at 16. The Supreme Court definitively answered that question in *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988). The Court held that the Court of Federal Claims does not provide an adequate remedy for purposes of 5 U.S.C. § 704 where a plaintiff seeks equitable declaratory and injunctive relief, because the Court of Federal Claims cannot provide such relief and instead is limited to awarding money damages. *Id.* at 901–08.

In sum, the Tucker Act does not apply in this case challenging Defendants' policies to impose unlawful grant conditions. Indeed, in every other challenge to similar conditions that agencies are imposing on funding recipients, the courts have concluded that the Tucker Act does not deprive district courts of jurisdiction over the claims. *RICADV*, 2025 WL 2271867, at *10; *California v. Dep't of Transp.*, No. 25-CV-208-JJM-PAS, 2025 WL 1711531, at *1 (D.R.I. June 19, 2025); *King Cnty.*, 2025 WL 1582368, at *9-11; *S.F. Unified Sch. Dist. v. AmeriCorps*, 2025 WL 1180729, at *9–11; *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 984 (N.D. Ill. 2025) (appeal pending, No. 25-2144) . Indeed, the government has abandoned its Tucker Act argument in its appeal of two of the injunctions that have been entered against certifications, demonstrating the clarity of the Tucker Act's inapplicability to this category of cases. *See* Gov't Br., *Chi. Women in Trades v. Trump*, No. 25-2144 (7th Cir. Aug. 18, 2025); Gov't Br., *King Cnty. v. Turner*. No. 25-3664 (9th Cir. July 8, 2025).

## II.     Plaintiffs' APA Claims Are Likely To Succeed

Plaintiffs are likely to prevail on their claims that the new New Conditions must be set aside under the APA. Contrary to Defendants' contentions, the claims are subject to APA review, and they fail that review for multiple independent reasons.

### A. The New Conditions are subject to APA review

In a footnote, Defendants suggest that some of Plaintiffs' challenges fail because decisions about grant terms are "committed to agency discretion by law" and thus unreviewable under 5 U.S.C. § 701(a)(2). Defs.' Opp'n at 20 n.6. If this argument were to be considered, it fails. The Supreme Court has emphasized that this exception to the strong "presumption of judicial review" under the APA is "quite narrow[]." *Dep't of Com. v. New York*, 588 U.S. 752, 771–772 (2019) (cleaned up). An agency action "is committed to agency discretion by law" only "where a statute is drawn in such broad terms that … the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster*, 486 U.S. at 599–600. Only in those "rare instances" in which there is "no law to apply" is it appropriate to deem an action "committed to agency action" and therefore unreviewable. *Id.* at 599.

"[T]he determination of grant terms and conditions is not a category of decision traditionally committed to exclusive agency discretion." *RICADV*, 2025 WL 2271867, at *7 (citing, *e.g.*, *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020)). Defendants cite no case holding that the imposition of funding conditions is committed to agency discretion by law.

And there clearly *is* law to apply for each of Plaintiffs' claims. The First Amendment, the Due Process Clause, the Spending Clause, and the separation of powers have well-worn standards that courts apply every day, and agencies do not have "discretion" to violate these constitutional protections. And even if the grant conditions were committed to agency discretion (and they are not), "[i]t is well-established that judicial review exists over allegations of constitutional violations even when the agency decisions underlying the allegations are discretionary." *Wong v. Warden*, 171 F.3d 148, 149 (2d Cir. 1999).

Defendants rely on cases that held certain agency funding decisions unreviewable, but those cases are inapposite. Defs.' Opp.'n at 20–21. Unlike *Lincoln v. Vigil*, 508 U.S. 182, 192–93 (1993), where the plaintiff challenged an agency's decision over how to allocate funds from a "lump-sum appropriation" that did not "restrict[] what can be done with those funds," Plaintiffs do not challenge HUD or HHS's decision to allocate unrestricted appropriations to one grant program or another. They challenge the choice to impose New Conditions on grant programs that HUD and HHS operate. Moreover, unlike *Lincoln*, all of the grant programs at issue are called for by statutes, providing law to apply in addition to Plaintiffs' constitutional claims. *Cf. Lincoln*, 508 U.S. at 193–94 (the statutes did "not so much as mention" the relevant program).

### B.  The New Conditions violate the APA

On the merits, Plaintiffs are likely to prevail on their claim that the New Conditions must be set aside on multiple independent grounds: they are arbitrary and capricious; they exceed Defendants' statutory authority; and several are contrary to law (on top of being unconstitutional, as discussed further below).

#### 1.  The New Conditions are arbitrary and capricious

The New Conditions fail arbitrary and capricious review, which requires that agency actions be both "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). Defendants barely attempt to explain how the New Conditions meet either requirement.

Defendants do not dispute Plaintiffs' argument that the agencies failed to address the "serious reliance interests" of grantees and the victims they serve. Defs.' Opp'n 25–26; *see* Pls.' Br. at 31–33. That alone renders their actions arbitrary and capricious. *See DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020); *RICADV*, 2025 WL 2271867, at *8 (agency acted arbitrarily and capriciously where it failed to address how "the vague and confusing

11

language in the challenged conditions would cause significant adverse effects on the Coalitions and the vulnerable populations that they serve").

Nor did Defendants meet the APA's most basic requirement that they offer a reasoned explanation for their actions. Defendants' actions here were not "explained at all"—and must be set aside for that reason alone. *King Cnty.*, 2025 WL 1582368, at *17.

Defendants offer that "the rationale for the conditions is self-evident from the language of the conditions themselves," Defs.' Opp'n 25–26, but the conditions do not explain what the agency considered in reaching its decision. Nor do they reveal whether or how the agencies considered important aspects of the problem. HUD, ACF, and HRSA, for example, do not appear to have considered how the requirements to certify compliance with nondiscrimination laws and Title IX—with their explicit threat of potentially ruinous False Claims Act liability, and the clear signals that the Administration has a new and expansive view of what those laws forbid—would deter grantees from helping marginalized populations or serving transgender individuals in accordance with their gender identity. There is likewise no indication that HUD considered how the restriction on promoting "gender ideology" would undermine organizations' ability to serve transgender individuals effectively, given that they would be blocked from recognizing and respecting a core part of those individuals' identity. Nor is there any indication HUD considered how the restriction on promoting "elective abortions" would undercut organizations' ability to advise survivors of sexual assault and domestic violence of their options when faced with an unwanted pregnancy.

At most, the conditions reference recent Executive Orders.[4] But "an agency cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant EO." *Woonasquatucket River Watershed Council v. USDA*, No. 1:25-CV-00097, 2025 WL 1116157, at *18 (D.R.I. Apr. 15, 2025), *appeal pending*, No. 25-1428; *see King Cnty.*, 2025 WL 1582368, at *17 ("rote incorporation of executive orders . . . does not constitute reasoned decisionmaking"). Finally, Defendants are wrong to suggest that agencies receive less scrutiny "when setting funding priorities." *Contra* Defs.' Opp'n at 25. Even if less explanation is typical in a funding announcement than a legislative rule, for example, an agency may not provide zero explanation. In any event, if evidence of reasoned decision making were in the record, Defendants could have provided it to the Court. Instead, they rely only on their claim to a lower standard for reasoning in this context. In the sole case that Defendants rely on, *City of Los Angeles v. Barr*, the Department of Justice's policy approach served statutory objectives and the agency "reasonably determined" that its chosen policy served the public interest. *See* 929 F.3d 1163, 1182 (9th Cir. 2019).

2.  *The New Conditions exceed Defendants' statutory authority and several are contrary to law*

The New Conditions also exceed Defendants' statutory authority. Contrary to Defendants' contention, Defs.' Opp'n at 24, the statutory authorization for HUD to require "compl[iance] with such other terms and conditions as the Secretary may establish to carry out" the CoC program in "an effective and efficient manner," 42 U.S.C. § 11386(b)(8), does not give the HUD Secretary free rein to require compliance with an unrelated social agenda as a condition to receiving funding.

---

[4] *But see* Defs.' Opp'n at 23 (arguing that recent Executive Orders are not relevant to the Funding Conditions).

HUD bases its sole defense of the Gender Ideology condition on its sweeping view of § 11386(b)(8), but does not explain how a housing provider's acknowledgement of a client's gender identity would lead to inefficient provision of housing services. Defendants further fail to engage with Plaintiffs' argument that this condition conflicts with HUD's *own regulations*, which mandate that grant recipients must provide individuals with equal access to shelters and other services "in accordance with the individual's gender identity" and must place and serve individuals "in accordance with the[ir] gender identity." 24 C.F.R. § 5.106(b)(1)–(2); *see also id.* §§ 5.106(b)(3), (c).

Section 11386(b)(8) likewise does not grant HUD the authority to adopt the Abortion Condition. Some CoC grants fund organizations that provide safe housing to victims of domestic violence and sexual assault provide a full suite of services to support those individuals needs—including information and referrals about victims' options if they have an unwanted pregnancy. *See* Declaration of Susan Higginbotham (Higginbotham Decl.) ¶ 51 (ECF No. 30-11); Declaration of Jonathan Yglesias (Yglesias Decl.) ¶ 37 (ECF No. 30-23). Barring organizations from providing information about abortion in those circumstances does not make the CoC program more "effective and efficient"; it advances policy goals wholly unrelated to the CoC program. Defendants further claim that the Abortion Condition "largely track[s] restrictions on appropriated funds that Congress has already imposed." Defs.' Opp. at 24. But that gets it backwards. Congress has *not* restricted CoC funds (or any other HUD funds) from being used to promote elective abortions, even though it has imposed similar restrictions on *other* appropriations. Pls.' Br. at 7–8. If anything, the fact that Congress did not see fit to impose such a restriction on HUD funds suggests that the restriction exceeds the agency's authority, not the other way around.

HUD fares no better in contending that the Anti-DEI Certification and HUD Discrimination Certification "simply call attention to recipients' preexisting obligation to comply with the law." Defs.' Opp'n at 22.[5] The Administration has made clear that it views most diversity, equity, inclusion, and accessibility activities as unlawful, including activities that the federal government has long recognized as appropriate or even promoted in its program administration. *See* Exec. Order 14173 § 3, 90 Fed. Reg. 8633 (Jan. 31, 2025) (revoking executive actions dating back decades; ordering OMB to "[t]erminate all 'diversity,' [and] 'equity' … programs[] or activities"; and ordering OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear," from financial assistance procedures); *see also* Exec. Order 14151 § 2, 90 Fed. Reg. 8339 (Jan. 20, 2025) (ordering agencies to "terminate … all DEI [and] DEIA … offices and positions"; "'equity' actions, initiatives or programs"; and "'equity-related grants or contracts'"); Pls.' Br. at 8. The Administration, moreover, has made clear it will use the False Claims Act as a "weapon" against people who transgress the Administration's new and ill-defined line. Pls.' Br. at 4–5 (quoting Blanche Memo); *see also*, Statement of Attorney General Pamela Bondi (May 5, 2025), *available at* https://perma.cc/T76H-25CB ("This Department of Justice will avail itself of every tool at its disposal to protect all Americans from illegal DEI discrimination."); Statement of Attorney General Pamela Bondi (May 19, 2025), *available at* https://perma.cc/A88E-VPH6 ("Institutions that take federal money only to . . . promote divisive DEI policies are putting their access to federal funds at risk.").

---

[5] Defendants do not respond to Plaintiffs' arguments that HUD lacks statutory authority to enact the HUD E.O. Condition and thus have waived any defense to this claim.

Against that backdrop, the Anti-DEI Certification and HUD Discrimination Certification effectively proscribe or prevent activities that Congress specifically authorizes or requires, including to serve or even prioritize services for racial and ethnic minorities or other underserved populations. Pls.' Br. at 35–36 (citing 42 U.S.C. §§ 5307(b)(2), (c), 5318(a)–(b)).

The ACF Title IX Certification and HRSA Title IX Certification also cannot be justified as "simply call[ing] attention to recipients' preexisting obligation to comply with the law." Defs.' Opp'n at 22. The Administration has made clear that it has a new and novel view that Title IX makes it illegal to allow individuals to access single-sex programs or spaces in line with their gender identity. Pls.' Br. at 6–7. By adopting the Title IX Certification requirements, ACF and HRSA have—without statutory authority—threatened grantees with potentially ruinous False Claims Act litigation and liability if they do not comply with that view.

Defendants claim that the Title IX Certifications do not impose any requirements beyond what Title IX itself requires, but that is mistaken. The HRSA certification explicitly requires recipients to certify that they are "compliant with … *the requirements set forth in Presidential Executive Order 14168* [the "Gender Ideology" Order]." HRSA, *FY 2025 HRSA General Terms and Conditions* at 4 (May 14, 2025), https://perma.cc/VLK7-3KB2 (emphasis added). Defendants point out that HRSA policy states that Executive Orders yield if they are inconsistent with statute or regulation, Defs.' Opp. at 23, but that does not change the language to which grantees must certify—that they will comply with the Executive Order's requirements. And while the ACF Title IX Certification does not expressly mention the Executive Order's new and novel view, that silence provides "cold comfort" given the very explicit provisions paving the way for False Claims Act claims if the Department of Justice (or any private relator) deems the grantee's actions noncompliant. *See RICADV*, 2025 WL 2271867, at *9 (describing

16

similar declarations from the government as "cold comfort" for plaintiffs that reasonably fear loss of grant funding or FCA liability); *see also* Pls.' Br. at 31, 35.

### III.    Plaintiffs' Fifth Amendment Claims Are Likely To Succeed

First, contrary to Defendants' suggestion, Defs.' Opp'n at 35, facial vagueness challenges are cognizable where Plaintiffs face potential criminal penalties. *See Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) ("pre-enforcement standing" for vagueness challenge to criminal statute because "plaintiff should not have to expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights" (quotation marks omitted)). Likewise, courts consider pre-enforcement vagueness challenges when plaintiffs allege a burden on First Amendment-protected speech. *See San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, 2025 WL 1621636 at *22 (N.D. Cal. June 9, 2025) ("Plaintiffs are likely to succeed on the merits of their Fifth Amendment vagueness challenge—both facial and as-applied."); *see also Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ("Vagueness challenges to statutes *not threatening First Amendment interests* are examined in light of the facts of the case at hand" (emphasis added)). Plaintiffs' facial vagueness challenge is appropriate because the New Conditions threaten draconian consequences for non-compliance—significant civil liability or even criminal penalties. With the threat of these significant penalties, Plaintiffs cannot simply wait and see how the government decides to interpret these vague terms—and a facial challenge is the only effective way to protect their Fifth Amendment rights.

Second, Defendants' suggestion that terms like "promote" can be given their common meanings is unconvincing absent comprehensible definitions for the terms to which they relate. *See* Pls.' Br. at 45 (relying, in part, on context to argue that the terms in combination are vague). Plaintiffs are left unsure whether providing information to a survivor seeking help with an unwanted pregnancy would "promote" "elective abortion," and whether using preferred

17

pronouns to refer to a non-binary person would "promote""gender ideology." When read in context, the terms of the New Conditions are vague on their face.

Third, Defendants, again, are wrong that the HUD discrimination-related conditions and ACF Title IX Condition cannot be vague because they "simply require compliance with federal law." Defs.' Opp'n. at 37. The surrounding context makes clear that the Administration plans to use these conditions to impose requirements that go well beyond what nondiscrimination law requires. Engaging in DEI programming is not illegal—yet the clear message is that some or even most of it is, in unclear circumstances. Pls.' Br. at 45. And Defendants do not address Plaintiffs' point that they cannot possibly know how to comply with the agency's apparent view that Title IX requires excluding transgender people from single-space programs in line with their gender identity, given that binding regulations require the opposite. *See* Pls.' Br. at 47. Under these new conditions, it is unclear what actions will be deemed impermissible uses of funds that could expose them to criminal or civil liability.

Finally, Defendants argue that there is no lack of notice problem because grant recipients would receive notice of the proposed cancellation of their grant funding and an opportunity to appeal. Defs.' Opp'n at 37. This notice is irrelevant to the risk imposed on Plaintiffs by Defendants, namely that the materiality provision of the grant agreements subject Plaintiffs to potentially massive civil and criminal liability under the False Claims Act. Neither of these comes with a pre-liability notice and opportunity to be heard. The pre-termination notice does not remedy that illegality.

## IV.    Plaintiffs' First Amendment Claims Are Likely To Succeed

The HUD Discrimination Certification and HUD "Gender Ideology" Condition violate the First Amendment for all the reasons explained in Plaintiffs' opening brief. Pls.' Br. at 39–43. Defendants' arguments to the contrary are unpersuasive.

18

*First*, as detailed, *supra* at III, facial challenges are cognizable where, as here, Plaintiffs face potential criminal liability and First Amendment rights are implicated.

*Second*, though it is true that the government does not violate the First Amendment by declining to subsidize specific speech, Defendants appear to recognize that "regulat[ing] speech…on the recipients' 'own time and dime'" "amounts to an unconstitutional condition." Defs.' Opp'n at 30–31. That is precisely what Defendants have done here. The HUD Discrimination Certification compels grantees to certify that they do not "operate *any* programs"—whether funded by the grant or not—"that violate any applicable Federal antidiscrimination laws." Those requirements "on [their] face make[] clear" that they apply to "any program …, irrespective of whether the program is federally funded." *Chi. Women in Trades*, 778 F.Supp 3d at 984,; *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013). And the HUD "Gender Ideology" Condition strays "outside the scope of the federally funded program" by effectively compelling grantees to adopt—as their own—the Government's view on an issue of public concern." Pls.' Br. at 43 (citing *All. for Open Soc'y*, 570 U.S. at 218). Defendants ignore these realities when claiming (incorrectly) that these restrictions merely "align the Government's sponsorship of activities with its policy priorities." Defs.' Opp'n at 31.

*Third*, the First Amendment places limits on the government even when it comes to government subsidies of speech. The First Amendment forbids using federal funding as a sword "aim[ed] at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998). The "Gender Ideology" Condition violates the First Amendment by defunding all activities "related to the dangerous ideas [the government] has identified." *S.F. AIDS Found.*, 2025 WL 1621636, at *18; *Rhode Island Latino Arts v. NEA*, No. 1:25- cv-00079, 2025 WL 1009026, at

19

*13–14 (D.R.I. Apr. 3, 2025) (noting that government cannot "use subsidies to suppress dangerous ideas" and concluding that bar on funding art programs that "promote gender ideology" was "a clear First Amendment violation").

*Fourth*, the HUD Discrimination Certification does more than "simply require recipients to certify compliance with existing legal obligations." Defs. Opp'n at 31–32. The context of HUD's decision to add this certification—which they now claim adds no new legal requirements— matters. Prior to HUD's decision to add the certification, the President directed all agencies to impose similar certifications not to ensure compliance with existing law, but to combat diversity, equity, and inclusion activities. Pls.' Br. at 40. And the Attorney General has reiterated the Administration's view that viewpoints and related activities previously condoned and even promoted by the government, *see* supra at II.B.2, will now be viewed as violations of federal civil rights laws. *See generally* Bondi Discrimination Memo. Indeed, the Administration has made clear its aim is to eradicate "DEI" and "DEIA" completely, and it is using certifications like this—and the accompanying threat of burdensome and potentially ruinous False Claims Act litigation and liability—to chill grantees from engaging in protected diversity- and equity-affirming speech that the Administration disfavors. Notably, Defendants do not appear to argue that the HUD Gender Ideology Condition merely restates current legal obligations, nor could they. Similar conditions have been held as violative of the First Amendment throughout the country. *See R.I. Latino Arts*, 2025 WL 1009026, at *13–14.

Defendants' instruction that recipients can "certify compliance with the antidiscrimination laws" and "still challenge the government's *interpretation* of those laws" Defs. Opp'n at 33 (*citing Nat'l Urban League*, No. CV 25-471 (TJK), 2025 WL 1275613 at *26 (D.D.C. May 2, 2025), offers no meaningful recourse. Recipients are left with the choice of

curbing their own speech or taking their chances in the face of potential criminal liability and ruinous civil liability.

*Finally*, Defendants are not entitled to a presumption of good faith in the application of federal antidiscrimination laws as they insist. Defs. Opp'n at 33.[6] Recipients are faced with potential liability, including enforcement actions brought by third-parties, if the government applies an overly broad interpretation of federal civil rights laws—as the Administration has signaled time and again since January. *See* Pls.' Br. at 2–6, 46. Recipients simply do not have the privilege of giving the government the benefit of the doubt. *See RICADV*, 2025 WL 2271867, at *6 (finding "cold comfort" in agency's assertion that it will reasonably interpret funding conditions, "in the context of . . . the present Administration).

## V.    Plaintiffs' Separation-Of-Powers Claims Are Likely To Succeed

Defendants' separation of powers arguments fare no better. They seek to rely on authority they simply do not have to enact a social agenda disconnected from the administration of these grant programs.

Defendants protest that Plaintiffs incorrectly assume that the Constitution requires Congress to set out every grant requirement by statute. Defs.' Opp. at 26. But Plaintiffs assume no such thing. Congress can authorize agencies to adopt grant conditions; the problem is that Congress has not done so here. *See supra* Section II.B.2; Pls.' Br. at 29–31. As another court recently held, HUD's statutory authority to administer the grant programs does not authorize it to

---

[6] Courts have recently found that this Administration is not entitled to the presumption of regularity. *See, e.g.*, *Fed. Educ. Ass'n v. Trump*, No. CV 25-1362 (PLF), 2025 WL 2355747, at *10 (D.D.C. Aug. 14, 2025) (collecting cases) ("Generations of presidential administrations and public officials have validated this underlying premise of the presumption of regularity: their actions writ large have raised little question that they act 'in obedience to [their] duty.' Over the last six months, however, courts have seen instance after instance of departures from this tradition.").

impose "[s]ubstantive conditions implicating controversial policy matters that are unrelated to the authorizing statute, such as prohibitions on DEI initiatives and 'promot[ing] elective abortion,'" because these conditions "are simply not of the same kind." *King Cnty.*, 2025 WL 1582368, at \*15 (W.D. Wash. June 3, 2025) (internal quotation marks omitted). That is, the New Conditions are not "germane" to Congress's grant of authority to the agencies. *Contra* Defs.' Opp'n at 27. By imposing those conditions without congressional authorization, the agencies tread on the separation of powers. *See id.* (holding that HUD's New Conditions "run afoul of the Separation of Powers doctrine").

Defendants next claim that the New Conditions are consistent with separation of powers principles because the conditions are consistent with existing law. Defs.' Opp'n. at 28. But, again, this misses the mark because even if they were—and several are not, *see supra* II.B.2; Pls.' Br. at 34–36—that does not mean that the executive agencies had authority to impose them, and the accompanying draconian consequences for noncompliance.

Finally, the savings clauses in ACF and HRSA grants do not save the illegality of the ACF and HRSA Title IX Certifications. Defs.' Opp'n at 28–29. While those agencies provide that statutes and regulations supersede any inconsistent terms and conditions (in ACF's case) or any inconsistent Executive Order (in HRSA's case), that does not do grantees any good because the condition requires them to make various certifications designed to expose the grantees to FCA liability for noncompliance with the Administration's novel view of Title IX. Once a grantee makes that certification—as they must to obtain grant funds—the savings clause does not appear to provide any protection. ACF and HRSA lack authority to require grantees to make those certifications, and they violate the separation of powers in doing so.

## VI.    Plaintiffs Have Established Irreparable Harm

Defendants fail to rebut Plaintiffs' showing of imminent, irreparable injury. Plaintiffs face a Hobson's choice between accepting unlawful conditions that impede their ability to provide core services, are at odds with their fundamental missions, and will expose them to potential criminal and civil liability under the FCA, or forgoing essential federal funding they rely on to serve people who are unhoused and victims of domestic violence and sexual assault.

First, Defendants argue Plaintiffs' injuries are monetary injuries and not irreparable, citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); Defs.' Opp'n at 39. But unlike that case, where plaintiffs failed to show that their injury would not have been compensable by money damages, *id.* at 674, Plaintiffs here have shown that they stand to suffer losses that a later damages award cannot remedy. *See Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003) (irreparable harm exists whenever "a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages."); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (same). Here, Plaintiffs will suffer immediate harm in the form of the inability to carry out their institutional missions as well as impacts on the vulnerable individuals and families that they serve. Pls.' Br. at 49–50 (explaining how loss of funding would interfere with missions); *Massachusetts v. Nat'l Insts. of Health*, 770 F.Supp. 3d 277, 325 (D. Mass. 2025) (interference with organizations' services "is not accurately measurable or adequately compensable by money damages").

Defendants also incorrectly suggest that economic loss can never constitute irreparable harm. *See* Defs.' Opp'n at 38–39. The relevant test is not whether a loss is economic, but whether it is compensable by a later money damages award. Where an economic injury "cannot adequately be compensated by an end-of-case award of money damages," it is irreparable. *See*

23

*Rosario-Urdaz*, 350 F.3d at 222. Here, if Plaintiffs are unable to accept their awards, Defendants will presumably fully fund other grant applicants, leaving no pool of grant money for Plaintiffs to access. *See City of Houston v. Dep't of Hous. & Urban Dev.,* 24 F.3d 1421, 1426 (D.C. Cir. 1994). Accordingly, Plaintiffs' face the permanent deprivation of their grant funds and the resulting loss of services and programs that those funds support—an injury that cannot be undone down the road.

Finally, Defendants' argument that Plaintiffs must wait for Defendants to deny their grants is misplaced, because Defendants fail entirely to engage with Plaintiffs' argument that "[t]his imminent 'choice itself demonstrates irreparable harm,'" Pls.' Br. at 48 (quoting *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017)). Plaintiffs and their members need not wait for the "Damoclese[] sword" of FCA liability "to actually fall" before the Court enters preliminary relief. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016).[7]

## VII.    The Balance of Equities Favors Relief

Defendants ignore the substantial services that Plaintiffs provide, directly and indirectly, to unhoused people, survivors of domestic violence and sexual assault, and their communities, when it argues that an injunction is improper because the government could not recover funds from Plaintiffs after an injunction enters. Defs.' Opp'n at 40. If Plaintiffs cannot access HUD, ACF, and HRSA grants on lawful terms now, they cannot provide services including rapidly rehousing survivors of sexual and domestic violence, securing housing for people who are unhoused, and offering a range of direct services—from helping people navigate mental health or

---

[7] In a declaration, HUD says that they have funded Plaintiffs' grants where Plaintiffs have removed the New Conditions. Decl. of Claudette Fernandez ¶ 13. But, at the least, HUD has indicated that it will not do so if the injunction is lifted. *See* Exhibit A, HUD Letter to the Rhode Island Coalition to End Homelessness.

substance use issues to helping survivors obtain restraining orders. *See* Declaration of Benedict Lessing ¶¶ 10, 11, 24, 27; Declaration of Laura Jaworski ¶¶ 8-14, 20, 33; Declaration of Kim Simmons ¶¶ 8-9, 11, 23; Declaration of Lisa Guillette ¶¶ 11-13; Declaration of Susan Higginbotham ¶ 14; Declaration of Jonathan Yglesias ¶ 10.a; Declaration of Carianne Fisher ¶¶ 12, 54–57; Declaration of Amanda Dotson ¶¶ 11.a- 13, 15, 43–45; Declaration of Monique Minkens ¶¶ 43–47; Declaration of Michelle McCormick ¶ 10, Declaration of Kelsen Young ¶¶ 14-16, 45–47; Declaration of David Lee ¶¶ 15, 43–49; Declaration of Krista Colón ¶¶ 13, 17, 57–59; Declaration of Brielyn Akins ¶¶ 12, 21, 37–40; Declaration of Dawn Dalton. ¶¶ 19, 25, 34–36; Declaration of Kirsten Faisal ¶¶ 26, 38-40.

Delaying receipt of these funds until after this litigation concludes will not enable Plaintiffs to serve those who need their help today. *See Nat'l Insts. of Health*, 770 F.Supp. 3d at 325. Defendants' observation that the judiciary should respect the Administration's spending priorities, Defs.' Opp'n at 41, fails to advance the public interest where, as here, the government has determined to fund these lifesaving federal grants, but attaches unlawful conditions to them.

### VIII.    Relief Should Extend Broadly Enough To Prevent Any Irreparable Harm

This Court should stay or preliminarily set aside the New Conditions under 5 U.S.C. §§ 705 and 706 in connection with Plaintiffs' APA claims, and should enter a preliminary injunction on all of Plaintiffs' claims barring Defendants from implementing or enforcing them or any substantially similar condition in any way during the pendency of this action.

The Government fails to discuss, much less rebut, Plaintiffs' request for an APA stay under 5 U.S.C. § 705. Defs.' Opp'n at 41–43 (discussing only preliminary relief under § 706). Where, as here, Plaintiffs show a likelihood of success on the merits of an APA claim, a § 705 stay is appropriate. *RICADV*, 2025 WL 2271867, at *10.

Defendants' assertion that APA relief is not appropriate "at this preliminary stage in the case," Defs.' Opp'n at 43, is at odds with the APA's provision for preliminary relief. Under 5 U.S.C. § 705, the Court may stay the agency action by "postpon[ing] the effective date" of the action or otherwise taking action necessary "to preserve status or rights pending conclusion of the review proceedings" to the extent necessary to prevent the kind of irreparable injury that Plaintiffs establish here. 5 U.S.C. § 705. And preliminary relief is also available under § 706(2) itself. *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2567 (2025) (Kavanaugh J., concurring); *see also id.* at 2569. Because the New Conditions violate the APA and threaten Plaintiffs with irreparable harm, preliminary relief under § 705 and § 706(2) is warranted and appropriate here.

The cases that Defendants cite do not discuss preliminary relief and are not to the contrary. *See* Defs.' Opp'n at 43 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015); *Town of Weymouth v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 38 (1st Cir. 2020), modified, 973 F.3d 143 (1st Cir. 2020). By proposing that the Court ultimately remand to the agencies without setting the challenged conditions aside, Defendants essentially request remand without vacatur—which is only appropriate where there is both a "serious possibility" that the agency can correct the defect on remand, and "no significant harm would result from keeping the agency's decision in place." *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 80 (D.D.C. 2010). Defendants' request "disregards a reviewing court's discretion to take any steps it deems necessary to prevent irreparable injury before a final judgment is reached." *New York v. McMahon*, No. CV 25-10601-MJJ, 2025 WL 1463009, at *28 (D. Mass. May 22, 2025) (citing 5 U.S.C. § 705). Here, preliminary relief under the APA is necessary in order to prevent imminent, significant harm. *See New York v. Kennedy*, No. 25-CV-196-MRD-PAS, 2025 WL 1803260, at *14 (D.R.I. July 1,

26

2025). Particularly so when there is no serious possibility that the agencies can remedy the challenged conditions' serious constitutional and statutory defects. *See id.*

Defendants complain about the scope of relief under the APA, Defs.' Opp'n at 42–43, but that is a feature of a § 705 stay and preliminary vacatur under § 706. Section 705 "operates upon the [agency action] itself by halting or postponing some portion of [it], or by temporarily divesting a rule or policy of enforceability." *Orr v. Trump*, 778 F. Supp. 3d 394, 430 (D. Mass. 2025)), *appeal pending*, No. 25-1579. Accordingly, "just as vacatur under § 706 is not a party-specific remedy, neither is a stay under § 705." *Cabrera v. U.S. Dep't of Lab.*, No. 25-CV-1909 (DLF), 2025 WL 2092026, at *8 (D.D.C. July 25, 2025). As Plaintiffs previously explained, the Supreme Court decision in *CASA* is not to the contrary, because the Court expressly distinguished relief under the APA from universal injunctions. *See* Pls.' Br. at 57–58.

The Court should set aside the New Conditions in full. *Contra* Defs.' Opp'n at 43 (suggesting that the Court act against only portions of the conditions). The text of § 705 provides that a court may "postpone the effective date of action" and § 706 provides that a court may "set aside agency action." The "agency action" for each funding condition is the entire condition. It would be for the Government, not this Court, to craft new, lawful funding conditions in the future.

## IX.    The Court Should Deny Defendants' Request For a Stay and Bond

Defendants' request that the Court stay any injunction that it issues pending appeal is premature. The Court has not yet issued any injunction to be stayed, and Defendants have not filed a motion for a stay of that yet-to-come injunction—and could not satisfy the factors in any event. *See* Fed. R. App. P. 8(a).

27

The Court should exercise its discretion and decline to require Plaintiffs to post a bond. Rule 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount" of a bond, "including the discretion to require no bond at all." *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *24. Where requiring a bond "would have the effect of denying the plaintiffs their right to judicial review of administrative action," no bond is necessary. *Id.*; *see also Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). A bond would have that effect here because the Plaintiffs—all nonprofits—do not have the resources to post a significant bond, and even requiring a modest one would require them to divert resources from their critical programs. At most, the Court should require Plaintiffs post only a nominal bond, because already Plaintiffs "have plenty on the line in this litigation." *See New York v. Kennedy*, No. 25-CV-196-MRD-PAS, 2025 WL 1803260, at *21 (D.R.I. July 1, 2025).

## CONCLUSION

The Court should stay the New Conditions under the APA and enter a preliminary injunction barring the implementation of those conditions or any substantially similar conditions.


August 25, 2025                                     Respectfully submitted,

                                                    */s/ Nina Cahill*
                                                    Nina Cahill (D.C. Bar No. 1735989)[+]
                                                    Daniel F. Jacobson (D.C. Bar # 1016621)[+]
                                                    Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
                                                    Brian C. Rosen-Shaud (ME Bar No. 006018)[+ ^]
                                                    Jacobson Lawyers Group PLLC
                                                    1629 K Street NW, Suite 300
                                                    Washington, DC 20006
                                                    (301) 823-1148
                                                    dan@jacobsonlawyersgroup.com

*/s/ Kristin Bateman*
Kristin Bateman (Cal. Bar No. 270913)[+] [^]
Robin F. Thurston (D.C. Bar No. 1531399)[+]
Skye L. Perryman (D.C. Bar No. 984573)[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*/s/ Amy R. Romero*
Amy R. Romero (RI Bar # 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

*/s/ Lynette Labinger*
Lynette Labinger (RI Bar # 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

_/s/ Mary C. Dunn_
Mary C. Dunn (RI Bar #6712)
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900
mcd@blishcavlaw.com
Cooperating counsel, Lawyers' Committee for RI

_/s/ Lauren A. Khouri_
Lauren A. Khouri (D.C. Bar No. 10282288)[+]
Elizabeth E. Theran (D.C. Bar No. 90030162)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org
etheran@nwlc.org

[+] Admitted _pro hac vice_
^ Not admitted in the District of Columbia. Practice supervised by members of the D.C. bar.

_Counsel for Plaintiffs_

**CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2025, I electronically filed the within document and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Nina Cahill*