## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE,

CALIFORNIA PARTNERSHIP TO END
DOMESTIC VIOLENCE,

COLORADO COALITION AGAINST SEXUAL
ASSAULT,

DISTRICT OF COLUMBIA COALITION
AGAINST DOMESTIC VIOLENCE,

END DOMESTIC ABUSE WISCONSIN: THE
WISCONSIN COALITION AGAINST
DOMESTIC VIOLENCE,

IDAHO COALITION AGAINST SEXUAL AND
DOMESTIC VIOLENCE,

IOWA COALITION AGAINST DOMESTIC
VIOLENCE,

JANE DOE INC., THE MASSACHUSETTS
COALITION AGAINST SEXUAL ASSAULT
AND DOMESTIC VIOLENCE,

KANSAS COALITION AGAINST SEXUAL AND
DOMESTIC VIOLENCE,

MONTANA COALITION AGAINST DOMESTIC
AND SEXUAL VIOLENCE,

NORTH CAROLINA COALITION AGAINST
DOMESTIC VIOLENCE,

OREGON COALITION AGAINST DOMESTIC
AND SEXUAL VIOLENCE,

PENNSYLVANIA COALITION AGAINST
DOMESTIC VIOLENCE,

Case No. 25-cv-00342

VALORUS,

VIOLENCE FREE MINNESOTA,

VIRGINIA SEXUAL AND DOMESTIC
VIOLENCE ACTION ALLIANCE,

WISCONSIN COALITION AGAINST SEXUAL
ASSAULT,

HOUSE OF HOPE COMMUNITY
DEVELOPMENT CORPORATION,

RHODE ISLAND COALITION TO END
HOMELESSNESS,

COMMUNITY CARE ALLIANCE,

FOSTER FORWARD, and

HAUS OF CODEC,

                    *Plaintiffs*,

        v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services,

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

ANDREW GRADISON, in his official capacity as
Acting Assistant Secretary of the Administration for
Children and Families,

ADMINISTRATION FOR CHILDREN AND
FAMILIES,

JIM O'NEILL, in his official capacity as Acting
Director of the Centers for Disease Control and
Prevention,

CENTERS FOR DISEASE CONTROL AND
PREVENTION,

THOMAS J. ENGELS, in his official capacity as Administrator of the Health Resources & Services Administration,

HEALTH RESOURCES & SERVICES ADMINISTRATION,

ARTHUR KLEINSCHMIDT, in his official capacity as the official performing the functions and duties of the Assistant Secretary of the Substance Abuse and Mental Health Services Administration,

SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION,

SCOTT TURNER, in his official capacity as Secretary of the United States Department of Housing and Urban Development, and

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,

*Defendants*.

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.    __INTRODUCTION__

1.      Plaintiffs in this case are nonprofit organizations that receive federal grants to serve some of the most vulnerable members of our society—victims of domestic violence and sexual assault, and individuals and families who are homeless. Congress has created a range of grant programs to support those populations, including by securing new housing for domestic violence victims who cannot safely remain at home, by helping prevent sexual assault and domestic violence from occurring in the first place, and by assisting unhoused individuals and families to obtain housing and stay in it long-term. Congress has tasked the Departments of Housing and Urban Development (HUD) and Health and Human Services (HHS) with administering many of those programs.

2.      The Departments have thrown a wrench in this life-saving work. Rather than faithfully carrying out the programs Congress created, the Departments are now forcing grantees to agree to various new conditions and certify compliance with various requirements. These new restrictions have no grounding in the relevant statutes and do not aim to better effectuate the programs' purposes. Instead, they seek to advance the Administration's wholly unrelated ideological goals—including to end "diversity, equity, inclusion, and accessibility," deny transgender people's identities, and cut off access to abortion resources and referrals. Worse yet, the Departments have imposed these requirements in a manner expressly designed to expose grantees to civil and criminal liability under the False Claims Act.

3.      These new conditions put Plaintiffs between a rock and a hard place: They can accept the conditions—and fundamentally change their programming, abandon outreach methods and programs designed to best serve their communities, and risk exposing themselves to ruinous liability. Or they can decline the funding and halt their funded programs—displacing domestic

and sexual violence survivors from safe housing, ending programs designed to reduce and prevent domestic and sexual violence, and putting previously homeless families and children back on the streets.

4.      Defendants cannot lawfully put Plaintiffs to that choice. In our constitutional system, Congress makes the laws. The executive branch cannot unilaterally leverage funding Congress appropriated for use on programs Congress created to advance the executive's own policy goals. The separation of powers does not allow that—and, here, Congress did not authorize the Departments to impose the new funding conditions. What's more, the new conditions violate due process in using vague terms that provide Plaintiffs and their members no clarity on the actual conduct that is prohibited. They also violate the First Amendment by forcing grantees to voice the Administration's views on gender and by chilling grantees from promoting diversity, equity, and inclusion even when not using federal funds. And they violate the Administrative Procedure Act by exceeding Defendants' authority, by in some cases outright conflicting with governing law or failing to follow required procedure, and by being arbitrary and capricious in virtually every way that an agency action can be arbitrary and capricious. The new conditions are unlawful and must be set aside.

## II. PARTIES

5.      Plaintiff Rhode Island Coalition Against Domestic Violence (Rhode Island Coalition) is a domestic violence coalition membership organization founded in 1979 and located in Warwick, Rhode Island. The Rhode Island Coalition provides statewide leadership to prevent and address domestic violence, supports and enhances the work of its 10 member agencies in Rhode Island to provide high quality victim-focused services, creates justice for victims through legislative and systemic advocacy, and raises awareness on the occurrence and  prevention of

domestic violence in Rhode Island. The Rhode Island Coalition aims to ensure that Rhode Island

is a place where domestic violence is not tolerated because communities are enlightened and

responsive to the needs of victims and their children.

6.      Plaintiff California Partnership to End Domestic Violence (California Partnership)

is a domestic violence coalition membership organization founded in 1993 as the California

Alliance Against Domestic Violence and located in Sacramento, California. The California

Partnership represents advocates and domestic-violence or other allied organizations throughout

the State, supports service providers, and advances systems change to prevent and end domestic

violence. The California Partnership aims to align prevention and intervention strategies through

policy, communications, and capacity-building efforts to advance social change.

7.      Plaintiff Colorado Coalition Against Sexual Assault (Colorado Coalition) is a

sexual assault coalition membership organization founded in 1984 and headquartered in Denver,

Colorado. The Colorado Coalition provides leadership, advocacy, and support to address and

prevent sexual violence. It is made up of over 90 member sexual assault programs, dual domestic

violence and sexual assault programs, college and university campuses, law enforcement

agencies, offender treatment programs, public health agencies, medical professionals,

prosecutors, sexual assault survivors, victim advocates, as well as other organizations and

concerned individuals throughout Colorado.

8.      Plaintiff District of Columbia Coalition Against Domestic Violence (DC

Coalition) is a domestic violence coalition membership organization founded in 1986 and

headquartered in Washington, D.C. The DC Coalition provides training and technical assistance

for its direct-service member programs, allied organizations, and government partners to

understand how to lawfully implement best practices when serving survivors of domestic

3

violence; leads local policy and advocacy efforts on behalf of and along with survivors of domestic violence; and works to build primary prevention efforts into programming available for young people in D.C.

9.      Plaintiff End Domestic Abuse Wisconsin: The Wisconsin Coalition Against Domestic Violence (End Abuse Wisconsin), founded in 1978, is a statewide non-profit membership organization of domestic violence victims, survivor programs, and allied partners committed to preventing and ending domestic violence.  Headquartered in Madison, Wisconsin, End Abuse Wisconsin promotes practices and policies to prevent and eliminate domestic violence, including by providing technical support and assistance to domestic violence programs across the State, training legal and other professionals on domestic violence dynamics, and engaging in public policy to ensure that survivors' needs are met.

10.     Plaintiff Idaho Coalition Against Sexual and Domestic Violence (Idaho Coalition) is a dual domestic violence and sexual assault coalition membership organization founded in 1980 and headquartered in Boise, Idaho. The Idaho Coalition works to end gender-based violence from its systemic roots, including by providing member organizations with training and technical assistance, access to statewide and national training and development, and participation in State-level advocacy and systems reform.

11.     Plaintiff Iowa Coalition Against Domestic Violence (Iowa Coalition) is a domestic violence coalition membership organization founded in 1985 and headquartered in Des Moines, Iowa. The Iowa Coalition supports a statewide network of 23 victim service provider agencies, connects survivors with the assistance they need and advocates for policy and community transformation to make Iowa a safer place for everyone. The Iowa Coalition supports

a survivor-centered approach to victim services and ensures access to services for all victims of gender based violence, particularly ensuring access to underserved populations.

12.     Plaintiff Jane Doe Inc., the Massachusetts Coalition Against Sexual Assault and Domestic Violence (JDI) is a dual domestic violence and sexual assault coalition membership organization founded in 1998 and headquartered in Boston, Massachusetts. JDI mobilizes collective power and resources to build a safer, healthier, freer Massachusetts beyond abuse and violence. JDI provides training, policy and systems advocacy, technical assistance and support for its 60 member programs, system partners, and the public.

13.     Plaintiff Kansas Coalition Against Sexual & Domestic Violence (Kansas Coalition) has operated as  a dual sexual assault and domestic violence coalition membership organization since 1990. Located in Topeka, Kansas, the Kansas Coalition comprises 24 member organizations. The Kansas Coalition is dedicated to preventing and ending sexual and domestic violence, dating violence and stalking in Kansas. The Kansas Coalition supports survivors and the people who serve them by promoting safety, healing, justice, and lasting change.

14.     Plaintiff Montana Coalition Against Domestic and Sexual Violence (Montana Coalition) is a dual domestic violence and sexual assault coalition membership organization founded in 1986 and headquartered in Helena, Montana. The Montana Coalition provides training and technical assistance to service providers addressing domestic and sexual violence in the State and serves as a resource for member and allied organizations by providing training, technical assistance, conducting statewide planning and needs assessment, developing and enhancing service standards, and gathering and disseminating critical resources and information.

15.     Plaintiff North Carolina Coalition Against Domestic Violence (North Carolina Coalition) is a domestic violence coalition founded in 1981 and headquartered in Durham, North

Carolina. The North Carolina Coalition provides training and technical assistance to its membership and convenes and participates in meetings across the State with membership and allied professionals with the goal of bridging any gaps in domestic violence services and improving communication and collaboration between service providers.

16.     Plaintiff Oregon Coalition Against Domestic and Sexual Violence (Oregon Coalition) is a dual domestic violence and sexual assault coalition membership organization composed of rural and urban members, founded in 1978 and headquartered in Portland, Oregon. The Oregon Coalition provides statewide leadership, technical assistance, and support to its member programs that serve survivors, the public, friends, family and all whose lives are affected by domestic and sexual violence.

17.     Plaintiff Pennsylvania Coalition Against Domestic Violence (Pennsylvania Coalition) is a domestic violence coalition founded in 1976 and headquartered in Harrisburg, Pennsylvania. The Pennsylvania Coalition serves as both a membership organization and a funder for Pennsylvania's domestic violence service programs, making it the largest domestic violence coalition in the United States. It provides technical assistance, training, and advocacy, as well as development of service standards and monitoring programs for compliance with funding requirements.

18.     Plaintiff ValorUS (VALOR) is a sexual assault coalition membership organization founded in 1980 and based in Sacramento, California. VALOR is committed to advancing equity and ending sexual violence, including by providing training and technical assistance to support California rape crisis centers and allied organizations; coordinating with partner organizations including law enforcement, prosecution, sex offender treatment, and violence prevention practitioners; and offering training and conference opportunities.

6

19.    Plaintiff Violence Free Minnesota (Violence Free Minnesota) is the Minnesota domestic violence coalition membership organization founded in 1978 and based in Saint Paul, Minnesota. Violence Free Minnesota is composed of over 90 member programs across the State that are aimed at ending relationship abuse. The coalition represents victims and survivors of relationship abuse; leads public policy advocacy and social change efforts; and offers support, education, and opportunities for connection for members.

20.    Plaintiff Virginia Sexual and Domestic Violence Action Alliance (Virginia Action Alliance) is a dual domestic violence and sexual assault coalition membership organization founded in 1981 and headquartered in Richmond, Virginia. The Virginia Action Alliance serves as a leading voice on sexual and intimate partner violence and as a network of survivors, sexual and domestic violence agencies, and allies that works to strengthen community responses to and prevention of sexual and intimate partner violence in the State. It provides more than 70 member sexual and domestic violence agencies statewide with access to resources, training opportunities, technical assistance, and input on policies and practices that advance safety, justice, and healing for survivors.

21.    Plaintiff Wisconsin Coalition Against Sexual Assault (Wisconsin SA Coalition) is a sexual assault coalition membership organization founded in 1985 and headquartered in Madison, Wisconsin. The Wisconsin SA Coalition works to create social change to end sexual violence by supporting and centering survivors, advocating for systemic and legislative change, and strengthening the capacity of sexual assault service providers across the State. The Wisconsin SA Coalition provides its members with individualized training and technical assistance opportunities, access to support and resources, and invitations to coalition-hosted events.

7

22.     Plaintiff House of Hope Community Development Corporation (House of Hope) is a non-profit homeless services organization founded in 1989 and headquartered in Warwick, Rhode Island. House of Hope takes a muilti-faceted approach in the fight against homelessness by addressing multiple barriers to housing faced by constituents. House of Hope funds and manages a housing stabilization program with 250 units of supportive housing; engages in intensive case management to address complex physical and mental health needs, and build life skills such as job searching; conducts street outreach to connect those living on the street with service provision; and provides basic needs to support the health and dignity of the unhoused.

23.     Plaintiff Rhode Island Coalition to End Homelessness (RICEH) is a non-profit organization founded in 1988 and located in Providence, Rhode Island. RICEH works collaboratively with advocates, providers, and faith-based organizations to create and advance lasting solutions to prevent and end homelessness. RICEH provides several services and programs to support the unhoused and unsheltered population in Rhode Island, which includes managing the Coordinated Entry System, maintaining a 365 day a year housing hotline, managing a database that tracks all the people in Rhode Island who are experiencing homelessness, implementing the SSDI and SSI Outreach Access and Recovery program, the Voices of Homelessness speakers' bureau, and facilitating the Constituent Advocacy Committee of the Community of Care Alliance.

24.     Plaintiff Haus of Codec is a non-profit organization founded in 2021 and located in Providence, Rhode Island. Building community through the arts and educational empowerment, Haus of Codec is committed to ensuring an end to transition-aged youth homelessness in Providence through the arts and workforce development. Haus of Codec provides short-term and long-term housing solutions to youth ages 18 to 24, specializing in

serving LGBTQIA+ youth, with an emphasis on freedom of expression that is crucial for the development of strong communities and individual spirits.

25.     Plaintiff Community Care Alliance (CCA) is a non-profit organization founded in 1891 and headquartered in Woonsocket, Rhode Island. CCA is a certified Community Behavioral Health Center, Community Action Program, and Family Service organization. CCA's mission is to support individuals and families of all cultural backgrounds in their efforts to meet economic, social and emotional challenges and enhance their well-being.

26.     Plaintiff Foster Forward is a direct service non-profit organization founded in 1995 and located in East Providence, Rhode Island, that aims to empower lives impacted by foster care. Foster Forward supports youth and young adults by integrating housing assistance, workforce development, educational support, financial literacy, mentorship opportunities, and mental health services to support young people in every aspect of their journey toward a fulfilling and independent adulthood.

27.     Defendant Robert F. Kennedy, Jr., is the Secretary of the Department of Health and Human Services (HHS), the highest ranking official in HHS, and responsible for the decisions of HHS. He is sued in his official capacity.

28.     Defendant the United States Department of Health and Human Services is an executive department of the United States federal government, headquartered in Washington, D.C. HHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

29.     Defendant Andrew Gradison is the Acting Assistant Secretary of the Administration for Children and Families, the highest ranking official at the Administration for Children and Families (ACF), and responsible for the decisions of ACF. He is sued in his official capacity.

30.    Defendant the Administration for Children and Families is an operating division of HHS, headquartered in Washington, D.C. ACF is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

31.    Defendant Jim O'Neill is the Acting Director of the Center for Disease Control and Prevention (CDC), the highest ranking official at the CDC, and responsible for the decisions of the CDC. He is sued in his official capacity.

32.    Defendant the Centers for Disease Control and Prevention is an operating division of HHS, headquartered in Atlanta, Georgia. The CDC is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

33.    Defendant Thomas J. Engels is the Administrator of the Health Resources & Services Administration (HRSA), the highest ranking official at the HRSA, and responsible for the decisions of the HRSA. He is sued in his official capacity.

34.    Defendant the Health Resources & Services Administration is an operating division of HHS, headquartered in Washington, D.C. The HRSA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

35.    Defendant Arthur Kleinschmidt is the Principal Deputy Assistant Secretary of the Substance Abuse and Mental Health Services Administration (SAMHSA) and is currently performing the functions and duties of the Assistant Secretary of SAMHSA. He is the highest ranking official at SAMHSA and responsible for the decisions of HRSA. He is sued in his official capacity as the official performing the functions and duties of the Assistant Secretary of SAMHSA.

36.     Defendant the Substance Abuse and Mental Health Services Administration is an operating division of HHS, headquartered in Rockville, MD. SAMHSA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

37.     Defendant Scott Turner is the Secretary of the United States Department of Housing and Urban Development (HUD), the highest ranking official in HUD, and responsible for the decisions of HUD. He is sued in his official capacity.

38.     Defendant Department of Housing and Urban Development is an executive department of the United States federal government. 42 U.S.C. § 3532(a). HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

### III. JURISDICTION AND VENUE

39.     This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

40.     This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

41.     Venue is appropriate under 28 U.S.C. § 1391(e) in the District of Rhode Island because Plaintiffs Rhode Island Coalition Against Domestic Violence, Foster Forward, Haus of Codec, House of Hope Community Development Corporation, Community Care Alliance, and Rhode Island Coalition to End Homelessness reside in this district.

## IV. FACTUAL AND LEGAL BACKGROUND

**A. President Trump's Administration Leverages Federal Funding to Advance the President's Ideological Vision and Expose Grantees to Massive Liability**

42.      The Administration is leveraging federal funding to advance the President's ideological vision. Upon taking office in January 2025, President Trump issued a series of executive orders that aim to effect sweeping social changes, including by directing agency heads to impose conditions on federal funding. Bolstering that effort, the Administration has announced it will weaponize the False Claims Act to threaten massive liability to federal funding recipients who do not comply with the Administration's conditions.

### *1. The Administration attacks diversity, equity, inclusion, and accessibility programs*

43.      In his first days in office, President Trump issued multiple executive orders attacking "diversity, equity, and inclusion" (DEI) and "diversity, equity, inclusion, and accessibility" (DEIA) initiatives. *See, e.g.*, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14173, 90 Fed. Reg. 8663 (Jan. 21, 2025) (Anti-DEI Order).

44.      Together, these orders reflect a far-ranging mission to entirely eradicate diversity, equity, inclusion, and accessibility programs and values. For instance, one order directs agencies to terminate all DEI and DEIA offices, all "equity" programs, and all "equity-related" grants or contracts. Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order No. 14151, § 2(b).

45.      Another order on "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (Anti-DEI Order), takes steps to end what it deems "illegal" DEI and DEIA in the federal government and the private sector. Anti-DEI Order §§ 3–4. To advance that goal, the Anti-DEI Order revokes multiple diversity-related executive actions issued over the last half century; purports to "streamline[]" the federal contracting process by, among other things,

12

ordering a contracting compliance office to "immediately cease … [p]romoting diversity"; and directs the Office of Management and Budget to "[e]xcise references to DEI and DEI principles, under whatever name they may appear," from federal funding procedures and to "[t]erminate all 'diversity,' 'equity,'" and similar programs and activities. *Id.* § 3.

46.    The Anti-DEI Order does not define "DEI" or "DEIA," and provides no guidance on what might make such programs "illegal" in the Administration's understanding. But it evinces a view that "illegal" DEI is widespread: It laments that "critical and influential" institutions—including "the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education"—have adopted "dangerous, demanding, and immoral" DEI or DEIA programs "that can violate the civil-rights laws." *Id.* § 1.

47.    The Anti-DEI Order requires agency heads to "include in every contract or grant award" a term requiring each counterparty or grant recipient to "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(iv)(B). The requirement that recipients not operate "*any* programs promoting DEI" is not limited to recipients' use of federal funds. *Id.* (emphasis added).

48.    The Anti-DEI Order directs agency heads to include terms requiring a grant recipient "to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code," *id.*, invoking the False Claims Act's (FCA) prohibition on "material" false claims to the government. The FCA imposes civil liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). For FCA liability to attach, the alleged

misrepresentation must be "material to the Government's payment decision"—an element the U.S. Supreme Court has called "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). The certification thus forces grant recipients to concede an essential, and otherwise demanding, element of an FCA claim—and facilitates the government's use of the FCA to target organizations that have missions or perform work that the government disfavors.

49.    To "combat illegal private-sector DEI," the Anti-DEI Order directs the entire government to come up with a plan that, among other things, identifies potential civil investigations that the Administration could target at institutions "to deter DEI programs or principles … that constitute illegal discrimination or preferences." Anti-DEI Order § 4.

50.    The Administration began implementing the Anti-DEI Order's directives shortly after it was issued.

51.    On February 5, 2025, Attorney General Bondi sent a letter to all employees of the Department of Justice (DOJ) on "Ending Illegal DEI and DEIA Discrimination and Preferences." Mem. from Att'y Gen. Pam Bondi, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ (Bondi Letter). The letter stated that "the Department of Justice's Civil Rights Division will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds." *Id.* The Bondi Letter does not define "DEI" or "DEIA" or explain what makes a DEI or DEIA program illegal, but it makes clear that DOJ intends to aggressively target organizations that engage in diversity, equity, inclusion, and accessibility activities, broadly construed.

14

52.     DOJ next announced its plans to use the False Claims Act as a "weapon" in combatting DEI and DEIA. Letter from Todd Blanche, Deputy Att'y Gen., to DOJ Offices, Divisions, and U.S. Attorneys (May 19, 2025), https://perma.cc/3W6K-FGHA (Blanche Memo). In a May 19, 2025 memorandum, DOJ Deputy Attorney General Todd Blanche announced a new DOJ "Civil Rights Fraud Initiative." *Id.* The memo describes the FCA as DOJ's "primary weapon" in combatting government waste, fraud, and abuse, and it promises to "vigorous[ly] enforce[e]" the FCA "against those who defraud the United States by taking its money while knowingly violating civil rights laws." The memo orders each of the 93 U.S. Attorneys' offices around the country to assign an attorney to the initiative.

53.     The Blanche Memo states that the "FCA is implicated whenever a federal contractor or recipient of federal funds knowingly violates civil rights laws. . .  and falsely certifies compliance with such laws." *Id.* It also broadly characterizes as unlawful any "knowing[] engag[ement] in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens [based] on race, ethnicity, or national origin." *Id.*

54.     The Blanche Memo also "strongly encourages" private parties to file suits under the FCA's *qui tam* provision, and encourages the public to report information about "discrimination by federal-funding recipients" to DOJ. *Id.*

55.     The Blanche Memo also states that the initiative will engage the DOJ's Criminal Division, *id.*, suggesting that DOJ will invoke the FCA's criminal penalty provisions, 18 U.S.C. § 287.

56.     The Blanche Memo does not explain when DEI would be considered "illegal," but a press release announcing the Initiative broadly warns institutions not to "promote divisive

15

DEI policies." DOJ, *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/ZS6R-B8E9.

57.     A June 11, 2025 memo announcing the DOJ Civil Division's enforcement priorities further confirms the Administration's plans to aggressively use the False Claims Act as a weapon in "advance[ing] the Administration's policy objectives." Mem. From Ass't Att'y Gen., Brett A. Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F. That memo focuses on aggressive use of the FCA throughout.

58.     The very first priority listed is to use the FCA to "pursue affirmative litigation combatting unlawful discriminatory practices in the private sector," citing to the Anti-DEI Order, the Bondi Memo, and the initiative outlined in the Blanche Memo. *Id.*

59.     At HHS, ACF's acting head has suggested that all DEI initiatives may violate federal nondiscrimination law. On July 3, 2025, ACF Acting Assistant Secretary Andrew Gradison issued a letter to Children's Bureau grant recipients stating that "[t]he Secretary of HHS has determined that awards supporting diversity, equity, and inclusion (DEI) do not meet a public purpose to the extent they are inconsistent with the Department's policy of improving the health and well-being of all Americans and may violate Federal civil rights law." Ex. C to 2nd Decl. of Mary Jane Brell Vujovic, *King Cnty. v. Turner,* No. 2:25-cv-00814 (W.D. Wash. July 14, 2025), ECF No. 276.

60.     Beyond attacking diversity, equity, inclusion, and accessibility programs, the Administration has also sought to eradicate what it terms "discriminatory equity ideology." In a January 29, 2025, Executive Order on "Ending Radical Indoctrination in K-12 Schooling," President Trump ordered agencies to ensure federal funds are not used to "directly or indirectly"

support "discriminatory equity ideology" in K-12 education. Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025) (K-12 Order). The Order sets forth a lengthy definition of the disfavored "discriminatory equity ideology" as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations." *Id.* § 2(b). The definition goes on to provide a non-exhaustive list of eight such prohibited "immoral generalizations," such as that "[a]n individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion," that "[v]irtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist," that "[a]n individual's … status as privileged … is primarily determined by the individual's race, color, sex, or national origin." *Id.*

### 2. The Administration attacks transgender rights

61.     The Administration has also launched a broadside attack on the rights and dignity of transgender people.

62.     On January 30, the President issued Exec. Order No. 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" Order). That Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It decries "the erasure of sex" in both "policy" and "language," and it commits to using what the Administration considers "accurate language and policy that recognize women are biologically female, and men are biologically male." *Id.* § 1.

63.     The Order defines "gender ideology" as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f). It states that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex," and that "[g]ender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f). And it states that "gender identity reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.* § 2(g). The Order's definition is ideological, not grounded in science, and does not address the conflicts it creates with policies and procedures that respect the existence, dignity, and rights of transgender people.

64.     To accomplish its ideological vision, the "Gender Ideology" Order makes a host of directives, including requiring federal agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e). The "Gender Ideology" Order states that "[f]ederal funds shall not be used to promote gender ideology" and requires each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g).

65.     The Order also pronounces that Title IX of the Educational Amendments Act does not require "gender-identity based access to single-sex spaces" and expresses a view that such access "has harmed women." *Id.* § 3(f).

18

66.    The Order directs the Attorney General to "ensure … the right to single-sex spaces in" federally funded entities covered by the Civil Rights Act of 1964 and directs a host of federal agencies to "prioritize" enforcement of that right. *Id.* § 5.

67.    To carry out this directive, the Department of Justice and Department of Education have since launched a "Title IX Special Investigations Team" to ramp up Title IX investigations involving transgender individuals using single-sex spaces that match their gender identity. Press Release, Dep't of Educ., U.S. Department of Education and U.S. Department of Justice Announce Title IX Special Investigations Team (Apr. 4, 2025), https://perma.cc/BXN6-499W.

### 3. The Administration attacks abortion access

68.    In his first days in office, President Trump also issued the "Enforcing the Hyde Amendment" Executive Order, which declares it the policy of the United States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (Abortion Order).

69.    The Acting Director of the U.S. Office of Management and Budget (OMB) issued a memorandum to the heads of the executive agencies providing guidance on how agencies should implement the Abortion Order. Mem. from Acting Dir. of OMB Matthew J. Vaeth to Heads of Exec. Dep'ts and Agencies (Jan. 24, 2025), https://perma.cc/5JZR-8V9X (OMB Memo). The OMB Memo states that the Administration's policy is "not to use taxpayer funds to fund, facilitate, or promote abortion, including travel or transportation to obtain an abortion, consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion." *Id.* at 1. It directs federal agencies to "reevaluate all … agency actions in conformity with the policy set out by the" Abortion Order. *Id.* at 2.

70.     The Hyde Amendment is an appropriations rider included in annual bills appropriating funds to HHS that, in its most recent iteration, generally prohibits the use of certain appropriated funds "for any abortion" and for certain other abortion-related expenses, subject to certain exceptions. Pub. L. No. 118-47, div. D, §§ 506, 507, 138 Stat. 460, 703 (Mar. 23, 2024). Other statutes impose similar but not identical restrictions and exceptions on other appropriations for certain other agencies, *see, e.g.*, Pub. L. No. 118-42, §§ 202, 203, 138 Stat. 25, 153 (Mar. 9, 2024) (DOJ); 10 U.S.C. § 1093 (Department of Defense), but Congress has imposed no such restriction on HUD's funding.

**B. Defendants Add Unlawful Conditions to Grant Awards**

71.     Following the President's instructions, HUD and HHS have begun imposing unlawful new funding conditions on grants (collectively, New Conditions).

*1. HUD's New Funding Conditions*

72.     HUD has begun carrying out Executive Orders by imposing new conditions on federal funding—through a new policy for Continuums of Care awards, a new policy for awards implemented by the Office of Community Planning and Development, and a new agency-wide policy for all HUD awards (collectively, HUD Conditions).

73.     The terms and conditions on HUD awards apply to both direct recipients and sub-recipients of those awards (that is, organizations that receive the funds indirectly, from a direct recipient of federal funds). HUD regulations adopt the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards at 2 C.F.R. part 200 (Uniform Requirements) for HUD awards to non-federal entities. 2 C.F.R. § 2400.101; 24 C.F.R. §§ 84.1, 85.1. The Uniform Requirements, in turn, provide that "[t]he terms and conditions of Federal awards … flow down to subawards to subrecipients unless a particular section of this part or the

terms and conditions of the Federal award specifically indicate otherwise." 2 C.F.R.

§ 200.101(b)(1). Under the Uniform Requirements, pass-through entities (i.e., direct recipients of

a federal award) must inform subrecipients of "[a]ll requirements of the subaward, including

requirements imposed by … the terms and conditions of the Federal award," and must

"[m]onitor" subrecipients' activities to "ensure that the subrecipient complies with … the terms

and conditions of the subaward." *Id.* § 200.332(b)(2), (e).

    *a.  HUD CoC Conditions*

    74.    The Continuum of Care (CoC) Program promotes a community-wide

commitment to the goal of ending homelessness via federal grant funding.

    75.    On March 13, 2025, Secretary Turner announced in a post on X that HUD was

implementing a policy to impose new funding conditions on "HUD's Continuum of Care

Program" (HUD CoC Conditions). Scott Turner (@Secretary Turner), X (Mar. 13, 2025,

2:47PM), https://x.com/SecretaryTurner/status/1900257331184570703, available at

https://perma.cc/2PHL-3Q2A; https://perma.cc/LPL2-WK5T. Secretary Turner proclaimed that

CoC funds "will not promote DEI, enforce 'gender ideology,' [or] support abortion." *Id.*

    76.    First, under this policy, HUD now prohibits CoC recipients from "us[ing] grant

funds to promote 'gender ideology,' as defined in [the "Gender Ideology" Executive Order]"

(HUD "Gender Ideology" Condition).

    77.    Second, under this policy as it exists currently, HUD now requires CoC recipients

to "certif[y]" that they do "not operate any programs that violate any applicable Federal

antidiscrimination laws, including Title VI of the Civil Rights Act of 1964" and to "agree that its

compliance in all respects with all applicable Federal anti-discrimination laws is material to the

U.S. Government's payment decisions for purposes of" the False Claims Act (HUD Discrimination Certification).

78.      Third, under this policy, HUD now prohibits CoC recipients from using grant funds to "fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment" (HUD Abortion Condition).

79.      Fourth, under this policy, the CoC agreements require that CoC recipients' use of grant funds and "operation of projects assisted with" grant funds be "governed by … [a]ll current Executive Orders" (HUD CoC E.O. Condition).

> *b.   Office of Community Planning and Development Grant Conditions*

80.      HUD's Office of Community Planning and Development (CPD) develops communities by promoting decent housing, suitable living environments, and expanded economic opportunities for low and moderate income people. It does so via the administration of grant programs, including the CoC, Community Development Block Grant (CDBG), Emergency Solutions Grants (ESG), HOME Investment Partnerships, and Housing Opportunities for Persons with AIDS programs, among others. In or around June 2025, CPD issued guidance announcing that it will attach new conditions substantially identical to the CoC Grant Conditions to Fiscal Year 2025 agreements governing all CPD-administered grants (collectively, HUD CPD Conditions).

81.      In particular, on June 5, 2025, CPD General Deputy Assistant Secretary Claudette Fernandez issued a letter to the executive directors of two organizations representing states and local jurisdictions that administer CPD grant programs (Fernandez Letter). The Fernandez Letter states that CPD "[g]rantees are . . . encouraged to review the White House Executive Orders as they develop their consolidated plan and annual action plans," which are required under various

CPD-administered programs. Letter from Claudette Fernandez, Acting Dir., CPD Gen. Deputy Assistant Sec'y, to Council of State Cmty. Dev't Agencies and Nat'l Cmty. Dev't Ass'n (June 5, 2025), https://perma.cc/92AE-R3BT.

82.     The Fernandez Letter goes on to state that "FY2025 grant agreement[s]" will "emphasize conformity with applicable Administration priorities and executive orders." Fernandez Letter at 2.

83.     It clarifies that, "[u]nder the FY 2025 grant agreement, conformity means" that the recipient will be subject to several enumerated conditions, including the HUD "Gender Ideology" Condition, the HUD Discrimination Certification, and the HUD Abortion Condition— conditions identical to the HUD CoC Conditions. *Id.*

    *c.  HUD-Wide Conditions*

84.     HUD has also revised its agency-wide policies to effectuate the Executive Orders leveraging federal funding.

85.     On April 22, 2025, HUD revised its General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs (HUD Policy). HUD, *General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs* (revised Apr. 22, 2025), https://perma.cc/K5KJ-L8ZF. The HUD Policy lists laws and policies "that may apply" to recipients of HUD financial assistance. *Id.* at 1.

86.     That list includes a requirement that "[r]ecipients of Federal Awards must comply with applicable existing and future Executive Orders, as advised by the Department," including but not limited to several specifically enumerated ones including the Anti-DEI Order, the

"Gender Ideology" Order, and the Abortion Order, as well as five others (General HUD E.O. Condition). *Id.* at 9–10.

87.     The Policy explains that some conditions may apply to only certain types of awards (like construction awards or awards associated with publications), and that some exceptions are noted on the table of laws and policies. *Id.* For Notices of Funding Opportunity (NOFOs), the Policy specifies that the enumerated laws and policies apply if they are listed in the program notice or NOFO. *Id.*

88.     On information and belief, HUD in fact has a general, agency-wide policy of requiring compliance with these Executive Orders. The Policy does not note any exceptions to or limitations on the General HUD E.O. Condition. And every NOFO that HUD has posted since the revision of the HUD Policy has incorporated a term requiring recipients to comply with Executive Orders, either by repeating the full list of Executive Orders enumerated in the HUD Policy or, in one instance, by stating that recipients "must adhere to the applicable requirements" in the HUD Policy.

89.     In addition, in or around May 2025, HUD updated its standard Applicant and Recipient Assurances and Certifications (HUD Certifications) on Form HUD-424-B, which must be submitted as part of any application for HUD funding or post-award submission. The revised HUD Certifications now require applicants and grantees to certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws" (General HUD Anti-DEI Certification).

### 2. HHS's New Funding Conditions

90.     Both HHS itself and operating divisions of HHS have imposed unlawful new funding conditions on grants (collectively, HHS Conditions).

*a. DEI-Related Conditions*

91.     HHS and its components have imposed new conditions to advance the Administration's anti-DEI and anti-DEIA agenda.

92.     In April of 2025, HHS revised its Grants Policy Statement (HHS GPS), which sets agency-wide policy on grants and cooperative agreements and is incorporated by reference as a standard term and condition of HHS awards. *See, e.g.*, HHS, HHS Grants Policy Statement (effective Apr. 16, 2025), at 3–4, https://perma.cc/S4GP-SXQD (April HHS GPS).

93.     The April HHS GPS imposed a new certification requirement (April GPS HHS Discrimination Certification) under which recipients were required to "certify[]" that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." April HHS GPS at 19. The April GPS specified that "DEI" refers to "diversity, equity, and inclusion"; that "DEIA" refers to "diversity, equity, inclusion, and accessibility"; and that "discriminatory equity ideology" has the meaning set forth in the K-12 Executive Order. *Id.* And it specified that "[f]ederal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin." *Id.*

94.     The April GPS HHS Discrimination Certification also required recipients to "certify[]" that "[t]hey do not engage in, and will not during the term of this award engage in, a discriminatory prohibited boycott." *Id.* This targeted boycotts advancing a specific disfavored viewpoint: Under the April GPS's definition, a prohibited "discriminatory prohibited boycott" is

only one where the party "refus[es]  to deal, cut[s] commercial relations, or otherwise limit[s] commercial relations specifically with Israeli companies" or other Israel-related companies. *Id.*

95.     The April HHS GPS stated that "HHS reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of this award, operate any program in violation of Federal anti-discriminatory laws or engage[] in prohibited boycott." *Id.* It also held out the threat of FCA liability by providing that recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4)," an apparent reference to § 3729(b)(4) of the False Claims Act.

96.     The April HHS GPS applied the new April GPS HHS Discrimination Certification to awards and award modifications that add funding made on or after April 16, 2025. HHS GPS at 3. That included supplements to award and competing and non-competing continuations. *Id.* The only exceptions were for awards made by the National Institutes of Health (NIH), non-discretionary awards, and awards to individuals. *Id.* The April HHS GPS therefore applied broadly to awards issued by all HHS components other than NIH, including CDC, ACF, HRSA, and SAMHSA. The April HHS GPS specified that it "applies to all HHS recipients and the requirements flow down to subrecipients." *Id.* And although the April HHS GPS did not apply to non-discretionary awards, it gave HHS agencies the option to apply parts of the HHS GPS to such awards. *Id.*

97.     HHS's Administration for Children and Families, which administers grant programs supporting the economic and social well-being of families, children, individuals, and communities, including grants under the Family Violence Prevention and Services Act (FVPSA), exercised this option.

98.    In May 2025, ACF updated its Standard Terms and Conditions that apply to awards administered by ACF to include a requirement, for all ACF awards, that recipients make the same DEI-related certification as was in the April HHS GPS: Recipients were required to "certify[]" that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" (May ACF Discrimination Certification). ACF, *Standard Terms and Conditions* (May 9, 2025 revision), at 7, https://perma.cc/KSH8-AA5U (May ACF Standard Terms).

99.    Except when specifically noted, the ACF Standard Terms apply to all awards administered by ACF, including "[n]on-discretionary awards." *Id.* at 3. Per the ACF Standard Terms and HHS regulations, ACF terms and conditions flow down to subrecipients. *Id.* at 3; 45 C.F.R. §§ 75.101(b)(1), 75.352.

100.    After Plaintiffs filed this suit and sought a temporary restraining order blocking (among other things) the April GPS HHS Discrimination Certification and May ACF Discrimination Certification, HHS revised those requirements.

101.    On July 24, immediately before the TRO hearing, HHS issued a revised Grants Policy Statement (July GPS) that removed the April GPS HHS Discrimination Certification language and replaced it with a statement (HHS Discrimination Certification) that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams." HHS, HHS Grants Policy Statement at 19 (effective July 24, 2025), https://perma.cc/H3W6-RTPN (July HHS GPS). The HHS

27

Discrimination Certification further states that "[r]ecipients are responsible for ensuring subrecipients, contractors, and partners also comply." July GPS at 19.

102.    The July GPS has an "[e]ffective date" of July 24, 2025, but also provides that it "applies to awards and award modifications that add funding made on or after April 16, 2025." *Id.* at 1, 3. The July GPS otherwise has the same applicability as the April GPS; it applies to awards made by all HHS components other than NIH, but not to nondiscretionary or individual awards. *Id.* at 3. The requirements flow down to subrecipients. *Id.*

103.    Several days later, on July 29, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. ACF, *Standard Terms and Conditions* at 1-2 (effective July 29, 2025), https://perma.cc/FRM5-F7G7 (July ACF Standard Terms). As with the earlier version, the July ACF Standard Terms apply (except when specifically noted) to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients. *Id.* at 4; 45 C.F.R. §§ 75.101(b)(1), 75.352.

104.    While the revised HHS Discrimination Certification no longer expressly mentions DEI, DEIA, or "discriminatory equity ideology," it still chills grantees from engaging in DEI and DEIA activities and expressing views about equity for fear of facing False Claims Act litigation or liability or other adverse consequences. On information and belief, this is the purpose of the HHS Discrimination Certification.

105.    In August, HHS also revised its Grants Policy Statement again, effective October 1, 2025. HHS, HHS Grants Policy Statement at 5 (effective Oct. 1, 2025), https://perma.cc/GR9D-SN9S (October HHS GPS). The October HHS GPS applies to awards and award modifications that add funding made on or after October 1, 2025. *Id.* at 5. As before,

28

the GPS applies to all HHS discretionary recipients other than individuals, except for NIH awardees, and the requirements flow down to subrecipients. *Id.*

106.    The October HHS GPS includes the HHS Discrimination Certification. *Id.* at 21.

107.    Other HHS components have also adopted the HHS Discrimination Certification.

108.    CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements. CDC, General Terms and Conditions for Non-Research Grants and Cooperative Agreements at 1 (revised July 30, 2025), https://perma.cc/GZ6X-66P2 (CDC General Terms); CDC, General Terms and Conditions for Research Grants and Cooperative Agreements at 1 (revised July 30, 2025), https://perma.cc/ND8S-SJYU.

109.    HRSA revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. HRSA, FY 2025 HRSA General Terms and Conditions at 4 (revised July 25, 2025), https://perma.cc/H5C3-5K5H (July HRSA General Terms). The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients. *Id.* at 1-2. The HRSA General Terms require that the terms and conditions of awards flow down to subrecipients. *Id.* at  2.

110.    SAMHSA incorporated the HHS Discrimination Certification into its FY 2025 Standard Terms and Conditions. SAMHSA, Fiscal Year (FY) 2025 Standard Terms and Conditions at 9, https://perma.cc/E3NM-XTMD (SAMHSA Standard Terms). The SAMHSA Standard Terms and Conditions, including the HHS Discrimination Certification requirement,

apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

    *b.*   *Gender Ideology-Related Conditions*

    111.     On March 28, 2025, the HHS Office of Grants issued a directive (Office of Grants Title IX Directive) instructing all HHS grant-awarding components to impose a new certification requirement (HHS Title IX Certification) on all new awards to entities that participate in, facilitate, or fund programs that implicate Title IX. In particular, the Office of Grants directed those components to require covered grantees to "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This required term also invokes the specter of False Claims Act liability and requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. The required certification also makes the threat of serious consequences explicit: The recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

112. Consistent with this directive, HHS revised its Grants Policy Statement in August 2025 to include the HHS Title IX Certification verbatim, effective October 1. October HHS GPS at 21-22.

113. Consistent with the Office of Grants Title IX Directive, HRSA revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. HRSA, *FY 2025 HRSA General Terms and Conditions* (May 14, 2025), https://perma.cc/VLK7-3KB2 (May HRSA General Terms); *see also* July HRSA General Terms at 4.

114. Consistent with the Office of Grants Title IX Directive, SAMHSA updated its Standard Terms to include the HHS Title IX Certification verbatim. SAMHSA Standard Terms at 8.

115. Consistent with the Office of Grants Title IX Directive, on May 9, 2025, ACF updated its Standard Terms to adopt a new certification requirement (ACF Title IX Certification) substantially similar to the HHS Title IX Certification. May ACF Standard Terms at 6. ACF's Title IX Certification is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive Order. *Id.*; *see also* July ACF Standard Terms at 8. As adopted on May 9, the ACF Title IX Certification applied to new awards made on or after March 28, 2025. May ACF Standard Terms at 6. In the July revisions to the Standard Terms, ACF changed the date so that the ACF Title IX Certification applies to new awards made on or after May 9, 2025. July ACF Standard Terms at 8.

    *c. Other HHS Condition*

116. SAMHSA also updated its Standard Terms and Conditions to include a new condition requiring awardees "to comply with all applicable Executive Orders" (SAMHSA E.O. Condition). SAMHSA Standard Terms at 2.

**C. Congress Tasked HUD and HHS with Administering Many Different Grant Programs HUD Programs**

117.    Congress established HUD in 1965 to promote the purpose of "sound development of the Nation's communities and metropolitan areas in which the vast majority of its people live and work," including by administering programs that provide housing assistance. Department of Housing and Urban Development Act, § 2, Pub. L. No. 89-175, 79 Stat. 667, 667 (Sept. 9, 1965).

*1. HUD Programs*

*a. HUD Continuum of Care Grant Program*

118.    Congress enacted the McKinney-Vento Homeless Assistance Act (Homeless Assistance Act) to establish a coordinated federal response to homelessness, "to meet the critically urgent needs of the homeless of the Nation," and "to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b).

119.    Subsequent amendments to the Act established the Continuum of Care (CoC) program, which helps individuals and families experiencing homelessness move into transitional and permanent housing, with the goal of long-term stability. *Id.* §§ 11381–11389. Congress directed the CoC program "to promote community-wide commitment to the goal of ending homelessness," to support efforts by nonprofit providers and state and local governments "to quickly rehouse homeless individuals and families," to "promote access to, and effective utilization of, mainstream programs," and to "optimize self-sufficiency among individuals and families experiencing homelessness." *Id.* § 11381.

120.    The Homeless Assistance Act directs the Secretary of HUD to award CoC Grants on a competitive basis using statutorily prescribed selection criteria to fund projects meeting

statutorily prescribed program requirements. *Id.* § 11382(a). These grants fund critical homelessness services administered by grant recipients either directly or through service providers contracted by the grant recipient. The CoC Program funds a variety of programs that help homeless individuals and families, including by constructing or rehabilitating housing, providing rental assistance, or offering supportive services such as child care, job training, healthcare, mental health services, trauma counseling, and life skills training. *Id.* §§ 11360(29), 11383(a).

121.    The Homeless Assistance Act also funds programs that help ensure that tenants in public and subsidized housing can move to a different, safe unit when they suffer domestic violence or sexual assault at home. *Id.* § 11383(a)(13); 34 U.S.C. § 12491(e).

122.    The VAWA Reauthorization Act of 2022 amended the Homeless Assistance Act, adding a new eligible CoC Program activity related to facilitating emergency transfer requests and monitoring compliance with VAWA confidentiality provisions. *VAWA Requirements for CoCs, CoC Recipients, and ESG Recipients*, Dep't of Housing and Urban Development, https://perma.cc/K6UF-9YQG (captured July 19, 2025).

123.    HUD also provides Domestic Violence Bonus project grants (DV Bonus Grants) to CoC Grant recipients to meet the needs of survivors of domestic violence and sexual assault. DV Bonus Grant recipients may use the funds for rapid rehousing, joint transitional housing and rapid re-housing, and coordinated entry supportive services. *Applying for DV Bonus Projects During the CoC Program Competition*, HUD Exchange, https://perma.cc/ZQH4-5P4A (captured July 19, 2025).

124.    CoC Grants are awarded to local "Continuums of Care," which are broad-based coalitions that may be composed of representatives from nonprofit homeless service providers,

victim service organizations, faith-based groups, state and local governments, public housing agencies, school districts, healthcare providers, universities, law enforcement, and individuals with lived experience of homelessness. 24 C.F.R. § 578.3. Each Continuum designates an eligible applicant to apply for CoC funding on its behalf. *Id.*

125.    Congress established statutory directives governing how HUD may administer the CoC Program and award CoC Grants, including delineating which activities are eligible for funding, selection criteria that HUD must apply to awards, and the program requirements that grantees must agree to as a condition of receiving funds. 42 U.S.C. §§ 11383; 11386a; 11386.

126.    First, Congress's authorization for HUD to award CoC Grants requires that "[t]he Secretary shall award grants, on a competitive basis, and using the selection criteria described in section 11386a of this title, to carry out eligible activities under this part for projects that meet the program requirements under section 11386 of this title, either by directly awarding funds to project sponsors or by awarding funds to unified funding agencies." *Id*. § 11382. Section 11386a, in turn, requires that the HUD Secretary establish certain "required" selection criteria that the Secretary must use to evaluate grant applications. *See id.* (listing required criteria such as reducing length of homelessness, rehousing effectiveness, collaboration with schools, and success in serving high-risk subpopulations).

127.    The Act also specifies the "[r]equired agreements" to which grant recipients must agree to receive funds under the program. *Id.* § 11386(b). For instance, recipients must agree to operate funded projects in accordance with statutory requirements, to involve individuals experiencing homelessness in project operations where practicable, and to certify that children in family programs are enrolled in school and connected to services such as Head Start and Individuals with Disabilities Education Act programs. *Id.* § 11386(b).

34

128.    The Homeless Assistance Act also authorizes the HUD Secretary to promulgate regulations establishing other terms and conditions on grant funding and other selection criteria "to carry out [the CoC program] in an effective and efficient manner." *Id.* §§ 11386(b)(8); 11386a(b)(1)(G); 11387.

129.    Pursuant to this authority, HUD promulgated the Continuum of Care Program rule (CoC Rule), which provides additional conditions to which grant recipients and subrecipients must agree in the CoC Grant agreements they execute with HUD. 24 C.F.R. § 578.23(c).

130.    Recipients of CoC funds must comply with regulatory nondiscrimination obligations. For instance, HUD's Equal Access Rule applies to CoC-funded programs and requires, inter alia, that equal access to programs, shelters, benefits, services, and accommodations be "provided to an individual in accordance with the individual's gender identity," that individuals be "placed, served, and accommodated in accordance with the[ir] gender identity," that "[a]n individual is not subjected to intrusive questioning" or asked to provide evidence of their gender identity, and that individuals be placed in facilities with shared sleeping quarters or bathing facilities according to their gender identity. 24 C.F.R. § 5.106.

131.    In addition, HUD regulations require that CoC recipients "affirmatively further fair housing," by affirmatively marketing services to those "who are least likely to apply in the absence of special outreach," reporting impediments to fair housing choice, and informing participants of their rights under applicable civil rights laws. 24 C.F.R. § 578.93.

132.    No legislation authorizes HUD to impose CoC Grant fund conditions related to prohibiting all kinds of DEI or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion," or requiring compliance with executive orders.

35

133.    The 2024 Appropriations Act authorized HUD to issue a two-year NOFO for Fiscal Years 2024 and 2025 program funding. *See* 2024 Appropriations Act, Pub. L. No. 118-42, 138 Stat. 25, 386 (Mar. 9, 2024) (2024 Appropriations Act).

134.    Accordingly, HUD posted a 2-year NOFO in July 2024, announcing the CoC NOFO for Fiscal Years 2024 and 2025 (HUD NOFO). *See* HUD, *Notice of Funding Opportunity for FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program* (Jul. 24, 2024), https://perma.cc/T4K9-2JW4. The NOFO required applicants to consider policies related to racial equity and LGBTQ+ inclusion and required that responses to preventing homelessness address racial inequities, that CoCs' planning processes address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals, and that CoCs ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation. *Id.* Among the types of CoC grants HUD issues are HUD CoC Coordinated Entry System Grants, HUD CoC Homeless Management Information Systems Grants, HUD CoC Domestic Violence Bonus Grants, HUD Youth Homelessness Demonstration Projects Grants, and HUD Rapid Rehousing Grants.

135.    The HUD Secretary must announce recipients within five months after the submission of applications. 42 U.S.C. § 11382(c)(2). Recipients included in the announcement receive a "conditional award," in that they must meet all requirements for the obligation of the funds. *Id.* § 11382(d)(1)(A). Once the recipient meets the requirements, the HUD Secretary must obligate the funds within 45 days. *Id.* § 11382(d)(2).

136.    Plaintiffs and their members that applied for HUD grants developed their applications in compliance with the Fiscal Years 2024 & 2025 NOFO's stated policy priorities and timely submitted their applications in response to the NOFO.

36

*b. HUD Emergency Solutions Grants*

137.    In 2009, Congress established the Emergency Solutions Grant (ESG) program through the Homeless Emergency Assistance and Rapid Transition to Housing Act, Pub. L. No. 111-22, 123 Stat. 1663 (May 20, 2009) (HEARTH Act). *See* 42 U.S.C. §§ 11371–11378. In enacting the HEARTH Act, Congress sought to remedy the "lack of affordable housing and limited scale of housing assistance programs" that it found to be "the primary causes of homelessness" and "establish a Federal goal of ensuring that individuals and families who become homeless return to permanent housing within 30 days." HEARTH Act, § 1002, 123 Stat. at 1664. ESG grants fund things like emergency shelters, homelessness prevention, rental assistance, and various supportive services. 42 U.S.C. § 11374(a).

138.    HUD's administration of the ESG program, including the award of ESG funds, is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the ESG program and imposed various responsibilities on ESG recipients. *Id.* §§ 11374(a), 11375(a). The statute directs HUD to award ESG grants to cities, urban counties, and states on a non-competitive basis according to a formula. *Id.* §§ 11372, 11373(a). The direct recipients can then pass funds on to subrecipients who help address the most critical and immediate needs of those experiencing or at risk of homelessness. *Id.* § 11373(c).

139.    The statute also sets forth certifications that recipients must make to the Secretary of HUD regarding their use of ESG funds. 42 U.S.C. § 11375. Recipients must certify that, among other things, they will operate facilities that receive funding as homeless shelters for a specified number of years, any ESG-funded renovation will be sufficient to ensure the shelter is safe and sanitary, they will assist homeless individuals in obtaining permanent housing and

37

services such as medical and mental health treatment and counseling, and they will involve homeless individuals and families through employment, volunteer services, or otherwise, in constructing and operating shelters to the maximum extent practicable. *Id.* § 11375(c).

140.    Recipients of ESG funds must comply with the same regulatory nondiscrimination obligations in 24 C.F.R. § 5.106 as do recipients of CoC funds, including the obligation to serve individuals in accordance with their "gender identity."

141.    Congress did not authorize HUD to impose conditions on ESG funds related to prohibiting all kinds of DEI or the "promot[ion]" of "gender ideology" or "elective abortion," or requiring compliance with executive orders.

### c. HUD Community Development Block Grant Program

142.    Congress established the Community Development Block Grant (CDBG) program through Title I of the Housing and Community Development Act of 1974 (HCD Act), Pub. L. No. 93-383, 88 Stat. 633 (Aug. 22, 1974), and subsequent amendments. The program's stated "primary objective" is to promote "development of viable urban communities" through "decent housing," a "suitable living environment," and "expan[sion of] economic opportunities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c). Specific objectives include "conserv[ing] and expan[ding] the Nation's housing stock" especially for low- and moderate-income households, promoting mixed-income communities, and enhancing the "diversity and vitality of neighborhoods" by eliminating slums or blight and revitalizing "deteriorating or deteriorated neighborhoods," among other goals. *Id.* § 5301(c)(1), (c)(3), (c)(6).

143.    The program provides flexible funding through annual block grants awarded on a formula basis to state and local governments for purposes related to economic and community development.

144.    The HCD Act authorizes the HUD Secretary to award CDBG funds using statutorily prescribed selection criteria. 42 U.S.C. §§ 5303–04. The HUD Secretary must distribute funds annually to states, local governments, and Tribes using a formula that considers various factors. *Id.* §§ 5303–5304, 5306. The direct recipients can then pass funds on to subrecipients to carry out community economic development or other activities. *Id.* § 5305(a).

145.    HUD's administration of the CDBG program, including the award of CDBG funds, is authorized and governed by statutory directives. *See* 42 U.S.C. §§ 5301, 5304–05.

146.    Congress specified by statute certifications that recipients must make to the Secretary of HUD regarding their use of CDBG funds. Recipients must certify, among other things, that they will develop and follow a citizen participation plan, comply with statutory transparency requirements, ensure funds are consistent with the HCD Act's objectives, and administer programs in conformity with nondiscrimination laws and "affirmatively further fair housing." *Id.* § 5304(a)(3), (b).

147.    Further, the HCD Act is designed to benefit historically disadvantaged groups. For example, the Act requires the Secretary to set aside some of the funds appropriated for the CDBG program for "special purpose grants," which may include, among other things, grants to "historically Black colleges." 42 U.S.C. § 5307(b)(2). The Act further provides that, of the amount set aside for special purpose grants, the Secretary "shall" make grants to institutions of higher education "for the purpose of providing assistance to economically disadvantaged and minority students who participate in community development work study programs and are enrolled in" qualifying degree programs. *Id.* § 5307(c). The Act also authorizes urban development action grants to cities and urban counties experiencing severe economic distress, but only if the HUD Secretary determines the city or county has "demonstrated results in,"

39

among other things, "providing equal opportunity in housing and employment for low- and moderate-income persons and members of minority groups." *Id.* § 5318(a)–(b).

148.    Recipients of CDBG funds also must comply with the same regulatory nondiscrimination obligations in 24 C.F.R. § 5.106 that apply to CoC and ESG funds, including the obligation to serve individuals in accordance with their "gender identity."

149.    Congress did not authorize HUD to impose conditions on CDBG funds related to prohibiting all kinds of DEI or the "promot[ion]" of "gender ideology" or "elective abortion, or compliance with executive orders.

### d. Additional HUD Grant Programs

150.    HUD administers many other grant programs, including HUD Home ARP grants. Recipients of these other HUD grants also must comply with the same regulatory nondiscrimination obligations in 24 C.F.R. § 5.106 that apply to CoC and ESG funds, including the obligation to serve individuals in accordance with their "gender identity."

### 2. HHS Programs

151.    HHS is the largest grant-making agency in the United States. *Grants*, HHS, https://perma.cc/AQT7-PU9N (captured July 17, 2025). HHS awarded over 165,000 grants and cooperative agreements totaling $1.85 trillion in fiscal year 2024, including over $73 billion in discretionary awards. *Grants by Activity Type*, HHS, https://perma.cc/Q4FJ-C5TJ (captured July 17, 2025).

152.    HHS comprises multiple operating divisions and agencies within the U.S. Public Health Service. HHS administers grants through many different divisions including ACF, CDC, HRSA, SAMHSA, and others.

40

*a.   CDC Rape Prevention and Education (RPE) Program*

153.    One HHS grant program, authorized through the 1994 Violence Against Women

Act (VAWA) and administered by the CDC, is the Rape Prevention and Education (RPE)

Program. Congress reauthorized and expanded this program in VAWA subsequent

reauthorizations, amending the Public Health Service Act (PHSA) to provide that HHS

Secretary, acting through the CDC, "shall award targeted grants to States to be used for rape

prevention and education programs conducted by rape crisis centers, State sexual assault

coalitions, and other public and private nonprofit entities." Pub. L. No. 106–386, § 1401, 114

Stat. 1464, 1512 (Oct. 28, 2000), codified at 42 U.S.C. § 280b–1b (RPE Program).

154.    The RPE Program statute currently authorizes recipients to use the grant for,

among other things, education and training seminars; education and training programs for

students and campus personnel designed to reduce the incidence of sexual assault at colleges and

universities; education to increase awareness about drugs used to facilitate rapes or sexual

assaults; and other efforts to increase awareness of the facts about, or to help prevent, sexual

assault. 42 U.S.C. § 280b–1b.

155.    In awarding funds to States under this section, Congress required that the HHS

Secretary "shall . . . ensure meaningful involvement of sexual assault coalitions, culturally

specific organizations, and representatives from underserved communities of the State or

territory in the application for, and implementation of, funding." *Id.*

156.    For the purposes of the RPE Program, Congress incorporates VAWA's definition

of "culturally specific" to mean "primarily directed toward racial and ethnic minority groups." 34

U.S.C. § 12291(a)(8); *see also* Pub. L. No. 117-103, div. W, §§ 2(b), 301(5)(A), 136 Stat. 49,

846 (Mar. 15, 2022) (reauthorizing rape prevention education grants and providing that 34

U.S.C. § 12291 "shall apply to … any grant program authorized under this Act"). And Congress further defines "underserved populations" to include populations "populations underserved because of geographic location, religion, sexual orientation, gender identity, underserved racial and ethnic populations, populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age." 34 U.S.C. § 12291(a)(46); *see also* Pub. L. No. 117-103, div. W, § 2(b).

157.    Congress has not authorized the agency to add to HHS grants generally, or to RPE Grants specifically, new conditions designed to deter DEI or DEIA activities or "discriminatory equity ideology" under the guise of enforcing federal anti-discrimination law, or to prohibit the expression of disfavored viewpoints through economic activity.

158.    The PHSA authorizes appropriations for the RPE Program for fiscal years 2023 through 2027. 42 U.S.C. § 280b-1b(d)(4). Of the total amount appropriated for each fiscal year, the PHSA requires that "not less than 15 percent shall be allocated to State, territorial, and Tribal sexual assault coalitions" for the purposes of coordinating and providing prevention activities, providing assistance to prevention programs, and collaborating and coordinating with applicable Federal, State, Tribal, and local entities engaged in sexual violence prevention. *Id*. at § 280b-1b(d)(1). The CDC published a NOFO in 2024 for RPE grant funding for Fiscal Years 2025 through 2028. , *Violence Prevention: Notice of Funding Opportunity CDC–RFA–CE–24–0068* (June 5, 2024), https://perma.cc/GV2U-UK4S (captured July 17, 2025).

159.    The NOFO directed grant applicants to describe how they would "work to reduce disparities and inequities to advance health equity among populations and communities disproportionately affected by [sexual violence]," including "racial/ethinic minorities," "non-English-speaking populations," and "sexual and gender minorities."

42

160.    According to designations on Grants.gov and HHS's TAGGS website, HHS treats the RPE Grant as a "discretionary" grant program.

   *b.  FVPSA Grant Programs*

161.    HHS grant programs also include programs under the Family Violence Prevention Services Act (FVPSA), which (among other things) provides funding to shelter-based programs and similar direct services organizations to help victims of domestic violence and sexual assault, and their families. Enacted as part of the 1984 amendments to the Child Abuse Prevention and Treatment Act, FVPSA's purpose is to "increase public awareness about" and "prevention of[] family violence, domestic violence, and dating violence" and to assist "in efforts to provide immediate shelter and supportive services for victims of family violence, domestic violence, or dating violence, and their dependents." Pub. L. No. 98-457, tit. III, 98 Stat. 1749, 1757 (Oct. 9, 1984), codified at 42 U.S.C. § 10401.

162.    The law currently authorizes grant programs for three major activities: domestic violence shelters, victim services, and program support; the National Domestic Violence Hotline; and the Domestic Violence Prevention Enhancement and Leadership Through Alliances (DELTA) program. *Family Violence Prevention and Services Act (FVPSA)*, Cong. Rsch. Serv. (July 7, 2024), https://perma.cc/3PA3-KQQ5.

163.    HHS administers FVPSA grants through the CDC and ACF's Office of Family Violence Prevention and Services (OFVPS). OFVPS, *Office of Family Violence Prevention and Services Act Grants*, https://perma.cc/27QK-L5SH (captured July 17, 2025); *Intimate Partner Violence Prevention*, CDC, https://perma.cc/M46H-BQHG (captured July 19, 2025).

164.    FVPSA specified that HHS fund programs "to provide specialized services" for "underserved populations" and "victims who are members of racial and ethnic minority populations." 42 U.S.C. § 10406(a)(3).

165.    FVPSA incorporates VAWA's definition of "underserved populations" as "populations who face barriers in accessing and using victim services, and includes populations underserved because of geographic location, religion, sexual orientation, gender identity, underserved racial and ethnic populations, and populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age)." 42 U.S.C. § 10402(14); 34 U.S.C. § 12291(a)(46).

166.    In addition, implementing regulations promulgated by ACF and HHS provide that "no person shall on the ground of actual or perceived sex, including gender identity, be excluded from participation in, be denied the benefits of, or be subject to discrimination under, any program or activity funded in whole or in part through FVPSA." 45 C.F.R. § 1370.5(a).  Instead, "as with all individuals served, transgender and gender nonconforming individuals must have equal access to FVPSA-funded shelter and nonresidential programs. *Id.* § 1370.5(a)(4). Additionally, "[a]ll programs must take into account participants' needs and be inclusive and not stigmatize participants based on actual or perceived sexual orientation." *Id*. § 1370.5(c)(1).

167.    Congress has not authorized the agency to add to ACF-administered grants generally, or to FVPSA grants specifically, new conditions designed to deter DEI or DEIA activities, or "discriminatory equity ideology," under the guise of enforcing federal anti-discrimination law. Nor does it authorize the required exclusion of transgender people, or the prohibition of the expression of disfavored viewpoints through economic activity.

i. FVPSA State Domestic Violence Coalitions Program

168.     In 1992, Congress added a State Coalitions Program to FVPSA. *See* Pub. L. No. 102–295, 106 Stat. 187 (May 28, 1992), amended and codified at 42 U.S.C. § 10411.

169.     The FVPSA State Coalitions grants are administered by ACF. *See* U.S. Dep't of Health & Human Services, ACF, OFVPS, *FVPSA Grants for State and Territorial Domestic Violence Coalitions* (last updated Jan. 22, 2024), https://perma.cc/9VH4-5GWG.

170.     Through the Coalitions Program, Congress requires that the HHS Secretary award grants to each recognized "State Domestic Violence Coalitions," defined as "a statewide nongovernmental nonprofit private domestic violence organization" that has a membership including a majority of primary-purpose domestic violence service providers in the state; has board membership representative of those providers; has as its purpose to "provide education, support, and technical assistance to such service providers" that enables providers to provide shelter and services to victims and their dependents; and serves as an "information clearinghouse, primary point of contact, and resource center on domestic violence for the State," and supports the development of policies, protocols, and procedures to enhance domestic violence intervention and prevention in the State. 42 U.S.C. § 10402(11). ACF has designated the Plaintiff State Domestic Violence Coalitions in this case as their states' domestic violence coalitions.

171.     Congress prescribes the specific amounts of funds that each Coalition must receive. 42 U.S.C. § 10403(a)(2)(B). Most recently, Congress appropriated $200 million for FVPSA formula grants. *See* Pub. L. No. 117-103, 136 Stat. at 460. FVPSA provides a formula prescribing how much of the appropriated amount the HHS Secretary "shall" allot to each state domestic violence coalition. 42 U.S.C. § 10411(b).

172.     As amended and reauthorized, FVPSA requires the Secretary to award state coalitions grants for domestic violence intervention and prevention activities. *Id*. § 10410(1)–(5). These include (1) working with local domestic violence programs and providers of direct services to encourage appropriate responses to domestic violence within the State; (2) working with judicial and law enforcement agencies to encourage appropriate responses to domestic violence cases and examine issue; (3) working with relevant stakeholders to develop appropriate responses to child custody and visitation issues in domestic violence cases; (4) conducting public education campaigns regarding domestic violence; and (5) planning and monitoring the distribution of grants and grant funds to their state. *Id.*

173.     In addition, Congress requires coalitions to collaborate with service providers, community based organizations, and tribes and tribal organizations to address the needs of family violence, domestic violence, and dating violence victims, and their dependents, who are members of racial and ethnic minority populations and underserved populations. *Id.* § 10411(d)(3), (8). Coalitions must also provide information to the public about prevention of family violence, domestic violence, and dating violence, including information targeted to underserved populations. *Id.*

174.     Congress has not authorized the agency to add to these grants new conditions designed to deter DEI or DEIA activities, or "discriminatory equity ideology," under the guise of enforcing federal anti-discrimination law. Nor does it authorize requiring grantees to deny transgender peoples' identity.

175.     In 2024, ACF's Office on Family Violence Prevention and Services posted a three-year NOFO titled "Standing Announcement for Family Violence Prevention and Services/ Grants to State and Territory Domestic Violence Coalitions." *Notice of Standing Funding*

46

*Opportunity to State Domestic Coalitions*, OFVPS, https://perma.cc/GFA2-A6KG (captured July 18, 2025). Application due dates for the program fell in March 2024, January 2025, and January 2026. *Id.* at 1.

### ii. CDC DELTA Program

176.    In the 2010 FVPSA Reauthorization, Congress established the Domestic Violence Prevention Enhancement and Leadership Through Alliances (DELTA) program. *See* Pub. L. No. 111-320, 124 Stat. 3459, 3507 (Dec. 20, 2010), codified at 42 U.S.C. § 10414(a). Congress directed that the HHS "Secretary shall enter into cooperative agreements with State Domestic Violence Coalitions for the purposes of establishing, operating, and maintaining local community projects to prevent family violence, domestic violence, and dating violence." 42 U.S.C. § 10414(a).

177.    The DELTA authorizing statute provides that, to be eligible for a DELTA grant, applicants must submit applications meeting specific criteria, including that they demonstrate the applicant's capacity to undertake the project involved; demonstrate that the project will include a coordinated community response to improve and expand prevention strategies, and demonstrate that the applicant has experience in providing, or the capacity to provide, prevention-focused training and technical assistance. *Id.* § 10414(e)(4).

178.    Congress directed that in establishing and operating DELTA projects, grant recipients "shall" "recognize, in applicable cases, the needs of underserved populations, racial and linguistic populations, and individuals with disabilities." 42 U.S.C. § 10414(g)(3)(F).

179.    Congress has not authorized the agency to add to these grants new conditions designed to deter DEI or DEIA activities, or "discriminatory equity ideology," under the guise of enforcing federal anti-discrimination law. Nor does it authorize requiring grantees to deny transgender peoples' identity.

47

180.    The CDC published a NOFO in September 2022 for DELTA "Achieving Health Equity through Addressing Disparities" (DELTA AHEAD) grants for fiscal years 2023 through 2027. Grants.gov Alerts, https://perma.cc/P54D-DS9U (captured July 19, 2025).

181.    CDC explains that "DELTA AHEAD funding recipients will address intimate partner violence, social determinants of health, and health equity." CDC, Intimate Partner Violence Prevention, *Domestic Violence Prevention Enhancement and Leadership Through Alliances: Achieving Health Equity through Addressing Disparities*, https://perma.cc/QHQ5-FL45 (captured July 19, 2025).The NOFO required grant recipients to "use data to select and implement IPV primary prevention strategies to promote racial, gender, and health equity at the local and state levels."

### c.  *HRSA Title V Maternal and Child Health Services Block Grant*

182.    Congress amended the Social Security Act in 1981 to provide for the Maternal and Child Health (MCH) Services Block Grant program. The MCH Grant Program provides funding for state governments to "assure mothers and children (in particular those with low income or with limited availability of health services) access to quality maternal and child health services," and "reduce infant mortality and the incidence of preventable diseases and handicapping conditions among children." Pub. L. No. 97-35, tit. XXI, 95 Stat. 357, 818 (Aug. 13, 1981), codified at 42 U.S.C. § 701.

183.    The MCH statute requires that the HHS Secretary distribute funds to state governments for use in "activities within the State . . . including supplemental food programs for mothers, infants, and children, related education programs, and other health, developmental disability, and family planning programs." 42 U.S.C. § 705. Congress authorized states to provide those services directly or through organizational partners. *Id.*

48

184.    HRSA declares that MCH block grants "helped provide services for an estimated 59 million people" in 2023, including "94% of all pregnant" people and "98% of infants." HRSA, *Title V Maternal and Child Health (MCH) Services Block Grant*, Maternal & Child Health, https://perma.cc/3N3N-FFCR (captured July 19, 2025). HHS's Health Resources and Services Administration (HRSA) administers MCH grants and posted a notice of funding opportunity for MCH grants in July 2024. *Maternal and Child Health Services*, HRSA, https://perma.cc/YD3Q-NTRT (captured July 19, 2025).

185.    Congress has not authorized the agency, for HRSA grant programs generally or for MCH block grants specifically, to require grantees to deny transgender peoples' identity.

    *d.  Public Health Service Grants*

186.    SAMHSA administers multiple grant programs under the Public Health Service (PHS) Act, including grants to address priority substance use disorder treatment needs and priority mental health needs of regional and national significance. *See* 42 U.S.C. §§ 290bb-2, 290bb-32.

187.    Congress has not authorized HHS or SAMHSA to add to SAMHSA grants generally or PHS Act grants specifically, new conditions designed to deter DEI or DEIA activities under the guise of enforcing federal anti-discrimination law. Nor does it authorize requiring grantees to deny transgender peoples' identity.

    *e.  Additional HHS Grant Programs*

188.    HHS administers many other grant programs subject to the HHS GPS, including CDC E-Learning Collaborative grants, as well as other grants subject to the ACF Standard terms (including the Temporary Assistance for Needy Families program), the CDC General Terms, and the HRSA General Terms, and the SAMHSA Standard Terms.

49

**D. Plaintiffs and Their Members Receive and Rely on HHS and HUD Funds**

189.    Plaintiffs have consistently received grants from HHS and HUD, including grant awards this year, and expect to receive grant awards in the future. Plaintiffs' members have also consistently received HHS and HUD grants, including grant awards this year, and expect to receive grant awards in the future.

*1. Plaintiffs and Their Members Receive HUD and HHS Funds*

190.    Plaintiff RICEH receives five federally funded CoC Grant awards directly from HUD. RICEH has received two NOAs from HUD that are subject to the HUD Conditions and expects to receive renewal contracts for the other CoC grants that will be subject to the new HUD Conditions.

191.    Plaintiff House of Hope receives awards from both HUD and HHS. House of Hope receives four federally funded CoC awards directly from HUD. In May 2025, House of Hope received NOAs for these grants that included the HUD Conditions. House of Hope also receives a subaward of HUD CoC funds passed through from the Rhode Island Housing and Mortgage Finance Corporation. House of Hope also receives an HHS grant through HHS's Substance Abuse and Mental Health Services Administration (SAMHSA), passed through the Rhode Island Department of Behavioral Health, Developmental Disability and Hospitals.

192.    Plaintiff Foster Forward received three federally funded CoC awards that it receives directly from HUD and uses to support youth experiencing homelessness in Rhode Island. In May 2025, Foster Forward received a Notice of Award for a CoC Grant that is subject to the HUD Conditions. Foster Forward also expects to receive renewal contracts for multiple other CoC Grants that will be subject to the HUD Conditions.

193.    Plaintiff Haus of Codec receives a federally funded CoC award directly from HUD, which it uses to support youth transitional and rapid re-housing. HUD has awarded Haus

50

of Codec a renewal contract to begin in October 2025, and the NOA includes the HUD Conditions.

194.    Plaintiff Community Care Alliance receives two federally funded CoC awards directly from HUD, and it has received an NOA for its most recent CoC Grants that is subject to the HUD Conditions.

195.    Community Care Alliance also receives an extensive number of HHS grants, both directly and as a subrecipient. This includes two direct grants from HHS through SAMHSA that are subject to the SAMHSA Standard Terms as well as the July HHS GPS. Community Care Alliance expects to receive renewal contracts for its other SAMHSA grant passed through from the State of Rhode Island that will be subject to the new HHS Conditions included in the October GPS and SAMHSA Standard Terms. In addition, Community Care Alliance receives multiple HHS grants passed through the State of Rhode Island. Most of these subawards are multi-year grants, and Community Care Alliance anticipates that future grants will be subject to the HHS Conditions.

196.    Plaintiff Rhode Island Coalition Against Domestic Violence receives HUD and HHS funds. With respect to HHS funds, the Rhode Island Coalition receives grants for the FVPSA Coalition Grant and other discretionary grants from HHS through ACF. The most recent FVPSA Coalition Grant, dated July 8, 2025, is subject to the ACF Conditions. The Rhode Island Coalition also receives a DELTA Grant from the CDC, and anticipates that the continued application in November 2025 will be subject to the HHS Conditions. The Rhode Island Coalition also receives several HHS grants passed through from the State of Rhode Island, and each subaward either is or will be subject to the HHS Conditions.

197.    The Rhode Island Coalition is also the subrecipient of a HUD CoC Grant, passed through from Plaintiff RICEH, and it anticipates that its next subawards will include those conditions.

198.    Various Rhode Island Coalition Against Domestic Violence members receive HHS funds that are or will be subject to the HHS Conditions. For example, Rhode Island Coalition member Women's Resource Center relies on a CDC DELTA Grant, and Rhode Island Coalition Member Doe[1] receives a Temporary Assistance for Needy Families Grant from HHS, passed through from the State of Rhode Island.

199.    In addition, various Rhode Island Coalition Against Domestic Violence members receive funds from HUD. For example, Rhode Island Coalition Member Doe is the direct recipient of four CoC Grants from HUD and the subrecipient of additional HUD CoC and ESG Grants. The direct grants from HUD CoC included the HUD Conditions, and Rhode Island Coalition Member Doe anticipates that the continued subgrants will contain the new HUD conditions as well.

200.    Plaintiff California Partnership receives HHS funds. Most recently, the California Partnership received in July 2025 a FVPSA Coalition Grant award that is subject to the ACF Conditions. The California Partnership also receives a DELTA Grant from the CDC, and anticipates that the continued application will be subject to the HHS conditions.

201.    Various California Partnership members receive HUD and HHS funds. For example, California Partnership Member Doe 1 has received ESG Grants from its county, and it expects that future awards will be subject to the HUD Conditions. California Partnership

---

[1] Several membership organizations requested to proceed anonymously to protect against the risk of retaliation.

52

Member Doe 3 has received a CoC Program Grant, and this member expects that future awards will include HUD Conditions. California Partnership Member Doe 4 received in August 2025 a CDBG award subject to the challenged conditions.

202.    Additionally, California Partnership Member Doe 2 has received RPE grant funding, and this member expects that its next award will be subject to the HHS Conditions. California Partnership members also receive FVPSA funds passed through their state administrator.

203.    Plaintiff Colorado Coalition has received an RPE Program Grant for the past two years. On June 27, 2025, the Colorado Coalition received an RPE Program Grant award subject to the HHS Conditions.

204.    Various Colorado Coalition members receive HUD and HHS funds. For example, Colorado Coalition Member Doe 1 has received HUD CoC Grants. The Notice of Funding Opportunity for those grants did not include the HUD conditions, but the NOA did. Colorado Coalition Member Doe 2 has received an NOA through the FVPSA Grant Program, to which the HHS GPS applies.

205.    Plaintiff D.C. Coalition has received the FVPSA Coalition Grant for over two decades, and received in July 2025 a FVPSA Coalition Grant award subject to the challenged ACF conditions.  The D.C. Coalition has also received funds from the FVPSA Grants for Battered Women's Shelters Program, and expects that its next award will be subject to the HHS Conditions and ACF Conditions. In addition, since 2019, the D.C. Coalition has also received a competitive grant through the D.C. Department of Health composed of funds from the RPE Program and the Maternal and Child Health Block Grant Program, and it expects that future awards will be subject to the HHS Conditions.

206.    Various DC Coalition members have received HHS funds. DC Coalition Member Doe, for instance, has historically received an annual grant of FVPSA funds as pass-through funding from the D.C. Department of Human Services and expects that its next award will be subject to the ACF Conditions.

207.    Plaintiff End Abuse Wisconsin receives HHS funds. On July 9, 2025, End Abuse Wisconsin received a FVPSA Coalition Grant award subject to the challenged ACF Conditions. End Abuse Wisconsin is also operating under a prior FVPSA Coalition Grant and expects that the next award will be subject to the ACF Conditions.

208.    Various End Abuse Wisconsin members receive HUD grants. For instance, End Abuse Wisconsin Member Doe 1 has received a CoC Program Grant as a pass-through grant from the Wisconsin Balance of State Continuum of Care, and this member expects that NOAs for future continuation awards will be subject to the HHS Conditions.

209.    End Abuse Wisconsin members also receive HHS grants. For instance, End Abuse Wisconsin Member Doe 2 receives FVPSA funds as pass-through grants through the State of Wisconsin, and expects that future awards will be subject to HHS Conditions.

210.    Plaintiff Idaho Coalition manages and administers multiple federal grants, including HHS FVPSA Grants. The Idaho Coalition has received the FVPSA Coalition Grant for decades, and recently received a FVPSA Coalition Grant award that is subject to the ACF Conditions.  Idaho Coalition members also receive and rely on HHS and HUD Grants.

211.    Plaintiff Iowa Coalition has applied for and received the FVPSA Coalition Grant for decades. In July 2025, the Iowa Coalition received a FVPSA Coalition Grant award from ACF that is subject to the ACF Conditions. In addition, the Iowa Coalition is operating under the

prior FVPSA Coalition Grant and received a notice of the yearly continuation of that grant in July 2025, which is subject to the ACF Conditions.

212.    All of the Iowa Coalition's members receive HHS grants, including FVPSA grants, which are passed through the Iowa Attorney General's Office in a competitive process. For instance, Iowa Coalition member SafePlace applies for and receives a FVPSA grant yearly and expects to receive its next award in October 2025, which it expects will be subject to the HHS Conditions.

213.    The Iowa Coalition's members also receive HUD grants, including grants under the CoC Program and ESG Program, which they receive directly from HUD. For instance, HUD awarded Iowa Coalition member SafePlace a CoC Grant, which it accepted in January 2025. SafePlace expects that the next award for this grant will include HUD Conditions.

214.    Plaintiff JDI receives HHS funds through ACF and the CDC. JDI has received the FVPSA Coalition Grant since at least 2007, and JDI's most recent FVPSA Coalition Grant award is subject to the ACF Conditions. In addition, JDI has applied for and received an RPE Grant from the CDC for the past two years and recently received a new RPE Grant NOA that is subject to the HHS Conditions.

215.    Various JDI members receive HHS funds, including direct grants through ACF and pass-through FVPSA grants through the Massachusetts Department of Public Health (MDPH). For instance, JDI member the Network/La Red received funds from ACF sources, passed through the MDPH, including an award subject to the HHS Conditions.

216.    Various JDI members receive HUD funds. For instance, JDI Member Doe has received a HUD CoC grant since 2006, and expects that its next award for a period beginning in November 2025 will be subject to the challenged conditions.

55

217.    Plaintiff Kansas Coalition receives funds from HUD and from HHS.  The Kansas Coalition has received a CoC grant from HUD for the past four years and received its grant agreements for that award in August 2025, which it expects will be subject to the HUD Conditions.

218.    In addition, the Kansas Coalition has received the FVPSA Coalition Grant from ACF since at least 1993. HHS awarded the Kansas Coalition a new FVPSA Coalition Grant on July 8, 2025, in an NOA that is subject to the challenged ACF Conditions. The Kansas Coalition is currently operating under a prior FVPSA Coalition Grant and expects that the next NOA for that grant will be subject to the ACF Conditions. The Kansas Coalition has also received an RPE Program Grant from the CDC for the past two years. On June 27, 2025, HHS awarded the Kansas Coalition an RPE Grant that is subject to the challenged HHS Conditions.

219.    Various Kansas Coalition members receive HUD and HHS funds, most commonly through subcontracts passed through the State or other governmental entities, such as their city or county government. For instance, Kansas Doe Member 1 and Kansas Member Doe 3 receive ESG Grants, which contracts with the grant's pass-through entity, and they expect that future awards will be subject to the HUD Conditions. Kansas Member Doe 2 receives both HUD ESG Grants and HUD Home ARP Grants, and expects that the renewal of those grants will be subject to the HUD Conditions.

220.    Plaintiff Montana Coalition has received HHS Funds through ACF's FVPSA Coalition Grant for at least the past three decades. In July 2025, the Montana Coalition received a FVPSA grant award from ACF that is subject to the ACF Conditions. In addition, the Montana Coalition has received RPE Grant funds through the CDC for the past two years and in June 2025 received an RPE Grant from that is subject to the HHS Conditions.

221.     Various Montana Coalition members receive HHS funds, including from grants passed through the Montana Board of Crime Control (MBCC) to Montana Coalition member domestic violence shelters. The MBCC expects that its most recent award is subject to the challenged HHS Conditions, and therefore those Conditions will pass through to Montana's member domestic violence shelters.

222.     Various Montana Coalition members receive HUD funds. For instance, Montana Coalition member The Friendship Center of Helena, Inc., receives "Rapid Rehousing" funds through the CoC Program, and their grant renewal will require them to sign a grant agreement in Fall 2025 that includes the HUD Conditions. The Friendship Center also received a notice of award for another CoC grant from HUD in August 2025, which is subject to the challenged conditions.

223.     The North Carolina Coalition has received the HHS FVPSA Coalition Grant for at least the past 22 years. In July 2025, the North Carolina Coalition received an NOA subject to the ACF Conditions. In addition, the North Carolina Coalition has applied for and received CDC DELTA AHEAD Grant for the past 23 years, is currently in the midst of a multiyear DELTA AHEAD Grant cycle, and expects its next NOA to include the HHS Conditions.

224.     The North Carolina Coalition has applied for and received a HUD CoC Grant for the past two and a half years, and expects that its next award will include the challenged HUD Conditions. The North Carolina Coalition also intends to apply for a HUD CoC grant for a bonus renewal and expansion of funds, which it expects will be subject to the challenged conditions.

225.     Various North Carolina Coalition members receive HUD grants, including grants under the CoC, ESG, and CDBG Programs. For example, North Carolina Member Doe  has received and expended FY 25 ESG funding and submitted an application for FY26 ESG funding

57

that is awaiting approval. North Carolina Member Doe expects that any new ESG award will include the HUD Conditions. Member Doe is also in the process of applying for CDBG funding and expects that its next grant award will include the HUD Conditions.

226.    In addition, at least one North Carolina Coalition member has received HHS funds through an RPE Grant.

227.    Plaintiff Oregon Coalition receives HHS Funds. Most recently, the Oregon Coalition received an NOA for the FVPSA State Coalition Grant which is subject to the ACF Conditions. In addition, the Oregon Coalition recently received an RPE Grant NOA that is subject to the HHS Conditions.

228.    Various Oregon Coalition members receive HUD grants. For instance, Member Doe 1 has received a HUD CoC Grant award letter for six awards that it expects will be subject to the HUD Conditions.

229.    Various Oregon Coalition members receive HHS grants. For instance, Oregon Coalition Member Doe 2 receives an RPE award and expects that its continuation award of that grant will be subject to the HHS Conditions.

230.    Plaintiff Pennsylvania Coalition has applied for and received a FVPSA Coalition Grant for the past 23 years, and has also passed through FVPSA state formula grants from the Commonwealth of Pennsylvania to Coalition member programs for 23 years. In July 2025, the Pennsylvania Coalition received a FVPSA Coalition Grant award that is subject to the ACF Conditions. Additionally, the Pennsylvania Coalition receives the CDC DELTA AHEAD Grant and expects that grant's next renewal will include the HHS Conditions.

231.    The Pennsylvania Coalition has applied for and received HUD CoC Program Grants for the past 6 years, through passthrough entities. In June 2025, the Pennsylvania

Coalition received a CoC Grant NOA that is subject to the HUD Conditions. Since then, the Pennsylvania Coalition has received four additional CoC NOAs that include the HUD Conditions. The Pennsylvania Coalition also receives numerous other awards from HUD, including ESG Program Grants, that it expects will be subject to the HUD Conditions when they are up for renewal this year.

232.    Various Pennsylvania members receive HHS Grants, including FVPSA pass-through funds through the Pennsylvania Coalition, which the Coalition receives from the Pennsylvania Department of Human Services. For instance, Pennsylvania Member Program Doe 2 applied for the Pennsylvania Coalition's Culturally Specific Project grant.

233.    Various Pennsylvania Coalition members have received HUD Grants, both directly from HUD and as pass-through funds from the Pennsylvania Coalition. For instance, Pennsylvania Member Doe 1 received awards of three HUD CoC Grants that it expects will be subject to the HUD Conditions when it renews them.

234.    Plaintiff VALOR has received the RPE Grant through the CDC for the past two years. In June 2025, the CDC awarded VALOR a new RPE Grant that is subject to the HHS Conditions.  VALOR also receives a multi-year E-Learning Collaborative for Sexual Violence and Intimate Partner Violence Grant from the CDC, and expects that the next yearly continuation award under that grant will be subject to the HHS Conditions.

235.    Various VALOR members receive HHS Grants, including grants from the CDC under the RPE Program as passed through the California Department of Public Health. For instance, VALOR Member Doe 2 has received RPE grant funding, and this member expects that its next award will be subject to the HHS Conditions. VALOR Member Doe 1, VALOR Member

Doe 2, and VALOR Member Doe 3 receive FVPSA funds that will be subject to the HHS
conditions.

236.    Various VALOR members receive HUD Grants, including grants under the CoC
Grant Program, the ESG Program, and the CDBG Program, through pass-through organizations
including local county governments. For instance, in July 2025, HUD awarded VALOR Member
Doe 1 ESG and CDBG Grants through a pass-through entity. Both awards are subject to the
HUD Conditions.

237.    Plaintiff Violence Free Minnesota receives the FVPSA Coalition Grant from ACF
On July 8, 2025, Violence Free Minnesota received an award for a new Coalition Grant that is
subject to the ACF Conditions.

238.    Plaintiff Virginia Action Alliance receives HHS Grants. The Virginia Action
Alliance has applied for and received the FVPSA Coalition Grant from ACF since it has been
publicly available. On July 10, 2025, the Virginia Action Alliance received an award for the new
Coalition Grant that is subject to the ACF Conditions. The Virginia Action Alliance has also
received an RPE Grant from the CDC since it has been publicly available. On June 26, 2025, the
Virginia Action Alliance received an award under the RPE Grant Program that is subject to the
HHS Conditions.

239.    Various Virginia Action Alliance members receive RPE Program Grants as pass-
through funds. For instance, Virginia Member Doe 3 receives an RPE Grant Program award
which it will have the opportunity to renew and continue, and Virginia Member Doe 3 expects
that the HHS Conditions will apply to its continuation awards.

240.    Various Virginia Action Alliance members receive HUD Grants. For instance, in June 2025, Virginia Member Doe 1 and Virginia Doe Member 2 received CoC Grant awards subject to the HUD Conditions.

241.    Plaintiff Wisconsin SA Coalition receives HHS Grants. The Wisconsin SA Coalition has applied for and received a competitive CDC RPE Grant for the past two years, and recently received an NOA for that grant that is subject to the HHS Conditions. The Wisconsin SA Coalition also receives and plans to reapply for the PHHS grant from the CDC as a pass-through from the State of Wisconsin Department of Health Services, and it expects that its next award for that grant will be subject to the HHS Conditions.

242.    Various Wisconsin SA Coalition members also receive HHS Grants as pass-through funds. For example, Wisconsin SA Coalition Member Doe 1, Member Doe 2, Member Doe 4, and Member Doe 5, receives FVPSA funds through a Statewide Domestic Violence Grant Program administered through Wisconsin's State Department of Children and Families (DCF), and expects that the HHS Conditions will apply to new awards and continuation awards.

243.    Various Wisconsin SA Coalition members also receive HUD Grants as pass-through funds. For example, Wisconsin SA Coalition Member Doe 1, Member Doe 3, and Member Doe 4 receive HUD funds under the CoC Grant Program. These members expect that their next CoC Program awards will include the HUD Conditions. Wisconsin Member Doe 4 also receives other HUD pass-through funding, including CDBG and ESG funds.[2]

---

[2] Plaintiffs who have or expect to receive, or whose members have or expect to receive, grants from HUD are referred to as "HUD Plaintiffs." Plaintiffs who have or expect to receive, or whose members have or expect to receive, HUD CoC grants are referred to as "HUD CoC Plaintiffs." Plaintiffs who have or expect to receive, or whose members have or expect to receive, grants from HUD's Office of Community Planning and Development are referred to as "HUD CPD Plaintiffs." Plaintiffs who have or expect to receive, or whose members have or expect to receive, grants from HHS subject to the HHS GPS are referred to as "HHS Plaintiffs."

## 2. *Plaintiffs Rely on HUD and HHS Funds*

244.    Plaintiffs and their members rely on HHS and HUD grants to carry out their critical, life-saving work. For instance, Plaintiffs and their members depend on funds from HUD's Continuum of Care (CoC) Program to support survivors of domestic violence who are experiencing homelessness. These funds provide emergency shelter for individuals fleeing abuse and enable programs to transition survivors from shelter to stable, semi-permanent housing. CoC Program Grants have consistently allowed Plaintiffs and their members to pay directly for survivors' rent, utilities, and housing deposits—support that is essential for survivors who face serious barriers to obtaining safe, affordable housing on their own.

245.    Plaintiffs and their members rely on HUD ESG Grants to, for instance, cover operational costs for emergency shelters, provide the majority of food needed for emergency shelter clients and their children, and pay for other necessities for emergency shelter programs, like household supplies and hygiene products. Plaintiffs and their members also rely on ESG funds to cover emergency shelter operational costs, like salaries for shelter managers and emergency hotline operators, and facility maintenance expenses. And Plaintiffs and their members use ESG funds to pay emergency relocation expenses for survivors who have to flee from violence. Plaintiffs and their members also rely on HUD CDBG funds to support staffing at

---

Plaintiffs who have or expect to receive, or whose members have or expect to receive, grants administered by ACF are referred to as "ACF Plaintiffs." Plaintiffs who have or expect to receive, or whose members have or expect to receive, grants administered by CDC are referred to as "CDC Plaintiffs." Plaintiffs who have or expect to receive, or whose members have or expect to receive, grants administered by HRSA are referred to as "HRSA Plaintiffs." Plaintiffs who have or expect to receive, or whose members have or expect to receive, grants administered by SAMHSA are referred to as "SAMHSA Plaintiffs."

emergency shelters, where they provide direct services to clients, including restraining order assistance.

246.    HHS funding is just as critical. Plaintiffs and their members use the RPE Grant to implement strategies that protect against sexual violence, like comprehensive sexuality education and training that increases member programs' capacity to prevent sexual violence. Plaintiffs rely on RPE Grant funding to address sexual violence as a public health problem, increasing primary prevention efforts to decrease the risk of state residents experiencing sexual violence and subsequent adverse short and long-term health outcomes.

247.    Plaintiff Domestic Violence Coalitions have received the FVPSA Coalition Grant for decades and rely on it to consistently provide the support that their member programs need. For instance, the FVPSA Coalition Grants support Coalitions' state level coordination with partners, training and technical assistance programs that build the capacity of local domestic violence programs, and the creation of educational resources for member programs, survivors, and professionals in the field. Coalitions also use the FVPSA Coalition Grant to provide statewide services, like conducting statewide needs assessments that inform comprehensive responses to domestic violence, and to plan and monitor the distribution of state formula FVPSA funds.

248.    Plaintiffs and their members rely on DELTA AHEAD Grants to fund primary prevention programs to stop violence before it happens. Plaintiffs and their members use DELTA AHEAD Grant funds to support, for instance, community and societal level change efforts to reduce survivors' poverty and economic stress. And Plaintiff the California Partnership subawards a portion of its DELTA AHEAD Grant funds to a community-based domestic violence organization that implements community prevention strategies.

249.    Plaintiffs and their members also rely on other HHS grants as well, including the Title V Maternal and Child Health Services Block Grant, Public Health Service Act grants, CDC E-Learning Collaborative grants, Teen Pregnancy Prevention, Personal Responsibility Education Program, Sexual Risk Avoidance Education, and Temporary Assistance for Needy Families grants.

**E. Plaintiffs and Their Members Face an Impossible Choice of Certifying Compliance with Illegal Conditions or Forgoing Critical Federal Funding**

250.    Defendants' imposition of the Challenged Conditions place Plaintiffs and their members in an impossible position. They must choose between forgoing funding essential to their ability to fulfill their missions and accepting and certifying compliance with conditions that are in tension with their statutory duties, unlawfully vague, restrictive of speech, in violation of other constitutional and statutory requirements, and at odds with their values and missions.

251.    Plaintiffs and their members genuinely fear that in performing their lawful activities, including in some cases those not funded by HHS or HUD funds, they will be accused of violating the New Conditions to which Defendants insist they agree. This fear is amplified by the government's stated goal to use the False Claims Act as a "weapon" against grantees' conduct.

252.    For example, Plaintiffs fear that refusing to discriminate based on gender identity—a statutory requirement of VAWA, and a regulatory requirement for FVPSA funds—could be viewed as promoting "gender ideology" or violating the HHS Title IX Certification or ACF Title IX Certification. And they fear the chilling effect that the certifications will have on their ability to carry out their missions.

253.    Yet choosing to refuse the grants with the illegal funding conditions will also cause enormous harm.

254.    Without the FVPSA Coalition Grant, coalitions would be dramatically limited in the services they could provide to members and others who benefit from their domestic-violence and sexual-assault intervention and response work. Many Plaintiffs and their members would lose hundreds of thousands of dollars in irreplaceable federal funds. The loss of funds means the coalitions would not be able to provide the same level of training and technical assistance to members, who rely on that assistance in providing trauma-informed, ethically, and legally-compliant, and, in many cases, life-saving direct services to victims. Many Plaintiffs and member organizations would have to cut staff, drastically reducing their abilities to provide personalized advice and services to members seeking their support as they provide essential services to victims and survivors. Plaintiffs would have to eliminate educational programming that they conduct in partnership with K-12 schools and college campuses. And loss of funds would also affect Plaintiffs' ability to ensure adequate housing opportunities, forcing victims to choose between returning to an abuser or becoming homeless.

255.    Coalition members would also be seriously harmed both by the loss of grants to their coalitions and by the loss of grants they directly receive. If a member's coalition cuts its services because it loses a FVPSA Coalition Grant or a competitive grant, members would no longer be able to receive personalized advice, training, technical assistance, and other critical services. A key function of a statewide coalition is to serve as a reliable source of information on issues of domestic violence and sexual assault, not only to educate the public and raise awareness, but also to foster communication, share resources, and promote networking and collaboration among member agencies.

256.    Coalition member organizations would suffer grave harms from losing their own grant opportunities. A member forced to give up a competitive grant for direct services would no

longer be able to provide the same level of—or perhaps any—assistance, advocacy, and intervention work on which victims and survivors (many of whom belong to underserved populations) rely.

257.    For instance, if RPE and DELTA AHEAD Grant recipients are unable to use HHS funds to carry out primary prevention programs, their ability to reduce intimate partner and sexual violence will be severely impaired—and as a result, more people in their communities will experience preventable intimate partner and sexual violence.

258.    And individuals and families currently housed through HUD CoC funds will face eviction. As a result, emergency shelter beds will become more scarce, shelter stays will be longer, and programs will be forced to turn away homeless survivors and their children. The lack of safe, affordable housing traps victims in abusive situations, and Plaintiffs rely on HUD funds to provide survivors a safe and viable path to leave.

## V. CLAIMS FOR RELIEF[3]

### COUNT I
### Violation of the Administrative Procedure Act: In Excess of Statutory Authority (All New Conditions)

259.    The paragraphs above are incorporated and reasserted as if fully set forth here.

---

[3] Claims challenging the HUD CoC Conditions—namely, the HUD "Gender Ideology" Condition, HUD Discrimination Certification, HUD Abortion Condition, and HUD CoC E.O. Condition"—are brought by the HUD CoC Plaintiffs against Defendants HUD and Turner. Claims challenging the HUD CPD Conditions—namely, the HUD "Gender Ideology" Condition, HUD Discrimination Certification, and HUD Abortion Condition—are brought by the HUD CPD Plaintiffs against Defendants HUD and Turner. Claims challenging the HUD-wide Conditions—namely, the HUD E.O. Condition and the General HUD Anti-DEI Certification—are brought by HUD Plaintiffs against Defendants HUD and Turner. Claims challenging the HHS Discrimination Certification in the July HHS GPS and October HHS GPS, the April HHS Discrimination Certification, the HHS Title IX Certification in the October HHS GPS, and the Office of Grants Title IX Directive are brought by the HHS Plaintiffs against Defendants HHS, Kennedy, CDC, O'Neill, ACF, Gradison, HRSA, Engels, SAMHSA, and Kleinschmidt. Claims challenging the May ACF Discrimination Certification, the ACF Title IX Certification, and the HHS Discrimination Certification in the July ACF Standard Terms are

260.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

261.    An agency action is reviewable under the APA if it is a final agency action. 5 U.S.C. § 704. An agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is an action by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

262.    Defendants have made a final decision to maintain policies of imposing new funding conditions on grants made by their respective agencies—the HHS GPS, ACF Standard Terms, CDC General Terms, HRSA General Terms, SAMHSA Standard Terms, Office of Grants Title IX Directive, HUD CoC Conditions, HUD CPD Conditions, General HUD E.O. Condition, and General HUD Anti-DEI Certification. Their decisions to maintain those policies are final agency action reviewable under 5 U.S.C. § 704, as they determine awardees' rights and obligations and produce legal consequences by requiring awardees to accept the requirements and restrictions in order to receive funding.

263.    The inclusion of the new funding conditions in individual awards and NOFOs implements these policies and is also final agency action reviewable under 5 U.S.C. § 704. The

---

brought by ACF Plaintiffs against Defendants HHS, Kennedy, ACF, and Gradison. Claims challenging the HHS Discrimination in the CDC General Terms are brought by the CDC Plaintiffs against Defendants HHS, Kennedy, CDC, and O'Neill. Claims challenging the HHS Title IX Certification in the May and July HRSA General Terms and the HHS Discrimination Certification in the July HRSA General Terms are brought by the HRSA Plaintiffs against Defendants HHS, Kennedy, HRSA, and Engels. Claims challenging the HHS Discrimination Certification and the HHS Title IX Certification in the SAMHSA Standard Terms, and claims challenging the SAMHSA E.O. Condition are brought by the SAMHSA Plaintiffs against Defendants HHS, Kennedy, SAMHSA, and Kleinschmidt.

agencies' decisions to incorporate the new conditions in awards under individual programs and to individual grantees, as reflected in both NOFOs and award agreements, are final. The inclusion of those conditions determines the rights and obligations of awardees and produces legal consequences because it imposes requirements and restrictions on awardees as a condition of accepting the funding.

264.    No statute authorizes Defendants to adopt any of the New Conditions. Defendants therefore acted in excess of their statutory authority in imposing them.

265.    Defendants' policies adopting the New Conditions, and their imposition of the New Conditions in individual award programs and individual awards, must be declared unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations."

### COUNT II
**Violation of the Administrative Procedure Act: Contrary to Law (HHS Discrimination Certification, April GPS HHS Discrimination Certification, May ACF Discrimination Certification, and General HUD Anti-DEI Certification)**

266.    The paragraphs above are incorporated and reasserted as if fully set forth here.

267.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law." 5 U.S.C. § 706(2)(A).

268.    The July HHS GPS, October HHS GPS, July ACF Standard Terms, CDC General Terms, July HRSA General Terms, and SAMHSA Standard Terms are final agency action and adopt a policy of imposing the HHS Discrimination Certification on awards covered by those policies. Defendants' decisions to maintain those policies are final agency action reviewable under 5 U.S.C. § 704, as they determine awardees' rights and obligations and produce legal consequences by requiring awardees to accept the conditions in order to receive funding.

68

269.     The April HHS GPS and May ACF Standard Terms are final agency action and adopted a policy of imposing the April GPS HHS Discrimination Certification and May ACF Discrimination Certification, respectively, on awards covered by those policies. Defendants' decisions to maintain those policies are final agency action reviewable under 5 U.S.C. § 704, as they determined awardees' rights and obligations and produced legal consequences by requiring awardees to accept the conditions in order to receive funding. Defendants voluntarily revised those Certifications in response to litigation but could attempt to reinstate them at any time.

270.     The General HUD Anti-DEI Certification is final agency action and adopts a policy of requiring HUD grantees to certify that grant funds will not be used for "DEI" activities that violate applicable federal antidiscrimination laws. Defendants' decision to maintain that policy is final agency action reviewable under 5 U.S.C. § 704, as it determines awardees' rights and obligations and produces legal consequences by requiring awardees to make the General HUD Anti-DEI Certification in order to receive funding.

271.     The inclusion of the new funding conditions in individual awards and NOFOs implements these policies and is also final agency action reviewable under 5 U.S.C. § 704. The agencies' decisions to incorporate the new conditions in awards under individual programs and to individual grantees, as reflected in both NOFOs and award agreements, are final. The inclusion of those conditions determines the rights and obligations of awardees and produces legal consequences because it imposes requirements and restrictions on awardees as a condition of accepting the funding.

272.     The HHS Discrimination Certification and April GPS HHS Discrimination Certification conflict with statutes authorizing particular grants and therefore must be set aside as contrary to law. Statutory provisions establishing multiple grant programs expressly contemplate

69

grants targeting "underserved populations"—a group that Congress defined to include those who face barriers to accessing and using victim services, including because of their "religion, sexual orientation, gender identity," race or ethnicity, disabilities, or "alienage status"—as well as grants involving "culturally specific" services or organizations "primarily directed toward racial and ethnic minority groups." *See* 34 U.S.C. §§ 12291(a)(8), (46). In defunding and deterring diversity, equity, inclusion and diversity, equity, inclusion, and accessibility programs, the HHS Discrimination Certification and April GPS HHS Discrimination Certification—backed by the threat of FCA liability—conflict with statutory provisions supporting such initiatives. The HHS Discrimination Certification and April GPS HHS Discrimination Certification conflict with, for example:

a.  The specific statutory authorization for rape prevention education grants supporting "efforts to increase awareness in underserved communities" and among "individuals with disabilities" and "Deaf individuals." 42 U.S.C. § 280b-1b(a)(7); *see also* Pub. L. No. 117-103, §§ 2(b), 301(5)(A) (reauthorizing rape prevention education grants and providing that 34 U.S.C. § 12291 "shall apply to … any grant program authorized under this Act"); 34 U.S.C. § 12291(a)(46) (defining "underserved populations"). Congress also required the HHS Secretary to ensure that "culturally specific organizations" and "representatives from underserved communities" have "meaningful involvement" in applying for and implementing funding. 42 U.S.C. § 820b-1b(c); 34 U.S.C. § 12291(a)(9).

b.  The provision requiring DELTA AHEAD grant recipients to "recognize, in applicable cases, the needs of underserved populations, racial and linguistic populations, and individuals with disabilities." 42 U.S.C. § 10414(g)(3)(F).

c.  The direction that DELTA AHEAD grant recipients "shall" "recognize, in applicable cases, the needs of underserved populations, racial and linguistic populations, and individuals with disabilities." *Id.* § 10414(g)(3)(F).

273.    The May ACF Discrimination Certification similarly conflicts with multiple statutory provisions, including those that support the types of DEI and DEIA programs that the condition defunds and deters. The HHS Discrimination Certification and the MayACF Discrimination Certification conflict with, for example:

a. The authorization in FVSPA for grants "to provide specialized services for … underserved populations[] and victims who are members of racial and ethnic minority populations." 42 U.S.C. § 10406(a)(3); *id.* § 10402(14) (defining "underserved populations").

b. The requirement in FVPSA for recipients of State Coalition Grants to address the needs of victims "who are members of racial and ethnic minority populations and underserved populations." *Id.* § 10411(d)(3).

c. FVPSA's mandate that HHS award grants in specific amounts to each state domestic violence coalition for domestic violence intervention and prevention activities. *Id.* §§ 10410(1)-(5), 10411(b). Defendants' actions conflict with these statutory directives by adding conditions that Congress did not require for each State coalition's entitlement to its formula funding, and by withholding the congressionally mandated formula amounts from State coalitions if they do not agree to the funding conditions.

274.    The General HUD Anti-DEI Certification conflicts with statutes authorizing CDBG grant funds to be used to assist "economically disadvantaged and minority students" and "historically Black colleges" and conditioning certain grants on recipients' success in providing "equal opportunity in housing and employment for" minority groups and others. 42 U.S.C. §§ 5307(b)(2), (c); 5318(a)-(b).

275.    The HHS Discrimination Certification, April GPS HHS Discrimination Certification, the May ACF Discrimination Certification, and HUD's policy of requiring the General HUD Anti-DEI Certification for all HUD grants, as well as Defendants' imposition of those conditions in individual award programs and individual awards, must be declared unlawful and set aside as "contrary to law."

**COUNT III**

**Violation of the Administrative Procedure Act: Contrary to Law (HUD "Gender Ideology" Condition, HUD CoC E.O. Condition, General HUD E.O. Condition, and ACF Title IX Certification)**

276.    The paragraphs above are incorporated and reasserted as if fully set forth here.

277.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law." 5 U.S.C. § 706(2)(A). Action that violates an agency's own regulations is contrary to law.

278.    The HUD CoC Conditions adopt a policy of imposing the HUD Gender Ideology Condition and HUD CoC E.O. Condition on CoC awards. The General HUD E.O. Condition adopts a policy of imposing that Condition on HUD awards. The ACF Standard Terms adopt a policy of imposing the ACF Title IX Certification on ACF awards. Defendants' decisions to maintain those policies are final agency action reviewable under 5 U.S.C. § 704, as they determine awardees' rights and obligations and produce legal consequences by requiring awardees to accept those conditions in order to receive funding.

279.    The inclusion of these conditions in individual awards and NOFOs implements these policies and is also final agency action reviewable under 5 U.S.C. § 704. The agencies' decisions to incorporate the new conditions in awards under individual programs and to individual grantees, as reflected in both NOFOs and award agreements, are final. The inclusion of those conditions determines the rights and obligations of awardees and produces legal consequences because it imposes requirements and restrictions on awardees as a condition of accepting the funding.

280.    The HUD "Gender Ideology" Condition, as well as the HUD CoC E.O. Condition and General HUD E.O. Condition—insofar as they purport to require compliance with the

73

"Gender Ideology" Order—are contrary to HUD regulations requiring that, for specified funded programs, individuals be treated in accordance with their gender identity. *See* 24 C.F.R. § 5.106.

281.    The ACF Title IX Certification is contrary to HHS regulations barring discrimination on the basis of gender identity in programs and activities funded under FVPSA. 45 C.F.R. § 1370.5.

282.    The Defendants' policies imposing the HUD "Gender Ideology" Condition, HUD CoC E.O Condition, the General HUD E.O. Condition, and ACF Title IX Certification, and the HUD Defendants' imposition of these conditions in individual award programs and individual awards, must be declared unlawful and set aside as "contrary to law."

**COUNT IV**
**Violation of the Administrative Procedure Act: Arbitrary and Capricious (All New Conditions)**

283.    The paragraphs above are incorporated and reasserted as if fully set forth here.

284.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

285.    Defendants have made a final decision to maintain policies of imposing new funding conditions on grants made by their respective agencies—the HHS GPS, ACF Standard Terms, CDC General Terms, HRSA General Terms, SAMHSA Standard Terms, Office of Grants Title IX Directive, HUD CoC Conditions, HUD CPD Conditions, General HUD E.O. Condition, and General HUD Anti-DEI Certification. Their decisions to maintain those policies are final agency action reviewable under 5 U.S.C. § 704, as they determine awardees' rights and obligations and produce legal consequences by requiring awardees to accept the requirements and restrictions in order to receive funding.

286.    The inclusion of the new funding conditions in individual awards and NOFOs implements these policies and is also final agency action reviewable under 5 U.S.C. § 704. The

74

agencies' decisions to incorporate the new conditions in awards under individual programs and to individual grantees, as reflected in both NOFOs and award agreements, are final. The inclusion of those conditions determines the rights and obligations of awardees and produces legal consequences because it imposes requirements and restrictions on awardees as a condition of accepting the funding.

287.    Defendants provided no reasoned explanation for their decision to adopt the New Conditions, nor did they offer any reasonable explanation for including the New Conditions in individual award programs and individual awards.

288.    Defendants failed to reasonably explain the reasons for their change in policy in imposing the New Conditions.

289.    Defendants ignored the factors that Congress required the agencies to consider and considered factors that Congress did not permit them to consider.

290.    Defendants failed to consider the serious reliance interests of grantees, applicants, and the members of the public that they serve that are jeopardized by the imposition of the New Conditions.

291.    In imposing the New Conditions, Defendants have failed to consider multiple important aspects of the problem. There is no indication that Defendants considered the detrimental impact of the New Conditions on the communities served by grantees, any alternative more limited policy change, or grantees' reasonable reliance on the funds or the reliance interests of communities served by grantees.

292.    The funding conditions are also arbitrary and capricious because they are so vague that they do not give grantees adequate notice of what they must do to comply.

293.    The HUD Gender Ideology Condition, HUD CoC E.O. Condition, and General HUD E.O. Condition are also arbitrary and capricious because they conflict with binding agency regulations and fail to acknowledge or address those conflicts.

294.    The ACF Title IX Certification is also arbitrary and capricious because it conflicts with binding agency regulations and fails to acknowledge or address those conflicts.

295.    The HHS Discrimination Certification, April GPS HHS Discrimination Certification, the May ACF Discrimination Certification, and the General HUD Anti-DEI Certification are also arbitrary and capricious because they conflict with statutory requirements and fail to acknowledge or address those conflicts.

296.    Defendants' policies adopting the New Conditions, and their imposition of the New Conditions in individual award programs and individual awards, must be declared unlawful and set aside as arbitrary and capricious.

## COUNT V
## Violation of the Administrative Procedure Act: Contrary to Constitutional Right (All New Conditions)

297.    The paragraphs above are incorporated and reasserted as if fully set forth here.

298.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C.§ 706(2)(B).

299.    Defendants have made a final decision to maintain policies of imposing new funding conditions on grants made by their respective agencies—the HHS GPS, ACF Standard Terms, CDC General Terms, HRSA General Terms, SAMHSA Standard Terms, Office of Grants Title IX Directive, HUD CoC Conditions, HUD CPD Conditions, General HUD E.O. Condition, and General HUD Anti-DEI Certification. Their decisions to maintain those policies

76

are final agency action reviewable under 5 U.S.C. § 704, as they determine awardees' rights and obligations and produce legal consequences by requiring awardees to accept the requirements and restrictions in order to receive funding.

300.    The inclusion of the new funding conditions in individual awards and NOFOs implements these policies and is also final agency action reviewable under 5 U.S.C. § 704. The agencies' decisions to incorporate the new conditions in awards under individual programs and to individual grantees, as reflected in both NOFOs and award agreements, are final. The inclusion of those conditions determines the rights and obligations of awardees and produces legal consequences because it imposes requirements and restrictions on awardees as a condition of accepting the funding.

301.    As described in Counts VII-VIII and X-XII, the New Conditions violate multiple constitutional commands, including the First Amendment, Fifth Amendment, the Spending Clause, and the constitutional separation of powers and associated constitutional provisions.

302.    Defendants' policies adopting the New Conditions, and their imposition of the New Conditions in individual award programs and individual awards, must be declared unlawful and set aside as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

**COUNT VI**
**Violation of the Administrative Procedure Act: Not in Observance of Procedure Required By Law (All HUD Conditions)**

303.    The paragraphs above are incorporated and reasserted as if fully set forth here.

304.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

305.    Defendants have made a final decision to maintain policies of imposing the HUD CoC Conditions on CoC grants, the HUD CPD Conditions on CPD grants, and the General HUD E.O. Condition and General HUD Anti-DEI Certification on all HUD grants. Their decisions to maintain those policies are final agency action reviewable under 5 U.S.C. § 704, as they determine awardees' rights and obligations and produce legal consequences by requiring awardees to accept the requirements and restrictions in order to receive funding.

306.    The inclusion of the HUD Conditions in individual awards and NOFOs implements these policies and is also final agency action reviewable under 5 U.S.C. § 704. HUD's decisions to incorporate the new conditions in awards under individual programs and to individual grantees, as reflected in both NOFOs and award agreements, are final. The inclusion of those conditions determines the rights and obligations of awardees and produces legal consequences because it imposes requirements and restrictions on awardees as a condition of accepting the funding.

307.    An agency "must abide by its own regulations." *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990).

308.    HUD has adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants," "even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. § 10.1 ("It is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts . . . ."); *Id*. § 10.2 (definition of "rule"); *Id*. §§ 10.7–10.10 (notice-and-comment procedures); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447, 448 (9th Cir. 1994). While the regulation has an exception for "statements of

78

policy, interpretative rules, rules governing the Department's organization or its own internal practices or procedures, or if a statute expressly so authorizes," it does not have an exception for substantive rules. *See* 24 C.F.R. § 10.1

309.     Through the HUD Conditions, HUD has not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions consistent with the relevant statutes and regulations, but also attached new conditions on CoC agreements that require recipients to comply with various Administration directives as a condition of receiving CoC funds. These new conditions thus comprise a substantive rule.

310.     In imposing the HUD Conditions, HUD failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe procedures required by law.

311.     The policies adopting the HUD Conditions, and Defendants' imposition of those conditions in individual award programs and individual awards, must be declared unlawful and set aside as "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT VII
### Violation of the Separation of Powers (All New Conditions)

312.     The paragraphs above are incorporated and reasserted as if fully set forth here.

313.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution, including the separation of powers. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

314.     The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. The President lacks the unilateral authority to modify or amend duly enacted Legislation—the President may only "approve all the parts of a Bill, or reject it in toto." *Clinton v. City of New York*, 524 U.S. 417,

79

439–40 (1998) (citation omitted); *see* U.S. Const. art. I, § 7, cl. 2. The President cannot delegate powers to other executive branch officials that violate the Constitution.

315.    Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1426226, *18 (D.R.I. May 16, 2025) (quoting *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018)); *see* U.S. Const., art. I, § 8, cl. 1; *id.*, § 9, cl. 7.

316.    Duly enacted statutes establish grant programs for specified purposes, and Congress has consistently appropriated funding for those programs. Nothing in those laws authorizes the Executive Branch to impose the New Conditions. Defendants may not lawfully condition funding on the New Conditions, which are nowhere to be found in statute and which Congress did not authorize Defendants to impose.

317.    Defendants' imposition of each New Condition violates the separation of powers in infringing on Congress' legislative authority and power of the purse, in failing to faithfully execute Congress's laws, and in attempting to amend, modify, or partially veto duly enacted legislation.

318.    To prevent Defendants' violations of the separation of powers, Defendants must be enjoined from implementing or enforcing each New Condition.

## COUNT VIII
### Violation of the Spending Clause (All New Conditions)

319.    The paragraphs above are incorporated and reasserted as if fully set forth here.

320.    The Spending Clause of the Constitution provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and

Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. The Spending Clause vests the power of the purse, including the power to attach conditions to the expenditure of federal funds, exclusively with Congress.

321.     Congress has not authorized Defendants to attach conditions to HHS and HUD grants that are unrelated to the purpose of the grant programs.

322.     Defendants' imposition of each New Condition violates the separation of powers by infringing Congress's power under the Spending Clause, and Defendants must be enjoined from implementing or enforcing those New Conditions.

## COUNT IX
### Ultra Vires (All New Conditions)

323.     The paragraphs above are incorporated and reasserted as if fully set forth here.

324.     This Court has inherent equitable power to enjoin and declare unlawful executive ultra vires conduct. *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (cleaned up).

325.     No statute, constitutional provision, or other source of law authorizes Defendants to impose the New Conditions.

326.     The New Conditions are ultra vires, and Defendants must be enjoined from implementing or enforcing them.

## COUNT X
### Violation of the First Amendment – Free Speech Clause (HUD "Gender Ideology" Condition, HUD CoC E.O. Condition, General HUD E.O. Condition, SAMHSA E.O. Condition)

327.     The paragraphs above are incorporated and reasserted as if fully set forth here.

81

328.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund*, 561 U.S. at 491.

329.    The First Amendment to the United States Constitution provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

330.    While the government may in some circumstances attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Where the government imposes a funding condition "not relevant to the objectives of the program," that can violate the First Amendment. *See id.* at 214. And, even in providing government funding, "the Government may not aim at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998). In addition, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Alliance for Open Soc'y*, 570 U.S. at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)).

331.    The HUD "Gender Ideology" Condition runs afoul of those limits.

332.    The HUD "Gender Ideology" Condition is not relevant to the objectives of the funded programs—to address the needs of individuals and families experiencing homelessness. The HUD "Gender Ideology" Condition curtails grantees' speech with respect to gender identity broadly, without advancing any legitimate objectives of the programs. It accordingly violates the First Amendment.

333.    The HUD "Gender Ideology" Condition is designed to suppress ideas that the Administration deems dangerous—namely, that a person can have a "self-assessed gender identity" distinct from their biological sex assigned at birth. The censorious purpose of this funding condition renders it unconstitutional in violation of the First Amendment.

82

334. The HUD "Gender Ideology" Condition restricts protected speech outside the scope of the grants. The HUD "Gender Ideology" Condition impermissibly demands that grantees adopt as their own the government's view that "there are two sexes, male and female," and that the "immutable biological reality of sex" cannot and should not be displaced by anyone's "self-assessed gender identity." Gender Ideology Order § 2. Although framed as a requirement not to "promote" a contrary view using grant funds, the condition in fact requires grantees to adopt the government's view because there is no way to avoid the topic during day-to-day interactions with people.

335. The HUD CoC E.O. Condition and General HUD E.O. Condition—insofar as they purport to require compliance with the "Gender Ideology" Order—violate the First Amendment for the same reasons.

336. The SAMHSA E.O. Condition likewise violates the First Amendment insofar as it purports to require compliance with the "Gender Ideology" Order. Compliance with the "Gender Ideology" Order is not relevant to the objectives of the programs SAMHSA administers—to address substance use and mental health conditions. The SAMHSA E.O. Condition curtails grantees' speech with respect to gender identity broadly, without advancing any legitimate objectives of the programs; it suppresses ideas that the Administration deems dangerous; and it impermissibly demands that grantees adopt the government's view on gender as their own. It accordingly violates the First Amendment.

337. For these reasons, the HUD "Gender Ideology" Condition, HUD CoC E.O. Condition, General HUD E.O. Condition, and SAMHSA E.O. Condition violate the First Amendment, and Defendants must be enjoined from enforcing or implementing them.

**COUNT XI**
**Violation of the First Amendment – Free Speech Clause (HHS Discrimination Certification, April GPS HHS Discrimination Certification, May ACF Discrimination Certification, HUD Discrimination Certification)**

338.    The paragraphs above are incorporated and reasserted as if fully set forth here.

339.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund*, 561 U.S. at 491.

340.    The April GPS HHS Discrimination Certification compels grantees to certify that they do not and will not "operate *any* programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws,." or engage in "a discriminatory prohibited boycott." The May ACF Discrimination Certification likewise requires grantees to certify that they do not and will not "operate *any* programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws."

341.    The HHS Discrimination Certification, which HHS applies to awards under the July and October HHS GPS, the July ACF Standard Terms, the CDC General Terms, the July HRSA General Terms, and the SAMHSA Standard Terms, requires awardees to "certify compliance with all federal antidiscrimination laws" and "that complying with those laws is a material condition of receiving federal funding streams."

342.    The HUD Discrimination Certification, which HUD has a policy of imposing on all CoC awards, requires awardees to certify that they do not violate federal "antidiscrimination laws" and that their compliance with those laws is material for False Claims Act purposes.

343.    These provisions implement the Anti-DEI Order's instruction to impose certification requirements on federal funding as a means of eradicating DEI and DEIA programs and activities. Anti-DEI Order § 3(b)(iv). The Anti-DEI Order clearly signals that the Executive Branch now generally views DEI and DEIA activities as violations of federal antidiscrimination

84

laws, even where the federal government, until recently, regarded them as lawful or even actively encouraged them.

344.    DEI and DEIA programs include First Amendment-protected speech and advocacy, and "discriminatory equity ideology" is inherently First Amendment protected-speech.

345.    Political speech on issues of great national and international importance is central to the purposes of the First Amendment. Speech and advocacy related to the diversity, equity, inclusion, and accessibility is core political speech on a matter of public concern entitled to the highest levels of constitutional protection.

346.    No HHS or HUD policy or other guidance, nor the Anti-DEI Order, provides any detail on the Administration's view of what might make any given DEI or DEIA program violate antidiscrimination laws.

347.    The HHS Discrimination Certification, April GPS HHS Discrimination Certification, May ACF Discrimination Certification, and HUD Discrimination Certification expose grantees to potential adverse consequences under the False Claims Act—both a significant risk of burdensome litigation by *qui tam* relators or by the government itself and a risk of significant liability (liability that exceeds liability the nondiscrimination laws would themselves impose) should a court determine that a program was unlawful.

348.    The HHS Discrimination Certification, April GPS HHS Discrimination Certification, May ACF DiscriminationCertification, and HUD Discrimination Certification thus both directly censor speech outside the scope of the federally funded program, and have the natural effect of forcing grantees to refrain from engaging in protected speech even outside the scope of the federally funded program. They therefore violate the First Amendment.

349.    The HHS Discrimination Certification, April GPS HHS Discrimination Certification, May ACF Discrimination Certification, and HUD Discrimination Certification also violate the Free Speech Clause of the First Amendment because they impermissibly regulate and chill the exercise of Plaintiffs' and their members' constitutionally protected speech based on its content and viewpoint. As the larger context shows, the requirement is meant to suppress programs that promote a particular viewpoint—namely, that diversity, equity, inclusion, and accessibility are laudable goals. The Executive Order underlying these certification requirements makes clear that the Administration is not focused on unlawful discrimination generally, but rather specifically on "DEI" and "DEIA"—a set of "principles" that the Administrative deems "corrosive" and "pernicious" and seeks to "excise" from the federal government. And the April GPS HHS Discrimination Certification and May ACF Discrimination Certification's prohibition on advancing or promoting a "discriminatory equity ideology" is expressly viewpoint-based on its face.

350.    No compelling government interest justifies Defendants' viewpoint-based targeting of speech, and the HHS Discrimination Certification, April GPS HHS Discrimination Certification, May ACF Discrimination Certification, and HUD Discrimination Certification are not the least restrictive means available to advance whatever interest the conditions serve.

351.    The HHS Discrimination Certification, April GPS HHS Discrimination Certification, May ACF Discrimination Certification, and HUD Discrimination Certification therefore violate the First Amendment, and Defendants must be enjoined from enforcing or implementing them.

## COUNT XII
### Violation of the Fifth Amendment Due Process Clause (All New Conditions)

352.    The paragraphs above are incorporated and reasserted as if fully set forth here.

86

353.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall

. . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

354.    Due process requires that parties "know what is required of them so they may act

accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United

States v. Williams*, 553 U.S. 285, 304 (2008)).

355.    The New Conditions are unconstitutionally vague. They fail to provide grantees

notice of what conduct is prohibited and fail to specify clear standards for enforcement,

encouraging arbitrary and discriminatory application of the law.

356.    The April GPS HHS Discrimination Certification and May ACF Discrimination

Certification are unconstitutionally vague because, among other reasons, (i) they, the DEI

Executive Order on which they are based, and the surrounding context signal that the

Administration has a novel and expanded view of when programs that advance "DEI" and

"DEIA" would violate federal anti-discrimination laws, but fails to provide fair notice of when

they do; and (ii) they fail to provide fair notice of how a grantee could comply with these

conditions while also carrying out statutory programs to serve underserved populations and racial

and ethnic minorities, *see, e.g.*, 42 U.S.C. §§ 280b-1b(a)(7), (c); 1406(a)(3); 10411(d)(3);

10414(g)(3)(F).

357.    The HHS Discrimination Certification is unconstitutionally vague because,

among other things, it fails to provide fair notice of how a grantee could comply with these

conditions while also carrying out statutory programs to serve underserved populations and racial

and ethnic minorities, *see, e.g.*, 42 U.S.C. §§ 280b-1b(a)(7), (c); 1406(a)(3); 10411(d)(3);

10414(g)(3)(F).

358.    The Office of Grants Title IX Directive and HHS Title IX Certification are unconstitutionally vague because, among other reasons, they require compliance with the "Gender Ideology" Executive Order but do not explain how a grantee would comply with that Order. That Executive Order issues directions to the Executive Branch; it does not impose any clear legal requirements or obligations on private parties like federal grantees, leaving grantees to guess as to what it means to violate it.

359.    The ACF Title IX Certification is unconstitutionally vague because, among other reasons, they and the related "Gender Ideology" Executive Order signal that the Administration has a novel and expanded view of when conduct would violate Title IX, yet they do not provide fair notice on how a grantee could comply with the Administration's view without violating other binding regulations requiring grantees to treat individuals in accordance with their gender identity, *see, e.g.*, 45 C.F.R. § 1370.5.

360.    The HUD "Gender Ideology" Condition is unconstitutionally vague because, among other reasons, it fails to provide fair notice of (i) what it means to "promot[e]" "gender ideology" or (ii) how a grantee could comply with this condition while also complying with binding regulations requiring grantees to treat individuals in accordance with their gender identity, *see, e.g.*, 24 C.F.R. § 5.106.

361.    The HUD Discrimination Certification and General HUD Anti-DEI Certification are unconstitutionally vague because, among other reasons, the DEI Executive Order on which they are based and the surrounding context signal that the Administration has a novel and expanded view of what conduct violates federal anti-discrimination laws, and considers most or all DEI or DEIA activity illegal, yet it fails to provide fair notice of what does.

88

362.    The HUD Abortion Condition is unconstitutionally vague because, among other reasons, it fails to provide fair notice of what it means to "promote" elective abortion, or what qualifies as an "elective" abortion.

363.    The HUD CoC E.O. Condition, General HUD E.O. Condition, and SAMHSA E.O. Condition are unconstitutionally vague because, among other reasons, Executive Orders are issued by the President to direct the Executive Branch—they do not on their own impose legal requirements or obligations on private parties like federal grantees, leaving grantees to guess as to what it means to violate an Executive Order. The HUD CoC E.O. Condition, General HUD E.O. Condition, and SAMHSA E.O. Condition also purports to incorporate all executive orders, leaving grantees uncertain how to treat executive orders entirely irrelevant to their programs, including those that predate this administration. In addition, it is unclear how a grantee could comply with the policies in the "Gender Ideology" Executive Order—as potentially required by the HUD CoC E.O. Condition and General HUD E.O. Condition—while also complying with binding regulations requiring grantees to treat individuals in accordance with their gender identity, *see, e.g.*, 24 C.F.R. § 5.106.

364.    The vagueness of these conditions threatens the property interests of grantees in their grant funds and in their own, non-federal funds that could be subject to FCA damages and penalties.

365.    The New Conditions are unconstitutionally vague in violation of Fifth Amendment Due Process guarantee and Defendants must be enjoined from enforcing or implementing them.

## VI. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.  Declare unlawful, vacate, and set aside the New Conditions;

B.  Declare unlawful, vacate, and set aside Defendants' decision to include the New Conditions in individual award programs and in individual awards;

C.  Stay the New Conditions in the respective agency policies, in any individual notices of funding opportunity, and in any awarded grants, pursuant to 5 U.S.C. § 705, and issue all other necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings;

D.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from including any of the New Conditions or any substantively similar condition in any NOFOs or awards, from requiring or permitting any funding recipient to impose any of the New Conditions or any substantively similar condition on subrecipients, and from otherwise imposing the New Conditions or any substantively similar condition on any funding recipient;

E.  Award Plaintiffs reasonable costs and attorneys' fees; and

F.  Grant any other relief that the Court deems fit and proper.


September 15, 2025                          Respectfully submitted,

                                           /s/ Kristin Bateman

Kristin Bateman (Cal. Bar No. 270913)[+][^]
Robin F. Thurston (D.C. Bar No. 1531399)[+]
Skye L. Perryman (D.C. Bar No. 984573)[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar No. 1016621)[+]
Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
Brian C. Rosen-Shaud (ME Bar No. 006018)[+][^]
Nina Cahill (D.C. Bar No. 1735989)[+]
Jacobson Lawyers Group PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

*/s/ Amy R. Romero*
Amy R. Romero (RI Bar # 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

*/s/ Lynette Labinger*
Lynette Labinger (RI Bar No. 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

*/s/ Mary C. Dunn*
Mary C. Dunn (RI Bar No. 6712)
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900
mcd@blishcavlaw.com
Cooperating counsel, Lawyers' Committee for RI

_/s/ Lauren A. Khouri_
Lauren A. Khouri (D.C. Bar No. 10282288)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org

[+] Admitted _pro hac vice_
[^] Not admitted in the District of Columbia. Practice
supervised by members of the D.C. bar.

_Counsel for Plaintiffs_

92