# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, et al.,<br>　　　Plaintiffs,<br><br>　　　v.<br><br>ROBERT F. KENNEDY, JR. in his official capacity as Secretary of the United States Department of Health and Human Services, et al.,<br>　　　Defendants. | ）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>） | C.A. No. 25-cv-342-MRD-PAS |

## MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.

## I.    INTRODUCTION

Over twenty non-profit coalitions that receive federal grant money to help support survivors of domestic violence and sexual assault as well as members of society who are unhoused or without stable housing filed suit against the United States Departments of Health and Human Services ("HHS") and Housing and Urban Development ("HUD") as well as various administrators and subagencies who fall under and within these agencies (hereinafter the "Coalitions" or the "Plaintiffs"). Compl. at 1-4. The Plaintiffs allege that the Defendants are springing new conditions on them as grantees and are requiring compliance with new spending restrictions on grant funds (the "Grants"), all in violation of the Administrative Procedures Act (the "APA"), 5 U.S.C. § 706, the U.S. Constitution's clearly articulated separation of

powers principles such as the Article I Spending Clause, the First Amendment, and the Due Process Clause under the Fifth Amendment. *Id.* ¶¶ 4, 66-89. The new conditions and certifications foisted upon the grantees are focused on compelling compliance with sweeping changes imposed by the executive branch by way of Executive Orders ("E.O.s") aimed at eliminating programs that are perceived as promoting gender ideology; diversity, equity, and inclusion; elective abortions; and antidiscrimination. *Id.* ¶¶ 21-31, MPI at 73-74.

A Temporary Restraining Order currently enjoins the Defendants from requiring a subset of the Plaintiffs to agree to the new conditions and restrictions prior to receiving additional funds under some of the awarded grants. FifthRev. TRO, ECF No. 64. Pending before this Court is the Plaintiffs' Motion for a Preliminary Injunction ("MPI"). ECF No. 30. The MPI challenges a slew of new demands from the Defendants that the Plaintiffs refer to as the "New Conditions." MPI at 18-26. These New Conditions include: (1) HUD's Continuums of Care (CoC) Grant Conditions, (2) HUD Office of Community Planning and Development (CPD) Grant Conditions, (3) HUD's Agency-Wide conditions, including Discrimination Certification, General Anti-DEI Certification, Abortion Condition, CoC E.O. Condition, and General E.O. Conditions, (4) HHS' Administration for Children and Families (ACF) Conditions, including Anti-DEI and Title IX Certifications, and (5) HHS' Health Resources & Services Administration (HRSA) Conditions, including Title IX certifications (collectively, the "New Conditions" or the "Challenged Conditions"). MPI at 18-26, 73-74. According to the Plaintiffs, many of these New

Conditions exceed the Defendants' statutory authority, are arbitrary and capricious, are contrary to law, and violate various constitutional provisions "safeguarding the separation of powers." MPI at 39-46. The Plaintiffs also contend that the DEI-related certifications and gender ideology conditions violate the First Amendment, MPI at 49-53, and that the DEI-related certifications, HUD's Gender Ideology Condition, HUD's Abortion Condition, HUD's CoC E.O. Condition and General HUD E.O. Condition, and ACF's Title IX Certification are unconstitutionally vague, MPI at 54-57.

For the reasons explained below, the Court grants the Plaintiffs' Motion.

## II.  STANDARD

"A request for a preliminary injunction . . . may be granted only if 'the district court finds that . . . four . . . factors . . . weigh in favor of granting the request.'" *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022) (quoting *Comcast of Me./N.H., Inc. v. Mills*, 988 F.3d 607, 611 (1st Cir. 2021)). The factors are: "(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Id.* (quoting *Comcast of Me./N.H., Inc.*, 988 F.3d at 611). "The most important is whether the movant has demonstrated a likelihood of success on the merits," a factor that the Circuit makes clear is indispensable to "the preliminary injunction inquiry." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020) (citing *Ryan v. ICE*, 974 F.3d 9, 18-19 (1st Cir. 2020)). When the government is the opposing party, the third and fourth factors merge and are

considered together. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## III.    DISCUSSION

The Court begins with an explanation as to why the Plaintiffs' claims have been filed in the proper forum and need not be adjudicated in the Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491(a). The Court then discusses why the Plaintiffs have shown that (1) they are likely to succeed on at least one of their APA claims and one of their constitutional claims; (2) they face irreparable harm absent preliminary relief; and (3) the balance of the equities and public interest weigh in their favor.

### A.    The Tucker Act

The first obstacle for Plaintiffs to overcome in their challenge to the New Conditions is establishing that this Court has subject matter jurisdiction over these claims and that the Tucker Act, 28 U.S.C. § 1491(a), does not vest jurisdiction in the Court of Federal Claims. The Tucker Act has been raised repeatedly by the Government in several lawsuits filed across the country challenging various executive agency actions and most recently has been alluded to in Supreme Court shadow docket proclamations. *See Nat'l Inst. of Health, et al. v. Am. Pub. Health Assn'n, et al.*, 145 S.Ct. 2658 (2025) ("*NIH*"); *Dep't. of Educ., et al. v. California, et al.*, 604 U.S. 650, 651 (2025). Before discussing those cases and whether the Tucker Act applies to the Plaintiffs' claims at bar, it is necessary to explore whether all Plaintiffs

4

seeking preliminary relief from this Court are similarly situated for purposes of the analysis.

The Court views Plaintiffs in two distinct buckets for purposes of the Tucker Act analysis[1]; 1) those who signed the Challenged Conditions before this lawsuit commenced[2] and 2) all other Plaintiffs, which includes those who have not signed the Challenged Conditions, those who are mid-grant and expect the Challenged Conditions to be part of a renewal process, and those who accepted the Challenged Conditions after the Court's July 24, 2025 Order granting temporary relief. The Court acknowledges that the Plaintiffs are not all similarly situated to one another as it works through this jurisdictional argument.

"[T]he APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' . . . Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Dep't. of Educ., et al. v. California, et al.*, 604 U.S. 650, 651 (2025) (first quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002), then 28 U.S.C. § 1491(a)(1)). Defendants argue that this Court "lacks

---

[1] At the hearing on the Plaintiff's MPI, they conceded that they could be, if necessary, separated into various buckets. "[Plaintiffs] do have people in sort of all of the buckets your Honor is mentioning people; who applied because they couldn't wait for relief, people who have gotten grant agreements and have accepted them under the TRO . . . there are people who are getting grant agreements in the near future or are expecting them in the coming weeks or months." Mot. for Prelim. Inj. Hr'g Tr. 6: 1–11 (Sept. 4, 2025).

[2] *See, e.g.*, ECF No. 30-5 at ¶ 12 (explaining that California "Doe Member 1 accepted this award on May 23, 2025."); ECF No. 30-7 ¶ 13(b) (regarding a Wisconsin coalition member who accepted the Grant Conditions on July 9, 2025).

jurisdiction over Plaintiffs' claims because they arise from Plaintiffs' contracts with the Government and must therefore be heard in the Court of Federal Claims." ECF No. 43 at 27. According to Defendants, the Court should apply the *Megapulse* test, which requires the Court to examine "the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Disputing that this Court should apply the *Megapulse* test, Plaintiffs instead point this Court to *Webster*, where the Supreme Court reiterated the principle that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). The Plaintiffs rely on *Webster* because they "assert constitutional claims not under the APA, for which this Court must have jurisdiction under Supreme Court precedent." ECF No. 49 at 7. They go on to argue that "this case does not involve grant terminations for which Plaintiffs could bring breach of contract claims" and that they "do not ask the Court to order Defendants to contract with Plaintiffs or pay Plaintiffs any money." *Id.* They further note that "the vast majority of Plaintiffs and their members do not even have a contract with the federal government as relevant to the claims." *Id.*

Although Plaintiffs raise constitutional claims and seek equitable relief in addition to their APA claims, this does not end the Court's analysis because Defendants highlight an important principle outlined by the Federal Circuit.

> [I]n determining whether a plaintiff's suit is to be heard in district court or the Court of Federal Claims, we must look beyond the form of the pleadings to the substance of the claim. We have cautioned litigants that

dressing up a claim for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction to make it an APA case.

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Housing and Urban Dev. et al.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). This brings us to the *Megapulse* test to determine whether these claims are "at [their] essence a contract action" subject to the Tucker Act. 672 F.2d at 968; *see also California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. Mar. 21, 2025); *Woonasquatucket River Watershed Council v. U.S. Dept. of Agric.*, 778 F. Supp. 3d 440 (D.R.I. Apr. 15, 2025).

Beginning with "the source of the rights upon which the [P]laintiff bases its claims," *Megapulse*, 672 F.2d at 968, Defendants argue that "Plaintiffs seek to enforce rights under their contracts with the agencies," ECF No. 43 at 31. In sum, they proffer that the "only source of Plaintiffs' claimed rights is their grant agreements. Plaintiffs seek to challenge Defendants' insertion of one or more of the challenged conditions into their funding contracts." ECF No. 43 at 31. Plaintiffs counter that "the source of [their] rights resides in statutes and the Constitution, not in any contractual provisions in the Grant Agreements." ECF No. 49 at 12 (quoting *Martin Luther King, Jr. Cnty., et al. v. Turner, et al.*, 785 F. Supp. 3d 863, 878 (W.D. Wash. June 3, 2025)) ("*MLK Jr.*").

This Court agrees with Plaintiffs and adopts the same reasoning as its colleagues in *R.I. Coal. Against Domestic Violence, et al. v. Bondi, et al.*, 25-279-WES, 2025 WL 2271867, at *5 (D.R.I. Aug. 8, 2025) ("*RICADV*") and *MLK Jr.*, 785 F. Supp. 3d at 877–82. *RICADV* dealt with the Government's attempt to "place allegedly unlawful conditions on all future grants issued under the Violence Against Women

Act." 2025 WL 2271867, at *1. In swiftly rejecting the Government's Tucker Act argument, the Court said, "[i]mportantly, the Coalitions do not challenge conditions, terms, or agency action related to grants that the Office has previously awarded them; they object to the challenged conditions only to the extent that they are or will be placed upon grants for which they seek to apply." *Id.* at *5. Similarly, in *MLK Jr.*—also dealing with the "imposition of what Plaintiffs claim[ed] [were] unlawful and politically motivated funding conditions on . . . federal grants"—the court rejected the Tucker Act argument because "[r]esolution of the Plaintiffs' claims [would] require the Court to conduct an in-depth analysis of the [] statutes and regulations to determine whether Defendants acted reasonably and in compliance with Plaintiffs' statutory and constitutional rights; *resolution of Plaintiffs' claims w[ould] not require an analysis of the respective Grant Agreements.*" *MLK Jr.*, F. 785 Supp. 3d 863 at 878 (emphasis added). That is the same analysis that this Court must engage in—a review of the relevant statutes and regulations, not an analysis of any current or prospective grant agreements.

Most Plaintiffs here are similarly situated to those in *RICADV* and *MLK Jr.* because the Challenged Conditions the Government seeks to impose have not become ratified terms to any grant agreement/contract.[3] The Government essentially concedes this by acknowledging that only "*some* of Plaintiffs' members [] have already accepted grant contracts subject to the challenged conditions." ECF No. 43 at 32

---

[3] As the reader will see *infra*, the Tucker Act does not deprive this Court of jurisdiction for the bucket of Plaintiffs who have ratified/accepted the Grant Conditions.

(emphasis added).  They go on to argue that "Plaintiffs' claims and the relief sought make clear that the purpose of the suit is to challenge contractual terms."  ECF No. 43 at 31.  The Federal Circuit has stated that "grant agreements [are] contracts when the standard conditions for a contract are satisfied," explaining that standard conditions for a contract include "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338-39 (Fed. Cir. 2021).  For most of the Plaintiffs here, the standard conditions for a contract have not been met because, either they have not accepted the Government's proposed Challenged Conditions, or they have accepted the grant award after this Court entered a temporary restraining order prohibiting the Challenged Conditions from taking effect for the time being.  Either way, the Challenged Conditions have yet to become the actual terms to any grant agreement and, instead, must be viewed as offers that have not been accepted by most Plaintiffs.

With that said, the Court acknowledges the Government's position that there is a bucket of Plaintiffs who "have already accepted grant contracts subject to the challenged conditions before Plaintiffs brought this lawsuit."  ECF No. 43 at 32.  The Court finds, however, that these Plaintiffs are similarly situated to the rest of the Plaintiffs because "the gravamen of [these] Plaintiffs' Complaints does not turn on terms of a contract between the parties; it turns on federal statute and regulations put in place by Congress and [other agencies]." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 293 (D. Mass. March 5, 2025).  Further, "Plaintiffs'

contractual relationships with [Defendants] do not automatically 'convert a claim asserting rights based on federal regulations into one which is, at its essence, a contract claim." *Id.* (quoting *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1299 (10th Cir. 2009). The Court concludes that the first *Megapulse* factor weighs in Plaintiffs' favor.

The Court will now discuss the second *Megapulse* factor—the type of relief sought. 672 F.2d at 968. The Government's contention is that "[w]here, as here, a plaintiff seeks to enforce a contractual agreement with the Government and obtain payment of money, the inquiry is straightforward: a district court 'cannot order the Government to pay money due on a contract.'" ECF No. 43 at 32 (quoting *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025). Plaintiffs, however, are not seeking to enforce a contract to obtain payment of money, but "seek to set aside unlawful conditions that Defendants have imposed as requirements 'to be eligible' to receive an award." ECF No. 49 at 13 (citing *RICADV*, 2025 WL 2271867, at *5). And, as they point out, this is what sets this case apart from the Supreme Court's shadow docket orders in *NIH* and *Dep't of Educ.* Those cases dealt with grant terminations, not grant conditions. *See NIH*, 145 S. Ct. at 2661 (stating "the District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong[ed] in the Court of Federal Claims (CFC)."); *Dep't of Educ.*, 604 U.S. at 650–51 (staying a district court's Order "enjoining the Government from terminating various education-related grants" because "the APA's limited waiver of immunity does not extend to orders to enforce a contractual

obligation to pay money . . . Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on any express or implied contract with the United States.") (cleaned up).

The Government argues that "[i]f Plaintiffs were not grantees of the agencies, they would have no way to negotiate the terms under which the Government administers its funds or Plaintiffs receive them . . . Plaintiffs cannot evade the exclusive jurisdiction that the Tucker Act invests in the Court of Claims merely by requesting equitable relief." ECF No. 43 at 33. The Supreme Court has foreclosed this argument. In *Bowen*, the Supreme Court concluded that the district court had jurisdiction to hear APA claims because the relief sought did not constitute money damages within the meaning of the APA. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *NIH*, 145 S. Ct. at 2658 (reaffirming *Bowen* as "good-law"). The Supreme Court made clear that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* As a district court colleague summed up recently, "[t]he term 'money damages' for purposes of the APA's sovereign immunity waiver refers to 'a sum of money used as compensatory relief' that is 'given to the plaintiff to *substitute* for a suffered loss.'" *MLK Jr.*, 785 F. Supp. 3d at 881 (quoting *Bowen*, 487 U.S. at 895).

It is clear that the type of relief sought by the Plaintiffs is, as they put it, "seek[ing] to set aside unlawful conditions that Defendants have imposed as requirements 'to be *eligible*' to receive an award," and not payment for a suffered loss. ECF No. 49 at 13 (quoting *RICADV*, 2025 WL 2271867, at *5). This is consistent with

the Supreme Court's recent *NIH* decision which vacated the district court's order as to grant terminations only.  145 S.Ct. at 2658.  That decision did not stay the district court's Order vacating NIH guidance.  And as Plaintiffs argue here, "[t]he same is true with respect to vacating the New Conditions: if the Court stays the conditions, that relief applies prospectively, and Plaintiffs will still need to receive, accept, and execute grant agreements with HUD and HHS to be entitled to payment on future grants."  ECF No. 49 at 13.  This Court agrees and finds the type of relief sought by Plaintiffs is the type of relief that this Court can provide.  The second *Megapulse* factor weighs in Plaintiffs' favor.

All in all, the Tucker Act does not strip this Court of subject matter jurisdiction, and Plaintiffs need not proceed in the Court of Federal Claims on their claims against the Defendants.

### B.    Likelihood of Success on the Merits

The Court now turns to the preliminary injunction factors.  The Plaintiffs must first demonstrate that they are likely to succeed on the merits of at least one of their claims.  As the Court will discuss, the Plaintiffs have shown that the Defendants' imposition of the Challenged Conditions likely violates the APA's restriction against agency action that is arbitrary, capricious, or an abuse of discretion pursuant to 5 U.S.C. § 706(2)(A).  Later, the Court will also briefly explain why it finds the Plaintiff's constitutional claims viable.

1.  Administrative Procedures Act

a.  Final Agency Action

The APA provides that "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Pursuant to this provision, a plaintiff may challenge a "discrete agency action" but may not invoke the APA to make a "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). As a preliminary matter, the Court must determine whether the announcement of the imposition of the Challenged Conditions constitute "final agency action." An agency action is deemed final if: (1) it marks the consummation of the agency's decisionmaking process," and (2) "the action [is] one by which "rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The Supreme Court has "long taken" a "pragmatic approach" to the question of what constitutes final agency action. *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016). This Court determines, as others have, that agency placement of new conditions on grant funding amounts to final agency action for the reasons stated below. *MLK Jr.*, 785 F. Supp. 3d 863 at 880-90.; RICADV, 2025 WL 2271867, at *6.

The adoption of the Challenged Conditions satisfies the pragmatic and flexibility standard used for evaluating final agency action. *See New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for

the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once."). The insertion of the Challenged Conditions into prospective and current grant agreements also evidences the Defendants' "'consummation' of [their] decisionmaking process." *Bennett*, 520 U.S. at 177-78 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 113 (1948)).

Moving to the second prong of the *Bennett* test, the imposition of the Challenged Conditions both determines the Plaintiffs' rights and obligations and creates legal consequences. *See* 520 U.S. at 178. The Plaintiffs are effectively prevented from participating in the application process and from receiving funding Congress has appropriated for supporting their missions if they decline to abide by the newly implemented Challenged Conditions. Moreover, the Challenged Conditions will change the lawful scope of activities permitted with grant funds, may lead to the termination of grant awards, and will require the Plaintiffs to "expose them[selves] to potential criminal and civil liability under the [False Claims Act]." ECF No. 49 at 28.

Notably, the Defendants do not argue that there is no such final agency action here to review. The Court, therefore, does not linger on this issue. Having established that final agency action has occurred by the pending imposition of the Challenged Conditions, the Court progresses to the element of the APA Defendants do argue prevents this Court's review of its actions – that their decision was simply the product of exercising its lawful agency discretion. ECF No. 43 at n.6.

14

### b. Exclusive Agency Discretion

Judicial review under the APA does not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has interpreted this exception narrowly, limiting it only to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (internal citations omitted). The Supreme Court has only deployed the exception for "administrative decisions that courts traditionally have regarded as committed to agency discretion." For example, it has been applied to a decision related to the allocation of funds from a lump-sum appropriation, *id.*, to the Food and Drug Administration's decision not to initiate an enforcement action, *Heckler v. Chaney*, 470 U.S. 821, 831-832 (1985), and to the Central Intelligence Agency's decision to terminate a federal employee in the interest of national security, *Webster v. Doe*, 486 U.S. 592, 600-601 (1988). The Defendants have not harkened to any analogous caselaw holding that an agency's implementation of grant terms and conditions is traditionally committed to exclusive agency discretion. In fact, as a colleague noted in *RICADV*, in recent cases, courts have consistently found the opposite to be true. *See* 2025 WL 2271867, at *6 (citing *Biden v. Missouri*, 595 U.S. 87, 142 (2022) ("reviewing the Centers for Medicare and Medicaid Services' imposition of new conditions on Medicare and Medicaid grant funds") and *City of Providence v. Barr*, 954 F. 3d 23 (1st Cir. 2020) ("assessing the Department of Justice's decision to place new conditions on Byrne JAG grant funds")).

Undoubtedly, Congress has delegated authority to HUD and HHS over their grant programs. For example, 42 U.S.C. § 11386(b)(8), which governs the requirements for the Continuum of Care Program, enables the Secretary of HUD to require applicants to agree "to comply with such other terms and conditions as the Secretary may establish to carry out [the purpose of the program] in an effective and efficient manner." But Congress has also established a statutory framework[4] defining the specific purposes for which the Grants may be used, the specific populations the Grants are to serve, and a series of statutory grant conditions and eligibility requirements to guide and limit the agency's decisions, which also simultaneously provides a reviewing court with meaningful standards to judge the agency's decisions.

Because the Court finds that the statutory scheme demonstrates that "this is not a case in which there is 'no law to apply,'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402. 410 (1971)), and that the implementation of grant terms and conditions has not historically been committed to exclusive agency discretion, it will proceed to assess the Plaintiffs' APA claims.

---

[4] *See the Homeless Assistance Act, 42 U.S.C. § 11301; see also the Housing and Development Act of 1974, 42 U.S.C. §§ 5301-5321; § 5304(b); see also the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act of 2009, 42 U.S.C. §§ 11371-11378.*

### c. Arbitrary and Capricious

As previewed above, the APA "embodies a basic presumption of judicial review," and "instructs reviewing courts to set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Dep't of Com.*, 588 U.S. at 771 (cleaned up) (citing 5 U.S.C. § 706(2)(A)). An agency action is arbitrary or capricious "if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). The First Circuit has expounded that a decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could be ascribed to a difference in view or the product of agency expertise." *Craker v. DEA*, 714 F.3d 17, 26 (1st Cir. 2013).

Although details of the Defendants' decisionmaking process may be revealed later in the litigation pipeline, at this preliminary injunction stage, the Court must conclude that the Defendants engaged in a baseless and arbitrary process. The Defendants merely claim that "the rationale for the conditions is self-evident from the language of the conditions themselves." ECF No. 43 at 25-26. Aside from that, nothing in the Defendants' opposition articulates a "satisfactory explanation" for their decision to implement the Challenged Conditions, let alone discusses the process they engaged in to arrive at such decision. *See Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Based on the record, it is impossible for this Court to find that the Defendants considered the harmful

impact their decision would have "on the Coalitions and the vulnerable populations they serve." *See RICADV*, 2025 WL 2271867, at *8; *see also* ECF No. 49 at 17 (listing possible harms of accepting the Challenged Conditions). At a bare minimum, in order for the "agency's path [to] reasonably be discerned," the agency must actually provide some sort of explanation. *See Bowman Transp., Inc. v. Ark-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). To date, the Defendants have failed to achieve even this basic requirement. *See Dep't of Com.*, 588 U.S. at 785 (holding that "[t]he reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public"). Based on the considerations stated, the Court need not consider the Plaintiff's additional APA claims since the Court is satisfied that they have demonstrated a likelihood of success on the merits for their arbitrary and capricious claim.

## 2. Constitutional Claims

While the Court need not discuss the Plaintiffs' constitutional claims given its conclusion that the Challenged Conditions represent arbitrary and capricious action in violation of the APA, it will briefly consider two of the more compelling constitutional arguments posited at this preliminary stage of the litigation. *See Vaquería Tres Monjitas, Inc. v. Pagan*, 748 F.3d 21, 26 (1st Cir. 2014) (noting that "federal courts are not to reach constitutional issues where alternative grounds for resolution are available" (quoting *Am. Civil Liberties Union v. U.S. Conference of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013))).

### a. First Amendment

The Plaintiffs argue that the Challenged Conditions violate their First Amendment rights for a variety of reasons. For one, they claim that the Challenged Conditions restrict speech "outside the scope of the federally funded program[s]" because they require the Plaintiffs to certify that they do not "operate any programs" that "advance or promote DEI, DEIA, or discriminatory equity ideology ...." ECF No. 30-1 at 49. They characterize the Challenged Conditions as completely untethered to any legitimate objective of the programs and instead as a tool to suppress what the government views as "the dangerous idea of . . . 'gender ideology.'" ECF No. 30-1 at 52. The Plaintiffs argue that the Challenged Conditions effectively coerce them into adopting the Government's view on issues of public concern and require them to self-censor in order to mitigate the risk of government investigation and liability for any DEI related activities, expression related to gender identity, and referral to abortion services. ECF No. 30-1 at 43, 50-53. Defendants, conversely, argue that the "Government is permitted to have policy priorities, and [it] does not violate the First Amendment by declining to fund programs that do not align with those policies." ECF No. 43 at 45.

"It is [] a basic First Amendment principle that 'freedom of speech prohibits the government from telling people what they must say.'" *Agency for Int'l Dev. v. alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006)); *see also Knox v. Service Employees*, 567 U.S. 298, 309 (2012) ("The government may not . . .

compel the endorsement of ideas that it approves."); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) (stating "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). The Supreme court has mulled this over in a string of cases involving government efforts to control the speech of funding recipients. Generally, such cases fall into two categories: 1) where speech-related conditions "define the limits of the government spending program," and 2) where speech-related conditions "seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. V. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013). In either case, the Supreme Court has affirmed that "the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Id.* at 214. But it has also recognized that the government is not required to subsidize activities that it does not wish to promote. *Id.* at 215 (citing *Rust v. Sullivan*, 500 U.S. 173 (1991) (noting that Congress could "selectively fund certain programs to address an issue of public concern, without funding alternative ways of addressing the same problem")). That being said, the highest court has recognized that the First Amendment supplies a "limit on Congress' ability to place conditions on the receipt of funds." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006).

The constitutional rub surfaces when the Government's speech-related condition "goes beyond defining the limits of the federally funded program to defining

the recipient." *Agency for Int'l Development v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 218 (2013); *see also Rust v. Sullivan*, 500 U.S. 173, 196 (1991) (holding that "[t]he Title X grantee can continue to . . . engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives title X funds."); *Regan v. Taxation with Representation*, 461 U.S. 540, 544 (1983) (finding no First Amendment violation because the non-profits could continue to claim § 501(c)(3) status for their nonlobbying activities, while attempting to influence legislation in their § 501(c)(4) capacity with separate funds); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 399-410 (1984) (finding that a grant condition preventing broadcasters from sharing their own partisan opinions was unconstitutional because the condition leveraged the federal funding to regulate the stations' speech outside the scope of the program).

The landscape established by the cases noted above considers challenges to funding conditions that were baked into the development of specific government programs by Congress, but here, the Challenged Conditions are being enacted as "extrinsic, extra-statutory conditions" on top of already existing and well-established programs. *See RI Latino Arts et al. v. National Endowment for the Arts et al.*, 777 F. Supp. 3d 87, 110 (D.R.I. 2025). The categorial and expansive nature of the Challenged Conditions telegraph that the Defendants will deny federal funding to a whole class of programs based on viewpoint alone. It cannot be mistaken that in this case federal funding is being employed as a carrot to impose a "disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" *Nat'l*

21

*Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)). In effect, the Challenged Conditions force the Plaintiffs to pledge allegiance to the Government's position on issues of public concern and go "beyond preventing recipients from using [] funds in a way that would undermine the federal program." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 US 205, 220 (2013). Because the Challenged Conditions impose a viewpoint-based condition on the receipt of public funding and require "the affirmation of [] beliefs that by [their] nature cannot be confined within the scope of the Government program," they likely violate the First Amendment. *Id.* at 221.

### b. Fifth Amendment

Invoking the Fifth Amendment, the Plaintiffs also argue that the Challenged Conditions are unconstitutionally vague because "they impose unclear, ill-defined prohibitions that give the Defendants sweeping discretion over their enforcement." ECF No. 30-1 at 53. Plaintiffs contend that the Challenged Conditions are at odds with the goals and parameters Congress has laid out for the programs they run. As a result, they argue that because the Challenged Conditions fail to provide fair notice about how Plaintiffs could comply while simultaneously implementing the various instructions Congress set forth by statute, the new conditions violate the Fifth Amendment. ECF No. 30-1 at 45-46. To highlight this tension, Plaintiffs identify several instances in which Congressional statutes specifically require Plaintiffs to serve "members of racial and ethnic minority populations and underserved

populations,"[5] to provide "culturally specific services,"[6] and to acknowledge and cater services in accordance with gender identity.[7]  ECF No. 30-1 at 46-47.  Plaintiffs also claim that the Challenged Conditions violate the Fifth Amendment for vagueness because they do not clearly define terms that would trigger noncompliance.  For example, Plaintiffs argue that the Challenged Conditions do not provide fair notice of what it means to: i) "promote 'gender ideology'"; ii) "promote 'elective abortion'"; and iii) comply with current and yet to materialize executive orders.  ECF No. 30-1 at 46-47.

In their defense, the Defendants characterize Plaintiff's facial vagueness challenge as premature because Defendants have not yet sought to enforce any of the challenged terms against Plaintiff.  ECF No. 43 at 50.  They argue that the language being challenged by the Plaintiffs is not vague at all and can be read within their ordinary meanings.  ECF No. 43 at 50.  They dispel Plaintiffs' distress regarding fair notice by noting that Plaintiffs are entitled to a "notice of any proposed cancellation

---

[5] *See* 42 U.S.C. § 10411(d)(3), which governs the grant awards for the funding of State Domestic Violence Conditions.

[6] *See* 34 U.S.C. § 12291(a)(9), of the Violence Against Women Act, which defines "'culturally specific services' as community based services that include culturally relevant and linguistically specific services and resources to culturally specific communities."

[7] *See* 24 C.F.R. § 5.106, which applies to assistance provided under Community Planning and Development ("CPD") programs and requires that all programs shall provide accommodations "in accordance with the individual's gender identity"; *see also* 45 C.F.R. § 1370.5, which governs the Family Violence Prevention and Services Programs ("FVPSA") and stipulates that "no person shall on the ground of actual or perceived sex, including gender identity, be excluded from participation in, be denied the benefits of, or be subject to discrimination under, any program or activity funded in whole or in part through FVPSA."

of funding" and "must be provided with an opportunity to appeal the agency's determination" by law.[8]

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). To that end, Plaintiffs may facially challenge a law under the Due Process Clause of the Fifth Amendment. *United States v. Williams*, 553 U.S. 285, 304 (2008). In order to succeed, a Plaintiff making the facial challenge must "demonstrate that the law is impermissibly vague in all its applications." *URI Student Senate v. Town of Narragansett*, 631 F. 3d 1, 13 (1st Cir. 2011) (citing *Whiting v. Town of Westerly*, 942 F.2d 18, 22 (1st Cir. 1991)). To be sure, a law will not be found to circumvent due process so long as it defines the offense "1) with sufficient definiteness that ordinary people can understand what conduct is prohibited; and 2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The First Circuit has noted that "the fact that a statute requires some interpretation does not perforce render it unconstitutionally vague." *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 61 (1st Cir. 2008).

Here, the Court finds that the Challenged Conditions are likely unconstitutionally vague. The phrases "promote gender ideology" and "promote elective abortion" obscure meaning like Russian dolls stacked inside each other.

---

[8] *See* 2 C.F.R. §§ 200.341-42, which does state that federal agencies must provide grant recipients and subrecipients with notice and an opportunity to object.

Nothing in the Challenged Conditions sheds light on how this Court and Plaintiffs are to construe the intentions of the phrases.  As Plaintiffs fairly point out, they are "left unsure whether providing information to a survivor seeking help with an unwanted pregnancy would 'promote' 'elective abortion,' and whether using preferred pronouns to refer to a non-binary person would 'promote' 'gender ideology.'"  In fact, when asked what would fall into the category of "promoting elective abortion" at the Preliminary Injunction hearing on September 4, 2025, even the Defendants could not answer.  Counsel for the Defendants could only muster, "I don't have a more detailed answer to give [], I'm sorry to say."  Mot. for Prelim. Inj. Hr'g Tr. 73:12-14 (Sept. 4, 2025).

Because the Challenged Conditions do not clearly identify and define the contours of what is prohibited and therefore provides the Defendants with unlimited discretion, the Court finds that they expose the Plaintiffs to potentially arbitrary discrimination and enforcement and in effect are unconstitutionally vague.  *See Kolender*, 461 U.S. at 357.

The Court now moves on to its evaluation of the next preliminary injunction factor, whether the Plaintiffs have shown irreparable harm.  ECF No. 30-1 at 50-51, 53.

### C.    Irreparable Harm

The Plaintiffs assert that without preliminary relief they will be forced to decide "whether to (a) accept unconstitutional and otherwise unlawful funding conditions that are inconsistent with congressional directives, will impede their

ability to provide core services, and are at odds with their fundamental missions; or (b) forgo federal funds that are essential to their ability to fulfill their missions, and that are necessary to save lives." ECF No. 30-1 at 58.

For example, several Plaintiffs have expressed concern that if they accept the Challenged Conditions, they may no longer be able to provide the same quality of services to eligible victims who identify as transgender. ECF No. 30-1 at 28, 34. They worry that they could lose their funding, or worse, face False Claims Act liability for engaging in practices that are crucial to their mission and values, such as providing trainings on addressing the needs of the vulnerable groups they serve. ECF No. 30-1 at 28, 50-51, 62. As a result, the Plaintiffs contend that those in need of services will "experience greater barriers to receiving vital services due to lack of trauma informed care training among service providers." ECF No. 30-1 at 65. The Plaintiffs fear that even addressing victims with their preferred pronouns could run afoul of the so-called "gender ideology" Executive Order and place them in a precarious position. ECF No. 30-1 at 53. On the other hand, the Plaintiffs do not see declining the Grants as a viable alternative because "losing out on these grants would decimate Plaintiffs' budgets and require them to lay off staff and cut services to members, individuals, and communities." ECF No. 30-1 at 60. The Plaintiffs grimly forecast that "without the statewide infrastructure that [the] Plaintiff Coalitions provide, systems will become more fragmented, and survivors [will be] left navigating unsafe and inequitable conditions," and provide over twenty declarations testifying as much. ECF No. 30-1 at 65. Notably, Defendants provide no declarations rebutting the harm

Plaintiffs have sworn to. Instead, the Defendants argue that "[b]ecause Plaintiffs ultimately seek an order from this Court to force Defendants to pay them money despite their lack of agreement to the agencies' terms, Plaintiff's claims are essentially for money damages" and therefore not entitled to equitable relief. ECF No. 43 at 52. In their view, "other than withholding future income streams, neither HUD, ACF, nor HRSA is taking any action that impedes Plaintiffs' ability to carry out their programming initiatives." ECF no. 43 at 52.

A party seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (emphasis omitted). "The plaintiff's showing must possess some substance" and "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor,* 836 F.2d 566, 575-76 (D.C. Cir. 1987)).

The gravity of the "Hobson's Choice" facing the Plaintiffs is not lost on this Court. ECF No. 30-1 at 58. Its piercing nature was eloquently articulated in *RICADV*:

> Accepting grant funds subject to the Challenged Conditions would unfairly require the Coalitions to guess at what a formerly objectionable activities are not proscribed by a given grant award. And that uncertainty, created by the [Defendants], comes with serious risks of enhanced and aggressive False Claims Act prosecutions. But declining

to apply for or accept grants, which they would otherwise be eligible to receive, would cause the Coalitions just as much harm.

2025 WL 2271867, at *10. The Plaintiffs stand between a rock and a hard place, and surely such a high stakes dilemma constitutes irreparable harm in the eyes of this Court.

Furthermore, because Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment Claim, the Court presumes that they face irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (noting that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F. 3d 1, 11 (1st Cir. 2012) (stating that irreparable harm is "presumed upon a determination that [Plaintiffs] are likely to prevail on their First Amendment claim.").

### D.    Balance of the Equities and the Public Interest

Next, the Court considers the final preliminary injunction factors together. "A plaintiff seeking a preliminary injunction must establish . . . that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Since the Government is the opposing party here, these factors merge. *Nken*, 556 U.S. at 435.

Without preliminary relief, the Plaintiffs will face irreparable harm that will disrupt vital services to victims of homelessness and domestic and sexual violence. ECF No. 30-1 at 28-29. On the contrary, if preliminary relief is granted, the

Defendants will merely need to revert back to considering grant applications and awarding funds as they normally would.

This Court is unmoved by the Defendants' claim and three accompanying declarations that they would shoulder all the risk "if grantees are given access [to the Grants] now and draw on funds throughout the litigation, [because] Defendants will be left with no meaningful course to recover the expended funds." ECF No. 43 at 55. This Court also notes a fundamental distinction between this case and the issue before the Supreme Court in *National Institutes of Health, et al. v. American Public Health Association, et al.*, 606 U.S. __, at *1 (2025). There, the Court recently found Plaintiffs' arguments that they would be unable to continue their research projects without federal funding unavailing because the Government too faced irreparable harm. The Court reasoned that "while the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'" *Id.* at 1. The Court explained "[t]hat [APA's] limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* at 1 (internal citations omitted). But here, the Plaintiffs are not requesting this Court to mandate a distribution of the funds, and instead are seeking to halt the implementation of the Challenged Conditions on the grants appropriated by Congress for which they seek to apply.

Furthermore, "the public has an interest in the Executive respecting the Legislature's spending decisions." *RICADV,* 2025 WL 2271867, at *10 (citing U.S. Const. art. I, § 8, cl. 1.). Accordingly, the balance of the equities and the public interest tip in favor of the Plaintiffs.

### E.    Scope of Remedy and Order

The Plaintiffs are asking this Court to enjoin the Defendants from enforcing the Challenged Conditions or substantially similar conditions on the Grants. ECF No. 30-1 at 70.

After careful consideration of the Plaintiffs' Motion for a Preliminary Injunction, and for the reasons discussed in this Memorandum, the Court hereby orders that:

1. The Plaintiffs' Motion for Preliminary Injunction, ECF No. 30-1, is GRANTED.

2. The Court preliminarily sets aside the following pursuant to 5 U.S.C. § 705:

    a. The Department of Housing and Urban Development (HUD)'s policy of imposing the following conditions on Continuum of Care grants:

        i. The requirement that the recipient not "use grant funds to promote 'gender ideology,' as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government";

ii.   The requirement that the recipient "agrees that its
compliance in all respects with all applicable Federal anti-
discrimination laws is material to the U.S. Government's
payment decisions for purposes of section 3729(b)(4) of title
31, United States Code";

iii.  The requirement that the recipient "not use any Grant
Funds to fund or promote elective abortions, as required by
E.O. 14182, Enforcing the Hyde Amendment"; and

iv.   The condition that "the recipient's use of funds provided
under this Agreement …, and the recipient's operation of
projects assisted with Grant Funds are governed by … [a]ll
current Executive Orders."

b.  HUD's policy of imposing the following conditions on grants
administered by the HUD Office of Community Planning and
Development:

i.   The requirement that the recipient not "use grant funds to
promote 'gender ideology,' as defined in E.O. 14169,
Defending Women from Gender Ideology Extremism and
Restoring Biological Truth to the Federal Government";

ii.  The requirement that the recipient "agrees that its
compliance in all respects with all applicable Federal anti-
discrimination laws is material to the U.S. Government's

31

payment decisions for purposes of section 3729(b)(4) of title 31, United States Code";

    iii.  The requirement in Form HUD-424-B that recipients certify that they "will not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities."

c.  The following policies of the United States Department of Health and Human Services (HHS) Administration for Children and Families (ACF):

    i.  The requirement in the ACF Standard Terms and Conditions that recipients must "certify" that "they do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology"; and

    ii.  The requirements in the ACF Standard Terms and Conditions relating to Title IX of the Education Amendments of 1972, including the requirement that a recipient "certify" that "it is compliant with Title IX" and "will remain compliant for the duration of the Agreement" and that these are "material terms of the Agreement."

d.  The following policy of the HHS Health Resources and Services Administration (HRSA):

      i.   The requirement in the HRSA General Terms and Conditions relating to Title IX of the Education Amendments of 1972, including the requirement that a recipient "certify" that it "is compliant with Title IX of the Education Amendments of 1972, as amended..., including the requirements set forth in [the "Gender Ideology" Order" and "will remain complaint for the duration of the Agreement" and that these are "material terms of the Agreement."

e.  Accordingly, pursuant to FRCP 65:

      i.   Defendant HUD, Defendant Scott Turner, and any person in active concert or participation with those parties, are enjoined from requiring any recipient or subrecipient to agree to, and from enforcing, the following requirements or any substantially similar requirement:

          1.   The requirement that the recipient not "use grant funds to promote 'gender ideology,' as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government";

          2.   The requirement that the recipient "agrees that its compliance in all respects with all applicable

Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code [and] … certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964";

3. The requirement that the recipient "not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment";

4. The condition that "the Recipient's use of funds provided under this Agreement …, and the Recipient's operation of projects assisted with Grant Funds are governed by … [a]ll current Executive Orders";

5. The requirement that recipients comply with applicable existing and future Executive Orders; and

6. The requirement in Form HUD-424-B that recipients certify that they "w]ill not use Federal

funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or."

ii.   Defendant Robert F. Kennedy, Jr., Defendant HHS, Defendant Andrew Gradison, Defendant ACF, Defendant Thomas J. Engels, Defendant Health Resources and Services Administration ("HRSA"), and any person in active concert or participation with those parties, are enjoined from requiring any recipient or subrecipient to agree to, and from enforcing, the following requirements or any substantially similar requirement:

1.   The requirement in the ACF Standard Terms and Conditions that recipients must "certify" that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology."

2.   The requirements in the ACF Standard Terms and Conditions relating to Title IX of the Education Amendments of 1972, including the requirement that a recipient "certify" that "it is compliant with Title IX" and "will remain compliant for the duration

of the Agreement" and that these are "material terms of the Agreement."

3. The requirement in the Family Violence Prevention Services Act State Domestic Violence Coalition Grant (FVPSA Coalition Grant) which instructs recipients to "certify[]" that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology."

iii.    Defendant Robert F. Kennedy, Jr., Defendant the United States Department of Health and Human Services, Defendant Thomas Engels, Defendant Health Resources and Services Administration, and any person in active concert or participation with those parties, are enjoined from requiring any recipient or subrecipient to agree to, and from enforcing, the following requirements or any substantially similar requirement:

1. The requirement in the HRSA General Terms and Conditions that any recipient "certify" that it "is compliant with Title IX of the Education Amendments of 1972, as amended, . . . ., including

the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" and "will remain compliant for the duration of the Agreement" and that these are "material terms of the Agreement."

3. Defendants shall immediately treat any actions taken to implement or enforce the conditions above, or any materially similar terms or conditions, as to the Continuums of Care grants or Community Development Block Grants, and the FVPSA Coalition grants, including any delays or withholding of funds based on such conditions, as null, void, and rescinded.

4. Defendants and their assignees shall immediately treat as null and void any such conditions included in any agreement pertaining to an ACF FVPSA Coalition Grant or HUD Continuum of Care Grant or HUD Community Development Block Grant executed by any applicant or grantee, while this Preliminary Injunction is in effect.

5. Defendants shall immediately take every step necessary to effectuate this order, including clearing any administrative, operational, or technical hurdles to implementation.

6. By the end of the second business day after issuance of this Order, HUD's counsel shall provide written notice of this Order to all of its employees.

7. By the end of the second business day after issuance of this Order, the Defendants HUD and Scott Turner shall file on the Court's electronic docket a Status Report documenting the actions that they have taken to comply with this Order, including a copy of the notice and an explanation as to whom the notice was sent.

## IV.    CONCLUSION

As stated, the Court determines that the Plaintiffs have met their burden as to the preliminary injunction factors and finds them entitled to relief.  Pursuant to Section 705 of the APA, the Court finds that it is necessary and appropriate to grant the Plaintiffs' request for a preliminary stay of the Challenged Conditions.  *See* 5 U.S.C.  § 705 (permitting a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings on such conditions as may be required and to the extent necessary to prevent irreparable injury").

IT IS SO ORDERED.

_____
Melissa R. DuBose
United States District Judge


October 10, 2025