**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-00342-MRD-PAS |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A. Congress tasked HUD and HHS with administering many different grant programs ...... 3

        1.    HUD programs ................................................................................................. 3

        2.    HHS programs ................................................................................................. 4

    B. The Administration leverages federal funding to advance the President's ideological vision and expose grantees to massive liability .................................................... 5

        1.    Diversity, equity, inclusion, and accessibility ................................................. 5

        2.    Gender identity ............................................................................................... 10

        3.    Abortion access .............................................................................................. 12

    C. Defendants impose unlawful new conditions on grants ................................................. 13

        1.    HUD's New Conditions .................................................................................. 13

        2.    HHS's New Conditions ................................................................................... 15

            a.    "Gender ideology"-related conditions ................................................. 15

            b.    DEI-related conditions ......................................................................... 16

            c.    Executive order condition .................................................................... 18

    D. The New Conditions harm Plaintiffs and their members ............................................... 18

        1.    HUD grants ..................................................................................................... 18

        2.    HHS grants ..................................................................................................... 23

LEGAL STANDARD .......................................................................................................... 27

ARGUMENT ...................................................................................................................... 27

I.    Plaintiffs Are Entitled to Summary Judgment ........................................................... 27

    A. The New Conditions violate the APA ........................................................................... 28

1.    The New Conditions exceed Defendants' statutory authority............................ 28

    a.   HUD Conditions.................................................................................. 29

    b.   HHS and HUD Discrimination and Title IX Certifications ........................ 30

2.    The New Conditions are arbitrary and capricious................................................ 33

3.    The New Conditions violate the Constitution ...................................................... 38

4.    Multiple "Gender Ideology"-Related Conditions are contrary to law ............... 38

5.    HUD adopted its New Conditions without required procedures......................... 39

B. The New Conditions violate the Spending Clause and other constitutional provisions safeguarding the separation of powers ............................................................ 40

C. The "Gender Ideology"-Related Conditions and DEI-Related Conditions violate the First Amendment ...................................................................................... 43

    1.    The "Gender Ideology"-Related Conditions violate the First Amendment ........ 43

    2.    The DEI-Related Conditions violate the First Amendment ............................... 45

D. The New Conditions are unconstitutionally vague ......................................................... 49

E. The New Conditions are ultra vires................................................................................ 53

II.  The Court Should Vacate the New Conditions and Permanently Enjoin Defendants from Re-Imposing or Otherwise Implementing Them......................................................... 54

A. The Court should set aside the New Conditions under the APA ..................................... 54

B. The Court should enjoin Defendants from enforcing the New Conditions or imposing the same or substantially similar New Conditions in the future...................... 55

CONCLUSION........................................................................................................................... 58

APPENDIX: NEW CONDITIONS .................................................................................. Appx-1

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) .......................... 31

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ................. 43, 44, 46

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42 (1st Cir. 2016) ............................... 27

*California v. Trump*, No. 25-CV-10810-DJC, 2025 WL 2663106
    (D. Mass. Sept. 17, 2025) ........................................................................................... 53

*Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election
    Pracs.*, 144 F.4th 9 (1st Cir. 2025) ............................................................................ 49

*Chamber of Com. of U.S. v. CFPB*,  691 F. Supp. 3d 730 (E.D. Tex. 2023) .............................. 55

*Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025) .............. 32, 46, 47, 48, 50

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) .................................. 40, 41, 42, 43

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ...................................................................... 28

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) ........................................................... 40, 42

*City of Fresno v. Turner*,  No. 25-cv-07070-RS, 2025 WL 2721390
    (N.D. Cal. Sept. 23, 2025) ...................................................................................... 29, 32

*City of Los Angeles v. Sessions*, No. 18-cv-7347, 2019 WL 1957966
    (C.D. Cal. Feb. 15, 2019) ......................................................................................... 57

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) ......................................................... 28

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998) .......................................................................... 42

*Colorado v. U.S. Dep't of Health & Human Servs.*, 783 F. Supp. 3d 641 (D.R.I. 2025) ............. 38

*Colorado v. U.S. Dep't of Health & Human Servs.*, 788 F. Supp. 3d 277 (D.R.I. 2025) ............. 41

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) .......................... 54

*Counterman v. Colorado*, 600 U.S. 66 (2023) ........................................................................ 49

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ........................................................... 37

iii

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)................................................ 33, 37

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)............................................... 49

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)................................................. 33

*Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022) ............................................................. 49

*Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158 (D.C. Cir. 2021) ......................... 53

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .......................................... 49, 51, 53

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)................................. 31

*Hall v. Evans*, 165 F. Supp. 2d 114 (D.R.I. 2001)......................................................... 34

*Illinois v. FEMA*, 801 F. Supp. 3d 75 (D.R.I. 2025)..................................................... 54

*Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2908807 (D.R.I. Oct. 14, 2025)......................... 56

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)................................................... 28

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (E.D. La. 2022)............................................. 35

*Manguriu v. Lynch*, 794 F.3d 119 (1st Cir. 2015) ....................................................... 38

*Martin Luther King, Jr. Cnty. v. Turner,* 785 F. Supp. 3d 863
    (W.D. Wash. 2025) ...................................................................... 29, 30, 35, 40, 58

*Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-814, 2025 WL 1331488
    (W.D. Wash. May 7, 2025)........................................................................... 47

*Massachusetts v. NIH,* 770 F. Supp. 3d 277 (D. Mass. 2025) ....................................... 57

*Michigan v. EPA*, 576 U.S. 743 (2015) ................................................................... 34

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)........................................ 55

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................ 33, 36

*N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018)................................................ 40

*Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36 (D.D.C. 2025) ............................ 35

*NEA v. Finley*, 524 U.S. 569 (1998) .................................................................... 43, 45

*New York v. Kennedy*, 789 F. Supp. 3d 174 (D. R.I. 2025) .......................................... 34

*O'Connell v. Shalala*, 79 F.3d 170 (1st Cir. 1996) ...................................................... 41

*Ohio v. EPA*, 603 U.S. 279 (2024) ............................................................................... 33

*Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28
(1st Cir. 2013) .............................................................................................................. 56

*Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) ......................................... 31

*PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405 (D. Md. 2025) ................................. 40, 42

*R.I. Coalition Against Domestic Violence v. Kennedy*, No. 25-cv-342,
2025 WL 2988705 (D.R.I. Oct 23, 2025) ...................................... 28, 34, 44, 50, 52, 56, 57

*R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 2d 58 (D.R.I. 2025) ..................... 35

*R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31 (1st Cir. 2002) ...................... 53

*R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351 (D.R.I. 2025)............. 35

*R.I. Latino Arts v. NEA*, 777 F. Supp. 3d 87, 109–10 (D.R.I.) ...................................... 44

*Reno v. ACLU*, 521 U.S. 844 (1997) ........................................................................... 49

*Rust v. Sullivan*, 500 U.S. 173 (1991) ................................................................... 43, 44

*S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) ................... 43, 44, 45

*Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69 (1st Cir. 2020) ...................... 27

*South Dakota v. Dole*, 483 U.S. 203 (1987) ................................................................ 41

*Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013) ......................... 57

*Texas v. Cardona*, 743 F. Supp. 3d 824 (N.D. Tex. 2024) ........................................... 55

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ................................................................. 57

*United States v. Facteau*, 89 F.4th 1 (1st Cir. 2023) ................................................... 49

*United States v. Williams*, 553 U.S. 285 (2008) ......................................................... 49

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016)............. 7, 33

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,* 455 U.S. 489 (1982) .............................. 49

*Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78 (1st Cir. 2022) .................................................. 27

*Washington v. Trump*, 768 F. Supp. 3d 1239 (W.D. Wash. 2025) ................................. 40

*Woonasquatucket River Watershed Council v. USDA,* 778 F. Supp. 3d 440, 471 (D.R.I. 2025) .................................................................................................. 35

## US CONSTITUTIONAL PROVISIONS

U.S. Const. art. I § 1 ........................................................................................................ 41

U.S. Const. art. I § 7 ........................................................................................................ 41

U.S. Const. art. I § 8 ........................................................................................................ 41

U.S. Const. art. I § 9 ........................................................................................................ 41

U.S. Const. art. II § 3 ....................................................................................................... 42

U.S. Const. amend. I ........................................................................................................ 43

## FEDERAL STATUTES

5 U.S.C. § 553 ................................................................................................................. 39

5 U.S.C. § 706 .................................................................................................... 38, 39, 54

10 U.S.C. § 1093 ............................................................................................................. 12

18 U.S.C. § 287 ........................................................................................................... 7, 16

18 U.S.C. § 1001 ............................................................................................................... 7

31 U.S.C. § 3729 ..................................................................................................... 6, 7, 16

31 U.S.C. § 3730 ............................................................................................................... 7

34 U.S.C. § 12291 ................................................................................................. 5, 36, 51

34 U.S.C. § 12491 ............................................................................................................. 3

42 U.S.C. § 280b-1b ......................................................................................... 4, 5, 36, 51

42 U.S.C. § 705 ................................................................................................................. 4

42 U.S.C. § 5301 ............................................................................................................... 3

42 U.S.C. § 1406 ................................................................................................... 50

42 U.S.C. § 5307 .............................................................................................. 3, 36

42 U.S.C. § 10410 .................................................................................................. 4

42 U.S.C. § 10411 ....................................................................................... 5, 36, 51

42 U.S.C. § 10414 ....................................................................................... 4, 36, 51

42 U.S.C. § 11373 .................................................................................................. 3

42 U.S.C. § 11374 .................................................................................................. 3

42 U.S.C. § 11381–11389 ..................................................................................... 3

42 U.S.C. § 11386 ..................................................................................... 28, 29, 30

Consolidated Appropriations Act 2022, Pub. L. No. 117-103, 136 Stat. 49 (2022)...................... 5

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460
    (Mar. 23, 2024) ............................................................................................. 12

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25
    (Mar. 9, 2024) ............................................................................................... 12

## FEDERAL REGULATIONS

24 C.F.R. § 5.106 ............................................................ 4, 20, 21, 38, 39, 51, 52

24 C.F.R. § 10.1 ........................................................................................... 39, 40

28 C.F.R. § 85.5 ..................................................................................................... 7

45 C.F.R. § 1370.5 .................................................................................... 39, 52, 53

## EXECUTIVE ORDERS

Defending Women from Gender Ideology Extremism and Restoring Biological Truth
    to the Federal Government, Exec. Order No. 14168 of January 20, 2025, 90 Fed.
    Reg. 8615 (Jan. 30, 2025) .......................................................................... 11

Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order
    No. 14173 of January 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025) ........................... 6, 34, 35

Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec.
    Order No. 14151 of January 21, 2025, 90 Fed. Reg. 8339 (Jan. 29, 2025) ...................... 5, 6

Enforcing the Hyde Amendment, Exec. Order No. 14182 of January 24, 2025, 90 Fed. Reg. 8751 (Jan. 31, 2025) ............................................................................. 12

Ending Radical Indoctrination in K-12 Schooling, Exec. Order No. 14190 of January 29, 2025, 90 Fed. Reg. 8853 (Feb. 3, 2025) ........................................................... 17

**OTHER AUTHORITIES**

Assistant Secretary for Public Affairs (ASPA), *HHS Priorities - End illegal race discrimination*, HHS (Sept 30, 2025), https://perma.cc/7V5P-J9SH ...................................... 9

HHS, *HHS Grants*, HHS (March 2, 2023), https://perma.cc/BZ2Q-LRCX .................................. 4

*HUD Funding Opportunities*, HUD (Jan. 8, 2026), https://perma.cc/6U8H-H32N ................... 14

HUD News, *ICYMI | Secretary Scott Turner on Fox & Friends - "DEI is dead at HUD,"* HUD (2025), https://perma.cc/G6HD-8S34 ................................................................. 9

HUD News, *Secretary Turner Denounces DEI Criteria in Asheville's Draft Disaster Plan*, HUD, https://perma.cc/LRG7-P3AC ................................................................. 9

HUD News, HUD Cancels $4 Million in DEI Contracts, HUD, https://perma.cc/LKZ8-SETD (last visited Jan. 13, 2026) ...................................... 9

HUD Partners, *HUD Community Planning and Development CPD Programs*, HUD (2026), https://perma.cc/WWZ4-JDKH ........................................................ 3, 4, 14

Jennifer Hansler *et al.*, *US government agencies order employees to remove gender pronouns from email signatures,* CNN Politics (Jan. 31, 2025), https://perma.cc/NG4W-7SJY ...................................................................... 11, 12

Mem. from Acting Dir. of OMB Matthew J. Vaeth to Heads of Exec. Dep'ts and Agencies (Jan. 24, 2025), https://perma.cc/5JZR-8V9X ...................................... 12

Mem. from Att'y Gen. Pam Bondi, Ending Illegal DEI and DEIA Discrimination and Preferences, OAG (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ ............................. 9

Mem. from Att'y Gen. Pam Bondi, *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025), https://perma.cc/T4B4-QTYH ................................................................................................... 9, 10

Off. of Assistant Attorney Gen. Brett A. Shumate for the Civil Div., to Civil Div. Employees, *Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/SV3A-NE9F ................................................................................ 8

Off. of the Atty. Gen., Memorandum for All Department of Justice Employees:
  *Eliminating Internal Discriminatory Practices*, OAG (Feb. 5, 2025),
  https://perma.cc/24KA-GFJ6 ................................................... 9

Office of Public Affairs, *Justice Department Establishes Civil Rights Fraud Initiative,*
  *U.S. DOJ* (May 19, 2025), https://perma.cc/ZS6R-B8E9 ....................... 8

Press Release, Office of Communications and Outreach (OCO), *U.S. Department of*
  *Education and U.S. Department of Justice Announce Title IX Special*
  *Investigations Team,* U.S. Dept. of Education (Apr. 4, 2025),
  https://perma.cc/BXN6-499W ................................................. 11

The White House, *Fact Sheet: President Donald J. Trump Protects Civil Rights and*
  *Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025),
  https://perma.cc/G8JU-QQ44 ................................................. 47

## INTRODUCTION

This case concerns the Administration's sweeping and unprecedented effort to use federal grant funding as a blunt instrument to coerce grantees into carrying out its ideological agenda. Through a series of executive orders, the President has directed agencies to use grant funding to curtail diversity, equity, inclusion, and accessibility activities; deny the rights and existence of transgender people; and restrict access to abortion care. To enforce this agenda, the Administration has announced it will weaponize the False Claims Act (FCA), exposing grant recipients to risk of severe civil and criminal liability if they fail to comply with novel and ill-defined grant conditions that Congress did not authorize.

This case concerns the implementation of this campaign by the Departments of Housing and Urban Development (HUD) and Health and Human Services (HHS) on programs that Congress enacted to support victims of domestic violence and sexual assault and people experiencing homelessness. Plaintiffs are nonprofit organizations and statewide coalitions that rely on these grants to provide emergency shelter, housing assistance, crisis intervention, and prevention services. The new grant conditions Defendants have imposed bear no relationship to the statutory purposes of these programs, do not further Congress's objectives, and will only undermine essential services and harm those Congress sought to protect. The Administrative Procedure Act (APA) and the Constitution do not permit this result.

There is no genuine dispute of material fact and Plaintiffs are entitled to judgment as a matter of law on each of their claims. Defendants' adoption and implementation of the conditions violate well-established APA requirements. No statute authorizes Defendants to adopt the conditions. Defendants also offered no explanation for their actions, much less a reasoned one, and failed to consider the substantial reliance interests affected by the new conditions.

Several conditions outright conflict with binding agency regulations. And Defendant HUD failed to follow required procedures in adopting the new conditions. Defendants' actions also contravene fundamental separation-of-powers principles, because the Constitution's Spending Clause vests Congress alone with authority to impose conditions on federal funding, and Congress neither prescribed nor authorized these conditions. Multiple conditions violate the First Amendment by chilling and discriminating against protected speech, and all of the conditions are unconstitutionally vague in violation of Fifth Amendment due process guarantees.

The Court should grant summary judgment and vacate the challenged conditions under the APA. To protect Plaintiffs from irreparable harm, the Court should also permanently enjoin Defendants from enforcing conditions already agreed to or reimposing the conditions via a new agency action. The new conditions have left Plaintiffs and their members with an impossible choice. If they accept the conditions, they will have to fundamentally change their programming, abandon outreach and practices designed to best serve their communities, and risk exposing themselves to criminal penalties or ruinous civil liability. If Plaintiffs decline the funding, they will be left with budgetary shortfalls that will result in displacing domestic violence and sexual assault survivors from safe housing, putting previously homeless families and youth back on the streets, and ending programs designed to reduce and prevent domestic violence, sexual assault, and homelessness. This Court should enjoin Defendants from further imposing the conditions and allow Plaintiffs and their members to continue their critical work in accordance with Congress's directives.

# BACKGROUND

## A. Congress tasked HUD and HHS with administering many different grant programs

### 1. HUD programs

The Department of Housing and Urban Development administers a host of grant programs, including through its Office of Community Planning and Development (CPD). CPD programs include the Continuum of Care (CoC) program, which Congress created as the federal government's primary response to homelessness. The CoC program provides housing to individuals and families experiencing homelessness as well as services to help them remain in housing long term. 42 U.S.C. §§ 11381–11389. The program also funds projects that help ensure that tenants in public and subsidized housing can move to a different, safe unit when they suffer domestic violence or sexual assault at home. *Id.* § 11383(a)(13); 34 U.S.C. § 12491(e). Another CPD program is the Emergency Solutions Grants (ESG), formula grants to states and urban areas that pass funds on to subrecipients providing emergency shelter and supportive services to address the most pressing needs of those experiencing, or at risk of, homelessness. 42 U.S.C. §§ 11373(c), 11374(a).

CPD also administers Community Development Block Grants (CDBG), formula grants to states and local governments to support community development. The statute creating the CDBG program directs HUD to use the program to benefit historically disadvantaged groups in multiple ways, including by making grants to assist certain "economically disadvantaged and minority students" doing community development work study and to support "historically Black colleges." 42 U.S.C. § 5307(b)(2), (c).

Among other programs, CPD also administers the HOME Investment Partnerships, Housing Opportunities for Persons with AIDS, and HOME American Rescue Plan programs, which provide funding to reduce homelessness and increase housing stability. HUD Partners,

*HUD Community Planning and Development CPD Programs*, HUD (2026),

https://perma.cc/WWZ4-JDKH.

Binding HUD regulations require the recipient of any CPD-administered grant to provide

"[e]qual access in accordance with gender identity." 24 C.F.R. § 5.106(a)–(b). That includes

providing accommodations and services to individuals "in accordance with the individual's

gender identity." *Id*. § 5.106(b).

### 2. *HHS programs*

HHS is the largest grant-making agency in the United States, and its operating divisions

administer a wide variety of grant programs. *HHS Grants*, HHS (March 2, 2023),

https://perma.cc/BZ2Q-LRCX . Those grant programs include programs to prevent and respond

to sexual assault and domestic violence and other health needs. For example, the Family

Violence Prevention and Services Act funds a range of grants, including to fund state domestic

violence coalitions in working with service providers and law enforcement to encourage

appropriate responses to domestic violence and to conduct public education campaigns. 42

U.S.C. § 10410. As another example, Rape Prevention and Education (RPE) grants support state

sexual assault coalitions in coordinating and providing assistance on rape prevention activities.

42 U.S.C. § 280b-1b. The Domestic Violence Prevention Enhancement and Leadership Through

Alliances (DELTA) program funds "local community projects to prevent family violence,

domestic violence, and dating violence." 42 U.S.C. § 10414(a).  And the Maternal and Child

Health (MCH) Services Block Grant program provides funding for supplemental food programs

for mothers, infants, and children, related health and education programs, and more. 42 U.S.C.

§ 705.

Congress enacted various statutory provisions governing HHS grant programs that reflect

a commitment to diversity, equity, and inclusion. For instance, Congress directed HHS, when

awarding RPE grants, to "ensure meaningful involvement" of "culturally specific organizations[] and representatives from underserved communities" in the application for and implementation of funding. 42 U.S.C. § 280b-1b(c). Under the relevant statutes, "culturally specific" means "primarily directed toward racial and ethnic minority groups," while "underserved populations" include those "underserved because of" any one of a host of factors, including "gender identity," "racial [or] ethnic" identity, "religion," and "disabilities." 34 U.S.C. § 12291(a)(8), (46); *see also* Consolidated Appropriations Act 2022, Pub. L. No. 117-103, div. W, § 2(b), 136 Stat. 49, 846 (2022). Likewise, the relevant statute specifically requires state domestic violence coalitions to address the needs of "racial and ethnic minority populations and underserved populations" and to provide violence-prevention information "targeted to underserved populations" when carrying out FVPSA State Coalitions grants. 42 U.S.C. § 10411(d)(3), (7).

**B. The Administration leverages federal funding to advance the President's ideological vision and expose grantees to massive liability**

The Administration has launched a far-reaching campaign to leverage federal grant funding to advance ideological goals wholly unrelated to the purposes of the grant programs Congress created. Relevant here, President Trump has issued a series of executive orders targeting diversity, equity, and inclusion; so-called "gender ideology"; and abortion. The Administration, moreover, has weaponized the False Claims Act (FCA) to scare grantees into ceasing lawful activities that the Administration disfavors.

*1. Diversity, equity, inclusion, and accessibility*

In his first days in office, President Trump issued multiple executive orders that broadly seek to eradicate "diversity, equity, and inclusion" (DEI) and "diversity, equity, inclusion, and accessibility" (DEIA) values and initiatives. One order directed agencies to terminate all DEI and DEIA offices, all "equity" programs, and all "equity-related" grants or contracts. *Ending Radical*

*and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151 of January 20, 2025, § 2(b), 90 Fed. Reg. 8339 (Jan. 29, 2025). Another order aims to end purportedly "illegal" DEI and DEIA in the federal government and the private sector. *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14173 of January 21, 2025, §§ 3–4, 90 Fed. Reg. 8633 (Jan. 31, 2025) (Anti-DEI Order).

Without defining "DEI" or "DEIA," or explaining what might make such programs "illegal," the Anti-DEI Order makes clear that the Administration has a novel and extreme view that diversity, equity, and inclusion is often illegal. Among other things, the Order laments that "dangerous, demeaning, and immoral" DEIA or DEIA programs are widespread across the public and private sectors and revokes multiple diversity-related executive actions issued over the last half century. *Id.* at § 3.

Among other ways of advancing its goal, the Anti-DEI Order initiates a scheme to use the False Claims Act as a weapon to stop federal funding recipients from engaging in diversity, equity, and inclusion activities. The Order requires agency heads to "include in every contract or grant award" a term requiring the funding recipient (1) to "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and (2) "to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code [the False Claims Act]." *Id.* § 3(iv)(B).

This certification would threaten federal funding recipients with considerable risk of burdensome, and potentially ruinous, FCA litigation and liability if they engage in diversity, equity, and inclusion activities that the Administration disfavors. The FCA makes it unlawful for anyone to "knowingly present[], or cause[] to be presented," to the government "a false or

fraudulent claim for payment." 31 U.S.C. § 3729(a)(1)(A). For a misrepresentation to be actionable under the FCA, the plaintiff must show that it was "material to the Government's payment decision"—a requirement the Supreme Court has emphasized is "rigorous" and "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181, 192, 194 (2016). Thus, the Anti-DEI Order seeks to make it easier to establish FCA liability by requiring grantees to concede upfront an essential, and otherwise demanding, element of an FCA claim. The Anti-DEI Order's certification, moreover, sweeps beyond what grantees do with their federal grant funding: Grantees must certify that they do not operate "*any* programs promoting DEI," no matter the source of funds. Anti-DEI Order § 3(iv)(B) (emphasis added).

If they are deemed not to comply with their certification, grantees face potentially massive liability, both civil and criminal. Civil liability under the FCA is so significant that the Supreme Court has described it as "essentially punitive in nature"—potential treble damages (meaning three times the amount of federal funds that the recipient received from the government in connection with the certifications) plus civil penalties of up to approximately $28,600 per false claim. *See Universal Health Servs.*, 579 U.S. at 182 (cleaned up); *see also* 28 C.F.R. § 85.5. Compounding the risks, in addition to authorizing DOJ to enforce the Act, the FCA also authorizes private citizens to enforce it and then receive a share of any resulting judgment or settlement. 31 U.S.C. § 3730. Liability can be criminal, too: The government can seek up to five years imprisonment for those who knowingly make a "false, fictitious, or fraudulent" claim to any agency in seeking funds. 18 U.S.C. § 287; *see also id.* § 1001(a).

Following the Anti-DEI Order, DOJ has tripled down on leveraging the FCA to combat diversity, equity, and inclusion. On May 19, 2025, Deputy Attorney General Todd Blanche announced the formation of a new task force, called the "Civil Rights Fraud Initiative," which

will use the False Claims Act as a "weapon" against federal funding recipients. HUD

Administrative Record (HUD-AR) 5–6 (Dkt. No. 94-3) (Blanche Memo). The Blanche Memo

specifically focuses on funding recipients that engage in DEI activities as targets for potential

investigation and enforcement actions. HUD-AR 5–6. The memo also "strongly encourages"

private parties to file suits under the FCA's *qui tam* provision, and encourages the public to

report information about "discrimination by federal-funding recipients" to DOJ. HUD-AR 6.

And it states that the new initiative will engage the DOJ's Criminal Division. HUD-AR 6. The

Blanche Memo does not explain when DEI would be considered "illegal," but a press release

announcing the Initiative broadly warns institutions not to "promote divisive DEI policies."

Office of Public Affairs, *Justice Department Establishes Civil Rights Fraud Initiative*, U.S. DOJ

(May 19, 2025), https://perma.cc/ZS6R-B8E9.

Further confirming the Administration's plans to aggressively use the FCA, a June 11

memo announcing the DOJ Civil Division's enforcement priorities lists using the FCA to combat

"illegal private-sector DEI" as the very first priority. Mem. From Ass't Att'y Gen., Brett A.

Shumate, to Civil Division Employees, *Civil Division Enforcement Priorities* (June 11, 2025),

https://perma.cc/SV3A-NE9F.

At the same time, the Administration has denounced "DEI" generally, while doing more

to confuse than to clarify when it will consider "DEI" to be unlawful—making it risky for

grantees to do *anything* reflecting diversity, equity, and inclusion values. The Anti-DEI Order

itself gives cause to fear that the Administration will deem illegal anything involving diversity,

equity, or inclusion. In the name of eradicating purportedly "illegal" DEI, it directs agencies to

stop "[p]romoting 'diversity,'" to "[e]xcise references to DEI and DEI principles," and to

"terminate all 'diversity,' 'equity,'" and similar activities. Anti-DEI Order §§ 3(b)(ii)(A),

8

3(c)(ii), 3(c)(iii). A February 5, 2025, letter from Attorney General Bondi to all DOJ employees similarly announced that DOJ intends to aggressively "investigate, eliminate, and penalize" "illegal DEI and DEIA," but without defining "DEI" or "DEIA" or explaining what makes a DEI or DEIA program illegal. Mem. from Att'y Gen. Pam Bondi, *Ending Illegal DEI and DEIA Discrimination and Preferences*, OAG (Feb. 5, 2025), https://perma.cc/KH9Y-A2VQ. The Attorney General has suggested that even talking about DEI or DEIA can be unlawful in DOJ's view. To eliminate illegal DEI and DEIA activities, the Attorney General instructed staff to "pay particular attention to ending references to DEI or DEIA" in programs, including "references to 'unconscious bias,' 'cultural sensitivity,' [and] 'inclusive leadership.'" Off. of the Atty. Gen., Memorandum for All Department of Justice Employees: *Eliminating Internal Discriminatory Practices*, OAG (Feb. 5, 2025), https://perma.cc/24KA-GFJ6.

HUD and HHS have similarly taken steps to eradicate DEI broadly, not just activities that violate antidiscrimination laws. HUD Secretary Turner has repeatedly announced that "DEI is dead at HUD." HUD News, *HUD Cancels $4 Million in DEI Contracts*, HUD, https://perma.cc/LKZ8-SETD (last visited Jan. 13, 2026) ("DEI is dead at HUD."); *see also* HUD News, *Secretary Turner Denounces DEI Criteria in Asheville's Draft Disaster Plan*, HUD https://perma.cc/LRG7-P3AC (last visited Feb. 9, 2026); HUD News, *ICYMI | Secretary Scott Turner on Fox & Friends - "DEI is dead at HUD,"* HUD (2025), https://perma.cc/G6HD-8S34. And HHS has denounced "diversity, equity, and inclusion" as "fundamentally anti-American." Assistant Secretary for Public Affairs (ASPA), *HHS Priorities - End illegal race discrimination*, HHS (Sept 30, 2025), https://perma.cc/7V5P-J9SH.

In July, the Attorney General issued a memo purporting to provide "guidance for recipients of federal funding regarding unlawful discrimination," but it provides little clarity.

Mem. from Att'y Gen. Pam Bondi, *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025), https://perma.cc/T4B4-QTYH (Bondi Discrimination Memo). The memo lists DEI activities and other practices that DOJ cautions would "risk" violating antidiscrimination laws and "recommend[s]" that funding recipients avoid. *Id.* at 1–2, 4–8. But the memo notes that its list is "non-exhaustive," *id.* at 4, and in any event the listed examples provide no guidance for most of the activities that Plaintiffs and their members must undertake (or avoid) in carrying out their grants. And even for the examples provided, the memo confirms that the Administration has a new, expansive, and unsupported view of when "DEI" is (or might be) illegal—warning against conduct like talking about "toxic masculinity," considering "cultural competence," and creating (non-exclusive) "safe spaces" for people of certain demographics. *See id.* at 5, 6, 8.

### 2. Gender identity

The Administration has also launched a broadside attack on the rights and dignity of transgender and nonbinary individuals. Shortly after taking office, the President issued an executive order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." ("Gender Ideology" Order). Exec. Order No. 14168 of January 20, 2025, 90 Fed. Reg. 8615 (Jan. 30, 2025). That Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. To advance this policy, it promises to exclude transgender people from single-sex spaces and activities that align with their gender identity. *Id.* §§ 1, 4. It also decries "the erasure of sex" in both "policy" and "language," and it commits to using what the Administration considers "accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.* § 1. The Order discredits so-called "gender ideology," which the Order defines as a "false" view

that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity." *Id.* § 2(f).

As part of its campaign to deny the very existence of transgender people, the Order, among other things, requires each agency to "ensure grant funds do not promote gender ideology." *Id.* § 3(g). The Order also pronounces that Title IX of the Educational Amendments Act does not require "gender identity-based access to single-sex spaces" and expresses a view that such access "has harmed women." *Id.* § 3(f). Going further, the Order announces a "right to single-sex spaces"—meaning, spaces that exclude transgender people from joining based on their gender identity—and directs DOJ and other enforcement agencies to "prioritize" enforcement of that purported right. *Id.* § 5. Following these directives, the Administration has since launched a "Title IX Special Investigations Team" to use Title IX to penalize education programs that allow transgender individuals to participate in single-sex programs that match their gender identity. Press Release, Office of Communications and Outreach (OCO), *U.S. Department of Education and U.S. Department of Justice Announce Title IX Special Investigations Team,* U.S. Dept. of Education (Apr. 4, 2025), https://perma.cc/BXN6-499W.

The Administration has also since made clear that, in its view, even so much as acknowledging a person's gender identity "promotes gender ideology" and must be stopped. In a memo instructing federal agencies on how to implement the "Gender Ideology" Order, the Office of Personnel Management (OPM) identified various activities that the Administration deems to "promote or reflect gender ideology" and that agencies accordingly should "take prompt actions to end." HUD-AR 72–73. Those actions include turning off email features "that prompt users for their pronouns"; ensuring that forms that require entry of an individual's sex "list male or female only, and not gender identity"; and ensuring that all documents "use the term 'sex' and not

11

'gender.'" HUD-AR 72–73. HHS has also reportedly terminated contracts for including the terms "he/she/they/them" or variations of "nonbinary." Jennifer Hansler *et al.*, *US government agencies order employees to remove gender pronouns from email signatures,* CNN Politics (Jan. 31, 2025), https://perma.cc/NG4W-7SJY.

### 3.  *Abortion access*

In another executive order, purportedly on "Enforcing the Hyde Amendment," President Trump declared a policy of ending "use of Federal taxpayer dollars to fund or promote elective abortion." Exec. Order No. 14182 of January 24, 2025, 90 Fed. Reg. 8751, 8751 (Jan. 31, 2025) (Abortion Order). The Order invokes the Hyde Amendment, an appropriations rider that limits HHS from using appropriated funds for abortions. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, §§ 506, 507, 138 Stat. 460, 703 (Mar. 23, 2024). In subsequent guidance, the Office of Management and Budget (OMB) stated that taxpayer funds would not be used to "fund, facilitate, or promote" abortion, "consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion." Mem. from Acting Dir. of OMB Matthew J. Vaeth to Heads of Exec. Dep'ts and Agencies at 1 (Jan. 24, 2025), https://perma.cc/5JZR-8V9X (OMB Memo).

There is no Hyde Amendment or similar statutory restriction that applies to HUD, however. The Hyde Amendment itself applies only to HHS funding. Pub. L. No. 118-47, div. D, §§ 506, 507, 138 Stat. 460, 703 (Mar. 23, 2024). Other statutes impose similar (but not identical) restrictions and exceptions on other appropriations for certain other agencies. *See, e.g.*, Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, §§ 202, 203, 138 Stat. 25, 153 (Mar. 9, 2024) (DOJ); 10 U.S.C. § 1093 (Department of Defense). Congress, however, has imposed no such restriction on HUD's funding.

**C. Defendants impose unlawful new conditions on grants**

Following the President's instructions, HUD and HHS have imposed new funding

conditions on grants (collectively, New Conditions).[1]

### 1. *HUD's New Conditions*

HUD modified its grant agreement templates to impose new conditions for one stated

reason—to "align with the Administration's executive orders and requirements." HUD-AR 110;

*see also, e.g.*, HUD-AR 36, 119, 131. HUD first announced these new conditions for the

Continuum of Care (CoC) Program, the primary federal program addressing homelessness. On

March 13, 2025, HUD Secretary Turner announced in a post on X that CoC funds would "not

promote DEI, enforce 'gender ideology,' [or] support abortion." HUD-AR 291. The post

announced a policy of including new conditions in CoC grant agreements, including conditions

providing that:

- The recipient "shall not use grant funds to promote 'gender ideology,' as defined in [the "Gender Ideology" Order]" (HUD "Gender Ideology" Condition);

- The recipient "certifies that it does not operate any programs promoting diversity, equity, and inclusion that violate any applicable Federal anti-discrimination laws" and "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the False Claims Act]" (HUD Discrimination Certification);

- The recipient "shall not use any Grant Funds to fund or promote elective abortions, as required by [the Abortion Order]" (HUD Abortion Condition); and

- The recipient's "use" of grant funds and "operation of projects assisted with Grant Funds are governed by … all current Executive Orders" (HUD CPD E.O. Condition).

---

[1] An appendix listing all New Conditions is included at the end of this brief.

Case 1:25-cv-00342-MRD-PAS    Document 96-1    Filed 02/11/26    Page 24 of 74 PageID
#: 3937

HUD-AR 292–93. At some point, HUD changed the template language for the HUD

Discrimination Certification to remove any explicit mention of "diversity, equity, and inclusion,"

such that recipients now must "certif[y]" that they do "not operate any programs that violate any

applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964."

HUD did not publicly announce that revision or suggest that it was meant to reflect a substantive

change. And it did not change the accompanying requirement that recipients agree that violations

are material for FCA purposes.

HUD's Office of Community Planning and Development CPD—the office that

administers the CoC Program as well as several other grant programs[2]—later adopted the same

conditions for all CPD-administered programs, again to "[a]lign … with Executive Orders."

HUD-AR 119.

HUD also adopted new agency-wide policies to implement the executive orders. First, it

adopted a policy of requiring grantees to comply with all Executive Orders (General HUD E.O.

Condition). In particular, in April 2025, HUD added to its General Administrative, National, and

Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs a

requirement that "[r]ecipients of Federal Awards must comply with applicable existing and

future Executive Orders, as advised by the Department," including but not limited to several

specifically enumerated ones including the Anti-DEI Order, the "Gender Ideology" Order, and

the Abortion Order, as well as five others. HUD-AR 43, 51–52. HUD has included the General

HUD E.O. Condition in every NOFO since these were added to the general requirements and

---

[2] In addition to the CoC Program, CPD administers the Community Development Block Grant (CDBG), Emergency Solutions Grants (ESG), HOME Investment Partnerships, and Housing Opportunities for Persons with AIDS programs, among others. HUD, HUD Community Planning and Development, *CPD Programs*, https://perma.cc/WWZ4-JDKH.

terms, reflecting HUD's policy of including that requirement in every grant. *See HUD Funding Opportunities*, HUD (Jan. 8, 2026), https://perma.cc/6U8H-H32N.

Second, HUD updated the standard Applicant and Recipient Assurances and Certifications on Form HUD-424-B "to align to EOs." HUD-AR 3; *see also* HUD-AR 2, 7–8. Applicants must include this form with any application for HUD funding or post-award submission. *See* HUD-AR 302. The revised form now requires applicants and grantees to certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws" (General HUD Anti-DEI Certification). HUD-AR 302.

### 2. *HHS's New Conditions*

HHS has also imposed new conditions, apparently to conform to executive orders.

#### a. *"Gender ideology"-related conditions*

First, HHS has imposed a new condition to implement the Administration's "gender ideology" agenda. On March 28, 2025, HHS's Office of Grants issued a directive to ensure grantees "are compliant with" Title IX and the "Gender Ideology" Executive Order. HHS Administrative Record (HHS-AR) 2–3 (Dkt. No. 93-3). In particular, the directive requires HHS agencies to include in all new awards "that implicate Title IX" a new term (HHS Title IX Certification) requiring grantees to certify that they are "compliant with Title IX of the Education Amendments …, including the requirements set forth in Presidential Executive Order 14168 [the "Gender Ideology" Order]" and with Title VI. HHS-AR 3. This new term also requires further certifications designed to ease the way for False Claims Act prosecutions against any grantee deemed not to comply. Covered recipients must "certify" that these requirements to comply with Title IX and VI and the "Gender Ideology" Order are "material terms of the Agreement"; that "[p]ayments under the Agreement are predicated on compliance" with those requirements and

that the recipient is therefore "not eligible for funding … absent compliance"; and that the recipient acknowledges that this "reflects a change in the government's position regarding the materiality" of those requirements and that "any prior payment" therefore "does not reflect the materiality" of those requirements. HHS-AR 3. The required certification also makes the threat of serious consequences explicit: Recipients must certify that they "acknowledge[] that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001." HHS-AR 3.

The sole explanation the Office of Grants provided for this directive was that "[i]t is the policy of the United States to recognize two sexes, male and female" and that "[t]his policy is reflected in" the "Gender Ideology" Order as well as (according to the directive) in Title IX and Title VI. HHS-AR 2.

In accordance with the Office of Grants' directive, HHS and its various components updated their standard terms and conditions to include the new HHS Title IX Certification. HHS-AR 241–42 (October HHS GPS); *id.* 957 (May HRSA General Terms); *id.* 975 (July HRSA General Terms); *id.* 1001 (SAMHSA Standard Terms). HHS's Administration for Children and Families (ACF) also updated its Standard Terms and Conditions to include the certification, but without the explicit mention of the "Gender Ideology" Order (ACF Title IX Certification). HHS-AR 364–65 (April ACF Standard Terms); HHS-AR 390 (July ACF Standard Terms).

      *b.  DEI-related conditions*

Second, HHS has also imposed certification requirements designed to deter diversity, equity, and inclusion activities. Initially, on April 16, 2025, the Office of Grants issued a directive announcing that the HHS Grants Policy Statement (GPS) had been updated to impose a

new condition on "all new awards," effective immediately. HHS-AR 5; *see also* HHS-AR 24–25. This new condition (April GPS Discrimination Certification) required recipients to "certify[]" that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" and that they do not and would not "engage in[] a discriminatory prohibited boycott." HHS-AR 6, 25. The new condition specified that "DEI" refers to "diversity, equity, and inclusion" and that "DEIA" refers to "diversity, equity, inclusion, and accessibility." *Id.* And it defined "discriminatory equity ideology" by reference to an executive order that defines that disfavored view as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations," and then goes on to provide a lengthy, non-exhaustive list of such prohibited "immoral" views. HHS-AR 6, 25; *see also Ending Radical Indoctrination in K-12 Schooling,* Exec. Order No. 14190 of January 29, 2025, 90 Fed. Reg. 8853, 8853–54 (Feb. 3, 2025). The Office of Grants' Action Transmittal provided no explanation of the reasons for this new condition. Effective May 9, 2025, ACF also updated its Standard Terms to include this condition, but without the mention of "discriminatory prohibited boycott[s]" (May ACF Discrimination Certification). HHS-AR 365.

Then, on May 28, the Office of Grants rescinded its April 16 memo that had notified HHS components of the Discrimination Certification added to the April GPS. HHS-AR 113. HHS, however, did not actually remove the April GPS Discrimination Certification from the GPS—despite the fact that the GPS is automatically incorporated in all HHS awards. *See* HHS-AR 5. The Office of Grants explained that it was "awaiting further Federal-wide guidance prior to updating" the GPS. HHS-AR 112.

Then, on July 24, 2025 (the day of a Temporary Restraining Order hearing in this case in which Plaintiffs sought to enjoin the April GPS Discrimination Certification), the Office of Grants replaced the Discrimination Certification in the GPS. HHS-AR 219; *see also* Tr. of Civil Cause Mot. for Temporary Restraining Order at 36–37 (Dkt. No. 38). The updated condition (HHS Discrimination Certification) requires grantees to "certify" (1) "compliance with all federal antidiscrimination laws and these requirements" and (2) "that complying with those laws is a material condition of receiving federal funding streams." HHS-AR 219. The HHS Discrimination Certification also provides that "[r]ecipients are responsible for ensuring subrecipients, contractors, and partners also comply." HHS-AR 219. The Office of Grants provided no explanation for the change, nor does the record include any "further Federal-wide guidance" that HHS had been waiting for before updating this condition. This updated language appears in the versions of the HHS GPS that were updated in July and October 2025, as well as the general terms and conditions documents for ACF, CDC, HRSA, and SAMHSA. HHS-AR 132 (July GPS); *id.* 241 (October GPS); *id.* 390 (ACF); *id.* 497, 514 (CDC); *id.* 975 (HRSA); *id.* 995, 1019 (SAMHSA).

### c. Executive order condition

Third, HHS's Substance Abuse and Mental Health Services Administration (SAMHSA) updated its standard terms to impose a requirement that recipients "comply with all applicable Executive Orders" (SAMHSA E.O. Condition). HHS-AR 995, 1019. The administrative record contains no explanation of the reasons for this new condition—or any discussion of it at all.

## D. The New Conditions harm Plaintiffs and their members

### 1. HUD grants

Plaintiffs and their members received grant agreements from HUD for new or continuation awards that are subject to the New Conditions that HUD has imposed (HUD

Conditions). Declaration of Jordan Day (Day Decl.) ¶ 8; Declaration of Colby O'Brien (O'Brien Decl.) ¶¶ 8–10; Declaration of Jonathan Yglesias (Yglesias Decl.) ¶ 10(a); Declaration of Amanda Dotson (Dotson Decl.) ¶ 11(a); Declaration of Kelsen Young (Young Decl.) ¶ 15; Declaration of Lucy Rios (Rios Decl.) ¶ 27; Declaration of Krista Colón (Colón Decl.) ¶¶ 11, 15; Declaration of Carianne Fisher (Fisher Decl.) ¶¶ 14–15; Declaration of Michelle McCormick (McCormick Decl.) ¶ 11; Declaration of Benedict Lessing (Lessing Decl.) ¶ 8; Declaration of Katie Kramer (Kramer Decl.) ¶ 12.

These include grants under the Continuums of Care, Emergency Solutions Grants, and Community Development Block Grants programs—which these organizations use for a wide range of activities, including rapidly rehousing survivors of sexual and domestic violence and their children, securing housing for people who are unhoused, helping people navigate mental health or substance use issues, and helping people obtain restraining orders. Lessing Decl. ¶ 7; Day Decl. ¶¶ 8–12; O'Brien Decl. ¶¶ 7–8; Declaration of Lisa Guillette (Guillette Decl.) ¶ 11; Declaration of Susan Higginbotham (Higginbotham Decl.) ¶¶ 10, 14; Yglesias Decl. ¶ 10(a); Fisher Decl. ¶¶ 12, 14–15; Dotson Decl. ¶¶ 10–14, 13; Declaration of Monique Minkens (Minkens Decl.) ¶¶ 8–9; McCormick Decl. ¶ 10; Young Decl. ¶ 14; Declaration of David Lee (Lee Decl.) ¶ 15; Colón Decl. ¶¶ 12, 16. Under the policies HUD has adopted, these grants are subject to the HUD Conditions.[3]

---

[3] Plaintiffs received HUD Grant notices of award that include the HUD Conditions on a rolling basis, and the Plaintiffs covered by the court's Temporary Restraining Order accepted the earliest of these awards by August 2025. *See* Jaworski Decl. ¶ 11; O'Brien Decl. ¶ 10; Yglesias Decl. ¶ 10(a); McCormick Decl. ¶ 11. Plaintiffs also accepted awards following the Court's grant of Section 705 stay and preliminary injunction on October 10, 2025 and pursuant to the terms of that order. *See* Rios Decl. ¶ 26; Guillette Decl.¶ 10.

Accepting the awards with the HUD Conditions would cause these organizations profound harm. Start with the HUD Discrimination Certification and General HUD Anti-DEI Certification. The requirement to certify compliance with the Administration's novel view of federal nondiscrimination law—and to agree that compliance is material for False Claims Act purposes—will force grantees to change their programming and mission for fear of facing massive liability. *See* Higginbotham Decl. ¶ 46; Day Decl. ¶ 30; O'Brien Decl. ¶¶ 21–22; Yglesias Decl. ¶¶ 32, 41–42; Guillette Decl. ¶¶ 20–21. While these organizations have always complied with federal antidiscrimination laws and always will, the Anti-DEI Order and statements from DOJ and the HUD Secretary indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all manner of DEI and DEIA activities. Even if the courts ultimately reject the Administration's view of the law, Plaintiffs still bear serious burdens—they must either attempt to comply with the Administration's expansive yet ill-defined view of antidiscrimination law or risk burdensome investigation and enforcement.

The prohibition on using grant funds to "promote" "gender ideology" also puts Plaintiffs in an impossible position. In providing direct client services and technical assistance in HUD-funded programs, Plaintiffs and their member organizations support housing for transgender and nonbinary people, including by using clients' preferred pronouns to demonstrate support and respect for people who do not identify with the sex they were assigned at birth, recognizing gender identity in providing direct assistance, and accommodating the needs of the nonbinary and transgender community in providing housing. *See* Yglesias Decl. ¶ 36; *see* Declaration of Julio E. Berroa (Berroa Decl.) ¶ 16; O'Brien Decl. ¶ 18; Day Decl. ¶ 27; Lessing Decl. ¶ 31; Dotson Decl. ¶ 37; Young Decl. ¶ 39. Complying with the HUD "Gender Ideology" Condition

would directly conflict not only with these organizations' missions and organizational values, Yglesias Decl. ¶ 38; Berroa Decl. ¶ 16, but with their ethical obligations to their clients, Guillette Decl. ¶¶ 16–17. In addition, HUD regulations require recipients of CPD-administered grants to serve people in accordance with their gender identity. *See* 24 C.F.R. § 5.106. Plaintiffs and their members do not know if or how they can comply with the HUD regulations while simultaneously complying with the funding condition not to "promot[e] gender ideology."

In addition, the HUD Abortion Condition would harm Plaintiffs, which do not offer abortion care themselves but routinely refer people to healthcare services that may include abortion care. O'Brien Decl. ¶ 19; Day Decl. ¶ 28; Guillette Decl. ¶ 18; Lessing Decl. ¶ 32; Dotson Decl. ¶¶ 32, 38; Young Decl. ¶ 40. For instance, as part of the "wraparound" supportive services that Pennsylvania Coalition's HUD grant provides to survivors, the Pennsylvania Coalition would provide a referral for abortion care if a client receiving rental assistance indicates to an advocate that she needs one. Higginbotham Decl. ¶ 51. Similarly, the Virginia Action Alliance's members make referrals to reproductive healthcare services when a pregnant survivor wishes to terminate a pregnancy. Yglesias Decl. ¶¶ 37, 39. Because reproductive and sexual coercion are common tactics of abuse, these services are particularly important to survivors of domestic violence and sexual assault: access to abortion care can be essential for survivors' safety and autonomy. Higginbotham Decl. ¶ 51; *see* Yglesias Decl. ¶ 37.

Plaintiffs would also be harmed by agreeing to the HUD CPD E.O. Condition and General HUD E.O. Condition. Plaintiffs do not know what this condition's broad and vague language means for their organizations or how to comply with it, given the many new executive orders that it implicates, the broad and vague language of those orders, and the reality that many of the referenced orders imply that providers should exclude certain populations from their

services. O'Brien Decl. ¶ 20; Higginbotham Decl. ¶ 52; Yglesias Decl. ¶ 38; Guillette Decl. ¶ 15; Dotson Decl. ¶ 39; Young Decl. ¶ 41. This Condition, moreover, would require compliance with the Anti-DEI Order and "Gender Ideology" Order—which would cause the same harms as complying with the related HUD Conditions, as described above.

But the alternative of losing access to these funds is no alternative at all. Plaintiffs use these funds to provide rental assistance to victims of domestic violence and sexual assault and individuals and families experiencing homelessness, fund permanent supportive affordable housing, offer on-site intensive case management to residents with mental health challenges and substance use disorders and other supportive services, and conduct street outreach to homeless adults and children. *See* Lessing Decl. ¶ 10; Day Decl. ¶¶ 8–12; O'Brien Decl. ¶¶ 8–10; Guillette Decl. ¶ 11; Rios Decl. ¶ 24; Higginbotham Decl. ¶ 16; Fisher Decl. ¶ 12; Kramer Decl. ¶ 14. They also use HUD grants to rapidly rehouse survivors of sexual and domestic violence, including by providing rental assistance to survivors and their children who are experiencing homelessness. Higginbotham Decl. ¶ 10, 14; Yglesias Decl. ¶ 10.a; *see also* Fisher Decl. ¶ 12; Dotson Decl. ¶ 10–14; Minkens Decl. ¶ 8–9; McCormick Decl. ¶ 10, Young Decl. ¶ 14. Some use HUD grants to provide emergency shelter or support operations for emergency domestic violence shelters, funding employees to answer a 24-hour help line and provide help obtaining restraining orders, and by covering expenses for facility security, utilities, and food. Fisher Decl. ¶¶ 12–13; Dotson Decl. ¶ 13(f), (g); Lee Decl. ¶ 15; Colón Decl. ¶¶ 12–13, 17.

Given the critical programs that HUD funds support, declining award funds is hardly an option. If Plaintiffs or their members lost access to the HUD grants, they would have to reduce programming and lay off staff. O'Brien Decl. ¶ 11; Lee Decl. ¶ 15; Fischer Decl. ¶ 18; Rios Decl. ¶¶ 24, 28; Colón Decl. ¶ 17; Higginbotham Decl. ¶ 12; Lessing Decl. ¶¶ 11, 26; Guillette

Decl ¶¶ 12-13; Dotson Decl. ¶ 11.b. This would have a devastating impact on the people that Plaintiffs and their members serve: Without funding dedicated to the operating costs of their emergency shelters, Plaintiffs would be forced to cut services. They would have to turn people away, including youth experiencing homelessness who are in urgent need of shelter and support, and more survivors and their children would be forced to remain in abusive situations. Dotson Decl. ¶ 13(g); Fisher Decl. ¶ 12; *see* Guillette Decl. ¶¶ 11–13. This would also have a devastating impact on the staff members who are terminated, many of whom may be themselves survivors or peers to the clients that their organizations serve. *See* Day Decl. ¶ 35 ("To rip [program staff] away from their employment and pitch them back into financial and possible housing stability would be a remarkably cruel twist of fate.").

Turning down funds that support rental assistance would similarly place low-income people at risk of imminent eviction and homelessness. Higginbotham Decl. ¶¶ 11–12, 14; Yglesias Decl. ¶ 10(a); Lessing Decl. ¶ 11; Dotson Decl. ¶ 12(b); Young Decl. ¶ 16; Rios Decl. ¶ 28 ("Because these households are very low income, paying the full rent will be impossible and people will be evicted."). And Plaintiffs would be forced to terminate the supportive services on which their clients rely, including intensive case-management services for residents with mental health challenges and substance abuse disorders, and the provision of utility assistance, legal support, and emergency food. *See* Day Decl. ¶ 11; O'Brien Decl. ¶¶ 11, 23; Dotson Decl. ¶¶ 11(b), 13(e); Lee Decl. ¶ 15.

### 2.  *HHS grants*

Plaintiffs and Plaintiff Coalitions' members receive, both directly and indirectly, a variety of HHS grants subject to the New Conditions imposed by HHS (HHS Conditions), including under the Family Violence Prevention and Services, Rape Prevention and Education, Maternal and Child Health, Temporary Assistance for Needy Families, Community-Based Child Abuse

Prevention, Ryan White HIV/AIDS, Youth and Family TREE, and Projects for Assistance in Transition from Homelessness programs, among others. Akins Decl. ¶¶ 19, 24–25; Colón Decl. ¶¶ 25, 34–35, 38-39; Dalton Decl. ¶¶ 16, 18, 21, 23–24; Dotson Decl. ¶¶ 12–14, 20; Faisal Decl. ¶¶ 20–21, 25; Fisher Decl. ¶¶ 22–23; Higginbotham Decl. ¶ 33; Day Decl. ¶ 20; Kramer Decl. ¶¶ 15–21; Lee Decl. ¶¶ 31-32; Lessing Decl. ¶¶ 18, 24; McCormick Decl. ¶¶ 25, 37, 40–41; Minkens Decl. ¶¶ 19–21, 26-27; Moran-Kuhn Decl. ¶¶ 19, 29–30; Rios Decl. ¶¶ 35–37, 61; Sarang-Sieminski Decl. ¶¶ 21–22, 28, 31; Declaration of Tai Simpson-Bruce (Simpson-Bruce Decl. ¶ 13); Yglesias Decl. ¶¶ 16–17; Young Decl. ¶ 28. Plaintiffs and their members have accepted HHS grants, and are now operating under the terms of this Court's Order granting a § 705 stay and preliminary injunction. *See, e.g.*, Colón Decl. ¶¶ 38, 39; Lee Decl. ¶ 38; Akin Decl. ¶ 25; Dalton Decl. ¶ 12; Dotson Decl. ¶ 27(a); Faisal Decl. ¶ 26; Fisher Decl. ¶ 11; McCormick Decl. ¶ 31; Minkens Decl. ¶ 25; Moran-Kuhn Decl. ¶ 21; Sarang-Sieminski Decl. ¶ 23; Yglesias Decl. ¶19; Young Decl. ¶ 25.

Plaintiffs and their members use those grants for a wide range of programs, including providing emergency and other shelter to domestic violence survivors; supporting crisis hotlines; engaging in street outreach for people experiencing chronic homelessness and mental health challenges; treating adolescents and youth with substance use and mental health disorders; providing meals, transportation, and rehabilitative and other services to individuals with HIV; providing training and otherwise strengthening the capacity of domestic violence and sexual assault programs; educating school-based mental health counselors on how to screen for domestic violence; and helping implement age-appropriate education on healthy and unhealthy relationships. Akins Decl. ¶¶ 24–26; Colón Decl. ¶ 26; Dalton Decl. ¶¶ 16, 18, 21, 23–24; Faisal Decl. ¶¶ 20-21, 25; Day Decl. ¶ 20; Kramer Decl. ¶¶ 17–18; Lessing Decl. ¶¶ 20, 23; Minkens

Decl. ¶¶ 26–27; Moran-Kuhn Decl. ¶ 20; Rios Decl. ¶¶ 38–41; Sarang-Sieminski Decl. ¶ 22; Simpson-Bruce Decl. ¶ 15. Given the critical work these grants support, declining the funding is generally not a viable option. Without that funding, Plaintiffs and their members would in many cases be compelled to lay off staff and significantly reduce programming, harming survivors, other clients, and their communities. Akins Decl. ¶¶ 21, 25; Colón Decl. ¶¶ 13, 17, 27, 32, 41; Dalton Decl. ¶¶ 20-21, 25, 31; Dotson Decl. ¶ 21; Faisal Decl. ¶¶ 24, 26; Fisher Decl. ¶¶ 26, 30; Higginbotham Decl. ¶ 43; Lee Decl. ¶¶ 26, 29, 35; Lessing Decl. ¶¶ 21, 24, 26; McCormick Decl. ¶ 37; Minkens Decl. ¶ 23; Moran-Kuhn Decl. ¶ 22; Rios Decl. ¶ 40; Sarang-Sieminski Decl. ¶¶ 24, 29; Simpson-Bruce Decl. ¶ 16; Yglesias Decl. ¶ 20; Young Decl. ¶ 28.

But accepting the grants subject to the HHS Conditions would also cause Plaintiffs and their members serious harm. First, agreeing to the HHS Discrimination Certification would chill Plaintiffs and their members from expressing views about and engaging in DEI and DEIA activities. This would impede Plaintiffs' ability to conduct their work in accord with their missions, which grounds their work in understanding that racism, homophobia, transphobia, ableism, and other forms of oppression are intertwined with gender-based violence and directly impact access to safety, healing, and justice. Sarang-Sieminski Decl. ¶¶ 37, 38; *see also* Dalton Decl. ¶ 27; Faisal Decl. ¶ 28; Minkens Decl. ¶ 30–31; Moran-Kuhn Decl. ¶ 33; Rios Decl. ¶ 64; Simpson-Bruce Decl. ¶ 18; Yglesias Decl. ¶ 29. Plaintiffs are also unsure whether the government would find their missions' commitment to diversity and equity to be in violation of the certification. *E.g.*, Day Decl. ¶ 25; Lessing Decl. ¶ 28.

The HHS Discrimination Certification also threatens to chill Plaintiffs and their members from continuing to operate programs that target underserved or marginalized populations, including people with disabilities, people for whom English is not their primary language, and

people who have been excluded from specific services such as shelter due to their gender. Dotson Decl. ¶ 34; Lessing Decl. ¶ 29; McCormick Decl. ¶ 47; Sarang-Sieminski Decl. ¶ 37; Yglesias Decl. ¶ 30. For instance, the Montana Coalition is unsure whether it could continue to use RPE funds to support efforts specifically addressing the needs of Indigenous people, who are at a disproportionate risk of experiencing violence or murder. Young Decl. ¶ 33. As another example, JDI Member The Network/La Red is an LGBTQ+ organization whose mission is to serve LGBTQ+ survivors of partner abuse across Massachusetts. Sarang-Sieminski Decl. ¶ 33. To avoid the risk of being deemed to violate the Discrimination Certification, The Network/La Red would have to "fundamentally change [] hiring practices, organizational culture, the communities they serve, and their programming." Sarang-Sieminski Decl. ¶ 34; *see also* Higginbotham Decl. ¶ 43 (member uses FVPSA funds for a culturally specific project); Faisal Decl. ¶ 39 (noting uncertain about whether it can provide programming targeting addiction, which qualifies as a disability). At bottom, Plaintiffs and their members would be forced to radically change their activities to avoid risking noncompliance, including by fundamentally altering programs in a way that undermines their ability to serve underserved populations and runs contrary to their values. Colón Decl. ¶ 47; Faisal Decl. ¶ 36; Day Decl. ¶ 25; McCormick Decl. ¶ 54; Minkens Decl. ¶¶ 32–33; Sarang-Sieminski Decl. ¶ 39; Yglesias Decl. ¶ 31.

Second, Plaintiffs are concerned that agreeing to the Title IX Certification would require them to turn away victims who are transgender or gender-nonconforming from services. Fisher Decl. ¶ 43; Simpson-Bruce ¶ 24; Dalton Decl. ¶¶ 27, 30; Minkens Decl. ¶ 35; Rios Decl. ¶ 69. Some plaintiffs are uncertain, for example, whether they may continue operating K–12 and college campus programs that use gender-selective groups—organized by identity and expression rather than biological sex—for programing on how rigid gender-norm conformity can

be a violence risk factor. Yglesias Decl. ¶ 33. Others are concerned that this condition could prohibit their organization from accommodating the needs of transgender and nonbinary survivors, including by recognizing their gender identity, using preferred pronouns to affirm and support them, or allowing them to use the bathroom that aligns with their gender identity. Higginbotham Decl. ¶ 49; Lessing Decl. ¶ 31; *see* Colón Decl. ¶ 50.

Likewise, Plaintiffs with SAMHSA grants face harm from the SAMHSA E.O. Condition because the requirement to comply with the "Gender Ideology" Executive Order, for example, would interfere with their practice of recognizing clients' gender identity in direct services and using preferred pronouns to affirm and support them. Day Decl. ¶ 27; Lessing Decl. ¶ 31.

## LEGAL STANDARD

Summary judgment "is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (quotations omitted). "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020).

For APA claims, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016).

## ARGUMENT

### I.    Plaintiffs Are Entitled to Summary Judgment

Plaintiffs are entitled to summary judgment on their claims under the APA as well as directly under the Constitution.

### A.  The New Conditions violate the APA

The New Conditions must be set aside under the APA for multiple independent reasons[4]: They exceed Defendants' statutory authority, are arbitrary and capricious, and violate the Constitution; several are contrary to law; and HUD's New Conditions were adopted without following required procedures.

#### 1.  *The New Conditions exceed Defendants' statutory authority*

The New Conditions exceed Defendants' statutory authority. For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "Any action that an agency takes outside the bounds of its statutory authority . . . violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). No statute authorizes HUD or HHS to impose any of the New Conditions at issue in this case.

At the preliminary relief stage, Defendants pointed to only two claimed sources of authority to impose (some of) the New Conditions: (1) for various HUD Conditions, 42 U.S.C. § 11386(b)(8), and (2) for the conditions barring purported violations of antidiscrimination laws and Title IX, inherent authority to require compliance with the law. *See* Dkt. No. 43 at 22–25. Those sources of authority do not in fact authorize the New Conditions.

---

[4] As this Court already held at the preliminary injunction stage, the New Conditions are reviewable under the APA—they are final agency action and not committed to agency discretion by law, and the Tucker Act does not preclude review. *See R.I. Coalition Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2988705, at *2–6 (D.R.I. Oct. 23, 2025).

a.  *HUD Conditions*

Contrary to HUD's previous contentions in this case (Dkt. No. 43 at 24–25), 42 U.S.C. § 11386(b)(8) does not authorize any of the New Conditions that HUD has imposed. That provision requires recipients of CoC grants to agree to a list of statutorily required conditions and further authorizes HUD to establish additional conditions "to carry out [the CoC program] in an effective and efficient manner." *See* Dkt. No. 43 at 24–25. That does not authorize HUD's New Conditions for several reasons.

As an initial matter, § 11386(b)(8) authorizes HUD to impose additional conditions only for CoC grants—and not for the many other CPD programs on which HUD has imposed these conditions. *See* 42 U.S.C. § 11386(b)(8) (authorizing HUD to impose certain conditions "to carry out this part," referring to part governing "Continuum of Care Program").

In addition, § 11386(b)(8) does not authorize the New Conditions even for the CoC program, as two other district courts have held. *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 886–87 (W.D. Wash. 2025), *appeal pending*, No. 25-3664; *City of Fresno v. Turner*, No. 25-cv-07070, 2025 WL 2721390, at *11 (N.D. Cal. Sept. 23, 2025). Restricting grantees from promoting "gender ideology" or "elective abortions," and requiring them to comply with executive orders on those topics and others, does nothing to advance the effectiveness or efficiency of the CoC program. Barring providers from acknowledging a client's gender identity—conduct that the Administration has made clear it considers to promote "gender ideology," *see supra* Background Section B.2—does not help address homelessness more effectively or efficiently. Nor does barring providers from "promot[ing]" elective abortion. Some CoC-funded programs provide safe housing to victims of domestic violence and sexual assault, along with a full suite of services to support those individuals' needs—including information and referrals about victims' options if they have an unwanted pregnancy. *See* Higginbotham Decl.

29

¶ 52; Yglesias Decl. ¶ 39. Barring organizations from providing information about abortion in those circumstances does not make the CoC program more "effective and efficient"; it advances ideological goals wholly unrelated to the CoC program.

In addition, as one court explained, under ordinary canons of construction, a residual provision like § 11386(b)(8) is "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific" provisions. *King Cnty.*, 785 F. Supp. 3d at 886. And the conditions restricting activity related to "gender ideology" and abortion (and requiring compliance with executive orders on those and other topics) are "simply not of the same kind" as the conditions that § 11386(b) otherwise enumerates, *id.*—which require grantees to do things like "monitor and report to the Secretary the progress of the project," "ensure … that individuals and families experiencing homelessness are involved" in the project, and "monitor and report" the receipt of any matching funds, 42 U.S.C. § 11386(b).

### b.  *HHS and HUD Discrimination and Title IX Certifications*

Defendants also err in suggesting (Dkt. No. 43 at 22–23) that HUD and HHS have authority to impose the various discrimination-related and Title IX certifications[5] because they merely require compliance with the law. That is mistaken for two separate reasons. The certifications unlawfully go beyond requiring compliance with the law or force grantees to concede False Claims Act materiality—or both.

---

[5] Those certifications are the HUD Discrimination Certification, General HUD Anti-DEI Certification, HHS Discrimination Certification, April GPS and May ACF Discrimination Certifications, HHS Title IX Certification, and ACF Title IX Certification.

First, many of these certifications go beyond affirming grantees' existing obligation to comply with antidiscrimination laws and Title IX.[6] The HHS Title IX Certification expressly requires grantees to certify compliance not just with Title IX, but also with the "Gender Ideology" Executive Order's view of what Title IX requires. HHS-AR 3 (requiring grantees to certify compliance with "Title IX …, including the requirements set forth in [the "Gender Ideology" Order]"). That executive order suggests that Title IX guarantees a "right to single-sex spaces" (as defined by the Administration), such that it would violate Title IX to allow transgender individuals to access spaces consistent with their gender identities. *See* "Gender Ideology" Order § 5, 90 Fed. Reg. at 8617. But that would not violate Title IX, as multiple courts have held. *See, e.g.*, *Parents for Privacy v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020); *see also, e.g.*, *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 771 (7th Cir. 2023) (holding that it would violate Title IX *not* to allow transgender individuals access in accordance with their gender identity); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618–19 (4th Cir. 2020) (same).[7] And even if some courts might disagree, HHS lacks authority to impose its own interpretation of Title IX via a grant certification.

The certifications requiring grantees to certify that they do not engage in "diversity, equity, and inclusion" activities that violate federal anti-discrimination laws also go beyond merely requiring compliance with nondiscrimination laws.[8] As other district courts have held,

---

[6] The General HUD Anti-DEI Certification, the original version of the HUD Discrimination Certification, the HHS Title IX Certification, and the April GPS and May ACF Discrimination Certifications go beyond requiring compliance with the law.

[7] If the HHS Title IX Certification were understood to require compliance with the "Gender Ideology" Executive Order, period, not just with what that executive order suggests Title IX requires, it would go even further beyond what the law requires—including by barring grantees from even so much as recognizing transgender and nonbinary individuals' identities.

[8] HHS's April GPS and May ACF Discrimination Certifications, the General HUD Anti-DEI Certification, and the original version of the HUD Discrimination Certification all specifically

such conditions' references to DEI activities that violate federal law "act as announcements of policies rather than as limits to the scope of the new conditions." *City of Fresno*, 2025 WL 2721390, at *8. The Administration has made clear that "the government's view of what is illegal" under antidiscrimination laws "has changed significantly with the new Administration." *See Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 984 (N.D. Ill. 2025); *accord City of Fresno*, 2025 WL 2721390, at *8 (explaining that government's interpretation of anti-discrimination laws "is undergoing significant change"). These certifications improperly "go beyond prohibiting violations of federal law as it is currently understood and pose a real risk of curtailing programs that would not be found violative." *City of Fresno*, 2025 WL 2721390, at *11.

Second, many of the discrimination-related and Title IX certifications also exceed Defendants' statutory authority for the independent reason that they require grantees to agree upfront that their compliance with the relevant laws is material for False Claims Act purposes.[9] While Defendants can require grantees to certify compliance with nondiscrimination laws—and long have (though without unlawfully singling out one category of generally lawful conduct for special scrutiny)—they cannot require grantees to agree in advance that compliance with those laws is material to any payment decision by the government. The materiality certifications undercut an important part of the FCA's statutory scheme. As the Supreme Court has emphasized, "strict enforcement" of the FCA's "rigorous" materiality requirement is important,

---

call out diversity, equity, and inclusion activities. HHS-AR 24–25, 365; HUD-AR 302, 291. HHS's April GPS and May ACF Discrimination Certifications further forbid grantees from adopting any "discriminatory equity ideology." HHS-AR 24–25, 365.

[9] The HUD Discrimination Certification, HHS Discrimination Certification, HHS Title IX Certification, and ACF Title IX Certification all require grantees to certify to materiality. Only the General HUD Anti-DEI Certification and April GPS and May ACF Discrimination Certifications do not.

including because it guards against "open-ended liability" under a law that was not intended to be a "vehicle for punishing garden-variety … regulatory violations." *Escobar*, 579 U.S. at 192, 194. Noncompliance with statutory requirements is "not automatically material, even if they are labeled conditions of payment." *Id.* at 191. Nor is materiality automatically established merely because "the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 194. More is required. *See id.* at 192–96. The required certifications of materiality would gut this by excusing the government (and any *qui tam* relator) from meeting the "demanding" materiality standard, *id.* at 194, and enabling them to satisfy it automatically instead. No statute authorizes Defendants to effectively write the materiality element out of the FCA in this way.

For all these reasons, Defendants lack authority to impose any of the New Conditions, and they therefore must be set aside under the APA.

### 2.  The New Conditions are arbitrary and capricious

The New Conditions must also be set aside as arbitrary and capricious. Under arbitrary and capricious review, courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). For a challenged agency action to pass muster, the agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In assessing the reasonableness of an agency's

explanation for its action, "the Court must look to 'the grounds that the agency invoked when it took the action.'" *New York v. Kennedy*, 789 F. Supp. 3d 174, 205 (D.R.I. 2025) (quoting *Michigan v. EPA*, 576 U.S. 743, 758, (2015)). The New Conditions fail on multiple fronts.

To begin, "the administrative record is so devoid of justification for the [agencies'] decision[s] that [they are] necessarily arbitrary and capricious." *Hall v. Evans*, 165 F. Supp. 2d 114, 128 (D.R.I. 2001). Based on the record available at the preliminary relief stage, this Court concluded "that the Defendants engaged in a baseless and arbitrary process." *RICADV v. Kennedy*, 2025 WL 2988705, at \*7. The full administrative record supports the same conclusion.

For both agencies, the record provides no explanation other than that they were following executive orders. HUD imposed its New Conditions to "align with the new Administration's executive orders." HUD-AR 36; *see also, e.g.*, HUD-AR 110 (noting plan to "modify[] the grant agreement template to align with the Administration's executive orders and requirements"), 111 ("model Grant Agreement to address EOs"), 119 (listing New Conditions in document on "Aligning CPD Action Plans with Executive Orders"), 123 (noting that leadership was amenable to "using 'grant agreements' as a method to enforce compliance with the EOs"), 131 (proposing "Grant agreement which incorporates leadership's request to address specific Executive Orders")

The record of HHS's decision shows the same. HHS's Office of Grants required all grantmaking components to impose the HHS Title IX Condition "to ensure financial assistance recipients are compliant with … [the 'Gender Ideology' Executive Order]." HHS-AR 2. The only further explanation given is that, as "reflected in" that executive order, "[i]t is the policy of the United States to recognize two sexes, male and female." HHS-AR 2. The record contains no explanation at all of the reasons HHS adopted the DEI-Related Conditions or SAMHSA's E.O. Condition. *See* HHS-AR 4–6 (Office of Grants directive requiring components to impose the

April GPS Discrimination Certification); HHS-AR 220 (Office of Grants directive requiring components to impose HHS Discrimination Certification). But the HHS Discrimination Certification now in place matches language that the Anti-DEI Executive Order directed all agencies to include in every grant award. E.O. 14173 § 3(b)(iv), 90 Fed. Reg. at 8634.

It is well established that compliance with an executive order does not satisfy the APA's requirement for reasoned decisionmaking. Courts have made abundantly clear that "an agency cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant EO." *Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025), *appeal pending*, No. 25-1428; *see also, e.g.*, *R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351, 372–73  (D.R.I. 2025), *appeal pending*, No. 25-2113 (holding that action was arbitrary and capricious where agency's "only explanation" was that it was "furthering the current administration's priorities as provided in" an executive order); *R.I. Coal. Against Domestic Violence v. Bondi*, No. 794 F. Supp. 2d 58, 70 (D.R.I. 2025) (holding that agency cannot "avert the 'arbitrary and capricious' analysis by simply deferring to the relevant Executive Order" (cleaned up)); *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) ("[F]urthering the President's wishes cannot be a blank check for OMB to do as it pleases."); *King Cnty.*, 785 F. Supp. 3d at 888–89 ("[R]ote incorporation of executive orders— especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relation to the agency's underlying action—does not constitute 'reasoned decisionmaking.'"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–95 (E.D. La. 2022) ("A command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement.").

Defendants' rote implementation of executive orders is all the more problematic because Defendants failed to consider multiple "important aspect[s] of the problem"—a hallmark of arbitrary and capricious decisionmaking. *State Farm*, 463 U.S. at 43. The agencies did not consider, for example, how barring grantees from "promoting gender ideology" or from violating the "Gender Ideology" Executive Order would make it impossible for grantees to effectively serve transgender and nonbinary people—whose very identity the grant conditions require grantees to deny. Nor did HUD consider or explain how a grantee could possibly comply with the "Gender Ideology" Condition (or General HUD E.O. Condition or HUD CPD E.O. Condition) without violating the binding regulation requiring grantees to serve individuals in accordance with their gender identity. *See infra* Section I.A.4.

The agencies likewise did not consider or explain how the conditions barring and deterring "DEIA"-related activity would chill grantees from engaging in entirely lawful activity to foster inclusion, diversity, and equity. Nor did they consider or explain how that would result in fewer services to populations that are already underserved—or how that could be reconciled with Congress's express authorization for programs targeting underserved populations.[10]

---

[10] *See, e.g.*, 42 U.S.C. § 5307(c) (authorizing activities focused on "economically disadvantaged and minority students" under HUD's CDBG program); *id.* § 10411(d)(3) (authorizing activities targeted toward "racial and ethnic minority populations and underserved populations" under HHS's FVPSA program); *id.* §§ 10406(a)(3), 10411(d)(8) (similar); *id.* § 280b-1b(a)(7) (authorizing, under rape prevention and education program, "efforts to increase awareness in underserved communities" and among "individuals with disabilities" and "Deaf individuals"); *id.* § 280b-1b(c) (requiring HHS to "ensure that "culturally specific organizations" and "representatives from underserved communities" have "meaningful involvement" in applying for and implementing rape prevention and education funding); 34 U.S.C. § 12291(a)(8) (defining "culturally specific" as "primarily directed toward racial and ethnic minority groups"); 42 U.S.C. § 10414(g)(3)(F) (requiring grantees to "recognize, in applicable cases, the needs of underserved populations, racial and linguistic populations, and individuals with disabilities").

HUD likewise did not consider how barring grantees from "promoting elective abortion" would block grantees from providing information about reproductive health options to survivors of domestic violence, sexual assault, and reproductive coercion.

Defendants also failed to consider how grantees would struggle to understand their obligations under the vague conditions. It is not clear, for example, what it means to "promote" gender ideology or elective abortion, what counts as an "elective" abortion, when the agencies will consider a grantee's DEI activities to be unlawful, or how a grantee can comply with executive orders that by their terms announce general policies and direct *federal agencies* on what actions to take, but generally do not (and cannot) impose obligations on the public. Defendants did not consider the confusion this would cause.

Defendants also failed to consider how the New Conditions jeopardize the "serious reliance interests" of grantees and the members of the public they serve. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). The Supreme Court has made clear that the failure to "consider[] potential reliance interests," standing alone, renders agency action arbitrary and capricious. *Id.* Specifically, an agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33 (emphasis added). Defendants did not do that here. They did not consider the reliance interests of grantees in continued funding on terms they can understand and comply with without violating their missions, nor did Defendants consider the reliance interests of the people those grantees serve. That failure to consider reliance interests is particularly egregious given that, in many instances, Defendants imposed the conditions in the middle of grantees' period of performance, when they were relying on continued funding to

carry out their ongoing, mission-critical activities. *See, e.g.*, Moran-Kuhn Decl. ¶ 21; Higginbotham Decl. ¶¶ 21–22; Sarang-Sieminski Decl. ¶¶ 22–23.

Defendants also failed to "show that there are good reasons for" the New Conditions' change in policy—the record contains no explanation on that front. *FCC*, 556 U.S. at 515. And, for some conditions—like the ones requiring grantees to agree to abide by Defendants' view of nondiscrimination laws and to certify to FCA materiality—Defendants fail even to "display awareness" that the New Conditions are a change in policy at all. *Id.*

### 3. *The New Conditions violate the Constitution*

The New Conditions also must be set aside because they are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). For the reasons explained in Sections I.B–I.D below, the New Conditions violate the Spending Clause and other constitutional separation-of-powers provisions, the First Amendment, and the Fifth Amendment's Due Process Clause. That warrants relief under the APA.

### 4. *Multiple "Gender Ideology"-Related Conditions are contrary to law*

Various conditions that require grantees to deny the identity of transgender and nonbinary individuals must be set aside because they conflict with binding regulations specifically requiring grantees to acknowledge and respect people's gender identity. It is well established "that agencies must comply with their own regulations." *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015). Agency action that violates a regulation is "contrary to law" in violation of the APA. *Colorado v. U.S. Dep't of Health & Human Servs.*, 783 F. Supp. 3d 641, 647 (D.R.I. 2025).

To begin, the HUD "Gender Ideology" Condition, as well as the HUD CPD E.O. Condition and General HUD E.O. Condition—which require grantees to comply with the "Gender Ideology" Executive Order—conflict with a binding agency regulation requiring grantees to treat people in accordance with their gender identity. In particular, under HUD's

Equal Access Rule, recipients of grants administered by CPD must provide individuals with equal access to shelters and other services "in accordance with the individual's gender identity" and must place and serve individuals "in accordance with the[ir] gender identity." 24 C.F.R. § 5.106(b)(1)-(2); *see also id.* §§ 5.106(b)(3), (c). The HUD "Gender Ideology" Condition, HUD CPD E.O. Condition, and General HUD E.O. Condition conflict with that rule. Those conditions all apparently require grantees to deny individuals' gender identity and to instead serve people in accordance with their "biological sex" as defined under the executive order. That flies in the face of the regulation, which unequivocally requires grantees to recognize individuals' gender identity and to serve them in accordance with it, not their biological sex. *See* 24 C.F.R. § 5.106.

Similarly, the ACF Title IX Certification—which applies to grants administered by ACF, including grants under the Family Violence Prevention and Services Act (FVPSA)—contravenes HHS regulations barring discrimination "on the ground of … gender identity" in FVPSA programs. 45 C.F.R. § 1370.5(a). In addition to generally barring gender-identity-based discrimination, the regulation further explicitly states that, "transgender and gender nonconforming individuals must have equal access to FVPSA-funded shelter and nonresidential programs" and must be offered "an assignment consistent with their gender identity." *Id.* § 1370.5(a)(4). Given the Administration's (incorrect) view that Title IX requires grantees to exclude transgender people from single-sex places and programs that align with their gender identity, *see supra* Background Section B.2; Argument I.A.1.C, the ACF Title IX Certification would effectively require grantees to violate these regulatory requirements.

### 5. *HUD adopted its New Conditions without required procedures*

HUD's New Conditions must also be set aside because they were adopted "without observance of procedure required by law." *See* 5 U.S.C. § 706(2)(D). Before taking action that qualifies as a legislative rule under the APA, government agencies must provide notice and an

opportunity to comment. 5 U.S.C. § 553(b), (c). Although the APA exempts matters relating to grants, 5 U.S.C. § 553(a)(2), HUD's regulations have long required the agency to undertake notice and comment even in rulemakings involving grants, despite the APA's exemption. 24 C.F.R. § 10.1.

HUD's New Conditions are effectively legislative rules that HUD cannot impose without notice and comment. As the First Circuit has explained, "a legislative rule is one that creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (cleaned up). HUD's New Conditions impose obligations that are not already outlined in the law: They require grantees to comply with executive orders; to certify to False Claims Act materiality; to forswear purportedly unlawful diversity, equity, and inclusion activities; and to avoid using grant funds to promote "gender ideology" or "elective abortion." They therefore are legislative rules, and HUD's own binding regulations require the agency to undertake notice and comment before imposing them. *See* 24 C.F.R. § 10.1.

## B. The New Conditions violate the Spending Clause and other constitutional provisions safeguarding the separation of powers

The New Conditions also violate multiple constitutional provisions safeguarding the separation of powers. As court after court has recognized, imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of ... the separation of powers." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) (holding that the executive branch violated separation of powers by conditioning federal funding on recipients' facilitating immigration enforcement).[11] Defendants have done

---

[11] *See also, e.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231, 1234-35 (9th Cir. 2018) ("withhold[ing] all federal grants from so-called 'sanctuary' cities and counties" violated separation of powers); *King Cnty.*, 785 F. Supp. 3d at 874–75, 885–88 (agencies violated

precisely that here. As explained above, *supra* Section I.A.1, Congress has not authorized Defendants to impose any of the New Conditions. In imposing them anyway in order to carry out executive orders, Defendants have exceeded their constitutional authority and encroached on Congress's power to control federal spending, in violation of foundational separation-of-powers principles.

The Constitution "exclusively grants the power of the purse to Congress, not the President." *Colorado v. U.S. Dep't of Health & Human Servs.*, 788 F. Supp. 3d 277, 308 (D.R.I. 2025) (quoting *City & Cnty. of S.F.*, 897 F.3d at 1231); *see also* U.S. Const. art. I, § 8, cl. 1 (Spending Clause); *id.* art. I, § 9, cl. 7 (Appropriations Clause). Among the "legislative powers" the Constitution vests in Congress, *see* U.S. Const. art. I, § 1, is the authority to distribute funds to states and private entities to promote "the general welfare" under the Spending Clause, *id.* art. I, § 8, cl. 1. Exercising these powers, Congress may, within limits, "attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

The executive branch may not. Rather, "[w]hen it comes to spending, the President has none of his own constitutional powers to rely upon" and can only exercise authority Congress has delegated. *City & Cnty. of S.F.*, 897 F.3d at 1233–34. Here, because Congress has not delegated to the executive branch the authority to impose the New Conditions, *see supra* Section I.A.1, Defendants unconstitutionally "claim[] for [themselves] Congress's exclusive spending power" and "attempt[] to coopt Congress's power to legislate." *See id.* at 1234.

---

separation of powers by barring grant recipients from "us[ing] grant funds to promote 'gender ideology'" and by requiring recipients to cooperate with federal immigration enforcement); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 432–41 (D. Md. 2025) (conditioning funding on recipients' denying gender-affirming care violated separation of powers); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261–63 (W.D. Wash. 2025) ("gender ideology" funding conditions violated separation of powers).

Defendants also violate the Presentment Clause, "which requires that all federal laws … be passed by both houses of Congress and signed by the President." *O'Connell v. Shalala*, 79 F.3d 170, 173 n.2 (1st Cir. 1996); *see also* U.S. Const. art. I, § 7, cl. 2. Nothing in the Constitution "authorizes the President to enact, to amend, or to repeal statutes" on his own. *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998). Defendants' imposition of the New Conditions attempts to amend unilaterally the statutes governing the myriad HUD and HHS grant programs in violation of the Presentment Clause. *See PFLAG*, 769 F. Supp. 3d at 441 ("Article I does not allow the President to circumvent bicameralism and presentment by unilaterally amending … federal appropriations through an executive order.").

Defendants' imposition of the New Conditions also violates the Take Care Clause, under which the President is obliged to "take care that the laws be faithfully executed," U.S. Const. art. II, § 3. Congress enacted statutes requiring Defendants to disburse funds Congress appropriated to carry out purposes Congress identified. By failing to follow those commands, Defendants fail to faithfully execute the law.

At bottom, the Founders established our system of separated powers to guard against "a concentration of power [that] would allow tyranny to flourish." *City of Chicago*, 961 F.3d at 892. In that system, "the power to wield the purse to alter behavior rests squarely with the legislative branch"—whose "elected representatives and dual chambers" supply "institutional protection from the abuse of such power." *Id.* That "institutional protection from abuse" would disappear if the executive branch could "impose [its] policy preferences regardless of the will of Congress." *Id.* Defendants' attempt to leverage federal funding "to effectuate [the executive's] own policy goals" violates the separation of powers. *See City & Cnty. of S.F.*, 897 F.3d at 1235.

**C. The "Gender Ideology"-Related Conditions and DEI-Related Conditions violate the First Amendment**

The various conditions requiring grantees to implement the Administration's views on gender as well as conditions implementing the Anti-DEI Executive Order violate the First Amendment's protection of "the freedom of speech," U.S. Const. amend. I.[12] While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Crucially, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Nor may it leverage government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998). And imposing a funding condition "not relevant to the objectives of the program" can also violate the First Amendment. *Open Soc'y*, 570 U.S. at 214. The gender- and DEI-related conditions transgress these limits.

### *1. The "Gender Ideology"-Related Conditions violate the First Amendment*

The HUD "Gender Ideology" Condition barring grantees from using grant funds to "promote 'gender ideology'" as defined in the "Gender Ideology" Executive Order, as well as the various conditions requiring grantees to comply with executive orders, violate the First Amendment. As another court recently held in preliminarily enjoining a similar funding condition, such conditions cannot be justified as the government merely refusing to

---

[12] The conditions unconstitutionally requiring grantees to implement the Administration's views on gender are the HUD "Gender Ideology" Condition as well as the conditions requiring grantees to follow the "Gender Ideology" Executive Order—the HUD CPD E.O. Condition, General HUD E.O. Condition, and SAMHSA E.O. Condition. The conditions implementing the Anti-DEI Executive Order are the HHS Discrimination Certification, April GPS HHS Discrimination Certification, May ACF Discrimination Certification, HUD Discrimination Certification.

"affirmatively fund[]" the targeted speech. *S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184, 1218–20 (N.D. Cal. 2025).

For one, as this Court preliminarily determined, these conditions unconstitutionally "require the affirmation of beliefs that by their nature cannot be confined within the scope of the Government program." *RICADV v. Kennedy*, 2025 WL 2988705, at *8 (cleaned up; quoting *Open Soc'y*, 570 U.S. at 221). As the Supreme Court has explained, a funding condition "by its very nature affects 'protected conduct outside the scope of the federally funded program'" when it "demand[s] that funding recipients adopt—as their own—the Government's view on an issue of public concern." *Open Soc'y*, 570 U.S. at 218 (quoting *Rust*, 500 U.S. at 197). The HUD "Gender Ideology" Condition and various E.O. conditions do just that. Under those conditions, a grantee risks noncompliance if it says anything recognizing someone's gender identity, such as by using a transgender person's preferred pronouns. Indeed, in a recent case, the government said merely using preferred pronouns would violate a materially identical funding restriction. *See S.F. AIDS Found.*, 786 F Supp. 3d at 1219. So this Condition leaves grantees with no choice but to affirmatively use the pronouns corresponding to the person's sex assigned at birth—speech reflecting the Administration's view that gender identity should not be acknowledged or respected—and thus impermissibly controls the grantee's own speech.

In addition, these conditions impermissibly aim at the suppression of disfavored ideas by, as this Court put it at the preliminary relief stage, "telegraph[ing] that the Defendants will deny federal funding … based on viewpoint alone." *RICADV v. Kennedy*, 2025 WL 2988705, at *8; *see also S.F. AIDS Found.*, 786 F. Supp. 3d at 1220 (concluding that a similar condition "violate[s] the First Amendment by withholding subsidies for a censorious purpose—aiming to suppress" what the government views to be "the dangerous idea[] of … 'gender ideology'"); *R.I.*

*Latino Arts v. NEA*, 777 F. Supp. 3d 87, 109–10 (D.R.I.), *appeal pending*, No. 25-2113 (noting that government cannot "use subsidies to suppress dangerous ideas" and concluding that bar on funding art programs that "promote gender ideology" was "a clear First Amendment violation"). The underlying Executive Order makes clear its goal is "to root out the 'extreme,' 'false claims' of gender identity that contradict the government's view that there is only one 'biological reality of sex'"—in other words, to erase the recognition of transgender people's existence. *S.F. AIDS Found.*, 786 F. Supp. 3d at 1220 (citing "Gender Ideology" Order §§ 1, 2(f)). By defunding any activities "related to the dangerous ideas it has identified," the HUD "Gender Ideology" Condition and various E.O. Conditions effectuate "precisely the kind of 'invidious viewpoint discrimination' that the Supreme Court has suggested would present First Amendment concerns even in the context of federal subsidies." *Id.* (citing *Finley*, 524 U.S. at 587).

Finally, the conditions also are "entirely untethered to any 'legitimate objective'" of the programs they burden. *SF AIDS Found.*, 786 F. Supp. 3d at 1218 (cleaned up). Instead, they are "directed … towards disfavored speech." *Id.* at 1219. Under these conditions, a grantee apparently could not "refer to the clients they serve … by any pronoun" or preferred name that matches their gender identity as opposed to their sex assigned at birth. *Id.* But that "is pure speech that has no relation to" grant programs' purposes. *See id.*

For all these independent reasons, the HUD "Gender Ideology" Condition and the various conditions requiring compliance with "Gender Ideology" Executive Order violate the First Amendment.

### 2.  *The DEI-Related Conditions violate the First Amendment*

The various conditions barring grantees from engaging in (purportedly illegal) "diversity, equity, and inclusion" activities—even outside the scope of the funded program—and requiring

45

them to agree to FCA materiality upfront violate the First Amendment as well.[13] These conditions impermissibly restrict speech "outside the scope of the federally funded program," *Open Soc'y*, 570 U.S. at 217.

There can be no question that these conditions constrain grantees' activities outside the scope of the funded program. They all compel grantees to certify that they do not "operate *any* programs"—whether funded by the grant or not—that (in the case of the April GPS HHS Discrimination Certification and May ACF Anti-DEI Certification) "advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" or (in the case of the updated HUD Discrimination Certification and the updated HHS Discrimination Certification) that "violate any applicable Federal antidiscrimination laws." Those requirements "on [their] face make[] clear" that they apply to "any program …, irrespective of whether the program is federally funded." *Chi. Women*, 778 F. Supp. 3d at 984.

Those conditions also impermissibly restrict speech on the basis of viewpoint. The April GPS HHS Discrimination Certification and May ACF Anti-DEI Certification are open about it. They specifically prohibit advancing "discriminatory equity ideology"—an undisguised suppression of a particular viewpoint. The prohibitions on promoting "DEI" and "DEIA" likewise curtail certain speech, as "diversity, equity, and inclusion" programs almost invariably contain speech promoting those values. Indeed, as the Administration itself has acknowledged, it is restricting "diversity, equity, and inclusion" because of disagreement with its "foundational rhetoric and ideas." The White House, *Fact Sheet: President Donald J. Trump Protects Civil*

---

[13] These conditions are the HUD Discrimination Certification, HHS Discrimination Certification, April GPS HHS Discrimination Certification, and May ACF Discrimination Certification.

*Rights and Merit-Based Opportunity by Ending Illegal DEI* (Jan. 22, 2025),

https://perma.cc/G8JU-QQ44.

While less transparent, the HUD Discrimination Certification and HHS Discrimination

Certification's requirement for grantees to certify that they do not violate anti-discrimination

law—and, crucially, that this is material for FCA purposes—also inhibits speech. The

surrounding context makes clear that these certification requirements are meant to further the

Administration's anti-DEI agenda. After all, when HUD first imposed its new discrimination

certification, Secretary Turner announced that it would ensure that funds would "not promote

DEI." HUD-AR 291. HUD at some point quietly changed the language to no longer expressly

refer to "diversity, equity, and inclusion" activities, but its purpose remained clear. Likewise, at

HHS, the agency first imposed a condition that expressly barred unlawful "diversity, equity, and

inclusion" activities as well as "discriminatory equity ideology." HHS-AR 6. The day of the

TRO hearing in this case, HHS replaced that with a condition that no longer expressly refers to

DEI—but nothing in the record suggests HHS intended this to narrow the condition's scope.[14]

*See* HHS-AR 219. Whether or not they expressly mention DEI, these conditions transparently

implement the Anti-DEI Order's instruction that federal agencies impose these types of

certification requirements to combat DEI activities—and threaten grantees with the specter of

FCA liability. And given the Administration's (novel and unfounded) view that DEI activities

---

[14] The record shows that HHS's Office of Grants withdrew the directive requiring HHS
components to impose the certification expressly mentioning DEI on May 28, 2025, after courts
in other cases had granted preliminary relief against similar certification requirements. HHS-AR
113; *see also* HHS-AR 5–6; *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-814, 2025 WL
1331488, at *1 (W.D. Wash. May 7, 2025); *Chi. Women*, 778 F. Supp. 3d at 984. HHS, however,
did not actually remove the condition from the Grants Policy Statement (which is incorporated in
all covered awards) or otherwise inform grantees that the condition had been withdrawn until
July 24, 2025, the day of the TRO hearing in this case.

are often illegal—and their plans to aggressively enforce that view—these conditions constrain grantees' speech regarding DEIA values. Anti-DEI Order § 3(b)(iv); *see also* Bondi Discrimination Memo at 7-8 (warning that the "content" of "DEI training programs" may be unlawful).

It does not matter that these DEI-related conditions purport to bar only conduct that violates nondiscrimination laws. For one, the Administration is taking a novel and incredibly broad view of what violates nondiscrimination laws, suggesting that all manner of DEI-related speech could be unlawful. *See* Bondi Discrimination Memo. For example, the Department of Justice has warned that the "content" of "DEI training programs" may be unlawful and has said that it could be illegal to talk about "toxic masculinity," to designate places as "safe spaces" for certain groups (even while making them open to all), or to discuss job applicants' "cultural competence." Bondi Discrimination Memo at 6, 8. Given that DOJ has announced its plans to pursue criminal and civil claims against grantees under the False Claims Act if they violate (DOJ's view of) the antidiscrimination laws—and given that the challenged DEI-related certifications require grantees to concede FCA materiality—these certifications will chill grantees' speech.

The vagueness of the DEI-related certifications makes their chilling effect even worse. As another court recently held in preliminarily enjoining a similar certification requirement, "[t]he problem … is that the meaning of this is left entirely to the grantee's imagination." *Chi. Women*, 778 F. Supp. 3d at 984. Indeed, the DEI-related certifications independently violate the First Amendment due to their vagueness and chilling effect, as explained further below. *See infra* Section I.D.

**D.  The New Conditions are unconstitutionally vague**

The New Conditions are unconstitutionally vague because they impose unclear, ill-defined prohibitions that give Defendants sweeping discretion over their enforcement. Due process fundamentally requires that the law give "fair notice of what is prohibited." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)). A government-imposed requirement violates due process if it fails to "provide a person of reasonable intelligence fair notice of what is prohibited," or if it fails to provide explicit standards for the law's application, opening the door to "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

"[H]eightened" and "stricter" standards for potentially vague regulations are applied in two circumstances, both of which are present here. *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (cleaned up). First, "vagueness review is more stringent when the challenged laws implicate the First Amendment's protections for speech." *United States v. Facteau*, 89 F.4th 1, 33 n.20 (1st Cir. 2023); *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). With any "content-based regulation of speech," "[t]he vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). "First Amendment freedoms need breathing space to survive, and therefore government may regulate in the area only with narrow specificity." *Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*, 144 F.4th 9, 36 (1st Cir. 2025) (Aframe, J., concurring) (cleaned up).

Second, "a stricter standard is applied" for vagueness where "criminal penalties may be imposed." *Frese, 53* F.4th at 6 (cleaned up). "The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno,* 521 U.S. at 872. And where, as here, there is "content-based regulation of

49

speech" that implicates criminal penalties, vagueness is of the utmost "special concern." *Counterman v. Colorado*, 600 U.S. 66, 100 (2023).

As the Court held at the preliminary relief stage, the New Conditions are unconstitutionally vague because they "do not clearly identify and define the contours of what is prohibited and therefore provides the Defendants with unlimited discretion." *RICADV v. Kennedy*, No. 2025 WL 2988705, at *10.

***DEI-Related Certifications.*** The DEI-related certifications[15]—which generally require grantees not to engage in "DEI" activities that violate federal antidiscrimination law—are unconstitutionally vague and violate both the First and Fifth Amendments.

These conditions, the Anti-DEI Order on which they are based, and the surrounding context signal that the Administration has a novel and expanded view that many until-recently-encouraged "DEI" and "DEIA" activities would violate federal anti-discrimination laws. But the DEI-related conditions fail to provide fair notice of what exactly the Administration believes is prohibited. As one court observed, what this Administration will claim is illegal "is anything but obvious." *Chi. Women*, 778 F. Supp. 3d at 984. The vagueness of the DEI-related conditions is amplified by the fact that "the thrust" of the underlying Anti-DEI Executive Order "is that the government's view of what is illegal in this regard has changed significantly with the new Administration." *Id.*; *see also, e.g.*, Anti-DEI Order § 1 (criticizing diversity, equity, and inclusion practices of a wide variety of "influential institutions of American society"); *id.* § 3 (revoking multiple longstanding diversity-related executive actions and requiring the Office of Management and Budget to "[e]xcise" from federal funding procedures all "references to DEI

---

[15] These are the HUD Discrimination Certification, General HUD Anti-DEI Certification, HHS Discrimination Certification, April GPS Discrimination Certification, and May ACF Anti-DEI Certification.

and DEIA principles, under whatever name they may appear," and to "[t]erminate all 'diversity,' 'equity,'" and similar activities).

The DEI-related conditions also fail to provide fair notice of how a grantee could comply while also carrying out various instructions Congress set forth by statute—such as the instruction to use FVPSA State Coalition Grants to address the needs of victims "who are members of racial and ethnic minority populations and underserved populations." 42 U.S.C. § 10411(d)(3); 34 U.S.C. § 12291(a)(9); *see also, e.g.*, 42 U.S.C. §§ 280b-1b(a)(7), (c); 1406(a)(3); 10414(g)(3)(F). Particularly given the Administration's explicit plan to use the FCA—and certifications like these—as a "weapon" in its battle against "DEI," the certification requirements' unclear commands leave Plaintiffs vulnerable to the kind of "arbitrary and discriminatory" application of the law that due process prohibits. *Grayned*, 408 U.S. at 108–09.

The DEI-related certifications fail ordinary vagueness review, and they certainly cannot meet the heightened standards applicable to regulations that implicate criminal liability or that regulate protected speech. The DEI-related certifications—and the accompanying exposure to burdensome *qui tam* litigation and potential False Claims Act liability—will predictably chill grantees from speaking in support of diversity, equity, and inclusion, including in their activities unrelated to the use of federal funds. That violates the First Amendment.

***HUD "Gender Ideology" Condition.*** The HUD "Gender Ideology" Condition, which bars grantees from using awarded funds to "promote 'gender ideology,'" unconstitutionally fails to provide fair notice of what it means to "promote" what the Administration terms "gender ideology." Is respecting a person's gender identity (for example, by using their preferred pronouns or name) enough, or does the restriction reach only more affirmative advocacy? The condition also does not provide fair notice of how a grantee could comply with this condition's

apparent command that grantees deny that individuals have a gender identity separate from their biological sex while also following binding regulations that require grantees to accommodate and serve individuals "in accordance with the[ir] gender identity." *See* 24 C.F.R. § 5.106. As with the DEI-related certifications, the HUD "Gender Ideology" Condition could not meet ordinary vagueness standards, and it falls far short under the heightened standards for requirements that implicate First Amendment speech and could lead to criminal liability.

**HUD Abortion Condition.** The HUD Abortion Condition unconstitutionally "obscure[s] meaning like Russian dolls stacked inside each other." *RICADV v. Kennedy*, 2025 WL 2988705, at *9. It leaves unclear what it means to use grant funds to "promote" so-called "elective abortion." For instance, it provides no guidance on whether advising someone about the option of abortion counts as "promoting," or whether more active advocacy is required. Nor does it provide any guidance on what counts as an "elective" abortion, which undeniably is subject to different interpretations among those holding different views on the subject.

**E.O.-Related Conditions.** The General HUD E.O. Condition, HUD CPD E.O. Condition, and SAMHSA E.O. Condition—which generally require grantees to comply with executive orders—also fail to provide fair notice. Executive Orders are issued by the president to direct federal agencies and officials on how to implement or enforce the law—they do not impose legal requirements or obligations on private parties such as federal grantees. These conditions require Plaintiffs to guess at what it means for an executive order to purportedly apply to a private party, and how to comply. That is particularly the case given that the referenced executive orders are themselves broad and vague.

**Title IX Certifications.** The HHS Title IX Certification and ACF Title IX Certification are also unconstitutionally vague because they and the related "Gender Ideology" Executive

Order signal that the Administration has a novel and expanded view of when conduct would violate Title IX, yet they do not provide fair notice on how a grantee could comply with the Administration's view without violating other binding regulations requiring grantees to treat individuals in accordance with their gender identity, *see, e.g.*, 45 C.F.R. § 1370.5.

Each of these conditions requires people of ordinary intelligence to guess at what is prohibited. *See Grayned*, 408 U.S. at 108. And by failing to provide guidance or standards to determine what activities this Administration considers newly prohibited, each of the conditions also subjects Plaintiffs' funding to the Administration's unlimited discretion and exposes them to potentially arbitrary and discriminatory enforcement. Faced with threatened civil penalties and potential criminal liability under the FCA, recipients are forced to curtail their activities by "steer[ing] far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (cleaned up).

### E. The New Conditions are ultra vires

Defendants' imposition of the New Conditions is also ultra vires. This Court has inherent equitable power to enjoin and declare unlawful executive ultra vires conduct. *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002). An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (cleaned up); *see California v. Trump*, No. 25-CV-10810-DJC, 2025 WL 2663106, at *7 (D. Mass. Sept. 17, 2025). "To act ultra vires a government official is either acting in a way that is impermissible under the Constitution or acting outside the confines of his statutory authority." *California*, 2025 WL 2663106, at *7 (quotation omitted). As explained above, *supra* Section I.A.1, Defendants acted without statutory authority in imposing the New Conditions. Because no statute, constitutional provision, or other source of

law authorizes Defendants to impose the New Conditions, the New Conditions are ultra vires, and Defendants must be enjoined from implementing or enforcing them.

## II. The Court Should Vacate the New Conditions and Permanently Enjoin Defendants from Re-Imposing or Otherwise Implementing Them

The Court should set aside the New Conditions under the APA and issue a permanent injunction barring Defendants from enforcing any conditions to which grantees previously agreed and from imposing the same or substantially similar conditions by other means in the future.

### A. The Court should set aside the New Conditions under the APA

The Court should set aside the New Conditions pursuant to 5 U.S.C. § 706(2). The APA directs courts to "set aside agency action" when the court determines the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory … authority"; "contrary to constitutional right, power, privilege, or immunity"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D). "[T]he text and history of the APA, [and] the longstanding and settled precedent adhering to that text and history," makes clear that to "set aside" an unlawful agency action means to "vacate" that action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring). APA vacatur is not a party-specific remedy. *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring); *accord, e.g.*, *Illinois v. FEMA*, 801 F. Supp. 3d 75, 97 (D.R.I. 2025).

APA vacatur is warranted here because the New Conditions violate the APA for the multiple reasons described above. This Court should set aside the New Conditions—such that no applicant or awardee is required to agree to them and no condition is enforced against any grantee.

**B.  The Court should enjoin Defendants from enforcing the New Conditions or imposing the same or substantially similar New Conditions in the future**

In addition to vacating the New Conditions, the Court should also permanently enjoin Defendants (1) from attempting to enforce any New Condition in any agreement that a grantee already signed or from otherwise treating any such New Condition as effective and (2) from imposing or enforcing the New Conditions or any substantially similar conditions via any new agency action. That injunctive relief is warranted to fully protect Plaintiffs from irreparable injury. Moreover, to ensure that Plaintiffs do not suffer any competitive disadvantage, this relief should bar Defendants from taking these actions against any grantee, not just Plaintiffs and their members.

Injunctive relief on top of vacatur is warranted where setting aside an agency action alone is not "sufficient to redress [the plaintiffs'] injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). So, for example, an injunction is warranted where the agency could attempt to take similar action again "as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024). In such circumstances, injunctive relief can appropriately "restrain agency officials from … conduct based on the disputed agency [action]." *Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023), *appeal dismissed*, No. 23-40650, 2025 WL 1304573 (5th Cir. May 1, 2025); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs).

Injunctive relief is necessary because merely setting aside the New Conditions and the policies imposing them would not on its own prevent Defendants from (1) attempting to enforce conditions to which grantees already agreed in order to get their funding or (2) adopting a similar new policy or imposing the same or similar conditions via a new agency action. The need for this

relief is all the more clear because this Administration has previously sought to re-impose funding conditions that a court had vacated. *See Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2908807, at *1 (D.R.I. Oct. 14, 2025), *appeal pending*, No. 25-2131.

A permanent injunction is warranted here. The issuance of a permanent injunction is appropriate where: "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief (i.e., an injury for which there is no adequate remedy at law); (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28, 40 (1st Cir. 2013) (cleaned up). First, Plaintiffs prevail on the merits for the reasons explained above. *See supra* Section I.

Second, absent permanent injunctive relief, Plaintiffs risk irreparable injury. To begin, some Plaintiffs or their members agreed to New Conditions when they accepted awards before Plaintiffs obtained preliminary relief in this case. Defendants must be enjoined from holding grantees to those conditions, lest Plaintiffs ultimately face the same irreparable harm that led this Court to stay the conditions in the first place. *RICADV v. Kennedy*, 2025 WL 2988705, at *10–11. If Defendants are able to take a new agency action to impose the New Conditions again, or substantially similar ones, Plaintiffs and their members would once again need to decide whether to: (a) accept unconstitutional and otherwise unlawful funding conditions that will impede their ability to provide core services and are at odds with their fundamental missions; or (b) forgo federal funds that are essential to their ability to fulfill their mission. As this Court already held, that is irreparable harm. *Id.*

Plaintiffs, moreover, will face irreparable harm if Defendants are able to impose or enforce the New Conditions against *any* grantee because Plaintiffs and their members compete with other grantees for funding from Defendants. Excusing some grantees from abiding by the unlawful conditions favored by Defendants while others remain subject to them would create an uneven playing field and incentivize Defendants to award grants to organizations on which it could impose the conditions. *Cf. City of Los Angeles v. Sessions*, No. 18-cv-7347, 2019 WL 1957966, at *6 (C.D. Cal. 2019) (concluding that "injunction that bars Defendants from applying [challenged funding conditions] only as to [the plaintiff] does little to ensure an even playing field"). The injunction should therefore bar Defendants from imposing or enforcing the New Conditions against anyone in order to ensure "complete relief" to Plaintiffs. *See Trump v. CASA, Inc.*, 606 U.S. 831, 850–51 (2025) (recognizing that universal injunction may be warranted to "award[] complete relief" to a plaintiff).

Finally, the balance of equities and the public interest weigh decisively in Plaintiffs' favor for the same reasons they did at the preliminary relief stage. *See RICADV v. Kennedy*, 2025 WL 2988705, at *11–12. On the one hand, "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Mass. v. NIH*, 770 F. Supp. 3d 277, 326 (D. Mass. 2025) (cleaned up); *see also Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). By contrast, the loss of funding to Plaintiffs and Plaintiff Coalitions' member programs would directly harm individuals and families experiencing homelessness as well as victims of domestic violence and sexual assault, depriving them of critical, life-saving services, including safe housing away from their abusers, legal assistance in seeking protective orders, safety planning and counseling, and much more. *See, e.g.*, Akins Decl. ¶ 25; Yglesias Decl.

57

¶¶ 10.a; 40; Guillette Decl. ¶ 17; Rios Decl. ¶ 27 ; Faisal Decl. ¶ 12;  Lee Decl. ¶ 15; Colón Decl. ¶ 13. Especially here—where the stakes are so high—the government should not be allowed to "leverag[e] the needs of our most vulnerable fellow humans" by conditioning federal grants on compliance with unlawful requirements. *King Cnty.*, 785 F. Supp. 3d at 891.

## CONCLUSION

The Court should grant summary judgment to Plaintiffs, vacate the New Conditions, and permanently enjoin Defendants from imposing, enforcing, or otherwise implementing the New Conditions or any substantially similar conditions.

February 11, 2026                    Respectfully submitted,

                                     */s/ Kristin Bateman*
                                     Kristin Bateman (D.C. Bar No. 90037068)[+]
                                     Robin F. Thurston (D.C. Bar No. 1531399)[+]
                                     Skye L. Perryman (D.C. Bar No. 984573)[+]
                                     Democracy Forward Foundation
                                     P.O. Box 34553
                                     Washington, D.C. 20043
                                     (202) 448-9090
                                     kbateman@democracyforward.org
                                     rthurston@democracyforward.org
                                     sperryman@democracyforward.org

                                     Daniel F. Jacobson (D.C. Bar No. 1016621)[+]
                                     Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
                                     Brian C. Rosen-Shaud (D.C. Bar No. 90042065)[+]
                                     Nina C. Cahill (D.C. Bar No. 1735989)[+]
                                     Jacobson Lawyers Group PLLC
                                     1629 K Street NW, Suite 300
                                     Washington, DC 20006
                                     (301) 823-1148
                                     dan@jacobsonlawyersgroup.com
                                     lynn@jacobsonlawyersgroup.com
                                     brian@jacobsonlawyersgroup.com
                                     nina@jacobsonlaywersgroup.com

Amy R. Romero (RI Bar # 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI


Lynette Labinger (RI Bar # 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI


Mary C. Dunn (RI Bar #6712)
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900
mcd@blishcavlaw.com
Cooperating counsel, Lawyers' Committee for RI


Lauren A. Khouri (D.C. Bar No. 10282288)[+]
Elizabeth E. Theran (D.C. Bar No. 90030162)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org
etheran@nwlc.org

[+] Admitted *pro hac vice*

*Counsel for Plaintiffs*

# APPENDIX: NEW CONDITIONS

| HUD Agency-Wide Conditions | |
|---|---|
| **General HUD E.O. Condition** | "Recipients of Federal Awards must comply with applicable existing and future Executive Orders, as advised by the Department, including but not limited to" a list of nine executive orders. |
| **General HUD Anti-DEI Certification** | Applicants and grantees must certify on form HUD-424-B that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws." |
| **HUD CPD Conditions / HUD CoC Conditions** | |
| **HUD "Gender Ideology" Condition** | "The Recipient … shall not use grant funds to promote 'gender ideology,' as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." |
| **HUD Discrimination Certification** | As originally adopted:<br>"The Recipient … agrees that it compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code" and "certifies that it does not operate any programs promoting diversity, equity, and inclusion that violate any applicable Federal anti-discrimination laws."<br><br>As revised:<br>"The Recipient … agrees that it compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code" and "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964." |
| **HUD Abortion Condition** | "The Recipient … shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment." |
| **HUD CPD E.O. Condition** | "This Agreement, the Recipient's use of funds provided under this Agreement … , and the Recipient's operation of projects assisted with Grant Funds are governed by … [a]ll current Executive Orders." |

| HHS DEI-Related Conditions | |
|---|---|
| **HHS Discrimination Certification**<br><br>In:<br>• October HHS GPS<br>• July HHS GPS<br>• July ACF Standard Terms<br>• CDC General Terms<br>• July HRSA General Terms<br>• SAMHSA Standard Terms | "By applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams. Recipients are responsible for ensuring subrecipients, contractors, and partners also comply." |
| **April GPS Discrimination Certification** | "[R]ecipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 3729(b)(4).<br><br>(1) Definitions. As used in this clause –<br><br>    (a) DEI means "diversity, equity, and inclusion."<br><br>    (b) DEIA means "diversity, equity, inclusion, and accessibility."<br><br>    (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.<br><br>    (d) Discriminatory prohibited boycott means refusing to deal, cutting commercial relations, or otherwise limiting commercial relations specifically with Israeli companies or with companies doing business in or with Israel or authorized by, licensed by, or organized under the laws of Israel to do business.<br><br>    (e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.<br><br>(2) Grant award certification.<br><br>    (a) By accepting the grant award, recipients are certifying that:<br><br>        (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote |

| | |
|---|---|
| | DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and |
| | (ii) They do not engage in, and will not during the term of this award engage in, a discriminatory prohibited boycott. |
| | (3) HHS reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of this award, operate any program in violation of Federal anti-discriminatory laws or engages in prohibited boycott." |
| **May ACF Discrimination Certification** | "[R]ecipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 3729(b)(4). |
| | (1) Definitions. As used in this clause – |
| | (a) DEI means "diversity, equity, and inclusion." |
| | (b) DEIA means "diversity, equity, inclusion, and accessibility." |
| | (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025. |
| | (e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin. |
| | (2) Grant award certification. |
| | (a) By accepting the grant award, recipients are certifying that: |
| | (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and |

| HHS "Gender Ideology"-Related Conditions | |
|---|---|
| **HHS Title IX Certification**<br><br>● Imposed by Office of Grants Title IX Directive<br><br>In:<br>● October HHS GPS<br>● July HRSA General Terms<br>● May HRSA General Terms<br>● SAMHSA Standard Terms | By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients, whose programs, are covered by Title IX certify as follows:<br><br>● Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.<br><br>● The above requirements are conditions of payment that go the essence of the Agreement and are therefore material terms of the Agreement.<br><br>● Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.<br><br>● Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.<br><br>● Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001. |
| **ACF Title IX Certification** | By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients whose programs are covered by Title IX certify as follows:<br><br>● Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.<br><br>● The above requirements are conditions of payment that go to the essence of the Agreement and are therefore material terms of the Agreement. |

| | |
|---|---|
| | • Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements. |
| | • Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement. |
| | • Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001. |
| **Other HHS Condition** | |
| **SAMHSA E.O. Condition** | "Recipients are required to comply with all applicable Executive Orders." |