IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*<br><br>*Defendants*. | Case No. 25-cv-342 |

**DECLARATION OF JULIO E. BERROA**

I, Julio E. Berroa, declare as follows:

 **I.** **Background**

  1. I am the Executive Director at Haus of Codec (HOC), a direct services nonprofit organization in Rhode Island offering housing services to youth ages 18-24.

  2. Haus of Codec is a non-profit corporation founded in 2021 and located in Providence, Rhode Island. Building community through the arts and educational empowerment, HOC is committed to ensuring an end to transition-aged youth homelessness in Providence through the arts and workforce development. HOC provides short-term housing solutions while searching for more long-term housing solutions. In the long term, HOC's goal is for our residents to have created a close-knit community of like-minded peer groups that can help support one another to achieve their long-term goals. Additionally, as our clients move on to more permanent housing solutions, they then can provide support to younger generations of clients who are facing

1

similar struggles just as the founding members did. From HOC's beginning the conversation of arts has always had an emphasis on freedom of expression and that it is crucial for the development of strong communities and individual spirits. We strive to facilitate opportunities for people to discover, explore, and nurture their own creativity and share their unique artistic voice.

3. HOC provides short-term housing for transition-age youth, ages 18 to 24, including emergency shelter (ES), transitional housing (TH), and rapid re-housing (RRH); wraparound supportive services, including weekly or monthly case management, access to a food pantry, clothing, and essential personal items, among other services; workforce development opportunities, including 1:1 coaching on resume writing and job searching, and workshops on interviewing and other areas. HOC also hosts art markets and helps develop client creativity and work ethics by creating art for sale, organizing and managing the art markets, and other volunteer opportunities for HOC. All HOC housing programs are for young adults ages 18 to 24, and Haus of Codec specializes in serving LGBTQIA+ youth.

4. In 2024,[1] HOC enrolled a total of 44 youth ages 18 to 24: 14 youth were provided emergency shelter, 16 youth were enrolled in the TH program, and 16 youth were enrolled in the RRH program. Since 2021, HOC has enrolled 84 youth in one or more of its housing programs.

5. HOC receives grants from the Department of Housing and Urban Development (HUD). My organization has an annual budget of roughly $1,166,276.17. Of that total amount, roughly $420,510.00 comes from HUD grants, including subcontracts.

---

[1] Data collected between December 1, 2023 and December 1, 2024.

2

## II.     HUD's New Funding Conditions

6. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

7. The Notice of Awards (NOAs) for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

## III.     Haus of Codec's HUD Grants

8. My organization has applied for and received a noncompetitive grant from HUD for the Continuum of Care Grant Program ("CoC Grant"), for the past three (3) years. HOC applied for and received its first HUD Youth Homelessness Demonstration Program (YHDP) Grant under the CoC Program in 2022 for a total funding obligation of $800,000.00. On February 26, 2024, HOC received a NOA for a CoC Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants for $400,000.00 for FY2023. The performance period for that grant was from October 1, 2024, to September 30, 2025.

9. On March 11, 2025, HUD awarded HOC a total of $420,510 through the CoC Grant for YHDP Transitional Housing and Rapid Re-Housing. The grant has a period of performance of October 1, 2025, to September 30, 2026. While the NOFO did not include the new HUD funding conditions described above, on September 3, 2025, HUD sent my organization our CoC NOA which contains the new HUD funding conditions. On September 5, 2025, HUD emailed me that Ft. Worth will close in late September through October, and that means that if we return a grant after Ft. Worth is closed in late September, we would have to wait until Ft. Worth reopens for funds to be contracted for the grant. Because our performance period started on October 1, 2025, and because of cash flow, we needed to be able to execute the grant before Ft. Worth closes, so that we could draw down funds in October. On September 4th 2025, after this Court issued a Temporary Restraining Order that included HOC, HOC executed the grant award, and is now actively drawing down the funds for this grant.

10. HOC relies heavily on the CoC Grant to fund critical services to support individuals and families experiencing chronic homelessness. For instance, these funds support the TH and RRH programs, which are nearly fully funded by HUD, and those programs would have to be entirely abandoned if the HUD funding was withdrawn.

11. Declining the HUD CoC funding would have a very significant detrimental impact on HOC and its mission. Without this funding, the TH and RRH programs would have to be completely abandoned, leaving certain youth (including 13 current clients receiving leasing support, and 5 clients receiving transitional housing) without any support. This would hurt the people we serve substantially. First, the clients receiving lease support would almost certainly lose their current housing. Second, the clients in transitional housing would have to be transferred to another transitional housing program. The clients in our programs would be

retraumatized by being forced out of needed programs that allow them to currently have housing. For those clients currently in transitional housing, they would be guaranteed to have to go on a new waiting list, as all of the transitional housing programs in Rhode Island are currently experiencing extreme scarcity of beds compared to the number of individuals in need. This would not only put their housing status at great risk, but also their mental and physical health.

12. HOC uses HUD funding to provide essential wraparound and case management services that address mental health and access to critical care. A loss of HUD funding would result in a loss of up to 2 staff members to provide these critical services. Because LGBTQIA+ youth have the highest suicide rates of any categories of youth, losing these services would most certainly accelerate the decline in the mental health of our clients in the TH and RRH programs, resulting in destructive decisions and poor health choices, including but not limited to suicidal ideations, self-harm, and death.

**IV.     HUD's New Funding Conditions Place Haus of Codec in an Untenable Position**

13. Agreeing to the HUD conditions would cause HOC profound harm. The funding conditions are vague, and several could be read to conflict with HOC's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD grants. The funding conditions may require HOC to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

5

14. HOC is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws and agreeing that compliance with those antidiscrimination laws is material for False Claims Act purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization's mission is expressly related to diversity, equity, and inclusion, in that we specialize in providing services for LGBTQIA+ youth, including individuals with disabilities, who have a lengthy history of housing instability. These vulnerable groups have become a target of the current Administration at a time when they need more support, not less. Our organization's mission and guiding principles, particularly our emphasis on supporting LGBTQIA+ youth seems likely to conflict with the certification, and it is unclear whether HOC could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

15. HOC is also unsure whether it can continue to operate programs that target underserved or marginalized communities, including the TH and RRH programs, workforce development, individual coaching and workshops, and other programs that provide services to the specific underserved population of LGBTGIA+ youth experiencing homelessness. Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

16. HOC is also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. In providing direct client services and wraparound supportive services, many of my organization's staff use clients' preferred pronouns to demonstrate support

6

for people who do not identify with the sex they were assigned at birth, recognize gender identity in providing direct assistance with access to trans-affirming therapists and the best possible resources to help them express their truest identity, and accommodate the needs of the LGBTQIA+ community in creating safe spaces and spaces for likeminded individuals to exist in community. It is very likely that HOC may not continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

17. HOC is concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." While HOC does not specifically advocate for abortion care, we do not know what the government may consider to "promote" abortion. Reproductive health access, including emergency contraception and abortion, is part of our organization's framework, and we offer clients information about any healthcare services that they need. When pregnant residents request assistance accessing abortion care, we provide them with resources on how to seek that care.

18. HOC is concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders." We do not know what this condition's broad and vague language means for our organization or how to comply with it, given the many new executive orders that it implicates.

19. The new funding conditions present my organization and its members with an impossible choice. My organization could forgo accepting HUD grant awards and face the direct consequences to HOC's financial health and ongoing operations and to those residents in the TH and RRH programs who receive direct services. Or my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory

7

requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

20. HOC fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, HOC would have to change its practices, in many cases contrary to its core values.

## V. These Funding Conditions Threaten to Harm LGBTQIA+ Youth Experiencing Homelessness

21. These funding conditions would have devastating effects on the community of LGBTQIA+ youth among other individuals between the ages of 18 and 24 experiencing homelessness who receive housing services from HOC. HOC was the first emergency shelter for LGBTQIA+ youth in our state, and is currently one of only a very few organizations offering services to this historically underserved and marginalized population. By agreeing to these conditions, we would be specifically threatening the housing status of all of our current and future TH and RRH residents.

22. If HOC were to change or abandon any of its wraparound services, such as providing access to healthcare services for transitioning youth, abandon its acceptance and support of gender non-conforming community members, or otherwise distance itself from "gender ideology" in order to comply with these conditions, the consequences to the entire organization would be devastating. Not only would this be completely contrary to HOC's

mission and purpose, but it would effectively retraumatize individuals who have already been subjected to the ostracization and shame of being different.

23. Conversely, if HOC turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the community of LGBTQIA+ youth experiencing homelessness.

24. HOC's operations are essential to create a community for LGBTQIA+ youth centered around art, creativity, safety, and inclusivity, which is critical for the emotional and physical wellbeing of members of this community who often feel ostracized and shamed for simply being who they are, and are at a greater risk of suicide and self-harm than any other group. In the absence of fully funded services, these individuals would have nowhere to turn to find the support and care that they desperately need to become full, active and confident participants in our society.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 5, 2026.

*[signature]*

Julio E. Berroa