## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

        *Plaintiffs*,

   v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services, *et al.*

        *Defendants*.

Case No. 1:25-cv-00342

## DECLARATION OF KRISTA COLÓN

I, Krista Colón, declare as follows:

### I.   **Background**

1. I am the Executive Director at the California Partnership to End Domestic Violence ("the Partnership"), a domestic violence coalition membership organization.

2. The Partnership was founded in 1993 as the California Alliance Against Domestic Violence. In 2005, the organization amended and restated the Articles of Incorporation, including a name change to the California Partnership to End Domestic Violence. It was founded and remains headquartered in Sacramento, California.

3. The Partnership is California's recognized state domestic violence coalition, representing over 2,000 advocates, organizations, and allied groups throughout the state. The Partnership supports service providers to prevent and end domestic violence. Through

public policy, communications, and capacity-building efforts, the Partnership aligns prevention and intervention strategies to advance social change.

4.  The Partnership creates a wide range of technical assistance documents for service providers and provides various trainings, including webinars, toolkits, and curricula. For example, the Partnership has a sample 40-Hour Training Curriculum that helps organizations meet California's domestic violence advocate training requirements under California Evidence Code §1037.1. Another example is the Partnership's "Building Change Together: Prevention Core Competencies" training, which equips advocates with the skills and knowledge to prevent domestic violence through the lens of the social-ecological model and systemic change.

5.  The Partnership provides support to over 100 domestic violence service providers statewide. With seven geographic membership regions, the Partnership consistently convenes in-person and virtual peer-to-peer connection spaces for advocates in their community. Their annual conference provides workshops across a wide array of topic areas and reaches hundreds of advocates every year. The Partnership's communications team works to educate the public and shift the narrative about domestic violence, connecting with the public through traditional media, social media, and awareness month campaigns. The Partnership's prevention team leads the "Building Change Together Training" and convenes Prevention Peer Networking spaces and other trainings to support prevention advocates in building their skills and strengthening their community-based efforts. The Partnership's policy team engages in state and federal legislative and budget advocacy, and advances systemic changes to improve programs and practices impacting survivors' lives. The policy team also focuses on addressing the intersection of

housing, homelessness, and domestic violence through systems change work, including supporting a cohort of eleven organizations throughout California to improve the safety and economic security of Californians who are experiencing homelessness due to domestic violence.

6. My organization receives grants from the Department of Health and Human Services (HHS). My organization has an annual budget of roughly $3,013,794. Of that total amount, roughly $1,360,195 comes from HHS grants, including HHS funds received directly from HHS and through subawards from the California Governor's Office of Emergency Services.

## II.     My Organization's Member Organizations

7. The Partnership is a membership organization with over 2000 member advocates. Members fall into one of two categories. The first category is organizational members, which includes (1) organizations dedicated to domestic violence prevention and/or intervention; (2) organizations with a specific program or project dedicated to domestic violence prevention and/or intervention; (3) governmental agencies, multi-disciplinary committees, and coalitions addressing domestic violence and/or intersecting social justice issues; and (4) organizations dedicated to addressing other intersecting social justice issues that may be related to, but are not specifically, domestic violence, (e.g. homelessness, child welfare, etc.). The second category is individual members.

8. The Partnership provides its members with various services, including listservs that function as a robust network of advocates and attorneys; policy briefings on relevant budget and legislative items; webinars, events, and trainings; and one-on-one technical assistance.

9. Members of my organization receive grants from HUD and HHS.

III. **HUD's New Funding Conditions**

8. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

9. The NOAs for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

10. I understand that HUD has a general, agency-wide policy of requiring compliance with these Executive Orders, has updated its standard Applicant and Recipient Assurances and Certifications to require applicants grantees to certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws," and that HUD's Office of Community Planning and Development (CPD), which administers the

Continuum of Care (CoC) CoC, Community Development Block Grant (CDBG),

Emergency Solutions Grant (ESG), HOME Investment Partnership Program (HOME),

and Housing Opportunities for Persons With AIDS (HOPWA) programs, among others,

issued guidance announcing that it will attach new conditions substantially identical to

the CoC Grant Conditions to Fiscal Year 2025 agreements governing all CPD-

administered grants.

IV.    **My Organization's Members' HUD Grants**

10. My organization's members have received HUD grants, including grants under the CoC

Grant Program and the Domestic Violence Bonus Funding through the CoC, Community

Development Block Grant Program (CDBG), and the Emergency Solutions Grants

Program (ESG). These grants are frequently subawards through their Continuum of Care

or other entities.

11. On July 1, 2024, HUD awarded Doe Member 1 a total of $26,830 through the Emergency

Solution Grants (ESG)  as a pass through from their county government. The grant has a

period of performance of July 1, 2024 through June 30, 2026 and a budget period of July

1, 2024 through June 30, 2026.  Doe Member 1 accepted this award on June 10, 2024.

The NOFO and agreement with the agency did not include new HUD funding conditions

but, as described above, I am aware that HUD enforces the CoC funding conditions for

ESG grants.

12. On May 13, 2025, HUD awarded Doe Member 1 a total of $10,000 through the

Community Development Block Grant (CDBG) program, as a pass through from a City

in their county. The grant has a period of performance of July 1, 2025 through June 30,

2026 and a budget period of July 1, 2025 through June 30, 2026. Doe Member 1 accepted

this award on May 23, 2025. The NOFO and agreement with the City did not include new HUD funding conditions but, as described above, I am aware that HUD enforces the CoC funding conditions for CDBG grants.

13. Declining this funding would have a very significant detrimental impact on my organization's members. Without HUD funding, Doe Member 1 would need to cut staff hours for two employees. The ESG grant funds an employee who supervises staff and answers the 24 hour crisis phone line. The CDBG grant funds a second employee who manages Doe Member 1's satellite office and provides direct services to clients, including restraining order assistance. Reducing hours for these employees would result in a reduction of quality of service at Doe Member 1's domestic violence shelter and longer wait times for service at Doe Member 1's satellite office, potentially eliminating restraining order assistance at that location entirely. When someone needs an emergency restraining order, the wait time matters.

14. Doe Member 1 responded to two NOFOs that closed on July 8, 2025 and applied for ESG and CDBG grant funding, receiving conditional awards in or around the fall 2025. I am aware that HUD will enforce the CoC funding conditions for these grants

15. On June 27, 2025, HUD awarded Doe Member 3 a total of $125,151 in grants under the CoC Grant program. The NOA included the new HUD CoC grant conditions. The grant has a period of performance of October 1, 2025 through September 30, 2026 and a budget period of October 1, 2025 through September 30, 2026. Doe Member 3 accepted the award.

16. Doe Member 3 relies on the CoC Grant program to support its rapid rehousing and transitional housing programs. Doe Member 3 serves 49 individuals through their rapid

rehousing program. An additional 6 survivors receive support through their transitional

housing program. Without CoC funding, these 55 survivors would likely lose access to

safe, stable housing, with no clear alternative source of support to replace what HUD

currently provides. Many of these individuals would face an increased risk of

homelessness or be forced to return to (or stay in) abusive situations. Additionally, these

funds not only cover rental assistance but also the advocacy services necessary to support

survivors on their path to independence and recovery. Without the HUD CoC funds,

survivors of violence likely will be homeless and at risk of addiction relapse.

17. Declining all HUD funding would have a very significant detrimental impact on my

organization's members. Without HUD funding, domestic violence service providers in

every corner of the state would have fewer funds available to provide housing services

for survivors. Programs would need to reduce staffing, reduce the number of shelter beds

available for survivors and their children, and reduce the amount of rental assistance and

other housing supports they provide for survivors and their children. Safe, stable housing

is an essential component for survivors' well-being and can provide a survivor with the

ability to heal from the experience of abuse. Housing insecurity is a primary reason why

survivors across genders and age ranges stay in abusive relationships and why children

continue to be exposed to domestic violence - a key risk factor for future perpetration and

chronic health conditions. According to the National Center on Family Homelessness,

57% of homeless women report domestic violence as the immediate cause of their

homelessness. Unstable housing and homelessness increase the vulnerability to new

forms of violence for survivors' and their children, creating a still greater risk that the

cycle of violence will continue into new generations. Survivors leaving abusive situations

are often fleeing dangerous, violence situations. Leaving an abusive relationship is one of the most dangerous times for survivors, when risk of violence or death increases. Emergency shelter, which is often funded through HUD and HHS grants, can be essential to keeping survivors and their children safe. Immigrant survivors are vulnerable to abusive partners using threats of immigration enforcement to maintain control over the survivor, and immigrants may have limited financial resources and opportunities for employment due to their legal status, which can limit their ability to access market rate housing when fleeing violence. According to the Report of the 2015 Transgender Survey, more than half (54%) experienced some form of intimate partner violence, including acts involving coercive control and physical harm and nearly one-quarter (24%) have experienced severe physical violence by an intimate partner, compared to 18% in the U.S. population. Ensuring that shelter and housing are available to all survivors, regardless of their gender identity, sexual orientation, immigration status, or other characteristics, is essential for keeping survivors safe. Domestic violence survivors also face barriers to exiting homelessness - abusive partners often interfere with a survivor's employment, restrict survivors' access to money, and ruin survivors' credit scores through unpaid debts taken out in the survivors' name, among other financial abuse tactics. Additionally, survivors are often navigating through physical and emotional health needs, supporting their children through the trauma impacts, and navigating through criminal and/or civil court proceedings. All of these dynamics make it even more essential that housing options are readily available for survivors. Fewer funds available to meet the housing needs for survivors will mean that more survivors and their children will experience homelessness in communities across California.

**V.    <u>HHS's New Funding Conditions</u>**

18. In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that
    imposed new conditions on grantees: It required that, "[b]y applying for or accepting
    federal funds from HHS, recipients certify compliance with all federal antidiscrimination
    laws and these requirements and that complying with those laws is a material condition of
    receiving federal funding streams," and applies to awards and modifications adding
    funding made on or after April 16, 2025.[1]

19. In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which
    includes the same HHS Discrimination Certification and applies to awards and
    modifications that add funding made on or after October 1, 2025.

20. The October HHS GPS also includes a requirement that grantees "certif[y]" that they are
    "compliant with Title IX of the Education Amendments of 1972 …, including the
    requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights
    Act of 1964" and that they "will remain compliant for the duration of the Agreement."
    This condition also requires covered recipients to "certify" that this requirement is a
    "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated
    on compliance" with Title IX and Title VI and that the recipient "therefore … is not
    eligible for funding … absent compliance with" those requirements, and that the recipient
    "acknowledges that this certification reflects a change in the government's position
    regarding the materiality" of those requirements. A recipient must also certify that it
    "acknowledges that a knowing false statement relating to Recipient's compliance with

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new
conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity
ideology in violation of Federal anti-discrimination laws." The July GPS replaced the April GPS.

the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

21. In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive Order. In July 2025, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

22. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

23. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

24. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification

verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

## VI.  **My Organization's and its Members' HHS Grants**

25. My organization and its predecessor organization has applied for and received a competitive grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Grant") every year since at least 2001.

26. My organization has used FVPSA Coalition Grant funds for many purposes. For instance, these funds support the Partnership's training and technical assistance to local family violence, domestic violence, and dating violence service programs, and to providers of direct services to encourage appropriate and comprehensive responses. This work includes monthly topical webinars, an annual membership meeting with in-depth discussion of key issues impacting service providers and survivors, and specialized, individual support and resources for service providers addressing complex issues related to supporting survivors through trauma and healing. We also utilize these funds to provide statewide conferences and training and provide prevention resources in an online searchable resource library, provide specialized training and assistance on effective prevention strategies, and conduct statewide public campaigns to commemorate Domestic Violence and Teen Dating Violence Awareness & Prevention Months; develop website content that addresses the fundamentals of domestic violence for general public

education, and feature resources in online library. We convene members in seven different geographic regions to ensure we're meeting the needs of each location. The FVPSA Coalition Grant also funds our statewide needs assessment to determine the needs of local service providers and allied professionals responding to the changing and wide-ranging needs of survivors and their families. We also utilize the FVPSA Coalition Grant funds to convene regional meetings that strengthen collaboration among advocates and promote coordinated responses to survivors and their children; to center our public communications and activities for the needs of survivors.

27. On July 8, 2025, HHS awarded my organization a total of $368,750 through the FVPSA Coalition Grant. The grant has a period of performance of October 1, 2024 through September 30, 2026 and a budget period of October 1, 2024 through September 30, 2026. On July 9, 2025, HHS sent a second notice of award providing an additional $13,657 for this period of performance and budget period, bringing the cumulative grant award to date to $382,407. The NOFO did not include the new funding conditions, but the NOA indicates that the HHS GPS and ACF Standard Terms and Conditions, which contains the new funding conditions described above, applies to the award.

28. Declining this funding would have a very significant detrimental impact on my organization. Without the funding for this grant, we would need to eliminate multiple staff positions. This would limit our ability to provide individualized technical assistance, provide monthly training webinars with content to support advocates' skills in working with survivors, and would limit our ability to convene our members for peer support, connection, and shared work. Declining this funding would likely reduce our public communications capacity, reducing our ability to educate the public about domestic

violence and prevention, our ability to execute awareness month campaigns, and our capacity to provide peer learning spaces for local service providers to strengthen their public communication work.

29. My organization has applied for and received a competitive grant from the Center for Disease Control (CDC) for the Domestic Violence Prevention Enhancement and Leadership Through Alliances (DELTA) program ("DELTA Grant") for the past 22 years.

30. My organization has used DELTA Grant funds for many purposes. For instance, these funds support our organization's focus on community and societal level changes to prevent domestic violence before it ever occurs. Our work is directed by the evidence base for specific strategies and guided by the CDC's Intimate Partner Violence Prevention Resource for Action: A Compilation of the Best Available Evidence. The Partnership's project focuses on strengthening economic supports for families. and increasing the number of Californians utilizing the paid leave policies and benefits available to them, including paid family leave, paid sick and safe days, and job-protected time off for domestic and sexual violence survivors. Our work includes a targeted effort to increase domestic violence service providers' understanding of how paid leave policies and benefits can be increasingly applied to domestic violence prevention, as well as work to build awareness and utilization of these benefits and policies among California's general population. We work to increase the number of individuals reached by domestic violence service providers who take paid leave authorized by state law, thus reducing poverty and economic stress. We work closely with the Statewide Prevention Collaborative to increase coordination of training, technical assistance, and data

collection and assessment. We also participate in state and national activities to share knowledge, skills, and practice of Intimate Partner Violence (IPV) primary prevention. Additionally, the Partnership facilitates four topic-specific peer learning circles. Finally, a core component of the DELTA project is evaluation work to build the evidence base of effective strategies.

In addition to the work done directly by Partnership staff, per DELTA grant requirements we also subaward a portion of the funds to a community-based domestic violence organization to implement community level prevention strategies. This organization is implementing a peer-led parenting program, "ReDefine Parenting" to engage parents and school communities by providing an opportunity for peer learning and leadership. Some of the issues addressed in this program are consent, bodily autonomy, and healthy masculinity. The organization is also implementing the Fourth R and a Comprehensive Sexual Education curriculum that was created to meet the requirements of the California Healthy Youth Act, to ensure that youth have access to Intimate Partner Violence prevention education. Additionally, grant funds support the organization's social marketing campaign, which addresses the risk and protective factors of weak community sanctions against IPV; low social capital and lack of institutions, relationships, and norms that shape community social interactions; and traditional gender norms.

31. On March 7, 2025, CDC awarded my organization a total of $499,964 through the DELTA Grant. This is the third year non-competing continuation award, for a five year grant period. The grant has a period of performance of March 2, 2023 through March 1, 2028 and a budget period of March 2, 2025 through March 1, 2026.  The NOFO and NOA did not include the new HHS and CDC funding conditions described above, but I

expect that the next award will be subject to the HHS GPS and CDC Terms and
Conditions with the next year's continuation award for the period beginning in March
2026.

32. Declining this funding would have a very significant detrimental impact on my
organization. Without the funding for this grant, the Partnership would need to eliminate
staff in our prevention team, which is already small. The DELTA grant is the largest
prevention funding source for the Partnership and represents over half of our prevention
budget. Without this funding we would lose the capacity to focus efforts on preventing
domestic violence from ever occurring. We would not have the capacity to engage
preventionists in peer learning circles to develop their skills, or to increase the awareness
and usage of critically needed economic supports for families. The loss of the funding
would also directly impact the community-based organization funded through the grant
subaward. Losing this funding would be a significant step backward towards our vision
of a California free from domestic violence.

33. The Partnership also receives HHS FVPSA funds through two subawards from the
California Governor's Office of Emergency Services (Cal OES). The State Coalition
Technical Assistance & Training Program is partially funded by HHS FVPSA funds. The
purpose of the Program is to be a resource to the domestic violence victim service field
by providing technical assistance, informational resources, and networking opportunities
to the domestic violence service providers in California. The Statewide Domestic
Violence Prevention Resource Center (PV) Program's purpose is to (a) establish, expand,
and maintain a resource center for the collection, retention, and distribution of
educational materials related to domestic violence, family violence, and/or teen dating

violence; (b) prevent domestic violence and intimate partner violence, including teen dating violence, prioritize underserved populations within communities, and build the capacity of local organizations to do this work; and (c) provide training and ongoing technical assistance for Cal OES Intimate Partner Violence Prevention (FD) Program subrecipients. The Partnership is currently the only eligible applicant and recipient of these funds. These two grants support the following activities conducted by the Partnership:

a. Hosting a distance learning domestic violence advocate training course, with consistent updates to this 40-hour training's modules.

b. Providing individualized technical assistance, in addition to convening regional meetings, regularly webinar trainings, and hosting an in-person multi-day conference to build the skills of domestic violence advocates and allied professionals.

c. Developing and conducting the skills-based training, "Building Change Together Prevention Core Competencies". Design of the training curriculum was drawn from groundbreaking work completed by the Partnership (with support from expert advisors and partner organizations) to articulate core competencies for prevention advocates, which would serve as the basis for a training curriculum. Core competencies for domestic violence prevention refer to the basic and essential frameworks, attitudes, characteristics, skills, and behaviors that are widely considered to be necessary for an individual and/or a team to develop, implement, evaluate, and sustain prevention initiatives in communities. This training creates a better supported, less isolated, and more sustainable prevention

workforce; Stronger, more effective efforts to prevent domestic violence; and a greater sense of connectedness to each other and to a larger evolving movement; Greater articulation of the unique and specific strengths and contributions prevention specialists bring to our communities and anti-violence movement.

d.  Monthly networking meetings that employ a strength-based coaching and capacity-building approach to help improve program performance, invite participation and diversity, facilitate learning, and emphasize outcomes and accountability.

e.  Participation in the quarterly California State Level Collaborative for domestic violence, sexual violence, and teen dating violence Prevention. The Collaborative is an ongoing forum for government and state coalition staff to promote comprehensive prevention and better support the field.

f.  Development of a Youth Advisory Committee composed of youth leaders working with direct service organizations to assist the Partnership in developing activities for Teen Dating Violence Awareness and Prevention Month. Additionally, the committee will advise the prevention field on best practices for developing a youth leadership program, engaging, and sustaining youth leaders.

g.  Training and technical assistance that fosters the advancement of prevention across the state by analyzing state- level policies to identify strategies that include, but are not limited to practices, training requirements, and programmatic expectations.

h.  An online resource center for the collection, retention, and distribution of educational materials related to domestic violence and/or family violence and its

17

prevention. This resource center includes training manuals, curriculum, reports, multi-media resources, books, and other educational materials on a wide variety of topics related to domestic violence and/or family violence and its prevention.

34. My organization's members have received HHS grants, including grants through the Family Violence Prevention and Services Act, as subawards from our state administrator, the California Governor's Office of Emergency Services (Cal OES). Cal OES receives a formula grant award from HHS and subawards the funds to direct service providers across the state. The majority of Cal OES' FVPSA funds are allocated to the Domestic Violence Assistance Program, where they are combined with state general fund and federal Victims of Crime Act Victim Assistance Formula Grant Program (VOCA). These grants support over 100 programs that provide comprehensive support, including emergency shelter to victims of domestic violence and their children, as well as support for the development and establishment of domestic violence services to unserved and underserved populations, including, but not limited to, rural areas, non-English speaking individuals, persons of color, and various geographical areas with limited access to services. The people of California need more resources, not less. In California FY2021-22, funded victim service organizations provided shelter to 13,370 individuals for a total of 354,227 shelter bednights. 15,706 requests for shelter went unmet. These programs answered 149,198 crisis calls, over 400 crisis calls per day.

35. My organization's members have received HHS grants, including grants through the CDC under the RPE Program and FVPSA through the Domestic Violence Assistance Program (DVAP). Members receive CDC RPE Program funding as passed through the California Department of Public Health (CDPH). 12 Partnership members received RPE

funding from CDPH with 5 year awards for the period of February 1, 2024 to January 31, 2029. Members received HHS funding as passed through the California Governor Office of Emergency Services (Cal OES). Approximately 100 Partnership members receive DVAP funding each year. Recipients must submit a continuation application each year in the summer.

36.     For example, Cal OES awarded Partnership Doe Member 1 a total of $100,398 through the Cal OES Domestic Violence Assistance Program (DVAP) using HHS FVPS funds in FY2024-2025. The grant has a period of performance of October 1, 2024 to September 30, 2025 and a budget period for the HHS FVPS portion of the funds are from October 1, 2024 through July 31, 2025. Partnership Doe Member 1 accepted this award on August 26, 2024. Partnership Doe Member 1 submits a yearly continuation grant application each year during the summer and received the most recent continuation award on or around October 1, 2025. Partnership Doe Member 1 fears the HHS GPS will apply.

37.  Additionally, Partnership Doe Member 1 received $ 208,942 through its county government's Domestic Violence Welfare to Work program using HHS Temporary Assistance for Needy Families funds in FY2024-2025. The grant has a period of performance of July 1, 2025 to June 30, 2026 and a budget period of July 1, 2025 through June 30, 2026. Partnership Doe Member 1 accepted this award on April 9, 2025. Partnership Doe Member 1 renews its contract with the county for these funds each year.

38.  Finally, Cal OES awarded Partnership Doe Member 1 a total of $94,445 through the Cal OES Intimate Partner Violence Prevention Program using HHS FVPS funds in FY2024-2025. The grant has a period of performance of January 1, 2025 to December 31, 2025 and the HHS FVPS funds have a budget period of January 1, 2025 - July 31, 2025.

19

Partnership Doe Member 1 accepted this award on November 4, 2024. Partnership Doe Member 1 submits a yearly continuation grant application each year during the fall. Partnership Doe Member 1 is in the fourth year of a five-year grant and received a continuation grant in Fall 2025 for the next funding period of January 1, 2026 through December 31, 2026.

39. Declining any of these funds would have a very significant detrimental impact on Partnership Doe Member 1. The organization has already lost over 200 planned staffing hours from July 2024 to present and is impacting its ability to serve the needs of our community. Losing any HHS grant would mean eliminating more positions or whole departments, impacting shelter clients, crisis line coverage, and crisis intervention and advocacy services at multiple offices. Partnership Doe Member 1 would not survive without the DVAP grants.

40. Partnership Doe Member 1 received HHS Community-Based Child Abuse Prevention Grants (CB-Cap) for $89,708 from their county for the grant period of July 1, 2025 to June 30, 2027 and the budget period of July 1, 2025 to June 30, 2027. The grant was accepted on May 12, 2205. CB-Cap provides school based prevention programming at elementary school level, mostly through after school programs, and intervention programming with known child survivors. Without this funding, Partnership Doe Member 1 would have to eliminate this program.

41. Partnership Doe Member 2 received a total of $850,00 through the Rape Prevention Education program from California Department of Public Health using HHS RPE funds in FY24-25. The grant has a period of performance of February 1, 2024 to January 31, 2029 and a budget period of February 1, 2024 through January 31, 2029. Doe Member 2

accepted this award on April 29, 2024. Without this funding, **Partnership** Doe Member 2
will be unable to provide sexual assault prevention services in their county. **Partnership**
Doe Member 2 implements a community based sexual violence prevention program that
includes youth and adult community leaders meetings, hosting sexual violence prevention
orientation training for organizations and their leaders, and in partnership with
community based organizations, provides multiple workshops about various sexual
violence prevention topics and implementations of sexual violence prevention such as
community-led campaigns, policies, practices, protocols designed to prevent sexual
violence. If **Partnership Doe Member 2** loses this funding, over 1.2 FTE staff positions
would be eliminated as would support for other community organizations.

42. Cal OES awarded Partnership Doe Member 2 $97,392 in HHS FVPS funds as a portion
of their Cal OES Domestic Violence Assistance Program total grant award for FY2024-
2025. The grant has a period of performance of October 1, 2024 to September 30, 2025
and a budget period of October 1, 2024 through September 30, 2025. Partnership Doe
Member 2 received the executed agreements for these awards on October 30, 2024 and
November 4, 2024. Partnership Doe Member 2 submits yearly continuation grant
applications each year during the summer. Partnership Doe Member 2 received its
continuations award that started on October 1, 2025, and fears the HHS GPS will apply to
that.

Services provided under DVAP include the following: 24-Hour Crisis Hotline, individual
and peer counseling, operating business centers, emergency shelters for survivors and
their children, providing emergency food and clothing, emergency response to calls from
law enforcement, medical advocacy and emergency response, transportation for

survivors, children counseling, criminal justice and social service advocacy, legal

assistance [referrals], court accompaniment, community resource and referral, household

establishment assistance, children's programs, and transitional housing assistance. These

are all things required by the grant to operate under this funding and are the large

majority of Partnership Doe Member 2's offered services. DVAP is one of Partnership

Doe Member 2's single largest funding sources.

43. Cal OES awarded Partnership Member Doe 3 a total of $97,392 in HHS FVPS funds as a

portion of their Cal OES Domestic Violence Assistance Program total grant award for

FY2024-2025. The grant has a period of performance of October 1, 2024 to September

30, 2025 and a budget period of October 1, 2024 through September 30, 2025.

Partnership Doe Member 3 submits yearly continuation grant applications each year

during the summer. Partnership Doe Member 3 received its continuations award, which

started on October 1, 2025, and fears the HHS GPS will apply to that.

44. Services provided under DVAP include the following: 24-Hour Crisis Hotline, individual

and peer counseling, operating business centers, emergency shelters for survivors and

their children, providing emergency food and clothing, emergency response to calls from

law enforcement, medical advocacy and emergency response, transportation for

survivors, children counseling, criminal justice and social service advocacy, legal

assistance [referrals], court accompaniment, community resource and referral, household

establishment assistance, children's programs, and transitional housing assistance. The

grant requires these services. DVAP is one of Partnership Doe Member 3's primary

funding sources.

22

45. Declining any of these funds would have a very significant detrimental impact on Partnership Doe Member 3. Losing any of this funding could impact emergency shelter services, crisis line coverage, and crisis intervention and advocacy services.

## VII. HUD's and HHS's New Funding Conditions Place My Organization and its Members in an Untenable Position

46. Agreeing to the HHS conditions would cause my organization and our members profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

47. My organization and our members are concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization's mission is to promote the collective voice of a diverse coalition of organizations and individuals, working to eliminate all forms of domestic violence. As

an advocate for social change, we advance our mission by shaping public policy, increasing community awareness, and strengthening our members' capacity to work toward our common goal of advancing the safety and healing of victims, survivors and their families.  We recognize the diverse experiences of survivors, the impact of systemic racism, oppression, and barriers, and the ways that communities are disproportionately impacted. We recognize the importance of centering culturally responsive approaches and creating communities of practice and peer support spaces that respond to the differing needs of LGBTQ+ survivors, Black, Indigenous, and People of Color experiencing abuse, and more. It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

48. My organization and our members are also unsure whether it can continue to operate programs that target underserved or marginalized communities, including continuing to convene peer spaces or create training and technical assistance content specific to LGBTQ+, immigrant, communities of color, or other specific populations. Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

49.  For the same reasons, my organization and our members are concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

50. My organization and our members are also concerned about the HHS ACF condition requiring a certification of compliance with the Title IX of the Education Amendments of

1972. Recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. My organization is concerned that this interpretation could require organizations to ignore federal law prohibiting discrimination based on gender identity and would ultimately result in victims who are transgender or gender-nonconforming being turned away from services.

51. Members Doe 1 and 3 are concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." While they do not provide abortion care, Members Doe 1 and 3 do not know what the government may consider to "promote" abortion. Reproductive health access, including abortion, is part of our members' framework, and they offer clients information about any healthcare services that they need. When pregnant survivors request abortion care, Members Doe 1 and 3 provide them with resources on how to seek that care.

52. Members Doe 1 and 3 are concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders." Members Doe 1 and 3 do not know what this condition's broad and vague language means for our organization or how to comply with it, given the many new executive orders that it implicates."

53. The new ACF funding conditions present my organization and its members with an impossible choice. My organization could forgo accepting ACF grant awards and face the direct consequences to my organization's financial health and ongoing operations. Or my organization could accept the funding with the conditions and jeopardize its mission and

compliance with statutory or regulatory requirements, and face enormous risks of

litigation and government investigations under the False Claims Act.

54. Additionally, my organization's members would have to fundamentally change their

programming or accept new grants and risk running afoul of various funding conditions

imposed on those grants. Foregoing the funds would have serious impacts on the health

and operations of our member organizations, and leave survivors with far fewer options

for finding safety. For example, members have expressed concerns about whether or not

these conditions will limit their ability to provide shelter and services to LGBTQ+

survivors, and if this will limit their ability to provide language on their website and in

public communication that makes clear they are a safe and welcoming space for survivors

of all identities. They have expressed concern that displaying a Pride flag, including

language specifically about serving LGBTQ+ survivors, asking survivors for their

pronouns, and engaging in other inclusive approaches could run afoul of these new

conditions. They have also expressed concern that they will be required to screen for

immigration status before accepting a survivor fleeing a dangerous situation into their

emergency shelter, and that providing any services to someone without clear legal status

would run afoul of these restrictions. For programs that provide legal services to support

survivors in seeking legal immigration remedies, these conditions create a challenging set

of barriers. The HHS restrictions will also negatively impact their ability to conduct

effective prevention work and focus on root causes that can lead to violence.

55. My organization and our members fear that if we agree to the new funding conditions, it

could face not only the loss of grant funds, but federal government investigation, private

party litigation under the False Claims Act, and potential liability for not complying.

These potential consequences of seeking a grant subject to the new, vague conditions
make my organization concerned about applying or accepting an award. To mitigate
these risks, my organization would have to change its practices, in many cases contrary to
its core values

## VIII.   **These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors**

56. These funding conditions threaten harm to domestic violence service providers who rely
on the Partnership for training and technical assistance that enhances their services for all
survivors of domestic violence and equips them with the tools to serve their communities.
These conditions could limit our ability to provide content specific to serving LGBTQ+
survivors, immigrant survivors, Black, Indigenous, or People of Color who are survivors,
or approaches that are grounded in diversity, equity, and inclusion. These limitations
would also fundamentally change the prevention work we are able to do.

57. Conversely, if my organization or its members turned down the funds because of the
conditions, the reduction or outright termination of these services would have devastating
effects on the community of victim service providers and the survivors and victims of
domestic violence that they serve.

58.  My organization's operations are essential to supporting the community of service
providers working every day to support survivors through trauma and healing, and to the
critically needed work of implementing strategies to prevent violence and abuse from
ever occurring, and to building safe, healthy communities. In the absence of fully funded
services, California' s response to survivors and communities will be weakened.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2026.

Krista Colón

_____

Krista Colón