IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*<br><br>*Defendants*. | Case No. 1:25-cv-00342 |

**DECLARATION OF DAWN DALTON**

I, Dawn Dalton, declare as follows:

**I.   Background**

1. I am the Executive Director at the District of Columbia Coalition Against Domestic Violence (hereinafter "the D.C. Coalition"), Washington D.C.'s federally designated domestic violence coalition.

2. The D.C. Coalition was founded in 1986 and is headquartered in Washington, D.C.

3. The D.C. Coalition is a membership organization of the domestic violence direct service providers in Washington D.C. It provides training, technical assistance, and a platform for collaboration for its member programs and leads local policy and advocacy efforts on behalf of and along with survivors of domestic violence.

4. The D.C. Coalition is a resource for the thousands of adults and children experiencing domestic violence in Washington, D.C. each year as well as the local organizations that

serve them. The D.C. Coalition provides regular training and technical assistance for its member organizations and trainings for community members and business owners—including faith leaders, health centers, educators, local criminal and/or civil legal system representatives, military personnel, beauticians, and bartenders—who are likely to interact with those experiencing domestic violence. It also works to build primary prevention efforts into programming available for young people in D.C.

5. The D.C. Coalition provides information and education to the mayor's administration and D.C. Council on matters that impact survivors of domestic violence. This includes survivor-centered feedback on proposed legislation and the implementation of services to ensure survivors have safe and confidential access to our community's resources.

6. The D.C. Coalition convenes a Survivor Advisory Board comprised of survivors of domestic violence who live in Washington D.C. and/or have received domestic violence services in Washington D.C. This group provides expert advice on the needs and experiences of survivors in D.C. and informs the D.C. Coalition's policy and systems engagement, community outreach, and training offerings.

7. The D.C. Coalition currently has an annual budget of roughly $2,266,126. In fiscal year 2025, Health and Human Services ("HHS") grants, including subcontracts, constitute about $920,000 of that annual budget. For fiscal year 2026, Health and Human Services ("HHS") grants, including subcontracts, would constitute approximately just under $800,000 of our annual budget.

II. **The D.C. Coalition's Organization's Member Organizations**

8. The D.C. Coalition is a membership organization with 16 member organizations. Members fall into one of three categories: 1) a nonprofit organization whose primary

mission is to provide services to survivors of domestic violence, dating violence, or stalking; 2) a nonprofit organization who has a dedicated program that serves survivors of domestic violence, dating violence, or stalking; 3) a nonprofit organization who does not have a program that serves survivors of domestic violence, dating violence, or stalking but survivors are accessing their services for other social supports. Most of the member organizations fall under the first category.

9. Members of the D.C. Coalition receive grants, including subcontracts, from HHS.

### III. HHS's New Funding Conditions

10. In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.[1]

11. In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

12. The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement."

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." The July GPS replaced the April GPS.

3

This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

13. In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive Order. In July 2025, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

14. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

15. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

16. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

IV.  **The D.C. Coalition's and its Members' HHS Grants**

10. The D.C Coalition has applied for and received a grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act (FVPSA Coalition Grant) for September 30, 2024 through September 29, 2026. The D.C. Coalition has used FVPSA Coalition Grant funds for many purposes. For instance, these funds support our engagement with culturally specific communities, providing training on trauma informed care, facilitating data collection for a D.C.-focused domestic violence needs assessment, participation in FVPSA subgrants in partnership with D.C.'s state administrator, partnerships with local health care professionals to improve domestic violence response, and training for allied organizations and government partners.

5

11. On July 9, 2025, HHS awarded the D.C. Coalition a total of $382,407 through this FVPSA Coalition Grant for FY2025. The grant has a period of performance of October 1, 2024 through September 30, 2026 and a budget period of October 1, 2024 through September 30, 2026. The Notice of Funding Opportunity (hereinafter "NOFO") did not include the new funding conditions, but the Notice of Award (hereinafter "NOA") indicates that the ACF Standard Terms and Conditions, which contain the new funding conditions described above, apply to the award. My organization accepted this award by drawing down funds some time in August or September 2025.

12. On September 26, 2024, HHS awarded the D.C. Coalition a total of $347,727 through the competitive Family Violence Prevention and Services – Grants for Battered Women's Shelters Discretionary Grants in fiscal year 2025. We received the NOA on September 26, 2024, and the grant had a period of performance of September 30, 2024 through September 29, 2026 and a budget period of September 30, 2024 through September 29, 2025. The NOFO and NOA did not include the new HHS funding conditions described above, but we understand our current award is be subject to the HHS GPS and ACF Standard Terms and Conditions, absent court intervention. This is a two-year grant, and we are currently in the first year of the award. We received the NOA for the second year. That year's grant amount is $409,091, for a budget period of September 30, 2025 through September 29, 2026.

13. Declining this funding would have a very significant and detrimental impact on my organization. Without the funding for this grant, parents who have experienced domestic violence and their children will not receive the mental health services they need to recover from harm and thrive, peer education and assistance from community health

workers, and access to healing workshops through wellness events. Additionally, domestic violence service providers will not receive training on how to implement best practices when facilitating parent workshops for parents who have been impacted by domestic violence. These workshops provide education to help parents understand their children's developmental growth, the impact trauma can have on the brain, and how-to best parent their children and help their children to heal. This HHS grant provides 100% of the funding for this program which will have to be completely cut if we are forced to decline this funding

14. Every year, beginning in 2019, the D.C. Coalition has received a formula grant in the form of a sub-award from the DC Department of Health (DC Health) that is made up of funds from Center for Disease Control's (CDC) Rape Prevention and Education program ("RPE Grant") and Maternal and Child Health Block Grant program. The grant had a period of performance of May 1, 2024 through January 31, 2027 and a budget period of October 1, 2024 through September 30, 2025. We are currently in the budget period of October 1, 2025 through September 30, 2026. While the former NOA did not include the new HHS funding conditions described above, we now understand the award is subject to the HHS GPS Standard Terms and Conditions, absent court intervention.

15. My organization has used this grant for many purposes. For instance, these funds support domestic and sexual violence prevention education efforts in Washington D.C., including engaging schools to implement age-appropriate education on healthy and unhealthy relationships. Additionally, we provide training and technical assistance to medical care providers including home visiting staff and school-based mental health counselors on

    how to screen for domestic violence in a manner a survivor would feel comfortable disclosing harm. We also provide information on available resources and referrals.

16. The D.C. Coalition's members have also received HHS grants.

17. For example, D.C. Coalition Member Doe has historically received an annual FVPSA grant as pass through funding from the D.C. government to provide support services for survivors of domestic violence.

18. On or around September 30, 2025, we expect HHS to award Member Doe approximately $300,000 through the District of Columbia's Department of Human Services' Family Violence Prevention and Services Act (FVPSA) Program funding in FY26. The grant has a period of performance and a budget period of October 1, 2025 through September 30, 2026.  Because this is a discretionary grant awarded after April 15, 2025, the new funding conditions in the HHS GPS apply to it. Member Doe accepted this award in the fall.

19. Declining this funding would have a very significant detrimental impact on the organization. Without the funding for this grant, Member Doe would be forced to reduce social services for victims. This reduction in funding Member Doe has come to rely on would undo progress made in hiring and retaining experienced staff to provide ongoing, long-term services to survivors. Without these services, particularly during a time of increased need among the community, survivors and their dependents would be at risk of remaining in cycles of violence.

V. **HHS's New Funding Conditions Place the D.C. Coalition and its Members in an Untenable Position**

20. Agreeing to the HHS conditions would cause my organization profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

21. My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally-unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization's mission is to build a community where domestic violence is replaced with human dignity. We apply a framework for identifying social, economic, cultural, political, and legal factors that have critical implications for those affected by violence, oppression, subordination, and discrimination. Our guiding principles are:

9

a. Respect and Dignity. We are dedicated to promoting equality, respect, and dignity among all people.

b. Social Justice. We demand that all people live free from violence, economic deprivation, discrimination, and prejudice. We are dedicated to the inclusion and active participation of individuals and groups that have been traditionally unheard and historically devalued or excluded.

c. Trauma-Informed. We see each individual we serve and those we work with through a trauma-informed lens. Trauma-informed means we recognize and respond to the effects of all types of trauma, including historical trauma a person has experienced at any and all points in their lifetime.

d. Cultural Humility. We honor every individual we work with and are committed to learning from and lifting up the voices of the people we serve. We honor culture, tradition, race, ethnicity, religion, age, sexual orientation, gender identity, gender expression, and ability.

e. Confidentiality. We provide confidential services and believe in each person's right to decide who knows their story. We safeguard and respect the privacy of the people we support.

f. Self Agency. We are committed to the freedoms and choices of the people we serve and support their right to decide their path to healing.

g. Survivor-Centered Supports. We assist people to direct the course of their own lives; survivors make, act on, and take responsibilities for their own decisions.

    h.  Accessibility. We advocate for justice, inclusion, and full community participation, removing barriers, real or perceived, to encourage the widest possible participation.

    i.  Accountability. We believe that everyone must work together to affect a coordinated community response with an intersectional lens for there to be a successful shift in societal attitudes and beliefs about domestic violence.

    j.  Self Care. We celebrate each individual's sense of belonging and value to this work. We recognize the right of each individual and organization to identify and practice self-care while being aware of vicarious trauma, re-victimization, and burn out.

It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

22. The D.C. Coalition is also unsure whether it can continue to operate programs that target underserved or marginalized communities, including training that provides framing of domestic violence as being a part of systemic oppression and support of member programs that are providing culturally-specific services. Now, it is unclear whether these programs would fall within the administration's interpretation of federal anti-discrimination law as prohibiting DEI and DEIA programs.

23. For the same reasons, my organization is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

24. The D.C. Coalition is concerned about the HHS ACF condition requiring a certification of compliance with Title IX of the Education Amendments of 1972. Recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. The D.C. Coalition is concerned that this interpretation could require organizations to ignore local and federal law prohibiting discrimination based on gender identity and would ultimately result in victims who are transgender or gender-nonconforming being turned away from services. We also regularly ask for and use pronouns, participate in an LGBTQ+ Budget Coalition, and include information about LGBTQ+ survivors in advocacy and public information.  My organization is further concerned that we will be unable to deliver training and materials to schools that fully address domestic and intimate partner violence and comply with anti-discrimination provisions.

25. The new funding conditions present my organization and its members with an impossible choice. My organization could forgo accepting HHS grant awards and face the direct consequences to my organization's financial health and ongoing operations. Or my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements and face enormous risks of litigation and government investigations under the False Claims Act.

26. Additionally, the D.C. Coalition's members would have to fundamentally change their programming or accept new grants and risk running afoul of various funding conditions imposed on those grants. For example, Member Doe would be forced to reduce social services for victims. This reduction in funding Member Doe has come to rely on would

undo progress made in hiring and retaining experienced staff to provide ongoing, long-term services to survivors. Without these services, particularly during a time of increased need among the community, survivors and their dependents would be at risk of remaining in cycles of violence.

27. My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core values.

## VI. These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors

28. These funding conditions threaten harm to survivors of domestic violence by weakening the support provided to domestic violence service providers, allied organizations, government partners, and local educational agencies in Washington D.C. Most of the residents of Washington, D.C. are people of color; and the D.C. Coalition meets the District's unique needs by providing culturally-responsive services. But these funding conditions, and the resulting limitations on our services and programs, would harm these survivors as they would have few services available that are responsive to their lived experiences.

29. Furthermore, if the D.C. Coalition or its members turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic and sexual violence.

30. The D.C. Coalition's operations are essential to ensuring a domestic violence service continuum that is responsive to the needs of survivors and that allied organizations and government partners are informed on best practices and how to implement funding requirements. In the absence of fully funded services, organizations and government agencies would not have access to the necessary training to implement services that adhere to local and federal statutes. I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2026

                                                                     */s/ Dawn Dalton*
                                                                     Dawn Dalton