IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HOUSE OF HOPE COMMUNITY DEVELOPMENT CORPORATION, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*<br><br>*Defendants*. | Case No. 25-cv-342 |

**DECLARATION OF JORDAN A. DAY**

I, Jordan A. Day, declare as follows:

    **I.**    <u>**Background**</u>

    1.    I am the President and Board Chair at House of Hope Community Development Corporation (HOHCDC), a homeless service provider in Rhode Island.

    2.    My organization was founded in 1989 and is headquartered in Warwick, RI, providing services across Rhode Island. We believe in safe, stable housing as a basic human right, and so address the trauma of homelessness by empowering constituents through direct service work, diversifying housing options, and advocating for policies to counter the issues that lead people to become homeless. Our ultimate aim is to end homelessness in Rhode Island.

1

3. My organization takes a multi-faceted approach against homelessness by addressing multiple barriers to housing faced by our constituents. HOHCDC funds and manages a housing stabilization program with 250 units of supportive housing; engages in intensive case management to address complex physical and mental health needs, and gaps in financial literacy and job skills; conducts street outreach to connect those living on the street with service provision; and provides basic needs to support the health and dignity of the unhoused.

4. My organization receives grants from the Department of Housing and Urban Development (HUD) and from the Department of Health and Human Services (HHS). My organization has an annual budget of roughly $4,500,000. Of that total amount, roughly $1,500,000 comes from HUD grants, including subcontracts; and another $300,000 comes from HHS grants, including subcontracts.

II. **HUD's New Funding Conditions**

5. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

6. The Notice Of Awards (NOAs) for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any

2

programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

### III.     My Organization's HUD Grants

7.      My organization has applied for and received multiple competitive grants from HUD for the Continuum of Care Grant Program ("CoC Grant"), for almost 20 years. We currently have four grants directly through HUD, and are a sub-recipient of another through Rhode Island Housing (RI Housing).

8.      On May 28, 2025, my organization received NOAs for the four grants we receive directly from HUD. RI Housing also received an NOA around that time for the grant of which we are a sub-grantee.

9.      Grant #RI0018L1T002417 for Permanent Supportive Housing in Warwick was initially awarded over 15 years ago. The previous grant period provided for $167,151 from September 1, 2024, through August 31, 2025. It was renewed for a two-year period, with a non-competitive renewal after the first year. The first year runs from September 1, 2025, through August 31, 2026. This grant provides funding for 18 units of permanent supportive affordable housing for 24 people. HOHCDC maintains the property and runs supportive services for all occupants. The Notice of Funding Opportunities (NOFOs) for these grants did not include the new funding conditions described above, but the recent NOA did. While HUD requires that a recipient sign grant agreements before the end of the grant period, my organization needed to accept the awards by September 1, 2025 in order to seek payment without interruption of services. After this Court issued a Temporary Restraining Order that included HOHCDC, my organization executed the grant award and is now actively drawing down the funds for this grant.

3

10. Grant #RI0064L1T002411 for Permanent Housing, Access to Home, was initially awarded in the early 2010s. The previous grant period provided for $438,457 from December 1, 2024, through November 30, 2025. It was recently renewed for two years, with a non-competitive renewal after the first year. The first year runs from December 1, 2025, through November 30, 2026. This grant provides rental assistance and supportive services to multiple households in the private rental market. The Notice of Funding Opportunities (NOFOs) for these grants did not include the new funding conditions described above, but the recent NOA did. While HUD requires that a recipient sign grant agreements before the end of the grant period, my organization needed to accept the awards by December 1, 2025, in order for there not to be an interruption in services. After this Court issued a Temporary Restraining Order that included HOHCDC, my organization executed the grant award and is now actively drawing down the funds for this grant.

11. Grant #RI0128L1T002402 for Permanent Housing, Dean Street Studios, was initially awarded in 2023. The previous grant period provided for $209,528 from August 1, 2024, through July 31, 2025. It was recently renewed for two years, with a non-competitive renewal after the first year. The first year runs from August 1, 2025, through July 31, 2026. This grant provides on-site intensive case management services to 51 residents, including supports for people with mental health challenges and substance use disorders; training on life skills such as job searching; and more. The Notice of Funding Opportunities (NOFOs) for these grants did not include the new funding conditions described above, but the recent NOAs did. While HUD requires that a recipient sign grant agreements before the end of the grant period, my organization needed to accept the awards by August 1, 2025, in order to avoid interruption of

4

services. After this Court issued a Temporary Restraining Order that included HOHCDC, my organization executed the grant award and is now actively drawing down the funds for this grant.

        12.      Grant #RI0115Y1T002402 for Youth Housing Demonstration Program, HYPE Youth Outreach, was also initially awarded in 2023. The current grant period provides for $84,652 from October 1, 2024, through September 30, 2026. It was recently renewed for two years, with a non-competitive renewal after the first year. The first year runs from October 1, 2025, through September 30, 2026. This grant funds street outreach services to 18–24-year-old homeless young adults. These services include connecting constituents with youth-specific resources; housing; efforts to reconnect with family as it is safe and appropriate; and basic needs supplies. The Notice of Funding Opportunities (NOFOs) for these grants did not include the new funding conditions described above, but the recent NOAs did. While HUD requires that a recipient sign grant agreements before the end of the grant period, my organization needed to accept the awards by October 1, 2025, in order to avoid interruption of services. After this Court issued a Temporary Restraining Order that included HOHCDC, my organization executed the grant award and is now actively drawing down the funds for this grant.

        13.      Grant #RI00031L1T002316/2417 for RI Rental Assistance Program is a HUD-funded pass-through grant through RI Housing. The most recent iteration of this grant, #RI00031L1T002316, provided HOHCDC with $654,000 of $4,964,705 awarded to RI Housing for the period January 1 to December 31, 2025. This grant was recently renewed as Grant #RI00031L1T002417, running from January 1 to December 31, 2026. It provides for supportive services and rental assistance for 30 households, Homeless Management Information System (HMIS) connectivity, and administrative costs.

14.     Declining the HUD Continuum of Care (CoC) funding would have an extremely detrimental impact on my organization and its mission. My organization relies heavily on our CoC grants to fund critical services to support individuals and families experiencing chronic homelessness – they are our largest sources of funding, and therefore absolutely critical to our core infrastructure. Without this funding, not only would key services provided by individual grants (as described above) be terminated or greatly diminished, but our ability to support hundreds of Rhode Islanders facing housing instability would be placed in jeopardy.

**IV.     HHS's New Funding Conditions**

15.     In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.

16.     In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

17.     The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX

6

and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

18. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

V. **My Organization's HHS Grants**

19. My organization has been a sub-grantee of an HHS grant through the Substance Abuse and Mental Health Services Administration (SAMHSA), passed through the Rhode Island Department of Behavioral Health, Developmental Disabilities and Hospitals (BHDDH). BHDDH was initially awarded this grant in 2016. Most recently, it was renewed for the period of October 1, 2024, through September 30, 2028, with HOHCDC receiving $299,000 of a $300,000 per year award.

20. My organization has used these SAMHSA funds to support our PATH program: Projects that Assist the Transition from Homelessness. This program involves street outreach,

social work, intensive case management, and harm reduction, particularly for those experiencing unsheltered chronic homelessness and comorbid mental health challenges.

21. The grant Agreement did not include the new HHS funding conditions described above, but I expect that the next award will be subject to the HHS GPS Terms and Conditions.

22. Declining this funding would have a significant detrimental impact on my organization. Without the funding for this grant, approximately 800 constituents without permanent shelter would experience cutbacks in the basic resources and services we provide to preserve their lives and dignities as they take steps toward reintegrating with mainstream society.

VI. **HUD's and HHS's New Funding Conditions Place My Organization in an Untenable Position**

23. Agreeing to the HUD and HHS conditions would cause my organization profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD and HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for our community members experiencing homelessness.

24. My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, and that by signing any NOA would indicate that complying with those antidiscrimination laws is material to the False Claims Act. Though we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the

government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA.

25.     My organization's mission is grounded in the professional ethics of social work. Social work requires advocates to address clients without judgement or conditional service related to the identities and life experiences they disclose – to meet them where they are. It follows that building respectful, authentic relationships with our clients is imperative to our mission. If we aim to address homelessness by taking a multi-faceted approach (with particular consideration to the traumatic nature of experiencing homelessness), we must also acknowledge and honor the unique backgrounds (i.e. diversity) within our own clientele. It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

26.     For the same reasons, my organization is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

27.     My organization is also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. In providing direct client services and technical assistance, many of my organization's staff use clients' preferred pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth, recognize gender identity in providing direct assistance, and accommodate the needs of the LGBTQ+ community as appropriate for their care. It is unclear whether my organization may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

28. My organization is concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." We do not know what the government may consider to "promote" abortion, and if our work is considered as such. Part of social work specifically and client-centered care/advocacy generally, means relating to our clients all the available options under State law related to their healthcare and housing needs. We do not provide abortion care ourselves, but if a client expresses an interest in an abortion, we will assist them in seeking appropriate medical advice.

29. My organization is also concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders." Our concern here is twofold. First, the language used in many of the current Executive Orders is vague and of dubious legal standing. It is impossible to know how we may or may not be in compliance with the Orders as they stand. Second, as further Executive Orders are released, we are concerned that we will face a similar process to this one, where our critical work will be further interrupted by political distraction.

30. The new funding conditions present my organization and its members with an impossible choice. My organization could forgo accepting HUD and HHS grant awards and face the direct consequences to my organization's financial health and ongoing operations. Or, my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

31. My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential

consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices and risk severely curtailing its efficacy.

### VII. These Funding Conditions Threaten to Harm Everyday Rhode Islanders

32. These funding conditions threaten harm to everyday Rhode Islanders. Of course, our work is primarily targeted at the individuals comprising Rhode Island's homeless population. But with so many Rhode Islanders living paycheck to paycheck, where just one misfortune could send a family into financial crisis, our work serves as a buffer between a home and the street for all those experiencing housing instability.

33. Our work has further impact on communities as a whole. Through our social work, we connect constituents to high-quality housing, public education, healthcare, career development, jobs, and more. In doing so, we reduce trauma and pathways toward incarceration, and promote public health. Integrating individuals into community where they can participate economically and socially in a healthy way pays dividends to the entire community.

34. Agreeing to the new funding conditions could require us to give up the holistic approach we take to achieve those dividends for individuals and communities. If we are unable to build relationships with our clients grounded in grace, regardless of their proclaimed identity or individual healthcare choices, our provably effective social work model becomes defunct. Our clients remain unmoored, unhoused, and unable to participate fully in society.

35. Conversely, if my organization or its members turned down the funds because of the conditions, the reduction or outright termination of our services would, as described, have devastating effects on our community, and also our staff. An estimated 80% of HOHCDC staff have experienced of homelessness, substance use disorders, incarceration, and/or other related

11

forms of trauma. They work every day to help others overcome the challenges they once faced. The termination of these grants would result in massive layoffs to those same staff members that serve as leaders to their peers currently using HOHCDC services. To rip them away from their employment and pitch them back into financial and possible housing instability would be a remarkably cruel twist of fate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2026.



Jordan A. Day