IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*<br><br>*Defendants*. | Case No. 1:25-cv-00342 |

**DECLARATION OF KIRSTEN FAISAL**

I, Kirsten Faisal, declare as follows:

**I.      Background**

1.      I am the Director of Training and Technical Assistance at the Iowa Coalition Against Domestic Violence (Iowa Coalition). Through a network of 23 statewide victim service programs, the Iowa Coalition provides comprehensive services to survivors of violent crimes, by taking a survivor-centered approach to victim services and supporting programs providing services to underserved populations, and providing member organizations with training, technical assistance, and other resources.  The Iowa Coalition also serves as a direct service provider offering a legal program, financial literacy, educational scholarships, and emergency client assistance.

2.      My organization was founded in 1985 and is headquartered in Des Moines, IA. The Iowa Coalition's mission is "to engage all people in a movement to change the social and

political systems that perpetuate violence. We do this through education, advocacy, and quality services." Its purpose includes addressing "the oppressive conditions and systems that perpetuate violence" and advancing "the needs of all people by shaping public policy, increasing civic engagement, and strengthening relationships to change the social and political systems that perpetuate violence." The Iowa Coalition refers to our "plumbline" when referencing moving toward our purpose horizon. Our plumbline allows us to measure our course in service to our purpose. It allows for course correction and gathered momentum while staying centered and on course for the long arc of social/racial justice work toward a world that works for everyone, to the last girl.

3. The Iowa Coalition has a forty-year history of advancing best practices and engaging systems that respond to domestic violence, providing training and technical assistance, and lifting survivors' voices.

4. The Iowa Coalition first created statewide standards of service in the early 1990s. They have gone through several iterations since then, with the biggest overhaul taking place in 2012. They were recently updated with minor revisions and ratified by the Iowa Coalition's member organizations in 2024. The standards of service are detailed and informative. It includes, for example evidence based best practices on emergency and long-term housing, non-judgmental victim-centered interventions and supports, and non-discriminatory and voluntary accessible services that meet the distinct needs of all people. They require that services to victims cannot be restricted based on: race, ethnicity, religion, gender, age, sexual orientation, substance use or abuse outside of shelter, disabilities, income, country of origin, immigration status, or English proficiency.

5. The Iowa Coalition plays a central and official role in Iowa's comprehensive response to domestic abuse. Under Iowa Law, courtroom victim counselors must be affiliated with either the Iowa Coalition or the state's sexual assault coalition. Similarly, victim counselors must receive at least twenty hours of training by the Iowa Coalition or one of two other organizations.

6. The Victims Assistance Section of the Iowa Attorney General's Office requires that all domestic abuse advocates who work in domestic violence shelters be certified by the Iowa Coalition and that all programs operate according to the standards of service developed by the Iowa Coalition in order to be eligible for funding.

7. The Iowa Coalition provides member organizations and the public with a variety of other resources to advance quality and necessary services to victims of domestic abuse. These include best practice documents to aid in: supporting immigrant victims of crime; providing affirming and safe services to LGBTQ+ identifying individuals; making decisions around child abuse reporting; and addressing confidentiality when law enforcement comes to a shelter. They also include direct resources for victims of crimes, including financial literacy classes, support groups for non-English speaking victims, outreach and engagement in rural communities, and housing and economic empowerment resources.

8. In fiscal year 2024, the Iowa Coalition responded to 1,075 technical assistance requests, providing critical support to advocates, organizations, and leaders serving victims across Iowa. The same year, the Iowa Coalition organized and completed 708 training, equipping 1,184 advocates and community members with tools to address domestic violence and foster prevention efforts. The Iowa Coalition held twenty-four community engagement events, including an annual Dia de los Muertos Tribute for Domestic Violence Awareness Month and

Advocacy Day, raising awareness of the root causes of violence and amplifying the voices of survivors of violence and the crime victim service providers that assist them. Fifty-two students were awarded scholarships through the Iowa Coalition's Alice Barton Scholarship Program, empowering survivors to pursue education and economic independence.

9. My organization receives grants from the Department of Health and Human Services (HHS). My organization has an annual budget of roughly $1.3 million. Of that total amount, roughly $490,670 comes from HHS grants, including subcontracts.

## II. My Organization's Member Organizations

10. The Iowa Coalition Against Domestic Violence is a membership organization with 23 member agencies. To be a member, an organization must have, as its primary focus, crisis response services to crime victims and their families through crisis intervention, accompaniment during medical and legal proceedings, and follow-up counseling. Members must also provide only voluntary-based services, ensure confidentiality in services, and comply with our standards of service, our code of ethics, federal funding certified assurances of the Family Violence Prevention and Services Act, the Victims of Crime Act, and the Violence Against Women Act. Members pay a portion of their domestic violence services budget in dues.

11. The Iowa Coalition's membership includes a member, SafePlace, which provides services to victims of domestic abuse, sexual assault, stalking, human trafficking, homicide and other violent crimes in metro area and ten rural counties. SafePlace uses the funding for supportive services to survivors at risk or already homeless, provide intervention services to ensure housing stability, house victims of domestic and sexual violence in transitional housing and permanent housing models in rural and metro areas.

12. Members of my organization receive grants from HUD.

### III. HUD's New Funding Conditions

8. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

9. The NOAs for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

### IV. My Organization's Members' HUD Grants

10. My organization's members have received HUD grants, including grants under the CoC Grant Program and Emergency Solutions Grant Program. These funds are received directly from HUD. Awards are signed directly with HUD.

11. On January 29, 2025, HUD awarded SafePlace a total of $115,775 through the CoC Grant in FY2025. The grant has a period of performance of January 1, 2025, through December 31, 2025, and a budget period of January 1, 2025, through December 31, 2025. SafePlace accepted this award on January 31, 2025. The NOFO and NOA did not include the

new HUD funding conditions described above, but SafePlace's next award included those conditions. SafePlace also received funding for a domestic violence expansion project that began January 1, 2026, and increased the current project by $298,382.

12. Declining this funding would have a catastrophic detrimental impact on my organization's members. Without HUD funding, SafePlace would be forced to make devastating cuts to housing advocacy and support services. SafePlace would face the loss of trained staff who provide direct care to victims/survivors, including safety planning, emergency shelter access, housing navigation, and legal advocacy. Survivors fleeing violence would be left without critical housing support, increasing their risk of homelessness or returning to unsafe environments. The ripple effect would harm not only individual survivors, but also the broader community—including local law enforcement, healthcare providers, and child welfare systems—as the need for emergency response and crisis intervention surges. This funding is essential to keeping survivors safe and ensuring our communities continue to have a coordinated, trauma-informed response to domestic violence.

13. SafePlace has received HUD funding since 2016. They plan on applying for the Iowa Balance of State CoC to provide CoC Rapid Rehousing in other counties.

**V. HHS's New Funding Conditions**

14. In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal

funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.[1]

15. In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

16. The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

17. In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." The July GPS replaced the April GPS.

7

explicitly refer to the "Gender Ideology" Executive Order. In July 2025, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

18. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

19. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

20. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

### VI. My Organization's and its Members' HHS Grants

21. My organization has applied for and received a grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Coalition Grant") for the past 39 years.

22. My organization has used FVPSA Coalition Grant funds for many purposes. For instance, these funds support training for mediators in family law cases that involve domestic abuse; victim counselor training for new advocates around the state; advance training and technical assistance on topics such as serving immigrant victims of crime, engaging men, best practice for serving LGBTQ+ survivors; technical assistance on HUD regulations, best practice and protocols for homeless and housing services; expert witness consultation and testimony in domestic abuse prosecutions; and crisis counseling, information, referrals, and support for victims of violent crime.

23. On July 8 and 9 2025, HHS awarded my organization a total of $382,407 through the FVPSA Coalition Grant for FY 2026 and a supplemental award, respectively. The grant has a period of performance of October 1, 2024, through September 30, 2026, and a budget period of October 1, 2025, through September 30, 2026. The NOFO did not include the new funding conditions, but the NOA indicates that the HHS GPS and ACF Standard Terms and Conditions, which contain the new funding conditions described above, apply to the award.

24. On August 1, 2024, HHS awarded my organization a total of $350,670 through the FVPSA Coalition Grant in FY 2025. The grant has a period of performance and a budget period of October 1, 2023 through September 30, 2025. My organization accepted this award on October 1, 2024. While that NOFO and NOA did not include the new HHS funding conditions described above, the next award is subject to the HHS GPS and ACF Standard Terms and

Conditions. The Iowa Coalition receives yearly continuation for the FVPSA Coalition Grant and we received notice of the new award for this budget and project period on July 8 and 9, 2025.

25. Declining this funding would have a catastrophic detrimental impact on my organization. Without the funding for this grant, up to 5 FTE positions, which is equivalent to half the current staff, would be laid off. The Iowa Coalition is an essential part of the structure of victim services in Iowa. The Iowa Coalition provides consistency in services through training and maintenance and enforcement of standards of services. The Iowa Coalition strengthens the infrastructure of victim services by providing evidence-based training and specialized support to each member program and direct service provider to meet their technical needs. Without this funding, domestic violence service providers will no longer have a unified voice at the state and federal level to ensure policies and protocols are victim centered; this funding helps us monitor, advocate, and shape policies and proposals that affects survivors safety, housing, law enforcement response, and economic justice and it helps us push back on harmful policies and advance systemic solutions to end violence. Victims will be impacted too, particularly those from underserved communities, as they would experience greater barriers to receiving vital services due to lack of trauma-informed care training among service providers, especially for unhoused/homeless individuals. Further, the legal system would be less victim-friendly with victims entering into mediation and other processes without specialized knowledge of domestic violence. Without the Iowa Coalition's services, systems will become more fragmented, and survivors are left navigating unsafe, and inequitable conditions. Our work is a strategic investment in public-safety, survivor well-being, and a more just response to domestic violence victims across all sectors.

26. All of my organization's members receive HHS grants, including Family Violence Prevention and Services Act Grants (FVPSA). These grants are passed through the Iowa Attorney General's Office, Victim Assistance Section (VAS) through a competitive process. For example, on October 8, 2024, VAS awarded Iowa Coalition member SafePlace a total of $140,800 from FVPSA monies awarded to the state on FY 2025. The grant had an initial performance period of and budget period of October 1, 2024 through September 30, 2025. SafePlace accepted this award on October 8, 2024. Many of our members, including SafePlace, as the region's dedicated victim services shelter received FVPSA funding for FY 2026 as well. SafePlace, like other members, submits a competitive application annually and awards are typically granted in October of every year to match the federal fiscal year. SafePlace received its new award in fall 2025 and it is our understanding that the HHS GPS apply.

27. Declining this funding would have a catastrophic detrimental impact on my organization's members. Without the funding, SafePlace would be forced to make devastating cuts to shelter operations, and other victim support services. HHS' FVPSA was designed to fund confidential domestic violence shelters and SafePlace serves 19-counties in Iowa who rely on its emergency housing services to keep survivors and their dependents safe. SafePlace would face the loss of trained trauma-informed staff with years of experience and who provide direct care to survivors, including safety planning, emergency shelter access, housing navigation, medical and legal advocacy. Survivors fleeing violence would be left without critical housing support, increasing their risk of homelessness or returning to unsafe environments. The ripple effect would extend beyond individual survivors—straining entire communities in rural and metro areas including local law enforcement, healthcare systems, and child welfare services—as demand for emergency response and crisis intervention intensifies. This funding is essential to

keeping survivors safe and ensuring our communities continue to have a coordinated, trauma-informed response to domestic violence.

VII.     **HUD's and HHS's New Funding Conditions Place My Organization and its Members in an Untenable Position**

28.     Agreeing to the new conditions would cause significant harm to my organization. The conditions are vague and appear to conflict with our core mission and long-standing activities—many of which have been carried out in good faith under prior HUD and HHS grants. These new terms would require us to abandon work that was previously supported and encouraged. Thus, my organization does not know how it may comply with the new funding conditions and contradicting terms, while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic and sexual violence. It is an untenable position.

29.     My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws while compliance with those antidiscrimination laws may be material for False Claims Act purposes under these new conditions. While we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization's mission is focused on serving victims down to the last person with the most barriers. This necessitates a focus on underserved communities and specialized strategies and tools to provide trauma-informed services. For example, from our direct services standards for member programs: "*Programs shall not inquire about immigration status as part of initial screening to determine*

*eligibility for services. [...]On request, programs link women with immigration concerns to an attorney specializing in immigration. [...] Programs shall inform immigrant clients of their right to self-petition for immigration status under the Violence Against Women Act, or as crime victims under U-visa provisions, or as victims of trafficking under T-visa provisions. [...] Advocates will assist battered immigrant women with documenting and substantiating their claims of abuse as part of their petition for immigration status."* Also *"Programs shall be sensitive to any additional privacy or safety needs of transgender clients and make accommodations as necessary to ensure they receive services. Accommodations needed are not a factor in determining eligibility for services. Staff maintains confidentiality about transgender status in the same way they would respect the privacy of other clients' medical information. Transgender clients needing assistance with maintaining hormonal treatment are connected to appropriate medical resources."* It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

30.     My organization is also unsure whether it can continue to operate programs that target underserved or marginalized communities, including providing Victim Know Your Rights information and materials to the community, and training and technical assistance on immigrant populations to our member programs that serve them.  Furthermore, addiction can often qualify as a disability under the Americans With Disabilities Act. One of the most common technical assistance requests the Iowa Coalition receives involves helping clients who are struggling with substance use and mental health issues, particularly anxiety disorders, depression, and post-traumatic stress disorder. Now, it is unclear whether these programs would fall within the

13

administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

31. For the same reasons, my organization is concerned that it cannot comply with conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology." For example, the Iowa Coalition's direct services standards for member programs includes: "*Domestic abuse programs shall strive to connect with and serve previously underserved women. This includes engaging women from these communities as volunteers, paid staff, board members, and resource providers.*" Another standard regarding disability access states: "*Advocates shall be knowledgeable about their clients' rights to sign language interpreters, and other accommodations, and will advocate for these rights within medical, legal, educational, social service, and other systems.*"

32. Domestic violence programs and shelters have long built their services around accessibility mandates—ensuring inclusive support for LGBTQ+ individuals, immigrants, and survivors with disabilities. Yet, under the new DEI and DEIA restrictions, these life-saving accommodations are now being called into question, despite the fact that survivors with disabilities experience domestic and sexual violence and disproportionately high rates.

33. Iowa Coalition member organization SafePlace is also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. In providing direct client services and technical assistance, SafePlace staff use clients' preferred pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth, recognize gender identity in providing direct assistance, and accommodate the needs of the LGBTQ+ community by referring survivors to LGBTQ+ services, discussing LGBTQ+ relationships in victim counselor training; and assisting local service providers to develop

protocol and practices that are victim-centered, which includes being an organization that affirms and validates the victim/survivor as a whole regardless of their gender identity or sexual orientation. It is unclear whether SafePlace may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

34.     The Iowa Coalition's member organizations are concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." Neither the Iowa Coalition nor its member programs provide abortion care, however assisting clients to meet their healthcare needs is a common type of advocacy, this includes the full range of reproductive healthcare. When survivors request abortion care, SafePlace connects them with trusted resources and support them in navigating access to that care.

35.     Members including SafePlace are concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders." There have been an unprecedented number of Executive Orders so far during this administration and SafePlace does not know what this condition's broad and vague language means for compliance. Many of these orders would not seem to be relevant to victim services but considering the lack of interpretation available, they do not know what they are being asked to comply with.

36.     The new funding conditions present my organization and its members with an impossible choice. My organization and its members could forgo accepting HUD and HHS grant awards and face dire financial consequences and dramatically reduce programming and services, impacting crime victims/survivors directly. The other option is that my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or

15

regulatory requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

37. Additionally, my organization's members would have to fundamentally change their programming or accept new grants and risk running afoul of various funding conditions imposed on those grants. For example, when working with victims of domestic violence, SafePlace advocates may gather information about housing accommodation needs, the need for specific legal services, including immigration legal services, to facilitate proper care and access to available resources. When carrying out programs under the FVPSA Grant, SafePlace ensures that any accessibility, legal or medical needs are identified and addressed, including the use of preferred pronouns to ensure that care is respectful, compassionate, and appropriate. Under this new grant terms and conditions, SafePlace would have to fundamentally alter this programming in a way that undermines its ability to serve certain underserved populations and runs contrary to the organization's values.

38. My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core values and FVPSA statute.

### VIII. These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors

39. These funding conditions threaten harm to victims of domestic abuse who face the greatest barriers to achieving safety and stability. Batterers weaponize social vulnerabilities such

as immigration status, LGBTQ+ identity, race, and disabilities to prevent their partners from leaving; for example: a U.S. citizen might dangle promises of completing immigration paperwork over an immigrant partners head to establish compliance; or a person might be threatened with being outed at work as transgender and then face possible termination in a state like Iowa with no workplace protections for transgender individuals.  Without the ability for advocates to have honest open discussions about the full range of vulnerabilities victims face, including risk factors that impact them differently based on their race, gender, or LGBTQ+ status, safety plans have major gaps that can even prove fatal. All victims deserve the respect and dignity of receiving personalized advocacy that meets their needs.

40. Conversely, if my organization or its members turned down the funds because of the conditions, The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic and sexual violence.

41. My organization's operations are essential to creating and supporting comprehensive services for domestic abuse survivors. Through training, standards, technical assistance, and day to day assistance, the Iowa Coalition supports a trauma-informed culture of respect and personal service provision among our member programs. We link survivors and their loved ones who contact us to appropriate services including culturally-specific programming. And we give guidance to housing and homeless assistance, medical and legal system, and other allied professionals whose work intersects with the lives of victims of domestic violence.  In the absence of fully funded services, the connection between national level best protocols and emerging practices to the direct services field would be broken, crisis responders would have nowhere to turn for assistance and support when they find themselves at a loss with a particular

situation, and the safety of individuals trapped in those domestic violence situations would be directly impacted.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2026.

*/s/ Kirsten Faisal*

Kirsten Faisal
