IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*<br><br>*Defendants*. | Case No. 25-cv-342 |

**DECLARATION OF CARIANNE FISHER**

I, Carianne Fisher, declare as follows:

**I.   Background**

1. I am the Executive Director at the North Carolina Coalition Against Domestic Violence (North Carolina Coalition), North Carolina's federally designated domestic violence coalition.

2. The North Carolina Coalition was founded in 1981 and is headquartered in Durham, North Carolina. The North Carolina Coalition has a goal of bridging gaps in domestic violence services and improving communication and collaboration between service providers.

3. The North Carolina Coalition provides training and technical assistance to its membership and convenes and participates in meetings across the State with membership and allied professionals.

4. My organization receives grants from the Department of Housing and Urban Development (HUD) and from the Department of Health and Human Services (HHS). My

1

organization currently has an annual budget of roughly $6.2 million. Of that total amount, roughly $3.8 million comes from HUD grants, including subcontracts; and another $994,000 comes from HHS grants, including subcontracts and state passthrough funding.

## II.  My Organization's Member Organizations.

5.  The North Carolina Coalition's membership is comprised of approximately 125 organizations across the state, including organizations singularly devoted to serving victims of domestic violence, educational institutions, and community partner organizations that serve victims of domestic violence in fields such as housing, legal services, and healthcare.

6.  Members of my organization receive grants from HUD and HHS.

## III.  HUD's New Funding Conditions

7.  In 2025, HUD began applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

8.  The Notices Of Award (NOAs) for those HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also included requirements that the recipient: (1) "shall not use grant funds to promote 'gender ideology,'" as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the

2

Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

### IV.     My Organization's and its Members' HUD Grants

10. My organization has applied for and received a competitive grant from HUD for the Continuum of Care Grant Program ("CoC Grant"), for the past 2 1/2 years. The North Carolina Coalition signs an award letter with HUD and receives funds directly from them.

11. On February 26, 2024, HUD awarded my organization $3,274,177 through the CoC Grant for FY 2023. The grant had a period of performance of 12 months and a budget period of January 1, 2025 through December 31, 2025. My organization accepted this award on February 26, 2024. The NOFO and NOA did not include the new HUD funding conditions described above. On September 29, 2025, we received an award letter for the budget period of January 1, 2026 through December 31, 2026, indicating we had been awarded $3,760,266 for FY 2024. The grant agreement included the conditions listed above. My organization accepted the award and signed the grant agreement, striking through the above conditions, on December 19, 2025. .

12. My organization relies heavily on the CoC Grant to fund critical services to support individuals and families experiencing chronic homelessness. These funds support 20 "Safe at Home" subrecipient agencies across the Balance of State, a geographic designation that includes 72 counties in North Carolina. These agencies' programs use CoC funds to provide rental assistance and supportive services to individuals and families who meet the Category IV HUD definition of homelessness related to domestic and sexual violence and stalking. *See* 24 CFR § 578.3. In 2025, our program will serve 164 households and 304 individuals through rapid rehousing. Losing this funding would eliminate one of the only housing programs dedicated to

3

survivors of domestic violence in the state, causing imminent evictions, increasing homelessness, or forcing families to remain in unsafe homes.

13.   Declining the HUD CoC funding would have a very significant detrimental impact on my organization and its mission. Without this funding, we would likely be forced to cut staffing, as would the 20 subrecipient agencies of the Safe at Home program. Furthermore, survivors and their families across the Balance of State would be without a dedicated permanent housing program. Without this program, it is nearly impossible for many families to find affordable housing, particularly when navigating the physical, emotional, and financial fallout and trauma of violence. Other rental assistance and housing programs in the state are over-burdened with long waiting lists and are not tailored to the safety and confidentiality needs of survivors.

14.   My organization's members have received HUD grants, including grants under the CoC Grant Program, Emergency Solutions Grant (ESG), and Community Development Block Grant (CDBG). For example, Member Doe receives ESG funding and CDBG funding as passed through their local city government, who receives these funds directly from HUD.

15.   My organization's members have also applied for the following upcoming HUD Grants: CoC Grant, ESG Grant, and CDBG Grant.

V.     **HHS's New Funding Conditions**

16.   In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams," and applies to awards and modifications adding funding made on or after April

4

16, 2025.[1] In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

17. The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

18. In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive Order. In July 2025, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new conditions the following new conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws. That was replaced by the July GPS.

July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

19. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

20. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

21. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. Id. at 1.

### VI. My Organization's and its Members' HHS Grants

22. My organization has applied for and received a grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Coalition Grant") for at least the past 22 years.

6

23. My organization has used FVPSA Coalition Grant funds for many purposes. For instance, these funds support training and technical assistance for local domestic violence service providers; conducting statewide needs assessments gathering critical information on direct service needs for victims of domestic violence; assisting in planning and monitoring the distribution of FVPSA state subgrants; collaborating with service providers and community-based organizations to address the needs of domestic violence victims; collaborating with community entities in fields such as housing, healthcare, mental health, social welfare or business to develop effective policies, protocols, and programs to address domestic violence victims' needs; working with judicial and law enforcement agencies to ensure appropriate responses to cases of domestic violence and child custody and visitation cases involving child exposure to domestic violence; collaborating with Indian tribes and tribal organizations to address the need of Native American victims of domestic violence; supporting the development of polices, protocols, and procedures to enhance domestic violence prevention and intervention in North Carolina; serving as an information clearinghouse, primary point of contact, and resource center on domestic violence for North Carolina; and supporting trauma-informed programming to identify training, technical assistance, and supports needed for trauma-focused intervention strategies that address lifetime exposure to domestic violence.

24. On September 11, 2024, HHS awarded my organization $363,657 through the FVPSA Coalition Grant for FY 2024. The grant had a period of performance of up to 24 months and a budget period from October 1, 2023 through September 30, 2025. My organization accepted this award on October 23, 2024. The NOFO and NOA did not include the new funding conditions described above, but we understand from FVPSA that the next award is subject to the ACF Standard Terms and Conditions.

25.     On July 8, 2025, HHS awarded my organization a total of $368,750 through the FVPSA Coalition Grant for FY 2025. On July 9, 2025, HHS awarded my organization an additional $13,657 for this same grant, for a total of $382,407. The grant has a period of performance of up to 24 months and a budget period of October 1, 2024 through September 30, 2026. The NOFO did not include the new funding conditions, but the NOA indicates that the ACF Standard Terms and Conditions, which contains the new funding conditions described above, apply to the award. My organization drew down on these funds on September 30, 2025.

26.     Declining this funding would have had a very detrimental impact on my organization. Without the funding for this grant, we would likely need to lay off 2 to 5 staff members. We would be unable to maintain the staffing levels necessary to provide needed training and support to local domestic violence service providers who work directly with domestic violence victims every day. Without this funding, we would be unable to travel to other areas of the state and devote time to developing new training curricula based on topics identified by service providers and on emerging issues from the field.

27.     My organization applied for and received a non-competitive grant supplement called the Family Violence Prevention and Services Act (FVPSA) Hurricanes Fiona and Ian Domestic Violence Services Disaster Assistance and Recovery Supplemental Funding Program (FVPSA DVDR Supplement) from the HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act in 2023.

28.     My organization has used FVPSA DVDR Grant funds for many purposes. For instance, these funds have been used to provide technical assistance for disaster planning, to convene with other state coalitions to develop a domestic violence disaster response template,

8

and to promote the funding for repairs available through the FVPSA DVDR funding received by our state administrator.

29. On December 1, 2023, ACF awarded my organization a total of $111,111 through the FVPSA DVDR Supplement in FY2023. The grant has a period of performance of 09/14/2022 through 09/30/2027 and a budget period of 09/14/2022 through 09/30/2027. My organization accepted this award on 12/13/2023. The Supplemental Funding Program Instruction issued by ACF and the NOA did not include the new HHS funding conditions described above. But we expect that any future similar grant, or grant renewal, would include the HHS Conditions.

30. Declining this funding would have a very significant detrimental impact on my organization. Without the funding for this grant, we would not be able to move forward with our statewide disaster response plan and would not be able to provide assistance to those programs who have experienced hurricane-related destruction.

31. My organization has applied for and received a competitive grant from the Center for Disease Control (CDC) for the Domestic Violence Prevention Enhancement and Leadership Through Alliances program ("DELTA Grant") for the past 23 years. The current iteration of this program is called DELTA AHEAD (Achieving Health Equity through Addressing Disparities).

32. My organization has used DELTA Grant funds for many purposes. For instance, these funds support implementation and evaluation of community and society-level primary prevention strategies that move North Carolina and communities served towards decreasing risk factors and increasing protective factors for intimate partner violence as well as towards more equitable health outcomes.

33. On March 21, 2025, CDC awarded my organization a total of $500,000 through the DELTA Grant in FY 2025. The grant has a period of performance of 12 months and a budget

9

period of March 2, 2025 through March 1, 2026. My organization accepted this award on April 19, 2025. The NOFO and NOA did not include the new HHS and CDC funding conditions described above, but I expect that the next award will be subject to the HHS GPS and CDC Terms and Conditions. The CDC DELTA grant is a 5-year award, and we are currently in year 3 of the grant period. Every five years, CDC DELTA has a rigorous, competitive application. But in addition to that 5-year process, each year, NCCADV prepares and submits a comprehensive Annual Progress Report (APR) on grant goals. After the APR is accepted, CDC DELTA issues a technical review of that report. If our APR is accepted, then CDC DELTA will award the NOA each fiscal year. Accordingly, we expect that the next annual award we receive will be subject to the HHS GPS and CDC General Terms and Conditions.

34. Declining this funding would have a very significant detrimental impact on my organization, and more importantly, on the people of North Carolina. Without the funding from this grant, there would be no federally funded primary prevention of domestic violence in the state of North Carolina. Primary prevention efforts stop violence before it occurs. With this funding, my organization has led several efforts, including reviving and expanding a multi-sector Coordinated Community Response Team focused on violence prevention in New Hanover County, creating a Teen Advisory Council that will begin working on a social norms campaign this fall, training Executive Directors and other leadership about the importance of economically supportive policies and practices to support the wellbeing of advocates (preventing burnout, buffering against secondary trauma, and increasing economic stability) and improve the work that agencies do, creating other trainings for organizational leadership to better support advocate wellbeing (50% of whom are survivors themselves) based off of the findings from listening sessions we held with advocates, and supporting front line staff members in getting more support

10

from their organization that will benefit their mental and physical health – efforts which are vital to preventing abuse. Without this funding, we would be forced to lay off 2 to 4 staff members and close our prevention program.

35. My organization's members have received HHS grants, including grants through the CDC under the DELTA grant program. These funds are received from my organization as a subgrantee of my organization's DELTA funding.

36. For example, Member Doe currently receives a DELTA grant as a subgrantee of my organization. This funding is used to address prevention strategies and community collaborations to prevent domestic violence in Member Doe's multi-county service area and provides funding for one full time staff member and partial funding for another staff member's salary.

37. On March 2, 2025, HHS awarded Member Doe a total of $ 116,735.77 through the DELTA Grant Program in FY26. The grant has a period of performance of March 2, 2025 through March 1, 2026, and a budget period of March 2, 2025 through March 1, 2026. Member Doe accepted this award in March 2025. When Member Doe receives the continuation award, the HHS GPS will apply to it.

38. Declining this funding would have a very significant detrimental impact on this member organization. Without the funding for this grant, Member Doe would struggle to operate ongoing prevention programming, including existing collaborations with schools, law enforcement entities, and community partners working to prevent future domestic violence in Member Doe's community, and would have to find new funding sources for multiple staffing positions or risk reducing staff size. This would have a detrimental impact on the community that

Member Doe serves. Without prevention programming, more sexual violence will occur, causing devastating impacts on individuals and the community at large.

VII.     **HUD's and HHS's New Funding Conditions Place My Organization and its Members in an Untenable Position**

39. Agreeing to the HUD and HHS conditions would cause my organization profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD and HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

40. My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws and agreeing that compliance with those antidiscrimination laws is material for False Claims Act purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization's mission recognizes domestic violence as a pattern of behavior involving power and control dynamics, which often implicates systems of oppression including sexism, racism, and xenophobia. A guiding principle of our work is that organizations should be representative of the communities that they serve. It is unclear whether my organization's mission and guiding principles violate the certification, and

12

whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

41. My organization is also unsure whether it can continue to operate programs that target underserved or marginalized communities, including training and technical assistance tailored to culturally specific services or serving survivors with unique accessibility and tailored service needs. Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

42. For the same reasons, my organization is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

43. My organization is concerned about the conditions requiring a certification of compliance with the Title IX of the Education Amendments of 1972. Recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. My organization is concerned that this interpretation would require our organization to ignore federal law prohibiting discrimination based on gender identity and would ultimately result in victims who are transgender or gender-nonconforming being turned away from services.

44. My organization is also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. We believe in survivor-centered services, which require addressing survivors' individual needs—including needs based on their gender identity. In providing direct client services and technical assistance, many of my organization's staff use individuals' preferred pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth, recognize gender identity in providing training and technical

13

assistance, and accommodate the needs of the LGBTQ+ community in recognizing and addressing gaps in domestic violence service provision. It is unclear whether my organization may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

45. My organization is concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." We do not provide abortion care, but we do not know what the government may consider to "promote" abortion. Reproductive health access, including abortion, is part of my organization's understanding of the diverse network of care options needed to address the needs of all victims of domestic violence. We recognize that reproductive coercion, which includes a range of behaviors that interferes with a person's ability to control their reproductive health choices, is a common aspect of domestic violence. In recognizing that abusive partners often sabotage birth control, coerce someone to become pregnant, commit acts of rape, or use threats of violence to otherwise control their partner's reproductive health services, my organization recognizes that access to all forms of reproductive healthcare is necessary to help victims address and heal from abuse on their own terms. It is unclear if this recognition of reproductive coercion and the services needed to effectively address the needs of all survivors experiencing reproductive coercion would be interpreted as "promoting" abortion under the current HUD conditions.

46. My organization is concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders." Because executive orders currently only direct and prohibit conduct by federal agencies, which my organization is not, it is unclear how this language would be used to apply the content of executive orders to the work of my organization. Additionally, there are a

14

number of executive orders with vague language, making it difficult to discern the legal meaning and import of executive orders as related to my organization.

47. The new funding conditions present my organization and its members with an impossible choice. My organization could forgo accepting HUD and HHS grant awards and face the direct consequences to my organization's financial health and ongoing operations and the health and operations of its member organizations, and to those who receive direct services. Or my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements and face enormous risks of litigation and government investigations under the False Claims Act.

48. Additionally, when faced with these conditions, my organization's members would have to fundamentally change their programming or accept new grants and risk running afoul of various funding conditions imposed on those grants. For example, Member Doe is in the process of developing programming specifically for LGBTQ people and is uncertain whether creating this space in a trauma-informed way for trans survivors would run afoul of grant conditions. Member Doe also currently offers training for all staff on diversity, equity, and inclusion principles so that all staff are prepared to assist diverse survivor populations. Member Doe would have to cease this training under current grant conditions. Like my organization, Member Doe has also adopted an official definition of domestic violence that incorporates the following language, "[W]e believe that all oppressions play a central role at the individual, institutional, and cultural levels in creating and maintaining an environment which accepts domestic violence. We believe it is vital to understand and advocate for the elimination of all forms of oppression, including, but not limited to sexism, racism, and homophobia. Our principles embrace equality, diversity, and inclusion. We are committed to a vision of a just

society, and to changing the current beliefs and institutions which encourage domestic violence." This definitional language appears to be prohibited by current grant conditions, requiring Member Doe to fundamentally alter the language and philosophy of their work, interfering with their ability to provide services and programming for underserved populations across their community.

49. My organization's members fear that if they agree to the new funding conditions, they could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization's members would have to change its practices, in many cases contrary to its core values.

**VIII.** **These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors**

50. These funding conditions threaten harm to domestic violence service providers and the diverse cross section of victims of domestic violence that they serve in North Carolina. The lack of legal clarity of many of these conditions and the contradictory legal meaning of other conditions increases the risk that victims may be delayed in receiving services or denied services that may save their lives or the lives of their family members.

51. Conversely, if my organization or its members turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic violence.

52. My organization's operations are essential to ensuring that domestic violence service providers have access to the resources and expertise they need to serve the growing constituencies of domestic violence victims across North Carolina. In the absence of fully funded services under both HUD Grants and HHS Grants, my organization would not be able to provide the staffing, expertise, and legal clarity that our members rely upon, which will reduce their capacity for service and inevitably lead to victims being denied or turned away from lifesaving resources.

53. Member Organization Doe's operations are also essential, and it would also harm survivors if they are not fully funded. Without the DELTA grant, Member Doe will not be able to provide critical domestic violence prevention services and community collaboration services to survivors in its service area. Member Doe would also lose funding for staff that provide these critical services.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 09, 2026.

*Carianne Fisher*
Carianne Fisher (Feb 9, 2026 16:19:53 EST)

CARIANNE FISHER
EXECUTIVE DIRECTOR
The North Carolina Coalition
Against Domestic Violence

17

# Fisher Decl._NC_2.9.26

Final Audit Report 2026-02-09

| | |
|---|---|
| Created: | 2026-02-09 |
| By: | Carianne Fisher (cfisher@nccadv.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAGW08WJ-qHxaRqKH-9acpeWYICC3RXZYd |

## "Fisher Decl._NC_2.9.26" History

- **Document created by Carianne Fisher (cfisher@nccadv.org)**
  2026-02-09 - 9:17:53 PM GMT- IP address: 98.26.37.53

- **Document emailed to Carianne Fisher (cfisher@nccadv.org) for signature**
  2026-02-09 - 9:17:57 PM GMT

- **Email viewed by Carianne Fisher (cfisher@nccadv.org)**
  2026-02-09 - 9:18:04 PM GMT- IP address: 72.153.230.165

- **Document e-signed by Carianne Fisher (cfisher@nccadv.org)**
  Signature Date: 2026-02-09 - 9:19:53 PM GMT - Time Source: server- IP address: 98.26.37.53

- **Agreement completed.**
  2026-02-09 - 9:19:53 PM GMT

Adobe Acrobat Sign