IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HOUSE OF HOPE COMMUNITY DEVELOPMENT CORPORATION, *et al.*<br><br>*Plaintiffs,*<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*<br><br>*Defendants.* | Case No. 25-cv-342 |

**DECLARATION OF SUSAN HIGGINBOTHAM**

I, Susan Higginbotham, declare as follows:

**I. <u>Background</u>**

1. I am the Chief Executive Officer at the Pennsylvania Coalition Against Domestic Violence (PCADV, or Pennsylvania Coalition), a coalition of 59 domestic violence member programs providing direct services in all 67 PA counties. PCADV provides passthrough funding, training, and technical assistance to the local programs.

2. PCADV was founded in 1976 and is headquartered in Harrisburg, PA. PCADV serves as both a membership organization and a funder for Pennsylvania's domestic violence

1

service programs, making it the largest domestic violence coalition in the United States. It is the oldest statewide domestic violence coalition in the nation.

3. Each year, the Pennsylvania Coalitions' network of 59 local domestic violence programs provides free and confidential direct services to nearly 90,000 victims and survivors of domestic violence and their children in all 67 counties of the Commonwealth. Together, local programs and the statewide Coalition work in collaboration to deliver a continuum of services, support, and systems to help victims and survivors find safety, obtain justice, and build lives free from abuse.

4. Survivors served by the Pennsylvania Coalition have access to essential, life-saving interventions that enable them to live autonomous lives that are financially independent, free of violence, and sustainable. Intervention programming includes Domestic Violence Housing First, Civil Legal Representation, Lethality Assessment Screening, Medical Advocacy, and Economic Justice. The Pennsylvania Coalition has had great success in developing trauma-informed, survivor-centered supportive housing programs that meet otherwise unaddressed needs.

5. More than 3 million victims and their children have been served by the Pennsylvania Coalition and its member programs since 1976.

6. The Pennsylvania Coalition has an annual budget of roughly $53 million, of which $46.3 million passes through to other organizations. It has an internal annual budget of approximately $6.8 million.

7. PCADV receives grants from the Department of Housing and Urban Development (HUD) and from the Department of Health and Human Services (HHS). PCADV has an annual budget of roughly $53 million. Of that total amount, roughly $24 million comes

from HUD grants, including subcontracts; and another $6,254,101 comes from HHS grants, including subcontracts.

## II. PCADV's Member Organizations

8. The Pennsylvania Coalition, or "PCADV," is a membership organization with 59 member agencies. Members fall into one of two categories. The first category of members encompasses Pennsylvania domestic violence programs. To be eligible for membership, a program must operate a direct services program in Pennsylvania; demonstrate mission-alignment with the Pennsylvania Coalition, including a commitment to racial and social justice and philosophy of empowerment; demonstrate a commitment to working cooperatively with other programs in their region; and pay applicable dues. The second category of members includes caucuses.

9. To receive funds through the Pennsylvania Coalition, service providers shall utilize a culturally-responsive, trauma-informed model.

10. Pennsylvania Coalition's membership includes Pennsylvania Member Doe 1[1], which provides core domestic violence services, housing supports, legal representation, and medical advocacy.

11. Members of PCADV receive grants from HUD and HHS.

## III. HUD's New Funding Conditions

12. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

---

[1] Pennsylvania's member organizations request to proceed anonymously to protect against the risk of retaliation.

13. The NOAs for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

### IV. PCADV's and its Members' HUD Grants

10. PCADV has applied for and received multiple competitive grants from HUD for the Continuum of Care Grant Program ("CoC Grant"), for the past 6 years. The funds include HUD Domestic Violence bonus funds intended for rapid rehousing for domestic violence survivors. These are competitive grants through Pennsylvania CoCs, the passthrough entities.

11. On June 18, 2025, PCADV received a Notice of Award (NOA) for a total of $4.45 million through the CoC Grant in FY 26. The grant has a performance period of July 1, 2025, through June 30, 2026, and a budget period of July 1, 2025 through June 30, 2026. The NOFO for this award did not include the new funding conditions described above, but the NOA did. Awarded funds are not available for federal reimbursement until execution of the grant agreements. HUD requires that a recipient sign grant agreements within 45 days of receipt of the NOA, and PCADV is concerned HUD could attempt to cancel our grants and recapture funds if

4

the grant agreements are not signed within 45 days of the date the grant agreement was received. PCADV accepted the award in or around August 2025.

12. On August 16, 2024, HUD awarded PCADV $3,821,473 through the Western PA CoC for FY 25. The grant has a period of performance of 7/1/2024 through 6/30/2025 and a budget period of 7/1/2024 through 6/30/2025. This is another, separate award for the same grant that is due to renew on 7/1/2025 that now includes conditions. This award is also subject to those conditions. For the same reasons, PCADV had to accept the award in Summer 2025.

13. On 1/1/2025, HUD awarded PCADV a total of $8,365,048 through an Eastern Pennsylvania CoC Grant in FY 25/26. The grant has a period of performance of 1/1/2025 through 12/31/2025 and a budget period of 1/1/2025 through 12/31/2025 through. PCADV accepted this award on 1/6/2025. The NOFO and NOA did not include the new HUD funding conditions described above, but the current renewal grants do include those conditions.

14. PCADV relies heavily on the CoC Grants to fund critical services to support individuals and families experiencing chronic homelessness as a result of domestic violence throughout the state. For instance, these funds support "rapid rehousing" for survivors and their children, which provides short-term and medium-term rental assistance to survivors experiencing homelessness. As of April 2025, PCADV CoC Grant funds support around 380 households, including about 400 adults and about 350 children. Without PCADV CoC Grant funding, these families will not be able to pay the rent and will face imminent eviction from their homes. Widespread evictions will cause these families to rely on emergency shelters, and will risk overloading those shelters, causing longer waits for available beds. Given that there is limited space in emergency shelters, and the fact that lack of safe, affordable housing is what keeps

victims in abusive situations, this funding has been critical to domestic violence survivors in Pennsylvania.

15. Declining the HUD CoC funding would have an extremely detrimental impact on PCADV, its mission, and survivors of domestic violence. Without this funding, PA survivors and their children will be evicted with no safe place to go for assistance and may have to return to abusive situations just to access housing. Further, local programs will have to lay off staff, as will PCADV.

16. PCADV receives other grants from HUD as well. Currently, PCADV has additional HUD CoC grants, including: a YWCA Hanover York RRH Grant for $466,823.00 for 10/1/25–9/30/26; a Lancaster County CoC RRH Grant for $725,329.00 for 11/1/25-10/31/26; a Safe Berks RRH Grant for $1,069,389.00 for 1/1/26-12/31/26; a CE Expansion Grant for $331,027.00 for 7/1/25–6/30/26; a CE Transfer Grant – Transitions of PA for $90,341.00 for 11/1/25–10/31/26; three West CoC RRH Grants for $4,454,561.00 for 7/1/25–6/30/26, $1,331,877 for 9/1/25-8/31/26, and $2,419,041 for 10/1/25-9/30/26 totaling $8,205,479.00; and two East CoC RRH Grants totaling $12,597,375.00 for 1/1/26–12/31/26.  PCADV currently receives a total of $23,485,763 in HUD CoC funds.  PCADV also receives a HUD ESG grant for $500,000.00 for 7/1/25–6/30/26.

17. Declining this funding would have a detrimental impact on PCADV and its mission. Without this funding, PA survivors and their children will be evicted with no safe place to go for assistance and may have to return to abusive situations just to access housing. Further, local programs will have to lay off staff, as will PCADV.  For instance, for just one PCADV CoC Grants pays for rental assistance for 130 families, salaries for 9 local programs, and salaries at PCADV.

18.  PCADV's members have received HUD grants, including grants under the CoC Grant Program, and as pass-through funds from PCADV. Most local programs receive the HUD CoC funds through PCADV, while a few have HUD funds directly.

19.  For example, Member Program Doe 1 receives CoC grants directly from HUD: On 1/1/2025, HUD awarded Member Doe 1 a total of $480,644 through three HUD CoC Grants in FY 25/26. The grants have a period of performance of 1/1/2025 through 12/31/2025 and a budget period of 1/1/2025 through 12/31/2025.  Member Doe 1 accepted these awards on 1/17/2025 and on July 17, 2025, Member Program Doe 1 received the renewal contract for this grant for a performance period that began on January 1, 2026, and it includes the HUD Conditions.

20.  Being forced to decline this funding would have a detrimental impact on Member Doe 1, and it would be forced to rebrand, strategize, and fundamentally change its mission, values, and approach to serving survivors. But accepting the money and the conditions would also have a detrimental impact. These requirements not only conflict with Member Doe 1's mission and organizational identity—they are in direct violation of VAWA mandates, federal civil rights laws, HUD's Equal Access Rule, and constitutional protections essential to safe, ethical, survivor-centered care.

21.  Member Doe 1 would be required to dismantle all of its efforts to advance diversity, equity, inclusion, and accessibility (DEI/DEIA)—including staff training, inclusive hiring practices, culturally specific programming, and public language that affirms its values. This is not a compliance tweak; it is a demand to erase foundational principles that define the organization's approach to survivor care and staff wellbeing.

7

22. Under HUD's prohibition on promoting so-called "gender ideology," Member Doe 1 would be compelled to remove gender-affirming practices—such as honoring pronouns, ensuring access to appropriate shelter accommodations, and acknowledging the lived experiences of transgender survivors. These practices are not optional; they are essential to safe, ethical, trauma-informed care.

23. Member Doe 1 would have to erase language related to racial equity, gender inclusion, reproductive justice, and anti-oppression from all internal and external materials—including training curricula, policies, website content, and public messaging. Staff would be silenced, partnerships severed, and critical learning stripped from the organization's workforce.

24. Compliance with these certifications would require Member Doe 1 to knowingly violate ethical standards by denying services, suppressing identity, and avoiding referrals aligned with a survivor's lived experience. This would compromise staff integrity, retraumatize survivors, and erode trust with the communities we exist to serve.

V. **HHS's New Funding Conditions**

25. In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.[2]

---

[2] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." The July GPS replaced the April GPS.

8

26.     In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

27.     The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

28.     In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive Order. In July 2025, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications

made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

29. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

30. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

31. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

## VI. PCADV and its Members' HHS Grants

32. PCADV has applied for and received a formula grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Grant") for the past 23 years. The total budget for the FY 25 FVPSA state coalition grant is $ 368,750.

33. PCADV has used the FVPSA Coalition Grant funds for many purposes. For instance, these funds support statewide domestic violence prevention efforts by providing pass-through funding to domestic violence programs to implement community-based prevention programming. In addition, these funds support domestic violence awareness through PCADV's Domestic Violence Awareness Month activities. Finally, these funds support the Online Learning Center which hosts the required training for domestic violence advocates in Pennsylvania. This training is critical for advocates to meet their statutory obligations under Pennsylvania law and to best serve survivors. These funds also support PCADV's training and technical assistance, and administrative staff.

34. PCADV has passed through FVPSA state formula grants from the Commonwealth of Pennsylvania to local member programs for 23 years. The total budget for FY 25 FVPSA pass through funds is $4,082,149. Programs utilize these funds for prevention of domestic violence and core domestic violence services.

35. PCADV has also been awarded a total $4,506,271 in FVPSA American Rescue Plan (ARP) pass through funds for member programs through the Commonwealth of PA, which did not include certifications in the NOFO. These funds are used to support short-term emergency housing and domestic violence services.

36. PCADV has been awarded a total of $12,173,843 in FVPSA ARP Mobile pass-through funds for local programs. These funds can be used to partner with local healthcare and behavioral health providers to provide coordinated support and information, in addition to providing safe housing for survivors.

37. On July 9, 2025, HHS awarded PCADV a total of $368,750 through the FVPSA Coalition Grant in FY26. The grant has a period of performance of 24 months starting in October

2024, through September 30, 2026, and a budget period of October 30, 2025 through September 30, 2026. The NOFO did not include the new funding conditions, but the NOA indicates that the ACF Standard Terms and Conditions, which contains the new funding conditions described above, applies to the award. PCADV needs to accept this award by drawing down funds by October 30, 2025.

38.  On September 20, 2023, HHS awarded PCADV a total of $2,500,000 through the CDC DELTA AHEAD grant in FY24. The grant has a period of performance of five years and an annual budget period. The most recent budget period is March 2, 2025, through March 1, 2026. PCADV accepted this award on May 1, 2024. The NOFO and NOA did not include the new HHS funding conditions described above, but I expect that the next award will be subject to the HHS GPS and ACF Standard Terms and Conditions. PCADV receives an annual continuation of this grant with an annual budget of $500,000. The continuation notice is anticipated to come around March 1, 2026.

39.  PCADV has used DELTA Grant funds for many purposes. For instance, these funds support a statewide prevention committee tasked with analyzing community level trends in public health and prevention of violence. PCADV has also produced materials and trainings on issues such as economic justice, pay equity, increasing community level protective factors and decreasing harmful factors to prevent domestic violence.

40.  PCADV has applied for and received a competitive grant from the Center for Disease Control (CDC) for the DELTA grant for the past 8 years.

41.  The Commonwealth of PA has applied for FVPSA state formula core services and prevention grants totaling $4,082,149. These funds are passed to 59 local programs from PCADV and together with state funding, make up the local programs' core services funding.

42. PCADV's members have received HHS grants, including FVPSA pass through funds from PCADV awarded to us by the Pennsylvania Department of Human Services.

43. FVPSA authorizes the funding of Culturally Specific Projects, and PCADV offering a Culturally Specific Project Grant as a pass-through grant to our members.

44. For instance, Pennsylvania Member Program Doe 2 applied to and received PCADV's Culturally Specific Project request for proposals for funding. This member's project assists undocumented survivors in a Pennsylvania county with creating safe space to receive tailored services they need and they trust confidentiality is maintained. The funding supports a staff member and an attorney at a partner agency who work closely to meet the needs of these survivors. Without this funding Member Program Doe 2 would have to terminate the project, and it would set back their progress in offering services and fray the partnership with a community collaborator. They would have to lay off staff and provide no more support for undocumented domestic violence survivors.

45. Declining HHS funding, including through FVPSA and DELTA AHEAD grants, would have a detrimental impact on PCADV and the members and survivors that it serves. Without the funding for this grant, PCADV core domestic violence services would cease to exist as we know it. Core functions like 24/7 hotline and shelter services would all but be eliminated or greatly reduced, causing additional shelter wait times and reducing access to life-saving services. Waitlists for critical services would expand, and in the meantime, impacts would be lethal for survivors who could not access critical services due to lack of staff, space, and shelter.

## VII. The New Funding Conditions Place PCADV and its Members in an Untenable Position

46. Agreeing to the new conditions would cause PCADV profound harm. The funding conditions are vague, and several could be read to conflict with PCADV's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD and HHS grants. The funding conditions may require PCADV to cease engaging in activities that it had previously understood the grants to plainly support. Thus, PCADV does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

47. PCADV is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, and agreeing that compliance with those antidiscrimination laws is material for False Claims Act purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. For instance, the PCADV requires all members to maintain a "commitment to racial and social justice and a philosophy of empowerment." It is unclear whether PCADV's mission and guiding principles violate the certification, and whether PCADV could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

48. PCADV is also unsure whether it can continue to operate programs that target underserved or marginalized communities, including developing materials and educational

14

opportunities for direct service staff at local programs regarding difficult to reach populations and those that require additional support such as immigrants, transgender survivors, racial/ethnic minorities, and men. Now, it is unclear whether these programs would fall within the administration's interpretation of federal anti-discrimination law as prohibiting DEI and DEIA programs.

49. For the same reasons, PCADV is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

50. PCADV is concerned about the HHS ACF condition requiring a certification of compliance with the Title IX of the Education Amendments of 1972. PCADV has always complied with Title IX, but recent executive orders have made clear that the government is advancing a new interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. PCADV is concerned, for instance, that this condition would prohibit us from accommodating the needs of our transgender and nonbinary survivors that we serve, including by allowing them to use the bathroom that aligns with their gender identity.

51. PCADV is also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. In providing direct client services and technical assistance using HUD funds, many of PCADV's staff and staff at local programs funded by PCADV would be compelled to remove gender-affirming practices such as honoring pronouns, ensuring access to appropriate shelter accommodations, and acknowledging the lived experiences of transgender survivors. It is unclear whether PCADV may continue these practices and activities using HUD Funds while complying with the funding condition not to "promot[e] gender ideology."

52. PCADV is concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." PCADV follows a "Housing First" model, meaning that we provide wrap-around supportive services for survivors. Additionally, the HUD funds come with funding for supportive services. Therefore, if any client receiving rental assistance informed an advocate that she needed an abortion referral, we would make that referral. PCADV and our funded local programs do not promote abortion services, yet we are concerned that HUD would consider referrals for healthcare to be "promoting" abortion. Reproductive health access, including abortion, is part of our organization framework, and we offer clients information about any healthcare services that they need. When pregnant survivors request abortion care, we provide them with resources on how to seek that care. The reason this issue is essential to providing services to survivors is because reproductive and sexual coercion are common features in abusive situations.

53. PCADV is concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders." We do not know how to interpret and comply with the numerous conditions in those orders, many of which are vague.

54. The new funding conditions present PCADV and its members with an impossible choice. PCADV could forgo accepting HUD and HHS grant awards and face the direct consequences to PCADV's financial health and ongoing operations. Local programs and the nearly 90,000 individuals who seek services in Pennsylvania each year would also suffer serious financial and operational issues. Or PCADV could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements and face enormous risks of litigation and government investigations under the False Claims Act.

55. Additionally, PCADV's members would have to fundamentally change their programming or accept new grants and risk running afoul of various funding conditions imposed on those grants. For instance: during its client intake process, Member Doe 1 gathers information about gender identity and the need for legal services, including immigration legal services, to facilitate proper care and access to available resources. When carrying out programs under the HUD CoC Grant, Member Doe 1 includes in its medical assessment process questions about gender identity and preferred pronouns to ensure that care is respectful, compassionate, and appropriate for each individual. Member Doe 1 is concerned that it would have to fundamentally alter this programming in a way that undermines its ability to serve certain underserved populations and runs contrary to the organization's values.

56. PCADV fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make PCADV concerned about applying or accepting an award. To mitigate these risks, PCADV would have to change its practices, in many cases contrary to its core values.

## VIII. These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors

57. Conversely, if PCADV or its members turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

58. Statewide, around 500 families benefit from HUD CoC-funded shelters provided by PCADV and local member programs. This will create long waiting lists within a matter of

17

weeks, people we serve would lose their housing, would be evicted, and would return to or stay with their abusers. Victims of abuse cannot wait six months for housing in abusive situations, and this kind of wait could be lethal.

59. Additionally, without FVPSA pass-through funds to local programs, member programs would lose funding for core services. Losing access to these funds will increase waiting lists for counseling, therapy, support groups, civil legal assistance, and emergency housing—programs that are critically important and when people experience trauma, they cannot wait multiple months for counseling, legal assistance, and emergency housing.

60. Declining the DELTA AHEAD funding would have a detrimental impact on PCADV. Without the funding from this grant, PCADV would have to eliminate or significantly reduce our prevention staff, reduce community-based prevention programming, and change the way we do prevention work. Violence is a behavior learned from parents, caregivers, schools, friends, communities, media, local, state, and national policies—all reflect how people treat others. In order to prevent these learned behaviors from occurring in relationships, violent behaviors need to essentially be unlearned and replaced with healthier behaviors, or even better, youth can start with healthy, non-violent behaviors. Not receiving prevention dedicated funding for this programming would dramatically restrict our ability to help reduce instances of intimate partner violence.

61. Both sets of funding conditions threaten harm to survivors of domestic violence in Pennsylvania who need intervention services, as the reduced funding would reduce access to services and create long waiting lists that survivors in emergency situations cannot accommodate with any sense of safety and empowerment. If PCADV and our programs must sign certifications to access funds needed to provide services, we will be forced to fundamentally rebrand our

organizations, change our missions, values, and approach. Further, these conditions are in direct opposition to the FVPSA statute and the HUD Equal Access Rule, creating an impossible situation for us to navigate.

62. Declining the FVPSA Coalition award would cause PCADV severe harm. PCADV's operations are essential to local programs in Pennsylvania and the almost 90,000 survivors they service each year because we provide training, resources, and financial support for the local programs. In the absence of fully funded services, programs will significantly reduce their services, they will lay off staff, many will have to end operations, and survivors will not get the comprehensive, timely interventions to stop lethality that are needed. Lives will tragically end, and survivors will suffer additional harm.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 10, 2026.

*Susan Higginbotham*

Susan Higginbotham