IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*<br><br>*Defendants*. | Case No. 25-cv-342 |

### DECLARATION OF KATIE KRAMER

I, Katie Kramer, declare as follows:

I. **Background**

1. I am a Co-Executive Director of Violence Free Minnesota, Minnesota's federally designated domestic violence coalition.

2. Violence Free Minnesota was founded in 1978 and is based in Saint Paul, Minnesota. Violence Free Minnesota is composed of over 90 member programs across the State that are aimed at ending relationship abuse. The coalition represents victims and survivors of relationship abuse; leads public policy advocacy and social change efforts; and offers support, education, and opportunities for connection for members.

3. Violence Free Minnesota's mission is to represent victim/survivors of relationship abuse and member programs; challenge systems and institutions; promote social change to

prevent domestic violence; and support, educate, and connect member programs. Our vision is to end relationship abuse, create safety, and achieve social justice for all.

4. Violence Free Minnesota is the state's primary resource for information, training, and technical assistance around domestic violence. As the state's domestic violence coalition, we are made up of 91 member programs providing direct services to victim/survivors in all 87 counties in Minnesota. Over the last decade, our work to end domestic violence in Minnesota has centered racial justice. Violence Free Minnesota has a statement, developed by staff and board, that we use both internally and externally to describe the ways in which we center racial justice work in all of our programming. Violence Free Minnesota is also the only agency in the state that tracks and reports on all intimate partner violence homicides that occur in our state, and we have been doing this for over 35 years, culminating in an intimate partner violence ("IPV") homicide report each year and a memorial each year to honor the victims and their families.

5. Violence Free Minnesota also has a policy and legal systems program area that works with member programs, criminalized survivors, and systems personnel in order to both improve system responses to domestic violence and to work to build alternative responses to domestic violence that are outside traditional systems, like restorative justice circles that are driven by the victim's needs in response to the violence, and community-based responses that individual communities determine. This program area also provides training to systems personnel around the lived experiences of marginalized and underserved victim/survivors, including BIPOC communities, the LGBTQ+ community, people with disabilities, rural communities, and more. These trainings include truth telling around historical trauma and social and system inequities rooted in colonialism

and white supremacy and patriarchy, and the way these systems have and continue to harm victims/survivors. Violence Free Minnesota also has a strong policy program that informs and educates policymakers on the needs of victim/survivors, and on creating policies and practices that are responsive to the needs of survivors, trauma-informed, and based in best practices.

6. My organization receives grants from the Department of Health and Human Services (HHS). My organization has an annual budget of roughly $1.3 million. Of that total amount, roughly $382,407 comes from HHS grants.

## II. My Organization's Member Organizations

7. Violence Free Minnesota is a membership organization with 91 member agencies. Members fall into one of two categories: (1) voting members; and (2) "supportive non-voting" organizational memberships. Voting members of the coalition must be incorporated as a Minnesota non-profit organization or tribal organization; be a program designed primarily to serve victims/survivors of relationship abuse and their children; be an organization that provides crisis intervention, advocacy, protective housing, referrals, peer support, and/or children's services; or be an organization that supports and promotes the mission statement and core values of Violence Free Minnesota. Supportive non-voting members are nonprofit; health and education organizations; tribal, state, and local governments; and other organizations that pay dues and support and actively promote the mission statement and core values of Violence Free Minnesota.

8. Violence Free Minnesota's 91 member programs provide a variety of essential services to victim//survivors and their families who are in crisis and have experienced trauma. Violence Free Minnesota has a large number of members that provide culturally-specific

3

victim services programs that respond to the direct needs of communities in a way that is culturally responsive, leading to better outcomes, holistic support, and healing for underserved communities. Other programs provide much needed support in rural and small town communities that are often isolated from easily accessible resources and support. For example, one member program covers a 9 county area with only 2 advocates in that region of the state. Other programs provide immediate shelter for victim/survivors—sometimes including hotel or motel stays —while others provide transitional housing support. Others provide legal assistance, including assistance in filing orders for protection, support in custody cases for victim/survivors, and more. Finally, some member programs provide restorative justice and domestic abuse transformation programming to provide a pathway both for accountability and to change the behavior of those that have caused harm, and to prevent future harm and violence from occurring again. These are just a few small examples of some of the services member programs provide that are essential for public safety in our state.

9. Members of my organization receive grants from HUD and HHS.

### III. HUD's New Funding Conditions

10. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

11. The Notice of Awards (NOAs) for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to

4

promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

## IV. Member Organizations' HUD Grants

12. Violence Free Minnesota does not receive HUD grants directly. However, Violence Free Minnesota's Member Program Domestic Abuse Project has received a competitive grant from HUD for the Continuum of Care Grant Program ("CoC Grant"). The County CoC through HUD awarded Domestic Abuse Project a total of $179,471 through the CoC Grant in FY 25-26. The grant has a period of performance of November 1, 2024 to October 31, 2025. Domestic Abuse Project has received this grant award since 2019 for permanent housing, has been selected by the competitive CoC process, and received a new contract for the period from November 1, 2025 through October 31, 2026 on or about September 2025.

13. Domestic Abuse Project relies heavily on the CoC Grant to coordinate entry screenings for victims of domestic violence, identify alternative forms of housing security for individuals who are not eligible for CoC services, and providing support services for needs that impact safe and secure housing, such as employment, budgeting, ending prior leases, changing locks, and filing for orders of protection.

14. Declining HUD CoC funding would have a significantly detrimental impact on Domestic Abuse Project and its mission. Without this support, Domestic Abuse Project would lose the ability to provide safety and stability for clients, including those needing mental health services and support. Moreover, the organization would no longer serve on committees within the CoC, which allows it to advocate for domestic violence victims within the homelessness continuum.

V. **HHS's New Funding Conditions**

15. In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.[1]

16. In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

17. The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." The July GPS replaced the April GPS.

"material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

18. In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive Order. In July 2025, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

19. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

20. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its

General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

21. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

**VI. My Organization's HHS Grant**

22. My organization has applied for and received a grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Grant") for the past 30 years.

23. My organization has used FVPSA Coalition Grant funds for many purposes. For instance, these funds support the core work of the coalition, including membership engagement, training and technical assistance, systems change work with the courts, law enforcement, housing, healthcare, and more in order to improve responses to domestic violence. This funding also allows us to track and document intimate partner homicides in the state of Minnesota. Our coalition is the only agency in the state to do this tracking. This funding also allows the coalition to engage in public awareness around domestic violence as a means of education and prevention in communities and with systems and other

stakeholders. FVPSA grant funding is the only federal funding source that allows for prevention work.

24. On July 8, 2025, HHS awarded my organization a total of $382,407 through the FVPSA Coalition Grant in FY 2026. The grant has a period of performance and a budget period of October 1, 2024 through September 30, 2026. The NOFO did not include the new funding conditions, but the NOA indicates that the ACF Standard Terms and Conditions, which contains the new funding conditions described above, applies to the award. My organization accepted this award on July 8, 2025.

25. Our organization receives a yearly continuation of the FVPSA Coalition Grant at the beginning of each new year. This funding is core, critical funding for our coalition.

26. Declining this funding would have a detrimental impact on our organization. FVPSA is the largest funding source for our coalition. Without the funding for this grant, our coalition would have to eliminate at least 2.5 FTEs of staff positions, eliminate prevention and awareness programming, and be extremely limited in the amount of technical assistance (which increases member program capacity to serve survivors) we could provide to member programs. Violence Free Minnesota is the go-to resource for direct service programs, systems personnel, and the general public on domestic violence issues in Minnesota. Without this funding, we would be unable to provide capacity building activities to our 91 member programs, which include providing training and technical assistance; convening of meetings for networking, strategizing and partnering; making online trainings more accessible to member programs; and increasing accessibility for underserved populations. The work to increase the capacity of service providers has a specific focus to assure that appropriate services are available across the

full spectrum of people living in communities in Minnesota, including underserved communities, which include rural, small town, and Tribal Nation communities. These activities would be extremely limited without FVPSA funding.

## VII. HUD and HHS's New Funding Conditions Place My Organization and its Members in an Untenable Position

27. Agreeing to the HHS conditions would cause my organization profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

28. My organization and our members are concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, and implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization recognizes that racism exacerbates violence in communities of color. While each racial and ethnic community faces different challenges, women of

10

color and Native women experience higher rates of violence. They also encounter more barriers when attempting to access supportive services. We recognize that racism and systemic racism are tools created to oppress people of color, and we work to dismantle racist systems and policies in order to achieve racial justice and end violence—including in our training and other programs that we provide for our members.

29. It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

30. My organization is specifically unsure whether it can continue to operate programs that focus on underserved or marginalized communities, including communications, training, and other programs that emphasize that communities may have different needs because of their status as, for instance, LGBTQ+ or as a member of a racial or ethnic minority group. Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs. We would need to change our communications materials, training materials, and foundational racial equity and racial justice framework to attempt to comply with these conditions.

31. My organization's member, Domestic Abuse Project, provides services to the only indigenous urban housing community in the country and is concerned that it would not be able to continue to provide services in a culturally rooted manner. It is also concerned that it will no longer be able to take into account experiences that marginalized

communities go through that impact their experience of violence and challenge in living a violence free life.

32. For the same reasons, my organization is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

33. My organization is also concerned about the HHS ACF condition requiring a certification of compliance with the Title IX of the Education Amendments of 1972. Recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. My organization is concerned that this interpretation could require organizations to ignore federal law prohibiting discrimination based on gender identity and would ultimately result in victims who are transgender or gender-nonconforming being turned away from services.

34. My organization's member, Domestic Abuse Project, is also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology, which it understands to be at direct odds with its core values and requirements of staff members.

35. My organization's member, Domestic Abuse Project, is also concerned about the HUD condition that prohibits using grant funds to "promote" "elective abortions." Domestic Abuse Project is concerned that, under the condition, it would no longer be able to provide victims with referrals, coordinate appointments, provide transportation or childcare, or otherwise coordinate services for clients in need or who may be facing reproductive violence as a form of coercion and control.

36. My organization's member, Domestic Abuse Project is also concerned about the HUD condition providing that the use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders." Domestic Abuse Project is concerned that this requirement would leave the organization open to having to adhere to Executive Orders without knowing what to expect or how they may impact its work.

37. The new funding conditions present my organization and its members with an impossible choice. My organization could forgo accepting HHS grant awards and face the direct consequences to my organization's financial health and ongoing operations. Or my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

38. Not having access to funds from the grants would severely undermine Violence Free Minnesota's ability to function as a state coalition. Without these funds, Violence Free Minnesota would have to reduce the size of its staff and, therefore, its services to members.

39. My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core.

40. The organization would have to shut down at least some of its programming, including providing training to programs and advocates on best practices around serving survivors,

as well as training to legal systems providers around appropriate responses to victims who have experienced domestic violence. These are just some of the ways Violence Free Minnesota's programming and its beneficiaries would suffer.

**These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors**

41. Conversely, if my organization or its members turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic violence.

42. In the absence of fully funded Violence Free Minnesota services, domestic violence victims will be confronted with more barriers when trying to access services following their assault, including discriminatory treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists who have not received anti-bias and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being linked to and receiving appropriate medical, therapy, and other critical services. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

43. Violence Free Minnesota's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the

epidemic of domestic violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2026.

                                               */s/Katie Kramer*
                                               Katie Kramer