IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*<br><br>*Defendants*. | Case No. 25-cv-342 |

**DECLARATION OF BENEDICT F. LESSING, JR.**

I, Benedict F. Lessing, Jr., MSW declare as follows:

**I.   Background**

1.  I am the CEO at Community Care Alliance (CCA), a Certified Community Behavioral Health Center, Community Action Program, and Family Service nonprofit organization in Rhode Island.

2.  My organization was founded in 1891 and is headquartered in Woonsocket, RI. CCA's mission is to support individuals and families of all cultural backgrounds in their efforts to meet economic, social and emotional challenges and enhance their well-being.

3.  CCA provides an array of supportive services that address the social determinants of health, serving over 11,000 individuals annually, across the lifespan.  Services include behavioral health treatment across multiple levels of care, basic needs assistance, and family supportive services. We operate the 988 suicide and crisis line for the State of Rhode Island, as well as the BH Link, which is the behavioral health triage system that connects individuals to the appropriate level of

1

care. Emergency Shelter, HIV supports, youth employment/education, and peer recovery supports are integral to the work that we do.

4. As described below, my organization receives grants from the Department of Housing and Urban Development (HUD) and from the Department of Health and Human Services (HHS).

## II. HUD's New Funding Conditions

5. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

6. The Notice of Awards (NOAs) for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

## III. Community Care Alliance's HUD Grants

7. My organization has applied for and received a competitive grant from HUD for the Continuum of Care Grant Program ("CoC Grant"), for the past 13 years. These funds are awarded by the RI Continuum of Care for the administration of two Rapid Rehousing Grants: Adult and Youth. On June 10, 2024, Community Care Alliance received a NOA for $229,447 for adult and youth rapid-rehousing directly from HUD CoC funding.

8. On March 11, 2025, HUD awarded Community Care Alliance $207,732 for Adult Rapid Re-Housing and $50,432 for Youth Rapid Re-Housing Projects. My organization received the Grant

Agreement on July 31, 2025, which included the new HUD funding conditions described above, despite the fact that the NOFO did not include these new HUD funding conditions. The period of performance for this award is March 1, 2025 through March 31, 2026, and my organization needed to accept the award by drawing down funds as soon as possible for cashflow reasons.

9. After this Court issued a Temporary Restraining Order that included Community Care Alliance, my organization executed the grant award, and is now actively drawing down the funds for this grant.

10. My organization relies heavily on the CoC Grant to fund critical services to support individuals and families experiencing chronic homelessness. The goals are to help people obtain housing quickly, increase self-sufficiency, and stay housed. Services include housing identification, rent and move-in assistance, case management and support services. This is accomplished via assessment and service planning, housing search and placement, financial assistance, and case management and supportive services.

11. Declining the HUD CoC funding would have a significant detrimental impact on my organization and its mission. Without this funding, we will have to lay off one staff member and will lose housing/rental assistance that we provide for nearly 20 adults and youth. The loss in services and rental assistance cannot be understated - multiple households in Rhode Island will be at imminent risk of homelessness.

### IV. HHS's New Funding Conditions

12. The April 2025 HHS Grants Policy Statement (GPS) imposed the following new conditions on grantees: (1) it required that all grant recipients "must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act];" and (2) it provided that by accepting the grant award, recipients certify that: (i) "they do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws"; and (ii) "they do not engage in, and will not during the term of this

3

award engage in, a discriminatory prohibited boycott." HHS stated that it "reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of this award, operate any program in violation of Federal anti-discrimination laws or engages in prohibited boycott." *Id.* at 19. The April HHS GPS stated that it applied to nondiscretionary "awards and award modifications that add funding made on or after April 16, 2025," including "supplements to award, competing and non-competing continuations," (other than awards from NIH), and it applies to all HHS recipients and subrecipients other than individuals.

13. In July 2025, HHS changed the GPS to remove replace this language with the following language: "By applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams." The July HHS GPS also states that it applies to nondiscretionary "awards and award modifications that add funding made on or after April 16, 2025," including "supplements to award, competing and non-competing continuations," (other than awards from NIH), and it applies to all HHS recipients and subrecipients other than individuals.

14. In August 2025, HHS changed the GPS again, effective October 1, 2025 (August GPS). This new version of the GPS includes a Discrimination Certification and also adopts a Title IX certification that requires grantees to certify that they are compliant with Title IX of the Education Amendments Act, including the requirements set forth in the Gender Ideology Executive Order.

15. The Center for Disease Control and Prevention ("CDC") has updated their policies to impose new conditions on certain new awards and award modifications by incorporating the HHS GPS.

16. The Substance Abuse and Mental Health Services Administration ("SAMHSA") has updated their policies to impose new conditions on certain new awards and award modifications and by incorporating the HHS GPS into its Fiscal Year (FY) 2025 Standard Terms and Conditions.

17. SAMHSA has also issued new Fiscal Year 2025 Standard Terms and Conditions for discretionary grants, including all active awards that did not reach their project period end date by October 1,

2024, and which superseded any previous terms and conditions. These new Terms and Conditions impose the following new conditions on grantees: (1) requires grantees to "certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding; (2) require that grantees certify that they are "compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"; and (3) requires grantees to "comply with all applicable Executive Orders."

## V.  Community Care Alliance's HHS Grants

18. My organization has applied for and received a competitive grant from the Substance Abuse and Mental Health Services Administration (SAMHSA) for the past 30 years.

19. On June 30, 2025, HHS's SAMHSA awarded Community Care Alliance $545,000 for the Community Care Alliance Youth and Family Tree. This grant has a period of performance of June 30, 2023 - June 29, 2028, a budget period of June 30, 2025 through June 29, 2026. While the NOFO and the most recent NOA, dated June 30, 2025, did not include the new SAMHSA or HHS funding conditions, the new HHS GPS and the new SAMHSA FY 2025 Terms and Conditions would apply, as of October 1, 2025, absent the Court's current Preliminary Injunction.

20. My organization has used SAMHSA Alliance Youth and Family Tree funds for many purposes. For instance, these funds enhance and expand comprehensive treatment, early intervention and recovery support for adolescents (ages 12-18) and transition-age youth (ages 16-25) who have substance use disorders (SUD) and/or co-occurring substance use and mental health disorders, as well as their families and primary caregivers. A minimum of 100 youth are served annually.

21. Declining the SAMHSA Youth and Family Tree Funding would have a significant detrimental impact on Community Care Alliance and its mission. Without this funding, we will have to lay

off several staff and lose the ability to provide life-saving prevention and treatment services to well over 100 youth and their families.

22. On October 7, 2022, SAMHSA awarded Community Care Alliance a total of $1,000,000 through the Certified Community Behavioral Health Clinic (CCBHC) Infrastructure Grant. This grant has a period of performance of October 7, 2022 through September 9, 2027, and a budget period of October 7, 2022 through September 29, 2027. My organization accepted this award on October 7, 2022, and we have received a continuation grant. While the NOFO and NOA did not include the new funding conditions described above, my understanding is that the most recent continuation award is subject to those new HHS and SAMHSA funding conditions as of October 1, 2025.

23. This SAMHSA CCBC Infrastructure grant funds multiple services: 1) the delivery of peer recovery support services for individuals challenged by active substance use; 2) complex care - primary care coordination for individuals with severe and persistent mental illness; 3) enhancement of emergency services to expedite speedy response to psychiatrist crises in the community; 4) timely access to assessment and medication through an expanded adult and child psychiatry team.

24. Declining the SAMHSA CCBHC Infrastructure grant would have a significant detrimental impact on hundreds of clients. Failure to provide these funds would leave individuals with active substance use without peer support to assist with navigating a pathway to recovery. Loss of funds will also eliminate primary care coordination for individuals with severe and persistent mental illness, and reduce access to emergency response for individuals experiencing psychiatric crises, as well as reduced access to psychiatry assessment and medication management.

25. In addition to the direct HHS grants listed above, Community Care Alliance receives multiple HHS grants, passed through by the State of Rhode Island. These grants include CCBHC Medicaid State Demonstration, CSBG, Early Intervention, LIHEAP, PASSR, Ryan White, SUD Emergency Respite Block Grant, SUD Residential Uninsured Block Grant, and Title XX/Social Services Block Grant, among others. These subawards lead to more than $4,000,000 of funding

that serve thousands of northern Rhode Islanders every year. Most of these subawards are multi-year grants, with the CCBHC Medicaid State Demonstration, CSBG, LIHEAP, and Ryan White grants last re-awarded on October 1, 2025, subject to the HHS new conditions, absent the Court's Preliminary Injunction.

26. Declining this funding would have a significant detrimental impact on my organization. Without the funding for these grants, the impact would be felt in multiple areas. For clients, the loss of this level of service would likely increase psychiatric hospitalizations, and the need to place these clients in more restrictive settings for longer periods of time. Both of these effects would have a fiscal impact on the state through their Medicaid budget. These programs filled the previous gap in the continuum of care for youth at high risk. For the agency, staff would lose their jobs. The budgetary impact on the agency would necessitate job loss for multiple staff and would lower the overall support for the infrastructure. As one example, declining the funding for the Ryan White award, administered by HRSA and passed through by the State of Rhode Island, would have a detrimental impact on my organization and the many clients we serve with that funding. Annually, our organization serves over 70 individuals living with HIV/AIDS, providing them with non-medical case management, nutrition support, transportation, food pantry/served meals, rehabilitative services, and emergency financial assistance. Declining this funding, due to the new funding conditions, would result in over 70 individuals living with HIV/AIDS unable to receive the multiple supportive services they need.

VI. **HUD's and HHS's New Funding Conditions Place Community Care Alliance in an Untenable Position**

27. Agreeing to the HUD and HHS conditions would cause my organization profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD and/or HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my

7

organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable citizens of our community.

28. My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, and agreeing or implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization's mission is to support individuals and families of all cultural backgrounds in their efforts to meet economic, social and emotional challenges and enhance their well-being. Our vision is that "through programs, advocacy and collaboration, people are empowered to discover their potential and live as engaged citizens, free of stigma, within a thriving *diverse*, *inclusive* community." (Emphasis added.) It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

29. My organization is also unsure whether it can continue to operate programs that target underserved or marginalized communities, which is central to our mission and to our programming. For example, we offer ESL classes and classes for adults with disabilities. We also offer Housing Opportunities for Persons with AIDS, as well as a number of programs exclusively designed for individuals with substance use disorder and/or mental health disabilities. Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

30. For the same reasons, my organization is concerned that it cannot comply with any HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

31. My organization is also concerned about the HUD, HHS and SAMHSA conditions that prohibit using grant funds to "promote" gender ideology. In providing direct client services and technical assistance, our organization uses clients' preferred pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth, recognizes gender identity in providing direct assistance, and accommodating the needs of the LGBTQ+ community. We offer a LGBTQIA Support Group, and a Queer Community Space, with monthly meetings. It is unclear whether my organization may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

32. My organization is concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion," since we are a healthcare agency and we do not know what the government may deem "promotion" of abortion. For instance, we serve females of child-bearing age who may become pregnant and who seek the support of one of our staff for assistance with making a decision about whether or not to terminate their pregnancy. For those who choose termination, staff could assist them with finding an appropriate provider and scheduling an appointment, as staff would with any other medical issue, and now we are not sure if this would be prohibited.

33. My organization is concerned about the HUD and SAMHSA new conditions providing that use of grant funds and operation of projects assisted with grant funds are governed by all "current" or "applicable" Executive Orders.
We do not know what these conditions' broad and vague language means for Community Care Alliance or how to comply with it, given the many new executive orders that it implicates.

34. The new funding conditions present my organization and its members with an impossible choice. My organization could forgo accepting HUD and HHS grant awards and face the direct

9

consequences to my organization's financial health and ongoing operations, and more importantly, the direct consequences to the health and safety of the thousands of individuals, youth and families we serve. Or my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

35. My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core values

## VII. These Funding Conditions Threaten to Harm Individuals, Families and Communities in Rhode Island.

36. Community Care Alliance creates a safety net for at-risk individuals and families in Rhode Island, many of whom live with serious behavioral health issues and substance use disorders. Every day, my staff is confronted with complex situations that could be the difference between life and death for individuals with serious healthcare needs. With funds from HHS and HUD, Community Care Alliance improves the lives of over 12,000 people each year by addressing financial insecurity, connecting people with education and employment opportunities, preserving housing and helping others access it, decreasing substance use and improving mental health and emotional wellbeing. At Community Care Alliance, we understand that there is a larger context in which the populations we serve experience social inequities that contribute to trauma, poor health outcomes and their overall well-being. These include racism, lack of access to affordable housing, and LGBTQIA related stigma. Populations are often permanently placed in and remain in a lower strata within our society as a result of their perceived value.  These funding conditions now imposed by HUD and HHS threaten harm our organization's mission, program design and service

10

delivery, which will negatively impact thousands of individuals and families in Northern Rhode Island that are served by Community Care Alliance, and who rely on our staff and services. To comply with these conditions, we would need to fundamentally change our mission, staff training, and programming, including by ignoring important risk factors to our clients caused by social inequities.

37. Conversely, if my organization or its members turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the thousands of individuals, youth and families we serve in Woonsocket and Northern Rhode Island every year.

38. My organization's operations are essential to the health and wellbeing of individuals, families and the community of Rhode Island. In the face of growing mental health and behavioral health challenges, Community Care Alliance uses evidence-based programs to improve access to integrated care, housing stability, education and employment opportunities, and decreased substance use and improved mental health and emotional well-being. In the absence of fully funded services, Community Care Alliance would not be able to support Rhode Islanders in crisis, particularly with housing and other basic needs. Turning down the HUD funds would put multiple families at risk of eviction, and would leave people with behavioral health issues and substance use disorders without the care that they need, including in situations that are a matter of life and death for people with serious healthcare needs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 5, 2026.

_Benedict F. Lessing, Jr., MSW, CEO_