**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.* <br><br> *Defendants*. | Case No. 25-cv-342 |

**DECLARATION OF MICHELLE MCCORMICK**

I, Michelle McCormick, declare as follows:

I.     **Background**

1.     I am the Executive Director at the Kansas Coalition against Sexual and Domestic Violence ("Kansas Coalition"), a nonprofit organization that is Kansas's federally designated dual sexual assault and domestic violence coalition.

2.     My organization was founded in 1990 and is headquartered in Topeka, KS. The Kansas Coalition is dedicated to preventing and ending sexual and domestic violence, dating violence and stalking in Kansas. It supports survivors and the people who serve them by promoting safety, healing, justice, and lasting change.

3.     The Kansas Coalition's work includes providing statewide support for domestic violence and sexual assault programs by offering technical assistance, resources, and guidance to agencies that serve survivors. The coalition also offers expert training and individualized support for advocates, counselors, medical staff, law enforcement, and other personnel working with

survivors. It raises awareness about sexual assault and domestic violence issues to promote prevention across the state. And it uplifts survivor voices by centering the needs and experiences of victims and survivors in everything it does. Additionally, the Kansas Coalition serves an accrediting function for domestic violence and sexual assault service organizations in the state. The coalition creates service standards in coordination with a committee made up of member programs. These standards ensure that member programs provide quality shelter and non-shelter services, and the accreditation process provides a formal mechanism for ensuring the standards are met. Any domestic violence or sexual assault service provider that wishes to receive state general fund grants or sales tax exemptions must receive accreditation of their programs from the Kansas Coalition.

4.      The Kansas Coalition operates a housing and economic justice program by directly serving survivors who qualify for rapid rehousing assistance.

5.      My organization receives grants from: the Department of Housing and Urban Development (HUD) and from the Department of Health and Human Services (HHS). My organization has an annual budget of roughly $4,237,655. Of that total amount, roughly $908,012 comes from HUD grants, including subcontracts; and another $789,426 comes from HHS grants, including subcontracts.

**II.      My Organization's Member Organizations .**

6.      My organization is a membership organization with approximately 25 member agencies that fall into three types of membership. There are: (1) an individual membership open to any person, (2) an organizational membership, open to any organization that supports or is engaged in providing services to victims and survivors of domestic violence, sexual assault, dating violence, or stalking, including non-accredited organizations, allied professional

organizations, companies, and other organizations aligned with the Kansas Coalition; and (3) Program Council Membership, open to any private, 501(c)(3) non-profit organization providing services in Kansas with a program established primarily for the purpose of providing advocacy and services to victims of sexual and/or domestic violence, dating violence, and/or stalking and is accredited.  All members pay dues to the Kansas Coalition and the Organizational and Program Council Members are eligible to representation on the Board of Directors..  Additionally, accredited Program Council members are eligible for designated funding from the state of Kansas and receive a state tax exemption as a benefit of their membership.  All members have access to training, technical assistance, and public awareness and education resources provided by the Kansas Coalition.

7.      The Kansas Coalition's membership includes three members that are being identified for purposes of this lawsuit as "Kansas Member Doe 1", "Kansas Member Doe 2", and Kansas Member Doe 3".  All of the Kansas Members are accredited Program Council member programs serving survivors of sexual and domestic violence, stalking, human trafficking, and teen dating violence in Kansas.  The services provided by the agencies include a 24-hour helpline, 24-hour crisis intervention, support for survivors engaging with the medical system (including accompaniment during a forensic exam), support through law enforcement and court processes, emergency shelter, supportive counseling, support groups, children and youth services, community education and awareness about these issues.

8.      Members of my organization receive grants from the Department of Housing and Urban Development (HUD) and from the Department of Health and Human Services (HHS), most commonly through subcontracts passed through the State of Kansas or other governmental entities, such as their City or County government.

III.     __HUD's New Funding Conditions__

8.      HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

9.      The NOAs for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

IV.     __My Organization's and its Members' HUD Grants__

10.     My organization has applied for and received a competitive grant from HUD for the Continuum of Care Grant Program ("CoC Grant"), for the past 4 years. The Kansas Coalition receives this grant directly from HUD as part of the CoC program.  The Kansas Coalition signs grant agreements directly with HUD for both past awards and the current award.

11.     On 8/6/2025, HUD awarded my organization a total of $922,844 through the CoC Grant Number KS0157L7P072403 for FY 25. The grant has a period of performance of January 1, 2026 through December 31, 2026 and a budget period of January 1, 2026 through December

31, 2026.  My organization accepted this award on 8/20/2025. The grant agreement included the conditions listed above.  My organization signed the grant agreement but with a letter notifying HUD of the temporary restraining order. On 8/21/2025 HUD accepted the grant agreements and confirmed receipt of the TRO notification.

12.     My organization relies heavily on the CoC Grant to fund critical services to support individuals and families experiencing chronic homelessness in the Kansas Balance of State Continuum of Care region. For instance, these funds support rapid rehousing needs for survivors of domestic and sexual violence who are homeless and seeking permanent housing. This part of the program provides rental assistance, housing relocation and stabilization services including supportive case management including support for financial literacy and economic empowerment. The goal is to rapidly connect survivors to permanent housing while supporting them to resolve the barriers they face to improve safety, stability, and overall well-being. Additionally, our CoC project expanded in FY 23 to include emergency transfer facilitation as required in the re-authorization of the Violence Against Women Act (VAWA). This includes supporting all the steps needed to implement a survivor's emergency transfer to other safe housing, if their current housing situation is compromised due to a threat to their immediate safety.  Under the expanded project, we also now  provide subject matter expertise to ensure VAWA confidentiality requirements are complied with by providing staff to monitor and evaluate compliance, developing and implementing strategies for corrective actions and providing training on compliance with VAWA confidentiality.

13.     Declining the HUD CoC funding would have a detrimental impact on my organization and its mission. Without this funding, nearly 40 households in rural Kansas would immediately lose their access to the housing assistance described above, which could result in

their immediate homelessness.  Additionally, our organization would have to reduce 5 full-time

staff positions who provide direct supportive services to qualifying homeless survivors fleeing

domestic or sexual violence. These supportive services include housing relocation, supportive

case management, financial literacy, safety planning, and other assistance to improve safety,

stability, and overall health. The result of this program is that the survivors who are served

achieve permanent, safe, and stable housing to prevent a return to homelessness and to achieve

self-sufficiency. These staff members average 60 client contacts per month, helping not only

those survivors, but their dependents who benefit from the stabilization services as well. This

housing program is the only dedicated HUD CoC funded rapid rehousing program for survivors

of domestic and sexual violence in 101 of the most rural Kansas Counties, where barriers to

safety and access to resources are much more limited than for the urban centers of the state.  It is

very likely the Kansas Coalition would have to terminate the housing program altogether without

the HUD CoC funding.  Another impact would be the loss of subject matter expertise at the State

level, as Kansas Coalition staff actively participate in and chair committees for the Kansas

Balance of State CoC and are an integral part of ensuring HUD funded partners provide a

trauma-informed response to homeless survivors of domestic and sexual violence in Kansas.

    14.    My organization also intends to apply for continued HUD CoC funding for future

fiscal years.

    15.    My organization's members have received HUD grants, including grants under

the  HUD HOME ARP program, and the Emergency Solutions Grant (ESG) program.  Kansas

Coalition member programs receive grants passed through either from their local unit of

government, or as passed through the Kansas Housing Resources Corporation.  The Kansas

Housing Resources Corporation (KHRC) is a nonprofit public corporation that is the primary

administrator of federal housing programs for the State of Kansas. For Kansas Coalition member programs who receive HOME ARP funds, KHRC implements the grants, grant agreements, and grant conditions on behalf of HUD.  For ESG funding, Kansas Coalition member programs sign agreements, receive conditions and funding from a local unit of government, such as their City or County, who have the direct engagement with HUD and ensure member programs are in compliance with HUD requirements and conditions..

16.    Kansas Member Program Doe 1 ("Doe 1"), receives an Emergency Shelter Grant from their City, which acts as the primary contractor with the Kansas Housing Resource Corporation, which is the pass-through entity for this HUD ESG grant. Doe 1 uses these funds to provide the majority of food that is needed for shelter clients and their children and to cover the costs for other basic necessities for the emergency shelter, including household supplies and hygiene products.

17.    Kansas Member Program Doe 2 ("Doe 2"), receives a HUD Emergency Shelter Grant and HUD HOME ARP grant funds passed through     the Kansas Housing Resource Corporation    . Doe 2 uses these     ESG funds     for the operational costs of the emergency shelter which operates 365 days a year, including the salary for a hotline advocate, and to     pay emergency relocation expenses for survivors who have to flee from violence.  Doe 2 also received HUD HOME ARP funds to expand their existing shelter to meet the demand for additional shelter beds for the large region they serve in rural Kansas.

18.    Kansas Member Program Doe 3 ("Doe 3), receives an Emergency Shelter Grant (ESG) from the Kansas Housing Resource Corporation, which is the pass-through entity for this HUD grant.  Doe 3 uses these funds for the emergency shelter operations costs, including a

portion of the residential manager's salary and for facility maintenance costs for the emergency

shelter, which operates 365 days a year.

## V.          HHS's New Funding Conditions

19.     In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that

imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal

funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these

requirements and that complying with those laws is a material condition of receiving federal

funding streams," and applies to awards and modifications adding funding made on or after April

16, 2025.[1]

20.     In August, HHS revised its GPS again, effective October 1, 2025 (October GPS),

which includes the same HHS Discrimination Certification and applies to awards and

modifications that add funding made on or after October 1, 2025.

21.     The October HHS GPS also includes a requirement that grantees "certif[y]" that

they are "compliant with Title IX of the Education Amendments of 1972 …, including the

requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of

1964" and that they "will remain compliant for the duration of the Agreement." This condition

also requires covered recipients to "certify" that this requirement is a "material term[] of the

Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX

and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance

with" those requirements, and that the recipient "acknowledges that this certification reflects a

change in the government's position regarding the materiality" of those requirements. A

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new
conditions the following new conditions on grantees prohibiting the operation of "DEI, DEIA, or
discriminatory equity ideology in violation of Federal anti-discrimination laws." [note re stip that
this does not apply]

recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001." : (1) it requires that all grant recipients "must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act];" and (2) it provides that by accepting the grant award, recipients certify that: (i) "they do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws"; and (ii) "they do not engage in, and will not during the term of this award engage in, a discriminatory prohibited boycott." HHS states that it "reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of this award, operate any program in violation of Federal anti-discrimination laws or engages in prohibited boycott." *Id.* at 19.

     22.    The HHS GPS applies to nondiscretionary "awards and award modifications that add funding made on or after April 16, 2025," including "supplements to award, competing and non-competing continuations," (other than awards from NIH), and it applies to all HHS recipients and subrecipients other than individuals.

     23.    In addition to the GPS conditions,  In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive ORder. In July 2025, ACF HHS's Administration for Children and Families (ACF) also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification.

The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients. is now imposing new funding conditions on ACF nondiscretionary and discretionary grants, including the Domestic Violence Coalitions Grant, that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

24.    The new ACF Standard Terms and Conditions document provides that a "Civil Rights Assurance" applies to new awards made on or after May 8, 2025, which requires that recipients "must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act];" and provides that, "[b]y accepting the grant award, recipients are certifying that: (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote the following in violation of Federal anti-discrimination laws: DEI, DEIA, or discriminatory equity ideology."

25.    In addition, the version of the ACF Standard Terms and Conditions document published on July 29, 2025, and effective for grants made "on or after" that date provided that, for new awards made on or after March 28, 2025, recipients whose programs are covered by Title IX certify to the following: (1) that the recipient "is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement; (2) that those "requirements are conditions of payment that go to the essence of the Agreement and are therefore material terms of the Agreement"; (3) that

"[p]ayments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements"; (4) that the "[r]ecipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement"; and (5) that "[r]ecipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."[2]

26.     CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements. The Center for Disease Control and Prevention ("CDC") has updated their policies to impose new conditions on certain new awards and award modifications by incorporating the HHS GPS, including the HHS Discrimination Certification.

27.     The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination

---

[2] A new version of the ACF terms and conditions effective on January 30, 2026, for awards and funded modifications made on or after that date replaces this Title IX provision with an Assurance of Compliance paragraph providing that "[b]y accepting federal funds from HHS, the recipient is providing its assurance of adherence to applicable nondiscrimination laws as indicated in the GPS. Recipients are also responsible for ensuring that their subrecipients, contractors, and HHS-funded partners that are bound by any of those nondiscrimination laws are operating in compliance with them."

Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients. .

28.     In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

## VI.        My Organization's and its Members' HHS Grants

29.     My organization has applied for and received a grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Grant") since at least 1993.

30.     My organization has used FVPSA Coalition Grant funds for many purposes. For instance, these funds support education, support, and technical assistance to domestic violence, family violence, and dating violence service providers to enable the providers to establish and maintain shelter and supportive services for victims of domestic violence and their dependents; to serve as an information clearinghouse, primary point of contact, and resource center on domestic violence, family violence, and dating violence for the State of Kansas; and to support the development of policies, protocols, and procedures to enhance intervention and prevention of these issues in Kansas.  The Kansas Coalition works in partnership with the State of Kansas administrator of FVPSA funds to conduct a needs assessment to inform comprehensive

responses to domestic violence, family violence, and dating violence as well as participate in the planning and monitoring of the distribution of the State of Kansas formula FVPSA funds. The Kansas Coalition also collaborates to provide training and technical assistance to allied professionals in such fields as housing, health care, social welfare, or business to support the development and implementation of effective policies or programs that address the safety and support needs of adult and youth victims of family violence, domestic violence, or dating violence. Additionally, the Kansas Coalition works with family law judges, criminal court judges, child protective services, and children's advocates to develop appropriate responses to children's issues related to domestic violence. The focus of all of this work is to support trauma-informed programming and intervention strategies that address lifetime exposure to family, domestic, and dating violence.

31.     On July 8, 2025, HHS awarded my organization a total of $368,750 through the FVPSA Coalition Grant Number 2501KSSDVC in FY 25. The grant has a period of performance of 10/01/2024 through 09/30/2026 and a budget period of October 1, 2025 through September 30, 2026.  The NOA indicates that the HHS GPS and ACF Standard Terms and Conditions, which contains the new funding conditions, applies to the award. My organization accepted this award by drawing down funds on 12/1/2025.

32.     Declining this funding would have a significant detrimental impact on my organization. Without this funding, the Kansas Coalition would have great difficulty in fulfilling our responsibilities to provide training, technical assistance, or in acting as a primary resource for professionals and service providers on the topics of domestic, family, or dating violence and effective responses. If this funding were to be declined, it would require a reduction in staff and cutting programs to adjust for this, as the FVPSA Coalitions grant provides primary operational

funding for my agency, including for the salaries of executive leadership and administrative support staff. These operational costs, often difficult to get covered by other funding sources, provide the critical funding needed to support the core functions of the Kansas Coalition. Ultimately, if the Kansas Coalition no longer has access to FVPSA funding, victims and survivors of domestic, family, and dating violence in Kansas would see a decline in a trauma-informed and victim-centered approaches by direct victim service providers and allied professionals who respond to these issues, due to the impact on the reduction of core Kansas Coalition programming.

33.     My organization has applied for and received a competitive grant from the Center for Disease Control (CDC) for the Rape Prevention and Education program ("RPE Grant") for the past 2 years.

34.     My organization has used RPE Grant funds for many purposes. For instance, these funds support the Kansas Coalition's capacity building to advance primary prevention of sexual violence in Kansas by funding a specific employee dedicated to primary prevention. On behalf of the Kansas Coalition, this employee collaborates with the Kansas Department of Health and Environment (the state health department or SHD) to enhance the state action plan for sexual violence prevention, including to implement sexual violence prevention approaches in Kansas that build upon partnerships and create new partnerships with those engaged in primary prevention. As a result of this collaboration, the State completed the update to the state action plan, which will guide sexual violence prevention actions for 2025-2030. These efforts included identifying data collection and evaluation methods to determine the effectiveness of the prevention efforts. This employee also began capacity building efforts with victim service providers to assess their current prevention efforts, to identify gaps and to inform the work plan

for building local capacity to implement prevention activities. The CDC RPE funding requires the Kansas Coalition to collaborate with the SHD and other applicable federal, state, tribal, and local entities engaged in sexual violence prevention to address the social and structural determinants of health at the community and societal levels to achieve health equity in Kansas. The Kansas Coalition sexual violence prevention activities are focused on two areas for sexual violence prevention by addressing barriers to affordable childcare and by supporting proactive sexual harassment prevention policies and procedures. Both strategies are community and societal level sexual violence prevention approaches that are effective to reduce disparities in specific social determinants of health.

35.     On June 27, 2025, HHS awarded my organization a total of $135,000 through the RPE Grant 5 NVF1CE002308-02-00 in FY 25. The grant has a period of performance of June 30, 2024 through June 29, 2028 and a budget period of June 30, 2025 through June 29, 2026. The NOA indicates that the HHS GPS and CDC Terms and Conditions, which contain the new funding conditions described above, apply to the award. My organization accepted this award by drawing down funds on July 30th, 2025.

36.     Declining this funding would have a detrimental impact on my organization. Without this grant, the Kansas Coalition would have limited capacity to engage in sexual violence primary prevention activities in collaboration with our State Health Department. The Kansas Coalition would be required to eliminate the full-time prevention coordinator position and would have difficulty engaging in and maintaining collaboration with federal, state, and local partners who are focused on sexual violence prevention in Kansas.  Without this full-time employee able to coordinate with our government partners, the Coalition's ability to contribute to the prevention of the widespread problem of sexual violence in Kansas would be significantly

diminished.  According to the 2025 Kansas Coalition sexual violence census, 23 of the 24 coalition member programs who completed the survey reported serving 301 victims during the week of the survey.  Retaining the RPE funding would allow the Coalition to build the capacity of our Members to put into place programming and policies in their local communities to help prevent victimization.

37.      My organization's members have received HHS grants, including CDC RPE grants. Member programs primarily receive HHS grants as passed through to them from the State agencies that pass through the funds through subgrants.  RPE funds are passed through to a few Member Programs through subgrants from the state health department.  Member Programs sign award agreements and accept grant conditions, from the State pass through agencies, who are required to implement the conditions as directed from HHS (ACF and CDC).

38.      Kansas Member Program Doe 2 receives HHS CDC RPE funding as passed through from the Kansas Department of Health and Environment (state health department) to fund a sexual assault prevention advocate. This advocate works with the State and locally to implement sexual violence prevention programming in their service area.  This prevention coordinator is one of the only dedicated sexual violence prevention staff for a large part of rural Kansas.

39.      In February 2026, HHS awarded Member Doe a total of $20,561 in collaboration with a partner nonprofit acting as the fiscal agent and lead subgrantee, and as passed through the Kansas Department of Health and Environment through a subcontract through the CDC RPE Program in FY 25. The grant has a period of performance and a budget period of February 1, 2026 through January 31, 2027.  Member Doe and the partner agency accepted this award on 2/4/2026.  The State of Kansas receives this award every 4 years, with the budget awarded

16

yearly.  The state health department confirmed that the HHS GPS will apply as well as a condition that the grantee and subgrantees will need to adhere to all executive orders..

40.     Declining this funding would have a detrimental impact on the members of my organization. Without the funding for this grant, our members would have to reduce staffing including shelter staff positions that are funded or partially funded by these grants, which could result in an increase of victims requesting crisis services, but being turned away due to a lack of staff.  Additionally, declining RPE funding would would have limited capacity to engage in sexual violence primary prevention activities in collaboration with our State Health Department. Member Doe 2 would be required to reduce the full-time prevention coordinator position and would have difficulty engaging in and maintaining collaboration with state and local partners who are implementing sexual violence prevention in Kansas.  While it is difficult to assess the full impact of losing this funding on rural Kansas, it is known that Members would not be able to contribute to the prevention of the widespread problem of sexual violence.

**VII.     HUD's HHS's New Funding Conditions Place My Organization and its Members in an Untenable Position**

41.     Agreeing to the HUD and HHS conditions would cause my organization profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD and/HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

42.     My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization's mission may be related to diversity, equity, and inclusion, as many of the services provided adopt the public health model approach for addressing domestic and sexual violence through addressing root cause issues, including but not limited to acknowledging the disproportionate violence that is experienced by different races, genders, people with different sexual orientations, or people with disabilities, as an example. It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

43.     My organization is also unsure whether it can continue to operate programs or services that target underserved or marginalized communities, including our sexual violence prevention program, in which the CDC requires a focus on health equity. The CDC NOFO states, "achieving health equity also requires addressing root causes that disproportionately disadvantage people and communities based on characteristics such as race, ethnicity, gender, and ability. These causes can include racism and biases in societal values and public policy." Additionally, the Kansas Coalition frequently responds to technical assistance requests regarding serving both legal immigrant survivors and undocumented survivors, given the increased vulnerability that these survivors face by those who exploit their immigration status.  This

includes training and technical assistance for advocates on best ways to conduct outreach to those who speak English as a second language, providing training to interpreters to be trauma informed, providing informational products on legal reliefs to survivors such as U-VISA or T-VISA processes, or related concerns affecting victims and survivors of immigrant communities. Now, it is unclear whether these programs would fall within the administration's interpretation of federal anti-discrimination law as prohibiting DEI and DEIA programs.

44.    For the same reasons, my organization is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

45.    My organization is concerned about the HHS ACF condition requiring a certification of compliance with the Title IX of the Education Amendments of 1972. My organization has always complied with Title IX, but recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting people to participate in single-sex programs based on their gender identity. My organization is concerned as it has been previously understood that VAWA and FVPSA prohibit discrimination against an individual based on their gender identity and therefore the Coalition has assisted Member Programs to understand their obligations to serve transgender survivors to comply, through our training and technical assistance on how to serve the underserved population of LGBTQ+ victims and survivors, including in shelter services.  Our concern is that this condition would prohibit us from accommodating the needs of the transgender and nonbinary survivors that we serve, including by allowing them to be recognized and served in ways that aligns with their gender identity.

46.     My organization is also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. In providing direct client services and technical assistance, many of my organization's staff: use clients identified pronouns for people who do not identify with the sex they were assigned at birth, recognize gender identity in providing direct assistance, and accommodate the needs of the LGBTQ+ community in by using inclusive language in our training, in guidance documents, and in our published materials, including public awareness materials. It is unclear whether my organization may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

47.     My organization is concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." The Kansas Coalition does not provide abortion care, but we do not know what the government may consider "promoting" abortion. Given the high occurrence of reproductive coercion in domestic or dating violence situations, as well as the possibility that an unwanted pregnancy can be a result of rape, the Coalition offers training and technical assistance to healthcare providers, advocates, and other professionals about reproductive coercion. It is unclear if the government would consider these activities as promoting elective abortion.

48.     My organization is concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders."  This broad and vague language lacks a clear connection to HUD grants and our programming, particularly given the many new executive orders that it implicates.

49.     The new funding conditions present my organization and its members with an impossible choice. My organization could forgo accepting HUD and HHS grant awards and face the direct consequences to my organization's financial health and ongoing operations, including

20

on the health and operations of its member organizations, and to those who receive direct services. Or my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements and face enormous risks of litigation and government investigations under the False Claims Act.

50.     Additionally, my organization's members would have to fundamentally change their programming or accept new grants and risk running afoul of various funding conditions imposed on those grants. For example, if members no longer have access to this funding, victims and survivors of domestic, sexual, family, and dating violence in Kansas would see a decline in trauma-informed services due to the impact on the reduction of core programming.   Member organizations are concerned if they accept the funding, that the conditions would require devastating, fundamental changes to their programs.  For example, in providing direct client services member organization staff: use clients' identified pronouns for people who do not identify with the sex they were assigned at birth, recognize gender identity in providing direct assistance, and recognizing the needs of the LGBTQ+ community by using inclusive intake forms, presentations that recognize the diversity of people who are victimized, and creating brochures and outreach materials for underserved population, displaying and providing LGBTQ specific support group information within the community, providing clients with local gender affirming care resources,providing gender neutral bathrooms amongst the entire facility, and celebrating Pride Month within the facility amongst staff and residents. Member organizations are concerned, as it has been previously understood that VAWA and FVPSA prohibit discrimination against an individual based on their gender, that this condition would prohibit them from accommodating the needs of the transgender and nonbinary survivors that we serve, including by allowing them to be recognized and served in ways that align with their gender

identity.  It is unclear whether my organization may continue these practices and activities while complying with     funding conditions related to     " gender ideology." Members also provide services and provide outreach to underserved communities which may be misconstrued as promoting DEI.  For example, member organizations use grant funds to translate materials into languages other than English, create public awareness and outreach campaigns that appeal to Hispanic individuals or other ethnic groups that may underutilize services, and use funds to support the creation of materials that increase the accessibility of information to survivors with disabilities.

51.    Member o    rganizations would be harmed as     members would have to fundamentally change their programming or accept new grants and risk running afoul of various funding conditions imposed on those grants.     My organization and our members fear that if we agree    to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core values or jeopardize our compliance with VAWA.

**VIII.     These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors and the Professionals Who Provide Services to Them.**

52.    These funding conditions threaten harm to our mission of providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic abuse and sexual violence. The Kansas Coalition's training and technical assistance frames domestic violence and sexual assault as not only criminal offenses but also includes additional

context about root causes and social drivers behind instances of domestic violence and sexual assault. This includes providing services that take a public health model approach to preventing domestic violence and sexual assault which is evidence-based and includes components addressing the intersection of violence and oppression, including: racism, classism, homophobia, and ableism. The Kansas Coalition and our Members do not discriminate against anyone, but the broad terms associated with DEI makes it impossible for the Kansas Coalition to know if its training would be considered an out-of-scope activity as provided by this funding condition.

53.     Conversely, if my organization or its members turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

54.     My organization's operations are essential to coordinated efforts to reduce and eliminate domestic and sexual violence in Kansas. Cuts to staff or reduction in programming, would limit our ability to ensure that services provided to survivors in Kansas are high quality, follow best practices, and meet standards. Our member programs would lose access to core, comprehensive training for their staff necessary to provide ethically compliant services to clients in addition to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The state would lose critical technical assistance in systemic response improvements that reduce domestic violence and sexual assault, increase effectiveness of legal responses, and dramatically improve survivor response and support efforts. These losses would make the Kansas Coalition less effective as a coalition and undermine its role as the state authority on domestic violence and sexual assault prevention, intervention, and response. In the absence of fully funded Kansas Coalition services, sexual assault victims will be confronted with more barriers when trying to access services following their assault, including discriminatory

treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists who have not received anti-bias and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being linked to and receiving appropriate medical and therapy services. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services. The Kansas Coalition's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of sexual violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.  In the absence of fully funded services, for my organization and the members of my organization, victims and survivors in Kansas would be at continued and increased risk of violence, injury, or death. Without this funding, we would have difficulty providing services to our community's most vulnerable.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2026.

 /s/                               

Michelle McCormick, LMSW
Executive Director
Kansas Coalition against
Sexual and Domestic Violence
