IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*<br><br>*Defendants*. | Case No. 25-cv-00342 |

### DECLARATION OF MONIQUE MINKENS

I, Monique Minkens, declare as follows:

**I.   Background**

1.  I am the Executive Director of End Domestic Abuse Wisconsin: the Wisconsin Coalition Against Domestic Violence ("End Domestic Abuse WI" or "Coalition"), which is Wisconsin's federally designated domestic violence coalition.

2.  End Domestic Abuse WI was founded in 1985 and is headquartered in Madison, Wisconsin. The Coalition works to create social change to end domestic violence by supporting and centering survivors, advocating for systemic and legislative change, and strengthening the capacity of domestic violence service providers across the state of Wisconsin. The Coalition provides its members with individualized training and technical assistance opportunities, access to support and resources, and invitations to coalition-hosted events.

1

3. My organization receives grants from the Department of Health and Human Services (HHS). My organization has an annual budget of roughly $6.08 million. Of that total amount, roughly $2,623,767 comes from HHS grants, including subcontracts.

**I.** **My Organization's Member Organizations**

4. End Domestic Abuse WI is a statewide coalition of approximately 53 anti-violence Program Members, Allied Partners, and Supporting Members working in partnership to address the root causes of violence, create a safer world, and end domestic violence. All Coalition members must agree to adhere to the mission, vision, and values of End Domestic Abuse WI. See https://www.endabusewi.org/mission-vision-values/. Any Wisconsin domestic violence program or program with work related to domestic violence is eligible to apply to be a Program Member in the Coalition. Although Wisconsin domestic violence programs are not required to join End Domestic Abuse WI, the Coalition must have at least half of the state's domestic violence programs as members to qualify as the State's federally designated domestic violence coalition, as it has done. Non-profit organizations and government agencies whose work intersects with, but is not primarily focused on, the issues of domestic violence and interpersonal violence are eligible to apply to be Allied Partners of the Coalition. Any individual who supports the Coalition's mission, vision, and values may apply to be a Supporting Individual Member of the Coalition.

5. Members of my organization receive grants from HUD and HHS.

## II. HUD's New Funding Conditions

6. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

7. The NOAs for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

## III. My Organization's and its Members' HUD Grants

8. My organization's members have received HUD grants, including grants under the CoC Grant Program. Member Doe 1 has received HUD grants, including grants under the CoC Grant Program. Member Doe 1 receives the grant as pass-through from the Wisconsin Balance of State Continuum of Care (WISBOSCOC) and another through Brown County Homeless and Housing Coalition Member Agency grant holder for WISBOSCOC regional distributions. Member Doe 1 signs awards as subgrantee through WISBOSCOC.

3

9. For example, on October 1, 2024, HUD awarded Member Doe 1 a total of $257,513.00 through the CoC Grant in FY 2024. The grant has a performance period of 3 years and a budget period of October 1, 2024 through September 30, 2025. Member Doe accepted this award on October 28, 2024. The NOFO and NOA did not include the new HUD funding conditions described above, but Member Doe current award does include the conditions. This is a yearly continuation grant. Member Doe began another non-competitive budget cycle, starting on October 1, 2025 through September 30, 2026. HUD notified Member Doe that it may instead be a competitive grant cycle the following year.

10. Declining this funding would have a very detrimental impact to Member Doe 1. Without HUD funding, Member Doe would not be able to house up to nine individuals and/or families who are homeless because of domestic violence. These nine households would be in jeopardy of returning to unsheltered homelessness on the streets, or needing to rely on family, friends, and other connections for temporary housing. Unstable housing conditions threaten already vulnerable people with the risk for further abuses from individuals who allowed a place to stay with ulterior expectations. Member Doe 1 will have to reduce two staff members and cut their Domestic Violence Rapid ReHousing Program.

11. Member Doe 1, as a newer grantee, has invested their organization and staff to incorporate extensive additional policies, and build infrastructure for the tracking and reporting procedures necessary to comply with the grant. The organization put a lot of thought and time into designing a program that meets the needs of community members and meets the grant program's requirements for implementation, documentation, and compliance. Member Doe 1 took great care to implement the grant properly. To cut this

funding or implement an abrupt redesign of the program's requirements will undo years of building capacity within the organization and the agency and funders. It will disrupt and remove services aiding very vulnerable populations.

12. My organization's members also receive HUD CoC Street Outreach funds to support their Safe Place Parking Program, which provides safe, designated parking spaces for individuals living in their vehicles, with 35-42 cars a night on the lot. It is a victory for us when someone at Safe Place Parking Program can be placed in a HUD COC funded units to provide them the essential supportive services for their successful transition to long term housing stability. Without funding—or with funding but with restrictive and vague limitations—this program would not exist.

### IV. HHS's New Funding Conditions

13. In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.[1]

14. In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." The July GPS replaced the April GPS.

15. The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

16. In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive Order. In July 2025, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

17. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

18. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

19. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

**V.   My Organization's and its Members' HHS Grants**

20. My organization received a grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Grant").

21. My organization has used FVPSA Coalition Grant funds for many purposes. For instance, these funds support training and technical assistance.

22. On July 9, 2025, HHS awarded my organization a total of $382,407 through the FVPSA Coalition Grant in FY25. The grant has a period of performance of 2 years and a budget

7

period of October 1, 2024 through September 30, 2026. The NOFO did not include the new funding conditions, but the NOA indicates that the ACF Standard Terms and Conditions, which contains the new funding conditions described above, applies to the award.

23. On September 11, 2024, HHS awarded my organization a total of $363,657 through the FVPSA Coalition Grant in FY24. The grant has a performance period of 2 years and a budget period of October 1, 2023 through September 30, 2025. My organization accepted this award on September 11, 2024 and is now on a new award for the October 1, 2024 through September 30, 2026 cycle. The NOFO and NOA did not include the new HHS funding conditions described above, but I understand our current award is subject to the HHS GPS and ACF Standard Terms and Conditions. We expect to apply every year around January for the grant for the following year.

24. Declining this funding would have a very significant, detrimental impact on my organization. Without the funding for this grant, we would have to limit important training and lay off three to five staff members. As a state-wide coalition, our work and influence stretches across the state. Declining the funding and discontinuing key training and technical assistance would have a negative impact on our ability to serve all of Wisconsin. The grant allows us to think creatively and offer training and technical assistance that keeps the public informed and focused on the goal of liberation of victims and survivors.

25. My organization's members have received HHS grants, including FVPSA. For example, one member organization, Member Doe 2, received FVPSA funds as a passthrough underneath the State's Department of Children and Families (DCF), through Domestic

8

Violence Services, Shelter Stabilization and Domestic Violence Housing First. Member Doe 2 signs their awards directly through the State of Wisconsin, Department of Children and Families.

26. For example, on January 1, 2025, HHS awarded Member Doe 2 a total of $351,539 through the State of Wisconsin's DCF in FY 2025. The grant has a period of performance of 12 months and a budget period of January through December. Member Doe 2 has this award as a yearly continuation grant that will expire in 2026. When that expires, Member Doe 2 plans to continue to apply for the available funds. Member Doe 2 expects the HHS GPS certifications will apply to any continued funds.

27. Declining this funding would have a very significant impact on Member Doe 2. Without funding from this grant, they may be forced to consider staff reductions and cutbacks to the services and shelter programs that operate 24 hours a day, seven days a week. This would have a direct and harmful effect on the essential services that the county and community partners rely on, as they are the only victim services organization of their kind within the county.

28. This could mean no helpline available for victims seeking immediate safety planning, no trained advocates to respond to law enforcement calls, court hearings, or hospital visits—especially during nights, weekends, and holidays. Victims in crisis may find themselves without a safer place to go or someone to accompany them during forensic exams, interviews, or court proceedings. It could also lead to delays or gaps in restraining order assistance, legal advocacy, and case management.

29. Community-wide, the absence of our services would likely result in increased pressure on already overburdened systems such as law enforcement, emergency rooms, and mental health providers—none of which are equipped to provide the specialized trauma-informed care that our organization offers.

30. In short, without this funding, or with restrictions on the funding, the safety net for victims of crime and abuse in the region would be severely compromised, leaving survivors without critical support at their most vulnerable moments and undermining the coordinated community response that is vital to public safety and justice.

VI. **HUD's and/or HHS's New Funding Conditions Place My Organization and its Members in an Untenable Position**

31. Agreeing to the HUD and/or HHS conditions would cause my organization and its members profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD and/or HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

32. My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although we have always complied with federal antidiscrimination laws,

10

the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization envisions communities fully engaged to provide safety and to give a voice to all affected by domestic abuse, while creating the social change necessary to address its root causes. We honor the wisdom and strength of domestic abuse survivors across the lifespan. Our mission is achievable through survivor-centered work that includes strategic partnerships and collaboration. As advocates for social justice, we embrace the voices of diverse communities. It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

33. In the view of the Coalition, education on issues related to domestic and sexual violence necessarily includes a recognition of the structural and cultural factors that perpetuate violence, silence survivors, and limit access to safety—especially for women, LGBTQ+ people, and other marginalized genders. In its training and public education work, the Coalition frequently frames domestic violence as an issue of social justice, because doing so prioritizes the safety of all victims. Relatedly, the Coalition's training and public education includes information about what victims with the most barriers need to attain freedom from violence, and typically includes information, based on the findings of its own homicide report, research by the U.S. Centers for Disease Control and Prevention (CDC), and a Columbia University study of homicides between 2019 and 2020, establishing that Black women and girls are the victims facing the most barriers to safety

in Wisconsin. Indeed, inspired in part by research findings that Black women aged 25 to 44 in Wisconsin are 20 times more likely to die by homicide than white women in the same age group, a Missing Murdered Indigenous Family Member task force was created in the state – a factor that the Coalition considers to be a public acknowledgment of the existence of the problem and of the inextricable connections between race and gender-based violence in Wisconsin.

34. My organization is also unsure whether it can continue to operate programs that target underserved or marginalized communities, as we aim to do and support our members in doing. Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

35. For the same reasons, my organization is concerned that it cannot comply with any conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

36. My organization is also concerned about the HHS ACF condition requiring a certification of compliance with the Title IX of the Education Amendments of 1972. Recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. My organization is concerned that this interpretation could require organizations to ignore federal law prohibiting discrimination based on gender identity and would ultimately result in victims who are transgender or gender-nonconforming being turned away from services.

37. Member Doe is also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. It is unclear whether Member Doe may continue these

12

practices and activities while complying with the funding condition not to "promot[e] gender ideology" or "DEI."

38. For Member Doe 1, providing trauma-informed, inclusive care to all survivors—including LGBTQI+ individuals and those who are transgender or nonbinary—is essential to its mission to support and bring healing and safety for survivors and their families. Excluding or ignoring aspects of a survivor's identity, such as gender identity, would cause harm and reduce the effectiveness of their services.

39. Member Doe 1 is concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." Member Doe 1 does not know what the government may consider to "promote" abortion, and whether referrals for abortion care that it provides would fall within this prohibition

40. Member Doe 1 is concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders."
Member Doe 1 does not know what this condition's broad and vague language means for our organization or how to comply with it, given the many new executive orders that it implicates.

41. The new funding conditions present my organization and its members with an impossible choice. My organization and members could forgo accepting HUD and/or HHS grant awards and face the direct consequences to my organization's and our members' financial health and ongoing operations. Or my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory

13

requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

42. Additionally, Member Doe 1 would have to fundamentally change their programming or accept new grants and risk running afoul of various funding conditions imposed on those grants. For example, during its client intake process, members including Member Doe 1 gather information about gender identity and the need for legal services, including immigration legal services, to facilitate proper care and access to available resources. Member Doe 1 assesses preferred pronouns to ensure that care is respectful, compassionate, and appropriate for each individual. Members like Member Doe 1 would have to fundamentally alter this programming in a way that undermines its ability to serve certain underserved populations and runs contrary to the organization's values.

43. The Coalition fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make the Coalition concerned about applying or accepting an award. To mitigate these risks, the Coalition would have to change its practices, in many cases contrary to its core values.

44. Not agreeing to the certifications would result in equally grave harm. Not having access to funds from the Coalition Grant and other competitive grants would severely undermine the Coalition's ability to function as a state coalition and to provide direct services. Without these funds, the Coalition would have to reduce the size of its staff and frequency and scope of its training, therefore, its services to members.

45. Our member programs would lose access to core, comprehensive training for their staff necessary to provide legally and ethically compliant advocacy services to clients in addition to regular training on emergent issues that ensure front-line staff are able to provide quality services to all survivors. The state would lose critical technical assistance in systemic response improvements that reduce domestic violence, increase effectiveness of legal responses, and dramatically improve survivor response and support efforts. These losses would make End Domestic Abuse WI less effective as a coalition and undermine its role as the state authority on sexual violence prevention, intervention, and response.

## VII. These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors

46. The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic violence.

47. In the absence of fully funded End Domestic Abuse WI services, domestic violence victims will be confronted with more barriers when trying to access services following the harm they've experienced, including discriminatory treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists who have not received anti-bias and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being linked to and receiving appropriate medical and therapy services. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

48. The Coalition's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of domestic violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 11, 2026.

*/s/ Monique Minkens*
Monique Minkens
Executive Director
End Domestic Abuse Wisconsin:
the Wisconsin Coalition Against Domestic Violence
