IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*

*Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*

*Defendants*.

Case No. 25-cv-342

# DECLARATION OF KERI MORAN-KUHN

I, Keri Moran-Kuhn, declare as follows:

## I. Background

1. I am the Executive Director at Oregon Coalition Against Domestic and Sexual Violence ("Oregon Coalition" or "OCADSV"), Oregon's federally designated domestic and sexual violence coalition.

2. Oregon Coalition is a dual domestic violence and sexual assault coalition membership organization composed of rural and urban members, founded in 1978 and headquartered in Portland, Oregon. Oregon Coalition provides statewide leadership, technical assistance, and support to member programs that serve survivors, the public, friends, family, and all whose lives are affected by domestic and sexual violence. We believe reaching our goal of a violence- and oppression-free society is most effectively done through grassroots efforts, communities that hold abusers accountable, and networking along with coalition building at the local, state and national levels.

1

3. My organization receives grants from the Department of Health and Human Services (HHS). My organization has an annual budget of roughly $1,301,158. Of that total amount, roughly $665,071 comes from HHS grants, including subcontracts.

## II. My Organization's Member Organizations

4. Oregon Coalition is a membership organization with the majority of the community-based direct-service domestic and sexual violence organizations in Oregon as our core members. Members fall into one of two categories. (1) Coalition member programs are local nonprofit organizations and Tribal Nation domestic and sexual violence service programs which provide shelter and community-based advocacy services primarily to survivors of domestic violence, sexual assault, stalking, and human trafficking throughout the state of Oregon. Affiliate and public service supporting members are community organizations and governmental entities (respectively) that support the Coalition's mission and values and are committed to supporting survivors of domestic violence, sexual assault, stalking, and human trafficking.

5. Members of my organization receive grants from HHS and HUD.

## III. HUD's New Funding Conditions

6. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

7. The NOAs for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined

2

in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

IV. **My Organization's Members' HUD Grants**

10. My organization's members have received HUD grants, including grants under the CoC Grant Program. Member Doe 1 receives the grant money as a pass-through from the state and they sign awards directly with HUD.

11. On May 6, 2025, HUD awarded Member Doe 1 an award letter for total of six awards totaling $2,000,204 through the CoC Grant Program, including for a new Permanent Housing-Rapid Rehousing project funded by Domestic Violence Bonus Funds (PH-RRH DV Bonus Project) and renewals for projects including an RHH project, a Permanent Supportive Housing (PSH) project, the Domestic Violence Bonus Award (DV Bonus), and more. The NOFO and NOA did not include the new HUD funding conditions described above, but the contract received in September, 2025 includes the HUD Conditions. The grant performance and budget periods vary, with the soonest from June 2025-May 31, 2026 for Permanent Supportive Housing (PSH) project, another from August 1, 2025-July 31, 2026 for a Supportive Services Only (SSO) grant, and others from October 1, 2025-September 30, 2026.

12. Through Member Doe 1's HUD contracts, they directly house a minimum of 55 households of victims of domestic violence or trafficking annually. They have also served more than that consistently for the past five years. Many of these households are already in the program and would at once lose the house they are currently in. HUD funding is a cornerstone of Member Doe 1's housing program and the loss would cause a reduction in program infrastructure, including the loss of 6 full time staffers. Additionally, one of Member Doe's HUD grants is an SSO grant, which funds their work in operating a coordinated entry program. Through this project, they conduct an average of 200 housing assessments a year, manage this waitlist, and help these households navigate into housing. Losing these funds would be devastating and so would agreeing to the conditions, which may require us to revamp the program, reallocate resources, or entirely cancel it.

V.     **HHS's New Funding Conditions**

13. In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.[1]

14. In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new conditions the following new conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." [note re stip that this does not apply]

4

15. The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001." : (1) it requires that all grant recipients "must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act];" and (2) it provides that by accepting the grant award, recipients certify that: (i) "they do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws"; and (ii) "they do not engage in, and will not during the term of this award engage in, a discriminatory prohibited boycott." HHS states that it "reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of

this award, operate any program in violation of Federal anti-discrimination laws or engages in prohibited boycott." *Id.* at 19.

16. The HHS GPS applies to nondiscretionary "awards and award modifications that add funding made on or after April 16, 2025," including "supplements to award, competing and non-competing continuations," (other than awards from NIH), and it applies to all HHS recipients and subrecipients other than individuals.

17. In addition to the GPS conditions, In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive ORder. In July 2025, ACF HHS's Administration for Children and Families (ACF) also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients. is now imposing new funding conditions on ACF nondiscretionary and discretionary grants, including the Domestic Violence Coalitions Grant, that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

18. The new ACF Standard Terms and Conditions document provides that a "Civil Rights Assurance" applies to new awards made on or after May 8, 2025, which requires that recipients "must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act];" and provides

6

that, "[b]y accepting the grant award, recipients are certifying that: (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote the following in violation of Federal anti-discrimination laws: DEI, DEIA, or discriminatory equity ideology."

19. In addition, the version of the ACF Standard Terms and Conditions document published on July 29, 2025, and effective for grants made "on or after" that date provideds that, for new awards made on or after March 28, 2025, recipients whose programs are covered by Title IX certify to the following: (1) that the recipient "is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement; (2) that those "requirements are conditions of payment that go to the essence of the Agreement and are therefore material terms of the Agreement"; (3) that "[p]ayments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements"; (4) that the "[r]ecipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement"; and (5) that "[r]ecipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability

under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."[2]

20. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements. The Center for Disease Control and Prevention ("CDC") has updated their policies to impose new conditions on certain new awards and award modifications by incorporating the HHS GPS, including the HHS Discrimination Certification.

21. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients. .

22. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all

---

[2] A new version of the ACF terms and conditions effective on January 30, 2026, for awards and funded modifications made on or after that date replaces this Title IX provision with an Assurance of Compliance paragraph providing that "[b]y accepting federal funds from HHS, the recipient is providing its assurance of adherence to applicable nondiscrimination laws as indicated in the GPS. Recipients are also responsible for ensuring that their subrecipients, contractors, and HHS-funded partners that are bound by any of those nondiscrimination laws are operating in compliance with them."

discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

## VI. My Organization's and its Members' HHS Grants

23. My organization has applied for and received a grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Coalition Grant") for the past 33 years.

24. My organization has used FVPSA Coalition Grant funds for many purposes. For instance, these funds support training and technical assistance to local family violence, domestic violence, and dating violence service programs and to providers of direct services to encourage appropriate and comprehensive responses to family violence, domestic violence and dating violence against adults or youth in Oregon. These include training and technical assistance to ensure programs are welcoming and accessible to underserved populations, conducting Statewide Needs Assessments that include member and non-member programs that provide direct services to encourage appropriate and comprehensive responses to family violence, domestic violence, and dating violence against adults or youth in Oregon; collaborating with service providers and community-based organizations to address the needs of family violence, domestic violence, and dating violence victims, and their dependents, who are members of racial and ethnic minority populations and underserved populations; working with judicial and law enforcement agencies to encourage appropriate responses to cases of family violence, domestic violence, or dating violence against adults or youth; providing information to the public about prevention of family violence, domestic violence and dating violence; and supporting the development of policies, protocols, and procedures to enhance domestic

9

violence intervention and prevention in the state including those related to maintaining the shelter and supportive services for victims of domestic violence and their dependents.

25. HHS awarded my organization a total of $367,750.00 through the FVPSA Violence Prevention and Services / State Domestic Violence Coalition Grant in FY 26 (FVPSA Coalition Grant). The grant has a period of performance starting in October 1, 2024 through September 30th, 2026, and a budget period of October 1, 2024, through September 30, 2026.The NOFO did not include the new funding conditions, but the NOA indicates that the HHS GPS and ACF Standard Terms and Conditions, which contains the new funding conditions described above, applies to the award. My organization needs to accept this award as soon as possible, but no later than August 1, 2025, for financial reasons.

26. Declining this funding would have a very significant detrimental impact on my organization. Without the funding for this grant, the Oregon Coalition would have to cut staffing FTE, would not be able to provide the supports and technical assistance to local communities across Oregon. In addition we would not be able to provide local service organizations training, policy and education for leadership and staff of those service providers.

27. My organization has applied for and received a competitive grant from the Center for Disease Control (CDC) for the Rape Prevention and Education program ("RPE Grant") for the past 2 years.

28. My organization has used RPE Grant funds for many purposes. For instance, these funds support the goal to prevent sexual violence among communities in Oregon, through a framework, which addresses ACEs and toxic stress, and incorporates the nine principles of

10

primary prevention. The Oregon Coalition works with the state health department regarding program development, strategic planning and messaging efforts to deepen primary prevention understanding across the state . Oregon Coalition staff promotes social norms that protect against violence.

29. On June 30th, 2025, HHS awarded my organization a total of 135,000 through the RPE Grant in FY26. The grant has a period of performance start date was 06/30/2024 and the end date of the grant is 06/29/2028 and a current budget period of 06/30/2025 through 06/29/2026. The NOFO did not include the new funding conditions, but the NOA indicates that the HHS GPS and CDC Terms and Conditions, which contains the new funding conditions described above, apply to the award. My organization needs to accept this award either by drawing down funds or otherwise communicating acceptance 30 days upon receipt of the notice of award, by July 30th, 2025.

30. We also receive the Preventative Health & Health Services grant and have every year since 1997. This past year we received $85,600 from this grant. Our PHHS grant funds a staff person who provides consistent technical assistance and training focused on sexual violence primary prevention based on models and practices that reflect an anti-oppression and trauma informed framework. The Oregon Coalition passes some of the funding to local organizations to build capacity for sexual violence prevention through supporting agencies primary prevention knowledge and skillsets to support future implementation of primary prevention strategies, and we measure and monitor capacity building grantees performance through reviews and workplans. This funding allows the Oregon Coalition to work towards the goal of preventing violence in communities throughout the state.

11

31. Without this money, or with this money but with limiting conditions, we would have to either cancel this program, fire this staff person, or completely alter the model of the work.

32. My organization's members have received HHS grants, under the RPE Program.

33. On February 1, 2025, HHS awarded Member Doe 2 a total of $35,000 through the RPE in FY25. The grant has a period of performance of 1 year and a budget period of 2024 through 2029. Member Doe 2 accepted this award on February 1, 2024. When Member Doe 2 receives the continuation award, which goes through 2029, Member Doe 2 believes HHS GPS will apply to that.

34. Declining this funding would have a very significant detrimental impact on Member Doe 2. Without the funding for this grant, they would no longer offer domestic and sexual violence prevention services in their county in Oregon. Because Member Doe 2 is the only Confidential Domestic and Sexual Violence Provider offering such services, it would result in extinction of services countywide.

35. Without prevention services, Member Doe 2's community is at a risk of experiencing greater rates of violence in our community and the violence escalates and leads to more dire outcomes like death. Also, this grant funds trauma informed violence prevention parenting classes. These classes would no longer be offered and there could be higher rates and more severe child abuse in our community.

VII. **HUD's and/or HHS's New Funding Conditions Place My Organization and its Members in an Untenable Position**

36. Agreeing to the HHS conditions would cause my organization profound harm, as would the HUD conditions for my members. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken

for years in furtherance of that mission and in reliance on HUD and/or HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

37. My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization's mission is to provide culturally specific programming and support to all who come through our doors. It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

38. My organization is also unsure whether it can continue to operate programs that target underserved or marginalized communities. For instance, Oregon Coalition's mission statement begins: "[Oregon Coalition] promotes equity and social change in order to end violence for all communities. We seek to transform society by engaging diverse voices, supporting the self-determination of survivors and providing leadership for advocacy

13

efforts." It also contains an express Statement of Equity and Inclusion that states, in part, "We engage in an ongoing process of analysis that sees all systems of oppression as interrelated and work to challenge the power structures that legitimize them and perpetuate injustices. We conduct education about the impact of the various oppressions. We examine and improve practices, policies and protocols, on an ongoing basis, to ensure compliance with this statement and encourage and enable member programs in their equity and inclusion efforts." Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

39. For the same reasons, my organization is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

40. Oregon Coalition is unsure whether it may undertake its day-to-day activities reflecting its mission and guiding principles, which reference "equity," without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" as HHS might interpret those terms. It is also unclear whether Oregon Coalition's mission and guiding principles, which recognize that the criminal offenses of sexual assault and domestic violence carry a systematic social justice element, violate the anti-social justice part of the certification, and whether Oregon Coalition could comply with the anti-social justice condition without adopting a view antithetical to its true beliefs.

41. Oregon Coalition is also concerned that it cannot continue to engage in certain practices that respect the dignity of all victims of sexual violence, regardless of gender and sexual

14

orientation, and are consistent with the VAWA mandate not to discriminate on the basis of gender or sexual orientation. As Oregon Coalition's Philosophy Statement provides, in relevant part, "Collectively, we support the rights of all people to have access to information, advocacy, crisis intervention, treatment, education and prevention services. We support the right of survivors to make choices about reporting, prosecution, pregnancy, future safety and other issues created by their experience. We believe in self-determination, empowerment and the right of all persons to live without fear of interpersonal violence regardless of race, gender, national origin, age, ability, religion or sexual orientation." It is unclear whether Oregon Coalition may continue its practices and activities while complying with the funding condition not to "inculcat[e] or promot[e] gender ideology."

42. My organization is also concerned about the HHS ACF condition requiring a certification of compliance with the Title IX of the Education Amendments of 1972. Recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. My organization is concerned that this interpretation could require organizations to ignore federal law prohibiting discrimination based on gender identity and would ultimately result in victims who are transgender or gender-nonconforming being turned away from services.

43.  My organization's members are also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. In providing direct client services and technical assistance, many member organizations' staff use clients' preferred pronouns to demonstrate support for people who do not identify with the sex they were assigned at

birth, recognize gender identity in providing direct assistance, and accommodate the needs of the LGBTQ+ community in providing housing services using HUD grants. It is unclear whether members may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

44. Members are also concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." Members do not provide abortion care, but they do not know what the government may consider to "promote" abortion. Members offer clients information about any healthcare services that they need. When pregnant survivors request abortion care, members provide them with resources on how to seek that care.

45. Member organizations are also concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders."

46. Members do not know what this condition's broad and vague language means for their organization or how to comply with it, given the many new executive orders that it implicates." The new funding conditions present my organization and its members with an impossible choice. My organization and its members could forgo accepting HUD and/or HHS grant awards and face the direct consequences to organizational financial health and ongoing operations and the health and operations of its member organizations, and to those who receive direct services. Or my organization and its members could accept the funding with the conditions and jeopardize our organizations' missions and compliance with statutory or regulatory requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

16

47. Additionally, my organization's members would have to fundamentally change their programming or accept new grants and risk running afoul of various funding conditions imposed on those grants.

48. My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core values.

49. Agreeing to the conditions would cause Member Doe 1 and 2 profound harm. The funding conditions are vague, and several could be read to conflict with Member Does' organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on the grants. The funding conditions may require Member Does to cease engaging in activities that it had previously understood the grants to plainly support. Thus, Member Does do not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for other organizations, advocates, and vulnerable victims and survivors of sexual violence.

50. Member Doe 1 and 2 are concerned about conditions requiring that they certify that it does not operate any programs that violate any applicable Federal antidiscrimination laws, implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although they have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination

17

law as prohibiting all aspects of programs focused on DEI and DEIA. For example, Member Doe 2's mission is "to provide culturally aware outreach, education, and services for survivors of domestic and sexual violence through leadership, hope, and respect for families." It is unclear whether Member Doe 2's mission and guiding principles violate the certification, and whether Member Doe 2 could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

51. Member Doe 1 and 2 are also unsure whether it can continue to operate programs that target underserved or marginalized communities. Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

52. For the same reasons, Member Doe 2 is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

## VIII. These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors

53. The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence in Oregon.

54. In the absence of fully funded Oregon Coalition services, sexual assault and domestic violence victims will be confronted with more barriers when trying to access services following their assault, including discriminatory treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists who have not received anti-bias

and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being connected to and receiving appropriate medical and therapy services. Direct service providers will be left without the critical assistance they need to navigate compliance with myriad federal, state, and local requirements, all the while desperately trying to keep up with the already-increasing demand for services. Ultimately, the quality of their services will inevitably suffer.

55. Conversely, if my organization or its members turned down the funds because of the conditions, The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

56. Oregon Coalition's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to survivors and ensuring that the systems that contribute to addressing and responding to the epidemic of sexual violence are operating with evidence-based, trauma-informed, and survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed February 9, 2026.

/s/Keri Moran-Kuhn
Keri Moran-Kuhn
Executive Director
Oregon Coalition Against Domestic
and Sexual Violence