## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

*Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services, *et al.*

*Defendants*.

Case No. 25-cv-342

## DECLARATION OF COLBY J. O'BRIEN

I, Colby J. O'Brien, declare as follows:

### I.  **Background**

1. I am the Executive Director at The Rhode Island Coalition to End Homeless (RICEH), a coalition that represents the full homelessness response system, including the Coordinated Entry System in RI.

2. My organization was founded in 1988 and is headquartered in Providence, Rhode Island. The Rhode Island Coalition to End Homelessness works collaboratively with advocates, providers, and faith-based organizations to create and advance lasting solutions to prevent and end homelessness. We ensure that all the experiences of homelessness are included in what we do. We also provide supportive services coordination to partner organizations.

3. My organization connects families and individuals who are living outdoors with shelters through our 365 day a year hotline. We manage the statewide database that tracks all persons experiencing homelessness in the state of Rhode Island. We analyze trends in

1

homelessness to achieve better outcomes, meaning that people are no longer at risk of homelessness or are at least sheltered and out of the elements. We run the SSDI SSI Outreach Access and Recovery (SOAR) program for the state of Rhode Island. SOAR increases access to disability benefits for individual adults, parents, and children who are experiencing homelessness or are at risk of homelessness. We provide the Voices of Homelessness (VOH) speakers bureau, which empowers people who have lived experience with homelessness to learn to tell their story, both in public presentations and public testimony during the legislative session. We also facilitate the monthly meeting of the Constituent Advocacy Committee (CAC), which is one of the standing committees of the Continuum of Care Alliance (CoC), which serves to inform the CoC policy and program development.

4.  My organization receives grants from the Department of Housing and Urban Development (HUD). My organization has an annual budget of roughly $4,113,010.25. Of that total amount, roughly $1,275,159 comes from HUD grants and $1,150,220 comes from Continuum of Care HUD grants.

## II.    HUD's New Funding Conditions

5.  HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

6.  The NOAs for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined

Docusign Envelope ID: B6CBFFB1-2570-4482-B460-903832DEE853

in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring

Biological Truth to the Federal Government;" (2) "agrees that its compliance in all

respects with all applicable Federal anti-discrimination laws is material to the U.S.

Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies

that it does not operate any programs that violate any applicable Federal

antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4)

"shall not use any Grant Funds to fund or promote elective abortions, as required by E.O.

14182, Enforcing the Hyde Amendment."

III.   **Rhode Island Coalition to End Homelessness's HUD Grants**

7.   My organization has applied for and received competitive grants from HUD for the

Continuum of Care Grant Program ("CoC Grant"), for the past 22 years. We are a direct

recipient of these grants which provide funding for a variety of our programs and

services. We have received CoC grants to support the Homeless Management

Information Services program since 2003. We have received CoC grants to support our

work in administrating the Coordinated Entry System since 2018. We have received CoC

grants to support our Statewide Street Outreach Coordination program since 2021.

Finally, we have received CoC grants to implement a new system of coordinating

supportive services for victims of domestic violence since 2021.

8.   Currently, my organization receives the following HUD grants:

   a.   The HUD COC Coordinated Entry System Grant, which provides a total of

   $156,203 for the period July 1, 2024 through June 30, 2025 to support the

   maintenance of the Coordinated Entry System, which provides a hotline people

   experiencing homelessness can call to receive our support and guidance to

connect those individuals to supportive services to get them off the street and get

back on their feet. The current award was awarded on June 11, 2024, and does not

include the new HUD funding conditions described above, but HUD asked

RICEH to sign an NOA for the period of July 1, 2025, through June 30, 2026, and

this NOA includes the new HUD funding conditions.

b.   The HUD COC HMIS Grant, which provides a total of $167,697 for the period

July 1, 2024, through June 30, 2025, to support the maintenance of the Homeless

Management Information System, which is a system RICEH uses to collect, track,

and analyze data about the population of unhoused and unsheltered people in

Rhode Island. That data is used to report to various stakeholders and

policymakers in the state to steer data driven policy solutions to end homelessness

in the state. The current award was awarded on June 11, 2024, and does not

include the new HUD funding conditions described above, but HUD asked

RICEH to sign an NOA for the period of July 1, 2025, through June 30, 2026, that

does include the new HUD funding conditions.

c.   The HUD COC DV Bonus Grant, which provides a total of $826,320 for the

period January 1, 2025, through December 31, 2025, to support programming that

allows RICEH to incorporate victims of domestic violence into the population it

serves, with the aim of helping those victims find safe housing and other

supportive services to get their lives back on track, known as the DV Bonus

program. The current award was awarded on June 17, 2024, and does not include

the new HUD funding conditions described above, but HUD asked RICEH to sign

an NOA for the period of January 1, 2026, through December 31, 2026, that does include the new HUD funding conditions.

d.  The HUD YHDP SOAR Grant, which provides a total of $32,820 for the period October 1, 2024, through September 30, 2025, to support the SSDI SSI Outreach Access and Recovery (SOAR) program for the state of Rhode Island. SOAR increases access to disability benefits for individual adults, parents, and children who are experiencing homelessness or are at risk of homelessness. The current award does not include the new HUD funding conditions described above, but HUD asked RICEH to sign an NOA for the period of October 1, 2025, through September 30, 2026, that does include the new HUD funding conditions.

e.  The HUD YHDP HMIS Grant, which provides a total of $92,119 for the period November 1, 2025, through October 31, 2026, to support the maintenance of the Homeless Management Information System, which is a system RICEH uses to collect, track, and analyze data about the population of unhoused and unsheltered people in Rhode Island. That data is used to report to various stakeholders and policymakers in the state to steer data driven policy solutions to end homelessness in the state. The current award does not include the new HUD funding conditions described above, but HUD asked RICEH to sign the NOA for the period of November 1, 2025, through October 31, 2026, that does include the new HUD

9.  On May 28, 2025, my organization received requests for certification for the renewal of all the grants listed above.  The NOFO for this award did not include the new funding conditions described above, but the NOAs that HUD asked us to sign did. On July 1, 2025, we sent back the NOAs with the new funding conditions stricken, but we do not

know whether HUD will accept the NOAs with the alterations we made. In fact, on July 14, 2025, HUD sent RICEH another NOA for a YHDP Renewal and Replacement Project that had the new funding conditions, which leads me to believe that HUD will not accept the NOAs with the alterations we made, removing those funding conditions. After this Court issued a Temporary Restraining Order that included RICEH, RICEH executed the grant awards and is now actively drawing down the funds for these grants.

10. Because the HMIS and the CES grants were needed for work performed starting July 1, 2025,  my organization needed to accept the award by drawing down funds as soon as July 30, 2025 for cashflow reasons. My organization relies heavily on the CoC Grant to fund critical services to support individuals and families experiencing chronic homelessness. For instance, these funds support all the programs mentioned above, which comprise the bulk of the services we provide. Our programs and services are focused on ending homelessness in the state of Rhode Island. Thousands of people in the state are unsheltered; many of those people have intense medical needs brought about by disabilities that they cannot effectively treat without our services. It is not an overstatement to say that our organization uses these funds to save lives. The people we help are too often overlooked by most people and organizations in our state, living largely invisible lives full of danger and uncertainty. We rely on our grant funding to provide supportive services to these people to provide them with shelter, housing, safety, and stability.

11. Declining the HUD CoC funding would have a devastating impact on my organization and its mission and on the most vulnerable Rhode Islanders. We would see a tremendous rise in the homeless population, including among the very sick and disabled. We work

with a number of people who would not be able to keep their insulin cold or connect with health care providers to provide treatment for kidney disease and cancer. To put it bluntly, we would see a rash of people dying out on the street. Without this funding, about 105,000 people would no longer be able to rely on and benefit from our services. We would no longer be able to provide data to HUD about homelessness in Rhode Island. There would be no vehicle for coordinated entry to determine who needs what service and connect those individuals with the right organizations. All these shortfalls would lead to more people living unhoused on the street, unable to access opportunities for housing, employment, social services, and benefits. Veterans would be disproportionately impacted by these shortfalls, as would the BIPOC community. We would also have to undergo severe layoffs without the CoC funding. We currently employ 28 people, and we would probably have to cut down to about 7 staff. We would not have the ability to function as we do now.

12. There are no other HUD grants that we have identified that would support our current mission with or without the new funding conditions described above.

**IV.    HUD's New Funding Conditions Place My Organization in an Untenable Position**

13. Agreeing to the HUD conditions would cause my organization profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support

7

the most vulnerable members of our community, the thousands of unhoused and

unsheltered seniors, veterans, families, runaway youth, and victims and survivors of

domestic violence who rely on us and our support services to get off the street and back

into safe and stable housing.

14. My organization is concerned about conditions requiring that we certify that we do not

operate any programs that violate any applicable Federal antidiscrimination laws, and

agreeing that compliance with those antidiscrimination laws is material for False Claims

Act purposes. Although we have always complied with federal antidiscrimination laws,

the DEI Executive Order and statements from the DOJ indicate that the government

intends to enforce a legally unsupported, new interpretation of federal antidiscrimination

law as prohibiting all aspects of programs focused on DEI and DEIA.

15. RICEH's mission is to serve the poorest and most vulnerable population, the unsheltered

across 39 cities and towns in Rhode Island. Those communities do not all look alike or

have the same lived experiences and we cannot do the work with a one size fits all

mentality. We need to meet people where they are at, so to speak, which means

considering the various aspects of a person's identity to best help them through a frightful

and dangerous period of their life. The population we serve tends to be overrepresented

by African Americans and Spanish speakers. We have recently seen more families and

seniors become unhoused. We serve a lot of runaway homeless youth aged 18-24, a

disproportionate number of whom are LGBTQ. We need our staff to be representative of

the people we serve, meaning that we need to staff people of color, people with

disabilities, members of the LGBTQ community to accurately and compassionately serve

the population of unhoused Rhode Islanders.  It is unclear whether my organization's

mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

16. My organization is also unsure whether it can continue to operate programs that target underserved or marginalized communities, including the CES, HMIS, SSOC, SOAR and DV Bonus programs. Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

17. For the same reasons, my organization is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

18. My organization is also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. In providing direct client services and technical assistance, many of my organization's staff are engaged in and integrate policies that are informed by including and respecting gender diversity. This is crucial in establishing trust between our staff and the people we serve. It is also crucial in developing and maintaining trust within our staff that we adopt policies that recognize and respect all forms of gender identity and sexual orientation. It is unclear whether my organization may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

19. My organization is concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." We don't know whether the work we do would be considered as promoting elective abortion. We are routinely referring people to

healthcare services through our Street Outreach program and are concerned that by referring people to those services we may be considered to have violated that condition.

**20.** My organization is concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders." We do not know what this condition's broad and vague language means for our organization or how to comply with it, given the many new executive orders that it implicates.

21. The new funding conditions present my organization and its members with an impossible choice. My organization could forgo accepting HUD grant awards and face the direct consequences to my organization's financial health and ongoing operations and to those who receive direct services. Or my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements and face enormous risks of litigation and government investigations under the False Claims Act.

22. My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying for or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core values.

**V.    These Funding Conditions Threaten to Harm the Most Vulnerable People in our State**

23. These funding conditions threaten harm to the thousands of unsheltered and unhoused people in Rhode Island and the many more who are victims of domestic violence. As mentioned above, a core element of our work is to meet people where they are at in order to connect them to supportive services to help them out of the worst moments of their lives. It is crucial that we develop trust between our staff and the people we serve, many of whom are justifiably distrusting and cynical towards institutional actors. We need staff who are representative of the people we serve in order to create that rapport. To reiterate, the people we serve typically have a complicated intersection of obstacles in their lives, many of which are rooted in core aspects of their identity and the impact it has had on their lived experience. It could be an African American Veteran with physical disabilities, an LGBTQ teenager who fled home and is now on the street and struggling to manage and maintain their mental health, or an elderly person with diabetes who cannot reliably obtain insulin or keep it cold when they do. The permutations are endless, but one core truth remains the same; we cannot effectively connect with any of these people and help them get the safe housing and social services they need and are entitled to unless we first develop a relationship grounded in trust and empathy. We are gravely concerned that the new funding requirements are anathema to our existing model, the only model that we have found successful in achieving our mission, and that by agreeing to those conditions the changes it would require in our strategy would fundamentally undermine our operations to the detriment of thousands.

24. Conversely, if my organization or its members turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the people we currently serve. As I describe above, without the funding that we have relied upon for years, and in some instances decades, we would have to discontinue core aspects of our organization and would no longer be able to effectively serve thousands of people across the state. We would lose the ability to collect data to inform sound policy proposals and, most importantly, we would abandon far too many people to a dangerous and unstable existence.

25.  My organization's operations are essential to improving people's lives and making Rhode Island a safer state for everyone to live in. There is no other organization in the state that does this work. If we were forced to discontinue our work, either because we do not receive the grant funding we have been awarded and relied upon for years, or because the work cannot be done while complying with HUD's new funding requirements, unsheltered and unhoused people and victims of domestic abuse would have a tremendously difficult time trying to access the services they need to get their lives back on track. This has a reverberating effect throughout the entire state and on the lives of everyone who lives here. Improving the lives of the people we serve improves the lives of everyone who shares a community with them. We need to maintain our ability to carry out our mission because no one else will.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 4, 2026.

Signed by:

*Colby J. O'Brien*

553E4388014C4AE...

Colby J. O'Brien