## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.* <br><br> *Defendants*. | Case No. 25-cv-342 |

## DECLARATION OF LUCY RIOS

I, LUCY RIOS, declare as follows:

**I.**     **Background**

1.      I am the Executive Director at the Rhode Island Coalition Against Domestic Violence or "Rhode Island Coalition," Rhode Island's federally designated domestic violence coalition.

2.      The Rhode Island Coalition was founded in 1979 and is headquartered in Warwick, Rhode Island. The Rhode Island Coalition is an organization dedicated to ending domestic violence made up of ten member agencies. Originally, we were formed to support and assist domestic violence shelters in Rhode Island. Today, in addition to supporting domestic violence shelters, we provide statewide leadership on the issue of domestic violence, enhance the

work of our member agencies, and strive to create justice for victims and survivors through our systems and policy advocacy. We raise awareness on the issue and the prevention of domestic violence in Rhode Island through our training, technical assistance, communications and primary prevention strategies.

3.      The Rhode Island Coalition and its member agencies have a recognized track record of successfully administering and implementing effective programs for victims and survivors of domestic violence, reaching an average of 10,000 victims every year. We are currently involved in various statewide collaborative projects with law enforcement, prosecution, and community-based organizations. As a coalition, we have the strength, unity, and statewide vision necessary to effect changes in services, policies, laws, and public attitudes.

4.      My organization receives grants from the Department of Housing and Urban Development (HUD) and from the Department of Health and Human Services (HHS). The Rhode Island Coalition has an annual budget of roughly $5.3 million, and approximately $3.4 million of that total is passed through to member agencies. Of that total amount, roughly $2.8 million comes from HHS grants, including subcontracts; and another $27,500 comes from HUD grants, including subcontracts.

## II.      Rhode Island Coalition's Member Organizations

5.      Rhode Island Coalition is a membership organization with 10 member agencies. Members fall into one of two categories. The first category of members is composed of primary purpose domestic violence agencies whose missions focus on domestic violence, and these organizations provide emergency shelter for survivors of abuse.

6.      In 2017, Rhode Island Coalition expanded its membership to include multi-service community-based organizations that have an established program that focuses on

addressing domestic violence. Through the addition of these affiliate members, Rhode Island Coalition is better able to support organizations that reach traditionally underserved communities and build stronger collaborations with effective community-based organizations. Each of these organizations brings their own area of expertise and specialized experience to the work of our coalition to help achieve our collective mission and vision, a world without domestic violence. These members are not voting members on the Rhode Island Coalition Board of Directors, but they are encouraged to engage in the business of the organization and actively serve on the statewide committees the Rhode Island Coalition convenes with equal voting power. Currently, we have six affiliate members. Each affiliate member has at least one specialized domestic violence program for victims and their children statewide.

7.    Our network of member agencies provide comprehensive emergency services and support to victims of domestic violence, dating violence, sexual violence, and stalking. Services include 24-hour helpline support, emergency shelter, transitional housing, permanent supportive housing, support groups, counseling services, children who witness services, prevention programs, and assistance with navigating the legal system.

8.    The Rhode Island Coalition's membership includes a member, which is being identified for the purposes of this lawsuit as "Rhode Island Member Doe." Rhode Island Member Doe is a provider of services for domestic violence victims and survivors and people experiencing homelessness in the state of Rhode Island, with a range of services, including housing, basic needs, shelter, case management, referrals, education and employment services.

9.    In 2024 alone, five of the Rhode Island Coalition's member agencies, including Rhode Island Member Doe, provided the following services:

• 9,661 individual victims of domestic violence received help;

• 296 adults and children stayed in shelters/safe homes;

• 63 adults and children lived in transitional housing;

• 2,738 victims were assisted by a Court Advocate in obtaining a restraining order;

• 158 victims participated in a support or educational group;

• 480 victims of domestic violence received clinical/counseling services;

• 303 children who witnessed domestic violence received services;

• 46,318 individual services provided by advocates; and

• 12,716 helpline/hotline calls were answered.

10.     For nearly 50 years, the Rhode Island Coalition has established itself as a bedrock of survivor services and advocacy in the state of Rhode Island. The Rhode Island Coalition has helped increase safety options for survivors and increase offender accountability in Rhode Island. We identify systemic gaps that compromise survivor safety and advocate for policy and legislative changes to address those gaps.

11.     The Rhode Island Coalition works to build the public's knowledge about domestic violence in order to help make resources more accessible to victims and empower communities to intervene. The Rhode Island Coalition collects and maintains statewide data on the occurrence of domestic violence using a Rhode Island Data Dashboard which contains data points that describe the problem of domestic violence in Rhode Island and related factors that increase the risk of domestic violence, such as economic insecurity, or that help protect against it, such as access to safe, affordable housing. The Rhode Island Coalition also executes statewide public awareness campaigns at least three times a year. The Rhode Island Coalition responds to domestic violence homicides and high-profile cases in the news, in order to raise up the voices

and experiences of survivors, honor the lives lost, identify system failures and policy solutions, and ensure media coverage is accurate, sensitive and well-informed.

12.     Building a world where we can prevent domestic violence before it starts is central to the Rhode Island Coalition's mission. Our primary prevention work focuses on creating protective environments, engaging influential adults and peers, and strengthening economic supports for families. The Rhode Island Coalition applies a public health approach to domestic violence prevention and works with our member agencies and community partners, including youth-serving organizations, on these strategies. Examples include signature programs like Ten Men, where participants educate themselves and others about men's role in ending domestic violence, bring visibility to men engaged in this work, and mobilize men to find community solutions for preventing domestic violence.

13.     Every aspect of our work is informed by Rhode Island Coalition's nationally-recognized survivor task force, Sisters Overcoming Abusive Relationships (SOAR). Since 1989, SOAR promotes, advocates for, and works towards the elimination of domestic violence by embodying and giving visibility to the voices of abused women. SOAR members share their stories of survival to affect systems change and educate the public about the dynamics of abuse and community resources.

14.     The Rhode Island Coalition and our membership receive grants from HHS and HUD in order to meet the complex needs of victims and survivors of domestic and sexual violence. These HHS grants include: Family Violence Prevention and Services Act (FVPSA) Coalition Grant; FVPSA Discretionary Grants Specialized Services for Abused Parents and Their Children Demonstration Projects (SSAPC) and the CDC DELTA AHEAD Grant; Family Violence Prevention & Services Act Grant; Family Violence Option Advocacy Program

5

(FVOAP) Grant; Title XX Social Services Block Grant (SSBG) and Culturally Specific Services Grant; and the Safe Families Program Grant. The HUD grants to the Rhode Island Coalition and its members include: Continuum of Care grants for DV Bonus Funds; Permanent Supportive Housing; Rapid Rehousing Program; Housing Problem Solving; Coordinated Entry; Emergency Solutions; and RI Housing Rental Assistance Program.

### III.        HUD's New Funding Conditions

15.    HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

16.    The Notice of Awards (NOAs) for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

### IV.        The Rhode Island Coalition's and its Members' HUD Grants

17.    The Rhode Island Coalition received a competitive grant from HUD for the Continuum of Care Grant Program ("CoC Grant"), beginning in 2022. The Rhode Island

Coalition is the subrecipient of a HUD CoC Grant, and the Program Agreement is sent from the pass through entity, Rhode Island Coalition to End Homelessness, for signature.

18.    For the past four years, Rhode Island Coalition and four of its members, including WRC, have received HUD CoC Program DV Bonus Funds subawards through the Rhode Island Coalition to End Homelessness (RICEH) totaling over $400,000. These funds are being used to increase communication and collaboration among Rhode Island's Coordinated Entry System (CES) and domestic violence advocacy organizations and service providers. The goal is to improve referral coordination for victims and survivors of domestic violence who are seeking shelter through CES and reduce barriers to obtaining shelter/housing in our state.

19.    On January 13, 2026, RICEH awarded the Rhode Island Coalition a total of $35,500 of HUD funding for DV Bonus Funds through the CoC Grant. The grant has a period of performance and budget period of January 1, 2026 – December 31, 2026 and includes the new HUD funding conditions described above.

20.    With this subaward, the homeless provider system and domestic violence providers system are still building relationships and trust with one another and identifying the ways in which these two systems work well together and where they need to improve to better support domestic violence survivors in need of housing and emergency shelter. Without this funding, it is unlikely that our systems would be engaged in cross trainings, monthly meetings, developing products together like domestic violence assessments that include lethality risks for victims of abuse and a workflow chart, sharing data and resources, all with the goal of eliminating barriers for survivors of abuse in accessing housing.

21.    The Rhode Island Coalition's members have received HUD grants, including grants under the CoC Grant Program, since approximately 2012 and prior to that, Supportive

Housing Program grants since the early 1990's. Rhode Island Member Doe is the direct recipient of four grants from HUD CoC. Upon funding approval, HUD sends contracts directly to Rhode Island Member Doe for signature. Rhode Island Member Doe is the subrecipient of an additional contract and the subrecipient Program Agreement is sent from the pass through entity, Rhode Island Housing, to Rhode Island Member Doe for signature.

22.     On June 4, 2025, Rhode Island Member Doe signed the grant agreement for four direct CoC grants. On June 30, 2025, Rhode Island Member Doe sent correspondence to HUD to rescind its agreement and request that the agreement be modified to remove the certifications. The total award under this contract is over $2 million for CoC FY 2024. The grant has a performance period for one grant from November 1, 2025 through October 31, 2026. The remaining three have performance budgets and budget periods of January 1, 2026 through December 31, 2026. The NOFO for this award did not include the new funding conditions described above, but the NOA did. Rhode Island Member Doe accepted the awards after this Court entered a Preliminary Injunction.

23.     Rhode Island Coalition membership relies heavily on the CoC Grant to fund critical services to support individuals and families experiencing chronic homelessness, including victims of domestic violence. For instance, these funds support rental assistance and/or operating costs for properties that Rhode Island Member Doe owns and manages, as well as rental units in the private market. Funds also pay for case management supportive services for the individuals and families enrolled, which is critical in maintaining housing stability. There are hundreds of families and individuals here in Rhode Island who participate in these programs each year.

8

24.     Declining this funding would have a very significant and detrimental impact on Rhode Island Member Doe and its mission. Without this funding, the most vulnerable people who have experienced homelessness will lose their housing and associated supportive services. This will lead to an increase in homelessness. Also, apartments supported with rental assistance or operating funds will lose those funds. Because many of these properties are deed restricted, there will be an increased vacancy and not enough rent to support operations. Additionally, private landlords will no longer receive rental subsidy payments. They will bear a financial burden of loss of rent and increased costs of eviction when tenants can no longer afford the full rent. And last, staff associated with these programs will lose employment contributing to an increased number of unemployed people.

25.     Additionally, Rhode Island Member Doe is a subrecipient of two awards from HUD, one passed through from Rhode Island Housing and the other is passed through from the City of Providence. While currently, neither subaward has the unlawful conditions, we anticipate that the next awards will include those conditions that are in the most recent CoC grants, and we anticipate that Rhode Island Member Doe will be invited to continue as subgrantees on both awards.

26.     On December 23, 2025, Rhode Island Housing awarded a subgrant to Rhode Island Member Doe in the amount of $253,875 through the CoC Grant FY24. The grant has a period of performance and budget period of January 1, 2026 through December 31, 2026. Rhode Island Member Doe accepted this subaward on December 23, 2025. The subaward between Rhode Island Housing and Rhode Island Member Doe for the HUD funds did not include the new funding conditions described above, but the renewal application did.

27.    Rhode Island Member Doe also receives an Emergency Solutions Grant from HUD, passed through the City of Providence, for a total of $423,613 for the period December 1, 2024 through June 20, 2025, and was amended in June 2025 to extend the period of performance through November 30, 2025. This subgrant is to support rental assistance for 90 homeless and at-risk households enrolled in the Rapid Rehousing program. This program provides rental assistance for approximately 90 households in 36 units of housing. The current subgrant was awarded on January 8, 2025 and does not include the new HUD funding conditions, but Rhode Island Member Doe expects that the next award will include those conditions. Rhode Island Member Doe has received another Emergency Solutions Grant for $440,410.08 and is in the process of reviewing the contract.

28.    Declining this funding would have a serious impact on Rhode Island Member Doe and the many people in Rhode Island it serves. Without this HUD finding, Rhode Island Member Doe would have to stop rental payments to landlords, and participants/tenants would have to pay the full rental amounts. Because these households are very low income, paying the full rent will be impossible and people will be evicted. This will increase homelessness. In addition, staff associated with the program will lose their employment, resulting in increased unemployment.

V.    **HHS's New Funding Conditions**

29.    The April 2025 HHS Grants Policy Statement (GPS) imposed the following new conditions on grantees: (1) it required that all grant recipients "must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act];" and (2) it provided that by accepting the grant award, recipients certify that: (i) "they do not, and will not during the term of this financial assistance award, operate any

programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws"; and (ii) "they do not engage in, and will not during the term of this award engage in, a discriminatory prohibited boycott." HHS stated that it "reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of this award, operate any program in violation of Federal anti-discrimination laws or engages in prohibited boycott." *Id.* at 19. The HHS GPS applies to nondiscretionary "awards and award modifications that add funding made on or after April 16, 2025," including "supplements to award, competing and non-competing continuations," (other than awards from NIH), and it applies to all HHS recipients and subrecipients other than individuals.

30.     In July 2025, HHS changed the GPS to remove replace this language with the following language: "By applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams." The July HHS GPS also states that it applies to nondiscretionary "awards and award modifications that add funding made on or after April 16, 2025," including "supplements to award, competing and non-competing continuations," (other than awards from NIH), and it applies to all HHS recipients and subrecipients other than individuals.

31.     In August 2025, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

32.     The October HHS GPS also includes a requirement that grantees "certif[y] that they are "compliance with Title IX of the Education Amendments of 1972 . . ., including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of

1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore . . . is not eligible for funding . . . absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that "it acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 UY.S.C. §§ 287 and 1001."

33.    In addition to the GPS conditions, HHS's Administration for Children and Families (ACF) is now imposing new funding conditions on ACF nondiscretionary and discretionary grants, including FVPSA Coalition Grant, FVPSA Discretionary SSAPC Demonstration Grant, Rhode Island DHS Family Violence Prevention & Services Act Grant, Rhode Island DHS FVOAP Grant, Rhode Island DHS Title XX (SSBG) and Culturally Specific Grants, Rhode Island Department of Children, and Youth and Families Safe Families Program Grant, that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

34.    The new ACF Standard Terms and Conditions document provides that a "Civil Rights Assurance" applies to new awards made on or after May 8, 2025, which requires recipients "must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act];" and provides that, "[b]y accepting the grant award, recipients are certifying that: (i) They do not, and will not

during the term of this financial assistance award, operate any programs that advance or promote
the following in violation of Federal anti-discrimination laws: DEI, DEIA, or discriminatory
equity ideology."

35.     In addition, the ACF Standard Terms and Conditions document provides that, for
new awards made on or after March 28, 2025, recipients whose programs are covered by Title IX
certify to the following: (1) that the recipient "is compliant with Title IX of the Education
Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including Title VI of the Civil
Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the
duration of the Agreement; (2) that those "requirements are conditions of payment that go to the
essence of the Agreement and are therefore material terms of the Agreement"; (3) that
"[p]ayments under the Agreement are predicated on compliance with the above requirements,
and therefore Recipient is not eligible for funding under the Agreement or to retain any funding
under the Agreement absent compliance with the above requirements"; (4) that the "[r]ecipient
acknowledges that this certification reflects a change in the government's position regarding the
materiality of the foregoing requirements and therefore any prior payment of similar claims does
not reflect the materiality of the foregoing requirements to this Agreement"; and (5) that
"[r]ecipient acknowledges that a knowing false statement relating to Recipient's compliance with
the above requirements and/or eligibility for the Agreement may subject Recipient to liability
under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18
U.S.C. §§ 287 and 1001."

36.     In May 2025, ACF updated its Standard Terms to adopt a new certification
substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX
Certification except that it does not explicitly refer to the "Gender Ideology" Executive Order. In

July 2025, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

37.     The Center for Disease Control and Prevention ("CDC") has updated their policies to impose new conditions on certain new awards and award modifications, including the CDC's DELTA AHEAD Grant, by incorporating the HHS GPS. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

## VI.     The Rhode Island Coalition's and its Members' HHS Grants

38.     The Rhode Island Coalition has applied for and received a grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Coalition Grant") annually, since at least 2002.

39.     Rhode Island Coalition has used FVPSA Coalition Grant funds for many purposes. For instance, these funds support our bi-annual Training Calendar for advocates and our community partners. We have been able to bring in national experts like Dr. Lundy Bancroft and Dr. Jacquelyn Campbell to provide training and technical assistance to our membership and local direct service providers to encourage appropriate and comprehensive responses to domestic and dating violence. The Rhode Island Coalition has also been able to provide training and technical assistance on trauma informed care and intergenerational trauma for example, to ensure member agencies are welcoming and accessible to traditionally underserved populations that

include but are not limited to lesbian, gay, bisexual, transgender, and queer communities, teens, male victims, immigrants, people with disabilities, Deaf and Hard of Hearing communities, communities of color, victims and survivors with limited English proficiency, and human trafficking victims.

40.     Rhode Island Coalition has used FVPSA Coalition Grant funding to develop, implement, and evaluate statewide needs assessments and strategic planning processes every three to five years in partnership with Rhode Island DHS. This work has enabled us to identify and address significant gaps in services for groups that are disproportionately impacted by violence. As a result, we have been able to provide anti-racism and Diversity, Equity, Inclusion and Belonging training for our membership, build the capacity of culturally specific community based agencies in Rhode Island to respond to domestic violence victims through training and technical assistance, establish culturally and linguistically specific grants for culturally specific organizations in Rhode Island to serve victims of domestic violence from communities of color, strengthen partnerships with organizations that serve traditionally underserved communities, and develop effective statewide public awareness campaigns annually to shift victim blaming attitudes in RI and educate bystanders and survivors about local domestic violence resources.

41.     FVPSA Coalition funds have been instrumental in furthering the Rhode Island Coalition's systems and policy advocacy work. Rhode Island Coalition staff have been able to collaborate with and provide information and support to partners in housing, health care, mental and behavioral health, social welfare, criminal legal system including the judicial system, corrections, and law enforcement, the Department of Children, Youth and Services, family court, batterers intervention programs, and the business sector to develop effective policies, protocols, and programs that address the safety and support needs of survivors of domestic violence and

their children. We have advocated for increased safety options for survivors like the expansion of the Address Confidentiality Program managed by the Rhode Island Secretary of State's Office.

42.     On July 8, 2025, HHS awarded the Rhode Island Coalition a total of $368,750 through the FVPSA Coalition Grant. The grant has a two year performance period and a budget period of October 1, 2024 through September 30, 2026.  The NOFO did not include the new funding conditions, but the NOA indicates that the ACF Standard Terms and Conditions, which contains the new funding conditions described above, applies to the award. My organization accepted this award by drawing down funds after this Court entered the Preliminary Injunction.

43.     Declining this funding would have a very significant and detrimental impact on the Rhode Island Coalition. The FVPSA Coalition Grant is critical funding that allows the Rhode Island Coalition to fulfill its mission. There is little funding available for statewide coordination of services, training, technical assistance, and systems and policy advocacy work, all key functions of a domestic violence coalition. A $368,750 funding cut is not something we could absorb without having to reduce staff by at least four positions, potentially leaving our survivors' task force without a coordinator and eliminating our community engagement staff and communications support staff. Our capacity to convene groups and maintain an active and visible presence on multisectoral, statewide committees like the Batterers Intervention Oversight Committee and the RI Violent Death Reporting Committee would be compromised, making us less effective as a coalition and the leading authority and voice on domestic violence in the state.

44.     My organization has applied for and received a competitive grant from the Center for Disease Control (CDC) for the DELTA AHEAD grant program ("DELTA Grant"). The Rhode Island Coalition has received different iterations of CDC DELTA funding since 2003. On February 24, 2023, CDC awarded my organization $500,000 annually for a period of five years

through the DELTA Grant. The performance period is March 2, 2023 through March 1, 2028.
The budget period for the DELTA Grant is for March 2, 2025 through March 1, 2026. We apply
for continuation funds annually and received our most recent award on March 7, 2025. We
accept the award by drawing down funds for the DELTA Grant. The NOFO and NOA did not
include the new HHS funding conditions described above. However, the Rhode Island Coalition
submitted a continuation application in November 2025, before the budget period ends on March
2, 2026.  I expect that the next continued funding award will be subject to the new funding
conditions in the HHS GPS.

     45.     The Rhode Island Coalition has used DELTA Grant funds for many purposes.
These funds support our statewide domestic violence primary prevention plan, which focuses on
changing the harmful conditions and norms that increase the risk for abuse, including poverty
and strict gender roles, and creating supported, connected communities that safeguard against
violence. For this reason, our state and community-level strategies center creating protective
environments, engaging influential adults and peers, and strengthening economic supports for
families. Signature programs include "Ten Men," a strategy designed for men and those
socialized into or identifying with masculinity who want a space to explore their own
relationship to masculinity and the intersections with domestic violence, gender-based violence,
and systems of oppression. For the past decade, the Rhode Island Coalition has mobilized local
men through Ten Men to change harmful gender norms and embody healthy masculinities that
reject violence and promote equality and care. Ten Men members attend monthly cohort
meetings and retreats, model healthy masculinity and gender equity in personal and professional
communities, participate in the Rhode Island Coalition's communications initiatives including its

June Men's Engagement public awareness campaign, and participate in ongoing evaluation of the Ten Men strategy.

46.     The Rhode Island Coalition serves on various statewide policy coalitions and helps educate decision makers on the need for policies that increase economic security for all people. Economic insecurity increases the risk that domestic abuse and other forms of violence will happen. By creating economic stability for all people, we can improve a wide range of health outcomes in our state and work towards decreasing rates of domestic violence. Economic support includes policies and strategies that help people meet basic needs, increase income, access paid leave, and participate in adult education and workforce training programs. Our strengthening economic supports strategy also includes advocating for fair housing and affordable childcare to ensure families have a safe, stable place to live and children receive quality care while their parents are at work; and promoting flexible workplace policies both within the Rhode Island Coalition and in the community.

47.     One of the Rhode Island Coalition members, the Women's Resource Center (WRC), has been a funded partner on the Rhode Island Coalition's CDC DELTA public health grant since it began in 2003. The WRC is the backbone agency of the Newport Health Equity Zone (HEZ), a citywide collaborative mobilizing residents and resources of the Broadway and NorthEnd neighborhoods to make Newport, RI, a place where everyone can thrive. WRC uses DELTA funding to support its Greening Urban Spaces strategy led by the Newport HEZ. Research has linked the presence of green space to reductions in rates of domestic violence and other violent crime. WRC's greening strategy aims to increase and improve parks and open space in places where residents want them and can access them easily. Efforts include activating local parks through public artmaking, community conversations, farmers markets, and projects

like the Big Blue Bike Barn, as well as stewarding biking and hiking trails and planting trees.
WRC and the Newport HEZ empower residents as leaders in local planning processes to share
their priorities for the community and influence the plans and decisions affecting their
neighborhoods.

48.     The Rhode Island Coalition remains committed to the understanding that
domestic violence is a public health and social justice issue. That understanding has been
influenced by our working relationship with CDC and it is central to our mission. DELTA
funding is essential for our primary prevention efforts. Without DELTA funding, the foundations
of our prevention work—the research, frameworks, and evidence developed over decades in
partnership with CDC, the national DELTA community, and our state and community partners
could be lost. Key leadership positions within the Rhode Island Coalition would be at risk of
being eliminated, jeopardizing the partnerships and trust that have been built with community-
based organizations over the years. Moreover, without dedicated efforts to prevent domestic
violence before it starts, I fear we will see an increase in the rates of domestic violence in our
communities.

49.     Declining this funding would have a significant detrimental impact on the Rhode
Island Coalition, WRC, and on all the community and state partners we have engaged in our
primary prevention efforts. For example, a Ten Men alumni who also runs a local youth-led
organization adapted the Ten Men program for the young people he serves. The Ten Men alumni
secured additional funds to launch Ten *Young* Men with programmatic technical assistance and
evaluation support from Rhode Island Coalition's prevention staff. Ten *Young* Men is now in its
third year. This would not have been possible without stable and consistent resources and
support from the CDC via the DELTA Grant.

50.     Similarly, the WRC has been leading community-level domestic violence primary prevention strategies in Newport Rhode Island for decades - from youth-based initiatives like Students Against Domestic Abuse, to community training programs for nonprofits on program development and evaluation through the Primary Prevention Institute, to its Greening Urban Spaces strategy in the North End of Newport. The capacity built as a DELTA subgrantee of the Rhode Island Coalition positioned the WRC to be the backbone agency for the Newport HEZ. Without DELTA funding, it is unlikely that these innovative approaches to preventing domestic violence and the partnerships required to implement these strategies would exist.

51.     The Rhode Island Coalition passes through to its member agencies FVPSA Discretionary Grants: Specialized Services for Abused Parents and Their Children Demonstration Projects (SSAPC). On September 26, 2024, ACF awarded the Rhode Island Coalition  $347,727 annually through the FVPSA SSAPC Grant. The grant has a period of performance of September 30, 2024 through September 29, 2026 and a budget period of September 30, 2024 through September 29, 2025.  The Rhode Island Coalition received our first Notice of Award on September 26, 2024 and a revised NOA on March 26, 2025.  The NOFO and NOA did not include the new HHS funding conditions described above. Rhode Island Coalition applied for and received continued funding of $409,091 on September 19, 2025, for a budget period of September 30, 2025 through September 29, 2026. My understanding is that this award is subject to the HHS GPS and ACF Standard Terms and Conditions.

52.     The Rhode Island Coalition's FVPSA SSPAC Grant "Safety and Resilience for Survivors and Their Children in Rhode Island Project" improves Rhode Island's domestic violence prevention and response systems and equips Rhode Island's domestic violence agencies to more fully and effectively respond to the wide range of needs of victims of domestic violence

20

and their children. This project focuses on 1) training domestic violence service providers to strengthen and increase the capacity of the Rhode Island Coalition and its member agencies to apply an evidence-based, comprehensive, systems approach to domestic violence service provision and prevention; 2) providing evidence-informed training to Rhode Island's Department of Children, Youth and Families to improve its response to and involvement with families experiencing domestic violence, with a focus on the nonabusing parent and their children; and 3) expanding services provided to victims of domestic violence and their children throughout the state of Rhode Island to provide a greater level of support, advocacy, safety, and healing options. These expanded services include counseling services to survivors of domestic violence and sexual assault; creative expression workshops for trauma survivors; a creative arts therapy program; advocacy for children staying in residential programs; outreach to abused parents that speak Spanish and Portuguese; and referrals to and from our Safe Exchange and Supervised Visitation Center.

53.     The WRC provides advocacy, education, and support services to victims of domestic violence in Rhode Island's Bristol and Newport Counties, the East Bay region of the state. In 2023, they served 1,035 clients. With funding from the SSPAC grant, WRC engages A Window Between Worlds (AWBW), a promising strategy listed in the Futures Without Violence Promising Futures resource hub, to assist with incorporating creative expression workshops into WRC's work with survivors. With facilitator training and ongoing support from AWBW, WRC is implementing this new program and equipping staff to become workshop facilitators and to incorporate trauma-informed healing art workshops into the wide range of services they provide to victims and their children. These workshops offer safe, non-judgmental spaces for survivors and their children to use art as a form of expression of their experiences and identities, and to

connect and attend to their needs in a safe, supportive atmosphere. If these funds were
eliminated, these specialized services would no longer be available to children who witnessed
violence and their nonabusive parents as they rebuild their lives after abuse. The advocates
funded by this grant would likely be laid off, reducing the WRC's capacity to meet the diverse
needs of families impacted by trauma and abuse.

54.     The Rhode Island Coalition receives a Family Violence Prevention & Services
Act Grant (FVSPA) grant passed through from the State of Rhode Island DHS. The Rhode Island
Coalition passes through a significant portion of the grant to five of its member agencies. On
September 23, 2024, the Rhode Island DHS provided an amended FVPSA award to the Rhode
Island Coalition for $851,000 annually. The FVPSA grant has a performance period and a budget
period of October 1, 2023 through September 30, 2025. On February 2, 2026, the Rhode Island
Coalition received a FVSPA grant, passed through from the State of Rhode Island DHS for
$818,465.65 with a performance period and a budget period of October 1, 2025 through January
31, 2027, and this award   is subject to the HHS GPS and ACF Standard Terms and Conditions.

55.     The Rhode Island Coalition member agencies use the FVPSA grant from the State
of Rhode Island to ensure core direct services to victims of abuse and their children are available
in every county in the state. Core direct services include shelter and advocacy programs,
counseling and support groups for children and adults, 24-hour helpline services, legal support,
activities for children, and prevention and education programs for victims of domestic violence.
The Rhode Island Coalition also uses these funds to conduct a statewide needs assessment to
determine the unmet needs of survivors. Without these funds, the infrastructure that has been
built in Rhode Island to provide a safety net for victims and survivors of abuse would be
decimated and domestic violence agencies in Rhode Island may have to close their doors. The

lifesaving services provided by our network of member agencies would cease to exist, leaving

survivors and their children alone at one of the most vulnerable times of their lives - after they've

left an abusive partner. It is well documented that leaving an abusive relationship is one of the

most dangerous times for a survivor. FVPSA grants ensure that survivors can access supportive

service as they navigate complex systems and rebuild their lives after abuse.

56.     The Rhode Island Coalition also receives $423,676 for the Family Violence

Option Advocacy Program (FVOAP) Grant, passed through from the State of Rhode Island

DHS.  The FVOAP Grant performance period and budget period is October 1, 2025 through

September 30, 2026. We received our Agreement on October 10, 2025 and is subject to the HHS

funding conditions described above. The Rhode Island Coalition passes through FVOAP funding

to the WRC to manage the statewide FVOAP Program.

57.     The FVOAP Program assists TANF clients who are survivors of domestic

violence access services and support. FVOAP advocates work with DHS, the Rhode Island

Coalition, RI Works (RI's cash assistance program), and the Child Care Assistance Program

(CCAP) to meet the needs of their clients. Through the FVOAP program, survivors may be able

to obtain a waiver from certain requirements of the RI Works program or Child Care Assistance

Program. FVOAP advocates assist victims and survivors with safety planning and provide

referrals to various programs and services throughout the state. FVOAP advocates work with but

are not DHS caseworkers. FVOAP advocates are employed by the WRC to help victims and

survivors with the paperwork necessary to apply for a Child Support waiver or a Work waiver.

FVOAP advocates only make a recommendation to DHS about a waiver; they do not make the

final decision. Without FVOAP funding, TANF clients that are victims of domestic violence

would be at increased risk for violence, with no respite from state mandated work and child

support requirements, and little support in accessing trauma-informed services.

58.     The Rhode Island Coalition also receives a combined total of $600,000 of funding

from Title XX Social Services Block Grant (SSBG) ($450,000) and Culturally Specific SSBG

Grant ($150,000), passed through from the State of Rhode Island DHS. The SSBG and

Culturally Specific Grants performance period and budget period is October 1, 2025 through

September 30, 2027. We received our Agreement on September 18, 2025, and is subject to the

new HHS funding conditions described above. The Rhode Island Coalition passes through SSBG

funding to member agencies and to culturally specific organizations for the provision of

domestic violence services.

59.     The Rhode Island Coalition uses these funds to increase statewide public

awareness about prevention of family, domestic, and dating violence and services for victims of

crime through its communication strategies. This work includes integrated campaigns,

publications, websites, social media, and other communications tactics to educate survivors,

bystanders, and the general public of the dynamics of domestic violence and community

resources. The Rhode Island Coalition also ensures statewide provision of immediate shelter and

supportive services for victims of family, domestic, dating violence or other violent crimes, and

serve as a resource for its member organizations and subgrantees, providing training, technical

assistance, statewide planning and needs assessment, community education, and gathering and

disseminating resources, information, and best practices.

60.     The Rhode Island Coalition member agencies and culturally specific

organizations provide programs and services that address the needs defined in the SSBG

Uniform Definition of Services (CFDA: 93.667) as it pertains to survivors of domestic violence

and human trafficking. Services may include among others: Case Management Services,

Counseling Services, Education & Training Services, Family Planning Services, Health-related

and Home Health Services, Home-based Services, Housing Services, Information and Referral

Services, Legal Services, Prevention & Intervention Services, and Transportation Services.

While each subgrantee does not provide all these services, collectively, they ensure these

services are available throughout the state. These funds support the safety net for survivors and

victims of abuse, with a focus on vulnerable communities at increased risk for violence. Without

SSBG funds, specialized services would likely be reduced, or eliminated altogether.

61.    The Rhode Island Coalition receives a total of $73,100 of funding from Safe

Families Program Grant (Safe Families), passed through from the Rhode Island Department of

Children, Youth and Families (DCYF). Safe Families performance period and budget period is

July 1, 2025 through June 30, 2026. We received our subaward on June 27, 2025. The Rhode

Island Coalition passes through Safe Families funding to a member agency for the provision of

domestic violence services. The Rhode Island Coalition will negotiate a new state contract for

continued funding before the budget period expires on June 30, 2026.

62.    The Safe Families Project is a partnership and collaboration between the DCYF,

the Rhode Island Coalition, and a local member agency, designed to help families involved with

DCYF where children witness domestic violence. We regularly hear from survivors involved

with DCYF that they are often penalized for being a victim of domestic violence and "failing" to

stop their children from witnessing the abuse. The survivor is held responsible for the behavior

of their abusive partner and may even lose custody or placement of the child as a result, despite

well-documented evidence that a child's relationship with the non-offending parent is a

significant protective factor and supports the child's resilience and well-being after experiencing or witnessing abuse.

63.     The Safe Families Program aims to improve Rhode Island's response to domestic violence incidents involving children, thus reducing the likelihood of child abuse and neglect: advocate for and support families at-risk of involvement or already engaged with Rhode Island's child welfare system with a wide range of resources and supportive services; and strengthen collaboration, cross-system functioning, and effective practices with the state's child welfare agencies. Safe Families funding enables a Rhode Island Coalition member agency to employ a family advocate to accompany Child Protective Investigators (CPIs) in the Child Protective Services Unit (CPS) on investigations involving domestic violence. The family advocate meets with CPS staff monthly and co-locates in the Providence DCYF and provides training and technical assistance to DCYF staff on domestic violence with the Rhode Island Coalition. The family advocate processes referrals from CPS for cases flagged for domestic violence and provides support, referrals, and program placement assistance to clients referred by the CPS in English and Spanish. Without this funding, victims of domestic violence involved with DCYF will be at increased risk of being separated from their children which will have an adverse impact on the safety and well being of the child(ren) and nonoffending parent. The capacity of CPS and CPI workers to support domestic violence victims would be reduced and victims of domestic violence will have to navigate the child welfare system alone, without the support of an advocate.

64.     Rhode Island Member Doe also includes a Temporary Assistance for Needy Families grant from HHS, passed through from the State of Rhode Island in the amount of over $900,000. This grant has a period of performance and budget period of October 1, 2024 through

September 30, 2025. In addition, there was an amendment on April 1, 2025, adding over $1.6 million to the award, bringing the new total to over $2.5 million. The subaward with the State did not have the new HHS funding conditions described above, however Rhode Island Member Doe expects that the next award will be subject to those funding conditions.

65.    Without these funds, the capacity at the family shelter and domestic violence shelter would decrease or be eliminated altogether, resulting in fewer shelter options for families and/or domestic violence survivors. In addition, shelter guests would no longer have access to education and employment programs, a critical tool in increasing income and securing and maintaining housing. This grant also provides financial assistance to resolve housing crises to stabilize housing. Without those funds, many more people in Rhode Island would become homeless or not be able to exit emergency shelter quickly.

**VII.    HUD's and HHS's New Funding Conditions Place My Organization and its Members in an Untenable Position**

66.    Agreeing to the HUD and HHS conditions would cause my organization and its members profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD and HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic and sexual violence.

67.    My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, and

agreeing that compliance with those antidiscrimination laws is material for False Claims Act purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. The Rhode Island Coalition's organizational values and intersectional, holistic approach to its advocacy work are rooted in advancing racial and gender justice. Our staff and board of directors engage in diversity, equity, inclusion, and belonging (DEIB) trainings, and we are developing equity action plans to operationalize DEIB at the staff and board levels. The Rhode Island Coalition administers culturally specific grants that prioritize providing culturally appropriate and linguistically relevant services to survivors from Black, Indigenous, People of Color communities and their children; and we also administer Domestic Violence Prevention Fund community microgrants that prioritize proposals that focus on engaging and affirming youth of color, LGBTQ+, Two-Spirit, and gender nonconforming youth, and youth with disabilities in domestic violence prevention activities. Additionally, one of three priorities of the Rhode Island Coalition's state vision for prevention are to address the root causes of domestic violence, which are systems of oppression and inequity, by centering the experiences of those most impacted by violence. Our DEIB work ensures that we are supporting all survivors of domestic violence and that our services are accessible and equitable.

68.     Rhode Island Member Doe's mission to help those experiencing homelessness secure stable homes is deeply connected to diversity, equity and inclusion. Rhode Island Member Doe recognizes that homelessness affects people from all backgrounds, but systemic barriers means some communities – especially people of color, LGBTQ+ individuals, and people with disabilities – are impacted more than others. By centering equity in its work, Rhode Island

Member Doe aims to remove those barriers and ensure everyone has access to housing and
support. Rhode Island Member Doe is committed to creating inclusive welcoming spaces where
all people feel valued and supported on their journey to stable housing.

69.    Another member agency, the WRC, is the backbone agency for Newport HEZ,
which is a primary prevention strategy that focuses on addressing root causes of violence,
including health disparities, to reduce rates of domestic violence in the North End community of
Newport.

70.    It is unclear whether the Rhode Island Coalition, Rhode Island Member Doe, and
the WRC's mission and guiding principles violate the DEI HHS GP policy, and whether any of
us could comply with the administration's interpretation of federal antidiscrimination law
without adopting a view antithetical to our true beliefs. We are also unsure whether we can
continue to operate programs that target underserved communities, including Southeast Asian
and Latino survivors, LGBTQ+ and gender nonconforming survivors, survivors with disabilities
or limited English proficiencies, etc. Now, it is unclear whether these programs would fall within
the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA
programs.

71.    For the same reasons, my organization is concerned that it cannot comply with
any HHS conditions that prohibit the operation of any programs that "advance or promote DEI,
DEIA, or discriminatory equity ideology." To be compliant would be to hamper our right to free
speech, and would require that we retrain staff on how to talk about the root causes of domestic
violence, and re-write our mission, vision, values, and strategic plan.

72.    The Rhode Island Coalition and its membership are concerned about any ACF
condition requiring a certification of compliance with the Title IX of the Education Amendments

of 1972. While our network has always complied with Title IX, recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. We are concerned that this condition would prohibit member agencies from accommodating the needs of transgender and nonbinary survivors served, including by allowing them to use the bathroom that aligns with their gender identity.

73.     My organization and my member organization are also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. This condition would potentially prohibit Rhode Island Member Doe from accommodating the needs of its transgender and nonbinary clients that it serves, especially in congregate shelters where placement is based on gender identity. It is unclear whether Rhode Island Member Doe may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

74.     My organization and my members are concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." While we do not provide abortion care, we do not know what the government may consider to "promote" abortion. Reproductive health access may be a part of a survivor's case plan when they are working with an advocate, since reproductive coercion is a common form of abuse. Reproductive coercion includes birth control sabotage, forcing a partner to perform sexual acts they do consent to, and/or intentionally exposing a partner to sexually transmitted disease just to name a few. Our core values of empowerment and self-determination ensure advocates in our network present survivors with all options, including medical care for reproductive health, and let them decide their next step. For many survivors, including those that have experienced reproduction coercion as part of their

abuse, it may be the first time in a long time that they are making decisions for themselves. This

contributes to their healing and increases agency.

75.     My organization is concerned about the HUD condition providing that use of

grant funds and operation of projects assisted with grant funds are governed by "[a]ll current

Executive Orders." We do not have the capacity to track the number of executive orders that are

issued. We also do not know what this condition's broad and vague language means for our

organization or how to comply with it, given the many new executive orders that it implicates.

76.     The new funding conditions present the Rhode Island Coalition and its members

with an impossible choice. My organization could forgo accepting HUD and HHS grant awards

and face the direct consequences to my organization's financial health and ongoing

operations,and the health and operations of its member organizations, and to those who receive

direct services. Or my organization could accept the funding with the conditions and jeopardize

its mission and compliance with statutory or regulatory requirements, and face enormous risks of

litigation and government investigations under the False Claims Act.

77.     Additionally, my organization's members would have to fundamentally change

their programming or accept new grants and risk running afoul of various funding conditions

imposed on those grants. For example, WRC operates an LGBTQ+ Advocacy Program, that

explicitly provides supports to ensure LGBTQ+ survivors have access to services. WRC is also

designated a Blue Cross Blue Shield Safe Zone. When carrying out programs under the Rhode

Island DHS FVPSA Grant, WRC includes in its assessment process questions about gender

identity and preferred pronouns to ensure that care is respectful, compassionate, and appropriate

for each individual. We are concerned that WRC would have to fundamentally alter this

programming in a way that undermines its ability to serve certain underserved populations and runs contrary to the organization's values.

78.     My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core values.

VIII.     **These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors**

79.     These funding conditions threaten harm to vulnerable communities that are traditionally underserved and at increased risk for violence like survivors are LGBTQ+, nonbinary, immigrants, and survivors with disabilities. In Rhode Island, data confirms disparities in dating violence among high school teens, with LGBTQ+ youth experiencing more than three times the rate of violence (25.5%) compared to straight youth (7.3%). We see similar rates with teens reporting having a disability experiencing more than double the rate of violence (15.3%) compared to youth not reporting a disability (7.5%).We know that agreeing to these funding conditions would harm these LGBTQ+ survivors as our membership would no longer be allowed to let clients self-identify their gender and pronouns, or include more options on intake paperwork than the male and female binary.

80.     Conversely, if my organization or our members turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the community of survivors and victims of domestic violence in Rhode Island.

81.     My organization's operations are essential to elevating survivors' needs and
safety concerns, to ensure statewide coordination and planning for domestic violence services,
and to advance policies and prevention strategies that will eradicate domestic violence. The work
of Rhode Island Coalition member agency advocates is meaningful and specialized. We need
stable and consistent funding to continue to work with victims in humanizing, survivor-centered,
trauma-informed ways. Court Advocates and Law Enforcement Advocates have expert
specialized knowledge of the criminal legal system that survivors and the courts, law
enforcement, and prosecutors rely on. Helpline Advocates support victims in the middle of the
night when most service providers are closed. Housing advocates help survivors navigate the
complex housing system amid the housing crisis. Child abuse advocates are specially trained to
work with minor victims of crime. The expertise of the Rhode Island Coalition's network and the
comprehensive supportive services they provide save lives. In the absence of fully funded
services, victims will have less safety options, increasing the likelihood that they will remain
with abusive partners because they don't have anywhere else to go. Victims and survivors of
domestic violence will be left to navigate these complex systems on their own, with no support
from advocates.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February __10__, 2026.

_Lucy Rios_
_____

[Lucy Rios]