IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.* <br><br> *Defendants*. | Case No. 25-cv-342 |

**DECLARATION OF HEMA SARANG-SIEMINSKI**

I, Hema Sarang-Sieminski, declare as follows:

    **I.**    **Background**

    1.    I am the Executive Director at Jane Doe Inc., The Massachusetts Coalition Against Sexual Assault and Domestic Violence ("JDI"), a dual domestic violence and sexual assault coalition membership organization.

    2.    JDI was founded in 1998 as a dual coalition for domestic violence and sexual assault, and is headquartered in Boston, Massachusetts.

    3.    JDI is Massachusetts' state domestic violence and sexual assault coalition, comprised of 60 member programs. Through training, policy and systems advocacy, and technical assistance and support for its members, partners, and the public, JDI mobilizes collective power and resources to build a safer, healthier, freer Massachusetts beyond abuse and violence.

1

4. JDI creates a wide range of resources as a coalition, including toolkits, resource guides, papers, reports, and other documents that inform the field of emerging issues. JDI also convenes regular meetings of program directors and works with external partners to shape public dialogue around issues of sexual violence and domestic violence, ensure accuracy of information, and hold systems accountable.

5. JDI receives grants from the Department of Health and Human Services (HHS) through the Administration for Children and Families (ACF) and the Centers for Disease Control (CDC). JDI has an annual budget of roughly $2M. Of that total amount, $382,407 is from a direct coalition grant to domestic violence coalitions with another $135,000 through CDC Rape Prevention and Elimination Coalitions Funding (RPE Program). An additional $225,000 is passed from HHS through the Massachusetts Department of Public Health through state RPE and PHBG funding.

**II. My Organization's Member Organizations**

6. JDI is a membership organization with over 65 members. Members of JDI are the hubs of expertise in addressing sexual and domestic violence throughout Massachusetts. JDI's members include nonprofit organizations and domestic violence/sexual assault prevention or direct service providers. Membership is open to organizations for which addressing sexual and domestic violence is either the primary purpose or is part of their mission.

7. JDI provides its members with technical assistance, including around the provision of court-related support for survivors, workforce support, child welfare systems related work, and assistance related to privacy, confidentiality and safety. JDI operates numerous listservs that function as a robust network of advocates. Additionally, JDI creates a wide range of resources such as an online training curriculum, toolkits and resource guides, papers, and reports.

8. JDI's members include Member Doe, an organization that provides free culturally and linguistically responsive safety and support to domestic violence survivors and The Network/La Red which provides services and support for LGBTQ+ survivors of partner abuse. Member Doe receives HUD funding through their Continuum of Care (CoC) as well as HHS (ACF) funding that is passed through the Massachusetts Department of Public Health. The Network/La Red receives HHS(ACF) Funding that is passed through the Massachusetts Department of Public Health.

9. Other members of JDI also receive grants from both HUD and HHS.

I. **HUD's New Funding Conditions**

8. In 2025, HUD began applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

9. The NOAs for those HUD CoC grants provided that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also included requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

3

## II.     JDI Members' HUD Grants

10.     JDI does not directly receive HUD Funds. However, JDI Member Program Member Doe has received a competitive grant from HUD for the Continuum of Care Grant Program ("CoC Grant"),  since 2006. Member Doe is a subrecipient of the Balance of State CoC who releases a competitive grant program periodically.  The competition is for renewal, expansion and new projects that provide permanent supportive housing (PSH), rapid rehousing (RRH) or a combination of transitional housing and rapid rehousing (TH-RRH). There is a bonus amount of funds available only for projects that serve victims of domestic violence, dating violence, sexual assault, and stalking.

11.     Member Doe has received HUD grants since 2006. On November 2, 2024, the Balance of State CoC through HUD awarded Member Doe a total of $120,000 through the CoC Grant in FY 25-26. The grant had a period of performance of November 1, 2024 to October 31, 2025. The NOFO and NOA did not include the new HUD funding conditions described above, but they expect that the next award will include those conditions. Member Doe was selected again by the competitive CoC process this fall and received a new contract for the period from November 1, 2025 through October 31, 2026. Member Doe accepted on September 10, 2025, pursuant to the terms of this Court's Temporary Restraining Order.

12.     Member Doe relies heavily on the CoC Grant to provide permanent housing units and essential services that support individuals and families experiencing domestic violence, chronic homelessness, and elder survivors with disabilities. This funding also supports critical case management services.

13.     Declining HUD CoC funding would have a significantly detrimental impact on Member Doe and its mission. Without this support, Member Doe would lose six units of

permanent housing and the capacity of three full-time staff members. Survivors of domestic violence with disabilities, currently residing in Member Doe's permanent housing and working toward long-term safety and stability, would lose their housing and risk becoming homeless again. The broader community would also see an increase in homelessness, particularly among low- to no-income survivors, as the demand for housing continues to exceed availability.

### III.       HHS's New Funding Conditions

14.     In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.[1]

15.     In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

16.     The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." The July GPS replaced the April GPS.

5

with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

17. In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive ORder. In July 2025, ACF ) also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

18. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

19. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

6

20. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

### IV. Jane Doe Inc and its Members' HHS Grants

21. JDI organization has applied for and received a grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Grant") since at least 2007.

22. My organization has used FVPSA Coalition Grant funds for many purposes. The Family Violence Prevention and Services Act (FVPSA) Coalition grants strengthen the capacity of domestic and sexual violence programs in Massachusetts through a comprehensive approach centered on training, technical assistance, needs assessment, and collaboration. JDI uses FVPSA Coalition funding to enhance leadership and advocacy skills among program directors, managers, and direct service staff. By offering ongoing training, webinars, and peer-led technical assistance, JDI helps programs adopt trauma-informed, survivor-centered practices and improve organizational leadership. An online training platform further supports onboarding and professional development across the field. To ensure services are responsive and accessible, JDI conducts ongoing statewide needs assessments in partnership with state agencies and member programs. These efforts identify service gaps, workforce challenges, and barriers faced by survivors—particularly those in culturally specific, rural, or historically marginalized

communities. Data from these assessments inform coalition priorities, support racial equity initiatives, and guide advocacy for sustainable funding. JDI also collaborates with the FVPSA state administrator to monitor and guide the distribution of subgrants, ensuring funding decisions reflect community needs and promote equitable access. In addition, JDI partners with culturally specific organizations, immigrant and refugee advocacy groups, and racial justice leaders to advance culturally responsive services and address systemic barriers. This work includes facilitating collaborations, providing technical assistance, and promoting language justice. Finally, JDI engages with sectors like health care, housing, economic justice, and business to improve survivor access to critical resources and strengthen systemic responses. These partnerships advance policies, practices, and programs that support survivor safety, well-being, and economic security. Through these strategies, FVPSA Coalition grants help JDI foster a stronger, more connected network of programs working toward justice, safety, and healing for all survivors across Massachusetts.

23. On July 8, 2025, HHS awarded my organization a total of $368,750 through the FVPSA Coalition Grant FY25. The grant has a period of performance of October 1, 2024 September 30, 2026 and a budget period of October 1, 2024 through September 30, 2026. The NOFO did not include the new funding conditions, but the NOA indicates that the HHS GPS and ACF Standard Terms and Conditions, which contains the new funding conditions described above, applies to the award. Following the entry of a Temporary Restraining Order by the Court on July 28, 2025, and pursuant to that Order's terms, my organization accepted this award by drawing down funds in to support personnel and operating costs of JDI.

24. Accepting this funding with the conditions imposed by this grant source would put our organization at heightened risk for liability should we inadvertently fail to comply with

conditions. The broad nature of the conditions imposed on grantees challenge fundamental values and approaches – values and approaches that center equity – to how we work to end domestic violence. Accepting these funds would place us at risk of compromising our commitment and approach to serving survivors. Declining this funding would have a very significant detrimental impact on my organization. Without the funding for this grant, JDI would be forced to reduce our already small team by at least 2 staff members and cease a range of core efforts to improve systems and build capacity of member programs to address the needs of domestic violence survivors. Our ability as a coalition to bring our membership together, to provide effective technical assistance and system intervention and support would be heavily compromised leaving communities of survivors as well as a survivor-advocate workforce without the supports they need to thrive.

25. My organization has applied for and received a competitive grant from the Center for Disease Control (CDC) for the Rape Prevention and Education: Enhancing Capacity for Sexual Violence Prevention Across State and Territory Sexual Assault Coalitions Grant ("RPE Grant") for the past 2 years.

26. My organization has used RPE Grant funds for many purposes. For instance, these funds supported a comprehensive capacity assessment to strengthen its role in advancing primary prevention of sexual violence across the Commonwealth. This project focused on evaluating JDI's internal capacity, financial health, and strategic partnerships to ensure its prevention efforts remain sustainable, impactful, and responsive to the needs of diverse communities.

27. A core focus of the project was examining how JDI's financial and staffing resources aligned with its prevention goals. The assessment also explored how to strengthen

investments in workforce development, capacity-building, and partnerships. Additionally, it examined how principles of equity—especially around access to services and leadership—could be further integrated into JDI's prevention work and community collaborations.

28. Through this initiative, JDI is enhancing its ability to support member programs and advance a shared vision of community health, financial stewardship, and meaningful violence prevention across Massachusetts.

29. On June 30, 2025, HHS awarded JDI a total of $135,000 through the RPE Grant in FY25. We are in year two of a multiyear grant that spans June 2024 throughJune 2028. The current grant has a period of performance of June 30, 2025 to June 29, 2026 and a budget period of the same span.  The NOFO did not include the new funding conditions, but the NOA indicates that the HHS GPS and CDC Terms and Conditions, which contains the new funding conditions described above, apply to the award. My organization accepted this award after the entry of the Court's TRO.

30. Declining this funding would have a very significant detrimental impact on my organization. Without the funding for this grant, a key source of funding for sexual assault prevention work will end. Our organization will be forced to lay off a staff member with expertise in prevention work and end the groundwork laid to build capacity for JDI and member programs with respect to prevention efforts. Violence prevention work is underfunded in the SA/DV field. This opportunity to focus on prevention is a lifeline to the future of our work to end sexual violence.

31. My organization's members have received HHS grants, including direct discretionary grants through ACF and pass through FVPSA grants through the Massachusetts

Department of Public Health. For the purposes of the member programs highlighted below, the two organizations highlighted receive these grants as pass-throughs from the state.

32.     For example, The Network/La Red (New England Women's Support, Inc. dba The Network/La Red) has been funded by the Massachusetts Department of Public Health since state domestic and sexual violence funding moved over from DCF in 2018. Their community-based services are partially funded through a pass-through award to DPH from HHS (FVPSA) through June 2026, and expect that funding to be continued at that point. For FY26, they received $120,657 in FVPSA funds from DPH for performance and budget period of October 1, 2025 through June 30, 2026.

33.     The Network/La Red is an LGBTQ+ organization serving LGBTQ+ survivors of partner abuse across Massachusetts. They provide training to mainstream domestic and sexual violence programs about partner abuse in LGBTQ+ communities and technical assistance on how to create a safe and accessible environment for LGBTQ+ survivors in their organizations and programs. They provide similar training for a wide variety of service providers both in and outside of LGBTQ+ communities. They also provide outreach and education for LGBTQ+ communities on how to recognize partner abuse and support survivors. And finally, they promote LGBTQ+ survivor leadership development to address partner abuse in their own communities.

34.     The funding conditions described above would require The Network/La Red to completely change their programming. The Network/La Red believes that a diverse staff in an environment that promotes equity and inclusion strengthens the organization and best positions them to serve all members of their communities with cultural competence and with services that do not re-victimize survivors. Promotion of equity and inclusion practices also promotes a

welcoming organizational culture that helps to reduce staff turnover. This, in turn, creates more stability for survivors served, and it also has the benefit of staff who use their increasing accumulated experience to better serve survivors and train other programs to do so. They also believe that, generally speaking, LGBTQ+ survivors are best served by LGBTQ+ staff who are also survivors. If they were to accept the grant with this funding condition, they would have to fundamentally change our hiring practices, organizational culture, the communities they serve, and their programming.

35. For example, Member Doe, a member program based in Chelsea, MA received $152,025 for emergency shelter services from ACF/FVPSA passed through the Massachusetts DPH for FY 26. These subgrants have a period of performance and budget period of July 1, 2025 through June 30, 2026. Member Doe accepted this award on June 30, 2025. They expect the HHS GPS will apply to continued funding or ACF will amend the grant to include the conditions. Without this funding, Member Doe would lose shelter beds and the corresponding supportive services provided by trained, multi-lingual staff, resulting in fewer individuals and families fleeing violence in Eastern Massachusetts and across the commonwealth being served. There is already a dearth of shelter options in Massachusetts and this would tax an already strained system.

### V. HUD's and HHS's New Funding Conditions Place My Organization and/or its Members in an Untenable Position

36. Agreeing to the HUD and/or HHS conditions would cause my organization and my member programs profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD and/or HHS grants. The funding

12

conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

37. My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, and agreeing that compliance with those antidiscrimination laws is material for False Claims Act purposes implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization's mission enshrines the values underlying any understanding of diversity, equity, and inclusion.

38. As JDI states, "Our work is grounded in racial and economic justice, and we believe that centering the leadership of those most impacted by violence is essential to building a safer, more equitable world." This commitment to confronting all forms of oppression is woven into every aspect of JDI's mission and coalition work. At the heart of Jane Doe Inc.'s mission is a steadfast commitment to promoting the safety, liberty, and dignity of all survivors of sexual and domestic violence—recognizing that these goals cannot be achieved without addressing the systemic inequities that shape survivors' experiences. JDI's work is grounded in the understanding that racism, xenophobia, homophobia, transphobia, ableism, and other forms of oppression are intertwined with gender-based violence and directly impact access to safety,

healing, and justice. As a statewide coalition, JDI intentionally centers marginalized voices, fosters inclusive leadership, and advances survivor-led advocacy that reflects the diverse communities across Massachusetts. Through this lens, JDI works in partnership with its member programs and community organizations to challenge systems of oppression and promote equitable responses to survivors, while building a movement rooted in justice, liberation, and collective care.

39. It is unclear whether my organization's mission and guiding principles violate the conditions placed on us by these funders, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs. JDI refused to compromise our values.

40. My organization is also unsure whether it can continue to operate programs that are designed to highlight the needs of underserved or marginalized communities, including Black, immigrant and/or LGBTQ+ survivors. Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

41. For the same reasons, my organization is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

42. My organization is also concerned about the conditions requiring a certification of compliance with Title IX of the Education Amendments of 1972. Recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. We are concerned that this interpretation could require organizations to ignore local and federal

law prohibiting discrimination based on gender identity and would ultimately result in victims who are transgender or gender-nonconforming being turned away from services. We also regularly ask for and use pronouns and include information about LGBTQ+ survivors in advocacy and public information. My organization is further concerned that we will be unable to deliver training and materials to schools that fully address domestic and intimate partner violence and comply with anti-discrimination provisions.

43. JDI is also concerned about the HHS GPS condition requiring grantees to certify that they do not engage in, and will not during the term of this award engage in, a "discriminatory prohibited boycott." While our work is not directly impacted by this prohibition, we are concerned with prohibitions that would restrict JDI's or a member programs ability to engage in activities in alignment of its values.

44. JDI member programs are also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. In providing direct client services and technical assistance, many Member Does will routinely use clients' stated pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth, recognize gender identity in providing direct assistance, and accommodate the needs of the LGBTQ+ community in providing compassionate, responsive care and referrals. This is keeping with Massachusetts state law and requirements of state funders. It is unclear whether member programs may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

45. JDI is concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." While JDI member programs do not provide abortion care, they do not know what the government may consider to "promote" abortion. Reproductive health

access, including abortion, is part of JDI's values and organizational framework, and certainly a framework embraced by JDI members including Member Doe. These programs offer clients information about any healthcare services that they need. When pregnant survivors request abortion care, they provide them with resources on how to seek that care.

46. JDI member programs are concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders." They do not know what this condition's broad and vague language means for their organization or how to comply with it, given the many new executive orders that it implicates,

47. The new funding conditions present my organization and its members with an impossible choice. JDI and/or its members could forgo accepting HHS or HUD grant awards and face the direct consequences to JDI's financial health and ongoing operations as well as the health and operations of its member organizations. Or my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

48. Additionally, my organization's members would have to fundamentally change their programming or accept new grants and risk running afoul of various funding conditions imposed on those grants. For example, during its client intake process, Member Doe and The Network/La Red routinely gather information about gender identity and the need for services, including safe housing or legal advocacy, to facilitate proper care and access to available resources. When carrying out programs under their pass through funding through the MA DPH, Member Doe and the Network/La Red will include in their general intake questions or follow up

interviews questions about gender identity and pronouns to ensure that care is respectful, compassionate, and appropriate for each individual. The Network/La Red and Member Doe are concerned that it would have to fundamentally alter this programming in a way that undermines its ability to serve certain underserved populations and runs contrary to the organization's values.

49. My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core values

## V. These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors

50. These funding conditions threaten harm to survivor-advocates who comprise the bulk of the sexual assault an domestic violence workforce as well as harm the larger poublic comprised of so many survivors who seek JDI's support in advancing systems change work that reflects their needs and experiences.

51. Conversely, if my organization or its members turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

52. Although JDI does not provide direct services, the loss of funding would have a profound impact on survivors across Massachusetts. As the statewide coalition, JDI strengthens the network of domestic and sexual violence programs by providing training, technical assistance, policy advocacy, and critical coordination. Without this backbone support, local

17

programs would face increased isolation, reduced access to vital resources, and fewer opportunities to influence systems that affect survivors' safety, healing, and justice. The ripple effect of losing coalition infrastructure would ultimately leave survivors with fewer protections, less responsive services, and diminished pathways to lasting change.

53. The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

54. In the absence of fully funded JDI services and JDI member services, domestic violence and sexual assault victims will be confronted with more barriers when trying to access services by limiting the reach of trusted organizations. The availability of culturally responsive services for survivors who identify as LGBTQ+ and/or immigrants are already limited. All too often, abusers use survivors' identities as a tactic of abuse—often forcing an already vulnerable survivor into silence. The loss of program services that cater to at-risk populations will leave survivors and their communities more vulnerable. There will be less transitional housing support available in Massachusetts. Programs that employ advocates who are often survivors themselves will have to lay off staff. As the state coalition, JDI will have to scale back its ability to provide training, technical assistance and statewide coordination including involvement with the state Governor's Council to Address Sexual Assault, Domestic Violence, and Human Trafficking, membership convenings for directors, civilian police advocates, and high-risk teams. Direct service providers will be unable to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

55. JDI's operations are essential to permitting the network of direct service providers to focus on lawfully providing the highest-quality services to the survivors they serve and

ensuring that the systems that contribute to addressing and responding to the epidemic of sexual violence are operating within lawful frameworks of evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 6, 2026.

/s/ *Hema Sarang-Sieminski* (DocuSigned by: 2E653BA12CED472...)

Hema Sarang-Sieminski