IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, et al.<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, et al.<br><br>Defendants. | Case No. 25-cv-342 |

**DECLARATION OF TAI SIMPSON-BRUCE**

I, Tai Simpson-Bruce, declare as follows:

**I.    Background**

1. I am the Executive Director at the Idaho Coalition Against Sexual and Domestic Violence (ICASDV), Idaho's federally designated dual sexual assault and domestic violence coalition.

2. My organization was founded in 1980 and is headquartered in Boise, Idaho. It is a 21-member dual domestic violence and sexual assault coalition membership organization that works to end gender-based violence from its systemic roots, including by providing member organizations with training and technical assistance, access to statewide and

1

national training and development, and participation in State-level advocacy and systems reform. The Idaho Coalition works with over 60 organizational partners, including community-based domestic and sexual violence programs, tribal service providers, culturally specific organizations, and grassroots collectives. Its partners include organizations and individuals committed to ending gender-based violence, including tribal domestic violence and sexual assault programs, culturally specific nonprofits, LGBTQIA+ organizations, and allied professionals.

3. The Coalition provides support and capacity building to more than 40 direct service organizations annually. These member programs collectively serve tens of thousands of survivors each year. Coalition activities include:

   a. Delivering training and technical assistance to advocates, legal professionals, and allied stakeholders;

   b. Disseminating printed and digital resources in English, Spanish, and other languages;

   c. Supporting youth prevention programs and school-based education efforts;

   d. Assisting programs with housing stabilization, shelter operations, and rapid re-housing;

   e. Coordinating statewide prevention and response strategies to domestic and sexual violence, including in rural, frontier, and tribal communities;

   f. Providing policy guidance and legislative analysis to state and federal partners;

   g. Maintaining infrastructure for statewide data collection, program evaluation, and survivor-informed practice;

    h.  The Coalition also engages in tribal government-to-government consultation, supports implementation of tribal codes related to domestic and sexual violence, and coordinates cross-jurisdictional responses involving tribal, local, and state law enforcement.

4. My organization has an annual budget of roughly $2.1 million. The Coalition manages and administers multiple federal grants, including awards from the Family Violence Prevention and Services Act (FVPSA). The FY24 FVPSA Coalition Grant totals $363,657 and supports core coordination, training, and capacity-building for domestic and sexual violence programs across Idaho. Federal funds make up more than 70% of the organization's total operating budget, with FVPSA funds accounting for approximately 17% on our budget.

## II.   My Organization's Member Organizations

5. Idaho Coalition is a membership organization with 21 member agencies. Members include organizations and individuals committed to ending gender-based violence, including tribal DV/SA programs, culturally specific nonprofits, LGBTQIA+ organizations, and allied professionals.

6. Members of my organization receive grants from HUD and HHS.

## III.   HHS's New Funding Conditions

7. In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of

3

receiving federal funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.

8. In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

9. The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

10. In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive ORder. In July 2025, ACF )

also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

11. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

12. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

13. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

**IV. My Organization's HHS Grants**

14. My organization has applied for and received a grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Grant") for decades.

15. My organization has used FVPSA Coalition Grant funds for many purposes. For instance, the Idaho Coalition uses FVPSA funding to provide culturally specific technical assistance to tribal, rural, and community-based domestic violence programs, centering the needs of Indigenous, immigrant, and LGBTQ+ survivors. FVPSA funds support training and capacity building through annual gatherings, regional convenings, and virtual peer exchange sessions focused on topics such as housing access, trauma-informed care, and transformative justice. The Coalition also provides policy guidance, resource development, organizational wellness support, and survivor-led feedback mechanisms to strengthen the sustainability and responsiveness of programs across Idaho.

16. On April 30, 2025, HHS awarded my organization a total of $363,657 through the FVPSA Coalition Grant in FY2024. The grant has a period of performance of October 1, 2023 through September 30, 2025 and a budget period of October 1, 2023 through September 30, 2025. The NOFO did not include the new funding conditions, but the NOA indicates that the HHS GPS and ACF Standard Terms and Conditions, which contains the new funding conditions described above, applies to the award absent court intervention. I had no choice but to accept the award. I needed the funds to pay staff and overhead costs, as we have used other resources to cover expenses in the interim.

17. Declining this funding would have had a very significant detrimental impact on my organization. Without the FVPSA Coalition Grant, the Idaho Coalition would be forced to significantly scale back its training, technical assistance, and capacity-building support to over 40 direct service organizations statewide. The loss of funding would jeopardize peer connection spaces, culturally specific guidance for tribal and rural programs, and the development of survivor-centered resources that are essential to safe, accessible services. Staff positions responsible for community building, policy support, and regional training would likely be reduced or eliminated. This would leave frontline programs—particularly those serving Indigenous, immigrant, and LGBTQ+ survivors—without access to critical support in navigating housing, safety planning, legal advocacy, and systems coordination. Ultimately, declining this funding would create dangerous service gaps and further isolate survivors in Idaho's most marginalized and under-resourced communities.

**HHS's New Funding Conditions Place My Organization and its Members in an Untenable Position**

18. Agreeing to the HHS conditions would cause my organization profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

19. My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, and implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from the DOJ indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization's mission is to serve all people in a culturally specific and genuine way. It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

20. My organization is also unsure whether it can continue to operate programs that target underserved or marginalized communities. Now, it is unclear whether these programs would fall within the administration's interpretation of federal antidiscrimination law as prohibiting DEI and DEIA programs.

21. For the same reasons, my organization is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

22. Agreeing to the certifications would cause Idaho Coalition profound harm. The funding conditions are vague, and several could be read to conflict with Idaho Coalition's core mission and the activities it has undertaken for decades in furtherance of that mission and in reliance on the grants. The funding conditions may require Idaho Coalition to cease engaging in activities that it had previously understood the grants to plainly support.

Thus, Idaho Coalition does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic abuse and sexual violence.

23. For instance, Idaho Coalition's mission is "to center collective liberation and address systemic oppression as a praxis for responding to, and preventing, gender-based violence"; it describes its values as "compassion, interconnection, lead[ing] boldly, social equity, and collective liberation." Idaho Coalition is unsure whether it may undertake its day-to-day activities reflecting its mission and guiding principles, which reference "equity," without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" as HHS might interpret those terms.

24. My organization is also concerned about the HHS ACF condition requiring a certification of compliance with the Title IX of the Education Amendments of 1972. Recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. My organization is concerned that this interpretation could require organizations to ignore federal law prohibiting discrimination based on gender identity and would ultimately result in victims who are transgender or gender-nonconforming being turned away from services.

25. The new funding conditions present my organization and its members with an impossible choice. My organization could forgo accepting HHS grant awards and face the direct consequences to my organization's financial health and ongoing operations and the health

and operations of its member organizations, and to those who receive direct services. Or my organization could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

26. My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core values

**These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors**

27. These funding conditions threaten harm to the Idaho Coalition. Not having access to funds would severely undermine the Idaho Coalition's ability to function as a state coalition and to provide direct services. The Idaho Coalition would be forced to eliminate multiple staff positions responsible for training, technical assistance, resource development, and coordination with tribal and rural programs. The Coalition would likely need to suspend critical program activities, including multilingual outreach resource production, statewide prevention education, housing advocacy support, and culturally specific programming. Technical assistance to over 40 community-based and tribal service providers would be drastically reduced or discontinued. This would have a cascading impact across Idaho, particularly in underserved rural and frontier areas, where many programs rely on the Coalition for programmatic guidance, legal coordination, and

capacity support. Survivor-serving agencies would experience reduced access to training, fewer culturally relevant tools, and less policy support—all of which would weaken the statewide response to gender-based violence.

28. Conversely, if my organization or its members turned down the funds because of the conditions, the reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

29. The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual violence.

30. In the absence of fully funded Idaho Coalition services, sexual assault and domestic violence victims will be confronted with more barriers when trying to access services following their assault, including discriminatory treatment from medical, law enforcement or courtroom personnel, hotline operators, and therapists who have not received anti-bias and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being linked to and receiving appropriate medical and therapy services. Direct service providers will be unable to maintain high-quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

31. Idaho Coalition's operations are essential to permitting the network of direct service providers to focus on providing the highest-quality services to the survivors they serve.

32. They ensure that the systems that contribute to addressing and responding to the epidemic of sexual violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2026.

*/s/ tai simpson*

tai simpson-bruce
Executive Director
Idaho Coalition Against Sexual and Domestic Violence