IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HOUSE OF HOPE COMMUNITY DEVELOPMENT CORPORATION, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*<br><br>*Defendants*. | Case No. 25-cv-342 |

**DECLARATION OF JONATHAN YGLESIAS**

I, Jonathan Yglesias, declare as follows:

**I.       Background**

    1.    I am Director of Mission Advancement at the Virginia Sexual and Domestic Violence Action Alliance (Virginia Action Alliance), Virginia's federally designated domestic violence and sexual assault coalition.

    2.    The Virginia Action Alliance was founded in 1981 and is headquartered in Richmond, Virginia. The Virginia Action Alliance is a dual state sexual assault coalition and domestic violence coalition that serves as a non-profit network of survivors, sexual and domestic

1

violence agencies, and allies working to strengthen how communities across Virginia respond to and prevent sexual and intimate partner violence. The Virginia Action Alliance uses its diverse and collective voice to create a Virginia free from sexual and domestic violence—inspiring others to join and support values of equality, respect and shared power.

3. The Virginia Action Alliance provides its member sexual and domestic violence agencies statewide with access to resources, training opportunities, technical assistance, and input on policies and practices that advance safety, justice, and healing for survivors.

4. The Virginia Action alliance receives grants from the Department of Health and Human Services (HHS). The Virginia Action Alliance has an annual budget of roughly $3,321,500. Of that total amount, roughly $1,100,000 comes from HHS grants, including subcontracts.

II. **My Organization's Member Organizations**

5. The Virginia Action Alliance is a membership organization with 73 member agencies. Membership primarily consists of sexual and domestic violence agencies; however, individual and professional memberships are also available to anyone who supports the coalition's mission and values. The Virginia Action Alliance's membership includes three members, which are being identified for the purposes of this lawsuit as "Virginia Member Doe 1," "Virginia Member Doe 2," and "Virginia Member Doe 3." Virginia Member Doe 1 is a domestic violence agency that is a community-based nonprofit with the core function of eradicating domestic violence through the empowerment of survivors. Virginia Member Doe 1 receives funding from HUD and HHS. Virginia Member Doe 1's primary services include counseling, emergency shelter and transitional housing, legal services, child and family advocacy services, domestic violence outreach and prevention, and systems advocacy. Virginia Member Doe 2 is a dual sexual assault and domestic violence agency that is community-based and

provides crisis intervention and emotional support, advocacy with medical, police, and court systems, short-term individual and group counseling, information and referrals, emergency shelter, rapid rehousing, and transitional housing, and outreach and prevention programming for survivors of sexual and domestic violence, their families, and partners in the community. Virginia Member Doe 2 receives funding from HUD and HHS. Finally, Virginia Member Doe 3 is a dual sexual and domestic violence community-based agency that provides safety and support to victims and their families, while working on community solutions to prevent and end violence in their service area. They operate a 24-hour hotline, provide court, medical, and systems advocacy, maintain access to emergency shelter and housing, run a professional development and jobs training program for survivors seeking economic independence, and coordinate robust violence prevention programming within the community. Virginia Member Doe 3 receives funding from HHS.

6. Members of my organization receive grants from HUD and HHS. Approximately 20 members receive direct HUD funding, approximately 55 members receive HHS Family Violence Prevention Services Act (FVPSA) funding as "pass through" funding from other agencies or organizations, and approximately 5 members receive HHS Rape Prevention and Education (RPE) funding as pass through.

### III. HUD's New Funding Conditions

8. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

9. The NOAs for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the

recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

### IV.  Virginia Action Alliance Members' HUD Grants

10.  My organization's members have received HUD grants, including grants under the CoC Grant Program, and HUD DV Set Aside. My organization's member agencies receive these funds as part of the local CoC and as pass-through via the Virginia Department of Housing and Community Development. While a majority of my organization's members enter into grants with their local CoC, funding agreements are made directly with HUD.

a.  In June 2025, Member Doe 1 received a Notice of Award (NOA) for an approximate total of $190,000 through the CoC Grant in FY25. The grant has a performance period of July 1, 2025 through June 30, 2026 and a budget period of July 1, 2025 through June 30, 2026. The NOFO for this award did not include the new funding conditions described above, but the NOA did. Member Doe 1 drew down the award in order to avert programmatic cashflow issues.

Declining this funding would have a very significant detrimental impact on Member Doe 1. This funding is critical to allowing Member Doe 1 to move survivors from emergency shelter into semi-permanent housing (sometimes for up to 2 years). Through this program, Member Doe

4

1 is able to pay rent, utilities, deposits, etc. for survivors of domestic violence for whom housing and rental assistance are not typically available. Member Doe 1 has about 20 households in the program per year. These funds pay for roughly 0.75 full time equivalent staff (FTE) at the agency and without it, they would lose a staff member. Additionally, if they couldn't accept this funding, individuals and families currently in their housing program would be evicted. This would also impact the availability of shelter beds and capacity within the program's emergency shelter program, as they would no longer have the option of moving survivors from shelter into transitional housing. Shelter stays would be longer and the number of survivors being turned away for lack of space would drastically increase. Over 40 children, and their parents, would be evicted. A large majority of the survivors that are moved into transitional housing have children and therefore experience more economic barriers justifying longer-term housing and support services as a wraparound need for the family. Approximately one-third of those served through this agency's transitional housing program are adults and two-thirds are children.

      b.      In June 2025, HUD awarded Member Doe 2 approximately $400,000 through the CoC grant in FY25. The grant has a period of performance of July 1, 2025 to June 30, 2026 and a budget period of July 1, 2025 through June 30, 2026. The NOFO for this award did not include the new funding conditions described above, but the NOA did. Member Doe 2 accepted this award in June 2025 by signing an agreement directly with HUD and through their CoC.

      Declining this funding would have a very detrimental impact on Member Doe 2. Without HUD funding, this agency would lose approximately 1.5 FTE staff and 39 families in their services area would be evicted from housing. This program funds rapid rehousing, housing location services, mental health services, ongoing case management, and financial assistance for 39 families per year in Member Doe 2's service area.

### V.  HHS's New Funding Conditions

11. In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.[1]

12. In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

13. The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." The July GPS replaced the April GPS.

6

subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

14. In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive Order. In July 2025, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

15. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

16. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

17. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA

7

Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. *Id.* at 1.

**My Organization's and its Members' HHS Grants**

16. My organization has applied for and received the Family Violence Prevention and Services Act Grants to State and Territorial Domestic Violence Coalitions from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Coalition Grant") since it has been made publicly available.

18. My organization has used FVPSA Coalition Grant funds for many purposes. For instance, these funds support state level coordination with partners (coordinated community response teams), the development and delivery of key technical assistance and training projects that build the capacity of local domestic violence programs to engage in best practices in service delivery and prevention programming, and the development and dissemination of resources, brochures, and campaigns designed for the public, for survivors, and for professionals in the field.

19. On July 10, 2025, HHS awarded my organization a total of $382,407 through the FVPSA Coalition Grant in FY 2025. The grant has a period of performance of October 1, 2024 through September 30, 2026 and a budget period of October 1, 2024 through September 30, 2026.[2] The NOFO did not include the new funding conditions, but the NOA indicates that the ACF Standard Terms and Conditions, which contains the new funding conditions described above, applies to the award. My organization accepts the award by drawing down on funds.

---

[2] Note that the award for this grant occurs annually, with year 2 of the 2 year grant being awarded partway through the overall performance period.

20. Declining this funding would have a very significant detrimental impact on my organization. Without the funding for this grant, the Virginia Action Alliance would need to make staff cuts totaling nearly 3 full time staff members and would be forced to cut a significant portion of training and technical assistance to member agencies statewide. This would include the availability of our basic and intensive advocacy training, partnership coordination and systems advocacy work on behalf of survivors, statewide meetings and convenings designed to advance best practices among professionals in the field, and resource and campaign development intended to create greater survivor access to services and support.

21. My organization has applied for and received a competitive grant from the Center for Disease Control (CDC) for the Rape Prevention and Education program ("RPE Grant") since the funds have been publicly available.

22. My organization has used RPE Grant funds for many purposes. For instance, these funds support key initiatives to build statewide capacity for sexual violence prevention, including developing and delivering training and technical assistance to member agencies, Coalition staff, and Virginia Action Alliance governing body members about the principles of primary prevention, with specific emphasis on strategies at the community and societal level that seek to promote optimal health for all. This funding has also supported the initiation of a statewide "Primary Prevention Learning Collaborative" with sexual violence prevention partners as well as making critical modifications to our VAdata Prevention Form and all associated reports that help the Virginia Action Alliance and our state partners to collect and analyze statewide data on prevention practices and activities. VAdata, managed by the Virginia Action Alliance, is Virginia's web-based data collection system. VAdata was developed in 1996 to enhance the collection of data from all survivors who use the services of member programs

9

across Virginia. The system documents the experiences of survivors seeking services from community-based programs, prevention activities implemented by programs throughout the Commonwealth, and training and technical assistance efforts of Coalition staff. The VAdata system is currently used by more than 60 SDVAs.

23. We also use funds from this grant to support staff efforts to adapt and evaluate the Coalition's existing "DO YOU Campaign." The DO YOU Campaign, launched in 2014, seeks to address youth violence by confronting root causes and enhancing protective factors to promote positive development and healthy relationships through creative expression. The Campaign is comprised of two phases: DO YOU (comprised of ten 90-minute sessions with youth to promote compassion and empathy) and DO SOMETHING (a youth-led project to make change in their community).

24. We have recruited members and other sexual violence prevention partners to serve as members of our DO YOU Steering Committee. Members have already given feedback on their implementation of the DO YOU Campaign, and the Virginia Action Alliance has established infrastructure to have them continue to provide feedback as the team develops and tests adaptations. These funds are also used to support collaborative meetings and planning with Virginia Department of Health (VDH) partners.

25. On June 26, 2025, HHS awarded my organization a total of $135,000 through the Rape Prevention and Education: Enhancing Capacity for Sexual Violence Prevention Across State and Territory Sexual Assault Coalitions Grant (RPE Grant) in FY 2025. The grant has a period of performance of June 30, 2024 through June 29, 2028 and a budget period of June 30, 2025 through June 29, 2026. The NOFO did not include the new funding conditions, but the NOA indicates that the HHS GPS and ACF Standard Terms and Conditions, which contains the

new funding conditions described above, apply to the award. My organization needs to accepted this award by drawing down funds.

26. Declining this funding or needing to limit the use of this funding would have a very significant detrimental impact on my organization. Without the funding for this grant, the Virginia Action Alliance would have to eliminate approximately 1.2 full time staff members and eliminate foundational technical assistance and training to member programs who implement primary prevention programming throughout the state.

27. Federal Rape Prevention and Education funding is designed with the knowledge that the root causes of violence must be addressed in order to achieve the mission of anti-violence agencies, to eradicate sexual and domestic violence. This is the nation's only federal funding stream dedicated to using a public health framework to identify individual, relational, and community risk factors for violence and to use data and the best available research evidence to inform our strategies to tangibly reduce risk for violence and to create protective factors against it. Eliminating the infrastructure to support primary prevention work at sexual and domestic violence coalitions nationwide would have deep generational impacts.

28. My organization's members have received HHS grants, including grants through the CDC under the RPE Program. These grants are primarily distributed to our member agencies as pass-through funds from the Virginia Department of Health ("VDH"). Agencies funded to do Rape Prevention and Education work with VDH enter into contracts that include a workplan and budget describing how their work will accomplish programmatic goals designed and outlined in partnership between VDH and the CDC. Awards are provided directly through VDH and contracts are entered into with this agency.

29. In February 2025, HHS awarded Member Doe 3 an approximate total of $100,000 through the RPE grant program in FY25. The grant has a period of performance of February 1, 2025 to January 31, 2026 and a budget period of February 1, 2025 through January 31, 2026. Member Doe 3 accepted this award in January 2025. Member Doe 3 has submitted a new workplan and budget to the Virginia Department of Health for a continuation grant = to run from February 1, 2026, to January 31, 2027. However, a new funding contract has not been produced for agreement, and no new conditions or certifications have been shared with the agency.

30. Declining this funding would have a very significant detrimental impact on Member Doe 3 and the community members they serve. Immediate impact would include a reduction in programming staff by 1.35 FTE, including one agency staff member and one lived-experience consultant and programmatic expert. Many of the key partnerships and collaborative efforts to implement and maintain community violence prevention programming would no longer exist in the agency's service area. Programming to address root causes of violence, including poverty and hunger in the community, would cease. This includes year-round maintenance of spaces that are used as sites to bring partners and community members together to engage in violence prevention programming, to produce food, and to share vital resources intended to build social cohesion and to address the social determinants of health that create protective factors against violence. In the course of a single year, Member Doe 3 reaches over 100 families and approximately 200 individuals through their prevention programming. Additionally, over 1,300 pounds of fresh produce are grown and distributed to families and individuals in the program, whose service area is a rural locality that is considered a "fresh food desert." Member Doe 3's programming provides vital skills building workshops, education, gathering and resource connection to a significant portion of their rural population. Without this

programming, hundreds of community members and families would no longer have access to these life-changing services.

**The New Funding Conditions Place My Organization and its Members in an Untenable Position**

31. Agreeing to the HUD and HHS conditions would cause my organization profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in reliance on HUD and HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of sexual violence.

32. My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, and agreeing that compliance with those antidiscrimination laws is material for False Claims Act purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. The Virginia Action Alliance is unsure whether it may undertake its day-to-day activities reflecting its mission and guiding principles, which reference "equity" and "diversity," without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" as HHS might interpret those terms.It is unclear whether my organization's mission and guiding principles violate the certification, and whether my

13

organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

33. Many of the Virginia Action Alliance's activities in furtherance of its HHS grant-funded direct service programs may also conflict with the new funding conditions. For instance, the Virginia Action Alliance currently operates programs and activities that promote access to services, dignity and healing for all people, and that focus on populations of people who traditionally have faced barriers to such access—including with disabilities, people for whom English is not their primary language, and people who have been excluded from specific services such as shelter due to their gender. In addition, the Virginia Action Alliance's statewide data system collects demographic information and history of violence information that has the potential to raise questions about services being provided to people who fall within the very broad group of people who might be included in "illegal" DEI categories. Furthermore, the programmatic goals and strategies outlined within the Rape Prevention and Education (RPE) grant acknowledge co-occurring risk factors for violence and underscore historical inequities in community access to resources like housing, food, schools and jobs, and other factors that are shown to lead to healthy outcomes. The work of preventing sexual violence is inextricably linked to work to create well-resourced communities with a high degree of social cohesion. This means that much of this work focuses on eliminating health inequities and focusing on historically under-resourced populations (based on identity categories that align with gender, race, sexuality, and more). For more information on programmatic theory and goals, see the CDC's Sexual Violence Prevention Technical Package: https://www.cdc.gov/violenceprevention/pdf/SV-Prevention-Resource_508.pdf

34. Now, it is unclear whether these programs would fall within the administration's interpretation of federal anti-discrimination law as prohibiting DEI and DEIA programs.

35. For the same reasons, my organization is concerned that it cannot comply with HHS conditions that prohibit the operation of any programs that "advance or promote DEI, DEIA, or discriminatory equity ideology."

36. My organization is concerned about the HHS ACF condition requiring a certification of compliance with the Title IX of the Education Amendments of 1972. Recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting allowing people to participate in single-sex programs based on their gender identity. My organization is concerned that, given the history of HHS in funding Virginia-based primary prevention projects such as the Red Flag Campaign, Peer Education Facilitator Guides, Campus Best Practices for Addressing Gender-Based Violence, and DO YOU, to the extent that Title IX applied, this condition could be construed as prohibiting us from providing technical assistance, training, and resource and campaign development that addresses the needs of all students, and especially those who identify as transgender and LGBTQ+. Some of the funded programs, that are made widely available to K-12 schools and college campuses, not only recognize that rigid conformity with gender norms in relationships is a risk factor for acceptance and use of violence, but they also employ gender-selective groups (based on identity and expression, as opposed to biological sex) as a strategy to safely deliver prevention activities that are tailored to those audiences most impacted by these risk factors. This condition would require college campuses and K-12 schools who utilize these programs to do so without regard to best available research evidence.

37. My organization is also concerned about the HHS GPS condition requiring grantees to certify that they do not engage in, and will not during the term of this award engage in, a "discriminatory prohibited boycott." The Virginia Action Alliance continually contracts with agencies that identify as small women and minority (SWAM) owned businesses, and we do not monitor to what extent these agencies conduct their business based on external factors like political beliefs. Therefore we cannot with certainty certify that we are not engaging with businesses allied with or against particular nations.

38. My organization's members are also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. In providing direct client services and technical assistance in HUD-funded programs, member organizations' staff support housing for transgender and LGBTQ+ people, including by using clients' preferred pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth, recognizing gender identity in providing direct assistance, and accommodate the needs of the LGBTQ+ community in providing housing. It is unclear whether member organizations may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

39. My organization's member agencies are concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." While our member agencies do not use funding to provide abortion services, they do, with the intention of meeting the needs of the survivors they are working with in HUD funded programs, provide direct community referrals to reproductive healthcare services when a pregnant survivor wishes to terminate a pregnancy, or when a survivor is concerned with the potential to become pregnant. A person's sexual and reproductive health are directly impacted by experiences of sexual and intimate partner violence.

Because acts of violence serve to remove power and agency from individuals, informed consent is imperative for treating survivors. Allowing survivors to make informed decisions regarding their care is an empowering step toward recovery. Furthermore, given the complexity of violence and survivorship, disparities based on age, gender identity, race, ethnicity, and socioeconomic status often limit access to quality health information and services, constrain the ability to control one's own body and health decisions, and make survivors from historically marginalized and oppressed groups more vulnerable to poor health outcomes.

40. My organization's members are concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders." Given the reality that many of the executive orders referenced ask service providers to limit availability of their services to specific populations (LGBTQ survivors, immigrant survivors, etc.) in order to comply and therefore receive funding, this puts members in untenable positions to determine whether to forgo critical funding—and possibly in the process evict survivors and their families—or to sign and either eliminate services to populations or risk running afoul of certifications.

41. The new funding conditions present my organization and its members with an impossible choice. My organization and its members could forgo accepting HUD and/or HHS grant awards and face the direct consequences to organizational financial health and ongoing operations. Or my organization and its members could accept the funding with the conditions and jeopardize our missions and compliance with statutory or regulatory requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

42. Additionally, my organization's members would have to fundamentally change their programming or accept new grants and risk running afoul of various funding conditions

17

imposed on those grants. For example, in order to comply with certifications regarding "gender ideology,", when providing services to trans and LGBTQ survivors, Member Doe 1 would have to ignore intake and assessment factors related to an individual's status for imminent danger, safety, and the need for emergency or long-term housing support in favor of new, non-evidence based criteria that seeks to prioritize only those survivors who are non-LGBTQ+. This is not only in direct conflict with Member Doe 1's mission statement and organizational values, but it is in direct conflict with federal non-discrimination policies and puts the agency at risk of breaking the federal and state laws. Member Doe 1 fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization concerned about applying or accepting an award. To mitigate these risks, Member Doe 1 would have to change its practices, in many cases contrary to its core values.

**These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors**

43. The reduction or outright termination of these services would have devastating effects on the community of survivors and victims of sexual and domestic violence in Virginia.

44. In the absence of a fully funded network of service providers in Virginia, sexual and domestic violence victims will be confronted with more barriers when trying to access services following their assault, including discriminatory treatment related to housing and shelter access. This will immediately lead to more survivors choosing not to seek help, and for those survivors who do, services and housing that are unavailable (due to shelter capacity and inability to provide services based on social and identity factors). Direct service providers will be unable

18

to maintain high quality services that follow best practice guidance or even that are fully compliant with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of coalitions, while desperately trying to keep up with the already increasing demand for services.

45. The operations of the Virginia Action Alliance and our member agencies' operations are essential to enabling direct service providers to provide the highest-quality services to the survivors they serve and ensuring that the systems that contribute to address and respond to the epidemic of sexual violence operate with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2026.

                                                             /s/Jonathan Yglesias

                                                        Jonathan Yglesias
                                                        Director of Mission Advancement
                                                        The Virginia Sexual and Domestic
                                                        Violence Action Alliance