IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION AGAINST
DOMESTIC VIOLENCE, *et al.*

*Plaintiffs,*

v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services, *et al.*

*Defendants.*

Case No. 25-cv-342

**DECLARATION OF KELSEN YOUNG**

I, Kelsen Young, declare as follows:

**I.      Background**

     1.     I am the Executive Director at the Montana Coalition Against Domestic and Sexual Violence (hereinafter "Montana Coalition"), Montana's federally designated domestic violence and sexual assault coalition.

     2.     The Montana Coalition was founded in 1986 and is headquartered in Helena, Montana.

     3.     The Montana Coalition is a dual domestic violence and sexual assault coalition and membership organization. The Montana Coalition provides training and technical assistance to service providers addressing domestic and sexual violence in the State and serves as a resource for member and allied organizations by providing training, technical assistance, conducting statewide planning and needs assessment, developing and enhancing service standards, and gathering and disseminating critical resources and information.

4.      The Montana Coalition was founded to strengthen the support systems serving survivors of domestic and sexual violence by facilitating networking among member programs while advocating for social and systems change in Montana. The Montana Coalition is the designated State Coalition for Montana by related federal government agencies.

5.      The Montana Coalition is the only statewide organization providing training and technical assistance to the array of service providers that address domestic and sexual violence in the state. One of the Montana Coalition's primary goals is to increase the representation of underserved populations in the coordination of activities and identifying gaps in services. We hold a number of training and membership events throughout the year that focus on promoting coalition building and collaboration, developing and enhancing strategies to address problems, and increasing the capacity of advocates and other system personnel to meet the diverse needs of survivors.

6.      The Montana Coalition has an annual budget of approximately $1.2 million. Of that total, 97 percent—over $1 million—is from direct federal funds. At least 50 percent of the Montana Coalition's budget is from grants issued by the U.S. Department of Health and Human Services (HHS) Family Violence Prevention Services Act (FVPSA) program. MCADSV also receives funding from HHS under the Rape Prevention and Education (RPE) housed within the Centers for Disease Control (CDC). MCADSV does not receive funding directly from the Department of Housing and Urban Development (HUD) but our member organizations do receive funding directly from HUD.

**II. The Montana Coalition Member Organizations**

7.      The Montana Coalition is a membership organization with 40 member organizations. Members include nonprofit organizations with the primary mission of providing

2

services to survivors of domestic violence, dating violence, sexual assault, or stalking, and state and local victim assistance programs and supports associated with the local prosecutors' or law enforcement office.

8. Member organizations receive regular email updates on related state and federal policy; receive access to the Montana Coalition trainings and conference, with options for need-based scholarships; opportunities to network with other members at membership and regional meetings throughout the state; and access to an extensive resource library, technical assistance, and webinars on a wide variety of topics.

## II. Grants That Montana Coalition Members Currently Have or Have Intended to Apply For

9. Montana Coalition members receive and/or have intended to apply HUD grants.

10. Montana Coalition member Friendship Center of Helena, Inc. receives Rapid Rehousing funds directly from HUD. Their contract renewal will require them to sign the new certifications from HUD.

## III. HUD's New Funding Conditions

11. HUD has begun applying new funding conditions on HUD grants that differ significantly from the conditions imposed on the use of federal funds under the same grant awards for prior years.

12. The NOAs for the HUD CoC grants provide that the recipient's "use of funds provided under" the agreement and its "operation of projects assisted with" grant funds "are governed by … [a]ll current Executive Orders." The NOAs also include requirements that the recipient: (1) "shall not use grant funds to promote "gender ideology," as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;" (2) "agrees that its compliance in all respects with all applicable Federal

3

anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act];" (3) "certifies that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964;" and (4) "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment."

### IV.     My Organization's Members' HUD Grants

13.     My organization's members have received HUD grants, including grants under the CoC Grant Program. They receive the funds directly from HUD and are required to sign a grant agreement that is an agreement between HUD and the member organization. These grant agreements are not all on the same timeline as each project has its own unique project period.

14.     For example, the Friendship Center is a member organization who receives CoC funds from HUD directly. When they are asked to sign the new grant agreement this Fall, they will be required to assert that they will follow the new certification requirements. Complying with the requirements will significantly impact the services they provide to survivors and, should they instead not receive funding, it would create an immediate reality of survivors not receiving housing support or being removed from the housing support that is currently operating.

15.     On June 19, 2024, HUD awarded Friendship Center of Helena, Inc. (TFC) a total of $186,226 through the CoC Grant in FY2023. The grant has a period of performance of 1-year and a budget period of January 1, 2025 through December 31, 2025. TFC accepted this award on June 19, 2024. The NOFO and NOA did not include the new HUD funding conditions described above, but expect that the next award will include those conditions. As a part of the CoC FY2024 award announcement on March 26, 2025, TFC learned that they were awarded $236,061. It is a renewal grant with an expected project period of January 1, 2026, through December 31, 2026.

4

They have successfully received a renewal grant every year that they have applied. They provide assistance for a 2-year period.

16. Without these funds, TFC will no longer be able to provide rental assistance to current program participants past December 31, 2025, and will be forced to end their assistance early. Without CoC funds, 3 individuals and 3 families, including 8 children, would lose their housing support from the Friendship Center of Helena, Inc. and be at risk of immediate eviction and homelessness. Safe and independent housing is a key factor for safety after fleeing domestic and sexual violence. Prematurely ending rental assistance will not only destabilize client's housing but could jeopardize their safety and sustainability. As of January 1, 2026, the Friendship Center of Helena, Inc. will also not be able to enroll any new program participants, severely limiting options for many victims and survivors in our difficult housing market. It is also possible that TFC may need to reduce staff or staff hours due to the loss of funding, reducing support and services related to housing. Declining this funding would have a very significant detrimental impact on TFC's clients and our community.

## V.    HHS's New Funding Conditions

17. In July 2025, HHS issued a new revised Grants Policy Statement (July GPS) that imposed new conditions on grantees: It required that, "[b]y applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams," and applies to awards and modifications adding funding made on or after April 16, 2025.[1]

---

[1] In April of 2025, the new HHS revised its Grants Policy Statement (GPS) to impose new conditions on grantees prohibiting the operation of "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." The July GPS replaced the April GPS.

5

15. In August, HHS revised its GPS again, effective October 1, 2025 (October GPS), which includes the same HHS Discrimination Certification and applies to awards and modifications that add funding made on or after October 1, 2025.

16. The October HHS GPS also includes a requirement that grantees "certif[y]" that they are "compliant with Title IX of the Education Amendments of 1972 …, including the requirements set forth in [the "Gender Ideology" Order], and Title VI of the Civil Rights Act of 1964" and that they "will remain compliant for the duration of the Agreement." This condition also requires covered recipients to "certify" that this requirement is a "material term[] of the Agreement," that "[p]ayments under the Agreement are predicated on compliance" with Title IX and Title VI and that the recipient "therefore … is not eligible for funding … absent compliance with" those requirements, and that the recipient "acknowledges that this certification reflects a change in the government's position regarding the materiality" of those requirements. A recipient must also certify that it "acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

17. In May 2025, HHS's Administration for Children and Families (ACF) updated its Standard Terms to adopt a new certification requirement substantially similar to the HHS Title IX Certification, which is identical to the HHS Title IX Certification except that it does not explicitly refer to the "Gender Ideology" Executive Order. In July 2025, ACF also updated its Standard Terms to make the same change and adopt the HHS Discrimination Certification. The July ACF Standard Terms apply effective July 29, 2025, "for awards and funded modifications

made on or after this date," and (except when specifically noted) apply to all awards administered by ACF, including "[n]on-discretionary awards," and flow down to subrecipients.

18. CDC has incorporated the HHS Discrimination Certification into its General Terms and Conditions for Non-Research Grants and Cooperative Agreements and its General Terms and Conditions for Research Grants and Cooperative Agreements.

19. The Health Resources and Services Administration (HRSA) revised its General Terms on May 14, 2025, to include the HHS Title IX Certification verbatim. It also revised its General Terms and Conditions, effective July 25, 2025, to include the HHS Discrimination Certification. The revised HRSA General Terms and Conditions, including the HHS Discrimination Certification requirement, "apply to all active awards" administered by HRSA and the flow down to subrecipients.

20. In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA) updated its Standard Terms and Conditions to include the HHS Title IX Certification verbatim, to incorporate the HHS Discrimination Certification, and to include a new condition requiring awardees "to comply with all applicable Executive Orders." The SAMHSA Standard Terms and Conditions, including these requirements, apply to all discretionary grants awarded by SAMHSA, including all active awards that did not reach their project period end date by October 1, 2024. Id. at 1.

**VI.     My Organization's and its Members' HHS Grants**

23. My organization has applied for and received a formula grant from HHS's Administration for Children and Families (ACF) for the Family Violence Prevention and Services Act ("FVPSA Grant") for the past three decades at least and likely longer.

7

24. My organization has used FVPSA Coalition Grant funds for many purposes. For instance, the Montana Coalition collaborates with the Montana Board of Crime Control on technical assistance and support to member programs regarding their administrative and programmatic capacity. This includes financial management and grant compliance, policies and procedures for internal and external operations, staff hiring and supervision, allowable expenses and federal rules for grants, as well as many other topics as needed. We hold regular calls and meetings with directors of programs in order to do so. We would not be able to afford the efforts at the same level if we lost our HHS/FVPSA grant.

25. On July 9, 2025, HHS awarded my organization a total of $382,407 for the FVPSA State Coalition grant. The grant has a period of performance of October 1, 2025 through September 30, 2026. The NOFO did not include the new funding conditions, but the NOA indicates that the ACF Standard Terms and Conditions, which contains the new funding conditions described above, applies to the award. My organization accepted this award by drawing down funds around October 2025.

26. Declining this funding would have a very significant detrimental impact on my organization. Without the funding for this grant, it would severely undermine the Montana Coalition's ability to function effectively and provide invaluable training and services to its members and other service providers in the community. Losing the Coalition Grant alone would result in a $382,407 loss of funds for the next fiscal year. Without these funds, the Montana Coalition would have to reduce the size of its staff and its services to members significantly.

27. My organization has applied for and received a grant from the HHS Center for Disease Control (CDC) for the Rape Prevention and Education program ("RPE Grant") for the past two years.

28.     On June 27, 2025, HHS/CDC awarded my organization a total of $135,000 through the RPE Grant. The grant has a period of performance of June 2025 – June 2026. The NOFO did not include the new funding conditions, but the NOA indicates that the HHS GPS and CDC Terms and Conditions, which contain the new funding conditions described above, apply to the award. My organization accepted this award by drawing funds in July 2025.

29.     Declining this funding would limit our ability to conduct prevention efforts in Montana and would result in the loss of a full-time staff person at our organization. The project started in 2024 and the prior year's funding was a planning process. By not being able to accept the award, we will face further delays in getting the project moving forward towards tangible results and detailed prevention planning activities occurring in Montana. This will also impact the state health department as we are required to partner on all activities.

30.     My organization's members have received HHS/FVPSA grants, including grants that are passed through the Montana Board of Crime Control (MBCC) and fund domestic violence shelters throughout Montana. MBCC has not yet been notified of their FVPSA State grant award, but the same requirements will exist in the state grant. Therefore, those restrictions will pass through to the domestic violence shelter members as well. This will significantly impact the provision of direct services to survivors and their children who are often in the most need and the most danger.

**VII.    HUD's and HHS's New Funding Conditions Place My Organization and its Members in an Untenable Position**

31.     Agreeing to the HHS conditions would cause my organization profound harm. The funding conditions are vague, and several could be read to conflict with my organization's core mission and the activities it has undertaken for years in furtherance of that mission and in

9

reliance on HHS grants. The funding conditions may require my organization to cease engaging in activities that it had previously understood the grants to plainly support. Thus, my organization does not know how it may comply with the funding conditions while also staying true to its mission and providing essential support for member organizations, advocates, and vulnerable victims and survivors of domestic violence.

32. My organization is concerned about conditions requiring that we certify that we do not operate any programs that violate any applicable Federal antidiscrimination laws, and implying that compliance with those antidiscrimination laws is material for False Claims Act Purposes. Although we have always complied with federal antidiscrimination laws, the DEI Executive Order and statements from HHS indicate that the government intends to enforce a legally unsupported, new interpretation of federal antidiscrimination law as prohibiting all aspects of programs focused on DEI and DEIA. My organization is concerned about how we can stay true to our mission and the essential support it has provided to member organizations, advocates, and vulnerable victims and survivors of domestic and sexual violence for four decades. It is unclear whether my organization's mission and guiding principles violate the certification, and whether my organization could comply with the administration's interpretation of federal antidiscrimination law without adopting a view antithetical to its true beliefs.

33. As one example of the potential misalignment between the Montana Coalition's work and the new conditions imposed by HHS/FVPSA is the Coalition's self-described goal to "uproot violence and oppression in order to end domestic and sexual violence in Montana." In furtherance of this goal, the Montana Coalition provides technical assistance and training to member organizations and allied organizations regarding the disproportionate impact of violence on marginalized communities in Montana. Those efforts evolve based on the most pressing

issues of the time, but, for example, we actively support efforts to address the Missing and Murdered Indigenous People Crisis in Montana. These efforts are critical to addressing the particular needs of Indigenous people, who the federal government has recognized are at a disproportionate risk of experiencing violence or murder or going missing. The Coalition also supports tribal programs directly while there is no designated tribal coalition in Montana.

34. The Montana Coalition also operates programs designed to advocate for justice, inclusion, and full community participation, remove barriers, real or perceived, to encourage the widest possible participation from vulnerable communities. Accordingly, the Montana Coalition is unsure whether it may undertake its day-to-day activities reflecting its mission and guiding principles without running afoul of the condition not to "promot[e] or facilitat[e] discriminatory programs or ideology, including illegal DEI" or "inculcat[e] or promot[e] gender ideology" as HHS might interpret those terms.

35. Many of the Montana Coalition's activities in furtherance of its HHS/FVPSA grant-funded training programs may also conflict with the new funding conditions. It is unsure if it may operate its current trainings that address explicit and implicit bias in program development, service delivery, and interactions with survivors, and the disparate impacts of societal risks and systems of oppression on survivors. Again, the Coalition does not know if those trainings would be construed as "promoting or facilitating discriminatory programs or ideology, including illegal DEI" as HHS might interpret those terms.

36. The Montana Coalition is also concerned that it cannot continue to engage in certain practices that respect the dignity of all victims of domestic and sexual violence, regardless of gender and sexual orientation, and are consistent with the FVPSA mandate not to discriminate on the basis of gender or sexual orientation. It offers training on how to help

11

advocates be attuned to and appropriately address specific needs of LGBTQ+ survivors, and the technical assistance they provide to Montana agencies, member programs, and community partners include information about compliance with the U.S. Housing and Urban Development's, FVPSA's and VAWA's anti-discrimination mandates. The Coalition also regularly requests and uses pronouns, participates in an LGBTQ+ Coalition, includes information about LGBTQ+ survivors in advocacy and public information, and again, complies with anti-discrimination provisions under VAWA and FVPSA. It is unclear whether it may continue these practices and activities while complying with the HHS's funding condition not to "inculcat[e] or promot[e] gender ideology."

38. My organization is also concerned about the HHS ACF condition requiring a certification of compliance with the Title IX of the Education Amendments of 1972. Recent executive orders have made clear that the government is advancing a new, unsupported interpretation of Title IX as prohibiting participation in single-sex programs based on their gender identity. My organization is concerned that this interpretation could require organizations to ignore federal law prohibiting discrimination based on gender identity and would ultimately result in victims who are transgender or gender-nonconforming being turned away from services.

39. My organization is also concerned about the HUD condition that prohibits using grant funds to "promote" gender ideology. In providing direct client services and technical assistance, many of my organization's members' staff use clients' preferred pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth, recognize gender identity in providing direct assistance, and accommodate the needs of the LGBTQ+ community. It is unclear whether our members may continue these practices and activities while complying with the funding condition not to "promot[e] gender ideology."

12

40. My organization is concerned about the HUD conditions that prohibit using grant funds to "promote" "elective abortion." Our member organizations do not provide or fund abortion but they do make referrals to clinics as needed for reproductive care and abortion in cases where the survivor desires that resource. Reproductive health access, including abortion, is part of our organization framework, and we offer clients information about any healthcare services that they need. When pregnant survivors request abortion care, we provide them with resources on how to seek that care.

41. My organization is concerned about the HUD condition providing that use of grant funds and operation of projects assisted with grant funds are governed by "[a]ll current Executive Orders."  We do not know what this condition's broad and vague language means for our organization's members or how to comply with it, given the many new executive orders that it implicates.

42. The new funding conditions present my organization and its members with an impossible choice. My organization and its members could forgo accepting HUD and HHS grant awards and face the direct consequences to my organization's financial health and ongoing operations, and the health and operations of our member organizations, and to those who receive direct services. Or my organization and its members could accept the funding with the conditions and jeopardize its mission and compliance with statutory or regulatory requirements, and face enormous risks of litigation and government investigations under the False Claims Act.

43. My organization fears that if it agrees to the new funding conditions, it could face not only the loss of grant funds, but federal government investigation, private party litigation under the False Claims Act, and potential liability for not complying. These potential consequences of seeking a grant subject to the new, vague conditions make my organization

13

concerned about applying or accepting an award. To mitigate these risks, my organization would have to change its practices, in many cases contrary to its core values.

**VIII.   These Funding Conditions Threaten to Harm Domestic Violence and Sexual Assault Victims and Survivors**

44.     These funding conditions threaten harm services to victims of domestic violence and their children across the state of Montana. Given that MCADSV and our member organizations rely entirely on federal funds for operation, this would result in real life consequences of death and increased injury without access to emergency shelter, housing assistance, and other forms of support offered by member organizations in Montana with these vital funding streams.

45.     Programs in Montana, including MCADSV, are not able to turn down these federal funds to continue to operate. In the absence of fully funded Montana Coalition services, domestic and sexual violence victims and survivors will be confronted with more barriers when trying to access services following their assault, including discriminatory treatment from medical, law enforcement or courtroom personnel who have not received anti-bias and other core victim services training. This will immediately lead to more survivors choosing not to participate in the criminal justice system and fewer being connected to and receiving appropriate medical and therapy services. Direct service providers will be unable to maintain high quality services that follow best practices guidance and comply with the myriad federal, state, and local requirements they would now have to navigate on their own, without the critical assistance of the Montana Coalition, while desperately trying to keep up with the already increasing demand for services.

46. The Montana Coalition's operations are essential to permitting the network of direct service providers to focus on providing the highest quality services to the survivors they serve and ensuring that the systems that contribute to addressing and responding to the epidemic of domestic violence are operating with evidence-based, trauma-informed, survivor-centered policies and practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2026.

/s/ Kelsen Young

Kelsen Young
Executive Director
Montana Coalition Against Domestic and Sexual Violence