IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND COALITION
AGAINST DOMESTIC VIOLENCE, *et al.*,

     Plaintiffs,

*v.*

ROBERT F. KENNEDY, JR., *et al.*,

     Defendants.

Case No. 1:25-cv-342-MRD-PAS

**DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................2

    I.   HUD and its grants ...........................................................................................2

    II.  HHS and its grants ...........................................................................................6

          A.       Administration for Children and Families ("ACF") .................................7

                1.      Grants under the Family Violence Prevention and Services Act ............... 8

                2.      The challenged ACF certification requirements ......................................... 8

          B.       Health Resources and Services Administration ("HRSA") ...................................11

          C.       Substance Abuse and Mental Health Services Administration ("SAMHSA") ...........................................................................................13

    III. Procedural context ...........................................................................................13

LEGAL STANDARDS ...................................................................................................14

    I.   Summary judgment in general .........................................................................14

    II.  Summary judgment in APA cases .....................................................................14

ARGUMENT ...................................................................................................................15

    I.   Plaintiffs' APA claims fail. ..............................................................................15

          A.       APA statutory Framework ..........................................................................15

          B.       Plaintiffs' first three APA claims fail because Defendants have the authority to adopt the challenged conditions and the challenged conditions are lawful. ..............................................................................16

                1.      The antidiscrimination certifications ....................................................... 16

                      a.      HUD's CoC certifications ...................................................... 16

                      b.      HHS's certifications ................................................................ 17

                 2.      The remaining CoC conditions ............................................................... 17

          C.       Plaintiffs' fourth APA claim fails because the challenged conditions are not arbitrary or capricious. ..............................................................20

          D.       Plaintiffs' fifth APA claim fails because the challenged conditions are constitutional. ............................................................................................22

E.    Plaintiffs' sixth APA claim fails because HUD did not forgo any required procedures when adopting its new grant conditions.................................23

II.  Plaintiffs' constitutional claims fail. .............................................................25

A.    The challenged conditions do not violate the Constitution's separation-of-powers provision or Spending Clause. ...............................................25

B.    The gender-ideology-related conditions and DEI-related conditions do not violate the First Amendment.......................................................26

1.    The conditions govern government funding, not private speech. ............. 26

2.    The antidiscrimination certifications are lawful and routine. .................. 28

C.    The challenged conditions do not violate the Fifth Amendment. .........................31

III.  Plaintiffs' ultra vires claim fails.................................................................34

IV.  Because the appropriate remedy for APA violations is to enjoin past agency action giving rise to the suit, the Court should deny Plaintiffs' request for forward-looking injunctive relief. .....................................................35

A.    Should the Court grant Plaintiffs' motion, the only proper remedy would be vacatur of the contested agency action and remand to the Defendants to administer the contest grant programs within their statutory authorization. ..................................................35

B.    The Court should reject Plaintiffs' request to enjoin speculative, prospective agency action that might impose "similar" conditions......................38

C.    The Court should tailor any relief to Plaintiffs and not all applicants or grantees. ...................................................................40

CONCLUSION.......................................................................................41

TABLE OF AUTHORITIES

**<u>Cases</u>**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) .................................................................................................. 39

*ACLU of Tenn. v. City of Memphis*,
   2020 WL 5630418 (W.D. Tenn. Sept. 21, 2020) .................................................... 33

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ............................................................................................ 27, 29

*Am. Cargo Transp., Inc. v. United States*,
   625 F.3d 1176 (9th Cir. 2010) ................................................................................ 30

*Anderson v. Liberty Lobby Inc.*,
   477 U.S. 242 (1986) ................................................................................................ 14

*Atieh v. Riordan*,
   797 F.3d 135 (1st Cir. 2015) .......................................................................... 14-15, 15

*Bennett v. Ky. Dep't of Educ.*,
   470 U.S. 656 (1985) ................................................................................................ 25

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................ 39

*Biden v. Missouri*,
   595 U.S. 87 (2022)................................................................................................... 25

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002) ................................................................................. 32

*Bluestone Env't Grp., Inc. v. Zapisek*,
   2022 WL 16857173 (D. Mass. Nov. 10, 2022) ..................................................... 14

*Boston Redev. Auth. v. Nat'l Park Serv.*,
   838 F.3d 42 (1st Cir. 2016) .................................................................................... 14

*Broderick v. di Grazia*,
   504 F.2d 643 (1st Cir. 1974) .................................................................................. 39

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ................................................................................................ 35

*California v. Trump*,
   267 F. Supp. 3d 1119 (N.D. Cal. 2017) ................................................................ 18

*Carney v. Adams*,
   592 U.S. 53 (2020) ................................................................................................. 38

*City of Fall River v. Fed. Energy Regulatory Comm'n,*
    507 F.3d 1 (1st Cir. 2007) ...................................................... 38-39, 39, 40

*City of Los Angeles v. Barr,*
    929 F.3d 1163 (9th Cir. 2019) ...................................................... 21, 22

*City of Providence v. Barr,*
    954 F.3d 23 (1st Cir. 2020) ...................................................... 20, 33

*Cty. of Los Angeles v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999) ...................................................... 36

*Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations,*
    643 F.3d 16 (1st Cir.) ...................................................... 38

*Draper v. Healey,*
    98 F. Supp. 3d 77 (D. Mass. 2015) ...................................................... 32

*Draper v. Healey,*
    827 F.3d 1 (1st Cir. 2013) ...................................................... 32

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................... 15, 16, 22

*Food & Drug Admin. v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ...................................................... 38

*Frederick Douglass Found., Inc. v. District of Columbia,*
    82 F.4th 1122 (D.C. Cir. 2023) ...................................................... 30

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ...................................................... 33

*Guardians Ass'n v. Civ. Serv. Comm'n,*
    463 U.S. 582 (1983) ...................................................... 17, 25, 29

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey,*
    844 F.3d 318 (1st Cir. 2016) ...................................................... 39

*Leathers v. Medlock,*
    499 U.S. 439 (1991) ...................................................... 28

*Lewis v. Casey,*
    518 U.S. 343 (1996) ...................................................... 35

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ...................................................... 24

*Mandel v. Boston Phoenix, Inc.,*
    456 F.3d 198 (1st Cir. 2006) ...................................................... 14

*Marquez-Reyes v. Garland,*
    36 F.4th 1195 (9th Cir. 2022) ............................................................. 33

*Matos ex rel. Matos v. Clinton Sch. Dist.,*
    367 F.3d 68 (1st Cir. 2004) .................................................................. 38

*Me. Med. Ctr. v. Burwell,*
    841 F.3d 10 (1st Cir. 2016) .................................................................. 36

*Medina-Munoz v. R.J. Reynolds Tobacco Co.,*
    896 F.2d 5 (1st Cir. 1990) .................................................................... 14

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ............................................................................. 37

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ............................................................................. 26

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ......................................................................... 15, 21

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ............................................................................... 40

*Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump,*
    167 F.4th 86 (4th Cir. 2026) ........................................... 16, 26-27, 30, 31-32

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ............................................................................. 26

*Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.,*
    174 F.3d 13 (1st Cir. 1999) .............................................................. 14, 15

*Nat'l Urban League v. Trump,*
    783 F. Supp. 3d 61 (D.D.C. 2025) .................................... 26, 28, 29, 30

*Nuclear Regul. Comm'n v. Texas,*
    605 U.S. 665 (2025) ......................................................................... 34, 35

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ............................................................................. 40

*Palisades Gen. Hosp. Inc. v. Leavitt,*
    426 F.3d 400 (D.C. Cir. 2005) ............................................................. 36

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
    918 F.3d 151 (D.C. Cir. 2019) ............................................................. 22

*Portela-Gonzalez v. Sec'y of the Navy,*
    109 F.3d 74 (1st Cir. 1997) .................................................................. 40

*R.I. Hosp. v. Leavitt*,
    548 F.3d 29 (1st Cir. 2008) ........................................................... 15

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ............................................................. 18, 27

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .................................................................. 36

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012) ....................................................... 19

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981) ....................................................... 19

*Sossamon v. Lone Star State of Tex.*,
    560 F.3d 316 (5th Cir. 2009) ........................................................ 30

*Texas v. Cardona*,
    743 F. Supp. 3d 824 (N.D. Tex. 2024) ................................................ 37

*Texas v. United States*,
    523 U.S. 296 (1998) ................................................................. 39

*Trump v. Am. Fed'n of Gov't Emps.*,
    145 S. Ct. 2635 (2025) .............................................................. 19

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ............................................................. 40-41

*U.S. Postal Serv. v. Gregory*,
    534 U.S. 1 (2001) ................................................................... 30

*United States ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) ....................................................... 31

*United States ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023) ................................................................. 31

*United States v. Am. Libr. Ass'n*,
    539 U.S. 194 (2003) (plurality opinion) ............................................. 28

*United States v. Hansen*,
    599 U.S. 762 (2023) ............................................................. 26, 30

*United States v. Kuzma*,
    967 F.3d 959 (9th Cir. 2020) ........................................................ 33

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ................................................................. 23

*West Virginia v. U.S. Dep't of the Treasury*,
    59 F.4th 1124 (11th Cir. 2023) ............................................. 25

*Wightman v. Springfield Terminal Ry.*,
    100 F.3d 228 (1st Cir. 1996) ............................................. 14

*Worman v. Healey*,
    293 F. Supp. 3d 251 (D. Mass. 2018) ............................................. 32

*Ysursa v. Pocatello Educ. Ass'n*,
    555 U.S. 353 (2009) ............................................. 28

## U.S. Constitutional Provisions

U.S. Const., art. III, § 2 ............................................. 38

## Federal Statutes

5 U.S.C. § 553 ............................................. 23, 24

5 U.S.C. § 702 ............................................. 36

5 U.S.C. § 706 ............................................. 14, 20, 22, 36

18 U.S.C. §§ 287 ............................................. 11, 13

20 U.S.C. §§ 1681-1869 ............................................. 8, 9, 10, 12, 19

20 U.S.C. § 1682 ............................................. 17

31 U.S.C. § 3729 ............................................. 5, 11, 13

42 U.S.C. § 2000d-1 ............................................. 16, 28

42 U.S.C. § 2000d ............................................. 16

42 U.S.C. § 10401 ............................................. 8

42 U.S.C. § 10406 ............................................. 8

42 U.S.C. §§ 10408, 10409, 10412 ............................................. 8

42 U.S.C. § 11360 ............................................. 3

42 U.S.C. §§ 11372, 11374 ............................................. 3

42 U.S.C. §§ 11381-11389 ............................................. 2, 8, 9, 10, 12, 18, 19

42 U.S.C. § 11382 ............................................. 6, 7

42 U.S.C. § 11383 ............................................. 18

42 U.S.C. § 11386 ............................................. 3, 4, 18, 20

## Federal Regulations

2 C.F.R. §§ 200.341, 200.342 ........................................................................... 34

24 C.F.R. § 1.5 ............................................................................................ 16, 17, 29

24 C.F.R. § 10.1 ............................................................................................... 24

24 C.F.R. § 92.552 ........................................................................................... 34

24 C.F.R. §§ 570.496, 570.502, 570.900 ........................................................ 34

24 C.F.R. § 576.1 .............................................................................................. 3

24 C.F.R. § 578.99 ........................................................................................... 34

45 C.F.R. Part 86 ............................................................................................. 17

45 C.F.R. § 75.300 ........................................................................................ 7, 29

45 C.F.R. § 75.374 ........................................................................................... 34

45 C.F.R. § 80.4 .............................................................................................. 29

45 C.F.R. § 86.4 .............................................................................................. 17

45 C.F.R. § 1370.3 ........................................................................................... 17

## Executive Orders

Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ............................................................................ 5, 6, 18, 19

Executive Order 14,182, *Enforcing the Hyde Amendment*, 90 Fed. Reg. 8751 (Jan. 24, 2025) ....................................................................................... 5, 6

## Federal Rules

Federal Rule of Civil Procedure 56 ................................................................. 14

## INTRODUCTION

Plaintiffs—seventeen state domestic violence and sexual abuse coalitions and certain of their individual members (collectively, "Plaintiffs")—ask this Court to invalidate a set of grant conditions that do nothing more than require federal funding recipients to (1) comply with Executive Orders and preexisting federal law and, and (2) use taxpayer dollars consistent with the purposes Congress expressly established. Plaintiffs' challenge rests on an extraordinary premise: that federal agencies lack authority to modify or clarify the conditions governing the award and disbursement of federal funds—even where Congress has expressly authorized such conditions and even where those conditions simply reiterate longstanding statutory obligations. That premise is wrong.

The Defendants in this case—the U.S. Department of Housing and Urban Development ("HUD") and the U.S. Department of Health and Human Services ("HHS") and their subdivisions—have statutory authority to adopt the grant conditions that Plaintiffs challenge here. The challenged conditions fall into two basic categories. First, certain certifications require grantees to affirm compliance with longstanding federal civil-rights statutes, including Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972—laws that have bound federal-funding recipients for decades. These provisions impose no new substantive obligations; they simply require recipients to acknowledge and adhere to preexisting legal requirements that accompany federal financial assistance.

Second, certain program-specific conditions restrict the use of particular grant funds. These restrictions either reflect limitations Congress has already embedded in the governing statutes or fall squarely within Defendants' authority to ensure effective, efficient, and lawful administration of the underlying grant programs. Agencies charged with administering federal funds not only may—but must—ensure those funds are expended in a manner consistent with statutory objectives.

None of the challenged conditions compels Plaintiffs to relinquish any constitutional right. And none was adopted in violation of the Administrative Procedure Act ("APA") or the

Constitution. To the contrary, the relevant statutes expressly authorize HUD and HHS to establish reasonable terms and conditions to carry out their grant programs. The agencies acted well within that delegated authority.

Plaintiffs' sweeping APA and constitutional claims ignore both the narrow and deferential standards of review that govern agency action in this context and the limited nature of the challenged provisions. At bottom, Plaintiffs object to the Executive Branch's articulation of funding priorities and enforcement of statutory requirements. But it is well settled that the Government may define the contours of the grant programs it funds and may decline to subsidize activities that do not align with statutory objectives or Executive policy—so long as it acts within the bounds of law. That is precisely what occurred here.

Because the challenged conditions are authorized by statutes, consistent with existing law, procedurally proper, and constitutionally sound, Plaintiffs are not entitled to summary judgment. Instead, the Court should enter judgment in favor of Defendants.

**BACKGROUND[1]**

I.      **HUD and its grants**

Congress tasked HUD with responsibility for administering a variety of grant programs, including two programs that are generally considered the Agency's largest:

- **Continuum of Care ("CoC") Program:** Under the Continuum of Care ("CoC") program, HUD awards grants to non-profits and local governments that provide housing and supportive services to the homeless. 42 U.S.C. §§ 11381-11389; Fernandez Decl. ¶ 4. Supportive services include, among other things, childcare,

---

[1] The facts in this section are supported with citations to the following:
  - HHS Administrative Record ("HHS-AR") (ECF No. 93-3);
  - HUD Administrative Record ("HUD-AR") (ECF No. 94);
  - the Declaration of Claudette Fernandez in Support of United States' Response in Opposition to Motion for Preliminary Injunction ("Fernandez Decl.") (ECF No. 43-1);
  - the Declaration of Katherine Chon ("Chon Decl.") (ECF No. 43-2); and
  - the Declaration of Cynthia Baugh ("Baugh Decl.) (ECF No. 43-3).

job training, outpatient health services, food, mental-health services, and assistance in obtaining other federal, state, and local assistance. 42 U.S.C. § 11360(29), § 11385.

- **Community Development Block Grant ("CDBG") Program:** The CDBG Program provides annual grants on a formula basis to states and municipalities to help provide decent housing, suitable living environments, and expanded economic opportunities for low and moderate-income individuals. Fernandez Decl. ¶ 5.

HUD also administers other related grant programs:

- **Emergency Solutions Grants ("ESG") Program:** The ESG Program provides funding to states, local governments, and nonprofits for emergency homeless shelters, homelessness prevention, and rapid rehousing of homeless individuals. 42 U.S.C. §§ 11372, 11374; 24 C.F.R. § 576.1.

- **Home Investment Partnerships Program—American Rescue Plan ("HOME-ARP"):** In 2021, Congress allocated $5 billion for a broad array of activities and services to help those who were homeless or at risk of homelessness. American Rescue Plan Act of 2021, Pub. L. 117-2, § 3205, 135 Stat. 4, 61.[2]

All four HUD grant programs are administered through its Office of Community Planning and Development ("CPD"). *HUD Community Planning and Development CPD Programs*, HUD (2026), https://perma.cc/WWZ4-JDKH.

To receive a HUD grant, the recipient must agree to various conditions. For example, to receive a CoC grant, the recipient must agree to various conditions listed in the corresponding statute. 42 U.S.C. § 11386(b). Those conditions require, for example, that the recipient:

---

[2] Plaintiffs allege that HUD's HOME-ARP grants will be subject to the challenged conditions. Am. Compl. ¶¶ 133, 199. HOME-ARP grants, however, have never been subject to those conditions, and Plaintiffs offer no evidence that they will be.

- monitor and report on the project's progress and the provision of matching funds to HUD;

- ensure that unhoused persons are involved in maintaining and operating facilities for the project and in providing supportive services; and

- take the educational needs of children into account by ensuring that children are placed near their schools so that their education is not adversely affected.

*Id.* § 11386(b)(2)–(3), (6), (7). As relevant to the litigation here, the list ends with a "catchall" provision that gives the Secretary broad discretion to adopt additional grant conditions. *Id.* § 11386(b)(8). Specifically, that catchall provision requires the recipient "to comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner." *Id.*

On March 13, 2025, HUD Secretary Scott Turner issued a public announcement that HUD was updating its grant agreements for the CoC Program to refocus the program on its core mission of fighting homelessness in an effective and efficient manner. HUD-AR 291. "HUD's Continuum of Care Program was meant to provide funds to end homelessness," he explained, "unfortunately, it was used as a tool" to promote a political agenda "at the expense of people in need." *Id*. Under his tenure, that would change: "CoC funds will now be used for their intended purpose—they will not promote DEI, enforce 'gender ideology,' support abortion, subsidize illegal immigration, and discriminate against faith-based groups." *Id.* Instead, "HUD will use all available resources to fight homelessness." *Id.*

Accordingly, the grant agreements that HUD has sent to recipients of CoC financial awards on or after March 11, 2025, contain the revised conditions (collectively, the "CoC Conditions"), which provide:

(1)    [The recipient] shall not use grant funds to promote "gender ideology," as defined in [Executive Order ("E.O.")] 14168, Defending Women from

> Gender Ideology Extremism and Restoring Biological Truth to the Federal Government;[3]
>
> (2) [The recipient] agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the False Claims Act, 31 U.S.C. § 3729(b)(4)];
>
> (3) [The recipient] certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964; [and]
>
> (4) [The recipient] shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182, Enforcing the Hyde Amendment[.[4]]

HUD-AR 97. The CoC grant agreements also provide that the grant agreement itself, the recipient's use of grant funds, and the recipient's operation of projects using grant funds are "governed by" "all current Executive Orders." HUD-AR 94.

Next, consistent with the Secretary's announcement, HUD revised one of its agency-wide policies in April 2025. Specifically, HUD made a change to its "General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs." HUD-AR 43-52. The Agency added a requirement that recipients "comply with applicable existing and future Executive Orders." HUD-AR 51, 43-52. Following that statement, the policy document lists and describes eight Executive Orders, including the following two:

---

[3] As relevant here, according to E.O. 14,168, "'Gender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. . . ." Exec. Order No. 14,168, 90 Fed. Reg. 8615, 8615-16 (Jan. 20, 2025). By its express terms, E.O. 14,168 cannot be "construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof[.]" *Id.*, § 8(a)(i), 90 Fed. Reg. at 8818. Agencies must also implement the order "consistent with applicable law . . . ." *Id.* § 8(b).

[4] By its express terms, E.O. 14,182 cannot be "construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof[.]" Exec. Order No. 14,182, § 4(a)(i), 90 Fed. Reg. 8751 (Jan. 24, 2025). Agencies must also implement the order "consistent with applicable law . . . ." *Id.* § 4(b).

1.    Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025); and

2.    Executive Order 14,182, *Enforcing the Hyde Amendment*, 90 Fed. Reg. 8751 (Jan. 24, 2025).

HUD-AR 51. The policy document contains a savings clause, which states that the listed conditions "apply only to the extent they are consistent with the requirements stated by applicable Federal statutes, regulations, and the applicable program . . . ." HUD-AR 43. Consistent with that policy document, HUD has been including the new requirement—i.e., that recipients comply with Executive Orders—as part of certain individual grants administered under the CoC, CDBG, and ESG programs. *See HUD Funding Opportunities*, HUD (Jan. 8, 2026), https://perma.cc/6U8H-H32N. But when applicable grant statutes conflict with grant conditions for specific programs, HUD will not require that grantees follow those conditions. Fernandez Decl. ¶ 9.

Once a recipient meets the required conditions, HUD executes a grant agreement with the recipient. 42 U.S.C. § 11382(d)(2). A template HUD grant agreement is included in the Administrative Record. HUD-AR 94-101. To the extent that Plaintiffs have either not yet executed and returned their fiscal year ("FY") 2024 grant agreements to HUD, as required, or have unilaterally attempted to change the grant agreement without HUD's authorization, they cannot draw down their FY 2024 CoC grant funds. Fernandez Decl. ¶ 13. Although some Plaintiffs have attempted to modify their agreements by deleting or nullifying the CoC Conditions at issue here, HUD has continued to fund their grants. *Id.*

## II.    HHS and its grants

HHS is the largest grant-making agency in the country. *See* Dep't of Health & Hum. Servs., *HHS Grants & Contracts*, https://perma.cc/FGB7-4R3J. The agency is composed of many operating divisions; as relevant here, these include the following three:

(1) Administration for Children and Families ("ACF");

(2) Health Resources and Services Administration ("HRSA"); and

(3) Substance Abuse and Mental Health Services Administration ("SAMHSA").

Chon Decl. ¶ 1; Baugh Decl. ¶ 1.

A.    **Administration for Children and Families ("ACF")**

To promote the economic and social well-being of children, families, and communities, ACF issues and manages discretionary and nondiscretionary awards to a variety of entities, including nonprofit organizations. Chon Decl. ¶¶ 4-5. The availability and structures of these grants are determined by the authorizing statutes. *Id*. Discretionary awards are given out after a competitive process, while nondiscretionary awards are given out to specific recipients as directed by the relevant program's authorizing statute. *Id.* ¶ 5.

Under certain programs, the primary grant recipients distribute a portion of their federal award to other organizations. In federal grant terminology, these second-tier entities are referred to as "subrecipients," and the funding they receive are "subawards." *Id.* ¶ 6. Subrecipients must use the subaward in accordance with applicable federal statutes, regulations, and grant conditions, and the primary grant recipients are responsible for monitoring their subrecipient compliance. HHS-AR 396-97 ¶¶ 24-29.

HHS grant regulations require ACF and other HHS grant-making operating divisions to ensure that federal funding is used in full compliance with federal statutory and public policy requirements, including those that prohibit discrimination. Chon Decl. ¶ 8; 45 C.F.R. § 75.300(a). These requirements must be clearly communicated to grant recipients and incorporated into the terms and conditions of each award. Chon Dec. ¶ 8. ACF achieves this requirement by incorporating compliance with applicable federal statutes in its Standard Terms & Conditions, which are made part of every funding award. Chon Decl. ¶ 8; HHS-AR 387, 386. The Standard Terms & Conditions for each grant expressly provide that "[a]ll applicable statutory or regulatory provisions supersede any conflicting or inconsistent provisions" within

the Standard Terms & Conditions themselves. HHS-AR 384. These provisions apply uniformly to both discretionary and nondiscretionary grants that ACF administers. HHS-AR 386.

### 1. Grants under the Family Violence Prevention and Services Act

ACF administers both discretionary and nondiscretionary grants under the Family Violence Prevention and Services Act ("FVPSA"), 42 U.S.C. §§ 10401-10414, which is designed to address and prevent domestic violence. *Id.* § 10401(b). By law, FVPSA supports specialized services for a variety of populations, including children exposed to forms of domestic violence, underserved populations, and victims who are members of racial and ethnic minority groups. *See, e.g., id.* §§ 10408, 10409, 10412. Many FVPSA grants are distributed to subrecipients, and primary awardees are responsible for ensuring subrecipient compliance with all applicable grant conditions. Chon Decl. ¶ 12.

FVPSA expressly requires grant recipients to comply with federal antidiscrimination laws, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1869. In that regard, one relevant section of FVPSA states:

> No person shall on the ground of sex or religion be excluded from participation in, be denied the benefits of, or be subject to discrimination under, any program or activity funded in whole or in part with funds made available under this chapter. Nothing in this chapter [of FVPSA] shall require any such program or activity to include any individual in any program or activity without taking into consideration that individual's sex in those certain instances where sex is a bona fide . . . programmatic factor reasonably necessary to the normal or safe operation of that particular program or activity.

42 U.S.C. § 10406(c)(2)(B)(i). This non-discrimination mandate applies to all FVPSA-funded programs. Chon Decl. ¶ 16.

### 2. The challenged ACF certification requirements

On March 28, 2025, the HHS Office of Grants directed HHS grant-making operating divisions, including ACF, to incorporate a certification requirement into notices of funding awards issued to entities that participate in, facilitate, or fund programs implicating Title IX. HHS-AR 1. Programs implicating Title IX include grants to schools, colleges, universities, non-

governmental organizations operating educational programs, and education-related programs within correctional or detention facilities. HHS-AR 1. The Title IX certification requires award recipients to provide assurance that they will comply with Title IX's requirements. HHS-AR 3. The March 28th version of the Title IX Certification, issued through the HHS Office of Grants, expressly incorporated by reference Executive Order 14,168 concerning gender ideology. HHS-AR 3. If further included a paragraph titled "Purpose and Background," explaining that the update was intended "to ensure financial assistance recipients are compliant with the requirements of these laws [Title IX and Title VI] and Executive Order 14168." HHS-AR 2.

On April 16, 2025, the HHS Office of Grants notified HHS grant-making operating divisions, including ACF, to update another certification: the "Civil Rights Assurance." HHS-AR 6. The revised Civil Rights Assurance required grant recipients to certify that they would not operate programs that advance or promote diversity, equity, inclusion, and accessibility in violation of Federal anti-discrimination laws. HHS-AR 6.

Consistent with these directives, ACF updated its Standard Terms & Conditions for Federal Fiscal Year 2025 on May 9, 2025, in two relevant respects:

1. ACF added its own Title IX certification ("the ACF Title IX Certification") applicable to funding awards made on or after March 28, 2025. HHS-AR 364-65 ¶¶ 6-7. The ACF Title IX Certification expressly referenced Title IX, 20 U.S.C. §§ 1681-1689, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, but did not reference Executive Order 14,168. HHS-AR 364-65 ¶ 6.

2. ACF also added its own Civil Rights Assurance (the "May ACF Discrimination Certification") applicable to funding awards made on or after May 8, 2025. HHS-AR 365. This certification required recipients to certify that they would not operate programs that advance or promote diversity, equity, inclusion, and accessibility in violation of Federal anti-discrimination law. HHS-AR 365.

In a letter to grant recipients, ACF explained its rationale:

The Department of Health and Human Services (HHS) is obligated to ensure that taxpayer dollars are used to advance the best interests of the government. The Secretary of HHS has determined that awards supporting diversity, equity, and inclusion (DEI) do not meet a public purpose to the extent they are inconsistent with the Department's policy of improving the health and well-being of all Americans and may violate Federal civil rights law.

HHS-AR 377.

On May 28, 2025, however, the HHS Office of Grants rescinded its April 16 notice regarding the updated Civil Rights Assurance. HHS-AR 112-113. The Office instructed operating divisions, including ACF, that they need not incorporate the new Civil Rights Assurance into future awards. HHS-AR 112. At the same time, the HHS Office of Grants kept the Civil Rights Assurance as part of the HHS Grants Policy Statement, which is automatically incorporated by reference into all HHS awards. HHS-AR 116, 131. The Office explained that it was awaiting further federal-wide guidance before updating the Grants Policy Statement. HHS-AR 112.

In response to this updated guidance, ACF again revised its Standard Terms and Conditions on July 29, 2025. HHS-AR 383-99. First, ACF removed the May ACF Discrimination Certification. HHS-AR 383-99. Second, ACF modified the applicability date of the ACF Title IX Certification so that it applies to funding awards made on or after May 9, 2025. HHS-AR 390.

The ACF Title IX Certification provides, in relevant part:

By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients whose programs are covered by Title IX certify as follows:

- Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.

- The above requirements are conditions of payment that go to the essence of the Agreement and are therefore material terms of the Agreement.

- Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.

- Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.

- Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

HHS-AR 390. Although the July 29 2025 Standard Terms and Conditions are no longer in effect, the current version continues to require a Title IX certification that is substantially similar to the one above.[5]

Notably, ACF has not paused or terminated funding, nor taken any adverse action against any FVPSA grant recipients based on the ACF Title IX Certification. Chon Decl. ¶ 23.

## B. Health Resources and Services Administration ("HRSA")

HRSA provides funding to thousands of recipients, including community-based organizations, to support health services projects. Baugh Decl. ¶ 4. HRSA grants share various attributes of ACF grants. HRSA issues both discretionary and nondiscretionary grants, and recipients may subaward funds to subrecipients. *Id*. ¶¶ 5-6; HHS-AR 973 ¶ 1(c). HRSA requires grant recipients to monitor the conduct of their subrecipients to ensure compliance with applicable statutes, regulations, and award terms. HHS-AR 973 ¶ 1(c).

Like other HHS operating divisions, HRSA requires recipients and subrecipients to comply with applicable federal laws and policies, including anti-discrimination laws, and

---

[5] The current Standard Terms and Conditions, adopted February 12, 2026, expressly incorporate by reference the broader HHS Grants Policy Statement. *See* ACF, Standard Terms and Conditions at 4 ¶ 6 (Feb. 12, 2026) (available at https://acf.gov/sites/default/files/documents/main/ACF-STANDARD-TC--eff.2026-02-12-.pdf). The HHS Grants Policy Statement, in turn, requires recipients to submit a form that contains a Title IX Certification that is substantially similar to the one quoted above. HHS-AR 241; Form HHS 690 ("Assurance of Compliance") (available at https://www.hhs.gov/sites/default/files/form-hhs690.pdf).

incorporates those obligations into award conditions. HHS-AR 972 ¶ 1. HRSA also incorporates compliance with federal statutes as a term of its General Terms & Conditions in every active award. Baugh Decl. ¶ 4; HHS-AR 972 ¶ 1.

HRSA's FY 2025 General Terms & Conditions also establish an order of precedence for resolving conflicts among requirements. In descending order, grant recipients must adhere to the U.S. Constitution, statutes, regulations, program guidance, and award-specific requirements. HHS-AR 972 ¶ 1; HHS-AR 331 ¶ D.1.3.1 ("General Order of Precedence"). Executive Orders are listed at the same level of precedence as program guidance. HHS-AR 331 ¶ D.1.3.1 ("General Order of Precedence").

HRSA updated its FY 2025 General Terms & Conditions to require a Title IX certification (the "HRSA Title IX Certification"), applicable to all active funding awards. HHS-AR 975; Baugh Decl. ¶ 17. It provides, in relevant part:

> By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients, whose programs, are covered by Title IX certify as follows:
>
> - Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14[,]168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.
>
> - The above requirements are conditions of payment that go the essence of the Agreement and are therefore material terms of the Agreement.
>
> - Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding compliance with the above requirements.
>
> - Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.
>
> - Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims

Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18
U.S.C. §§ 287 and 1001.

HHS-AR 975. As with ACF, HRSA has not paused or terminated funding, nor taken any adverse

action against any recipients based on the HRSA Title IX Certification. Baugh Decl. ¶ 19.

### C.     Substance Abuse and Mental Health Services Administration ("SAMHSA")

SAMHSA similarly updated its Standard Terms and Conditions to include three new

provisions that Plaintiffs challenge here:

(1)     a Title IX Certification;

(2)     a requirement that recipients certify that compliance with federal
antidiscrimination laws and grant conditions is "a material condition of receiving
federal funding streams"; and

(3)     a requirement that recipients comply "with all applicable Executive Orders."

HHS-AR 1019 ¶ 1, 1025 ¶ 20.

## III.     Procedural context

Plaintiffs filed their Complaint for Declaratory and Injunctive Relief on July 21, 2025,

followed by an amended complaint on September 15, 2025. Compl. for Declaratory & Injunctive

Relief, ECF No. 1; First Am. Compl. for Declaratory & Injunctive Relief ("Am. Compl."), ECF

No. 60. The Court issued a Temporary Restraining Order enjoining Defendants from requiring a

subset of Plaintiffs to agree to the new conditions before receiving additional funds under some

of the awarded grants. ECF No. 64. Meanwhile, on August 4, 2025, Plaintiffs moved for a

preliminary injunction. ECF No. 30-1. Following a hearing, the Court granted Plaintiffs' motion

and entered a preliminary injunction, which remains in place. Am. Mem. & Order, ECF No. 77.

The preliminary injunction prohibits Defendants from enforcing the grant conditions that

Plaintiffs challenged. *Id.* at 30-39. Separately, the parties entered into a stipulation whereby HHS

agreed that ACF would not enforce the May ACF Discrimination Certification. Stipulation, ECF

No. 39.

## LEGAL STANDARDS

### I.    Summary judgment in general

Summary judgment is proper when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute is "one that must be decided at trial because the evidence . . . would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

"The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006). In such circumstances, courts "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party against whom summary judgment has entered." *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir. 1996).

### II.    Summary judgment in APA cases

"[T]he summary judgment rubric has a special twist in the administrative law context," where "summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Boston Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (citation modified).

The Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 23 (1st Cir. 1999) (quoting 5 U.S.C. § 706(2)(A)). "The burden is on the party challenging the agency decision"—here, Plaintiffs—"to show that the arbitrary and capricious standard has been met." *Bluestone Env't Grp., Inc. v. Zapisek*, No. 3:21-cv-30056-MGM, 2022 WL 16857173, at *4 (D. Mass. Nov. 10, 2022).

The standard of review is "narrow" and "a reviewing court may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *Atieh v.*

14

*Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citation modified). "[A]gency action is presumptively valid . . . ." *R.I. Hosp. v. Leavitt*, 548 F.3d 29, 33-34 (1st Cir. 2008). An agency decision need only be "rational" to "pass muster under the APA's 'arbitrary and capricious test[.]'" *Beverly Enters.-Mass.*, 174 F.3d at 24; *see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (citation modified).

## ARGUMENT

### I.    Plaintiffs' APA claims fail.

Plaintiffs assert six APA claims. Am. Compl. 62-83.[6] For the reasons stated below, none of those claims has merit.

### A.    APA statutory Framework

As noted above, APA review is very narrow and deferential. *See* Legal Standards, Section II at 14-15, *supra.* Most relevant, under the APA "a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" *Atieh*, 797 F.3d at 138 (quoting *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). Defendants' objectives in this context are matters of policy discretion and not of "factual findings." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And all the APA requires for a policy change is that an agency "display awareness that it *is* changing position." *Id.* The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the

---

[6] The Court reached only one of those APA claims in its preliminary-injunction order. Am. Mem. & Order 7-8. The Court did not consider Plaintiffs' additional APA claims because it was satisfied, at that preliminary stage of the litigation, that Plaintiffs had demonstrated a likelihood of success on their APA claim that challenged the new grant conditions on the ground that they were arbitrary and capricious. *Id.* at 18.

statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

**B.     Plaintiffs' first three APA claims fail because Defendants have the authority to adopt the challenged conditions and the challenged conditions are lawful.**

Plaintiffs' first three APA claims rest on the related assertions that Defendants lack statutory authority to impose the challenged grant conditions and that those conditions are contrary to law. Am. Compl. ¶¶ 236-258 (Counts I-III); Mem. in Supp. of Pls.' Mot. for Summary Judgment ("Pls.' Mem.") 28-33, 38-39 ECF No. 96-1. Both assertions are incorrect. The challenged conditions fall squarely within Defendants' statutory authority and reinforce compliance obligations that already exist under federal law.

**1.     The antidiscrimination certifications**

**a.     HUD's CoC certifications**

HUD's antidiscrimination certification requires grant recipients to certify that they comply with federal antidiscrimination law, to acknowledge that such compliance is material to HUD's grant award, and to agree that program funds will not be put to specified unlawful uses. HUD-AR 97. These requirements are neither novel nor unlawful but simply call attention to recipients' preexisting obligation to comply with the law. *See Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 104 (4th Cir. 2026) (recognizing that "existing federal law demands such compliance" with federal antidiscrimination law).

As Plaintiffs acknowledge (Pls.' Mem. at 20), recipients of federal assistance must comply with federal antidiscrimination law. 42 U.S.C. § 2000d. Title VI of the Civil Rights Act of 1964 "authorize[s] and direct[s]" federal agencies that award federal funds to "effectuate" § 2000d by issuing rules and regulations. 42 U.S.C. § 2000d-1. HUD has thus promulgated regulations requiring that grant applications include, as a condition of payment, assurances that the grant recipient comply with federal antidiscrimination law. 24 C.F.R. § 1.5. For example, CoC grant recipients must certify that they "d[o] not operate any programs that violate any applicable Federal anti-discrimination laws," including Title VI. HUD-AR 97. The certification

calls attention to the recipients' legal obligations and makes them certify to HUD that they understand and have accepted those obligations. *Id.* The recipients' "assurances" of compliance are "given 'in consideration of federal aid,' and the federal government extends assistance 'in reliance on' the assurance of compliance." *Guardians Ass'n v. Civ. Serv. Comm'n*, 463 U.S. 582, 630 (1983) (Marshall, J., dissenting).

### b.    HHS's certifications

HHS's certifications are equally well grounded in statutory authority. Title IX authorizes federal agencies, including HHS and its components (ACF, HRSA, and SAMHSA) to promulgate regulations requiring grant recipients to certify compliance. *See* 20 U.S.C. § 1682; 45 C.F.R. § 86.4(a). The regulations provide HHS with the discretion to specify the form and scope of the required certification. 45 C.F.R. § 86.4(c). The FVPSA regulations expressly recognize 45 C.F.R. Part 86 (Title IX) may apply to grantees. *See* 45 C.F.R. § 1370.3(a)(10).

While Plaintiffs contend that the Administration's views regarding gender identity are incorporated into the ACF Title IX Certification (Pls.' Mem. at 31), the certification's text explicitly requires only that grant recipients assure ACF that they are and will remain "compliant with Title IX . . . ." HHS-AR 390 ¶ 6. It imposes no obligation beyond adherence to governing law.

Nor is there any practical conflict between the HRSA's Title IX Certification and other statutes or regulations. In the event of any inconsistency, HHS policy expressly provides that statutes and duly promulgated regulations take precedence over executive orders. HHS-AR 972 ¶ 1 (directing grant recipients to the HHS Administrative and National Policy Requirements "[i]n case of conflicting or inconsistent requirements); HHS, Admin. & Nat'l Pol'y Requirements 2, https://perma.cc/9M5Y-8PHG. The certification regime therefore reinforces, rather than supplants, existing legal requirements.

### 2.    The remaining CoC conditions

The remaining CoC Conditions restrict how grant recipients can use the CoC funds awarded to them. Specifically, HUD requires CoC grant recipients to agree (1) not to use grant

funds to promote "gender ideology" as defined in Executive Order 14,168 and (2) not to use grant funds to fund or promote elective abortions. HUD-AR 97. These conditions largely track existing restrictions on CoC funds and are lawful under the CoC's catchall provision, 42 U.S.C. § 11386(b)(8). The catchall provision makes the disbursement of CoC grant funds dependent on the recipient's "compl[iance] with such other terms and conditions as the Secretary [of HUD] may establish to carry out" the CoC program in "an effective and efficient manner." 42 U.S.C. § 11386(b)(8). HUD's funding conditions concerning gender ideology and abortion are directed at ensuring that grant dollars are not used for certain purposes: the promotion of "gender ideology" and promotion or funding of elective abortions. By prohibiting recipients from using grant funds for these purposes, the conditions ensure that grant funds are used "effective[ly] and efficient[ly]" to house and provide supportive services for the homeless. 42 U.S.C. § 11386(b)(8).

The challenged conditions largely track restrictions on appropriated funds that Congress has already imposed. The Hyde Amendment "is routinely enacted as part of annual appropriations legislation" to "bar[] the use of federal funds for abortion services." *California v. Trump*, 267 F. Supp. 3d 1119, 1131 (N.D. Cal. 2017). The Homeless Assistance Act approves the use of CoC funds to include housing and "supportive services" such as childcare, job training, food, and outpatient health services and medical assistance. 42 U.S.C. § 11383(a)(6); 42 U.S.C. §§ 11360(16), 11360(29). It is consistent with congressional intent as expressed in the Hyde Amendment to preclude the federal grant money set aside for such supportive services from being used to promote abortion. *Cf. Rust v. Sullivan*, 500 U.S. 173 (1991) (affirming constitutionality of regulations that prohibit use of federal funds to encourage, promote or advocate abortion as method of family planning).

When arguing that the challenged gender-ideology conditions are unlawful, Plaintiffs disregard the plain text of the conditions themselves. HUD requires compliance with the Gender Ideology Executive Order, but the Order expressly requires its application in accordance with existing law. Specifically, by its express terms, the Gender Ideology Executive Order cannot be

"construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof[.]" Exec. Order No. 14,168 § 8(a)(i), 90 Fed. Reg. at 8818. The Executive Order also states that agencies must also implement the order "consistent with applicable law . . . ." *Id.* § 8(b). Thus, the Order itself forecloses any interpretation that would require agencies to act beyond their statutory authority.

The same is true of the ACF Title IX Certification. On its face, the certification is limited to existing law. HHS-AR 390. It requires only that recipients certify compliance with Title IX of the Education Amendments of 1972, amended, 20 U.S.C. §§ 1681 et seq., including Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq." HHS-AR 390. Requiring grantees to certify compliance with statutes that already bind them cannot plausibly be characterized as exceeding statutory authority. To the contrary, agencies must implement presidential directives "to the extent permitted by law." By definition, imposing conditions on the issuance of grant funds to the extent *consistent* with applicable law cannot be interpreted as *exceeding* the law. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981); *cf. Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S. ---, 145 S. Ct. 2635, 2635 (2025) (staying a preliminary injunction "[b]ecause the Government is likely to succeed on its argument that the Executive Order and Memorandum are lawful"); *id.* (Sotomayor, J., concurring in grant of stay) (concurring in the stay because the "relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law'").

Second, ACF's grant agreements incorporate an express "savings clause" to ensure all contractual provisions conform to governing law. In its savings clause, ACF explicitly requires that, when interpreting the scope of a grant condition, the dictates of statutes and regulations take precedence over inconsistent contractual language. HHS-AR 384 ("Precedence"). Specifically, ACF's Standard Terms & Conditions states that "[a]ll applicable statutory or regulatory provisions supersede any conflicting or inconsistent provisions in this Standard T&Cs." HHS-

AR 384 ("Precedence"). Consistent with that savings clause, HHS's Administrative and National Policy Requirements lists Executive Orders at the same level of precedence as program guidance. HHS-AR 331 ¶ D.1.3.1 ("General Order of Precedence"). These provisions confirm that statutes and regulations control in the event of any conflict. Particularly as cabined by ACF's own terms and conditions, HHS's certification related to gender ideology in no way exceeds the Agency's statutory authority. HUD has adopted the same approach. In the same fashion as a savings clause, HUD will not enforce a grant condition where it conflicts with applicable statutory requirements. Fernandez Decl. ¶ 9. Properly understood—and expressly cabined by these saving provisions—the challenged conditions do not and cannot exceed the Defendants' statutory authority.

Finally, the condition prohibiting CoC recipients from using funds to promote "gender ideology" as defined in Executive Order 14,168, follows from the Homeless Assistance Act itself, which permits HUD to establish funding conditions that clarify recipients' responsibilities and ensure that CoC funds are used effectively and efficiently to further the Act's specific purposes. *See* 42 U.S.C. § 11386(b)(8); *cf. City of Providence v. Barr*, 954 F.3d 23, 41-42 (1st Cir. 2020) (endorsing similar language used by Congress to allow agency to "'impose reasonable conditions on grant awards to ensure that the States [grant recipients] meet statutory, regulatory, and other program requirements'").

In sum, nothing in the grant conditions concerning gender-ideology would require grantees to violate other statutory requirements or exceeds Defendants' lawful authority.

### C.    Plaintiffs' fourth APA claim fails because the challenged conditions are not arbitrary or capricious.

Plaintiffs next claim that the challenged conditions violate the APA's prohibition on agency action that is "arbitrary" or "capricious." Am. Compl. ¶¶ 259-271 (Count IV) (quoting 5 U.S.C. § 706(2)(A)); Pls.' Mem. at 33-38. That claim lacks merit. There is nothing arbitrary or capricious about requiring federal grantees to comply with federal antidiscrimination laws that already bind them—or to certify that they are doing so. Federal law *already* prohibits grantees

from violating Title VI and Title IX. The challenged conditions reinforce those obligations and ensure that federal funds are used in a manner consistent with statutory purposes. As discussed, the limitations on the use of grant funds flow directly from Congress's directive that these grant programs operate effectively and efficiently to accomplish their intended objectives. That is the essence of rational decision-making. Thus, the conditions are "rational," and the district court should not "substitut[e] its judgment" for that of Defendants. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42-43.

Nor did Defendants have an obligation to provide additional explanations of the conditions. Agencies have not typically been compelled to provide a more extensive explanation when establishing funding conditions or setting priorities. Rather, an agency's action must be upheld if "'its path may reasonably be discerned.'" *City of Los Angeles v. Barr*, 929 F.3d 1163, 1181 (9th Cir. 2019) (quoting *Bowman Transp.*, 419 U.S. at 286). Here, the rationale for the conditions is self-evident from the language of the conditions themselves: to prevent violations of federal antidiscrimination laws and ensure that federal grant funds advance, rather than undermine, the statutory purposes of the programs.

If a more fulsome explanation were required, the Court accurately predicted that "[d]etails of the Defendants' decisionmaking process may be revealed later in the litigation pipeline." Am. Mem. & Order 17. Now, with the benefit of an Administrative Record, the Defendants' decisionmaking progress "may reasonably be discerned" with even more ease. Specifically, the Administrative Record contains documentation of each agency's rationale for adopting the new grant conditions:

- *For HUD*, the Administrative Record contains a public announcement from the HUD Secretary explaining the rationale underlying HUD's decision to adopt the new grant conditions for its CoC Program. HUD-AR 291. "HUD's Continuum of Care Program was meant to provide funds to end homelessness," he explained, "unfortunately, it was used as a tool" to promote a political agenda "at the expense of people in need." *Id*. Under his tenure, that would change: "CoC funds

will now be used for their intended purpose—they will not promote DEI, enforce 'gender ideology,' support abortion, subsidize illegal immigration, and discriminate against faith-based groups." *Id.* Instead, "HUD will use all available resources to fight homelessness." *Id.*

- *For HHS*, the Administrative Record contains a formal memorandum from its Office of Grants, explaining that its decision to adopt the gender-ideology condition was to "to ensure financial assistance recipients are compliant with the requirements of these laws [Title IX and Title VI] and Executive Order 14168." HHS-AR 2. The Administrative Record also includes a letter to grant recipients, in which ACF explained the Agency's decisionmaking:

> The Department of Health and Human Services (HHS) is obligated to ensure that taxpayer dollars are used to advance the best interests of the government. The Secretary of HHS has determined that awards supporting diversity, equity, and inclusion (DEI) do not meet a public purpose to the extent they are inconsistent with the Department's policy of improving the health and well-being of all Americans and may violate Federal civil rights law.

HHS-AR 377. Again, Defendants "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Fox Television*, 556 U.S. at 515. After all, "new administrations are entitled to reevaluate and modify agency practices, even longstanding ones." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 918 F.3d 151, 158 (D.C. Cir. 2019).

### D. Plaintiffs' fifth APA claim fails because the challenged conditions are constitutional.

Plaintiffs next claim that the challenged conditions are "contrary to constitutional right, power, privilege, or immunity" in violation of the APA. Am. Compl. ¶¶ 272-277 (Count V); Pls.' Mem. at 38 (both citing 5 U.S.C. § 706(2)(B)). For the reasons explained in the following section, the challenged conditions do not violate constitutional separation-of-powers provisions,

the First Amendment, or the Fifth Amendment's Due Process Clause. *See* Argument, Section II at 25-35, *infra*.

**E.    Plaintiffs' sixth APA claim fails because HUD did not forgo any required procedures when adopting its new grant conditions.**

Plaintiffs contend that HUD failed to comply with required procedure by adopting the new conditions without first providing a notice-and-comment period. Pls.' Am. Compl. ¶¶ 278-286 (Count VI); Pls.' Mem. at 39-40. But no notice-and-comment period was required. That is because the grant conditions HUD adopted do not enact or amend any substantive rule or provision of law, such that they would trigger the notice-and-comment period requirement. And requiring HUD to engage in such a process every time it changed a funding condition, no matter how minor, would entirely ossify administration of the HUD's grant program, in direct conflict with the APA. *See* 5 U.S.C. § 553(b)(A) (providing exceptions to notice-and-comment requirements); *see also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524–25 (1978) (emphasizing that Congress balanced the need for the public to be informed of changes to substantive rules against substantial flexibility Congress intended to bestow on agencies for the formulation of interpretive or procedural rules).

The APA expressly exempts certain agency actions from notice-and-comment requirements; these actions are not procedurally invalid if they were issued without publication in the Federal Register and opportunity for interested parties to submit comments and information concerning the actions. Specifically, 5 U.S.C. § 553(b)(A) exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." The HUD grant conditions fall into this exempted zone. They should best be understood as embodying a general statement of policy and providing a formal notice of a policy or a set of standards applicable to individual grants. As the Supreme Court has recognized, § 553(b)(A) "exempts 'general statements of policy,' which we have previously described as 'statements issued by an agency to advise the public prospectively of the manner in which the agency

proposes to exercise a discretionary power.'" *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

Plaintiffs contend that a HUD regulation, 24 C.F.R. § 10.1, required HUD to "undertake notice and comment even in rulemakings involving grants, despite the APA's exemption." Pls.' Mem. at 40. Plaintiffs overread that regulation, which does not establish any substantive obligation by which HUD must abide and instead provides a general statement of policies related to public participation in HUD programs and functions. *See* 24 C.F.R. § 10.1 (setting forth the "policy of the Department of Housing and Urban Development"). Further, the regulation expressly provides that "[n]otice and public procedure may also be omitted with respect to statements of policy, interpretive rules, rules governing the Department's organization or its own internal practices or procedures, or if a statute expressly so authorizes." *Id.* The upshot of the rule is, at best, that HUD has chosen to impose upon itself an obligation to abide by notice-and-comment procedures whenever issuing a substantive rule related to grants, which rules the APA ordinarily exempts. *See* 5 U.S.C. § 553(a)(2). Indeed, the regulation, by its own terms, applies only to "notices of proposed rulemaking," 24 C.F.R. § 10.1, which the challenged HUD grant conditions—by their own terms—are avowedly not. Rather, what Plaintiffs refer to as the "General HUD E.O. Conditions" appear in a policy document titled "General Administrative, National, and Departmental *Policy Requirements* and Terms for HUD's Financial Assistance Programs." HUD-AR 43, 51-52 (emphasis added). And the remaining HUD grant conditions Plaintiffs challenge appear in the template "Continuum of Care Grant Agreement." HUD-AR 94, 97. Nowhere does HUD's regulation bind HUD, as Plaintiffs contend it does, to the notice-and-comment procedure for policy statements or template grant agreements.

In sum, Plaintiffs have not, and cannot, demonstrate that HUD's new grant conditions were passed without required procedures. Therefore, their APA claim based on that theory fails as a matter of law.

II.    **Plaintiffs' constitutional claims fail.**

A.    **The challenged conditions do not violate the Constitution's separation-of-powers provision or Spending Clause.**

Plaintiffs claim that the challenged grant conditions violate the separation of powers and the Spending Clause. *See* Compl. ¶¶ 287-297 (Counts VII-VIII); Pls.' Mem. at 40-42. That claim rests on a fundamental misunderstanding of Congress's spending power and the Executive's role in administering federal programs. The Constitution empowers Congress to authorize federal funding programs and entrusts the Executive Branch with implementing them. In doing so, agencies necessarily determine the terms and conditions under which federal funds will be disbursed. Nothing in the Constitution requires Congress to codify every operational requirement of a grant program in statutory text before it may be enforced.

Supreme Court precedent squarely rejects Plaintiffs' premise. In *Biden v. Missouri,* the Court upheld HHS's authority to impose a new condition on participation in Medicare and Medicaid requiring vaccination of facility staff, explaining that HHS has long "established long lists of detailed conditions" governing program participation and was not limited to issuing merely "bureaucratic rules regarding the technical administration of" those programs. 595 U.S. 87, 90, 94 (2022) (per curiam); *see also Bennett v. Ky. Dep't of Educ.,* 470 U.S. 656, 669 (1985) (stating that Congress cannot "prospectively resolve every possible ambiguity concerning particular applications of the requirements" it enacts). Agencies may therefore "fill in gaps that may exist in a spending condition." *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023). For decades, federal grant programs have required recipients to provide assurance of compliance with federal law as a condition of funding—assurances given "in consideration of" federal aid and upon which the Government extends assistance "in reliance." *Guardians*, 463 U.S. at 629-30 & n.22 (Marshall, J., dissenting).

Plaintiffs' separation-of-powers argument also collapses because it rests entirely on their incorrect assertion that Defendants lacked authority to impose the new grant conditions and they are contrary to law. Pls' Mem. at 42. Contrary to Plaintiffs' arguments, Defendants possess the authority to adopt the new grant conditions and they are consistent with existing law. *See*

Argument, Section I(B) at 16-20, *supra*. Where an agency acts pursuant to lawful statutory authority, there is no separation-of-powers violation.

**B.    The gender-ideology-related conditions and DEI-related conditions do not violate the First Amendment.**

Plaintiffs challenge the grant conditions concerning gender-ideology and DEI on their face rather than as applied to any particular speech activity. *See* Am. Compl. ¶¶ 302-322 (Count X-XI); Pls.' Mem. at 43-49. But a facial challenge requires Plaintiffs to demonstrate that the conditions are "unconstitutional in all [their] applications." *Nat'l Urban League v. Trump*, 783 F. Supp. 3d 61, 87-92 (D.D.C. 2025). "Even in the First Amendment context, facial challenges are disfavored." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024). "Facial invalidation is, manifestly, strong medicine that has been employed by [courts] sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotation marks omitted). To prevail, Plaintiffs must show that these conditions "prohibit[] a substantial amount of protected speech relative to [their] plainly legitimate sweep," as required to establish facial unconstitutionality. *United States v. Hansen*, 599 U.S. 762, 770 (2023) (citation omitted). They cannot meet that demanding standard, and therefore, their First Amendment facial challenges fail.

**1.    The conditions govern government funding, not private speech.**

Plaintiffs argue that grant conditions violate the First Amendment because they restrict speech outside the scope of the programs being funded by the grant, and that the restrictions amount to viewpoint- and content-based discrimination. Pls.' Mem. at 43-48. That argument fails because the challenged the grant conditions concern the Government's decision about what activities it will fund—not the regulation of private speech.

As the Fourth Circuit recently explained when rejecting a challenge to a similar grant requirement (one that required the recipient to certify that they were not operating any DEI programs), the government "has wide latitude to set spending priorities" and "to choose to fund one activity to the exclusion of the other." *Nat'l Assoc. of Diversity Officers in Higher Educ.*,

167 F.4th at 103 (internal punctuation omitted). It is well established that when the Government acts as a subsidizer, rather than a regulator, traditional First-Amendment scrutiny does not apply in the same manner. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest. . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust*, 500 U.S. at 193. In other words, the Government "has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.*

Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (collecting cases) ("*Open Society*").

Consistent with the First Amendment, the Government may "specify the activities [it] wants to subsidize," but it cannot "leverage funding to regulate speech *outside* the contours of the programs itself." *Id.* at 214-15 (emphasis added). For example, limiting the use of federal funds for a specific purpose—such as prohibiting the "promot[ion] or advoca[cy] [of] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted), but the outright conditioning of federal funds on the recipient's adoption of a policy "explicitly opposing prostitution or sex trafficking" is not, *id.* at 210 (citation omitted). The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218-19.

None of the challenged conditions imposes an unconstitutional condition on Plaintiffs' speech. Rather, as permitted under *Rust* and *Open Society*, the provisions align the Government's sponsorship of activities with its policy priorities. The challenged conditions do not prohibit grant recipients from engaging in protected speech on their "own time and dime." *Open Society*, 570 U.S. at 218. As the Supreme Court has repeatedly held, the Government does not penalize,

prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that Government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality opinion) (recognizing that a "decision not to subsidize the exercise of a fundamental right does not infringe the right," (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (acknowledging that the Government "is not required to subsidize First Amendment rights"). Simply put, the Constitution does not require the Government to subsidize activities that do not align with its policy priorities.

### 2. The antidiscrimination certifications are lawful and routine.

Furthermore, there is nothing unlawful about requiring recipients of federal grants to affirm that the Government considers compliance with antidiscrimination laws material to its payment decisions. Importantly, the explicit terms of HUD's antidiscrimination certification provision impose no new requirements on primary conduct. HUD-AR 97. HUD's antidiscrimination certification does not adopt any new construction of antidiscrimination law nor does it declare all diversity-related programming to be illegal. HUD-AR 97. Rather, the certification simply requires recipients to certify compliance with existing legal obligations under the "applicable" federal civil rights laws such as Title VI of the Civil Rights Act of 1964, which apply to all recipients of federal assistance. HUD-AR 97; 42 U.S.C. § 2000d-1.

Antidiscrimination laws bind grant recipients *independent* of any certification requirement. There is therefore no First Amendment problem with instructing agencies to require grant recipients to certify that these existing legal obligations are being honored. *See Nat'l Urban League*, 783 F. Supp.3d at 103 (citing *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024)). A certification that merely requires compliance with existing law cannot plausibly violate the First Amendment. Such certifications are by no means novel. It has been true for decades that "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to the executive

regulations issued under Title VI." *Guardians*, 463 U.S. at 629-30 & n.22 (Marshall, J., dissenting) (citing regulations from multiple federal agencies); *see also* 45 C.F.R. § 75.300(a); 45 C.F.R. § 80.4; 24 C.F.R. § 1.5(a)(1), (3). These "assurance[s]" of compliance are "given in consideration of" federal aid, "and the federal Government extends assistance in reliance on the assurance of compliance"—but Title VI's antidiscrimination obligations apply regardless of any certification. 463 U.S. at 630 (Marshall, J., dissenting) (citation omitted).

The requirement here is no different. HUD's two antidiscrimination certification provisions require compliance with "applicable Federal antidiscrimination laws." HUD-AR 97. Of course, to the extent conduct is protected by the First Amendment, the government may not impose a funding condition that "effectively prohibit[s] the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*, 570 U.S. 205, 218-19 (2013). But no such conduct is at issue here, because there is no First Amendment right to actually violate federal civil rights laws. Plaintiffs do not contend otherwise. Indeed, Plaintiffs maintain that they "have always" and "always will" comply with antidiscrimination laws. Pls.' Mem. at 20.

Plaintiffs contend that the HUD certifications' reference to federal antidiscrimination laws does not limit the certifications' scope because the Government has taken "a novel and incredibly broad view of the activities that violate nondiscrimination laws." Pls.' Mem. at 48. This argument likewise falls short for three reasons.

For starters, although grant recipients are being asked to certify compliance with the antidiscrimination laws, they can still challenge the Government's *interpretation* of those laws. *See Nat'l Urban League*, 783 F. Supp. 3d at 104-105 (concluding that, while grantees could challenge the Government's interpretation of what constitutes illegal DEI in a specific case, "the government does not violate the First Amendment by incorporating preexisting federal law" into a grant condition "and declining to detail hypothetical examples of things that might violate the law").

Second, Plaintiffs' argument is premised on the unsupported and speculative assumption that the Government will enforce HUD's certifications in bad faith by targeting legal diversity-related conduct. Pls.' Mem. at 48. Prognostication about bad-faith future enforcement actions cannot sustain a facial First Amendment challenge. *See Hansen*, 599 U.S. at 782, 785 (rejecting First Amendment overbreadth challenge because plaintiff relied on "hypotheticals" and "speculative shot at the bad"). And, in any event, such speculation is contrary to the presumption of good faith that courts routinely accord the Government. *See, e.g.*, *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) (referring to the "presumption of regularity" that "attaches to the actions of Government agencies"); *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("[U]nlike in the case of a private party, [the courts] presume the [G]overnment is acting in good faith."); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("[G]overnment actors . . . are accorded a presumption of good faith because they are public servants, not self-interested private parties."), *aff'd*, 563 U.S. 277 (2011).[7] In any potential individual enforcement action, Plaintiffs would, of course, have the opportunity to argue their conduct does not violate the law. *See Nat'l Assoc. of Diversity Officers in Higher Educ.*, 167 F.4th at 104; *Nat'l Urban League*, 783 F. Supp. 3d at 104-105. But they cannot block Defendants' statutorily derived enforcement priorities at the outset based on the possibility that a hypothetical future enforcement action may target legal conduct.

Third, the Plaintiffs appear to misconstrue the False Claims Act as allowing liability based on a good-faith misunderstanding of the law that turns out to be incorrect. (Pls.' Mem. at 1, 48.) In the Plaintiffs' view, recipients must guess the Government's interpretation of antidiscrimination law and conform their speech to that interpretation, or risk all federal funding as well as liability under the False Claims Act. *Id.* But the False Claims Act is "a fraud statute"

---

[7] Relatedly, any argument that enforcement actions would be motivated by something other than targeting unlawful discrimination amounts to a selective-enforcement claim, which arises in an as-applied posture. *See Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1137-38 (D.C. Cir. 2023) (explaining that to assert a selective-enforcement claim, a plaintiffs must "demonstrate he was singled out for enforcement from among others similarly situated," which is "a fact-intensive and case-specific comparative inquiry") (citation omitted).

that punishes false statements made with a "culpable state of mind." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749-52 (2023) (emphasis added) (quotation marks omitted). The Act reaches neither "an innocent, good-faith mistake about the meaning of an applicable rule," nor "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015). Those limitations provides ample protection against the sort of unfair liability that worries Plaintiffs.

For the reasons listed above, the Court should reject Plaintiffs' invitation to encroach on the Executive's Article II authority to set its enforcement priorities under the guise of protecting free speech. "The President may determine his policy priorities and instruct his agents to make funding decisions based on them." *Nat'l Ass'n of Diversity Officers in Higher Educ.*, 167 F.4th at 101.

### C.    The challenged conditions do not violate the Fifth Amendment.

Plaintiffs argue that the provisions of the challenged conditions are too ambiguous for them to comply with "because they impose unclear, ill-defined prohibitions" that provide Defendants with "sweeping discretion over their enforcement." Pls.' Mem. at 49; *see also* Am. Compl. ¶¶ 323-334 (Count XII). Plaintiffs assert that HUD's antidiscrimination certifications fail to provide them with fair notice of what "anti-DEI" conduct is prohibited, or how a grant recipient could comply with HUD's conditions while also obeying Congress's statutory directives, *e.g.*, in FVPSA. Pls.' Mem. at 50-51. Plaintiffs additionally claim that HUD's Gender Ideology condition does not notify them about what conduct qualifies as "promoting" gender ideology, or about how Plaintiffs can comply with both that condition and conflicting regulatory directives. Pls.' Mem. at 51-52. Plaintiffs express similar concerns about the meaning of "promote" in HUD's abortion condition, and also about HUD's condition requiring Plaintiffs to generally comply with executive orders. Pls.' Mem. at 52.

As for the ACF Title IX Certification, Plaintiffs do not fault its actual language. Pls.' Mem. at 47. But even though that language requires only that a grant recipient assure ACF that

the recipient is, and will remain, compliant with Title IX, Plaintiffs nevertheless attempt to bootstrap a vagueness argument based on what they call the Administration's "novel and expanded view of when conduct would violate Title IX." Pls.' Mem. at 52-53.

The appropriate posture for the void-for-vagueness doctrine under the Fifth Amendment's Due Process Clause is as-applied. Facial challenges in the Due Process context "are typically disfavored because they 'often rest on speculation,' which leads to the risk of premature interpretation of statutes and regulations." *Draper v. Healey*, 98 F. Supp. 3d 77, 82 (D. Mass. 2015), *aff'd*, 827 F.3d 1 (1st Cir. 2016). "The First Circuit has similarly recognized that even 'where an enactment is alleged to be "impermissibly vague in all of its applications," . . . it is clear that such an allegation must first be considered in light of the facts of the case—i.e., on an as-applied basis.'" *Worman v. Healey*, 293 F. Supp. 3d 251, 267 (D. Mass. 2018) (alterations in original) (quoting *Love v. Butler*, 952 F.2d 10, 13 (1st Cir. 1991)), *aff'd*, 922 F.3d 26 (1st Cir. 2019); *see also Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2013) (explaining that a claim that state regulation is vague, in violation of due process, is "a constitutional claim eligible only for as-applied, not facial, review"); *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) ("The mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that . . . is above suspicion in the ordinary course of administration.") (citation omitted). Because Defendants have not sought to enforce any of the challenged terms against Plaintiffs, (Fernandez Decl. ¶ 13; Chon Decl. ¶ 22; Baugh Decl. ¶ 18), Plaintiffs' Fifth Amendment claim fails insofar as it is premised on the void-for-vagueness doctrine. *See Nat'l Assoc. of Diversity Officer in Higher Educ.*, 167 F.4th at 100–102 (rejecting identical due-process challenge to Anti-DEI Order provisions). Absent an enforcement action, Plaintiffs' vagueness challenge is premature.

The challenged language uses common words with well-understood meanings. The challenged grant provisions, which use common words and phrases such as "promote," "violate," "compliance," "certify," and "material," are no more ambiguous than a host of previously upheld

grant provisions. Even criminal statutes need not define every ordinary word they use. Where challenged language does not define a word, it is simply read with "its ordinary meaning." *See, e.g., City of Providence*, 954 F.3d at 31 ("When Congress uses a term in a statute and does not define it, we generally assume that the term carries its plain and ordinary meaning."); *United States v. Kuzma*, 967 F.3d 959, 968-69 (9th Cir. 2020) (holding that the word "designed" in a criminal statute was not unconstitutionally vague). Even under the higher standard applied to criminal laws, courts have rejected facial vagueness challenges to the sort of ordinary terms that Plaintiffs criticize here. *See, e.g., Marquez-Reyes v. Garland*, 36 F.4th 1195, 1201-07 (9th Cir. 2022) (rejecting facially overbroad challenge to statute that made noncitizens ineligible for relief from removal if they knowingly "encouraged" another noncitizen to unlawfully enter the United States because its meaning was clear in the context of criminal law); *ACLU of Tenn. v. City of Memphis*, No. 17-cv-02120, 2020 WL 5630418, at *17 (W.D. Tenn. Sept. 21, 2020) (finding the phrase "cooperate with" is not ambiguous and not overly broad or confusing in the context of a consent decree). If such language satisfies due process in criminal statutes, it plainly suffices in the context of federal grant agreements.

Moreover, ACF's Title IX Certification and HUD's two antidiscrimination CoC certifications on their face simply require compliance with federal law. These certifications involve nothing more than a clear and unequivocal requirement that a grantee abide by existing law. A requirement to follow existing law cannot plausibly be deemed unconstitutionally vague, especially here, where Plaintiffs admit they already comply with existing antidiscrimination laws. Pls.' Mem. at 20. The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). While this doctrine may demand scrutiny of laws that identify *new* conduct for punishment, it has little bite with respect to existing laws.

Finally, federal regulations expressly provide grant recipients with notice and an opportunity to cure or appeal prior to the termination or cancellation of funding for non-

compliance with the terms and conditions of the grants. *See, e.g.*, 2 C.F.R. §§ 200.341, 200.342 (uniform requirements); 24 C.F.R. § 578.99(e) (CoC); 24 C.F.R. §§ 570.496, 570.502, 570.900(b)(5)-(7), 570.910(a) (CDBG); *id.* § 576.501(b) (ESG grantee opportunity to cure); *id.* § 92.552 (same for HOME-ARP); 45 C.F.R. § 75.374 (HHS). These provisions ensure that recipients are afforded meaningful procedural protections before any adverse funding action for non-compliance is finalized. Accordingly, Plaintiffs cannot plausibly establish a deprivation of due process for future enforcement actions.

### III.    Plaintiffs' ultra vires claim fails.

The Supreme Court has "strictly limited" the scope of ultra vires review, reasoning that "ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes" like the APA. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (noting than an ultra vires claim "is essentially a Hail Mary pass-and in court as in football, the attempt rarely succeeds" (quotation omitted)). To discourage such attempted "end runs," the Supreme Court has held that ultra vires claims must fit within "painstakingly delineated procedural boundaries," and ultra vires review is available "only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition'* in a statute." *Id.* (quoting *Railway Clerks v. Assoc. for Benefit of Noncontract Emps.*, 380 U.S. 650, 660 (1965)).

Here, Plaintiffs offer no particularized argument in support of their ultra vires claim. Pls.' Mem. at 53-54; Am. Compl. ¶¶ 298-301 (Count IX). Instead, they devote a single paragraph to that claim, acknowledging that it merely repackages one of their APA arguments. Pls.' Mem. at 53-54. In other words, Plaintiffs "basically dress up a typical statutory-authority argument as an ultra vires claim." *Nuclear Regul. Comm'n*, 605 U.S. at 682. "That is a fairly common maneuver" in trying to bring an ultra vires claim—a maneuver that the Supreme Court has now squarely rejected. *Id.*

Ultra vires review is also unavailable where Congress has provided a meaningful avenue for judicial review—here, the APA. *See Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Congress enacted the APA to

enable courts to review appropriate challenges to final agency actions. Given this "alternative path to judicial review," *Nuclear Regul. Comm'n*, 605 U.S. at 681, which Plaintiffs have invoked, an additional ultra vires claim is improper.

Finally, even if ultra vires review were available here, Plaintiffs' ultra vires claim would fail on the merits for the same reason as their APA claim: Defendants have the discretion, pursuant to statutory authority, to adopt the challenged conditions, as explained above. *See* Argument, Section I(B) at 16-20, *supra*.

IV.    **Because the appropriate remedy for APA violations is to enjoin past agency action giving rise to the suit, the Court should deny Plaintiffs' request for forward-looking injunctive relief.**

As Defendants have explained above, Plaintiffs' claims fail for multiple reasons and, as a result, there is no basis on which to vacate the challenged grant conditions.

Should the Court disagree and invalidate the contested grant conditions, the only proper remedy would be to stay or vacate the contested conditions and remand the case to HHS and HUD. Should the Court nevertheless issue an injunction, it should tailor that injunction narrowly to encompass only the agency actions that HUD and HHS have taken and that the Court concludes are unlawful. Finally, the Court should not issue any relief that constrains any future administrative action that HUD and HHS might take. Such prospective relief, based solely on Plaintiffs' speculation, exceeds this Court's jurisdiction, would improperly revise the discretion that Congress granted to these agencies by statute to operate certain grant programs, and thus would interfere with the proper separation of powers.

A.    **Should the Court grant Plaintiffs' motion, the only proper remedy would be vacatur of the contested agency action and remand to the Defendants to administer the contest grant programs within their statutory authorization.**

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996). Section 706 of the APA authorizes two forms of relief. A reviewing court may either:

(1)  compel agency action unlawfully held or unreasonably delayed, 5 U.S.C. § 706(1), or

(2)  "hold unlawful and set aside agency action" on certain statutorily enumerated grounds, 5 U.S.C. § 706(2).

What the APA does not authorize is "jurisdiction to order specific relief." *See, e.g.*, *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005);[8] *see also Me. Med. Ctr. v. Burwell*, 841 F.3d 10, 16 (1st Cir. 2016) (applying *Palisades*).

To ensure that reviewing court does not "intrude upon the domain which Congress has exclusively entrusted to an administrative agency," *SEC v. Chenery Corp.*, 318 U.S. 80, 88, (1943), and "under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (quoting *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)). Accordingly, any relief that this Court might order in this case should be limited to remedying improper agency action and must leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand and thus allow HUD and HHS to decide how to structure the grant programs at issue this case consistent with their lawful authority. *See* Background, Sections I (HUD), at 2-6 & II (HHS), at 6-13, *supra*.

Plaintiffs contend that this Court should do more by assuming the conclusion that injunctive relief is necessary because of their speculation that a stay or vacatur of the contested

---

[8]     *See also* 426 F.3d at 403:

The district court had no jurisdiction to order specific relief. Unlike a district court managing a "garden variety civil suit," a district court reviewing a final agency action "'does not perform its normal role' but instead 'sits as an appellate tribunal.'" *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (quoting *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)). Thus, "'under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards.'" *Id.*

conditions would not sufficiently redress their alleged injuries. Pls.' Mem. at 55. As a matter of law, the very authorities that they cite in support of a broader remedy undermine that requested result.

In *Monsanto Co. v. Geertson Seed Farms*, the Supreme Court invalidated a forward-looking injunction precisely because vacatur of the contested agency action—"a less drastic remedy"—was sufficient. 561 U.S. 139, 166 (2010) (cited in Pls.' Mem. at 55). "[A]n injunction is a drastic and extraordinary remedy," the Court cautioned, and "no recourse to the additional and extraordinary relief of an injunction was warranted." 561 U.S. at 165, 166. And in *Texas v. Cardona*, the court entered an injunction only after repeated litigation with the same agency over the same subject involving "a similarly incorrect interpretation and application" of the agency's own guidance. *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024), *appeal dismissed sub nom. Texas v. McMahon*, No. 24-10910, 2025 WL 2840825 (5th Cir. Apr. 23, 2025) (cited in Pls.' Mem. at 55). That does not come close to describing this case.

Plaintiffs expose the purely speculative grounds for their request for injunctive relief by contending that "this Administration"—not the Defendants in this case—"has previously sought to re-impose funding conditions"—for grant programs wholly unrelated to those in this case— "that a court had vacated." Pls.' Mem. at 56. And the authority that Plaintiffs cite for this proposition does not support what happened in that case, in which the relevant agency has filed a notice of appeal. In *Illinois v. FEMA*, the agency was not seeking to reimpose invalidated funding terms. Instead, after this Court invalidated the relevant funding terms, the agency drafted a contingency term in its grant conditions going forward that, if the district court's decision invalidating those terms were "stayed, vacated, or extinguished," only then would those grant conditions spring back into effect. *See* Defs.' Resp. in Opp'n to Pls.' Mot. to Enforce or to Clarify at 1-2 (Oct. 10, 2025) (ECF No. 74), *Illinois v. FEMA*, No. 25cv206-WES-PAS (D.R.I.).

The remainder of Plaintiffs' cited grounds for injunctive relief concerning the conditions at issue before this Court only seek the same result that vacatur would—the inability of HUD and HHS to re-impose the grant conditions at issue in this case. Pls' Mem. at 56-58. Various legal

doctrines far short of an injunction—issue and claim preclusion, for instance—would offer the protection that Plaintiffs contend only an injunction could provide.

**B.     The Court should reject Plaintiffs' request to enjoin speculative, prospective agency action that might impose "similar" conditions.**

This Court lacks jurisdiction to grant Plaintiffs' request for injunctive relief directed at hypothetical future agency action by Defendants for multiple reasons.

First, Article III bars advisory relief concerning speculative future conduct. The Constitution limits the federal courts' jurisdiction to "cases" and "controversies." U.S. Const., art. III, § 2. As the Supreme Court has repeatedly emphasized, that limitation requires "a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 592 U.S. 53, 58 (2020); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 397 (2024) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."). Plaintiffs ask this Court to enjoin potential future policies or grant conditions that might adopt at some unspecified time. That request does not present a live controversy. It instead seeks judicial supervision of hypothetical agency action—precisely the type of advisory ruling Article III forbids.

Second, the Court should deny Plaintiffs' request for prospective relief under the ripeness doctrine. Even apart from Article III's core limitation, Plaintiffs' demand for prospective relief is unripe. *See, e.g.*, *Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*, 643 F.3d 16, 17 (1st Cir.), *cert. denied*, 565 U.S. 977 (2011); *cf. Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) (affirming denial of preliminary-injunction motion) ("A threat that is either unlikely to materialize or purely theoretical will not do."); *id.* ("Preliminary injunctions are strong medicine, and they should not issue merely to calm the imaginings of the movant."). "Ripeness is a justiciability doctrine" whose purpose is to prevent "courts from 'entangling themselves in abstract disagreements over administrative policies' and from improperly interfering in the administrative decision-making process." *City of Fall River v.*

*Fed. Energy Regulatory Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). "The burden to prove ripeness is on the party seeking jurisdiction." *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (affirming dismissal of pre-enforcement judicial review on ripeness grounds).

Courts apply a two-part test to determine whether a case is ripe for review, and both parts favor denial of Plaintiffs' requested relief for an injunction concerning some future policy that Defendants might (or might not) adopt. First, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also City of Fall River*, 507 F.3d at 6 (declining to review agency's conditional project approval for lack of ripeness). Both factors defeat Plaintiffs' request.

There is no final agency action to review. Agency action is not ripe for judicial review until an agency has made a final decision. *Abbott Labs.*, 387 U.S. at 149. And, for an agency review to be final, it must be both (a) "the consummation of the agency's decisionmaking process," and (b) a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177 (1997); *Abbott Labs.*, 387 U.S. at 148-49.

Here, Plaintiffs speculate about some "similar ***new*** policy . . . or similar conditions via a ***new*** agency action," Pls.' Mem. at 55 (emphases added), that this Court should remedy concedes the groundlessness of their request for prospective relief. That speculation underscores the absence of any final agency action. Without any agency action to review setting forth such "new" administrative decisionmaking, it is unclear what the Court would be assessing, how, and on what grounds, as well as what relief it could grant. *See, e.g.*, *Broderick v. di Grazia*, 504 F.2d 643, 645 (1st Cir. 1974) (reasoning, as part of a declaratory-judgment action, that a Police Commissioner's verbal threat of due-process violations in future was not ripe because "[a] court could only guess at how [the statement] might be translated into practice"); *City of Fall River*, 507 F.3d at 6 ("[A] claim is not ripe for adjudication if it rests upon contingent future events that

may not occur as anticipated, or indeed may not occur at all."); *cf. Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 79 (1st Cir. 1997) ("Disregarding available administrative processes thrusts parties prematurely into overcrowded courts and weakens an agency's effectiveness by encouraging end-runs around it.").

Under the second ripeness prong, a court must consider the hardship to both parties, but there is no hardship to Plaintiffs. The hardship prong likewise defeats ripeness. If, at some point, Defendants adopt a concrete policy that Plaintiffs believe is unlawful, Plaintiffs may challenge that final agency action at that time. *See City of Fall River*, 507 F.3d at 7; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998) ("The [plaintiff] thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain."). In short, withholding review imposes no present hardship—it only postpones adjudication until a real dispute materializes.

### C.    The Court should tailor any relief to Plaintiffs and not all applicants or grantees.

Plaintiffs also ask that the Court enjoin the challenged conditions "against any grantee, not just Plaintiffs' and their members." Pls' Mem. at 55, 55-58. They contend that doing so is necessary to afford Plaintiffs complete relief because, otherwise, Defendants would be more likely to award grants to applicants to whom they could apply the conditions. Pls. Mem. at 55. This argument, however, is based on two layers of speculation: (1) that other applicants would agree to the challenged conditions, and (2) that Defendants' grantmaking decisions would be influenced by any relief the Court provided. Plaintiffs do not offer any evidence of these claims and thus have not met their burden to obtain such relief. Any relief must be limited to the specific parties who establish standing. Because "standing is not dispensed in gross," plaintiffs must establish standing "for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted). Instead, were the Court to issue an injunction, it should be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (staying preliminary injunctions "to the extent that the

injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue").

## CONCLUSION

For the preceding reasons, Defendants ask the Court to enter summary judgment in their favor on all of Plaintiffs' claims and to deny Plaintiffs' summary-judgment motion.

Dated: March 13, 2026

U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT, *et al.*,

By their Attorneys,

CHARLES C. CALENDA
United States Attorney

*/s/ Andrea Hyatt*
Andrea Hyatt
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (Fax)
Email: Andrea.Hyatt@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, I electronically filed the foregoing document and the accompanying exhibits through this Court's Electronic Case Filing (ECF) system, which will serve it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E).

*/s/ Andrea Hyatt*
ANDREA HYATT
Assistant U.S. Attorney