**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-00342-MRD-PAS |

<u>**COMBINED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

    I.    Plaintiffs Are Entitled to Summary Judgment on their APA Claims ............................... 2

        A.    The New Conditions exceed Defendants' statutory authority.................................... 2

            1.    The Discrimination and Title IX Certifications exceed Defendants' authority ... 3

            2.    The other Conditions exceed Defendants' authority .......................................... 4

        B.    Multiple "Gender Ideology"-Related Conditions are contrary to law ....................... 6

        C.    The New Conditions are arbitrary and capricious....................................................... 7

        D.    HUD unlawfully failed to undertake notice and comment before imposing the New Conditions .................................................................................................. 10

        E.    The New Conditions must be set aside as unconstitutional ..................................... 12

    II.    Plaintiffs Are Entitled to Summary Judgment on their Constitutional Claims................. 12

        A.    The New Conditions violate the Spending Clause and other constitutional separation-of-powers provisions ................................................................. 12

        B.    The "Gender Ideology"-Related Conditions and DEI-Related Conditions violate the First Amendment ..................................................................... 13

            1.    The conditions restrict speech outside the scope of the federally funded program ....................................................................................... 14

            2.    The conditions go beyond requiring compliance with existing law and unconstitutionally chill speech........................................................... 15

        C.    The New Conditions are unconstitutionally vague .................................................. 17

    III.    The Court Need Not Reach Plaintiffs' Ultra Vires Claim Given Defendants' Concession that APA Review Is Available.................................................................. 20

    IV.    Injunctive Relief Is Warranted to Redress Plaintiffs' Harm........................................... 21

        A.    An injunction is warranted because vacatur alone will not protect Plaintiffs from harm .................................................................................................. 21

        B.    To provide Plaintiffs complete relief, the injunction should bar Defendants from imposing the challenged conditions on any applicant or grantee, not just Plaintiffs and their members.............................................................. 24

CONCLUSION.................................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)..................................................................... 17

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) .............................. 15

*Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28 (1st Cir. 2026) ............................................................ 8

*Bell v. Hood*, 327 U.S. 678 (1946).................................................................................................. 21

*Building and Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28
(D.C. Cir. 2002) ....................................................................................................................... 18

*Chamber of Com. of U.S. v. FEC*, 69 F.3d 600 (D.C. Cir. 1995) .................................................. 17

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ................................................................. 13, 14

*Cnty. of L.A. v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999).............................................................. 22

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)......................................................................... 25

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020)................................ 8

*Draper v. Healey*, 98 F. Supp. 3d 77 (D. Mass. 2015) ............................................................ 18, 19

*Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016)................................................................................. 18

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................................... 10

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)...................................... 21

*Freedom Network USA v. Trump, 12419,* No. 25-cv-12419, 2026 WL 800392 (N.D.
Ill. Mar. 23, 2026) .............................................................................................................. 16, 25

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965).................................................................... 24

*FTC v. Pukke*, 53 F.4th 80 (4th Cir. 2022) .................................................................................... 23

*Furtado v. Oberg*, 949 F.3d 56 (1st Cir. 2020).................................................................... 3, 4, 8

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658
(D.C. Cir. 1978) ....................................................................................................................... 12

*Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2908807 (D.R.I. Oct. 14, 2025)........................... 23

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ................................................. 2

*Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) .................................................. 18

*Manguriu v. Lynch*, 794 F.3d 119 (1st Cir. 2015) ........................................ 11

*Maynard v. Cartwright*, 486 U.S. 356 (1988)................................................. 19

*Me. Med. Ctr. v. Burwell*, 841 F.3d 10 (1st Cir. 2016)................................... 22

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)......................... 22

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)................................... 13, 14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)........................................................................................ 8

*N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018)............................. 11, 12

*Nat'l Ass'n of Broadcasters v. FCC*, 147 F.4th 978 (D.C. Cir. 2025).......... 2

*Nat'l Ass'n of Diversity Officers in Higher Educ. (NADOHE) v. Trump*, 167 F.4th 86 (4th Cir. 2026)..................................................................... 17

*City of Los Angeles v. Sessions*, No. 18-cv-7347, 2019 WL 1957966 (C.D. Cal. Feb. 15, 2019) ....................................................................................... 25

*Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665 (2025)............................... 20

*Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400 (D.C. Cir. 2005) .......... 22

*R.I. Coal. Against Domestic Violence (RICADV) v. Bondi*, 794 F. Supp. 3d 58 (D.R.I. 2025) ........................................................................................ 7, 10

*S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) ....... 18

*Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014) ................ 9

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025)................................................... 24

*United States v. Stevens*, 559 U.S. 460 (2010)............................................... 7

*United States v. Zhen Zhou Wu*, 711 F.3d 1 (1st Cir. 2013) ......................... 18

*Worman v. Healey*, 293 F. Supp. 3d 251 (D. Mass. 2018) ...................... 18, 19

*Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994)...................................... 11

**FEDERAL STATUTES**

5 U.S.C.
    § 553............................................................................................................ 11
    § 703............................................................................................................ 21
    § 706............................................................................................................ 12

42 U.S.C.
    § 11386.......................................................................................................... 4

**FEDERAL REGULATIONS**

24 C.F.R.
    § 5.106.......................................................................................................... 6
    § 10.1.............................................................................................. 10, 11, 12

45 C.F.R.
    § 1370.5..................................................................................................... 6, 20

**OTHER AUTHORITIES**

Executive Order No. 14,168, 90 Fed. Reg. 8615 (2025) ................................................................ 6

HUD, *HUD Community Planning and Development CPD Programs,* HUD (2026),
https://perma.cc/WWZ4-JDKH ................................................................................................... 4

**INTRODUCTION**

The Departments of Housing and Urban Development and Health and Human Services seek to subject organizations to unlawful funding conditions that threaten those organizations' lifesaving work helping unhoused populations and survivors of domestic violence and sexual assault. Those new conditions are unlawful under the APA and the Constitution, and Plaintiffs are entitled to summary judgment.

Defendants offer no persuasive reason to deny Plaintiffs' motion for summary judgment or to grant Defendants' own motion. At bottom, Defendants contend that the new conditions do not actually do much—and just require grantees (1) to comply with existing law and (2) to use grant funds for their intended purposes. That blinks reality. Multiple conditions require compliance with executive orders—even though the executive branch cannot impose obligations on private parties through the fiat of executive order. And while other new conditions require organizations to certify their compliance with existing nondiscrimination laws, the certifications go well beyond just reiterating existing requirements. They expressly deter diversity, equity, and inclusion activities and force grantees to concede materiality under the False Claims Act—all part of Defendants' project to use the False Claims Act as a "weapon" in effectuating their ideological views. All of that is unlawful.

The other new conditions—barring grantees from using grant funds to "promote gender ideology" or "elective abortion"—stray beyond merely ensuring that grant funds are used for the purposes Congress intended. That goal is accomplished by preexisting restrictions that allow funds to be used only for housing and other authorized support. These new conditions, by contrast, bar grantees from engaging in activity that falls within the scope of what Congress authorized—like recognizing and respecting a transgender individual's gender identity or giving

1

a victim of reproductive coercion information about medical options. Those conditions are unlawful as well.

The Court should deny Defendants' motion for summary judgment, grant summary judgment to the Plaintiffs, vacate the challenged conditions, and permanently enjoin Defendants from imposing or enforcing them in their current or any substantially similar form, allowing Plaintiffs to continue their critical work in accordance with Congress's directives.

## ARGUMENT

## I.      Plaintiffs Are Entitled to Summary Judgment on their APA Claims

The New Conditions must be set aside under the APA, and Defendants fail to show otherwise.

### A.  The New Conditions exceed Defendants' statutory authority

Defendants offer no persuasive response to Plaintiffs' claim that Defendants acted beyond their statutory authority in imposing the New Conditions. At the outset, Defendants misstate the standard of review that applies to this claim. *See* Defs' Combined Cross-Mot. For Summ. J. and Opp'n to Pls.' Summ. J. Mot. (Defs.' Mem.) at 14-15 (Dkt. No. 98). While a "deferential" standard of review applies to claims that an agency action is arbitrary and capricious, *see* Defs.' Mem. at 15, no deference applies "in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); *see also, e.g.*, *Nat'l Ass'n of Broadcasters v. FCC*, 147 F.4th 978, 991 (D.C. Cir. 2025) (explaining that whether an agency "exceeded its statutory authority is a question of law [courts] review *de novo*").

And Defendants fail to point to any statute authorizing them to impose the New Conditions. Instead, at bottom, Defendants argue (at 1) that they have the requisite authority because (1) the antidiscrimination and Title IX certifications "simply require … adhere[nce] to

2

preexisting legal requirements" and (2) other conditions just ensure that "funds are expended in a manner consistent with statutory objectives." Neither justification holds water.

### 1.   The Discrimination and Title IX Certifications exceed Defendants' authority

While Defendants have authority to require grantees to certify they will comply with Title IX and other antidiscrimination laws, Plaintiffs' opening brief explains (at 30-33) that the particular certifications here exceed Defendants' statutory authority for two reasons: (1) these certifications go beyond requiring compliance with the law and (2) they force grantees to concede False Claims Act materiality. Each antidiscrimination or Title IX certification that Plaintiffs challenge has one or both of these flaws.[1] *See* Mem. i.s.o. Pls.' Mot. for Summ. J. (Pls.' Mem.) at 31 n.6, 32 n.9 (identifying which certifications have which problems).

Defendants do not even acknowledge these points, let alone respond to them—and therefore have waived any defense to this claim. *See Furtado v. Oberg*, 949 F.3d 56, 59 (1st Cir. 2020) (holding that courts may treat a party's failure "to respond to a properly raised argument for summary judgment as waiver"). The closest Defendants come is to argue (at 17) that "the ACF Title IX Certification['s]" text only requires compliance with Title IX, and not with the "Gender Ideology" Executive Order. But that is nonresponsive because Plaintiffs do not claim that *the ACF Title IX Certification* goes beyond requiring compliance with existing law.[2] *See* Pls.' Mem. at 31 n.6. *Other* certification requirements[3] do—and Defendants make no attempt to

---

[1] These certifications are the General HUD Anti-DEI Certification, HUD Discrimination Certification, HHS Discrimination Certification, April GPS Discrimination Certification, May ACF Discrimination Certification, HHS Title IX Certification, and ACF Title IX Certification.

[2] The ACF Title IX Certification exceeds Defendants' authority because it requires grantees to concede FCA materiality. Pls.' Mem. at 32 n.9.

[3] As Plaintiffs' opening brief explains (at 31 n.6), the General HUD Anti-DEI Certification, the original version of the HUD Discrimination Certification, the HHS Title IX Certification, and the

3

contend otherwise. Defendants also entirely fail to respond to Plaintiffs' point that Defendants lack authority to require grantees to certify to FCA materiality—so Defendants have effectively conceded this point as well. *See Furtado*, 949 F.3d at 59.

### 2.    *The other Conditions exceed Defendants' authority*

Defendants likewise fail to identify any statute that provides them authority to impose the remaining conditions—the HUD "Gender Ideology" Condition and HUD Abortion Condition, which bar recipients of grants administered by HUD's Office of Community Planning and Development (CPD) from using grant funds to "promote 'gender ideology'" or "promote elective abortions," respectively, as well as various conditions that require recipients to comply with executive orders.[4]

Defendants claim (at 18) that the HUD "Gender Ideology" and Abortion Conditions are authorized by 42 U.S.C. § 11386(b)(8), which authorizes HUD to impose conditions to "carry out" the Continuum of Care (CoC) program "in an effective and efficient manner." That is doubly incorrect. First, as Plaintiffs' opening brief pointed out (at 29), that provision authorizes conditions only for CoC grants—yet HUD has applied these conditions across the board to *all* grant programs administered by HUD's Office of Community Planning and Development, including (among others) the Community Development Block Grant, Emergency Solutions Grants, and Housing Opportunities for Persons with AIDS program.[5] As Plaintiffs previously

---

April GPS and May ACF Discrimination Certifications go beyond requiring compliance with the law.

[4] In particular, those conditions are the General HUD E.O. Condition, the HUD CPD E.O. Condition, and the SAMHSA E.O. Condition, which apply to all HUD grants, HUD CPD grants, and grants by HHS's Substance Abuse and Mental Health Services Administration (SAMHSA), respectively.

[5] Without citing any evidence, Defendants claim (at 3 n.2) that Home Investment Partnerships—American Rescue Plan (HOME-ARP) grants "have never been subject to those conditions, and Plaintiffs offer no evidence that they will be." But HOME-ARP grants are administered by CPD,

4

noted (at 29), this provision grants HUD no authority with respect to CPD programs other than the CoC program. Defendants offer no response on that.

Second, the statutory provision that Defendants cite does not authorize the conditions for the CoC program either. Defendants contend (at 18) that the conditions ensure that grant funds are used for the CoC program's designated purposes of providing "hous[ing] and … supportive services for the homeless," and not to promote "gender ideology" or abortion. But this misses that grantees could be performing exactly the services that the CoC program is meant to fund while also engaging in conduct that HUD might deem to impermissibly promote "gender ideology" or abortion—like using clients' preferred pronouns or providing information about reproductive options to a sexual assault victim with an unwanted pregnancy who turns to a CoC-funded program for safety. Plaintiffs explained this in their opening brief (at 29-30), and Defendants simply ignore it.

Defendants also attempt to defend the HUD Abortion Condition by pointing out that "[t]he Hyde Amendment is routinely enacted as part of annual appropriations legislation to bar the use of federal funds for abortion services." Defs.' Mem. at 18 (cleaned up). However, the Hyde Amendment applies to HHS, not HUD, and Congress has not enacted any comparable restriction on HUD funding. Again, Plaintiffs pointed this out in their opening brief (at 12), but Defendants offer no response. Because the Hyde Amendment does not apply to HUD's funding, it necessarily cannot authorize the HUD Abortion Condition.

As for the conditions requiring grantees to comply with executive orders, Defendants point to no statute that they claim provides the needed authority. Instead, Defendants point out

---

and the Administrative Record shows that CPD staff were instructed to impose these conditions on "all Grantees." HUD-AR 119; *see also* HUD, *HUD Community Planning and Development CPD Programs,* HUD (2026), https://perma.cc/WWZ4-JDKH.

that one particular executive order (the "Gender Ideology" Order) states that agencies must implement the order "consistent with applicable law" and claim that the order therefore cannot "require agencies to act beyond their statutory authority." Defs.' Mem. at 18-19 (citing Exec. Order No. 14,168 § 8(b), 90 Fed. Reg. 8615, 8618 (2025). That conclusion does not follow. Regardless of what the executive order directed agencies to do, Defendants have in fact imposed conditions requiring grantees to comply with executive orders, including the "Gender Ideology" Order. HUD-AR 43, 51-52, 119, 292; HHS-AR 995, 1019. They do not have statutory authority to do that—and Defendants point to no statute even purportedly conferring such authority, nor can they, as no such statutory authority exists.

For all these reasons, the New Conditions exceed Defendants' statutory authority and may be set aside for that reason alone.

### B.  Multiple "Gender Ideology"-Related Conditions are contrary to law

Defendants also offer no persuasive response to Plaintiffs' claim that various "gender ideology"-related conditions must be set aside as contrary to law. As Plaintiffs' opening brief explains (at 38-39), various conditions require grantees to implement the Administration's view that a person cannot have a gender identity separate from their sex assigned at birth. For grantees performing grants administered by HUD's Office of Community Planning and Development or grants under FVPSA, these conditions[6] conflict with binding regulations that expressly require grantees to treat people in accordance with their gender identity. *See* 24 C.F.R. § 5.106(b) (HUD CPD grants); 45 C.F.R. § 1370.5(a) (FVPSA grants). Defendants do not show otherwise.

---

[6] These conditions are the HUD "Gender Ideology" Condition, the HUD CPD E.O. Condition and General HUD E.O. Condition (which require compliance with the "Gender Ideology" Executive Order), and the ACF Title IX Certification.

On the conflict with the HUD CPD regulations, Defendants' sole response (at 20) is that HUD has stated—in a declaration filed at the preliminary relief stage of this case—that it "will not enforce a grant condition where it conflicts with applicable statutory requirements." Defs.' Mem. at 20 (citing Declaration of Claudette Fernandez ¶ 9 (Dkt. No. 43-1)). But an agency cannot salvage an unlawful requirement by promising not to enforce it. *Cf. United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). Besides, one HUD official's litigation statement that *HUD* will not enforce the requirements provides no assurance that *other* actors—notably, DOJ and private qui tam relators—would not seek to enforce the requirements under the False Claims Act. As Judge Smith held in addressing other unlawful funding conditions, an agency's "assurances" that it "will be reasonable" in applying the conditions "is cold comfort." *R.I. Coal. Against Domestic Violence (RICADV) v. Bondi*, 794 F. Supp. 3d 58, 71-72 (D.R.I. 2025).

On the conflict with the FVPSA regulations, Defendants similarly respond (at 19-20) by pointing out that the relevant terms and conditions—the ACF Standard Terms, which apply to FVPSA grants—contain a "savings clause" providing that "[a]ll applicable statutory or regulatory provisions supersede any conflicting or inconsistent" terms and conditions. HHS-AR 384 (citing ACF Standard Terms and Conditions). This, too, does not salvage the ACF Title IX Certification insofar as it leaves grantees unclear on what their obligations are.

## C. The New Conditions are arbitrary and capricious

As Plaintiffs' opening brief explains (at 33-38), the New Conditions are arbitrary and capricious for several reasons: Defendants failed to consider multiple independent aspects of the problem; failed to provide virtually any contemporaneous explanation; and failed to show that there are good reasons for the change in policy, or in some instances to even acknowledge that

7

the New Conditions were a change in policy at all. Defendants offer no effective response to these points—each one of which is reason alone to set aside the New Conditions as arbitrary and capricious.

First, Defendants completely fail to respond to Plaintiffs' arguments that, in imposing the New Conditions, Defendants failed to consider multiple important aspects of the problem— including how the conditions would make it impossible to effectively serve transgender and nonbinary people, chill grantees from engaging in lawful DEI activities and result in fewer services to populations that are already underserved, harm victims of domestic violence subject to reproductive coercion, and leave grantees with grave uncertainty about how to comply with vague requirements. *See* Pls.' Mem. at 36-38. Nor do Defendants show that they considered the reliance interests of grantees and the survivors they serve. *See* Pls.' Mem. at 37-38. Defendants have therefore waived any defense to those points. *See Furtado*, 949 F.3d at 59 (holding that courts may treat a party's failure "to respond to a properly raised argument for summary judgment as waiver"). That waiver alone warrants setting aside the New Conditions as arbitrary and capricious.

Second, Defendants fall short in attempting to show that they provided a "satisfactory explanation" for the New Conditions. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). They start by pointing to their briefing in this case. *See* Defs.' Mem. at 21. But it is black-letter administrative law that arbitrary-and-capricious review looks to "the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 20 (2020) (cleaned up). An agency "cannot rely on post-hoc rationalizations developed and presented during litigation." *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 34 (1st Cir. 2026) (cleaned up). Defendants also claim (at 21)

that the lack of explanation does not matter because "the rationale for the conditions is self-evident." But the Court already rightfully rejected this argument at the preliminary relief stage. Am. Mem. and Order at 17-18 (Dkt. No. 77); *see also, e.g.*, *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) ("[T]he wisdom of agency action is rarely so self-evident that no other explanation is required.").

While Defendants now also point to (thin) explanations in the administrative record, those explanations fall short. As justification for HUD's new conditions, Defendants point to a social media post by the HUD Secretary saying that the conditions would ensure that CoC funds would be used "to fight homelessness" and not to "promote DEI, enforce 'gender ideology,' [or] support abortion." Defs.' Mem. at 21-22 (citing HUD-AR 291). As an initial matter, this conclusory statement includes no rationale. Moreover, that social media post was before the Court at the preliminary relief stage, and the Court already deemed it insufficient. *See* Pls.' Mem. i.s.o. Mot. for Relief under 5 U.S.C. § 705 and for Preliminary Injunction at 8 (Dkt. No. 30-1); Am. Mem. and Order at 17-18 (Dkt. No. 77). That was for good reason, because this post fails to acknowledge that promoting diversity, respecting transgender and nonbinary individuals' identity, and providing information about abortions does not detract from fighting homelessness. On the contrary, those now-forbidden activities can be key to making homelessness services effective. *See* Pls.' Mem. at 36-37.

For the HHS Conditions, Defendants point to a memo stating that the agency imposed the Title IX Certification "to ensure financial assistance recipients are compliant with … [the 'Gender Ideology' Executive Order]." Defs.' Mem. at 22 (citing HHS-AR 2). But that just states what the condition does, not the reasons for it. Moreover, as Plaintiffs' opening brief explains (at 35)—and Defendants do not dispute—an agency cannot avoid providing a reasonable

9

explanation "by simply deferring to the relevant Executive Order." *E.g.*, *RICADV v. Bondi*, 794 F. Supp. 3d at 70 (cleaned up). As for HHS's Discrimination Certifications, the only (purported) explanation Defendants point to is a letter from HHS's Administration for Children and Families about HHS's disfavor of "awards supporting diversity, equity, and inclusion (DEI)." Defs.' Mem. at 22 (citing HHS-AR 377). But that letter does not appear to address any grant condition at issue in this case, but rather addresses the agency's separate decision to direct grantees "to review" their funded programs "to ensure that they do not support DEI initiatives." HHS-AR 377. Nothing in the record explains why HHS saw a need to impose new anti-DEI certification requirements. And Defendants point to nothing at all in the record explaining the SAMHSA E.O. Condition requiring recipients to comply with all executive orders.

Third, in response to Plaintiffs' argument (at 38) that the agencies have failed to even display awareness that the various discrimination-related certifications are a change in policy, Defendants just double down—and claim that there was no change because "[f]ederal law *already* prohibits grantees from violating" antidiscrimination laws. Defs.' Mem. at 20-21. But that ignores that the challenged conditions now—newly—single out DEI, expressly require compliance with the "Gender Ideology" Executive Order, and require grantees to concede FCA materiality. This failure to "display awareness that it is changing position" shows that Defendants have failed to "provide reasoned explanation for [their] action." *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

### D. HUD unlawfully failed to undertake notice and comment before imposing the New Conditions

Plaintiffs' opening brief explains (at 39-40) that HUD unlawfully imposed the New Conditions without notice and comment that HUD regulations require. 24 C.F.R. § 10.1. Defendants' responses all miss the mark.

First, Defendants contend (at 23) that requiring HUD to undertake notice and comment would be "in direct conflict with the APA." It would not. To be sure, the APA does not require notice-and-comment rulemaking for "matter[s] relating to … grants." 5 U.S.C. § 553(a)(2). But the relevant HUD regulation specifically requires HUD to undertake notice and comment for "matters that relate to … grants … even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. § 10.1. Thus, HUD has itself committed to undertake notice and comment beyond what the APA requires—and that presents no conflict.

Defendants also briefly suggest (at 24) that the HUD regulation, 24 C.F.R. § 10.1, does not actually "establish any substantive obligation by which HUD must abide." But it is well established that "agencies must comply with their own regulations." *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015). And at least one court of appeals has specifically held that this regulation requires HUD to "proceed by notice and comment rulemaking whenever it promulgates a substantive rule." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994).

Next, Defendants emphasize (at 23) that the regulation requires notice and comment only for substantive rules, and not "general statements of policy." But, contrary to Defendants' contention (at 23-24), the New Conditions are not mere statements of policy. Rather, as Plaintiffs previously explained (at 39-40), they are substantive rules because they "impose obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (cleaned up). Defendants protest (at 24) that one condition appears in a document with "Policy Requirements" in the title and that others appear in the grant agreements. But that has no bearing on whether the conditions are substantive rules or just statements of policy. As the D.C. Circuit put it, "[t]he form" of an agency action "is obviously not

11

controlling"; rather, "substance and effect will determine whether [it] is a 'general statement of policy.'" *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978). And the "substance and effect" of the New Conditions are to restrict what grantees can do. Indeed, Defendants do not—and could not—contest that the New Conditions "impose[] obligations," an effect that the First Circuit makes clear renders an agency action a substantive rule. *N.H. Hosp. Ass'n*, 887 F.3d at 70.

Finally, Defendants misread the regulation in asserting (at 24) that the regulation "applies only to 'notice of proposed rulemaking,'" which the New Conditions are not. The regulation requires HUD to issue a "notice[] of proposed rulemaking" when taking a covered action—it does not provide that notice and comment are required only when HUD chooses to issue a notice of proposed rulemaking. *See* 24 C.F.R. § 10.1.

### E.  The New Conditions must be set aside as unconstitutional

The New Conditions also must be set aside under the APA because they are contrary to multiple constitutional provisions. 5 U.S.C. § 706(2)(B); *see also* Pls.' Mem. at 38. Defendants' attempts to defend the constitutionality of the New Conditions fail for the reasons explained below. *See infra* Section II.

## II.    Plaintiffs Are Entitled to Summary Judgment on their Constitutional Claims

### A.  The New Conditions violate the Spending Clause and other constitutional separation-of-powers provisions

Plaintiffs are also entitled to summary judgment on their claim that the New Conditions violate the Spending Clause and other constitutional provisions safeguarding the separation of powers. *See* Pls.' Mem. at 40-42. Defendants principally respond (at 25) that they can impose grant conditions because "[n]othing in the Constitution requires Congress to codify every operational requirement of a grant program in statutory text before it may be enforced." That is a

12

red herring. Plaintiffs do not claim that executive agencies can never impose grant terms, but rather claim that they can do so only if authorized by Congress—that is, the executive branch does not have constitutional authority to impose conditions on appropriated funds without statutory authorization. Defendants do not, and could not, refute that point. Instead, Defendants contend (at 25) that this claim "collapses" because, in their view, Congress granted Defendants authority to impose the New Conditions. But Congress did not, in fact, authorize these conditions for all the reasons explained above. *See supra* Section I.A; *see also* Pls.' Mem. at 28-33.

### B. The "Gender Ideology"-Related Conditions and DEI-Related Conditions violate the First Amendment

As Plaintiffs' opening brief explains (at 43-48), the conditions requiring grantees to implement the Administration's views on gender as well as conditions implementing the Anti-DEI Executive Order violate the First Amendment.[7]

In response, Defendants first incorrectly assert in passing (at 26) that Plaintiffs cannot meet the standard for "facial challenges" under the First Amendment. A government action is facially unconstitutional under the First Amendment "if the law's unconstitutional applications substantially outweigh its constitutional ones." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723-24 (2024). Importantly, in making this assessment, courts should not consider applications in which the challenged provisions "do no work"—i.e., where the conduct that the challenged provision proscribed would be unlawful anyway, "irrespective of" the provision. *See City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015). Rather, courts must "consider[] only applications of the

---

[7] The conditions unconstitutionally requiring grantees to implement the Administration's views on gender are the HUD "Gender Ideology" Condition as well as the conditions requiring grantees to follow the "Gender Ideology" Executive Order—the HUD CPD E.O. Condition, General HUD E.O. Condition, and SAMHSA E.O. Condition. The conditions implementing the Anti-DEI Executive Order are the HHS Discrimination Certification, April GPS HHS Discrimination Certification, May ACF Discrimination Certification, HUD Discrimination Certification.

[provision] in which it actually authorizes or prohibits conduct." *Id.* at 418. Plaintiffs' facial challenges prevail under this standard. Defendants point to one constitutional application of the DEI-related certifications—they require grantees not to violate "existing legal obligations" under federal civil rights laws. Defs.' Mem. at 28. But the certifications do not "actually … prohibit" those violations; the civil rights laws already do that. *See City of Los Angeles*, 576 U.S. at 418. Those applications in which the challenged certifications "do no work" are irrelevant in assessing facial invalidity. *Id.* at 419. And Defendants do not identify any constitutional applications of the "Gender Ideology"-related conditions that could even potentially save them from facial invalidity. Instead, Defendants just (incorrectly) claim that those conditions have no unconstitutional applications at all. *See* Defs.' Mem. at 26-28. The New Conditions unconstitutionally curb protected speech and must be struck down on their face to provide needed "breathing room for free expression." *Moody*, 603 U.S. at 723.

Aside from their cursory objection that Plaintiffs cannot mount a facial challenge, Defendants contend (at 26-30) that the DEI-Related and "Gender Ideology"-Related Conditions do not violate the First Amendment because (1) the conditions govern only government funding and not private speech and (2) the DEI-Related Conditions merely require compliance with existing law. Both of these contentions lack merit.

### 1. The conditions restrict speech outside the scope of the federally funded program

Contrary to Defendants' assertion (at 26-28), the "Gender Ideology"-Related and DEI-Related Conditions regulate private speech and are not limited to governing "what activities [the agencies] will fund." By their plain terms, the DEI-Related Conditions compel grantees to certify that they do not "operate *any* programs"—whether funded by the grant or not—that involve DEI activities that violate antidiscrimination laws. Defendants do not acknowledge this language, let

14

alone explain how the conditions are just about what the agencies will fund even though they expressly apply to "any" programs the grantees operate. *See generally* Defs.' Mem. at 26-31.

Plaintiffs' opening brief also explains (at 43-44) that the "Gender Ideology"-Related Conditions do not merely limit what the government will fund either. Rather, they force grantees to "adopt—as their own—the Government's view" on gender because, for example, they appear to require grantees to refer to transgender and nonbinary individuals by the pronouns corresponding to their sex assigned at birth. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013). Thus, as this Court determined at the preliminary relief stage, these conditions unconstitutionally "require the affirmation of beliefs that by their nature cannot be confined within the scope of the Government program." Am. Mem. and Order at 22 (Dkt. No. 77). Defendants make no effort to argue otherwise and instead just ignore these points. For these reasons, the conditions cannot be justified as agency action that merely control what the government chooses to fund. *Contra* Defs.' Mem. at 27.

### 2. *The conditions go beyond requiring compliance with existing law and unconstitutionally chill speech*

Defendants fare no better in contending (at 28-31) that the DEI-Related Conditions cannot violate the First Amendment because they are "routine" requirements to certify compliance with antidiscrimination law. Given the Administration's new, incredibly broad, and ill-defined views on what violates nondiscrimination laws and given its announced plans to aggressively enforce those views using the False Claims Act, the new certification requirements will predictably chill grantees' DEI-related speech—indeed, that seems to be the point. *See* Pls.' Mem. at 46-48. Defendants suggest (at 29-31) that the certifications should not actually have this predictable chilling effect, but their arguments are mistaken.

15

First, Defendants contend that grantees "can still challenge the Government's *interpretation* of [the antidiscrimination] laws" in any FCA enforcement action, but that does not solve the problem. Defs.' Mem. at 29 (emphasis in original). Merely facing an FCA lawsuit would be devastating for nonprofits that do not have the resources to mount a legal defense. Even having to respond to litigation—by the government or by qui tam relators that the government has encouraged—could be ruinous. And although Plaintiffs believe in good faith that their diversity, equity, and inclusion activities are lawful, Defendants have telegraphed that they have a very different view. *See* Pls.' Mem. at 5-10. Particularly given the severe penalties the FCA imposes and Defendants' stated plans to aggressively use the FCA to combat DEI, *see* Pls.' Mem. at 6-8, grantees must comply with the Administration's anti-DEI views or else risk potentially ruinous litigation.

For similar reasons, Defendants miss the mark in pointing out (at 30-31) that grantees cannot be held liable under the FCA "based on a good-faith misunderstanding" of what antidiscrimination law requires. Given that even just facing an FCA lawsuit could be devastating, grantees cannot take the gamble that their good-faith beliefs will insulate them from liability.

Finally, Defendants object (at 30) that Plaintiffs' fear that the Government will target "legal diversity-related conduct" is "unsupported and speculative." But targeting diversity-related conduct that has long been considered legal is exactly what the Administration has said it plans to do. Without question, the executive branch has "signal[ed] an expansion in the types of conduct that the Executive now believes violates the federal civil rights and discrimination laws." *Freedom Network USA v. Trump*, No. 25-cv-12419, 2026 WL 800392, at *10 (N.D. Ill. Mar. 23, 2026); *see also* Pls.' Mem. at 5-10. And the Department of Justice has created an entire task force whose purpose is to use the False Claims Act as a "weapon" against those who violate

16

the Administration's view of the civil rights laws, and it has "strongly encourage[d]" private parties to do the same. HUD-AR 5-6. Given the executive branch's clearly stated intentions, it is hardly speculative or unsupported for grantees to fear that they could face burdensome and potentially ruinous FCA litigation if they engage in any DEI activities, even lawful ones.

### C. The New Conditions are unconstitutionally vague

The New Conditions are also unconstitutionally vague in violation of the Fifth Amendment, *see* Pls.' Mem. at 49-53, and Defendants arguments to the contrary are unavailing. At the outset, contrary to Defendants' suggestion (at 32), Plaintiffs can challenge the New Conditions as vague despite the fact that "Defendants have not sought to enforce any of the challenged terms against Plaintiffs." Plaintiffs need not wait until they face the ruinous FCA litigation that the New Conditions threaten before Plaintiffs can challenge the constitutionality of the vague conditions. "An agency rule, unlike a statute, is typically reviewable without waiting for enforcement." *Chamber of Com. of U.S. v. FEC*, 69 F.3d 600, 604 (D.C. Cir. 1995) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 139-41 (1967)). The baseline "presumption" is that judicial review is available to "one suffering legal wrong because of agency action"—and that parties can seek review where an agency action presents them with a "dilemma" of either changing their conduct to comply or "follow[ing] their present course and risk[ing] prosecution." *Abbott Labs.*, 387 U.S. at 140, 152 (internal quotations omitted).[8]

---

[8] Defendants also mistakenly claim that another court "reject[ed] [an] identical due-process challenge" to an anti-DEI provision that had not yet been enforced. Defs.' Mem. at 32 (citing *Nat'l Ass'n of Diversity Officers in Higher Educ. (NADOHE) v. Trump*, 167 F.4th 86 (4th Cir. 2026)). But unlike the New Conditions here, that case involved a vagueness challenge to an executive order provision that did not "ask anything of [plaintiffs], nor … regulate private conduct." *NADOHE*, 167 F.4th at 101 (rejecting challenge to provision requiring agencies to "terminate … 'equity-related' grants").

Defendants similarly miss the mark in objecting (at 32) that Plaintiffs can only bring "as applied" challenges under the Fifth Amendment, and not a "[f]acial challenge[]." The cases that Defendants cite stand for the proposition that "facial" challenges are unavailable under the Fifth Amendment in the sense that a party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Love v. Butler*, 952 F.2d 10, 13 (1st Cir. 1991); *accord Draper v. Healey*, 98 F. Supp. 3d 77, 82 (D. Mass. 2015) (citing *Love v. Butler*); *Worman v. Healey*, 293 F. Supp. 3d 251, 267 (D. Mass. 2018) (citing *Love v. Butler*); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (stating that a due process vagueness claim is "eligible only for as-applied, not facial, review" and citing a case that in turn explains that courts consider "whether a statute is vague as applied to *the particular facts at issue*, for a defendant who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others," *United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013) (cleaned up)).[9] Here, Plaintiffs do not claim that the New Conditions are vague "as applied to the conduct of others," but instead claim that the New Conditions are vague as applied to them—and that the conditions leave unclear whether they proscribe Plaintiffs' activities promoting diversity, acknowledging transgender and non-binary individuals' identity, and providing domestic violence survivors information about reproductive options, for example.

Plaintiffs, moreover, may bring facial vagueness challenges where the challenged provisions burden First Amendment rights. *See S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1226 (N.D. Cal. 2025) (holding that plaintiffs were "likely to succeed on the merits of their

---

[9] Defendants also cite (at 32) *Building and Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002), which does not involve a vagueness claim at all.

Fifth Amendment vagueness challenge—both facial and as-applied"—to a provision that "risk[ed] chilling First Amendment speech"); *see also Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ("Vagueness challenges to statutes *not threatening First Amendment interests* are examined in light of the facts of the case at hand" (emphasis added)). Indeed, the cases on which Defendants rely for the assertion that due process challenges are typically disfavored acknowledge that this principle only applies "[o]utside of the First Amendment context." *Draper v. Healey*, 98 F. Supp. 3d at 83; *see also Worman,* 293 F. Supp. 3d at 267.

On the merits, Defendants' suggestion that terms like "promote" can be given their common meaning is unpersuasive without comprehensible definitions for the terms to which they relate and which they modify. The terms leave unclear whether providing information to a survivor seeking help with an unwanted pregnancy would "promote" "elective abortion," which is not defined, and whether using preferred pronouns to refer to a non-binary person would "promote" "gender ideology." These phrases "obscure meaning like Russian dolls stacked inside each other," and in response to direct questions, Defendants have been unable to provide answers as to what they prohibit. Am. Mem. and Order at 24-25 (Dkt. No. 77) (noting that "when asked what would fall into the category of 'promoting elective abortion,'" defense counsel "could not answer").

Third, Defendants are also incorrect that the HUD discrimination-related conditions and ACF Title IX Condition cannot be vague because they "simply require compliance with federal law." Defs.' Mem. at 33. Context makes clear that the Administration plans to use these conditions to impose requirements that go well beyond what nondiscrimination law requires. Engaging in DEI programming is not illegal, but the Conditions send a message that some or even most of this programming is. And Defendants do not address Plaintiffs' point that they

19

cannot possibly know how to comply with the agency's apparent view that Title IX requires excluding transgender people from single-sex programs in line with their gender identity, given that binding regulations require the opposite. *See* Pls.' Mem. at 52-53 (citing 45 C.F.R. § 1370.5). Far from simply restating long-applied restrictions, these new conditions create ambiguity as to what will be deemed impermissible activity that could expose Plaintiffs to criminal or substantial civil liability.

Finally, Defendants argue (at 33-34) that grant recipients would receive notice of any proposed cancellation of their grant funding and an opportunity to appeal. But Plaintiffs' challenge is not premised on concern about the possibility that their grants may be terminated; it is premised on the threat of potential massive civil and criminal liability under the False Claims Act.

As this Court has already held, the New Conditions "do not clearly identify and define the contours of what is prohibited and therefore provide[] the Defendants with unlimited discretion." Am. Mem. and Order at 25 (Dkt. No. 77). The Fifth Amendment does not permit this result. Plaintiffs' facial vagueness challenge is appropriate because the New Conditions threaten draconian consequences for non-compliance. Under the threat of significant civil liability or even criminal penalties, Plaintiffs cannot simply wait and see how the government decides to interpret these vague terms. A facial challenge is the only effective way to protect their Fifth Amendment rights.

## III. The Court Need Not Reach Plaintiffs' Ultra Vires Claim Given Defendants' Concession that APA Review Is Available

Plaintiffs press their ultra vires claim only insofar as there would otherwise be no other path for judicial review. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (explaining that "[u]ltra vires review is … unavailable if, as is usually the case, a statutory

20

review scheme" such as the APA provides "a meaningful and adequate opportunity for judicial review"). Here, Defendants have conceded that the APA provides an avenue to review the New Conditions. *See* Defs.' Mem. at 15-24 (not contesting the reviewability of the New Conditions under the APA). There is therefore no need for the Court to consider Plaintiffs' ultra vires claim.

## IV.    Injunctive Relief Is Warranted to Redress Plaintiffs' Harm

Defendants rightly do not dispute that, if Plaintiffs prevail on the merits, vacatur of the New Conditions is warranted. The only dispute is over whether injunctive relief is also warranted. It is. Contrary to Defendants' contentions (at 35-41), injunctive relief is needed to fully protect Plaintiffs from harm; that injunctive relief should bar Defendants from imposing not only the exact same conditions, but also substantially similar ones; and the relief should extend to all grantees to ensure that Plaintiffs are not competitively disadvantaged or otherwise harmed by Defendants' imposing the conditions on others.

### A. An injunction is warranted because vacatur alone will not protect Plaintiffs from harm

Defendants are incorrect that relief under the APA must be limited to vacatur. *Contra* Defs.' Mem. at 35-38. For one, this ignores that Plaintiffs also bring constitutional claims, and it is well established that courts can issue "injunctions to protect rights safeguarded by the Constitution." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

In any event, relief for Plaintiffs' APA claims is not limited to vacatur either; the APA also authorizes injunctive relief. *See* 5 U.S.C. § 703 (authorizing review of agency action via "actions for … writs of prohibitory or mandatory injunction"). The cases that Defendants cite (at 36) hold only that the APA does not authorize courts to enter "specific relief" requiring an agency to correct a problem in one particular way, not that the APA does not authorize

injunctions barring the agency from taking unlawful action. *See Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (holding that it was "error" for the court "to devise a specific remedy for the [agency] to follow" to remedy its misinterpretation of statute); *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (holding that the court could not order an agency that had acted arbitrarily and capriciously to make an "adjusted reimbursement payment" reflecting the amount it would have paid had it reached a different decision); *Me. Med. Ctr. v. Burwell*, 841 F.3d 10, 16 (1st Cir. 2016) (noting that the court should not "determine the precise amounts due" if the agency had applied wrong standards in calculating medical reimbursements). To be clear: Plaintiffs do not seek an injunction that would require the Court "to decide how to structure the grant programs at issue in this case." *Contra* Defs.' Mem. at 37. Instead, they seek an injunction barring Defendants from taking action found unlawful—namely, enforcing the New Conditions in any agreement that any grantee has already signed or otherwise treating those conditions as effective and from reimposing the New Conditions (or substantially similar ones).

That injunctive relief is appropriate. As the Supreme Court has recognized, a court may enter injunctive relief based on APA claims where it is necessary to "redress [plaintiffs'] injur[ies]." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). Here, vacatur alone will not redress Plaintiffs' injuries. First, vacatur does not help those Plaintiffs who have already accepted awards from enforcement of conditions already incorporated into signed agreements. Pls.' Mem. at 55-56. Some Plaintiffs or their members accepted awards before preliminary relief was issued. *See, e.g.*, Declaration of Krista Colón ¶ 12 (Dkt. No. 30-5); Declaration of Amanda Dotson ¶ 13(b) (Dkt. No. 30-7). Unless Defendants are enjoined from treating those conditions as operative, Plaintiffs would be subject to threat of enforcement,

22

precipitating the very harm that led this Court to enjoin the New Conditions in the first place. *See* Am. Mem. and Order at 25-28 (Dkt. No. 77). Defendants fail to respond to this argument, and thus have waived any contention that such an injunction is not necessary to redress Plaintiffs' harm.

Second, an injunction prohibiting Defendants from reimposing the New Conditions is necessary because vacatur alone does not protect Plaintiffs from Defendants from doing that. Contrary to Defendants' contention (at 37-38), "issue and claim preclusion" do not protect Plaintiffs from such conduct because Plaintiffs would need to file a new lawsuit to vindicate their same rights. It is also hardly "speculative" to fear that Defendants could reimpose the vacated conditions. *Contra* Defs.' Mem. at 37. The government has repeatedly pushed these unlawful conditions. Pls.' Mem. at 55-56; *see also Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2908807, at *1 (D.R.I. Oct. 14, 2025), *appeal pending*, No. 25-2131. Contrary to Defendants' argument (at 37) that the government did not "seek[] to reimpose invalidated funding terms" in *Illinois*, that court found that the government did reimpose those terms in the funding agreements at issue, requiring that plaintiffs agree to comply with the conditions subject to the condition precedent of a stay of the court's injunction and vacatur. *Id.* The Court can properly enjoin Defendants from reimposing substantially similar conditions.

The injunction should bar Defendants from reimposing substantially similar conditions, not just literally identical ones. Defendants are wrong that such relief would be advisory or beyond the Court's authority. *Contra* Defs.' Mem. at 38. Plaintiffs are not asking the Court to opine in the abstract about unidentified future grant policies that are not yet ripe for evaluation. Instead, Plaintiffs ask that the Court, after adjudicating the lawfulness of the specific conditions now before it, prohibit Defendants from reimposing those very conditions—or essentially

indistinguishable substitutes—again. That is ordinary forward-looking relief designed to prevent recurrence of adjudicated unlawful conduct. *See, e.g.*, *FTC v. Pukke*, 53 F.4th 80, 110 (4th Cir. 2022) (holding that an injunction may appropriately include "fencing-in" provisions designed to "'prevent [defendants] from engaging in similarly illegal practices'" in the future (quoting *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965))).

Plaintiffs' request is necessary in light of the game of whack-a-mole that Defendants have played in this case. Defendants demonstrated their willingness to change grant conditions in an attempt to evade judicial review when HHS amended its Grants Policy Statement less than an hour before the TRO hearing in this case. *See* Tr. of Civil Cause Mot. for Temporary Restraining Order at 36:5-37:21 (Dkt. No. 38) (government's counsel stating, "And minutes before we stood up here, HHS adopted different language for the Grant Policy Statement…"). HHS's actions confirm the practical risk that, absent a prohibitory injunction, Defendants will attempt to repackage substantially similar unlawful conditions and force Plaintiffs to start over. Equity does not require Plaintiffs to relitigate each successive iteration of the same unlawful policy to obtain complete relief.

**B. To provide Plaintiffs complete relief, the injunction should bar Defendants from imposing the challenged conditions on any applicant or grantee, not just Plaintiffs and their members**

Finally, the injunction should also bar Defendants from reimposing or enforcing the New Conditions against any grantee, not just Plaintiffs and their members. Such relief is necessary "to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Barring Defendants from imposing or enforcing their favored unlawful conditions only against Plaintiffs and their members would obviously incentivize Defendants to award grants to organizations on which they could impose the conditions. Other courts have recognized the appropriateness of an injunction applicable to all grant program competitors in

24

the context of unlawful grant conditions. For instance, in *City of Los Angeles v. Sessions*, the court granted an injunction as to all grant program competitors because an "injunction that bars Defendants from applying [challenged funding conditions] only as to [the plaintiff] does little to ensure an even playing field." No. 18-cv-7347, 2019 WL 1957966, at *6 (C.D. Cal. Feb. 15, 2019). Courts have similarly recognized that grantees' work is interconnected, and so placing a condition on one grantee harms others, including by chilling grantees from associating with or supporting grantees whose conduct could be considered violative. *See, e.g., Freedom Network USA*, 2026 WL 800392, at *22 (holding that, to provide "complete relief" to the plaintiff, it was necessary to enjoin the defendants from enforcing an anti-DEI certification against any grant recipients because other grantees would be "likely to avoid any association with speech that could violate the [certification]").

Defendants' argument that Plaintiffs have failed to proffer evidence that other programs would agree to the grant conditions is disingenuous at best, particularly given that other grantees would have already have agreed to those conditions before this Court preliminarily stayed them. Other programs' likely agreement to the conditions is a "predictable effect of Government action on the decisions of third parties" that this Court can permissibly recognize. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

## CONCLUSION

The Court should grant summary judgment to Plaintiffs and deny Defendants' cross-motion for summary judgment.

April 13, 2026                                        Respectfully submitted,

                                                     */s/ Kristin Bateman*
                                                     Kristin Bateman (D.C. Bar No. 90037068)[+]
                                                     Robin F. Thurston (D.C. Bar No. 1531399)[+]
                                                     Skye L. Perryman (D.C. Bar No. 984573)[+]

Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org


Daniel F. Jacobson (D.C. Bar No. 1016621)[+]
Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
Brian C. Rosen-Shaud (D.C. Bar No. 90042065)[+]
Nina C. Cahill (D.C. Bar No. 1735989)[+]
Jacobson Lawyers Group PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
brian@jacobsonlawyersgroup.com
nina@jacobsonlaywersgroup.com


Amy R. Romero (RI Bar # 8262)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI


Lynette Labinger (RI Bar # 1645)
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI


Mary C. Dunn (RI Bar #6712)
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900
mcd@blishcavlaw.com
Cooperating counsel, Lawyers' Committee for RI


26

Lauren A. Khouri (D.C. Bar No. 10282288)[+]
Elizabeth E. Theran (D.C. Bar No. 90030162)[+]
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
lkhouri@nwlc.org
etheran@nwlc.org

[+] Admitted *pro hac vice*

*Counsel for Plaintiffs*

27

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2026, I electronically filed the within memorandum and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Kristin Bateman*
Kristin Bateman